# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE, et al.,

        *Plaintiffs,*

    v.

DONALD J. TRUMP, et al.,

        *Defendants.*

Civil Action No. 25-cv-00471

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

Jin Hee Lee, DC Bar No. 1740850
Gabriel Diaz, DC Bar No. 991618
Donya Khadem, DC Bar No. 1719557
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
jlee@naacpldf.org
gdiaz@naacpldf.org
dkhadem@naacpldf.org

Leah Wong
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
lzwong@naacpldf.org

Camilla B. Taylor, DC Bar No. IL0098
Kenneth D. Upton, Jr., DC Bar No. 1658621
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
(312) 605-3225
ctaylor@lambdalegal.org
kupton@lambdalegal.org

Stacey K. Grigsby, DC Bar No. 491197
Sarah E. Harrington, DC Bar No. 219218
Alison DiCiurcio, DC Bar No. 1601410
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
sgrigsby@cov.com
sharrington@cov.com
adiciurcio@cov.com

Nicholas E. Baer, DC Bar No. 1672517
James H. Fitch, DC Bar No. 1780894
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
nbaer@cov.com
jhfitch@cov.com

Jose Idio Abrigo
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(646) 307-7406
jabrigo@lambdalegal.org

Pelecanos
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017*
(323) 370-6909
pelecanos@lambdalegal.org

*Address for mailing purposes only

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................iii

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 3

I.     The Unconstitutional "Divisive Concepts" Executive Order from The First Trump
Administration. .................................................................................................... 3

II.    President Trump Issues Three New Executive Orders Targeted at DEIA and
Transgender People................................................................................................ 4

     A.     President Trump Targets DEIA through the Anti-Diversity1 Order....................... 4

     B.     President Trump Targets Views Supporting Transgender People Through
the Anti-Gender Order............................................................................... 5

     C.     President Trump Again Targets DEIA—and Private Speech Supporting
DEIA in Particular—Through the Anti-Diversity2 Order...................................... 6

III.    Administration Officials Implement the Executive Orders. ................................................. 7

IV.    District Court Enjoins the Administration's Unconstitutional Actions.............................. 9

V.     The Executive Orders Harm Plaintiffs............................................................................ 10

STANDARD OF REVIEW ................................................................................................ 13

ARGUMENT ...................................................................................................................... 14

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims........................................ 14

     A.     The Executive Orders Violate the Fifth Amendment's Due Process Clause. ....... 14

          1.     The Executive Orders Do Not Give Fair Notice of What They
Require. .................................................................................................. 15

               a)     The Equity Termination Provision, Diversity Termination
Provision, and Certification Provision of the Anti-Diversity
Orders Do Not Define the Views they Proscribe. ......................... 15

               b)     The Certification Provision of Anti-Diversity Order2
Compounds Ambiguity by Referring to DEIA as "Illegal." ......... 18

               c)     The Certification Provision and Gender Promotion
Provision Are Unclear About What It Means to "Promote"
Disfavored Views........................................................................ 20

2. The Executive Orders Authorize Arbitrary and Discriminatory Enforcement. .................................................................................... 21

    a) The DEIA Principles Provision Invites Officials to Enforce Based on Abstract "Principles." ................................................... 22

    b) The List Provision and Enforcement Threat Provision Give Officials Insufficient Guidance. .................................................... 23

    c) The Enforcement Threat Provision's Charge to "Deter" DEI Invites Open-Ended Enforcement. .................................................. 23

    d) The Gender Promotion Provision Also Invites Arbitrary and Discriminatory Enforcement. ....................................................... 24

3. The Executive Orders' Vagueness Chills Protected Speech. ................... 24

B. The Executive Orders Violate the Constitution's Guarantees of Free Speech. ....................................................................................... 25

1. The Certification Provision and Enforcement Threat Provision Suppress Speech Based on Viewpoint. ....................................... 26

    a) The Enforcement Threat Provision Blatantly Targets Speech Based on Viewpoint and Content. .................................... 26

    b) The Certification Provision Imposes Unconstitutional Funding Conditions Based on Viewpoint. .................................... 28

2. The Executive Orders Also Inflict a Chilling Effect on Protected Speech. ...................................................................... 29

    a) Multiple Provisions of the Executive Orders Chill Speech by Penalizing Disfavored Views. .................................... 30

    b) The Certification Provision Further Penalizes Disfavored Views Under the False Claims Act. ................................ 33

    c) The List Provision and Enforcement Threat Provision Threaten Further Reprisals. .......................................... 34

II. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief. .............................. 39

III. The Balance of Equities and Public Interest Favor Preliminary Relief. .......................... 41

CONCLUSION .................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for International Development v. Alliance for Open Society International, Inc.*,
570 U.S. 205 (2013).................................................................................................28, 29, 38

*Baggett v. Bullitt*,
377 U.S. 360 (1964)......................................................................................................24, 25, 30

*Baird v. State Bar of Arizona*,
401 U.S. 1 (1971).........................................................................................................30, 38

*Coates v. City of Cincinnati*,
402 U.S. 611 (1971).....................................................................................................14, 22

*Elrod v. Burns*,
427 U.S. 347 (1976) (plurality opinion) ................................................................39

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
28 F.3d 1268 (D.C. Cir. 1994).................................................................................39

*FCC v. AT&T Inc.*,
562 U.S. 397 (2011).....................................................................................................17

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)..........................................................................................2, 14, 15, 24

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)...................................................................................14, 15, 19, 22

*Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016)................................................................................43

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010)........................................................................................................14

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
515 U.S. 557 (1995).....................................................................................................38

*Joint Anti-Fascist Refugee Committee. v. McGrath*,
341 U.S. 123 (1951)....................................................................................................35, 36

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
383 U.S. 589 (1967)....................................................................................................30

*Laird v. Tatum*,
    408 U.S. 1 (1972).................................................................................29, 32

*Lamont v. Postmaster Gen.*,
    381 U.S. 301 (1965).....................................................................................30

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)........................................................................39

*NAACP v. State of Ala. ex rel. Patterson*,
    357 U.S. 449 (1958).....................................................................................30

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    No. 1:25-CV-00333, 2025 WL 573764 (D. Md. Feb. 21, 2025) ................... *passim*

*Nat'l Council of Nonprofits v. OMB*,
    No. 25-cv-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025)..........................10, 33, 38

*Nat'l Council of Nonprofits v. OMB*,
    No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025)................................10, 30

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)..................................................................................30, 34

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996)...................................................................39

*New York v. Trump*,
    No 1:25-cv-39, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ......................................10

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977).....................................................................................36

*Nken v. Holder*,
    556 U.S. 418 (2009).....................................................................................41

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
    215 F. Supp. 2d 120 (D.D.C. 2002)............................................................41

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015).................................................................................25, 27

*Rosenberger v. Rector & Visitors of U. Va.*,
    515 U.S. 819 (1995).................................................................................25, 27

*Rust v. Sullivan*,
    500 U.S. 173 (1991).....................................................................................28

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
   508 F. Supp. 3d 521 (N.D. Cal. 2020) ............................................................. 3, 4

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) (Gorsuch, J., concurring) .................................................. 22

*Smith v. Goguen*,
   415 U.S. 566 (1974) ...................................................................................... 15, 22

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ...................................................................................... 27, 38

*Texas v. Johnson*,
   491 U.S. 397 (1989) ...................................................................................... 27, 38

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ............................................................................................ 38

*Turner v. U.S. Agency for Glob. Media*,
   502 F. Supp. 3d 333 (D.D.C. 2020) .................................................................... 41

*United States v. Brock*,
   94 F.4th 39 (D.C. Cir. 2024) ............................................................................... 17

*United States v. Williams*,
   553 U.S. 285 (2008) ......................................................................... 14, 19, 20, 21

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ...................................................................................... 15, 24

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ........................................................................................ 2, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................................... 13, 41

**Statutes**

31 U.S.C. §§ 3729–30 .......................................................................................... 7, 33

42 U.S.C. § 3601 ...................................................................................................... 42

Ryan White Act, 42 U.S.C. § 300ff ......................................................................... 42

**Other Authorities**

Exec. Order No. 13950, *Combating Race and Sex Stereotyping*, 85 Fed. Reg.
   60683 (Sept. 22, 2020) ......................................................................................... 3

Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025) ..................................................... *passim*

Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025)................................................................................................... *passim*

Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025)............................................ *passim*

Office of the Attorney Gen., Dep't of Justice, Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025) ...........................................................8, 19, 35

Off. of Mgmt. & Budget, Exec. Off. of the President, M-25-13, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs (Jan. 27, 2025) ........................................................................................................8, 10, 12, 30

Off. of Pers. Mgmt., Initial Guidance Regarding DEIA Executive Orders (2025). .......................8

Pers. Mgmt., Initial Guidance Regarding President Trump's Executive Order *Defending Women* (2025) ...........................................................................................8

President Donald Trump, Inaugural Address, Jan. 20, 2025, https://www.whitehouse.gov/remarks/2025/01/the-inaugural-address/ ...................................4

U.S. Const. amend. I ............................................................................................. *passim*

U.S. Const. amend. V............................................................................................ *passim*

U.S. Const. art. I, § 9, cl. 3.............................................................................................36

## INTRODUCTION

In his first days in power, President Donald Trump issued three Executive Orders that aim to eradicate speech and viewpoints supportive of diversity, equity, inclusion, and accessibility ("DEIA") and recognizing transgender people. On January 20, 2025, the day of his inauguration, he issued an Executive Order prohibiting all programs "going by the name 'diversity, equity, and inclusion.'"[1] That same day, he issued another Executive Order setting out his Administration's view of "truth" about gender, repudiating the existence of transgender people, and condemning contrary views as "false."[2] On January 21, 2025, he signed another Executive Order targeting contractors' and private entities' programs of "so-called 'diversity, equity, and inclusion.'"[3]

The three Executive Orders direct Administration officials to stamp out views that support diversity, equity, inclusion, and accessibility or recognize transgender people, and do so in all manner of ways. They proclaim, without support, that what the Administration terms DEIA categorically violates federal anti-discrimination laws. They tell officials to cut contracts and funding to private entities that express views endorsing DEIA or promote the idea that transgender people exist and are entitled to respect. They mandate that all federal government contracts and grants require the counterparty or recipient to certify that it does not promote DEIA-related views and to agree that not doing so is material for purposes of the False Claims Act. And they direct officials to bring the President names of private organizations that have expressed views endorsing DEIA so that they may be investigated for those views. In the days after President Trump issued

---

[1] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).

