# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE, et al.,

      *Plaintiffs,*

  v.

DONALD J. TRUMP, et al.,

      *Defendants.*

Civil Action No. 25-cv-00471

## DECLARATION OF LISA RICE

I, Lisa Rice, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am Lisa Rice, President and Chief Executive Officer of the National Fair Housing Alliance ("NFHA"), a nonprofit 501(c)(3) organization based in Washington, D.C.  I have served in this capacity since April 1, 2018.

2.      I am submitting this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction to prevent defendant agencies from enforcing Executive Order No. 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" ("Anti-Diversity1 Order"), issued January 20, 2025;[1] Executive Order No. 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Anti-Gender Order"), issued January 20, 2025;[2] and Executive Order No. 14173, titled "Ending Illegal

---

[1] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).

[2] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

Discrimination and Restoring Merit-Based Opportunity" ("Anti-Diversity2 Order"), issued January 21, 2025 (collectively, the "Executive Orders").[3]

3.    NFHA is a national nonprofit, public service, civil rights organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C.  We are a nationwide alliance of more than 200 private, nonprofit, fair housing organizations and state and local civil rights agencies throughout the U.S.  We have over 70 operating member organizations nationwide that support fair housing work in 29 states and the District of Columbia.

4.    NFHA is the country's only national civil rights organization dedicated solely to eliminating all forms of housing and lending discrimination and ensuring equitable housing opportunities for all people.  Pursuant to our mission to eliminate all housing and lending discrimination, we advocate against discrimination based on race, national origin, religion, sex (including sexual orientation and gender identity), disability, and other protected classes covered by federal, state, and local fair housing laws, including the federal Fair Housing Act.

5.    Specifically, we work to eliminate housing discrimination and enforce fair housing and fair lending laws to ensure equitable housing opportunities for all people and communities. We do this work through our education and outreach, member services, public policy and advocacy, housing and community development, responsible AI, enforcement, and consulting and compliance programs.

6.    Our operating members also conduct activities to advance fair housing for all and to enforce fair housing and fair lending laws, including engaging in fair housing advocacy,

---

[3] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).

enforcement, education, and outreach; communicating with local community leaders on fair housing rights; and conducting training about fair housing rights and responsibilities, the harmful effects of segregation and other discriminatory practices, and the need to counteract the effects of these harmful practices.

7.      One of our core activities is to assist our members in accomplishing these tasks in various ways, including by providing technical assistance and training.  NFHA and our members' educational activities and trainings educate the public on issues concerning fair housing, fair lending, racial segregation, the continuing impact of racial segregation on housing and lending in America, the United States' history of systemic racism and its continuing effects, explicit and implicit bias, and racial privilege.  We and our members also educate the public on  the importance of increasing diversity, equity, inclusion, and accessibility ("DEIA"), access to fair housing, fair lending, and neighborhoods with the life affirming amenities necessary for people to live thriving lives, and the importance of removing barriers for persons impacted by historic and ongoing discrimination in the housing and lending markets, including people of color (Black, Latino, Asian American and Pacific Islander, Native and other communities of color), women, LGBTQ people, people with disabilities, families with children, people of faith, and others.

8.      NFHA and our members' educational activities and trainings also advocate for fair housing and lending for the LGBTQ community, such as by providing advocacy around how the Fair Housing Act protects people against discrimination based on sex, including sexual orientation and gender identity.  We are committed to exploring ways to build bridges with organizations that serve the LGBTQ community and exploring steps that fair housing groups and industry partners can take to make their workplaces more inclusive of people from the LGBTQ community.  For example, our national media campaign in 2021 (which received federal funding) was almost

entirely about discrimination based on LGBTQ status, and we have continued to devote resources to promote awareness that the Fair Housing Act and other fair housing laws bar such discrimination. We helped coordinate a webinar regarding how to investigate anti-LGBTQ discrimination, and we included speakers at its annual conferences from organizations devoted to combatting LGBTQ discrimination in housing.

