UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL URBAN LEAGUE, et al.,<br><br>　　　　　*Plaintiffs,*<br><br>　　v.<br><br>DONALD J. TRUMP, et al.,<br><br>　　　　　*Defendants.* | Civil Action No. 25-cv-00471 |

### DECLARATION OF NADEEN ISRAEL

I, Nadeen Israel, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the Senior Vice President of Policy and Advocacy for AIDS Foundation of Chicago ("AFC"), a not-for-profit 501(c)(3) organization based in Chicago, Illinois, that mobilizes communities to create equity and justice for people living with and vulnerable to the human immunodeficiency virus ("HIV") or chronic conditions. I have served in this capacity since February 24, 2020.

2. I am submitting this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction to prevent Defendants from enforcing Executive Order No. 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" ("Anti-Diversity1 Order"), issued January 20, 2025;[1] Executive Order No. 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Anti-Gender Order"), issued January 20, 2025;[2] and Executive Order No. 14173, titled "Ending Illegal

---

[1] Exec. Order No. 14151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).

[2] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

1

Discrimination and Restoring Merit-Based Opportunity" ("Anti-Diversity2 Order"), issued January 21, 2025 (collectively the "Executive Orders")[3].

3.   AFC was incorporated on November 13, 1985, as an Illinois not-for-profit corporation. It began operations on May 1, 1986. AFC brings together service providers and funders to develop systems that meet the needs of people living with HIV or acquired immunodeficiency syndrome ("AIDS"). Since its inception, AFC has led both state- and city-wide efforts to coordinate essential medical and support services for people living with HIV/AIDS.

4.   AFC provides systems-level leadership to the Chicago area's HIV/AIDS sector by providing funding to and coordinating the activities of Chicago's regional case management system; distributing funding for permanent, supportive housing including rental and utility assistance; providing capacity building services to community organizations that provide high quality HIV/AIDS programming and services to communities and neighborhoods that have been historically under-served by medical services, especially HIV care services; and engaging in local, statewide, and federal policy advocacy to promote HIV/AIDS funding and services.

5.   Preventing new cases of HIV is at the core of AFC's work—and it is at the core of Getting to Zero Illinois, a state-wide initiative to end the HIV epidemic in the state by 2030. AFC coordinates the Getting to Zero Illinois project in partnership with both the Illinois Department of Public Health ("IDPH") and the Chicago Department of Public Health ("CDPH"). The guiding principles of Getting to Zero Illinois include eliminating stigma, dismantling systems that perpetuate white privilege, promoting cultural humility, prioritizing trauma prevention and trauma-informed care, and focusing on data to achieve outcomes.

---

[3] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).

6. Every day, AFC walks alongside almost 7,000 people living with or vulnerable to HIV who need support to achieve their health and life goals. This work includes intentionally focusing on the communities and populations that are disproportionately impacted by the HIV epidemic. In Chicago, and across the nation, the populations most impacted by the HIV epidemic include Black, Latino, and transgender communities. Currently, of all of the clients in our programs, 57.5% are Black, 26.8% are Latino, and 2.5% identify as Indigenous, Asian, or multicultural. Additionally, 35% of our clients are gay or lesbian, 7% are bisexual, 1.2% are queer, and 8.5% are transgender, non-binary, or genderqueer. For many Black, Latino, and Indigenous communities, HIV-specific preventative and treatment services are less accessible due to the systemic under-resourcing of minority communities and neighborhoods. Moreover, LGBTQ communities often face a lack of access to competent, comprehensive, and compassionate healthcare services, and trans, non-binary, and genderqueer community members sometimes encounter additional discrimination within LGBTQ-centered spaces. Due to systemic racism, homophobia, anti-transgender bias, and misogyny, the HIV epidemic disproportionately impacts many of our priority communities. One of the most important ways to address and remedy systems and structures that have procedures or processes that disadvantage marginalized groups is by ensuring that we can train and educate service providers, community leaders, elected officials, and the public on these issues.

