UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE, et al.,

    *Plaintiffs,*

v.

DONALD J. TRUMP, et al.,

    *Defendants.*

Civil Action No. 25-cv-00471

## DECLARATION OF LAUREN GLODOWSKI

I, Lauren Glodowski, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am a Care Coordination Specialist at AIDS Foundation of Chicago ("AFC"), a not-for-profit 501(c)(3) organization based in Chicago, Illinois, that mobilizes communities to create equity and justice for people living with and vulnerable to the human immunodeficiency virus ("HIV") or chronic conditions. I have served in this capacity since March 2021.

2. I am submitting this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction to prevent Defendant agencies from enforcing Executive Order No. 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" ("Anti-Diversity Order"), issued January 20, 2025;[1] Executive Order No. 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Anti-Gender Order"), issued January 20, 2025;[2] and Executive Order No. 14173, titled "Ending Illegal

---

[1] Exec. Order No. 14151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).
[2] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

Discrimination and Restoring Merit-Based Opportunity" ("Anti-Diversity2 Order"), issued January 21, 2025 (collectively, the "Executive Orders").[3]

3. My life experiences led me to the work I do today. Growing up in a military family meant moving frequently and experiencing diverse cultures first hand. This constant change exposed me to a wide range of social and systemic structures, shaping my understanding of how different lived experiences influence people's lives. Through these experiences, I learned that creating meaningful, positive change requires a deep appreciation of the unique contexts in which individuals and communities operate.

4. At university, I pursued a degree in biology with a specialization in biochemistry. One of my educational focuses was on HIV, and I attended post-secondary educational institutions in the United States and South Africa.

5. After graduating from university, I interned in AFC's prevention department. During my internship, I conducted outreach and education for the community and HIV/AIDS care providers. Upon completing my internship, AFC hired me to work in outreach case management. In this position, I worked with underserved Medicaid and Medicare enrollees who we assisted in reconnecting with benefits for unmet health needs. In 2021, AFC recognized my contributions and promoted me to my current role as a Care Coordination Specialist.

6. As a Care Coordination Specialist for HIV/AIDS clients, my role is to help ensure client eligibility for Ryan White services. My role requires me to identify client needs and barriers to care. I provide coordination, guidance, and assistance to clients in accessing medical, social, community, legal, financial, employment, housing, and/or other needed services. My main focus

---

[3] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).

is ensuring that people with HIV/AIDS are engaged with their medical care and stay connected with their providers to optimize their health and wellbeing.

7. I currently serve around 60 of 500 clients enrolled in AFC's Ryan White case management programs. My daily responsibilities include conducting assessments with clients of their medical and supportive service needs, assisting clients to establish and maintain their eligibility for services, helping clients complete applications and provide documentation, guiding clients through confusing and convoluted medical processes, and contacting service providers on clients' behalf. Each task depends on my ability to build lasting relationships and foster trust with my clients.

8. AFC's case managers and programs receive Ryan White Part A and Part B Program funding. The Illinois Department of Public Health Ryan White Part B Program receives funding from the Health Resources and Services Administration and the U.S. Department of Housing and Urban Development to administer and monitor services to assist persons living with HIV/AIDS.

9. The Illinois Ryan White Part B Program produces case management standards as part of its mandate to monitor funding use. The case management standards acknowledge that the daily duties of non-medical case managers must be tailored specifically to the populations they serve, and the standards require annual training on cultural competency and training on working with LGBTQ clients. Due to the Illinois Ryan White Part B Program case management standards, AFC mandates that I undergo annual, ongoing training, including diversity and LGBTQ training.

10. Diversity awareness is crucial for my role, as I must respect and value the varying perspectives and experiences of individuals. I must adapt my behavior and manage people from diverse cultural, ethnic, gender, age, educational, professional, sexual orientation, gender identity,

and gender expression backgrounds. When I excel in my job and am able to implement and achieve AFC's vision and mission, it is because I actively understand these individual differences.

11. As a case manager, I recognize that providing effective support requires tailoring my approach to meet the specific needs of diverse communities. Every individual's lived experience is shaped by their identity, history, and the systemic barriers they face, so a one-size-fits-all approach is not sufficient. For Black clients, this may mean acknowledging the impact of generational trauma and systemic racism while fostering culturally affirming spaces. For transgender clients, it may involve understanding the unique challenges they encounter in healthcare, employment, and safety and ensuring my approach is gender-affirming and trauma-informed. Working with any marginalized community requires centering their specific needs, respecting their self-determination, and providing services that reflect their lived realities. While at AFC, I have attended trainings with topics that include LGBTQ, Black and Indigenous people of color, gender minority populations, techniques to advance health equity for those populations, how to practice cultural humility, and how to counter racism and implicit bias. These trainings have significantly impacted my work, enabling me to assist clients in overcoming health barriers. They have also enhanced my comprehension of social determinants of health and empowered me to advocate for clients affected by incarceration, substance use, ableism, and immigration status discrimination.

12. Conducting my work through a DEIA lens creates an environment where my clients feel deeply understood, ensuring they feel truly heard and seen. This helps my clients maintain a stable living environment and get continuous medical care to combat the HIV/AIDS epidemic. I have found implementing this approach to be highly effective at improving the lives of my clients living with HIV/AIDS. Furthermore, my clients who feel heard and understood are, in my

4

experience, more likely to take their HIV medications and go to their doctor—keeping their HIV viral loads undetectable and averting serious health episodes that could lead to an AIDS diagnosis. This is especially beneficial because people whose HIV viral load is undetectable cannot transmit HIV to their partners; HIV treatment is a powerful form of HIV prevention.  I strongly believe that my culturally competent approach to care improves my clients' lives, reduces healthcare costs, improves health outcomes, and reduces new HIV transmissions.

13.   I cannot effectively serve a diverse community without comprehending how race and gender influence our interactions.

14.   Since the announcements of the Anti-Gender Order and Anti-Diversity2 Order, I have been grappling with uncertainty regarding my work responsibilities.  I know that my clients' needs, AFC's mission, and my general moral obligations require that I serve my clients by understanding how gender and race affect their care, but the Executive Orders and government agencies may prohibit it.

15.   I do not know if the Executive Orders limit my ability to attend necessary cultural competency trainings, restrict what DEIA tools I use to serve my clients, limit what I write in my case notes, censor how I discuss my clients during case management meetings, or prohibit discussions at AFC about transgender identities or racial realities.  It is infuriating to try and navigate all of the unknowns associated with the Executive Orders and try not to disrupt AFC's current or future federal funding while still providing necessary services to our clients.  But the truth is that we might lose our federal funding even if we try to comply with the Executive Orders, because all HIV/AIDS services are intertwined with race and gender, even if we eliminate the words from our website.  Likewise, many other organizations that I interact with regularly while supporting my clients are equally confused and scared.

16. And if AFC loses the federal funding that supports my position, I am not even sure if I will still be employed in two weeks.

17. My clients also have been grappling with the uncertainty brought on by these Executive Orders. My clients are unsure which medications they can pick up, whether they will continue to receive my case management care, and what violence or discrimination they will encounter in this sociopolitical environment. They are living in fear of the unknown consequences of the Executive Orders.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed: February 27, 2025

_____
Lauren Glodowski
AFC Care Coordination Specialist