IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL URBAN LEAGUE, et al., *Plaintiffs*, v. DONALD TRUMP, in his official capacity as President of the United States, et al., *Defendants*, DO NO HARM, [*Proposed*] *Intervenor-Defendant*. | No. 1:25-cv-00471-TJK |

**MOTION TO INTERVENE AS DEFENDANT
AND SUPPORTING STATEMENT OF POINTS AND AUTHORITIES[1]**

Plaintiffs are three nonprofits that dedicate themselves to promoting controversial programs concerning race and gender. Do No Harm is a nonprofit that dedicates itself to challenging those very programs. As Plaintiffs' "direct counterpar[t]," DNH is "uniquely qualified" to intervene in this case. *DNC v. Bostelmann*, 2020 WL 1505640, at *5 (W.D. Wis. Mar. 28). DNH has years of experience and expertise with the illegal DEI and gender policies addressed by the three executive orders that Plaintiffs seek to undo. And Plaintiffs' challenge to those orders directly threatens DNH's mission and its ability to protect its members—medical professionals, patients, and students—from discrimination and other harms. Courts allow advocacy organizations to intervene in defense of laws whose enactment they supported and whose continued enforcement benefits their members. *E.g.*, *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 57 n.9 (D.D.C. 2020) (Nichols, J.) (allowing similar nonprofits to intervene in defense of President Trump's Title IX regulation).

This Court should grant intervention. DNH and its members have unique interests not represented by the parties. DNH will present unique arguments, including that federal law not only permits

---

[1] Per LCvR.7(m), counsel for Do No Harm discussed this motion in good faith with counsel for Plaintiffs and Defendants to determine the parties' positions. It could not obtain their nonopposition.

but *requires* the government to withdraw funds from organizations who discriminate based on race. And DNH's years of experience litigating "DEI" practices will assist this Court in resolving the issues at the center of this litigation.

DNH is a classic case for permissive intervention. But if necessary, it also satisfies the test for intervention as of right. Especially because DNH sought intervention as promptly as it could, while this case is still in its "early stage[s]." *EPIC v. FTC*, 2019 WL 11307643, at *1 (D.D.C. Aug. 28) (Kelly, J.). DNH notified the parties of its intent to seek intervention on February 28, just nine days after Plaintiffs filed their complaint and before Plaintiffs filed their motion for a preliminary injunction. DNH also seeks no changes to the existing preliminary-injunction briefing schedule: By March 12, it will either join Defendants' opposition in full or join that opposition in a short supplemental opposition that stresses only its unique arguments. Nor will DNH seek additional argument time at the preliminary-injunction hearing: Whatever brief argument time it gets can either be taken from Defendants' time or added to Plaintiffs' time. Intervention, in other words, will not delay these proceedings. But it is vital to protect DNH and its members, and it will facilitate the Court's resolution of Plaintiffs' claims.

## BACKGROUND

In the first two days of his administration, President Trump made it clear that he intends to vigorously enforce federal antidiscrimination laws. He issued three executive orders combatting unlawful racial preferences and gender ideologies:

- The first, *Ending Radical and Wasteful DEI Programs and Preferencing*, directed executive branch officials to terminate "all discriminatory programs" in the federal government, "including illegal … 'diversity, equity, inclusion, and accessibility' … mandates, policies, programs, preferences, and activities." Exec. Order 14151 §2(a), 90 Fed. Reg. 8339 (Jan. 20, 2025), perma.cc/J42P-CN2C.

- The second, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, adopts the position that sex is an immutable biological reality, states that the federal government "will enforce all sex-protective laws to promote this reality," and

declares that "[f]ederal funds shall not be used to promote gender ideology." Exec. Order 14168 §§2, 3(g), 90 Fed. Reg. 8615 (Jan. 20, 2025), perma.cc/76GM-6W6F.

- The third, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, prohibited the use of "dangerous, demeaning, and immoral race- and sex-based preferences" across the government, orders federal agencies to enforce existing civil rights laws against "illegal private-sector DEI" practices, and requires federal contractors to certify that they do not operate unlawful DEI programs. Exec. Order 14173 §§1-2, 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025), perma.cc/W2JB-ZN3H.