[2] Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[3] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).

the Orders, Trump Administration officials have carried out those instructions by issuing sweeping implementing memoranda, freezing funds, and threatening to terminate existing grants and contracts.

Plaintiffs are three non-profit organizations that rely on federal funding to enforce and educate about civil rights, to work and advocate on behalf of traditionally underserved communities, and to carry out other vital services supportive of their missions. Their work requires them to endorse DEIA and recognize gender identity in their speech and activities. As such, Plaintiffs are squarely in the crosshairs of the Administration's attack. The executive's actions force Plaintiffs to make a choice: they must either censor their lawful speech, or else the government will gut their funding. Under either scenario, the Executive Orders leave Plaintiffs unable to provide services to vulnerable communities that need them most.

The Executive Orders trample core constitutional rights. Their amorphous provisions violate Fifth Amendment due process guarantees by failing to give "fair notice" of what is required and by inviting Trump Administration officials to penalize organizations as they see fit. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Moreover, by suppressing and chilling views that the Administration disfavors, the Executive Orders offend the fundamental First Amendment principle that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Finally, the Administration's qualifier—that it targets only DEIA that violates federal anti-discrimination law—does nothing to ameliorate the First Amendment or due process problems because in the same breath, the Administration makes clear that its view of what qualifies as a violation of federal anti-discrimination law is much broader than anything codified in statute, set out in regulations, or embodied in federal court decisions.

Plaintiffs ask this Court to reject the government's attempts to extinguish their constitutional rights, to protect them from imminent and irreparable harm, and to preliminarily enjoin Defendants from enforcing the Executive Orders.[4]

## FACTUAL BACKGROUND

### I.    The Unconstitutional "Divisive Concepts" Executive Order from The First Trump Administration.

The Executive Orders challenged here are not President Trump's first attempt to suppress speech related to DEIA that he dislikes.  In his first administration, President Trump issued an Executive Order titled "Combating Race and Sex Stereotyping" that sought to bar federal contractors and grant recipients from promoting a list of views the Administration labeled as "divisive concepts."[5]  Organizations targeted by the order sued, and the United States District Court for the Northern District of California quickly granted a nationwide preliminary injunction. *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020).  In doing so, the court determined that the plaintiffs were likely to succeed on their claims that the order violated the First Amendment by "impermissibly chill[ing] the exercise of  the Plaintiffs' constitutionally protected speech, based on the content and viewpoint of their speech" and the Due

---

[4] On February 21, 2025, the United States District Court for the District of Maryland issued a nationwide preliminary injunction enjoining numerous government agencies, as well as "other persons who are in active concert or participation with them," from enforcing three key provisions of two Executive Orders challenged here.  *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* ("*Diversity Officers*"), No. 1:25-CV-00333, 2025 WL 573764, at *31 (D. Md. Feb. 21, 2025).  Because many of the Defendants here were also defendants in *Diversity Officers* or work with them, Defendants are already largely enjoined from enforcing those key provisions against Plaintiffs.  Plaintiffs nevertheless ask this Court to issue a preliminary injunction to (1) enjoin additional provisions that harm Plaintiffs but were not at issue in *Diversity Officers* and (2) prevent enforcement of these provisions by any Defendants not covered by the injunction in *Diversity Officers*.

[5] Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020).

Process Clause of the Fifth Amendment by including provisions "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited." *Id.* at 540, 543.

## II.    President Trump Issues Three New Executive Orders Targeted at DEIA and Transgender People.

Prior to his election for a second term in office, President Trump previewed that, if elected, he would once again seek to silence private entities that speak in favor of "diversity, equity, and inclusion," as he used the term. For example, in December 2024, he promised, "I'll end all of the Marxist diversity, equity, and inclusion policies across the entire federal government immediately. And at the same time, *we will ban these unlawful policies from . . . the private sector as well.*"[6] During his inauguration speech, Trump again vowed to "end" what he claimed were government efforts to "socially engineer race and gender" in both "public *and private life.*"[7]

In the first few days of his presidency, President Trump proceeded to do exactly what he promised. He issued three Executive Orders aimed at ending DEIA, erasing transgender people, and prohibiting related speech—both within the government and among private organizations that administer federal grants or contracts.

### A.    President Trump Targets DEIA through the Anti-Diversity1 Order.

On January 20, 2025, President Trump signed an Executive Order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "Anti-Diversity1 Order").[8] That Order bans what it terms "illegal and immoral discrimination programs" that go "by the name 'diversity, equity, and inclusion.'" Anti-Diversity1 Order § 1. Not only does the Anti-Diversity1

---

[6] Pangambam S, *Trump Remarks at Turning Point's AmericaFest 2024 (Transcript)*, The Singju Post (Dec. 23, 2024), https://singjupost.com/trump-remarks-at-turning-points-americafest-2024-transcript/?singlepage=1 (emphasis added).

[7] President Donald Trump, Inaugural Address, Jan. 20, 2025, https://www.whitehouse.gov/remarks/2025/01/the-inaugural-address/ (emphasis added).

[8] 90 Fed. Reg. at 8339.

Order seek to eradicate discussion of DEIA within the federal government; it also threatens penalties against private entities that contract with or receive grants from the government.

Equity Termination Provision:  One provision of the Anti-Diversity1 Order directs agencies to "terminate, to the maximum extent allowed by law," all "'equity-related' grants or contracts."  *Id.* § 2(b)(i) (the "Equity Termination Provision").

List Provision:  Another provision of the Anti-Diversity1 Order directs agency heads to provide the director of the Office of Management and Budget ("OMB") with a "list of all . . . [f]ederal grantees who received funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021"—that is, the date President Trump's first term ended.  *Id.* § 2(b)(ii)(C) (the "List Provision").

### B.     President Trump Targets Views Supporting Transgender People Through the Anti-Gender Order.

Also on his first day in office, President Trump issued an Executive Order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Anti-Gender Order").[9]  The Anti-Gender Order attempts to control the "language" private entities use around matters of "sex" and "gender."  Anti-Gender Order § 1.  It elevates the Administration's views on those topics as "truth," denigrates views it calls "[g]ender ideology" as "false," and repudiates the existence of transgender people.  *Id.* §§ 1, 2(f).

Gender Termination Provision:  One section instructs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."  *Id.* § 3(e) (the "Gender Termination Provision").

---

[9] 90 Fed. Reg. at 8615.

Gender Promotion Provision:  Another section provides that "[f]ederal funds shall not be used to promote gender ideology," which it defines in such a way as to permit no acknowledgement of transgender people, let alone advocacy for their civil rights.  *Id.* § 3(g) (the "Gender Promotion Provision").  The Provision also directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."  *Id.*

### C.    President Trump Again Targets DEIA—and Private Speech Supporting DEIA in Particular—Through the Anti-Diversity2 Order.

On January 21, 2025, President Trump signed a third Executive Order that further targets private entities that engage in speech and activities supporting DEIA (the "Anti-Diversity2 Order").[10]  The Anti-Diversity2 Order, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," restricts what it calls "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)."  Anti-Diversity2 Order § 1.  The Order contains a number of provisions applying to federal contractors, grant recipients, and other private parties.

DEIA Principles Provision:  One provision directs the OMB Director to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear," from "contracting" and "grants."  *Id.* § 3(c)(ii) (the "DEIA Principles Provision").

Diversity Termination Provision:  A subsequent provision directs the OMB Director to work with the Attorney General to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities."  *Id.*  § 3(c)(iii) (the "Diversity Termination Provision").

---

[10] 90 Fed. Reg. at 8633.

<u>Certification Provision</u>:  Another provision directs agency heads to "include in every contract or grant award" terms requiring the private "counterparty or grant recipient" to (1) "certify" that they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and (2) "agree" that "compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code"—that is, the False Claims Act.  *Id.* §§ 3(b)(iv)(A)-(B) (the "Certification Provision").

<u>Enforcement Threat Provision</u>:  Section 4(b) takes further aim at private entities, without regard for whether they contract with or receive grant funding from the federal government.  *Id.* § 4(b) (the "Enforcement Threat Provision").  It directs the Attorney General of the Department of Justice ("DOJ") to work with agency heads and the OMB Director to submit a report with "recommendations" to end DEI in the "private sector."  *Id.*  Section 4 further charges officials with compiling a list identifying "[t]he most egregious and discriminatory DEI practitioners in each sector of concern" and a plan of action to "deter DEI programs or principles."  *Id.* § 4(b)(ii)–(iii).  As part of that plan, "each agency [must] identify up to nine potential civil compliance investigations" of private organizations, including large non-profit corporations, that engage in DEI programs or principles.  *Id.* § 4(b)(iii).