9.     As part of our core work to achieve fair housing for all, NFHA regularly holds conferences, symposia, and speaking events each year where speakers from various backgrounds present on these aforementioned topics. Attendees include employees of our members, representatives from the housing, lending, and insurance industries, representatives from federal, state, and local government agencies, and representatives from civil rights, faith, housing policy, and consumer protection organizations. On average, we conduct at least two such events every year, and in recent years we have regularly held more.

10.     For example, in 2024, NFHA held a conference titled "Housing Equity Now: Building an Inclusive and Just Future," where member organizations, fair housing advocates, policymakers, and subject matter experts from around the country engaged in discussions on a range of fair housing issues. The conference had panels that highlighted, among other things, the harmful impacts of the racial wealth gap on people, communities, and the economy; strategies for addressing the large disparities in rates of homeownership between Black and white families; and the connection between housing access and principles of diversity, equity, inclusion, and accessibility. As an organization focused on preventing housing discrimination, providing underserved populations with equal access to housing opportunities, and otherwise working for equity in the housing and lending markets, we appreciate the importance of embedding and advancing DEIA in everything we do. We also recognize that DEIA efforts are important to ensure

compliance with civil rights laws and rules. Therefore, within our own organizational plan, we require regular policies and practices supporting diversity, equity, inclusion, and accessibility principles as a means of avoiding discrimination, fulfilling our mission, and making our organization more effective. This includes, but is not limited to, updating our policies based on DEIA and other principles of fairness and justice, and providing DEIA training for all staff. For example, all staff received a three-hour training on DEIA at NFHA's 2022 staff retreat. Before our 2022 annual conference, we provided training for members and staff on how fair housing organizations can embrace a culture of DEIA and create workplaces where future generations of fair housing advocates can thrive and be leaders.

11.     Within our own organization, we have a mutual interest with our employees in ensuring DEIA in its workplace such that all employees, regardless of their race, ethnicity, sex, gender, sexual orientation, or gender identity, feel welcome and valued. In our experience, having a more diverse and inclusive workplace increases employee satisfaction and productivity, produces greater innovation and ideas, and helps us better serve its mission, which necessarily involves attention to inclusivity. We are concerned that the Executive Orders will have a detrimental impact not only on the communities we serve, but also on our employees of color, female employees, LGBTQ employees, and others who benefit from our attention to diversity, inclusion, equity, and accessibility.

12.     We also hold education and outreach events and trainings with other nonprofit organizations and housing and lending stakeholders, including fair housing organizations, academics, think tanks, nonprofit organizations, financial services institutions, governmental entities, real estate sales organizations, and housing and lending industry trade associations. These events and trainings address issues that include systemic racism, disparate impact, structural

5

inequities, sexism, unconscious bias, algorithmic bias, and intersectionality. These events and trainings also explain the continuing significance of residential segregation in many communities; the underlying cause of racial disparities with respect to arrest and conviction rates; the relationship between segregation and disparate health, housing, credit, criminal justice, and environmental outcomes; and programs and policies that should be implemented to address continuing racial inequality as well as discrimination based on other protected classes.

13. Every year, NFHA publishes a report on fair housing trends in the U.S. The 2024 report, like past reports, reveals that there remains much work to do to achieve the Fair Housing Act's promise of a nation free from housing discrimination and the harmful impacts of residential segregation. The Fair Housing Trends Report describes the universe of fair housing complaints received by local private nonprofit fair housing organizations and government agencies by state, protected class, type of housing or lending transaction, and more. It describes emerging and longstanding matters in fair housing and covers issues including residential segregation and its intersection with structural inequality, environmental injustice, criminal injustice, health disparities, lending redlining and discrimination, algorithmic bias, climate change, and other matters. The report often deals with issues that impact fair housing, such as implicit bias, systemic racism, and sexism, and is used by a wide group of stakeholders, including our operating members and employees. Our data is compiled from local private nonprofit fair housing organizations, the U.S. Department of Housing and Urban Development ("HUD"), state and local Fair Housing Assistance Program agencies, and the U.S. Department of Justice ("DOJ"). This data is instructive in educating the public and policymakers about the fact that housing discrimination continues to be a serious problem that perpetuates racial and ethnic inequality in communities throughout the nation and merits considerably more attention and remedies.