7. AFC is committed to prioritizing marginalized populations disproportionately impacted by social determinants that contribute to health disparities in HIV/AIDS. HIV and chronic conditions disproportionately impact specific populations. As an organization that has been doing this work for 40 years, AFC recognizes that it will have the greatest impact on the HIV epidemic by focusing its efforts on those most-impacted by HIV, based on epidemiological data

3

and unmet need: young Black gay and bisexual men, transgender women of color, Black women living in high-incidence areas, and Latino gay and bisexual men.

8. As described in detail below, the two primary forms of federal funding AFC receives are funding for HIV/AIDS-related services for care, case management and supportive services from the U.S Department of Health and Human Services ("HHS"), and funding to provide housing and supportive services from the U.S Department of Housing and Urban Development ("HUD").

9. AFC is a federal grantee and subgrantee, and manages local, state, and federal funds for an array of HIV/AIDS-related services. By assisting government entities in planning, distributing, and monitoring service contracts, AFC helps develop provider expertise and promotes uniform and high-quality delivery of care across the region. AFC receives various forms of funding and sub-grants from the Chicago Department of Public Health and the Illinois Department of Public Health as pass-through funding from HHS, including, but not limited to, funding under the Ryan White Comprehensive AIDS Resources Emergency Act of 1990 and funding from the Centers for Disease Control and Prevention. AFC also receives, directly or through other grantees, funding from the National Institute of Health, the Health Services and Resources Administration, and the Administration for Community Living, and it receives discounts under the 340B Drug Discount Program.

10. Additionally, AFC participates in a rental subsidy program partially funded by the U.S. Department of Housing and Urban Development. Through federal grants from HUD's Housing Opportunities for Persons with AIDS ("HOPWA") program, AFC assists people who are chronically homeless in finding permanent housing, manages the delivery of HIV rental subsidies

to low-income people with HIV and people living with chronic conditions, and convenes HIV housing advocates to both expand and improve the housing continuum.

11. Funding from HUD, HHS, and other federal agencies accounts for a significant portion of AFC's revenue. In total, 84.3%—or $34.8 million —of AFC's funding originates from the federal government, which includes over $21 million for programs that require case management training through programming from HHS and HUD. The loss of this federal funding would be catastrophic for our organization and would force us to shut down.

12. The federal funding AFC receives has given us the ability to connect people living with or vulnerable to HIV to safe and stable housing—which results in better health outcomes. Through federal funding received from the Chicago Department of Public Health, AFC was able to establish the HIV Resource "HUB." As of January 2025, the HUB has dispensed more than $1.76 million to cover housing, utility, and other financial emergencies for more than 826 people living with and vulnerable to HIV in the Chicago eligible metropolitan area (which includes Cook County and the surrounding "collar counties"). The majority of the funds distributed cover people's rent to prevent eviction and homelessness; utilities; and food needs.

13. AFC's vision is that people living with HIV or chronic conditions will thrive and there will be no new HIV cases. In working towards that purpose, AFC has identified and works to address systemic factors—including, racism, sexism, anti-transgender bias, homelessness, poverty, and immigration status—that drive the HIV epidemic and inequities in health outcomes. The data we have available nationally, statewide, and in the City of Chicago paint a picture of multiple epidemics and pandemics disproportionately impacting Black, Latino, Indigenous, and LGBTQ communities. AFC's work must include discussions of the impacts of race, gender, gender identity, sexual orientation, and income level on health outcomes.

14. Our clients are not just people living with or vulnerable to HIV—they are also members of predominantly Black and Latino communities that are more likely to live in areas that are denied access to affordable and nutritious food, healthcare, and employment that pays living wages. We must also acknowledge and address the barriers that they and their communities face in accessing comprehensive health care. A Black transgender woman living with HIV in Chicago and enrolled in Medicaid is not only worried about her viral load and access to medication; she is also worried about employment discrimination, housing security, and access to gender-affirming care with culturally aware and competent providers. Systemic racism limits access to comprehensive and equitable healthcare on the South and West Sides of Chicago; systemic anti-transgender bias contributes to transgender, non-binary, and genderqueer people disproportionately experiencing unemployment and housing instability; and systemic misogyny drives the gender pay gap. All of these things are further intensified for people who live at the intersection of various marginalized identities and thus suffer oppression in multiple ways. Without acknowledging and addressing all these factors, AFC cannot successfully achieve our mission and vision.