The orders depart from previous administrations. Previously, federal policy encouraged—and allocated funds to support—race-based DEI programs and transgender ideology. *See, e.g.*, *Advancing Equity and Racial Justice Throughout the Federal Gov't*, White House (archived Mar. 3, 2025), perma.cc/V49N-495H (detailing the Biden Administration's efforts to "build equity into the everyday business of government"). President Trump's orders, by contrast, promise to implement "our civil-rights laws," Exec. Order 14173 at §1, by withdrawing federal funds from groups that "promote gender ideology," Exec. Order 14168 at §3(g), or discriminate on the basis of race under the guise of "DEI," Exec. Order 14173 at §3(b)(iv)(B).

Plaintiffs are three nonprofits "committed" to promoting DEI programs based on, among other things, race and gender identity. Compl. (Doc. 1) ¶¶2, 18-23. All three receive funding from the federal government. Compl. ¶¶18-23. Two weeks ago, Plaintiffs filed this lawsuit against a group of executive officials. *See* Compl. ¶¶24-50 (listing Defendants). The lawsuit challenges the executive orders' funding-related provisions: the requirement that federal contractors certify they do not engage in unlawful DEI practices and the promise to terminate federal funding for entities that *do* engage in such discrimination or promote harmful gender ideologies. Compl. ¶¶239-43, 262, 279, 285, 298, 301-02, 306-07, 327-28. Plaintiffs then lodge a variety of legal attacks on these provisions, hoping something sticks. *See* Compl. ¶¶231-333 (arguing the funding provisions violate the First Amendment, the Fifth Amendment (three times over), the separation of powers, the Administrative Procedure Act, and various funding statutes). Plaintiffs ask this Court to declare the orders unlawful and enjoin them

3

in their entirety. Compl.99-100. Worse, their preliminary-injunction motion seeks to enjoin the orders *themselves*, rather than any specific actions taken against these three nonprofits. *See* PI-Mem. (Doc. 29-1) at 3 & n.4.

Do No Harm is a public-interest, nonprofit membership association with over 10,000 members from every corner of the medical field: physicians, nurses, medical students, patients, and policymakers. DNH is dedicated to ensuring that medicine is driven by scientific evidence rather than ideology and that professional opportunities are allocated based on merit rather than race, gender, or some other immutable characteristic. *See About Us*, Do No Harm, bit.ly/4imToqX. To that end, DNH opposes the spread of so-called "DEI" policies and transgender ideology in the medical profession. The association engages policymakers to encourage legislation and regulations that limit such practices and, when necessary, files lawsuits against universities, employers, and others whose DEI practices violate antidiscrimination laws. *See, e.g.*, *Federal Policy*, Do No Harm, bit.ly/4i16XwF; *Do No Harm Supports the EDUCATE Act*, Do No Harm (Mar. 19, 2024), bit.ly/43iASfa; *Rep. Crenshaw Introduces Bill Banning Medicaid Funding for Child Sex Change Interventions*, Do No Harm (Jan. 24, 2025), bit.ly/43eNpQS; *Litigation*, Do No Harm, bit.ly/3XpN3D6. A significant and increasing amount of its time and resources are devoted to these efforts. Even according to its ideological opponents, DNH is "a significant player in the ongoing national debate over transgender rights," via its "model legislation," "lobbying," and other "advocacy efforts." Wiggins, *Powerful Conservative Operative's Do No Harm Group Is a Threat to Transgender Kids*, Advocate (Aug. 13, 2024), perma.cc/4KE4-68BA.

DNH's members regularly find themselves on the losing end of DEI policies. Two of the association's members, for example, were not allowed to apply for a medical fellowship sponsored by Pfizer because the fellowship was limited to blacks, Latinos, and Native Americans. *See* Compl., *Do No Harm v. Pfizer, Inc.*, No. 1:22-cv-07908 (Sept. 15, 2022), ECF No. 1. Another member was excluded from the University of Washington School of Medicine's networking directory because he was white