## III.    Administration Officials Implement the Executive Orders.

Since President Trump signed the Executive Orders, officials in his Administration have taken broad actions that confirm that the Executive Orders' purpose is to elevate the Administration's favored views about DEIA while silencing private entities that express disfavored views.

On January 27, 2025, the acting director of the OMB issued a memorandum titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("OMB Memo M-25-13").[11]  OMB Memo M-25-13 purports to implement a series of executive orders signed by President Trump, including the Anti-Diversity1 Order and the Anti-Gender Order, and directs agencies to freeze "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to . . . DEI, [and] woke gender ideology."[12]

Subsequently, the acting director of the Office of Personnel Management ("OPM") issued two memoranda implementing the Executive Orders.  The first implements the Anti-Diversity1 Order by directing agencies to take "prompt actions" against "DEIA initiatives and programs," including by "terminat[ing] any DEIA-related contractors."[13]  The second implements the Anti-Gender Order by similarly directing agencies to "terminate" all programs, contracts, and grants and "[c]ancel any trainings that inculcate or promote gender ideology or have done so in the past.[14]

The Attorney General, too, issued a DOJ memorandum titled, "Ending Illegal DEI and DEIA Discrimination and Preferences" that implements the Anti-Diversity2 Order.[15]  It describes the Anti-Diversity2 Order as "making clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') 'violate the text

---

[11] Off. of Mgmt. & Budget, Exec. Off. of the President, M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://dcg.usc.edu/wp-content/uploads/2025/01/OMB-Memo-Pause.pdf.

[12] *Id.*

[13] Off. of Pers. Mgmt., Initial Guidance Regarding DEIA Executive Orders (2025).

[14] Off. of Pers. Mgmt., Initial Guidance Regarding President Trump's Executive Order *Defending Women* (2025).

[15] Off. of the Att'y Gen., Dep't of Just., Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

and spirit of our longstanding Federal civil-rights laws' and 'undermine our national unity.'"[16]  It

also outlines steps to "deter" DEI principles in the "private sector"—including notably by

threatening not only civil but also criminal investigations of private organizations that speak

favorably about DEIA.[17]

## IV.    District Court Enjoins the Administration's Unconstitutional Actions.

The constitutional defects in the Anti-Diversity Orders led one federal district court to

enjoin the Orders.  On February 21, 2025, the U.S. District Court for the District of Maryland

granted an injunction preventing the government defendants in that case and those working with

them from enforcing three provisions of the Anti-Diversity Orders that are also under challenge in

this case: the Termination Provision, the Certification Provision, and Enforcement Threat

Provision.  *Diversity Officers*, 2025 WL 573764, at *31.  The court concluded that the plaintiffs

were likely to succeed on their claims that these provisions violated the Constitution.  First, the

court found that Plaintiffs were likely to succeed in showing that the Termination Provision of the

Anti-Diversity1 Order did not provide adequate notice and invited arbitrary enforcement, in

violation of the Fifth Amendment's vagueness doctrine.  *Id.* at *19–21.  Second, the court held that

the Certification Provision of the Anti-Diversity2 Order likely constituted viewpoint

discrimination in violation of the First Amendment.  *Id.* at *21–23.  Third, the court determined

that the Enforcement Threat Provision likely violated both the First and Fifth Amendments.  *Id.* at

*23–26.  Accordingly, the court ordered the defendants and all "other persons who are in active

concert or participation" with them not to "pause, freeze, impede, block, cancel, or terminate any

awards, contracts or obligations" "or change the terms of any" such obligation "on the basis of the

---

[16] *Id.* at 1.

[17] *Id.* at 1–2.

Termination Provision"; not to "require any grantee or contractor to make any 'certification' or other representation pursuant to the Certification Provision"; and not to "bring any False Claims Act enforcement action, or other enforcement action, pursuant to the Enforcement Threat Provision." *Id.* at *31–32.

In addition, OMB Memo M-25-13 was enjoined by multiple courts. On January 31, 2025, the U.S. District Court for the District of Rhode Island granted the plaintiff states' motion for a temporary restraining order, preventing the government defendants from freezing federal funding to the states as threatened in OMB Memo M-25-13. *New York v. Trump*, No 1:25-cv-39, 2025 WL 357368 (D.R.I. Jan. 31, 2025). On February 3, 2025, the U.S. District Court for the District of Columbia entered a similar temporary restraining order, followed by a preliminary injunction on February 25, 2025. *See Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025); *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025). Most relevant here, the court held that the plaintiffs showed likelihood of success on the merits of their First Amendment claim where OMB Memo M-25-23 "appear[s] to target specific recipients *because* they associate with certain ideas." 2025 WL 597959, at *17.

## V.    The Executive Orders Harm Plaintiffs.

Although courts have enjoined OMB Memo M-25-13 and certain provisions of the Anti-Diversity Orders, the three Executive Orders remain in effect, and Defendant agencies have begun implementing them by halting contracts and grants, including those received by Plaintiffs.

Plaintiffs are organizations that serve historically marginalized communities. Plaintiff National Urban League ("NUL") has worked since 1910 to provide essential social services for Black Americans and other underserved urban communities. Declaration of Marc Morial ("Morial Decl.") ¶ 2. Plaintiff National Fair Housing Alliance ("NFHA") works to combat housing

discrimination, enforce fair housing and fair lending laws, and ensure equitable housing opportunities for all. Declaration of Lisa Rice ("Rice Decl.") ¶ 5. Plaintiff AIDS Foundation of Chicago ("AFC") provides crucial medical and support services to people with HIV or AIDS living in the Chicago area. Declaration of Nadeen Israel ("Israel Decl.") ¶¶ 3–4. The harms that Plaintiffs have experienced and will experience as a result of the Executive Orders exemplify the injuries that the Orders inflict on many other organizations with federal contracts or grants.

*First*, the Executive Orders place Plaintiffs at imminent risk of losing funding that fuels their mission-driven work. Each Plaintiff relies heavily on federal funds. NUL has consistently received federal funds since 1973, and currently receives funding through nineteen different grants from various federal agencies. Morial Decl. ¶¶ 29–31. NUL sub-grants some of that funding to its affiliates, which manage over 800 programs serving millions of people in 300 communities. *Id.* ¶ 32–33. NFHA has relied on federal grants as one of its primary funding sources throughout its history, and it is counting on these grants as a significant portion of its budget for the current fiscal year, including to do important enforcement work. Rice Decl. ¶ 19. AFC receives nearly 85% of its funding from the federal government; thus, losing that funding would be catastrophic to its operations. Israel Decl. ¶ 11.

Administration officials have already threatened Plaintiffs' funds pursuant to the Executive Orders. On January 22, 2025, Defendant DOL notified NUL and others that receive funding through the Employment and Training Administration ("ETA") that ETA is making changes to its federal awards to prohibit activities described in the Anti-Diversity1 and Anti-Diversity2 Orders. Morial Decl. ¶¶ 47–48, Ex. B. The DOL notice stated that "[e]ffective immediately," and "consistent with" the Anti-Diversity Orders, NUL must "cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and

accessibility' (DEIA) under their federal awards." *Id.* at ¶ 47, Ex. B.  Although the DOL notice stated that the Administration would "issue further guidance on specific activities that are allowable and unallowable," over a month has passed and it has not done so.  *Id.* at Ex. B.

Similarly, Defendant U.S. Department of Housing and Urban Development ("HUD") sent Plaintiff NFHA an email with the subject "Immediate Action - STOP WORK ORDER," directing it to "cease and desist all work activities associated with environmental justice, diversity, equity, and inclusion (DEI)."  Rice Decl. ¶ 26.  The HUD email provided no guidance as to how NFHA—an organization committed to diversity, equity, and inclusion—could discern which activities to stop pursuant to the Executive Orders.  *Id.*  NFHA was unable to withdraw funds under a HUD contract on January 28, 2025, while OMB Memo M-25-13 was in effect. *Id.*  HUD also terminated a NFHA subcontract that mentioned equity in its statement of work— even though the work delivered so far did not touch on equity.  *Id.* ¶¶ 29–31.  Plaintiff AFC has learned about similar notices that Administration officials sent to other organizations through which it receives pass-through funding, including one purporting to eradicate "[a]ny vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government" and declaring such programs "immediately, completely, and permanently terminated."  Israel Decl. ¶¶ 29–30. Although AFC has not itself received such a notice, it temporarily lost its ability to draw grant funds on January 28, 2025.  *Id.* ¶ 29.

*Second*, by targeting Plaintiffs for their disfavored views and threatening them with penalties, the Executive Orders are chilling Plaintiffs' speech and advocacy.  Discussions surrounding DEIA are inseparable from Plaintiffs' work.  NUL understands that the communities it serves suffer from stark, systemic inequality and that to effectively provide the wide range of services that it does, it must weave advocacy for DEIA into its work.  Morial Decl. ¶¶ 6–9.  For

instance, NUL regularly participates in speaking events advocating for DEIA, posts online resources on these topics, such as its "Demand Diversity" webpage, and publishes communications like its weekly "To Be Equal" syndicated opinion column and annual "State of Black America" report. *Id.* at ¶¶ 20–27. Much of NFHA's work involves confronting persistent racial and gender disparities in housing. Rice Decl. ¶ 7–8. To that end, among other things, NFHA organizes conferences and speaking events and publishes an annual report on fair housing trends in the United States, which describes persistent challenges to fair housing, provides data on complaints of discrimination, and addresses issues relating to implicit bias, systemic racism, and sexism. *Id.* at ¶¶ 9, 13. AFC focuses its work on addressing the disproportionate effects of HIV and AIDS on marginalized communities. Israel Decl. ¶¶ 6–7. Its work advocating on behalf of those communities necessarily involves acknowledging and discussing the impacts of racism and sexism and respecting the existence of transgender people. *Id.* ¶¶ 16, 40; Declaration of John Peller Decl. ("Peller Decl.") ¶¶ 9–14. AFC already has been informed that HRSA requires it to censor certain words from its program materials, and delete references to transgender people, changing "LGBTQIA" to "LGB." *Id.* ¶ 11. In sum, Plaintiffs do not know what, if any, of their advocacy they can continue without losing funding and facing other penalties. Morial Decl. ¶ 53; Rice Decl. ¶ 39; Israel Decl. ¶ 36; Declaration of Lauren Glodowski ("Glodowski Decl.") ¶¶ 14–15.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show that (1) it "is likely to succeed on the merits" of its claim, (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs readily meet this standard.