14.      NFHA also engages in public policy and advocacy around fair housing, the elimination of discrimination, and the promotion of equitable outcomes in housing and lending. Our leadership team testifies before Congress several times a year, and our recommendations have helped, for example, usher in new policies at federal agencies to promote a fairer, more inclusive, and more productive housing finance system.  We have advocated for more inclusive representation in the federal government.  For example, we helped ensure that highly qualified candidates of color were considered by the White House to serve on the Federal Reserve Board of Governors.  As a result, the Federal Reserve currently has its most diverse Board of Governors with the first Black women and first Latina serving as Governors in the Board's 109-year history. A major part of our public policy advocacy has been to advocate for explicit protections in the Fair Housing Act to prohibit discrimination on the basis of sexual orientation, gender identity, and marital and familial status.

15.      In addition to educating the public and aligning itself internally with the values necessary to combat discrimination, NFHA regularly contracts with the federal government to provide educational services related to supporting private nonprofit local fair housing organizations.  For example, until a recent early termination due to the Executive Orders, we had an active subcontract funded by the U.S. Department of Housing and Urban Development ("HUD").  The goal of NFHA's course is to cultivate strong financial management of Fair Housing Initiative Program ("FHIP")[4] fair housing partners to ensure timely, thorough, and comprehensive financial management and reporting amongst other efforts.

---

[4] HUD's Fair Housing Initiatives Program ("FHIP"), established by the Housing and Community Development Act of 1987, 42 U.S.C. § 3616(a), provides funding to fair housing organizations, known as FHIPs, to carry out education and outreach and enforcement activities to prevent or eliminate discriminatory housing practices and to inform individuals of their rights and

16.     Our initial work order for the subcontract also stated, "The [training] outline will include a foundation of cultural competency that addresses the diversity, equity, and inclusion necessary in all fair housing work, and how to recognize and address individual and collective biases."  The training product as developed, however, is solely about financial management and does not contain this information.  Prior to termination of the subcontract, we were expected to provide initial enrollment planning and deliver the training in the second financial quarter of 2025.

17.     Aside from providing public education through various forms of speech, our other core functions are to investigate and halt violations of fair housing and anti-discrimination laws, recover compensation for victims of housing discrimination, and prevent future discriminatory conduct.

18.     For example, after extensive investigation, NFHA and four of its members filed a housing discrimination lawsuit against one of the country's largest residential real estate developers, *National Fair Housing Alliance v. A.G. Spanos Construction Co.*, in federal district court in California. That suit, which alleged that units had not been designed and constructed in an accessible manner, resulted in a settlement that required retrofitting of apartments in eleven states to make them accessible and created a multi-million-dollar fund to further improve accessibility for people with disabilities.

19.     One of our primary annual funding sources for its enforcement work is the federal government.  Approximately one-third of the funding for our enforcement work comes from grants we have applied for and received from HUD.  From these grant agreements, we received

---

responsibilities under the Fair Housing Act.  Many of NFHA's members are FHIPs.  In addition to being specifically authorized by Congress, the FHIP program receives dedicated appropriations every year and has been supported by HUD through administrations of both parties.

approximately $2.23 million from HUD in the 2024 Fiscal Year, which accounted for approximately 15.1% of NFHA's expenditures that year. We are set to receive approximately $2.50 million from HUD in the 2025 Fiscal Year, which would account for approximately 14.9% of NFHA's Fiscal Year 2025 annual budget.