15. Everything AFC does needs to center on the root causes driving the HIV epidemic. Structural racism and anti-transgender bias are at the heart of the disparities that AFC witnesses in HIV and are some of the reasons why there are disparities driving the epidemic. Therefore, it is of the utmost importance that AFC's internal trainings, external federally funded trainings, and policy advocacy work all address structural racism and LGBTQ discrimination—explicitly. AFC convenes and trains close to 160 case managers, across 31 agencies, to learn the latest in providing comprehensive case management services that empower people living with HIV. When training case managers, we include trainings that familiarize them with the current

landscape of the HIV epidemic and include foundational information on how race and gender impact the way case managers execute their work with non-monolithic communities. Trainings cover a broad array of topics, including interpersonal cultural competency, trauma-informed care, financial literacy, effective communication with clients, HIV and aging, engaging with transgender clients, the impact of HIV on transgender populations, LGBTQ cultural competency, cultural competency and Black communities, and working with clients at risk for deportation.

16. A fundamental part of our mission is to serve all people affected by HIV, including transgender individuals, who face disproportionately high rates of HIV acquisition due to systemic barriers such as healthcare discrimination, poverty, and homelessness. To ignore the existence of transgender people in the fight against HIV is to actively undermine our efforts to end the epidemic and instead to perpetuate disparities that fuel its spread.

17. Transgender individuals, particularly Black and Latina trans women, experience some of the highest rates of HIV in the country. We have found that when policies, programs, and funding streams fail to explicitly recognize and include transgender people, it results in service gaps that leave one of the most vulnerable populations without adequate prevention, treatment, or support. This erasure not only increases HIV transmission rates among transgender people but also weakens our broader public health response.

18. The inability to acknowledge the special needs of transgender people in HIV prevention, care, and housing will result in exacerbated health disparities and stigma. An effective strategy to end the HIV epidemic must center on those most affected, including transgender communities, by ensuring targeted interventions, healthcare, and stable housing addressing the unique needs of the community.

19. In the HIV healthcare setting, many of our transgender clients arrive at our organization after experiencing profound anti-transgender bias. These experiences create deep mistrust in medical institutions, making it far less likely that transgender people will seek out or remain engaged in HIV care. When public health fails to account for these realities, that failure reinforces barriers that prevent transgender individuals from accessing the routine testing, prevention, and treatment services they need to stay healthy.

20. In our supportive housing programs, we witness firsthand the consequences of policies that fail to acknowledge the needs of transgender individuals. Many of our clients come to us after facing homelessness, poverty, and family rejection, with no access to safe housing. Case management and supportive housing must be designed with the understanding that transgender-specific needs are essential components to ensure continued engagement with care.

21. Healthcare and housing are crucial to our mission to end the HIV epidemic and are crucially related. Many shelters and housing programs do not accommodate transgender people. For those living with HIV, unstable housing can be a death sentence. Without a safe place to live, it becomes nearly impossible to maintain medication adherence, attend medical appointments, or prioritize self-care. Our housing programs have affirming policies for our transgender clients. If we cannot address these needs, our transgender clients will fall back to cycles of instability that exacerbate health disparities and prevent them from achieving long-term wellness.

22. As our decades of work has shown, when transgender people are recognized in HIV prevention and care, they are more likely to access services, remain in care, and achieve viral suppression.