4

and not "BIPOC" ("Black, Indigenous, or People of Color"). Compl., *Do No Harm v. Univ. of Wash. Sch. Of Med.*, No. 2:24-cv-01678 (Oct. 15, 2024), ECF No. 1. Yet another member, a Florida physician, was precluded from receiving a $100,000 sign-on bonus offered by a national medical practice because the bonus was offered only as a so-called "leadership incentive for Black physicians." Compl., *Do No Harm v. Vituity*, No. 3:23-cv-24746 (Dec. 8, 2023), ECF No. 1. After these orders issued, DNH resolved litigation against the University of Colorado, a federal funding recipient that was running a race-based fellowship for medical students. *See* Stipulation, *Do No Harm v. Univ. of Colorado*, No. 1:24-cv-03441 (D. Colo. Feb. 20, 2025), ECF No. 20. And the orders at issue here directly affect DNH's *active* lawsuit against the federal government and the Society of Military Orthopaedic Surgeons, who together run a race-based medical fellowship at our nation's military hospitals. *See* Compl., *Do No Harm v. SOMOS*, No. 1:24-cv-03457 (D.D.C. Dec. 11, 2024), ECF No. 1. Just this morning, Do No Harm filed another lawsuit in this Court, relying on Title VI and one of these orders to challenge another group's race-based program. *See* Compl. ¶8, *Do No Harm v. Am. Chemical Society*, No. 1:25-cv-638 (D.D.C. Mar. 5, 2025), ECF No. 1.

Other examples abound. Fortunately, DNH was able to file lawsuits to vindicate these members' nondiscrimination rights. But if the executive orders challenged here remain in place and federal funding stops flowing to discriminatory practices, then DNH will be able to shift more of its resources from litigation to research, education, and media engagement. And DNH cannot be everywhere. These orders are crucial for stopping practices that discriminate against and harm its members nationwide and deterring new ones.

**ARGUMENT**

**I.     Do No Harm is entitled to intervene as of right.**

The D.C. Circuit takes "a liberal approach to intervention." *Wilderness Soc. V. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000); *see Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967) (emphasizing "the need for a liberal application [of Rule 24(a)] in favor of permitting intervention"). Any "'doubt

5

concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors.'" *Lloyd v. Ala. Dep't of Corr.*, 176 F.3d 1336, 1341 n.9 (11th Cir. 1999); *accord United States v. Ritchie Special Credit Investments, Ltd.*, 620 F.3d 824, 831 (8th Cir. 2010) (similar).

To that end, this Court "must grant a timely motion to intervene that seeks to protect an interest that might be impaired by the action and that is not adequately represented by the parties." *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014). Under Rule 24, this Court grants intervention as of right if: (1) the motion is timely, (2) the movant has a "legally protected interest" in the action, (3) the action "threaten[s] to impair that interest," and (4) no existing party is "an adequate representative of [the movant's] interest." *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008); *see* Fed.R.Civ.P..24(a)(2). DNH satisfies all four requirements.[2]

### A. The motion is timely.

DNH indisputably filed "a timely motion." Fed.R.Civ.P.24(a). DNH filed this motion as quickly as it could after learning about this case, retaining counsel, and drafting the necessary papers. This motion comes merely two weeks after the complaint was filed and well before the government's answer or responsive pleading is due. "Such a prompt motion is timely under any reasonable measure." *Virginia v. Ferriero*, 466 F. Supp. 3d 253, 256 (D.D.C. 2020); *see, e.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 734-35 (D.C. Cir. 2003) (it is "not difficult at all" to find motion timely when filed "less than two months after the plaintiffs filed their complaint and before the defendants filed an answer"); *Akiachak Native Cmty. v. DOI*, 584 F. Supp. 2d 1, 5 (D.D.C. 2008) ("eighteen days after the plaintiffs

---

[2] The D.C. Circuit has at times required those seeking to intervene as plaintiffs to establish Article III standing. *E.g.*, *In re Endangered Species Act Section 4 Deadline Litig.-MDL 2165*, 704 F.3d 972, 976 (D.C. Cir. 2013). But the same is not true for those seeking to intervene as defendants who are not "invoking the court's jurisdiction or seeking additional relief beyond the claims asserted by" the plaintiff. *Children's Health Def. v. CDC*, 2024 WL 3521593, at *5 n.3 (D.D.C. July 24, 2024) (cleaned up); *see also Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (standing inquiry inappropriate for proposed intervenor-defendant); *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (same). Decisions from the D.C. Circuit stating otherwise "'predate, and are plainly inconsistent with, the Supreme Court's recent opinions.'" *Children's Health Def.*, 2024 WL 3521593 at *5 n.3.

filed their consolidated complaint"); *Connecticut v. DOI*, 344 F. Supp. 3d 279, 304 (D.D.C. 2018) ("within a month of when Plaintiffs filed the complaint"); *Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 13 (D.D.C. 2016) ("before any of the Defendants had filed an answer").