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

The Executive Orders violate Plaintiffs' constitutional rights in two independent but interrelated ways.  First, they are impermissibly vague in violation of the Due Process Clause of the Fifth Amendment.  Second, they suppress and chill Plaintiffs' constitutionally protected speech.

### A.    The Executive Orders Violate the Fifth Amendment's Due Process Clause.

The Due Process Clause of the Fifth Amendment provides that no person shall be "depriv[ed] of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  A fundamental requirement of due process is that the law must give "fair notice of conduct that is forbidden or required."  *Fox Television*, 567 U.S. at 253.  Government acts that fail to do that must be enjoined as void for vagueness.

To satisfy this due process standard, a law must be "clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Although a law need not have "mathematical certainty," *id.* at 110, it must provide sufficient "statutory definitions, narrowing context" or reference to terms with "settled legal meanings" that its meaning is not open to "wholly subjective" judgments. *United States v. Williams*, 553 U.S. 285, 306 (2008); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010) (finding a law unconstitutionally vague if it relies on "untethered, subjective judgments").  Laws must also not rely on inherently subjective concepts that are incapable of definition.  *See, e.g.*, *Fox Television*, 567 U.S. at 253 (explaining that a law is vague if it is not only "difficult to prove an incriminating fact," but also "unclear as to what fact must be proved" at all); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971) (holding that an ordinance against "annoying" conduct was unconstitutionally vague because "[c]onduct that annoys some

people does not annoy others"); *Smith v. Goguen*, 415 U.S. 566, 573–76 (1974) (holding that a prohibition against treating the American flag "contemptuously" was unconstitutionally vague).

The Supreme Court's vagueness precedents coalesce around "at least two connected but discrete" requirements for a law to afford adequate due process, *Fox Television*, 567 U.S. at 253, as well as a "[t]hird" consideration when speech is involved, *Grayned*, 408 U.S. at 108–09. First, the law must give those affected notice of "what is required of them so they may act accordingly." *Fox Television*, 567 U.S. at 253. Second, it must contain sufficient "precision and guidance" so that "those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* And finally, "[w]hen speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54; *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

### 1.    The Executive Orders Do Not Give Fair Notice of What They Require.

First, the Executive Orders do not give adequate notice. They contain ambiguous, subjective terms with few parameters, leaving Plaintiffs in the dark about what they must do to comply with them. The following are examples.

a)    *The Equity Termination Provision, Diversity Termination Provision, and Certification Provision of the Anti-Diversity Orders Do Not Define the Views they Proscribe.*

The Anti-Diversity Orders condemn an array of concepts without explaining what they mean or how they differ from each other. They condemn "diversity" and "equity," activities that are "equitable" or "equity-related," and "diversity, equity, and inclusion" (under the acronym "DEI"), or sometimes "diversity, equity, inclusion, and accessibility" (under the combined acronym "DEIA"). They also impose ruinous penalties on those who endorse those concepts. Notwithstanding these high stakes, neither Order defines any of these terms. The result is that

15

Plaintiffs and others are left guessing as to what views the Orders prohibit. That is unacceptable under the Due Process Clause.

Because the Anti-Diversity Orders purport to prohibit certain views, the Orders' failure to define those disfavored views—most notably, the failure to define DEIA, which is the subject of the Orders—infects all of their provisions, rendering them vague in their entirety. Nevertheless, three particularly offending provisions are the Equity Termination, Diversity Termination, and Certification Provisions.

The Equity Termination Provision threatens to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts." Anti-Diversity1 Order § 2(b)(i). Yet, the meaning of "equity-related" is entirely unclear. As the court noted in *Diversity Officers*, "the term 'equity' itself is broad," and "the modifier 'related' adds an impermissible layer of vagueness." 2025 WL 5473764, at *19–20. The result is that the range of grants and contracts that *might* be terminated under the Provision is "almost endless," *id.* at *20, and Plaintiffs have no way of knowing whether their grants or contracts are at risk. That is deeply concerning, because many of Plaintiffs' grants and contracts reference systemic inequities, and thus could conceivably fall within the Provision's ambit. Israel Decl. ¶ 23; Morial Decl. ¶¶ 34–35, 37. Defendants have not clarified the scope of grants and contracts that they plan to terminate under the Provision. Notably, NFHA's members have had confusing interactions with HUD that left them even more perplexed about what work is subject to termination. Rice Decl. ¶ 32–34.

Similarly, the Diversity Termination Provision directs heads of agencies to terminate all "programs" of "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," and "advancing equity." Anti-Diversity2 Order § 3(c)(iii). Because those terms are undefined—and some of them do not appear anywhere else in the Order—

16

the Diversity Termination Provision also leaves Plaintiffs unsure of what they must do or not do to ensure their programs are not among those terminated.

The Certification Provision of the Anti-Diversity2 Order is also ambiguous because of its failure to define prohibited views. It requires contractors and grantees to "certify" that they do not "operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Anti-Diversity2 Order § 3(b)(iv)(B). Contractors and grantees who do not make that certification cannot receive federal funding; those who make the certification do so at risk of making a false statement to the government. Plaintiffs are concerned about what to do when faced with that choice. A great deal of Plaintiffs' work both within and outside of government programs refers to "DEI," but without a clear definition of what DEI programs the Certification Provision covers, they have no way of knowing whether they can make the required certification or not. And given the Administration's hostility to all DEIA activities, it is unclear to Plaintiffs whether the Administration considers DEIA to be categorically illegal. Rice Decl. ¶ 40; Israel Decl. ¶¶ 24–25; Morial Decl. ¶¶ 52–53.

Although surrounding context can provide clarity about the meaning of terms in some cases, the context of the Anti-Diversity Orders aggravates the ambiguity. The Orders use a wide range of undefined terms for similar concepts in seemingly overlapping ways and without explaining the relationship between those terms. They also use those terms both individually and together, as part of the combined phrases DEI or DEIA—a difference in usage that suggests the phrases have different meanings than their constituent words, but which the Orders never explain. *See generally FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011) ("[T]wo words together may assume a more particular meaning than those words in isolation."); *United States v. Brock*, 94 F.4th 39, 57 (D.C. Cir. 2024) (recognizing that where a word "does not stand alone" but is instead used in a

"phrase," the phrase "connotes more than the sum of its verbal parts").  As the court asked in *Diversity Officers*, "[i]s 'equity' limited to one part of the acronym 'DEI' or 'DEIA'?"  2025 WL 573764, at *19.  Or "[i]s it meant as an umbrella term or synonym for some or all of the concepts encompassed by those acronyms?"  *Id.*  The Anti-Diversity Orders give no answer.

          *b)*      *The Certification Provision of Anti-Diversity Order2 Compounds Ambiguity by Referring to DEIA as "Illegal."*

The provisions in the Anti-Diversity Orders that label DEIA as "illegal" do not cabin the scope of what the Orders prohibit.  On the contrary, the Orders' references to illegal DEIA practices only magnify their ambiguity.

The Certification Provision is particularly ambiguous in this way.  It requires contractors and grantees to certify that they do not operate programs promoting DEI "that violate any applicable Federal anti-discrimination laws."  Anti-Diversity2 Order § 3(b)(iv)(B).  If the phrase "violate[s] any applicable Federal anti-discrimination laws" is a modifying clause that clearly and truly limits the kind of programs the Provision prohibits, then the Provision would allow contractors and grantees to operate some programs promoting DEI as long as they do not violate anti-discrimination laws.  But in context, the Executive Orders make clear that every DEI program might be considered illegal.  The Anti-Diversity1 and Anti-Diversity2 Orders repeatedly refer to "illegal DEI and DEI policies," implying that DEI—or whatever the Administration views as DEI—is categorically illegal.  *See* Anti-Diversity1 Order § 2; Anti-Diversity2 Order § 1.  Subsequent statements and actions by Administration officials reinforce that reading.  When the Attorney General issued a memorandum interpreting the Anti-Diversity2 Order, she described it as "making clear" that DEI policies "'violate the text and spirit of our longstanding Federal civil-

rights laws.'"[18]  Likewise, the stop-work orders that Defendants have issued to Plaintiffs prohibit all DEIA, without defining what DEIA is illegal.  Thus, far from clarifying the scope of the certification requirement, the reference to anti-discrimination law leaves well-meaning contractors and grantees even more baffled about what they must do or refrain from doing to comply.  That violates due process.  *See Grayned*, 408 U.S. at 108 ("Vague laws may trap the innocent by not providing fair warning.").