20.    NFHA's fair housing enforcement and education work has included grants from HUD's Fair Housing Initiatives Program Private Enforcement Initiative ("FHIP PEI"), HUD's Fair Housing Initiatives Program Fair Housing Organizations Initiative Establishing New Organizations Component ("FHIP ENOC"), HUD's Fair Housing Initiatives Program Fair Housing Organizations Initiative Continued Development Component ("FHIP CDC"), and HUD's Fair Housing Initiatives Program Education and Outreach Initiative National Media Campaign ("FHIP NMC"). We have received these grants many times over several decades. We currently have FHIP ongoing grants as well as pending grant applications. Our members similarly receive FHIP grants. After the Executive Orders were issued, we reached out to the Office of Management and Budget ("OMB") to explain that FHIP funding is explicitly authorized by statute and is specifically appropriated by Congress, and so should not be affected by the Executive Orders. We requested confirmation that FHIP funding would not be affected by the Executive Orders, but, thus far, have not received a response.

21.    The FHIP PEI provides funding to private, nonprofit fair housing enforcement organizations, like NFHA, that meet statutory requirements to conduct testing, investigate violations, and obtain enforcement of the rights granted under the Fair Housing Act or state or local laws that are substantially equivalent to the rights and remedies provided in the Fair Housing Act. We have received multiple FHIP PEI grants dating back to 1991 and are a current recipient of a FHIP PEI grant. We also have a FHIP ENOC grant as well as other FHIP grants. Pursuant

to these grants, we engage in enforcement, education and outreach, and a national media campaign regarding fair housing.

22.    NFHA has yet to receive or begin negotiating the terms that will govern pending FHIP grant applications.  Based on prior practice, such negotiations for the grant ordinarily would begin by April 2025.  Furthermore, based on prior experience, we know that these negotiations will be an important component in determining the substance of the terms that will govern the grant.

23.    NFHA works to create a society in which everyone can live in a neighborhood with ample affordable and accessible housing options, fresh air, clean water, good public transportation, well-resourced schools, internet access, living wage jobs, quality healthcare, healthy foods, and safe, affordable credit.  The work to affirmatively expand opportunity and create communities where everyone gets to thrive is inextricably intertwined with ending discrimination in housing based on race, national origin, sex, disability and certain other characteristics, and with eliminating racial segregation—which the federal government itself has done so much to create and sustain—and undoing the lasting harms it caused.  Our work, in partnership with the government and on our own with other community partners, must include considerations of and discussions regarding the impacts of race, national origin, religion, sex (including sexual orientation and gender identity), disability, familial status, and other protected classifications on fair housing.

24.    As a direct result of the Executive Orders, NFHA and its members have experienced, and continue to experience, a negative financial impact, a chilling effect on our ability to carry out core activities to stop discrimination and create well-resourced, thriving communities, and the need to divert resources to combat these negative effects.  We are concerned that the

Executive Orders create a tension in which we must either continue our work addressing housing discrimination without references to diversity, equity, inclusion, and accessibility—or any concepts that the Trump Administration deems to be equivalent—or lose federal funding for all of its existing and future programs.

25.    It is particularly difficult for NFHA to comply with these Executive Orders consistent with fulfilling its mission because the concepts of diversity, equity, inclusion, and accessibility are inextricably related to ending discrimination based on race, sex, and other protected classes.  Given the inherent conflict between these Executive Orders and the civil rights laws, we are not able to stop engaging in speech about DEIA or topics related to these broad concepts, while fully carrying out its work combating housing discrimination.  Effective anti-discrimination advocacy requires discussing the very concepts that the Executive Orders appear to eliminate from the federal government and the private organizations that it funds.  This conflict has already been made clear in practice.

26.    For example, on January 22, 2025, NFHA received an email from a unit of HUD with the subject, "Immediate Action - STOP WORK ORDER" requesting that certain government contractors "please cease and desist all work activities associated with environmental justice, diversity, equity, and inclusion (DEI)" while an agency office reviews all contracts with the intent to "cancel all work plans or assignments pertaining to these topics, consistent with an executive order."  Although the e-mail instructed us to stop work on "activities associated with environmental justice, diversity, equity, and inclusion," it provided no guidance as to how NFHA—an organization devoted to civil rights—could tell which of its activities it was supposed to stop.