23. The Anti-Diversity1 Order directs the termination of "equity-related grants or contracts," yet it fails to provide a clear definition of what constitutes an "equity-related" grant. As a result, we are unable to determine which of our federally funded programs may be affected. The term "equity" has multiple meanings across healthcare, public policy, and legal contexts. Many of our federal awards were specifically designed to address measurable and well-documented disparities in health and housing, including those related to race, gender identity, and other systemic inequities. It is unclear whether grants aimed at mitigating health risks for historically marginalized communities will be subject to termination or if funding is at risk merely because the award references "race" in its title. This lack of clarity creates significant uncertainty, making it impossible for us to assess compliance or anticipate the impact of the Executive Orders on our federally funded programs.

24. The Anti-Diversity1 Order and Anti-Diversity2 Order purport to prohibit "illegal DEI" initiatives, yet they fail to define what constitutes "illegal" and what would be now considered unlawful under federal law. There is no established legal doctrine categorically prohibiting DEIA programs, and in fact, many federal statutes and regulations that apply to AFC explicitly mandate equitable access to government programs, fair employment practices, and anti-discrimination protections. Without clear guidance, it is impossible to determine whether the Orders intend to forbid certain hiring and contracting policies, affirmative outreach to underrepresented communities, or the collection and use of demographic data to ensure equitable access to services. Indeed, we are left in the precarious position of having to determine whether we must potentially violate other applicable laws in order to comply with the Executive Orders and not lose our funding.

25. We are also unable to determine the meaning of "DEI" or "DEIA" in the Anti-Diversity1 Order and Anti-Diversity2 Order. It is unclear whether the Executive Orders are limited to specific training and hiring practices or if they extend to broader policies and initiatives designed to promote equitable access to healthcare and housing. As a result, we cannot ascertain whether acknowledging documented disparities in public health outcomes based on race would constitute a violation of the Executive Orders. We are uncertain whether tailoring our services to address the different healthcare and housing needs of different communities would be prohibited. We are even unsure whether the use of racial or demographic data in program design, evaluation, or service delivery would be deemed noncompliant. This uncertainty places us in a precarious position, as it is impossible to determine the extent to which of our evidence-based practices and federally funded initiatives may now be at risk.

26. Because we operate at the intersection of public health and social services, we must ensure that people living with HIV, including the transgender community, receive comprehensive and affirming care. The Anti-Gender Order's description of sex as strictly binary would undermine the established principles of inclusive healthcare we operate from. By mandating that we recognize only "biological sex" at birth, the Anti-Gender Order forces us to accept a restrictive framework that conflicts with both medical best practices and ethical standards of care.

27. Many transgender people already face stigma in healthcare settings. By enforcing a binary definition of sex, the Anti-Gender Order exacerbates distrust, potentially discouraging our clients from seeking essential HIV treatment and prevention services. We have established best practices that recognize the unique healthcare needs of transgender individuals. The directive undermines the effectiveness of these programs by restricting providers from offering culturally

competent and affirming services, such as referrals to trained medical professionals and targeted HIV prevention strategies.

28.     The Anti-Gender Order also prohibits Federal funds from being used to "promote gender ideology" but does not clearly define what actions would constitute promoting gender ideology. We cannot determine if "promote" refers to explicit advocacy, incidental mention, or inclusion in educational materials.

29.     Since the announcement of the Executive Orders, AFC has been concerned with the impact they will have on our existing projects and our communities. On January 29, 2025, we became aware of a notice disseminated by the United States Centers for Disease Control and Prevention ("CDC") to various non-profit organizations. The notice purports to implement the Anti-Diversity1 Order and the Executive Order titled "Initial Recessions of Harmful Executive Orders and Action." Specifically, the notice directs recipients of CDC funds to "immediately terminate, to the maximum extent possible, all programs, personnel, activities, or contracts promoting diversity, equity and inclusion (DEI)." It further provides, "[a]ny vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." Although AFC did not receive the notice directly, we have experienced adverse effects resulting from its implementation. On January 28, 2025, AFC attempted to draw on our federal grant award; however, we were unable to submit any requests due to the website being rendered inoperative. This disruption was later corroborated by reports concerning OMB Memorandum M-25-13, which mandated a freeze on all federal funding to facilitate the agencies' implementation of the aforementioned Executive Orders.