The only motion so far is Plaintiffs' request for a preliminary injunction, which was filed *after* DNH notified the parties of its intent to intervene and just a few days before this motion. *See Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 103 (D. Conn. 2007) (intervention timely when "no other parties had filed any significant substantive motions" "[b]esides the motion for preliminary injunction"); *Carcaño v. McCrory*, 315 F.R.D. 176, 179 (M.D.N.C. 2016) ("the deadline for responses to the Plaintiffs' motion for preliminary injunction has not yet passed"). And DNH does "not seek additional time to respond" to the preliminary-injunction motion; it will comply with "same schedule as the original Defendants." *Carcaño*, 315 F.R.D. at 179. Given the schedule, DNH will simply join Defendants' opposition to that motion, or join parts of that opposition in a short (no more than 7 pages) supplemental opposition that stresses its unique interests, expertise, and defenses. Because "no substantive progress has occurred" and the existing briefing schedule will not be interrupted, DNH's intervention could not "unduly disrupt the litigation or pose an unfair detriment to the existing parties." *100Reporters LLC v. DOJ*, 307 F.R.D. 269, 275 (D.D.C. 2014).

### B. Do No Harm has a protected interest in this action.

DNH also has a "legally protected interest." *Karsner*, 532 F.3d at 885. This "interest" test is "liberal." *Indep. Petrochemical Corp. v. Aetna Cas & Sur. Co.*, 105 F.R.D. 106, 109 (D.D.C. 1985). It is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse*, 385 F.2d at 700. Intervention, moreover, does not require "any specific legal or equitable interest." *Luna v. Cegavske*, 2017 WL 6512182, at *3 (D. Nev. Dec. 20). It is "sufficient" that the intervenor "will suffer a practical impairment of its interests as a result of the pending litigation." *Id.* (quoting *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011)).

DNH's interests are equal and opposite to Plaintiffs'. Like Plaintiffs, DNH supports "the robust enforcement of our civil rights laws" and "the full equality [of] all people." Compl. ¶2. But unlike Plaintiffs, DNH thinks that principle means giving all people opportunities and resources based on merit rather than race, ethnicity, or gender identity. *Compare* Compl. ¶226 (embracing "targeted efforts" to give advantages to certain "underrepresented" groups like racial minorities and LGBTQ people), *with About Us*, Do No Harm, bit.ly/4imToqX (opposing "identity politics" in healthcare). If Plaintiffs' interest in promoting so-called DEI and transgender programs was sufficient to initiate this lawsuit, then DNH's interest in opposing such programs is sufficient for intervention. *Cf. Zeeb Holdings, LLC v. Johnson*, 338 F.R.D 373, 376 (N.D. Ohio 2021) ("An intervenor does not need the same standing to intervene as is required to initiate a lawsuit."); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (same).

And DNH, to be sure, has a strong record of opposing "divisive trends in medicine, such as 'Diversity, Equity and Inclusion' and youth-focused gender ideology." *About Us*, Do No Harm, bit.ly/4imToqX. For example, DNH consistently objects to spending taxpayer money on so-called DEI and transgender programs in the medical field. *See, e.g.*, *NIH Funds $1.3 Million Study on 'Teen Pregnancy Prevention' for 'Trans-Identified' Kids*, Do No Harm (Feb. 24, 2025), bit.ly/4ioMu4u; *National Cancer Institute spends $218M per year on grants for 'underrepresented' groups*, Do No Harm (Feb. 24, 2025), bit.ly/4i6TEeg. It also endorses legislation and executive actions that limit the use of federal funds for such purposes or otherwise encourage merit-based practices in medicine. *See supra* 4. And it has taken matters into its own hands, using litigation on behalf of its members to terminate many illegal DEI programs. *See Litigation*, Do No Harm, bit.ly/3XpN3D6.