Settled usage can sometimes help elucidate the meaning of unclear terms.  *See, e.g.*, *Williams*, 553 U.S. at 306 (noting that "settled legal meanings" can help interpret otherwise-unclear terms).  Thus, if there were settled understanding that a certain type of program violates federal anti-discrimination law, that might help narrow the scope of the Certification Provision. There is no such settled understanding here, though, where the Administration has repurposed the very language that the previous administration used for efforts to eliminate discrimination and declared those same efforts to constitute discrimination.  For instance, the Anti-Diversity1 Order begins by accusing the previous administration of using "diversity, equity, and inclusion" to implement "illegal and immoral discrimination programs."  *See, e.g.*, Anti-Diversity1 Order § 1. As the court noted in *Diversity Officers*, the current Administration has thus "rescinded swaths of existing executive branch guidance on what the executive branch considers the federal civil rights laws to require, prohibit, or allow" without giving any "guidance on what the new administration considers to constitute 'illegal DEI discrimination.'"  2025 WL 573764, at *26 (quoting Anti-Diversity2 Order § 4(b)(iv)).  The disorienting result is that Plaintiffs cannot know whether, in

---

[18] Office of the Attorney General, *Ending Illegal DEI and DEIA Discrimination and Preferences*, (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

continuing work that the previous administration promoted or even required, they are in fact supporting the "DEIA" that the new Administration considers illegal.

In litigation over the Certification Provision, Defendants have not even tried to explain its scope. At the preliminary injunction hearing in *Diversity Officers*, "the government refused to even attempt to clarify what the Certification Provision means" and did not answer the court's questions about whether certain hypothetical DEIA practices would be legal or illegal. *Id.* at *22. Rather, it "merely reiterated that promoting DEI *can* be unlawful and that there is *uncertainty* about whether programs or policies that are sometimes referred to as 'DEI' are lawful." *Id.* at *22 (emphasis added). The government may try out a new explanation in this case, but any *post hoc* attempt would not change the fact that the Administration, which drafted the Provision, has so far been unable to explain it means. If the government cannot explain the scope of the Provision, how should Plaintiffs and other ordinary citizens be expected to follow it?

> c)    *The Certification Provision and Gender Promotion Provision Are Unclear About What It Means to "Promote" Disfavored Views.*

The Orders are equally unclear about what it means for private entities to promote the viewpoints they forbid. Both the Anti-Diversity and Anti-Gender Orders prohibit "promoting" disfavored views. The Certification Provision of the Anti-Diversity2 Order requires contractors and grantees to certify that they do not operate programs "promoting" DEI. Anti-Diversity2 Order § 3(b)(iv)(B). And the Gender Promotion Provision provides that "[f]ederal funds shall not be used to promote gender ideology," and directs each agency to "ensure grant funds do not promote gender ideology." Anti-Gender Order § 3(g). But neither Order defines the term "promoting."

As the Supreme Court has recognized, the word "promote[]" is "susceptible of multiple and wide-ranging meanings" unless its meaning is cabined by clarifying context. *Williams*, 553 U.S. at 294. In *Williams*, the Court determined that while the word "promotes" is indefinite on its

own, the statute at issue had sufficiently "narrowed" its meaning by placing it in a string of five "neighboring" verbs. *Id.* Because all five verbs ("advertises, promotes, presents, distributes, or solicits") had a "transactional connotation," the Court determined that "promotes," in context, meant "speech that accompanies or seeks to induce a transfer." *Id.* Here, by contrast, there is no such clarifying context. Rather, in both Provisions, "promoting" and "promote" appear in complete isolation. A different provision of the Anti-Gender Order, which is directed toward federal *agencies*, uses at least one other verb, saying that agencies shall not "promote or otherwise inculcate gender ideology." Anti-Gender Order § 2(e). Even to the extent that provision is relevant to interpreting the Gender Promotion Provision, though, the single additional verb "inculcate" does not provide nearly the clarifying context that the five neighboring verbs did in *Williams*.

Thus, Plaintiffs must guess at what it means to promote those disfavored views. Does "promoting" DEI or gender ideology require some concerted effort to further those views, or something less, such as merely endorsing what the Administration views as DEI or gender ideology? May Plaintiffs acknowledge that transgender people exist and deserve equal respect? May they direct resources to communities most impacted by HIV, such as Black men who have sex with men, collect data on health disparities, or train their staff on implicit bias? Must Plaintiffs certify that they will not "promote" those disfavored views in the programs for which they receive government funding, or must they make this certification with respect to *all* of their public or private activities? The Orders raise all of these questions and more, but answer none of them.

### 2. The Executive Orders Authorize Arbitrary and Discriminatory Enforcement.

The inherent malleability of the Executive Orders' terms leads to their second principal defect under the Fifth Amendment: the Orders' imprecision gives government officials unrestrained discretion in enforcing them. To satisfy due process, "laws must provide explicit

standards for those who apply them." *Grayned*, 408 U.S. at 108.  The concern is that if they do not, they will invite arbitrary and discriminatory enforcement.  *See Sessions v. Dimaya*, 584 U.S. 148, 175 (2018) (Gorsuch, J., concurring) (noting that a law with vague standards "can invite the exercise of arbitrary power . . . by leaving the people in the dark about what the law demands and allowing [enforcement officials] to make it up").

For all of the reasons discussed above about how the Executive Orders do not provide adequate notice, they also create risk of arbitrary enforcement.  *See, e.g.*, *Diversity Officers*, 2025 WL 573764, at *19–20 (explaining how the ambiguity of the Equity Termination Provision not only fails to give notice, but also creates risk of arbitrary and discriminatory enforcement).  In addition, the following Provisions are particularly open invitations to officials to base enforcement decisions on their subjective whims.

> a)    *The DEIA Principles Provision Invites Officials to Enforce Based on Abstract "Principles."*

The DEIA Principles Provision of the Anti-Diversity2 Order directs officials to excise DEIA "principles" from contracts and grants, and to do so "under whatever name they may appear."   Anti-Diversity2 Order § 3(c)(ii).  When officials choose to excise portions of contracts and grants, recipients like Plaintiffs lose funding, causing harm to the communities they serve. However, the DEIA Principles Provision directs officials to target not only DEIA (a concept that is itself undefined), but also whatever they deem to be DEIA *principles*, however denominated, thus abandoning any attempt to define the grounds for penalties objectively and allowing officials to make unilateral judgments about abstract concepts.  That is the peak of subjectivity and the kind of vagueness that the Supreme Court has ruled to violate due process.  *See, e.g.*, *Coates*, 402 U.S. at 614; *Smith*, 415 U.S. at 573.

b)    *The List Provision and Enforcement Threat Provision Give Officials Insufficient Guidance.*

The Anti-Diversity1 and Anti-Diversity2 Orders both direct officials to prepare lists singling out parties for potential enforcement action. The List Provision of the Anti-Diversity1 Order directs officials to provide OMB with a "list" of all grantees who received federal funding "to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities" since the end of President Trump's first term. Anti-Diversity1 Order § 2(b)(ii)(C). But the List Provision does not clarify what it means to "provide" or "advance" DEI. Similarly, the Enforcement Threat Provision of the Anti-Diversity2 Order directs officials to prepare a report "identifying . . . [t]he most egregious and discriminatory DEI practitioners," without explaining what practices rise to that level. Anti-Diversity2 Order § 4(b)(ii). Combined with the overall ambiguity about the terms "DEI" and "DEIA," *see supra* Section 1.A.1.a, these Provisions effectively give officials free rein to name, shame, and target for further government action those whose views they dislike.

c)    *The Enforcement Threat Provision's Charge to "Deter" DEI Invites Open-Ended Enforcement.*

The Enforcement Threat Provision invites further arbitrary and discriminatory enforcement by ordering officials to execute an open-ended mission to "deter DEI programs or principles" in the private sector. Anti-Diversity2 Order § 4(b)(iii). Much like the DEIA Principles Provision in Section 3, the Enforcement Threat Provision also eschews objective definition, instructing officials to deter such programs or principles "*whether specifically denominated 'DEI' or otherwise.*" *Id.* (emphasis added). Although the Provision adds the qualifier that only DEI programs constituting "illegal discrimination or preferences" will place private organizations on the list, *id.*, that is cold comfort for Plaintiffs, particularly given the Administration's apparent view that all programs that the Administration views as DEI programs are illegal. *See supra* Section I.A.1.b; *see also*

23

*Diversity Officers*, 2025 WL 573764, at *25 (rejecting government's argument that the Enforcement Threat Provision targets illegal speech only where the Order "offers no guidance or notice of what the government now considers 'illegal' DEI").

> d)    *The Gender Promotion Provision Also Invites Arbitrary and Discriminatory Enforcement.*

As discussed above, the Gender Promotion Provision does not give fair notice because it penalizes promoting gender ideology without properly defining that prohibition.  Because that Provision is framed as a directive to federal officials, though, it also violates due process by inviting arbitrary and discriminatory enforcement.  The Gender Promotion Provision instructs officials to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."  Anti-Gender Order § 3(g).  It thus give Administration officials an open mandate to find and eradicate whatever gender-related views they see as false and at odds with those of the Administration.

### 3.    The Executive Orders' Vagueness Chills Protected Speech.

Finally, the Executive Orders are unconstitutionally vague because they target First Amendment–protected speech while failing to provide the clarity required.

The Supreme Court applies "a more stringent vagueness test," requiring more demanding scrutiny, where "the law interferes with the right of free speech or of association."  *Hoffman Estates*, 455 U.S. at 499; *see also Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (finding a law's unconstitutional vagueness "further aggravated" where it "abut[s] upon sensitive areas of basic First Amendment freedoms").  The test is stricter in the First Amendment context "to ensure that ambiguity does not chill protected speech."  *Fox Television*, 567 U.S. at 254.