11

27.    The email did not state what activity NFHA undertakes, if any, is purportedly "associated with environmental justice, diversity, equity, and inclusion" such that payment is barred by the Executive Orders at issue in this case.  Nor have we received further guidance regarding what this vague wording might require in terms of changing future conduct to comply.

28.    On January 24, 2025, NFHA received a follow-up email from HUD informing it that, with respect to some HUD funding, any grants with certain terms deemed to have a "conceptual relationship" to the Executive Orders would receive greater scrutiny.  Such terms included "racial," "underserved," "affirmatively," "systemic," "adversely," "accessible," and "disparate."  These terms appear in some of the very laws and regulations that NFHA and its members seek to educate the public about and to enforce, such as the Fair Housing Act and the Equal Credit Opportunity Act.

29.    For example, the Fair Housing Act requires public and common use areas of dwellings to be "readily accessible to and usable by" persons with disabilities, and requires a dwelling to be "accessible" in numerous other ways.  *See* 42 U.S.C. § 3604(f)(3)(C). The Fair Housing Act also requires the HUD secretary to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies" of the Fair Housing Act. 42 U.S.C. § 3608(e)(5).  HUD's Fair Housing Act regulations—consistent with prevailing caselaw—provide that a practice "has a discriminatory effect where it actually or predictably results in a disparate impact." 24 C.F.R. § 100.500(a) (providing that practice). And ECOA provides protections for applicants who receive an "adverse action" from creditors.  15 U.S.C. § 1691(d) (providing protections).  The list could go on and on.

30.    Put simply, effective enforcement or discussion of the Fair Housing Act, Equal Credit Opportunity Act, and other relevant laws is impossible without reference to many of these

terms.  That use of such routine terminology of federal law is causing grants to be subject to arbitrary scrutiny and recipients of federal grants and contracts to be subject to potential termination demonstrates that it will be considerably more difficult, and perhaps impossible, for NFHA and our members to apply for and receive federal funding while carrying out core activities in furtherance of our missions and the purposes of these federal civil rights statutes.  We and our members will be forced to change the way we discuss these laws, which are central to our missions, in order to minimize the risk to our federal funding, in a way that makes our work to advance compliance with civil rights laws untenable.

31.    NFHA tried to withdraw FHIP funds due under contract with HUD on January 28, 2025, and could not access the payment portal known as the Line of Credit Control Systems.  Since then, we have been able to access this portal and draw down FHIP funds.  There has been no explanation for why the portal was unavailable or what we need to do to maintain access to it.  We were able to draw down the funds the next day, January 29.

32.    On January 31, 2025, NFHA was informed, with respect to the subcontract described above, that HUD had caused the subcontract to be terminated.  As described above, the work order for this contract included reference to DEIA concepts but the work product did not. We were not provided an opportunity to modify the work order or an explanation for why this decision was made.

33.    On February 11, 2025, we were informed that part of another contract related to equity and fairness in housing that had been subcontracted to NFHA had been cancelled.  Once again, NFHA was not provided with any explanation or opportunity to amend the work order.

34.    Indeed, it appears that the entire FHIP program may be considered contrary to the Executive Orders.  NFHA members have been advised by HUD that it is possible that no FHIP

payments will be made at all for work done after the DEIA Executive Orders issued, including work that relates to members' core business of enforcing fair housing laws. HUD has specifically advised NFHA members that they should submit separate vouchers for work done through January 19, 2025, although that date is not otherwise a meaningful date for the FHIP payment system. HUD also has advised NFHA members that it cannot guarantee payment for any work done on or after January 20. NFHA members thus face a stark choice—shut down most of their operations now, or perform work for which HUD has made clear they may not be paid. NFHA has had to divert time to counseling NFHA members regarding their options and devising strategies pursuant to which NFHA members can continue to carry out their missions.