30.     On January 31, 2025, we became aware of the existence of two other documents through sister organizations: a memorandum from the United States Office of Personnel

11

Management dated January 29, 2025, titled "RE: Initial Guidance Regarding President Trump's Executive Order Defending Women," and a notification from the CDC ordering award recipients to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . ." We have not yet received this notice. However as a CDC award recipient, we believe it has already harmed us as demonstrated by our inability to draw on our federal grant awards.

31. On February 1, 2025, we received an email from the City of Chicago concerning the Federal contracts the City sub-contracted to AFC. The email confirmed what we suspected: that we were subject to the Federal budget freeze, and that CDC and the Health and Resources Services Administration have been sending notices to grantees like the City of Chicago about the implementation of these Executive Orders. These actions have affected AFC as a sub-grantee of Chicago.

32. The vagueness of the Executive Orders has created an untenable situation: AFC must determine whether we are able to continue our targeted efforts to serve the populations most affected by HIV: Black, Latino, and transgender communities.

33. We are currently examining whether we are able to effectively train case managers without fear of retaliation from the federal government. More than $21 million of our funding, including grants tied to Ryan White and HOPWA, requires case management training. AFC is now forced to decide whether to train case managers in a manner that best equips them to work effectively with our clients or lose significant funding and grant opportunities. AFC cannot properly train case managers and fulfill our mission if we cannot discuss the systemic barriers that drive disparities in care and health outcomes for communities of color, LGBTQ communities, and people living with or vulnerable to HIV. There are many ways of measuring AFC's success in our

case management program, but one important metric—and the one AFC focuses on—is the percentage of our clients whose HIV is virally suppressed. Among AFC's HIV case management clients, 90% of them have achieved viral suppression. That is an incredible testimony to the power of AFC's case management. However, AFC cannot continue to meet, let alone improve, on that number without being able to discuss the barriers to care that our clients face due to systemic forms of oppression.

34.  To strengthen AFC and successfully end the HIV epidemic, we must work toward ending racism, white supremacy, and anti-transgender bias. AFC will never achieve our mission of mobilizing communities to create equity and justice for people living with and vulnerable to the HIV or chronic conditions without first recognizing and dismantling the racist and transphobic cores of the many systems AFC works within. These systems are part of the reason why HIV disproportionately impacts specific populations: young Black and Latino gay men, transgender women of color, and Black women living in high-incidence areas. To better identify ways we could improve access for clients to life-saving care, we have recognized the need to first look inward. AFC provides trainings that empower staff with the knowledge and skills to navigate institutions and processes shaped by biases, thus ensuring clients receive the care and support they deserve. We also provide trainings that help staff identify improvement opportunities in our own processes. Staff are now better equipped to foster stronger collaboration with our Community Advisory Boards so that client voices are fully represented. Staff are also better equipped to feel more confident using gender-affirming language that ensures no one feels like our services are not for them. Moreover, our trainings on topics like conflict resolution, social power, and equity help foster a workplace where everyone feels seen, valued, and respected. Trainings like these not only help our staff to better recognize how we can serve the most vulnerable and marginalized in our

communities, but also highlight how these various forms of oppression impact each of us in the work we do. Our internal work has also led to including our priority populations in our strategic plan; centering our work on DEIA to achieve greater impact; and increasing resource development for under-resourced groups. With the Executive Orders in place, our ability to train our staff to best fulfill our strategic plan is in jeopardy.