In that vein, DNH has prominently supported the executive orders at the center of this action. Before the orders were issued, DNH called for President Trump to take action against DEI programs in the federal government. *See Four Ways Trump Can Scrap Biden's 'Equity' Discrimination And Promote*

8

*Real Equality*, Do No Harm (Dec. 6, 2024), bit.ly/3DgBabS. When the President's orders did so, DNH promoted them. *See, e.g.*, *Trump Administration Takes Crucial First Steps Toward Tackling DEI in Medicine*, Do No Harm (Jan. 21, 2025), bit.ly/4hahyUC. When the orders faced lawsuits, like this one, DNH charted a path forward. *See Courts Pause Trump's Gender Executive Order – Here's the Path Forward*, Do No Harm (Feb. 20, 2025), bit.ly/4buej9l. And its litigation and other advocacy formed the basis for the orders' findings—and actions taken against—illegal DEI policies by, for example, "the Federal Government, major corporations, … the medical industry, … and institutions of higher education." Exec. Order 14173 §1.

Courts routinely allow public-interest organizations to intervene as a matter of right in these circumstances, where the organization seeks to defend the legality of measures whose enactment it supported. When "a public interest group … is involved in the process leading to the adoption of" government policy, it "'has a cognizable interest in defending that'" policy. *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 344 (6th Cir. 2007); *see Luna*, 2017 WL 6512182 at *4 (collecting cases holding that "'a public interest group [i]s entitled as a matter of right to intervene in an action challenging the legality of a measure it supported'"); *Mausolf v. Babbitt*, 85 F.3d 1295, 1302 (10th Cir. 1996) (association permitted to intervene in defense of ban on snowmobiling in public park because the association "has consistently demonstrated its interest" in "vindicating a conservationist vision for the Park"). That includes intervention in defense of executive actions. *E.g.*, *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983) (environmental group allowed to intervene in defense of Interior Secretary's decision to withdraw public land from potential development). And it is especially true when the intervenor is, like DNH, a "'repeat player'" in litigation on the subject matter. *Northland Family Planning Clinic*, 487 F.3d at 344.

Apart from its opposition to DEI and gender ideology, DNH has a second protected interest: ensuring its members are not disadvantaged by race-based policies in the medical field. As noted

9

above, DNH's members include medical professionals who have been denied professional opportunities on account of race-based hiring policies and medical students who have been denied scholarships because they were not members of a preferred race. *E.g.*, Compl. ¶¶11-13, 25-30, *Do No Harm v. Lee*, No. 3:24-mc-09999 (M.D. Tenn. Nov. 7, 2024), ECF No. 1; Compl. ¶¶2, 7, 29-32, *Do No Harm v. Univ. of Colorado*, No. 1:24-cv-03441 (D. Colo. Dec. 12, 2024), ECF No. 1. These race-exclusive practices violate federal law, including Title VI of the Civil Rights Act of 1964, *see* 42 U.S.C. §2000d; but DNH cannot be everywhere, and many employers, universities, and healthcare providers continue to utilize them. If President Trump's orders remain in place, these practices will likely diminish for lack of federal funds. But if Plaintiffs succeed in enjoining them, these practices can continue, to the detriment of DNH's members. That "interest" is one that Rule 24(a)(2) protects.

At bottom, this litigation implicates the continued existence of DEI funding and practices in the federal government and the medical industry. Tackling that issue is DNH's *core* mission; it could not have a greater interest in the outcome. *See, e.g.*, *Ass'n of Conn. Lobbyists*, 241 F.R.D. at 103 ("lobbying organizations" had a sufficient interest in litigation that implicated "the very purposes for which the organizations were originally created, namely, election reform").

### C.     This action threatens to impair Do No Harm's interests.

Continuing this litigation without DNH's participation would "impair or impede [DNH's] ability to protect its interest." Fed.R.Civ.P.24(a)(2). Again, this requirement is "libera[l]." *Nuesse*, 385 F.2d at 701. Courts applying the impairment requirement "look to the 'practical consequences' that the applicant may suffer if intervention is denied." *100Reporters*, 307 F.R.D. at 278. "Where the court finds that an applicant for intervention has a significant protectable interest in the lawsuit, the court generally has little difficulty in concluding that the disposition of the case may, as a practical matter affect it." *Luna*, 2017 WL 6512182 at *5.