The Executive Orders target speech; on their face, they announce the Administration's purpose to root out and silence disfavored views.  Yet, they are plainly vague under any standard,

let alone the more rigorous one that courts apply when protected speech is at risk. Consider, for example, an organization that is required to sign the Certification Provision of Section 3(b)(iv)(B) of the Anti-Diversity2 Order, stating as a condition for a contract or grant that they do not operate disfavored DEI programs. Because it is entirely unclear what kind of programs that Provision prohibits, organizations that might otherwise speak or write about ideas endorsing DEIA will "steer far wider of the unlawful zone" and have no choice but to "restrict[] their conduct to that which is unquestionably safe." *Baggett*, 377 U.S. at 372. As discussed in the section that follows, the Executive Orders' vagueness—along with their other speech-restrictive features—are profound threats to Plaintiffs' First Amendment rights.

### B. The Executive Orders Violate the Constitution's Guarantees of Free Speech.

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. It affirms that in our government, no official can decide what the People should or should not say. As the Supreme Court has put it, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642.

Thus, the Supreme Court has long recognized that government attempts to control the topics people discuss are presumptively unconstitutional. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also Rosenberger v. Rector & Visitors of U. Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). Even worse is when the "government targets not subject matter, but particular views taken by speakers on a subject." *Id.* at 829. Such viewpoint-based discrimination is a "blatant" and "egregious" form of government interference with free speech. *Id.*

The Executive Orders target speech based on content and viewpoint. They do so by directly suppressing speech that expresses the Administration's disfavored views. They also do so less directly—but more insidiously—through a variety of mechanisms that have the purpose and effect of chilling speech that the Administration dislikes.

### 1. The Certification Provision and Enforcement Threat Provision Suppress Speech Based on Viewpoint.

The Executive Orders brazenly target views that the Administration disfavors. Each Order announces that intent in its opening "Purpose" section. The Anti-Diversity1 Order states that its purpose is to target views "going by the name 'diversity, equity, and inclusion,'" and announces that expression of those views in and around the government "ends today." Anti-Diversity1 Order § 1. Similarly, the Anti-Diversity2 Order states that its purpose is "ending" views expressed "under the guise of so-called 'diversity, equity, and inclusion.'" Anti-Diversity2 Order § 1. Moreover, since issuing the Orders, the Administration has confirmed at every turn "that viewpoints and speech considered to be in favor of or supportive of DEI or DEIA are viewpoints the government wishes to punish and, apparently, attempt to extinguish." *Diversity Officers*, 2025 WL 573764, at *25. The Orders are thus precisely the kind of viewpoint- and content-based discrimination that the Supreme Court considers the worst form of government speech control. Two Provisions in particular exert that unconstitutional control.

### a) The Enforcement Threat Provision Blatantly Targets Speech Based on Viewpoint and Content.

The Enforcement Threat Provision calls for "[a] plan of specific steps or measures to deter DEI programs or principles" in the "private sector"—that is, in an area completely unmoored from private entities' involvement in government contracting or grants. Anti-Diversity2 Order § 4(b). As *Diversity Officers* recognized, that "is textbook viewpoint-based discrimination" because "the provision expressly targets, and threatens, the expression of views supportive of equity, diversity

and inclusion—a 'particular view[] taken by speakers.'" 2025 WL 573764, at *24 (alteration in original) (quoting *Rosenberger*, 515 U.S. at 829)).

When the government discriminates based on content or viewpoint, its action violates the First Amendment unless the government can show it passes strict scrutiny. *See Reed*, 576 U.S. at 163–64. To do so, the government must prove that its action is "narrowly tailored" to serve "compelling state interests." *Id.* Defendants cannot bear that heavy burden here. The government has no legitimate interest in restricting speech it disagrees with, even if it considers the speech offensive, disagreeable, or upsetting. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) ("[S]peech cannot be restricted simply because it is upsetting or arouses contempt."). Yet that is expressly the interest the Administration asserts in the Anti-Diversity2 Order: that it wants to end views it sees as "dangerous, demeaning, and immoral." Anti-Diversity2 Order § 1. Defendants' interests are thus not even legitimate, much less compelling. Nor can Defendants show that the Enforcement Threat Provision is "tailored" in any meaningful way. Quite the opposite, that Provision is wildly expansive: it directs officials to deter DEI programs and principles "whether specifically denominated 'DEI' or otherwise," in service of a freewheeling mission to "end" DEI in the private sector. Anti-Diversity2 Order § 4.

To the extent Defendants argue that the Enforcement Threat Provision furthers the government's interest in targeting illegal discrimination, that purported interest is belied by the Administration's apparent stance that all DEIA is illegal, coupled with its emphatic promises to stamp out all expression supporting DEIA, regardless of its illegality. And even if Defendants do have an interest in ending illegal discrimination, the Enforcement Threat Provision is far broader

27

than needed to accomplish that interest.  Thus, Defendants thoroughly fail to justify their unconstitutional viewpoint-based discrimination.

b) *The Certification Provision Imposes Unconstitutional Funding Conditions Based on Viewpoint.*

The Certification Provision restricts speech based on viewpoint in a different way: it leverages the power of federal funding to coerce private organizations like Plaintiffs to conform to the Administration's viewpoint.  That was exactly the kind of viewpoint-based speech discrimination that the Supreme Court struck down in *Agency for International Development v. Alliance for Open Society International, Inc.* ("*AID*"), 570 U.S. 205 (2013).  There, the government sought to coerce nonprofit organizations that fight AIDS and HIV to "adopt . . . the Government's view" by conditioning funding on adoption of a policy opposing prostitution and sex trafficking.  *Id.* at 218.  The Court explained that while the government can impose funding conditions "that define the limits of the government spending program," it cannot impose "conditions that seek to leverage funding to regulate speech outside the contours of the program itself."  *Id.* at 214.  And it held that the funding condition at issue in *AID* was the latter type, because it required recipients to conform their organizational policy to the government's views—a condition that "by its very nature affects 'protected conduct outside the scope of the federally funded program.'"  *Id.* at 218 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)).

The Certification Provision leverages funding in the same way as the unconstitutional condition in *AID*.  By requiring contractors and grantees to "certify," as a condition for funding, that they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," the Certification Provision uses federal funding as a blunt instrument to crush *all* speech about DEIA inside or outside of government programs.  Anti-Diversity2 Order § 3(b)(iv)(B).  To be sure, that Provision forbids speech promoting DEIA within government

28

programs. But it also goes further, to prohibit federal funding recipients from promoting DEIA in *any* of their public or private activities. As noted above, the clause concerning "Federal anti-discrimination laws" does not appear to limit the Provision's scope, since the Orders purport to cast all DEIA as "illegal"; on the contrary, Defendants' actions since the Orders have only confirmed that they consider all DEIA to be illegal. *See supra* Section I.A.1.b. Thus, like the unconstitutional funding condition in *AID*, the Certification Provision bars organizations from promoting DEIA *at all* if they are to receive federal funding.

*Diversity Officers* reached the same conclusion. The court said that the Certification Provision attempts "exactly what *AID* prohibits," reasoning:

> There is no language in the Certification Provision that restricts the certification to be specifically about the use of DEI using federal funding received by the government; the express language of the Certification Provision demands that federal contractors and grantees essentially certify that there is no "DEI" (whatever the executive branch decides that means) in any aspect of their functioning, regardless of whether the DEI-related activities occur outside the scope of the federal funding.

2025 WL 573764, at *22–23. The First Amendment does not allow the government to wield its power over funding to restrict private speech in that way.

## 2. The Executive Orders Also Inflict a Chilling Effect on Protected Speech.

The Executive Orders also violate the First Amendment because they use indirect means to chill speech disfavored by the Administration. Courts have recognized that the Constitution guards against not only plainly unconstitutional restrictions, such as direct viewpoint-based restrictions or funding conditions, but also attempts to control content and viewpoint in ways that are less direct. In a long line of cases, the Supreme Court has held that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11

(1972); *cf. Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (stating "a government official cannot do indirectly what she is barred from doing directly" to "punish or suppress disfavored speech").  Applying that principle, the Supreme Court has struck down action that chills protected speech.  *See, e.g.*, *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971) (striking down a rule requiring attorneys to disclose their association with organizations as a condition for joining the bar); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 383 U.S. 589 (1967) (prohibiting termination of teachers based on their acts or associations); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) (ruling against a provision requiring individuals to make a written request to receive certain kinds of mailings); *Baggett v. Bullitt*, 377 U.S. 360 (1964) (finding it unconstitutional to require teachers to pledge loyalty to the government as a condition for employment); *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958) (holding that requiring an organization to disclose its membership is an unconstitutional restriction on speech).  In these cases, the mechanisms the government used to control speech were multifarious, but their purpose and effect were the same: to suppress the views of private actors that the government disfavored.

As discussed above, one way that the Executive Orders chill speech is through their vagueness.  *See supra* Section I.A.3.  But the Executive Orders chill speech in other ways.

> a)   *Multiple Provisions of the Executive Orders Chill Speech by Penalizing Disfavored Views.*

In addition to imposing direct funding conditions like the Certification Provision does, the Executive Orders more broadly make clear that the Administration will cut federal funding to organizations that engage in protected speech that the government opposes.  In *National Council of Nonprofits*, the Court recognized that the plaintiffs were likely to succeed on the merits of their First Amendment claim where OMB Memo M-25-13 "appear[s] to target specific recipients *because* they associate with certain ideas."  2025 WL 597959, at *17.  Combined with the

Executive Orders' vagueness, the Orders' wide-ranging penalty provisions empower officials to punish organizations for expressing views about DEIA or gender ideology that they dislike. Various provisions in the Executive Orders chill speech through such viewpoint-based penalties.