35.    Our members have been left uncertain what work will be deemed eligible for funding, while we are uncertain how to advise them. Like NFHA, members have not been informed of what activities are purportedly implicated by the Executive Orders or how to remedy any issues. Many of these members are small nonprofits with very limited resources to survive a delay in anticipated payments.

36.    The Executive Orders have frustrated our ability to carry out our core activities, including fulfilling our obligations to our members and ensuring that our members can robustly enforce and educate about the Fair Housing Act and other relevant laws throughout the country. We already have had to divert significant resources to ensure that our members continue to get paid and are able to continue to perform their important work. We have spent time gathering information from members regarding their inability to receive contracted-for funds and the financial impact that is causing on them; advising members as to how to respond with respect to modifying their normal, core activities or changing the way they characterize those activities; and taking various actions to ensure that members receive funding to do their work, such as

communicating with the Office of Management and Budget about the necessity of releasing FHIP and FHAP grants and educating lawmakers and others about the impact the Executive Orders at issue in this case are having on the ability of NFHA and members to do their work to stop illegal discrimination banned by our nation's fair housing laws. If not for the need to ameliorate the effects the Executive Orders have had on NFHA and its members, NFHA would have spent this time on other important activities addressing discrimination, bias, and harassment in all areas of housing.

37.     On a local level, without the enforcement functions that organizations, including NFHA and its members, provide in partnership with the federal government, predatory landlords and organizations engaged in implicit and explicit bias against underserved communities will be empowered to continue illegal discrimination. These harms compound other inequities in accessing fair housing in the United States. For example, in 2022, a record high 22.4 million renter households were "cost-burdened," meaning they spent more than 30% of their income on rent and utilities. Black and Latino renters were more likely than white renters to be cost-burdened. These disparities make it more difficult for Black and Latino renters to build wealth and save for down payments for home ownership. Further, despite important efforts to close racial home ownership gaps, the white home ownership rate is nearly 67% higher than the Black home ownership rate, 45% higher than the Latino home ownership rate, and 20% higher than the home ownership rate for the Asian American community. But under these Executive Orders, we may not be able to marshal these basic facts to advocate for greater racial equity in homeownership.

38.     The Executive Orders represent another barrier to fair housing for communities that have long lacked affordable and accessible housing options and have faced rampant discrimination. It is already apparent that agencies will implement the Executive Orders in ways

that have harmed and will harm NFHA and our members' current and next round of grant agreements, prevent us from carrying out core activities, and impede us from accomplishing our mission of promoting fair housing. These harms are not just felt by NFHA and our members; they are felt by the tens of thousands of people we serve each year. These include people facing sexual harassment by their landlords; families evicted because a family member has become pregnant; people facing homelessness because landlords will not accept payments via government assistance; home buyers steered by real estate agents to certain homes and away from others based on their race; potential homebuyers denied a mortgage because of appraisal bias or redlining; homeowners losing their insurance because of arbitrary rules about how old an insured home can be (even when those homes have been upgraded); people with disabilities denied reasonable accommodations that allow them to safely enjoy their housing. All of these vulnerable people and more depend on NFHA and its members; it is for precisely that reason that Congress appropriates money for the FHIP program and grants. If we and our members lose our government funding because the Administration does not approve of our views on DEIA, we cannot protect these vulnerable communities from harm.

39.    The vagueness of the Executive Orders has created an even more untenable situation; NFHA and its members must determine whether we are able to conduct our fair housing enforcement programs and public education efforts effectively and without fear of retaliation from the federal government. We are uncertain about what they must stop doing or saying to avoid liability and penalties under multiple provisions of the three Executive Orders, particularly in light of the actions that have already been taken pursuant to those orders. So far, agencies have provided no guidance regarding how, if it all, we can change our conduct to ameliorate these harms.

40.    For example, Anti-Diversity2 Order states that all contracts or grants must include a "term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."  It is not clear to us what "promoting DEI" means in this instance or what activity might be considered to violate Federal anti-discrimination laws.  It is not clear whether our current and pending grants would have to be modified to include this certification.  We are also not sure whether this certification means that organizations may not "promot[e] DEI" even in our work that is not funded by the government. As noted above, this confusion is compounded by the fact that some of the words and phrases defendants have targeted are included in the laws, regulations, and caselaw that we refer to every day in the course of our core activities.