35. The HIV epidemic—nationally, in Illinois, and in Chicago—disproportionately affects Black gay and bisexual men, as well as Black cisgender and transgender women. The AIDS Foundation of Chicago leads two critical programs to address these disparities. The Welcome Home Program supports HIV-positive individuals involved in the justice system, including men who identify as gay, bisexual, or same-gender loving, as well as transgender and cisgender women, with a focus on people who are Black. This program assists those returning to the community from incarceration by providing access to equitable HIV care, rapid housing services, employment support, and behavioral health services. Funded by the Ryan White Program through a Special Project of National Significance grant, Welcome Home fosters innovative collaborations to overcome structural barriers that contribute to poor health and housing outcomes. It connects participants to medical care, permanent housing, and other essential services, helping to reduce recidivism. The Women's Connection Program specifically focuses on addressing the unique challenges faced by Black cisgender and transgender women living with HIV. This initiative provides specialized training for case managers, navigators, and advocates on topics such as domestic violence, health care access, transgender cultural competency, and systemic bias. By addressing these intersecting issues, the program aims to enhance service delivery and reduce barriers for women of color impacted by HIV. However, under the policy restrictions the

Executive Orders impose, AFC's ability to offer these critical programs and trainings and services could be undermined, potentially increasing barriers to care and recidivism rates.

36. When we were first confronted with the vague language of the Executive Orders and the subsequent memorandums and notices by the OMB and CDC, we began to discuss how we could continue our work both internally and externally. As an organization that has been in existence during the majority of the HIV epidemic, we are familiar with hardship, strife, and the harm that can be caused by federal administrations that prioritize profit and the status quo over the needs of people. Much like in the past, we are dedicated to continuing this work; however, it would be dishonest to imply that there will not be significant harm caused by the Executive Orders.

37. The Executive Orders have already begun to have a chilling effect on AFC's work and ability to do continued programming. AFC's program staff are concerned about funding streams for necessary work that discusses race and gender equity. Additionally, our partner organizations with smaller budgets are concerned that even a hint of impropriety will devastate their budgets. Moreover, our community members view these Executive Orders as an attack on all the progress that we have made toward ending the HIV epidemic. In the short time since the announcement of the Executive Orders, we have already held meetings to discuss the ways that funding will have to be rerouted, just in case the Administration determines we are operating outside of the unclear boundaries of what the Executive Orders allow. Through our services, we work toward calling attention to centuries of systemic oppression that have driven the disparities we see in the HIV epidemic. Housing insecurity contributes dramatically to shorter lifespans for Black, Latino, Indigenous, and transgender communities. The Executive Orders are an impediment on the road to progress and have left many organizations, including AFC, wondering

how we are supposed to execute our missions without being able to reach our communities in a truly informed manner.

38. Seventy percent of the individuals seeking services through our HUB program identify as Black or Latino and 7.8% identify as transgender. Thus, it is imperative that our case managers are trained on cultural competency to best meet the needs of our clients. Part of this cultural competency training is based on decades of research. Having a case manager that understands how a Black, Latino, and/or transgender person is disproportionately impacted by HIV is crucial to the work case managers do. However, our ability to provide comprehensive cultural competency trainings and tailored services is now in question—creating an additional barrier for the majority of our clients who are best served when their case managers are trained to recognize and address the systemic oppression impacting our clients' lives.

39. AFC is currently facing an impossible choice: be forced to implement the government's views on gender ideology and DEIA or lose federal funding. Federal funding accounts for 83.4% of our organization's budget. Should federal funding be withdrawn, our organization would have to shut down. This would be devasting to Chicago's community of people living with HIV/AIDS, as we currently coordinate case management for over 31 Chicago organizations serving 7,000 people a year. We also provide housing to 1,300 households, all of whom would become homeless without our services.

40. Ultimately, the Executive Orders are another barrier to health equity for communities that have long been pathologized as simply unhealthy. People living with HIV, Black, Indigenous, and Latino people, and LGBTQ people face systemic and structural oppression that often leads to deadly outcomes. AFC was born out of a need to rectify these harms and address the needs of these communities by working with and for them. This work will continue, because

it must, but the Executive Orders will negatively impact our best work. At AFC, we are dedicated to seeing the end of the HIV epidemic, and hope that the courts will recognize that this work must include conversations and trainings that specifically acknowledge and address the systems that oppress our community members because of their race, gender, and/or sexual orientation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed: February 27, 2025

*Nadeen Israel (Feb 27, 2025 12:42 CST)*

Nadeen Israel
AFC Senior Vice President of
Policy & Advocacy