Plaintiffs seek to enjoin the challenged executive orders in their entirety. Compl.99-100; *see* PI-Mem. (Doc. 29-1) at 3 & n.4, 43 (requesting a preliminary injunction against the orders' currently

10

unenjoined provisions). DNH's interest in eliminating DEI, youth transgender treatments, and other identity-based practices will plainly suffer if the executive orders—which accomplish exactly that—are enjoined. And again, if the orders are enjoined and federal grant recipients are free to use taxpayer money to implement race-conscious policies under the guise of "DEI," DNH's members will likely face greater discrimination in their applications for employment and educational opportunities. *See Brumfield v. Dodd*, 749 F.3d 339, 344-45 (5th Cir. 2014) (Rule 24 does not require the movant to establish that its interests "*will* be impaired," but only "that the disposition of the action 'may' impair or impede [its] ability to protect [its] interests"). DNH would then be forced to devote considerable time and resources to litigating each instance of such discrimination in separate actions. *Cf. United States v. Windsor*, 570 U.S. 744, 761 (2013) (emphasizing "the cost in judicial resources and expense of litigation for all persons adversely affected").

DNH's interests will be affected not only by *whether* this Court enjoins the challenged orders but also by *how* it does so. Plaintiffs state a number of claims for relief in their complaint, including the First Amendment, the Equal Protection Clause, the Administrative Procedure Act, vagueness, and the separation of powers. *See* Compl. ¶¶231-333. If the Court relies on Plaintiffs' procedural or void-for-vagueness arguments, then the door remains open for the administration to issue improved and procedurally compliant rules in the future. But if the Court considers and accepts Plaintiffs' constitutional arguments, the administration would be unable to re-issue the rules even in modified form. DNH, whose interest lies in the substance of the challenged orders rather than their procedural genesis, has a strong interest in the former over the latter. *See Nuesse*, 385 F.2d at 702 (the potential "stare decisis" effect of a decision can "supply the practical disadvantage that warrants intervention as of right").

Given DNH's interests in this litigation, participation as an amicus would not be adequate. This Court would not be required to consider DNH's unique arguments if they were presented only

11

in an amicus brief. Nor could DNH, as an amicus, appeal from an unfavorable judgment if the governmental defendants opted not to. Intervention is necessary for DNH to safeguard both its own interests and the interests of its members. *See Nuesse*, 385 F.2d at 704 & n.10 ("[R]elegat[ion] to the status of amicus curiae … is not an adequate substitute for participation as a party."); *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130 (D.C. Cir. 1972) (the "best" course is to give "all parties with a real stake in the controversy … an opportunity to be heard").

### D. The existing parties do not adequately represent Do No Harm's interests.

Finally, no existing party is "'an adequate representative of [DNH's] interests.'" *Karsner*, 532 F.3d at 885. This inadequate-representation requirement "is not onerous" and "should be treated as minimal." *Dimond v. Dist. of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986); *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). It is satisfied when "'the applicant shows that representation of his interest 'may be' inadequate,'" *100Reporters*, 307 F.R.D. at 279; "[t]he applicant need … not [show] that representation will in fact be inadequate." *Dimond*, 792 F.2d at 192; *see United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980) ("'[Intervention is] ordinarily … allowed … unless it is clear that the party will provide adequate representation for the absentee.'"). Representation is inadequate when the existing parties have "a 'different' interest" from the movant, even if they have "'a shared general agreement,'" "'tactical similarity [in their] legal contentions,'" or "general alignment" on the correct outcome. *Fund for Animals*, 322 F.3d at 737; *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015).

Plaintiffs clearly do not represent DNH's interests, and the government defendants do not adequately represent them either. Indeed, the D.C. Circuit "look[s] skeptically on [federal] government entities serving as adequate advocates for private parties," for good reasons. *Crossroads*, 788 F.3d at 321. The government's interests as a sovereign and DNH's interests as a private party change the kinds of arguments each will make. *See Coal. of Ariz./N.M. Counties for Stable Economic Growth v. DOI*, 100 F.3d 837, 845 (10th Cir. 1996) (contrasting "the public interest" with a private intervenor's

12

"particular interest"). The government has a long-term interest in preserving its enforcement discretion. Consistent with that interest, Defendants will not argue that Title VI or other federal non-discrimination laws *require* the government to withdraw funding from DEI initiatives and other race-conscious policies. Indeed, the government defendants have not made that argument in other litigation challenging the orders. *See generally* Defs' Mem. in Opposition to Pls' Mot. for Temp. Restraining Ord. or Prelim. Inj., *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-cv-00333 (D. Md. Feb. 18, 2025), ECF No. 35 ("*Nat'l Ass'n* Memorandum"). But DNH will, and when a proposed intervenor seeks to make "real and legitimate additional or contrary arguments" to the government, that fact "is sufficient to demonstrate that the representation may be inadequate." *Brumfield*, 749 F.3d at 346.