- The Certification Provision purports to make organizations that "promot[e] DEI" ineligible for government contracts and grants, Anti-Diversity2 Order § 3(b)(iv)(B);

- The Diversity Termination Provision directs the OMB director to work with the Attorney General to comprehensively "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities," *id.* § 3(c)(iii);

- The Equity Termination Provision directs the executive branch to "terminate, to the maximum extent allowed by law . . . all . . . 'equity-related' grants or contracts," Anti-Diversity1 Order, § 2(b)(i);

- The Gender Termination Provision directs agencies "to end the Federal funding of gender ideology," Anti-Gender Order § 3(e); and

- The Gender Promotion Gender authorizes agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Anti-Gender Order § 3(g).

Thus, although the meaning of these provisions in the Executive Orders is uncertain, their overall message is loud and clear: the Administration intends to stamp out speech it dislikes and will end funding and terminate contracts and grants of private organizations that express those views—even outside of their government work.

Plaintiffs have received the Administration's message. Because their work requires them to speak about topics and express views that the Executive Orders seem to prohibit, they are justifiably fearful that the Administration will punish them by cutting their funding, which will require Plaintiffs to significantly divert resources, reduce programming, and, for some Plaintiffs, terminate staff. Indeed, the Administration has already sent Plaintiffs specific communications threatening to cut federal funding, and it has already temporarily restricted funding for at least two Plaintiffs, NFHA and AFC. Rice Decl. ¶¶ 26–28, 31; Israel Decl. ¶¶ 29–31.

This specific threat of adverse government action, which has already started, render the government's threats "present objective harm or . . . threat of specific future harm" that the Supreme Court has ruled chills First Amendment rights in violation of the Constitution. *Laird*, 408 U.S. at 14; *see also id.* at 11 (collecting cases in which plaintiffs brought successful chilling-effects claims based on "exercise of government power that was regulatory, proscriptive, or compulsory in nature," and where "the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging"). Thus, while mere "allegations of subjective 'chill'" do not present a justiciable matter for the courts to decide, *id*. at 13–14, there is no question that the Administration's very real adverse actions and threats in this matter constitute the kind of *objective* chill consistently found to be unconstitutional.

Other federal courts that have decided plaintiffs are likely to succeed on chilled speech claims based on the Executive Orders and related actions have had no trouble recognizing that the Administration's threats constitute objective chill. As the court in *National Council of Nonprofits* put it, the plaintiffs alleged "exactly" what is needed to establish objective chill by their "claim that Defendants have singled out their funding programs (in other words, their economic lifelines)

based on their exercise of speech and association."  2025 WL 368852, at *4; *see also Diversity Officers*, 2025 573764, at *11, 25.

Because Plaintiffs rely heavily on government funding, the Administration's threats place them in an impossible dilemma: they can express the views they believe are necessary to do their work, or they can censor their protected speech to conform to the government's views in order to receive the funding they need.  That is not a choice that the First Amendment allows the government to create.

> b)    *The Certification Provision Further Penalizes Disfavored Views Under the False Claims Act.*

The penalties that the Executive Orders threaten also extend beyond loss of funding.  The Certification Provision requires contractors and grantees to agree that compliance with the Administration's understanding of applicable federal anti-discrimination law is "material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code"—that is, the False Claims Act ("FCA").  Anti-Diversity2 Order § 3(b)(iv)(A).  By requiring contractors and grant recipients to certify that their compliance with federal anti-discrimination law is "material" for purposes of the FCA, the Order creates a scenario in which the federal government and *qui tam* plaintiffs could initiate FCA actions against contractors and grantees for alleged violations, which could result in treble damages.  31 U.S.C. §§ 3729–30.  Because, as discussed above, the Orders wrongly suggest that all DEIA constitutes illegal discrimination, the Provision makes any Plaintiff that supports DEIA vulnerable to lawsuits.  *See supra* Section I.A.1.b.  This Provision thus intensifies the Order's chilling effects by threatening those who do not adopt the Administration's stance about DEIA programs with vexatious litigation and severe penalties.  *See Diversity Officers*, 2025 WL 573764, at *26 (remarking that the Certification

Provision's threatening "False Claims Act liability" is an "escalation of consequences" that "dramatically raises the stakes").

That threat is unconstitutional because "the First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Vullo*, 602 U.S. at 189. It is also unconstitutional because it enlists potentially countless private actors with hostility towards DEIA to chill speech on the government's behalf. As the Supreme Court has held, "a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at 190.

> c)  *The List Provision and Enforcement Threat Provision Threaten Further Reprisals.*

In addition, the Executive Orders chill speech by directing government officials to compile lists of people and organizations that express disfavored views. The List Provision directs agency, department, and commission heads to provide the Director of OMB with a list of contractors "who have provided DEI training or DEI training materials to agency or department employees" and grantees "who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities" in the last four years. Anti-Diversity1 Order § 2(b)(ii)(B)–(C). The Enforcement Threat Provision goes further: it directs an extensive effort "to deter DEI programs or principles" in the "Private Sector"—those untethered to government programs—by, among other things, making lists of entities engaged in disfavored speech. Anti-Diversity2 Order § 4(b)(iii). The Order requires each agency to deliver to the President the names of "up to nine" private entities whose use of "DEI programs or principles" makes them potential

targets of investigation.  *Id.*  The Order expressly mentions "civil compliance investigations," *id.*, but the Attorney General has also called for "proposals for *criminal* investigations."[19]

Requiring government officials to produce lists of private citizens expressing disfavored views is precisely the type of government action that the Supreme Court has recognized as raising significant constitutional concerns.  In *Joint Anti-Fascist Refugee Committee. v. McGrath*, 341 U.S. 123 (1951), the Court considered a government list-making operation that closely resembles the ones ordered here.  The executive order at issue in *McGrath* directed the DOJ to collect and disseminate the names of private organizations that it determined were "totalitarian, fascist, communist," "subversive," or promoted what the administration at the time deemed as other anti-government views.  *Id.* at 125.  Entities that had been placed on the list filed suit, asserting claims under the First Amendment, Fifth Amendment, and other constitutional provisions.  *Id.* at 132–33.

Although the plurality in *McGrath* decided a narrower question—ruling that plaintiffs had adequately stated a claim to relief, *id.* at 142—Justice Black addressed the chilling effects of "governmental blacklists" in a concurring opinion that speaks directly to the Trump Administration's Executive Orders.  *Id.* at 142–44 (Black, J., concurring).  Justice Black wrote that the government's list-making "effectively punishe[d] many organizations and their members merely because of their political beliefs and utterances," which "smacks of a most evil type of censorship" and "cannot be reconciled with the First Amendment."  *Id.* at 143.  He further noted that "prejudice" against "unpopular views" "manifests itself in much the same way in every age and country," and that "what has happened before can happen again."  *Id.* at 145.  As a "specific illustration," he included an account of a seventeenth-century parliamentary "bill of attainder."  *Id.*

---

[19] Office of the Attorney Gen., Dep't of Justice, Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline (emphasis added).

at 145–46.[20]  Justice Black analogized the acts in *McGrath* to a bill of attainder, noting that both involved a governmental list of disfavored persons.  *Id.* at 146.  He further noted that "[m]emories of such events were fresh in the minds of the founders when they forbade the use of the bill of attainder."  *Id.* at 143–46.  And—recognizing that the lists created by the executive in *McGrath* "possess almost every quality of bills of attainder" passed by legislatures—he said he could not "believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution."  *Id.* at 143–44.  In sum, Justice Black concluded that "the executive has no constitutional authority, with or without a hearing, officially to prepare and publish the lists" of people with disfavored views.  *Id.* at 143.

The Executive Orders here resemble the government action that Justice Black decried.  Like the list directed by the executive order in *McGrath*, the lists that the Executive Orders direct Administration officials to prepare have an enormous deterrent effect on speech.  Individuals and organizations will be fearful to speak in public or in private at risk of being placed on these lists.  And those who are placed on these lists are further deterred—either directly by adverse government action, or indirectly, through detrimental effects like potential loss of reputation.

*    *    *

Individually, each mechanism of the Executive Orders chills speech.  Taken together, their chilling effect is immense.  Given this complex web of prohibitions and possible reprisals,

---

[20] A bill of attainder is a law inflicting punishment on particular individuals without judicial process, which the Founders despised, and which they expressly prohibited in the Constitution's Bill of Attainder Clause.  *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."); *see generally Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977) (defining "bill of attainder" as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial").

there is no wonder that, as Plaintiffs have attested, they are fearful of the consequences of expressing views at all.  NUL is unsure whether it can continue speaking within or outside of its grant-funded work about the systemic racism and structural barriers to economic stability that affect the communities it serves without violating the Executive Orders.  Morial Decl. at ¶¶ 11, 45–47, 54–56.  NFHA is concerned that it may lose critical federal funding if it continues its advocacy combatting housing inequities and publishing its annual report on fair housing trends in the United States.  Rice Decl. ¶¶ 24, 30.  And AFC fears that it may not be able to serve its clients by acknowledging and respecting transgender clients and discussing the clients' race, gender, and other factors that have a very real impact on the clients' health outcomes.  Israel Decl. ¶¶ 13, 33–34, 37.

The Administration will no doubt argue that its Executive Orders do not offend the First Amendment because they do not use some of the most obvious means of speech restriction that courts have most frequently had the opportunity to strike down.  But as demonstrated above, the Executive Orders have the purpose and profound effect of chilling speech about views that the Administration dislikes—a kind of speech restriction that remains unconstitutional.  Thus, the fact that the Administration has used novel ways to suppress entire swaths of public discourse does not make the restrictions any less unconstitutional.