41.    Anti-Diversity2 Order also instructs the Director of OMB, with the assistance of the Attorney General, to "excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures."  NFHA has no way of knowing what might be deemed to be "references to DEI and DEIA principles" under other names in our government funded work.  What is clear already is that HUD and other agencies are implementing the Anti-Diversity2 Order by scouring our existing contracts for anything that could relate, even in a tangential way, to an extremely broad conception of DEIA, and so it is very likely that we and our members will continue to suffer financial harm as a result.

42.    Anti-Diversity1 Order requires the OMB to "terminate, to the maximum extent allowed by law . . . all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."  The term "equity-related grants" is undefined, vague, and concerning.

The core of our work—promoting fair housing by combatting discrimination in housing based on race, national origin, sex, disability, and other protected classes—may well be "equity-related" within the ordinary meaning of those terms.  By its plain terms, Anti-Diversity1 Order threatens to bar enforcement and discussion of the Fair Housing Act and other civil rights laws that make our country more equitable, fair, and just.  If Anti-Diversity1 Order means something else, that meaning is not clear, and we have no way of ascertaining whether its grants directly fall within the category of grants that would be terminated.

43.     The Anti-Gender Order instructs all agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."  The term "gender ideology" is vague.  We cannot tell what grants or work are affected by the Anti-Gender Order or the extent to which this Executive Order purports to require us to change the way we talk about and enforce civil rights laws.  We have been a strong proponent of combatting efforts throughout the country to deny housing to people because they are gay, lesbian, bisexual, queer, transgender, unmarried[5], or a recipient of housing subsidies. We have also advocated for the expansion of the Fair Housing Act to explicitly prohibit discrimination on the basis of sexual orientation, gender identity, marital status, and source of income.  Finally, consistent with the rulings of many courts around the country and HUD's guidance, we have taken the position that, following the Supreme Court's decision in *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020), the Fair Housing Act bars housing discrimination based on sexual orientation and gender identity; accordingly, we and our members have investigated and brought complaints regarding allegations of such discrimination. We are not clear as to whether any of these actions fall under the definition of "gender ideology,"

---

[5] The Equal Credit Opportunity Act includes "marital status" as a distinct protected class. 15 U.S.C. 1691(a)(1).

a term that has no established meaning and is not clearly defined in the Anti-Gender Order. However, HUD already appears to view the Anti-Gender Order as compelling it not to enforce existing legal protections for transgender persons. Our ability to carry out its mission and core business operations will be adversely affected by the Anti-Gender Order if we and our members are compelled to stop promoting fair housing for the LGBTQ community—including enforcing the Fair Housing Act in accordance with established caselaw—or lose federal funding. Additionally, our mission will be frustrated if HUD refuses to provide any administrative forum in which we and our members can bring complaints of discrimination that are recognized by federal law.

44. Even beyond their vagueness, the breadth of the Executive Orders, confirmed by their implementation so far, place NFHA and our members in a precarious situation. Complying with them (if that is even possible for us) would require severely self-censoring ourselves, such as by cancelling or limiting programs, presentations, reports, and public education efforts—and even taking down content from our website and social media accounts—and ultimately denying critical services to people needing our help, all of which are central to our work and mission. Moreover, because of the inherent conflict between the Executive Orders and the Fair Housing Act and other civil rights laws that we enforce and speak about, compliance with the Executive Orders necessarily means presenting a distorted version of the law in our presentations. But violating them risks serious consequences. At the least, we risk losing the funding that is crucial to our education, outreach, and enforcement work, which is also central to our mission and core business operations. And the Executive Orders go further and threaten even more draconian consequences, such as liability under the False Claims Act, if we do not comply with them.