Relatedly, because the government's interest is in preserving its discretion, it would "accept a procedural victory" that, for example, finds only that Plaintiffs lack Article III standing. *WalMart Stores, Inc. v. Tex. ABC*, 834 F.3d 562, 569 (5th Cir. 2016); *see also Nat'l Ass'n* Memorandum at 6-11 (raising jurisdictional arguments). DNH, on the other hand, would push for a definitive ruling that binds future administrations or at least confirms the illegality of the targeted practices. *See Crossroads*, 788 F.3d at 321 (finding the federal government an inadequate representative of the movant's interests because the government planned to raise a procedural standing argument). Defendants will also feel pressured not to describe certain DEI programs as illegal, since the federal government has run several such programs itself; indeed, in *SOMOS*, the same federal government is currently *adverse* to Do No Harm. *See* No. 1:24-cv-03457 (D.D.C.).

Further, the positions and personnel of the executive branch can change over the course of a single case, so it is "'not realistic to assume'" that Defendants will forever defend DNH's position. *Utah Ass'n of Cntys v. Clinton*, 255 F.3d 1246, 1256 (10th Cir. 2001). DNH "should not need to rely on a doubtful friend to represent its interests, when it can represent itself" as an intervenor-defendant. *Crossroads*, 788 F.3d at 321. At the very least, DNH will "serve as a vigorous and helpful supplement"

13

to the government defendants, will "'make a more vigorous presentation'" than the government defendants, and "can reasonably be expected to contribute to the informed resolutions of these questions." *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977); *accord 100Reporters*, 307 F.R.D. at 286 ("Though the Court agrees that the DOJ can represent capably many of the interests asserted by the [movant], the Court also has found that … the strength of the DOJ's position will be enhanced by the assistance of the [movant].").

## II.   Independently, Do No Harm is entitled to permissive intervention.

Even if DNH is not entitled to intervene as of right under Rule 24(a), this Court should nevertheless grant permissive intervention under Rule 24(b). Permissive intervention is granted at the discretion of the court. *New Hampshire v. Holder*, 293 F.R.D. 1, 8 (D.D.C. 2013). Critically, it does not ask whether the existing parties adequately represent the intervenor's interests. *100Reporters*, 307 F.R.D. at 286. Nor does it require that "the intervenor … have a direct personal or pecuniary interest in the subject of the litigation." *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 459 (1940). Instead, "Rule 24(b) is just about economy in litigation." *Chicago v. FEMA*, 660 F.3d 980, 987 (7th Cir. 2011). Specifically, it asks whether the motion is "timely," whether the movant's defense "shares with the main action a common question of law or fact," and whether intervention will "unduly delay or prejudice" the parties. Fed.R.Civ.P.24(b).

These requirements are readily satisfied here. As explained, DNH's motion is more than timely; it was filed just two weeks after the complaint and before any significant developments in the litigation. *Supra* I.A. And DNH's planned defenses, which "squarely respond" to Plaintiffs' claims, obviously share common questions with the main action. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002). The commonalities include whether the orders exceed presidential authority, Compl. ¶¶295-322, whether the government violates the First Amendment when it refuses to subsidize (allegedly) expressive activity, Compl. ¶¶231-54, and whether federal antidiscrimination laws—like the Equal Protection Clause and Title VI—permit, prohibit, or even require the

14

government to withdraw funds from organizations that use or promote race-conscious or race-exclusive practices, Compl. ¶¶265-94. Do No Harm litigates these exact questions almost every day. And these "similarities between the issues presented by [the proposed intervenor-defendant] and those raised by the DOJ" and Plaintiffs warrant permissive intervention. *100Reporters*, 307 F.R.D. at 286.