Nor do the Executive Orders avoid violating the First Amendment because they chill speech by leveraging government funding.  As discussed above, the government cannot abuse the control over funding to restrict speech outside of government programs.  *See supra* Section I.B.1.  Indeed, given the massive reach of government contracts, grants, and other benefits, funding is one of the *strongest* weapons for speech control in the government's arsenal.  Accordingly, the Supreme Court's precedents about chilling effects have struck down similar government attempts

to "withhold[] a right or benefit because of what [one] believes." *Baird*, 401 U.S. at 7.  As the court noted in *National Council of Nonprofits*, while it is true that the government has broad control over its spending and need not "subsidize First Amendment rights," "it is less clear whether it may deliberately withhold funds that have already been earmarked for certain recipients based exclusively on the recipient's viewpoints*." Nat'l Council of Nonprofits*, 2025 WL 368852, at *9 n.6 (citation omitted)*.*  In other contexts, too, the Supreme Court has consistently recognized that the government's role in providing funding or employment does not license it to strongarm citizens into giving up their rights as a condition for those benefits.  *See generally, e.g.*, *AID*, 570 U.S. at 206 (2013) (discussing the unconstitutional conditions doctrine); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.").  Here, the Administration is using its deep reach into the private sector to do just that.

Finally, the Administration's attempt to cast the views it targets as inferior—as the Orders call them, "demeaning," "immoral," or "false"—does not diminish their protection under the First Amendment.  Anti-Diversity2 Order § 1; Anti-Diversity2 Order § 1; Anti-Gender Order § 2(f).  The standard is quite the opposite: the First Amendment is even more necessary to protect views that the government opposes.  The Supreme Court has said unequivocally that "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414.  Likewise, the Court has affirmed First Amendment protection for speech that "is upsetting or arouses contempt," *Snyder*, 562 U.S. at 458, as well as speech that is "misguided" or is "even hurtful," *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).  Here, Plaintiffs and many other Americans strongly

38

disagree with the Administration's characterization of their views as offensive, and are themselves highly offended by the Trump Administration's views. And even if viewpoints supportive of diversity, equity, inclusion, and accessibility could be perceived as demeaning, immoral, or false—which they are not—the First Amendment protect those views from government suppression.

If the First Amendment protects against anything, it is against attempts to suppress views that the party in power dislikes. The Executive Orders and the Administration's related actions violate this fundamental constitutional protection.

## II. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief.

If Defendants are permitted to enforce the unconstitutional Executive Orders, Plaintiffs will suffer irreparable harm. Loss of constitutional rights is itself irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Thus, Plaintiffs' showing that they are likely to suffer violations to each of the constitutional rights discussed above meets their required showing of irreparable harm.

Even beyond their constitutional injury, though, Plaintiffs will suffer irreparable harm from the Executive Orders in other ways. An organization is harmed if the defendants' actions have "perceptibly impaired" the organization's programs and "directly conflict with the organization's mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (first quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994), then quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).

Plaintiffs have shown harm to their mission. The Executive Orders threaten to cut off Plaintiffs' funding, which would require Plaintiffs to reduce programming, lay off staff, and curtail

vital services to vulnerable communities, thus frustrating Plaintiffs' organizational programs. NUL, for example, currently has eleven employees whose positions are entirely federally funded, and another eight NUL employees have positions with salaries that are 50% funded by the federal government. Morial Decl. ¶ 59. An additional twenty NUL employees have positions with salaries that are partially funded by the federal government. *Id.* If NUL loses its federal funding because of its DEIA work, then these federally funded jobs will be at risk. *Id.* Similarly, NFHA already has had to divert significant resources and time to gathering information from members regarding their inability to receive contracted-for funds and the financial effects of that on them; advising members as to how to respond with respect to modifying their normal, core activities; and taking various actions to ensure that members receive funding to do their work. Rice Decl. ¶ 36. If not for the Executive Orders, NFHA would have spent this time on other important activities addressing discrimination, bias, and harassment in all areas of housing. *Id.* Plaintiffs will suffer more if they refrain from speech and activities that are central to their mission in an effort to preserve funding.

Because Plaintiffs serve disadvantaged populations, those communities will suffer serious harm by losing access to critical or even life-saving resources including health services, job training, and housing counseling. *See* Morial Decl. ¶¶ 59–60 (stating that NUL "would not be able to continue its impactful work at its current capacity without federal funds"; "NUL and its local affiliates would be forced to significantly divert resources," including cutting staff and programs; and "[c]ommunities served by these programs would also lose access to other critical, and at times life-saving, resources, including vital healthcare services and housing counseling"); Rice Decl. ¶ 36, 47 (asserting that "NFHA's program staff are concerned about losing funding for necessary work," and "the Executive Orders have frustrated NFHA's ability to . . . enforce and educate about

the Fair Housing Act and other relevant laws throughout the country"); Israel Decl. ¶ 29 ("Since the announcement of the Executive Orders, AFC has been concerned with the impact they will have on our existing projects and our communities.").

Simply put, Plaintiffs need an injunction immediately to continue their important mission-driven work because the communities they serve rely on them.

## III.    The Balance of Equities and Public Interest Favor Preliminary Relief.

Plaintiffs ask this Court to enjoin vague and unconstitutional Executive Orders to prevent irreparable harm to organizations that are fighting for the public good.  Neither Defendants nor the public at large has any legitimate injury that overcomes Plaintiffs' interest in preliminary relief.

When considering a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," while paying "particular regard for the public consequences" of entering or withholding injunctive relief.  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008).  When the government is the defendant, those inquiries merge, resulting in a balancing that turns on the public interest.  *Nken v. Holder*, 556 U.S. 418, 435–36 (2009).

Where, as here, constitutional rights have been violated, those merged factors favor relief.  "[T]he Constitution is the ultimate expression of the public interest, and consequently, government actions in contravention of the Constitution are always contrary to the public interest."  *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (internal quotation marks and citations omitted).  Indeed, "the public interest favors a preliminary injunction whenever First Amendment rights have been violated."  *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 215 F. Supp. 2d 120, 134 (D.D.C. 2002).  Thus, the Court does not need to look any further

than the illegality of the Executive Orders to conclude that the balance of equities and the public interest favor an injunction.

Even if the Court were to consider the broader public interest at stake, the result would be the same. The Executive Orders directly hinder Plaintiffs' ability to treat vulnerable communities with HIV, which contravenes the public's interest in improving public health. *See* Israel Decl. ¶ 40; Ryan White Act, 42 U.S.C. § 300ff. In addition, the Executive Orders hinder Plaintiffs' ability to ensure housing equality in furtherance of the goal stated by Congress in the Fair Housing Act to provide "fair housing throughout the United States." 42 U.S.C. § 3601; *see also* Rice Decl. ¶ 30. The Executive Orders also impede Plaintiffs' ability to create employment opportunities, thus undermining the public's interest in reducing homelessness and advancing the nation's overall economic health. *See* Morial Decl. ¶¶ 34, 36–41, 43; Rice Decl. ¶ 48.

Weighing the benefits of preliminary injunctive relief to Plaintiffs against the potential harms to Defendants from that relief also favors an injunction. As demonstrated above, without Court intervention, the Administration's prohibition of speech related to DEIA and gender ideology has harmed and will continue to harm Plaintiffs and the vulnerable communities they serve. It has already prevented Plaintiffs from accessing funding and led them to consider amending their work to avoid penalty. *See, e.g.*, Rice Decl. ¶¶ 36, 47.

Meanwhile, a preliminary injunction will not substantially injure Defendants. The government will not spend any additional effort or incur any cost to allow Plaintiffs to speak about DEIA or transgender people. On the contrary, it will require substantial effort and cost to enforce the prohibitions on speech set forth in the Executive Orders. And any harm the government might assert is outweighed by the protections of the First Amendment and other constitutional provisions. "[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged

by an unconstitutional regulation . . . ." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Without a preliminary injunction, the Plaintiffs will be unable to exercise those rights.

## CONCLUSION

The judicial power is most in need when the Government departs from the law and our nation's core values. This Court should not hesitate to exercise such power here. For the foregoing reasons, this Court should preliminarily enjoin Defendants' continued implementation of the challenged provisions of the Anti-Diversity1, Anti-Diversity2, and Anti-Gender Orders.

Dated: February 28, 2025

Respectfully submitted,

    /s/ *Stacey K. Grigsby*

Jin Hee Lee, DC Bar No. 1740850
Gabriel Diaz, DC Bar No. 991618
Donya Khadem, DC Bar No. 1719557
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
jlee@naacpldf.org
gdiaz@naacpldf.org
dkhadem@naacpldf.org

Leah Wong
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
lzwong@naacpldf.org

Camilla B. Taylor, DC Bar No. IL0098
Kenneth D. Upton, Jr., DC Bar No. 1658621
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613

Stacey K. Grigsby, DC Bar No. 491197
Sarah E. Harrington, DC Bar No. 219218
Alison DiCiurcio, DC Bar No. 1601410
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
sgrigsby@cov.com
sharrington@cov.com
adiciurcio@cov.com

Nicholas E. Baer, DC Bar No. 1672517
James H. Fitch, DC Bar No. 1780894
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
nbaer@cov.com
jhfitch@cov.com

(312) 605-3225
ctaylor@lambdalegal.org
kupton@lambdalegal.org

Jose Idio Abrigo
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(646) 307-7406
jabrigo@lambdalegal.org

Pelecanos
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017*
(323) 370-6909
pelecanos@lambdalegal.org

*Address for mailing purposes only