45.     We are aware of reports of multiple HUD grantees who have had their grants terminated after government officials examined their websites or LinkedIn profiles and found key words that were determined to be not in compliance with the Executive Orders because they had references to diversity, equity, inclusion, and accessibility. See Josh Kovensky, DOGE Cites 'DEI,' LinkedIn Profiles It Doesn't Like In Killing Off HUD Contracts, https://talkingpointsmemo.com/news/doge-cites-dei-linkedin-profiles-it-doesnt-like-in-killing-off-hud-contracts. We have confirmed with several of these contractors that, as reported, they lost their grants based on their statements of support for diversity, equity, inclusion, and accessibility, which the Administration deemed to be a violation of the Executive Orders.  See, e.g., Exhibit A to Rice Declaration, Notice of Award Cancellations For All XXXX Awards (redacted).  Thus, we and other HUD grantees understand that we face a very real possibility of losing funds based on our professed support for DEIA or related concepts, even where that speech has nothing to do with the grants at issue.

46.     NFHA is taking steps to avoid adverse consequences to its ability to perform existing work and to avoid harm to the communities it serves from the Executive Orders.  When we were first confronted with the vague language of the Executive Orders and the subsequent OMB memorandum NFHA received on January 27, 2025, we began to discuss the challenges the Executive Orders and OMB memorandum presented to continuing our work.  Though the current administration rescinded the OMB memo, it clarified that the funding freeze remained in place for any activities deemed to be covered by the Executive Orders.

47.     The Executive Orders have already begun to have a chilling effect and have forced us to divert scarce resources to try to figure out how we and our members can protect their funding streams, consistent with accomplishing our missions.  Our program staff are justifiably concerned

about losing funding for necessary work that includes discussion of compliance with civil rights laws; protected classes such as race, national origin, disability, and gender; and concepts such as diversity, inclusion, equity, and accessibility, strands which as I have described above are difficult to pull apart.  Additionally, our partner organizations with smaller budgets are very reasonably concerned that any failure—real or perceived—to follow the vague dictates of these Executive Orders will devastate their budgets.  Moreover, our members view the Executive Orders as an attack on all of the progress fair housing organizations have made toward realizing the promise of the Fair Housing Act and other civil rights laws in rooting out systemic discrimination within local and federal housing practices.  In the short time since the Executive Orders were signed, we and our members have already been unable to access funding and have seen contracts canceled, forcing us to explore whether and how programs might be shut down as well as how to secure alternative sources of funding in case any of our and its members' operations and funding streams will be deemed to fall within the unclear boundaries of the Executive Orders.

48.      The Executive Orders interfere with our and our members' ability to carry out their core business activities in pursuit of their mission to combat unequal access to housing opportunities.  Where you live matters; it affects access to schools, jobs, good health, a quality education, healthy foods, a clean and safe environment—everything people need to succeed.  At NFHA, we believe that the U.S. should be a nation where all individuals have a fair shot in life and the same opportunity to get ahead.  But this is not the case for millions of people.  Residential segregation, systemic appraisal bias, the dual credit market, biased algorithms, restrictive zoning ordinances, and many more mechanisms developed over years of unfair policies and practices still exist today, robbing people of equal access to opportunities. Many housing opportunities, and their related benefits, remain off limits to millions of people, and for too many Americans trying to

achieve their goal of owning a home or achieving housing security, hard work alone is not enough. Centuries of discriminatory housing industry and government policies have prevented Black, Latino, Native, Asian American, Pacific Islander, people with disabilities, poor White families, women, and members of the LGBTQ community from achieving wealth creation, economic opportunity, housing security, and home ownership. We believe that by helping traditionally underserved individuals, we can ignite economic opportunity in our nation that benefits everyone.

49.    Only by speaking clearly about what has happened and continues to happen to people in the pursuit of housing because of their race or other protected class can we make progress toward fairer housing markets, strengthen communities, and make our society more productive. The Executive Orders impede our ability to do so.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed:  February 28, 2025

_____
Lisa Rice
President and CEO, NFHA