DNH's intervention will not unduly delay proceedings or prejudice the existing parties. Again, DNH swiftly intervened while this action is still at "a nascent stage," *id.*, and DNH's participation will not slow proceedings any more than is normal for multiparty litigation, *see Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 553, 561 (E.D. Va. 2018) ("Rule 24(b) mentions only *undue* delay."). Especially because DNH will follow the existing briefing schedule. *100Reporters*, 307 F.R.D. at 286–87; *Nat'l Coal. for the Homeless v. U.S. Veterans Admin.*, 1988 WL 126227, at *1 (D.D.C. 1988). Although DNH will make a few different arguments from the government defendants, Plaintiffs "will have a full opportunity … to counter any such legal arguments." *United States v. Philip Morris USA Inc.*, 2005 WL 1830815, at *5 (D.D.C. July 22, 2005). And "there is nothing in the record to suggest that [DNH's] presence will unduly delay or prejudice the original parties' rights, especially at this early stage in the litigation." *EPIC*, 2019 WL 11307643 at *1.

Permitting DNH's intervention will assist the Court in other ways, too. To start, DNH has litigated many cases involving the kind of race-conscious policies targeted by the challenged orders. *See supra* 4; *Litigation*, Do No Harm, bit.ly/3XpN3D6. It also regularly engages policymakers on the issue, at both the state and federal level, and compiles research about DEI and transgender practices in the medical industry. *See Identity Politics in the U.S.*, Do No Harm, bit.ly/3F0G0KJ; *Federal Policy*, Do No Harm, bit.ly/3F30l2e; *Research*, Do No Harm, bit.ly/4h8enNa; *Resources*, Do No Harm, bit.ly/4koOLhR. DNH, in other words, brings a "vast experience" to bear on the issues at the center of this action. *Building & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, 2020 WL 5658703, at *11 (S.D.N.Y. Sept. 23). Plus, because many of DNH's members are doctors or other medical

professionals, DNH can marshal their expertise to explain why racial preferences and gender ideology are bad for medicine and education. *Id.* (granting permissive intervention where intervenor brought "'specialized expertise and substantial familiarity' to the [a]ction"). As a thought leader and "'repeat player'" in this space, DNH's participation will facilitate the Court's resolution of this dispute. *Northland Family Planning Clinic*, 487 F.3d at 344.

DNH's intervention here will also promote judicial economy. Again, DNH regularly challenges discriminatory employment practices and other race-based policies in federal court. But if the orders are upheld—especially on the constitutional and statutory grounds that DNH plans to stress—then many of these lawsuits can be avoided. Most universities and many employers in the medical industry accept federal funds, and most of them will abandon their race-based practices (in order to retain those funds) if the orders remain in place. That will reduce the number of lawsuits DNH files, conserving resources for the judicial system as a whole. *See Students & Parents for Privacy v. U.S. Dep't of Educ.*, 2016 WL 3269001, at *3 (N.D. Ill. Jun. 15, 2016).

Moreover, "the magnitude of this case is such that [DNH's] intervention will contribute to the equitable resolution of this case." *Kootenai Tribe*, 313 F.3d at 1111. This case involves all three of the recent executive orders that strike at the heart of DNH's mission—in the circuit where Do No Harm focuses much of its advocacy and litigation. And this case "impact[s] large and varied interests" that, without DNH's intervention, will be missing. *Id.* Plaintiffs purport to represent those who might benefit from race-conscious DEI practices and transgender-affirming policies. And the government defendants represent the executive's sovereign interest in enforcing federal law. But only DNH represents the individuals who are harmed by the practices and policies that the executive orders target. In other words, as an advocacy organization that *supports* the orders, DNH "represent[s] the 'mirror-image'" of the interests Plaintiffs seek to vindicate and is thus "uniquely qualified" to permissively intervene. *DNC*, 2020 WL 1505640, at *5.

**CONCLUSION**

This Court should grant DNH's motion to intervene and allow it to participate in this case as a defendant.

Dated: March 5, 2025                    Respectfully submitted,

/s/ *Cameron T. Norris*
Thomas R. McCarthy (DC Bar #489651)
Cameron T. Norris
Frank H. Chang (DC Bar #1686578)
Paul R. Draper*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
frank@consovoymccarthy.com
paul@consovoymccarthy.com

*\* pro hac vice application forthcoming*

*Counsel for Do No Harm*

**CERTIFICATE OF SERVICE**

On March 5, 2025, I e-filed this motion and its attachments with the Court via ECF, which will email everyone requiring service.

Dated: March 5, 2025    <u>*/s/ Cameron T. Norris*</u>
    Counsel for Do No Harm