# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

National Urban League, *et al.*,

      Plaintiffs,

      v.

Donald J. Trump, in his official capacity as President of the United States, *et al.*,

      Defendants.

Case No. 25-cv-471

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................4

ARGUMENT .......................................................................................................7

I.    Plaintiffs Are Not Likely To Establish Article III Jurisdiction............................8

    A.    Plaintiffs lack standing. ...........................................................................8

    B.    Plaintiffs' claims are not ripe for review. ..............................................12

II.   Plaintiffs Are Not Likely To Succeed on the Merits of Their Claim. ...............14

    A.    Plaintiffs' Fifth Amendment challenge fails. .........................................14

        i.    Plaintiffs' facial challenge under the Due Process Clause to presidential directives is categorically improper....................................14

        ii.   Plaintiffs' Due Process claims fail on the merits.....................................18

    B.    Plaintiffs' First Amendment challenges fail. ........................................25

III.  The Remaining Factors Counsel Against Granting the Requested Relief. .......37

    A.    Plaintiffs have not shown irreparable injury attributable to the EOs. .................37

    B.    The balance of the equities and public interest weigh squarely against relied......40

IV.   Any Injunctive Relief Should be Narrowly Tailored and Permit Lawful Agency Activity....................................................................................................41

    A.    Injunctive relief should be limited to the Plaintiffs and agency defendants only............................................................................................41

    B.    Relief should clarify that it preserves the Executive's discretionary authority........................................................................................42

V.    Any injunctive relief should be stayed pending appeal and Accompany a Bond. ...........43

CONCLUSION..................................................................................................44

i

# TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Gardner*,
 387 U.S. 136 (1967) ...........................................................................................13

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
 570 U.S. 205 (2013) ............................................................................... 26, 27, 30

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
 840 F. Supp. 2d 327 (D.D.C. 2012) ....................................................................39

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*,
 511 F. App'x 398 (6th Cir. 2013) .......................................................................38

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
 103 F.4th 765 (11th Cir. 2024) ...........................................................................33

*Am. Cargo Transp., Inc. v. United States*,
 625 F.3d 1176 (9th Cir. 2010) ............................................................................34

*Amdahl Corp. v. Baldrige*,
 617 F. Supp. 501 (D.D.C. 1985) .........................................................................12

*Am. Libr. Ass'n v. Barr*,
 956 F.2d 1178 (D.C. Cir. 1992) ......................................................................9, 10

*Ateba v. Jean-Pierre*,
 No. CV 23-2321, 2023 WL 5748567 (D.D.C. Sept. 6, 2023) ............................39

*Bd. of Regents of State Colls. v. Roth*,
 408 U.S. 564 (1972) ...........................................................................................19

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) ...........................................................................................41

*Carman v. Yellen*,
 112 F.4th 386 (6th Cir. 2024) .............................................................. 3, 16, 24, 25

*Cato Inst. v. U.S. SEC*,
 438 F. Supp. 3d 44 (D.D.C. 2020) ........................................................................9

*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290 (D.C. Cir. 2006) ............................................................. 7, 37, 38, 39

*City of El Cenizo v. Texas*,
 890 F.3d 164 (5th Cir. 2018) ...............................................................................17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................................9, 11

*Construction Trades Department, AFL-CIO v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) ...................................................................14, 21

*Copeland v. Vance,*
    893 F.3d 101 (2d Cir. 2018) ...........................................................................17

*Crooks v. Mabus,*
    845 F.3d 412 (D.C. Cir. 2016) .......................................................................17

*Cutter v. Wilkinson,*
    544 U.S. 709 (2005) .......................................................................................31

*Cutter v. Wilkinson,*
    423 F.3d 579 (6th Cir. 2005) ..........................................................................31

*Decatur Liquors, Inc. v. District of Columbia,*
    478 F.3d 360 (D.C. Cir. 2007) .......................................................................17

*Dep't of Homeland Sec. v. New York,*
    140 S. Ct. 599 (2020) .....................................................................................42

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ...............................................................................14, 15

*Fed. Express Corp. v. U.S. Dep't of Com.,*
    486 F. Supp. 3d 69 (D.D.C. 2020), *aff'd,* 39 F.4th 756 (D.C. Cir. 2022).................14

*Florida v. Dep't of Health & Hum. Servs.,*
    19 F.4th 1271 (11th Cir. 2021) ......................................................................42

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) .......................................................................................10

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .......................................................................................33

*Frederick Douglass Found., Inc. v. District of Columbia,*
    82 F.4th 1122 (D.C. Cir. 2023).................................................................34, 35

*Freedom Republicans, Inc. v. Fed. Election Comm'n,*
    13 F.3d 412 (D.C. Cir. 1994) .........................................................................12

*Fund for Animals v. Frizzell,*
    530 F.2d 982 (D.C. Cir. 1975) .......................................................................38

*FW/PBS, Inc. v. City of Dall.*,
    493 U.S. 215 (1990) .................................................................................28

*Gizzo v. Ben-Habib*,
    44 F. Supp. 3d 374 (S.D.N.Y. 2014) ........................................................19

*G.L. Christian & Assoc. v. United States*,
    160 Ct. Cl. (1963) ....................................................................................20

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) .................................................................................19

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...........................................................................15, 23

*Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*,
    463 U.S. 582 (1983) ...........................................................................29, 30

*Hein v. Freedom From Religion Found., Inc.*,
    551 U.S. 587 (2007) .................................................................................11

*Humanitarian L. Project v. U.S. Treasury Dep't*,
    578 F.3d 1133 (9th Cir. 2009) .................................................................15

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ...............................................................12

*Johnson v. District of Columbia*,
    71 F. Supp. 3d 155 (D.D.C. 2014) ...........................................................34

*Johnson v. United States*,
    576 U.S. 591 (2015) ...............................................................................3, 16

*Joint Anti-Fascist Refugee Committee v. McGrath*,
    341 U.S. 123 (1951) .................................................................................36

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) .................................................................15

*Kashem v. Barr*,
    941 F.3d 358 (9th Cir. 2019) ...................................................................17

*Laird v. Tatum*,
    408 U.S. 1 (1972) .....................................................................................35

*Leathers v. Medlock*,
    499 U.S. 439 (1991) .................................................................................27

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...........................................................................................................41

*Louisiana v. Biden*,
    64 F.4th 674 (5th Cir. 2023) .............................................................................................12

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 7, 8, 11, 42

*Maryland v. King*,
    567 U.S. 1301 (2012) .....................................................................................................4, 40

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
    367 F.3d 68 (1st Cir. 2004) .................................................................................................9

*Maynard v. Cartwright*,
    486 U.S. 356 (1988) ...........................................................................................................16

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ...........................................................................................22

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) .............................................................................................................42

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...........................................................................................................25

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) ...................................................................................................8, 42

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    ---F. Supp. 3d---, 2025 WL 573764 (D. Md. Feb. 21, 2025) .................................. 6, 20, 33, 38

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    ---F. Supp. 3d---, 2025 WL 750601 (D. Md. Mar. 10, 2025)...............................................7

*Nat'l Council of Nonprofits v. OMB*,
    ---F. Supp. 3d---, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ..................................................38

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ............................................................................................ 3, 22, 27, 28

*New Vision Photography Program, Inc. v. District of Columbia*,
    54 F. Supp. 3d 12 (D.D.C. 2014) ..............................................................................19, 20

*New York v. Trump*,
    ---F. Supp. 3d---, 2025 WL 357368 (D.R.I. Jan. 31, 2025), *appeal filed*,
    No. 25-1138 (1st Cir. Feb. 10, 2025)................................................................................38

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................................................7, 40

*Northrop Grumman Corp. v. United States*,
  46 Fed. Cl. 622 (2000)........................................................................................................20

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
  48 F. Supp. 3d 87 (D.D.C. 2014) .....................................................................................37

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ............................................................................................................19

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
  421 F.3d 1 (1st Cir. 2005) ..................................................................................................19

*Regan v. Tax'n With Representation of Wash.*,
  461 U.S. 540 (1983) ..............................................................................................................3

*Reno v. Flores*,
  507 U.S. 292 (1993) ............................................................................................................14

*Rice v. Paladin Enters., Inc.*,
  128 F.3d 233 (4th Cir. 1997)..............................................................................................33

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ...............................................................................................3, 26, 27

*S & D Maintenance Co. v. Goldin*,
  844 F.2d 962 (2d Cir. 1988)..........................................................................................19, 20

*Sampson v. Murray*,
  415 U.S. 61 (1974) ..............................................................................................................39

*Sandvig v. Barr*,
  451 F. Supp. 3d 73 (D.D.C. 2020), *appeal dismissed sub nom.*
  *Sandvig v. Garland*, 2021 WL 2525027 (D.C. Cir. June 10, 2021) .........................33

*Sea Containers Ltd. v. Stena AB*,
  890 F.2d 1205 (D.C. Cir. 1989).........................................................................................37

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) ......................................................................................................14, 17

*SisterSong Women of Color Reprod. Just. Collective v. Governor of Georgia*,
  40 F.4th 1320 (11th Cir. 2022)...........................................................................................24

*Sossamon v. Lone Star State of Tex.*,
  560 F.3d 316 (5th Cir. 2009), *aff'd*, 563 U.S. 277 (2011).......................................34

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................34

*Texas v. United States*,
    523 U.S. 296 (1998) ............................................................2, 13

*Town of Castle Rock v. Gonzalez*,
    545 U.S. 748 (2005) ................................................................19

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................................7, 43

*Trump v. New York*,
    592 U.S. 125 (2020) ............................................................2, 13

*U.S. ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) ................................................32

*United Presbyterian Church in the U.S.A. v. Reagan*,
    738 F.2d 1375 (D.C. Cir. 1984) ................................................9

*United States v. Am. Library Ass'n*,
    539 U.S. 194 (2003) ................................................................27

*United States v. Andries*,
    2022 WL 768684 (D.D.C. Mar. 14, 2022) ...................... 17, 20, 21

*United States v. Hansen*,
    599 U.S. 762 (2023) ............................................................25, 34

*United States v. Hasson*,
    26 F.4th 610 (4th Cir. 2022) ....................................................16

*United States v. Morales-Lopez*,
    92 F.4th 936 (10th Cir.), *cert. denied*, 145 S. Ct. 241 (2024) ............................................. 16, 17

*United States v. Nixon*,
    418 U.S. 683 (1974) ................................................................35

*United States v. Requena*,
    980 F.3d 30 (2d Cir. 2020) ......................................................17

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................36

*United States v. Williams*,
    553 U.S. 285 (2008) ................................................................22

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ..................................................................................42

*Veterans of Abraham Lincoln Brigade v. Att'y Gen. of U.S.*,
  470 F.2d 441 (D.C. Cir. 1972) ..................................................................36

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) ..........................................................................3, 24, 25

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ..................................................................................28

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ....................................................................................42

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ..............................................................37, 39

*Ysursa v. Pocatello Educ. Ass'n*,
  555 U.S. 353 (2009) ..................................................................................27

**STATUTES**

20 U.S.C. § 954 ..............................................................................................22

42 U.S.C. § 2000d-1 ......................................................................................29

**RULES**

Fed. R. Civ. P. 65 ..........................................................................................43

**REGULATIONS**

2 C.F.R. § 200.340 ........................................................................................20

48 C.F.R. § 31.205-42 ..................................................................................39

48 C.F.R. § 49.201 ........................................................................................39

*Ending Radical and Wasteful Government DEI Program and Preferencing*,
  Executive Order 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ............*passim*

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth
  to the Federal Government*,
  Executive Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ............*passim*

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,
  Executive Order 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ............*passim*

**OTHER AUTHORITIES**

Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order,
  24 Op. O.L.C. 29 (2000)...........................................................................................................15

**INTRODUCTION**

The President is permitted to have policy priorities. He is further permitted to align government funding and enforcement strategies with those policy priorities to the extent permitted by law. To that end, in his first days in office, the President issued three Executive Orders (EOs), which, among other things, included five provisions that steered agency discretion with respect to federal funding. Specifically, three provisions directed all federal agencies to (1) as "allowed by law," terminate "equity-related" grants or contracts (Termination Provision); (2) "as permitted by law," "end Federal funding of gender ideology" (Funding Gender Ideology (FGI) Provision); and, (3) "ensure grant funds do not promote gender ideology" (Promoting Gender Ideology (PGI) Provision). Two other provisions instructed the Director of the Office of Management and Budget (OMB) to (4) "[e]xcise references to" diversity, equity, inclusion (DEI) and diversity, equity, inclusion, accessibility (DEIA) "principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures" (Contract Terms Provision); and (5) terminate government-wide diversity and equity "mandates, requirements, programs, [and] activities" (Government DEIA Provision).

The EOs also instructed the Executive Branch with respect to one of this administration's enforcement priorities—namely, to enforce federal antidiscrimination laws against unlawful DEI and DEIA programs. To that end, these provisions (6) directed the Attorney General to coordinate with other federal agencies to produce a report recommending a plan of action for deterring DEI programs that constitute "illegal discrimination or preferences" (Reporting Provision), and (7) required agencies to ensure that their grantees/contractors certify that they do not operate any DEI programs that "violate any applicable Federal antidiscrimination laws" (Certification Provision).

Plaintiffs' lawsuit hinges on a fundamental misreading of these seven provisions (together, the Challenged Provisions), coupled with an equally fundamental misunderstanding of applicable

law. Each Challenged Provision falls squarely within the President's core Article II power to either provide intragovernmental guidance about the exercise of agency discretion (to the extent permitted by law) with regard to government funding, or to instruct government agencies to ensure compliance with existing federal law. Plaintiffs are wrong to allege that these unremarkable exercises of presidential authority are void for vagueness under the Due Process Clause, violate the First Amendment, or both. This Court should deny Plaintiffs' requested relief for the below reasons.

As an initial matter, Plaintiffs lack standing to bring their claims. Plaintiffs advance four theories of standing—regulatory uncertainty, chilling effect, harm to their organizational missions, and potential loss of funding—but none withstand scrutiny. The first three types of "harm" do not amount to injury in fact under Article III. While the potential loss of funding could satisfy injury in fact in certain circumstances, Plaintiffs' allegations are too speculative under Article III. Plaintiffs fail to sufficiently establish that any of their own federally funded grants/contracts are in imminent danger of termination, that any future termination would be the result of the EOs, or that an injunction against enforcement of the EOs would necessarily prevent Plaintiffs' grants/contracts from being terminated. For similar reasons, Plaintiffs' claims are not ripe for review. At bottom, their claims depend on a series of future Executive actions that "may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998).

Plaintiffs' claims also fail on merits. Plaintiffs' Fifth Amendment facial vagueness challenge is premised on a fundamental misapplication of the Due Process vagueness doctrine— which is generally reserved for criminal statutes—to presidential directives to subordinates. That error is particularly pronounced given the facial nature of the challenge. As courts have held time

and again, facial Due Process challenges are categorically improper outside the plainly inapplicable exception recognized in *Johnson v. United States*, 576 U.S. 591 (2015). Plaintiffs' Due Process claims also fail on the specifics. With respect to the funding provisions, Plaintiffs fail to assert a protectable property interest under the Due Process Clause, which generally does not apply to routine federal contracts/grants. Moreover, as the Supreme Court has held, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).

As to the Reporting and Certification Provisions, the vagueness doctrine has little bite because the provisions do not declare any *new* conduct unlawful; rather, they merely instruct agencies to ensure compliance with *existing* legal obligations. But even if there were new legal obligations, any injunction on vagueness grounds would be premature. *See Carman v. Yellen*, 112 F.4th 386, 402 (6th Cir. 2024) (explaining that a preenforcement facial vagueness challenge is not ripe for review). Federal agencies are still in the process of evaluating and implementing the President's EOs, and have already issued additional guidance. The Court should not "assume that the [government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 504 (1982). Instead, it should give the government the opportunity to "sufficiently narrow potentially vague or arbitrary interpretations of the [directives]." *Id*

Plaintiffs' First Amendment arguments are similarly meritless. As for the funding provisions, the Supreme Court has long held that when it comes to what the government affirmatively chooses to fund, a "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983)). Plaintiffs' First Amendment challenge to the

Reporting and Certification Provisions also fails for the simple reason that neither provision targets constitutionally protected speech—they both expressly target only illegal conduct.

Plaintiffs also fail to satisfy the irreparable-harm prong needed to obtain preliminary injunctive relief. At the outset, any allegation of irreparable harm is belied by the delay in Plaintiffs' filing of the Preliminary Injunction motion. But regardless, their allegation of irreparable harm fails on its merits. The only cognizable injury Plaintiffs allege is future financial harm, but that injury is neither imminent nor grave enough to warrant preliminary relief—nor is it irreparable. If their contracts or grants are terminated improperly, they may seek relief in an as-applied challenge. Moreover, Plaintiffs' requested relief is neither in the public interest nor equitable. While Plaintiffs' purported harms are purely speculative, the government will indisputably suffer an irreparable harm if it "is enjoined by a court from effectuating [the law]." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).

## BACKGROUND

On January 20, 2025, the President issued Executive Order 14,151, 90 FR 8339, entitled *Ending Radical and Wasteful Government DEI Program and Preferencin*g (EO 14,151). As relevant here, EO 14,151 includes a Termination Provision, which directs that within 60 days of its issuance, "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM [shall] . . . terminate, *to the maximum extent allowed by law*, . . . 'equity-related' grants or contracts." *Id.* § 2(b)(i) (emphasis added).

On January 21, 2025, the President issued Executive Order 14,173, 90 FR 8633, entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (EO 14,173). As relevant here, this EO includes a Certification Provision, which provides that "[t]he head of each agency shall include in every contract or grant award . . . [a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI *that violate any applicable Federal*

*anti-discrimination laws*." *Id.* § 3(b)(iv)(B) (emphasis added). That certification is material to the government's payment decisions. *Id.* § 3(b)(iv)(A). EO 14,173 also includes a Reporting Provision, which directs the Attorney General, in consultation with federal agencies, to write a report that will identify "[t]he most egregious and discriminatory DEI practitioners" and outline a plan of action to "deter DEI programs or principles . . . *that constitute illegal discrimination or preferences*," including through "[l]itigation," "[p]otential regulatory action and sub-regulatory guidance," and "[o]ther strategies." *Id*. § 4(b) (emphasis added). The directive further instructed that "[a]s a part of this plan," "to deter DEI programs or principles . . . *that constitute illegal discrimination or preferences . . .* . each agency shall identify up to nine potential civil compliance investigations" of certain large entities. *Id*. § 4(b)(iii) (emphasis added). EO 14,173 made clear, however, that it did not restrict recipients "from engaging in First Amendment-protected speech." *Id*. § 7(b).

EO 14,173 also includes a Contract Terms Provision, which instructed the OMB Director to "[e]xcise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures." *Id.* § 3(c)(ii). It also includes a Government DEIA Provision, which instructed the OMB Director to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id.* § 3(c)(iii).

On January 20, 2025, the President issued Executive Order 14,168, 90 FR 8615, entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (EO 14,168). As is relevant here, EO 14,168 includes a Funding Gender Ideology (PGI) Provision, which provides, among other things, that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). It

also includes a Promoting Gender Ideology (PGI) Provision, which provides that "Federal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g). All EOs make clear that they must be *implemented consistent with applicable law*." EO 14,151 § 4(b); EO 14,173 § 8(b); EO 14,168 § 8(b) (emphasis added).

On February 19, 2025, Plaintiffs National Urban League (NUL), National Fair Housing Alliance (NFHA), and AIDS Foundation of Chicago (AFC) brought the instant action. *See* ECF No. 1. On February 21, 2025, a United States District Court for the District of Maryland issued a nationwide Preliminary Injunction, enjoining the implementation of the Termination and Certification Provisions in full, and the Reporting Provision in part. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump (Diversity Officers)*,---F. Supp. 3d---, 2025 WL 573764 (D. Md. Feb. 21, 2025).[1] The government has appealed that decision and is also seeking to stay the injunction pending appeal. *See* Mot. for Stay Pending Appeal, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, ECF No./Doc. No. 13 (4th Cir. Mar. 4, 2025).

On February 28, 2025, Plaintiffs filed the instant Preliminary Injunction motion, challenging all Challenged Provisions, except for the FGI Provision, under the Due Process Clause of the Fifth Amendment. *See* ECF No. 29, 2 n.5 (PI). They also challenge all Challenged Provisions, except for the Contract Terms Provision, under the First Amendment. *Id.* Among other things, Plaintiffs request that the Court enjoin all Defendants from implementing or enforcing the Challenged Provisions, and further order that Defendants rescind all agency-wide directives

---

[1] The court did not enjoin the Attorney General (or any federal agency) from identifying "'[a] plan of specific steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences.'" *Diversity Officers*, 2025 WL 573764, *24 n.13 (quoting EO 14,173 § 4(b)(iii)).

implementing the Challenged Provisions against Plaintiffs, reinstate any contracts/grants and subcontracts/grants that have been rescinded as a part of implementing the Challenged Provisions, and unwind any terms inserted into Plaintiffs' contracts and subcontracts in furtherance of the Challenged Provisions. *See* [Proposed] Order Granting Pls.' Mot. for Prelim. Inj. 1-2, ECF No. 29-10.

On March 10, 2025, the court in *Diversity Officers*, in response to plaintiffs' clarification motion, ordered that "[t]he Preliminary Injunction applies to and binds Defendants other than the President, as well as all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions directed pursuant to [EO 14,151 and EO 14,173]." *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,---F. Supp. 3d---, 2025 WL 750601, at *2 (D. Md. Mar. 10, 2025).

## ARGUMENT

"To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, Plaintiffs bear the burden of showing subject matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

## I.    PLAINTIFFS ARE NOT LIKELY TO ESTABLISH ARTICLE III JURISDICTION.

Multiple jurisdictional defects plague Plaintiffs' claims and make clear that Plaintiffs cannot reach—let alone succeed on—the merits. First, Plaintiffs lack standing because they fail to allege that the agency defendants have implemented the challenged portions of EOs in any way that concretely or imminently impacts Plaintiffs. For similar reasons, their claims are unripe.

### A.    Plaintiffs lack standing.

To establish standing, a plaintiff must show an "injury in fact," a causal connection between the injury and the defendant's conduct, and a likelihood that that "the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. Importantly, as the Supreme Court clarified this past Term, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Murthy v. Missouri*, 144 S. Ct. 1972, 1988 (2024). Simply put, instead of asserting standing "in gross," Plaintiffs must do the work to untangle "*each* claim they press against *each* defendant." *See id.* (emphasis added) (citation omitted). Plaintiffs fail to meet their burden.

Here, Plaintiffs, three non-profit organizations, attempt to assert standing based on harms to themselves, i.e., organizational standing. Plaintiffs raise four different theories of injury in fact: (1) regulatory uncertainty, (2) chilled speech, (3) frustration of their organizations' missions, and (4) potential loss of federal funds. None withstand scrutiny.

***Regulatory uncertainty.*** The vast majority of Plaintiffs' alleged "harm" boils down to the "uncertainty" regarding any future termination of contracts/grants as well as enforcement action. *See, e.g.*, Decl. of Marc Morial ¶ 57, ECF No. 29-2 (Morial Decl.) ("[B]ecause there is no clarity regarding which grants are covered by the Executive Orders, there is uncertainty regarding NUL's eligibility to qualify for or fulfill future contracts or grants."); Decl. of Nadeen Israel ¶ 57, ECF No. 29-7 (Peller Decl.) ("This lack of clarity creates significant uncertainty, making it impossible

for us to assess compliance or anticipate the impact of the Executive Orders on our federally funded programs.").

Allegations of regulatory uncertainty, however, do not establish injury in fact. Regulatory uncertainty inevitably follows many new policy announcements. As such, the "'difficulty of determining the application of a regulatory provision to [Plaintiffs'] conduct' will not by 'itself support standing.'" *See Am. Libr. Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992) (quoting *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984)). A preliminary injunction "should not issue merely to calm the imaginings of the movant." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).

**Chilled speech.** Relatedly, Plaintiffs also allege an impending "chilling" effect on speech. *See, e.g.*, PI at 37 ("[T]he Executive Orders have the purpose and profound effect of chilling speech about views that the Administration dislikes."). The mere allegation of a "chilling effect," however, does not confer standing without a credible threat of enforcement. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013) (explaining that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of a specific present objective harm or a threat of specific future harm" in the standing inquiry). Plaintiffs' standing to challenge the EOs' relevant provisions "depends on how likely it is that the government will attempt to use these provisions against them—that is, on the threat of enforcement—and not on how much the prospect of enforcement worries them." *See Am. Libr. Ass'n*, 956 F.2d at 1193; *see also Cato Inst. v. U.S. SEC*, 438 F. Supp. 3d 44, 52 (D.D.C. 2020) (quoting *Presbyterian Church* and holding that "[plaintiff's] attempt to premise a constitutional violation that it has standing to vindicate on a chilling effect theory fails in the absence of an allegation that it has suffered, or is facing the threat of, actual concrete harm"). As described in detail below, *see infra* II.B, Plaintiffs' fear of enforcement turns

purely on "[s]ubjective 'chill,'" which "is not enough to constitute injury in fact." *Am. Libr. Ass'n*, 956 F.2d at 1193.

      ***Frustration of missions.*** As the Supreme Court reiterated this past Term, to establish organizational standing, plaintiffs "must show far more than simply a setback to the organization's abstract social interests," and that "impair[ment]" to plaintiffs' "ability to provide services and achieve their organizational mission" does not satisfy standing. *Food & Drug Admin. v. Alliance for Hippocratic Med. (FDA)*, 602 U.S. 367, 394 (2024) (citation omitted). And yet, Plaintiffs repeatedly revert to precisely what *FDA* rejected, and attempt to establish standing by arguing that the EOs generally frustrate their respective organizational mission. *See, e.g.*, PI at 39 ("Plaintiffs have shown harm to their mission."); Morial Decl. ¶ 9 ("Commitment to [DEIA] principles is central to NUL's mission."); Decl. of Lisa Rice ¶ 25, ECF No. 29-5 (Rice Decl.) ("It is particularly difficult for NFHA to comply with these Executive Orders consistent with fulfilling its mission."); Decl. of John Peller ¶ 10, ECF No. 29-9 (Peller Decl.) (alleging the EO 14,168 will "undermine [AFC's] mission"). Relatedly, Plaintiffs attempt to establish standing by alleging that they have diverted resources in response to the EOs. *See, e.g.*, PI at 40 (alleging that due to the EOs, "NFHA already has had to divert significant resources and time . . . . that it would have spent … on other important activities"). Such allegations are similarly insufficient. *See Food & Drug Admin.*, 602 U.S. at 394 (reasoning that plaintiffs cannot assert standing by alleging that the government action "has caused the associations to spend 'considerable resources' to the detriment of other spending priorities").

      ***Potential loss of federal funding.*** To the extent that Plaintiffs attempt to allege that they will suffer harm in the future due to federal funding cuts, those allegations are too speculative to

satisfy Article III standing. *See Clapper*, 568 U.S. at 409 (explaining that any allegation of "threatened injury must be certainly impending" (citations omitted)).

The declarations that Plaintiffs provide mostly assert in broad terms that Plaintiffs do, in fact, receive federal funds. *See, e.g.*, Morial Decl. ¶ 30 ("NUL currently has nineteen individual active federal grants . . . . from several agencies."); Rice Decl. ¶ 19 ("Approximately one-third of the funding for our enforcement work comes from grants we have applied for and received from HUD."). For the most part, in asserting these allegations, Plaintiffs do not even attempt to allege (let alone establish) that the funds fall under the scope of the EOs; nor do they allege that they have been asked to sign a certification provision with respect to any of the funds/contracts. The mere fact that Plaintiffs receive *some* federal funding is not nearly "concrete and particularized" enough to challenge *specific* funding decisions (let alone announcement of specific funding priorities). *See Lujan*, 504 U.S. at 560-61; *cf. Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007) ("[I]f every federal taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus."). In the absence of any concrete or particularized harm to specific funds, any injury stemming from Defendants' actions are purely "hypothetical," as opposed to "actual or imminent." *Lujan*, 504 U.S. at 560.

While Plaintiffs do identify some specific grants/contracts, they mostly fail to allege any imminent disruption of these grants/contracts. *See, e.g.*, NUL ¶¶ 34-41; *see also id.* ¶ 57 (alleging that NUL has been selected to receive a federal grant from the U.S. Environmental Protection Agency (EPA), without alleging any immediate disruption of that grant). Plaintiffs only allege potential disruption/modification of three specific contracts, to which none of the named Plaintiffs are parties: two contracts with the U.S. Department of Housing and Urban Development (HUD),

*see* Rice Decl. ¶¶ 15, 16, 32, 33, and one contract with HHS, *see* Peller Decl. ¶ 11. But Plaintiffs admit that they only serve as subcontractors to these contracts between non-plaintiff third parties and HUD/HHS. *Cf. Amdahl Corp. v. Baldrige*, 617 F. Supp. 501, 504 (D.D.C. 1985) (explaining the limited circumstances that give rise to subcontractor standing in the context of award protests).

But even if Plaintiffs had properly alleged imminent disruption of any particular funds, they fail to allege that such disruption is "fairly . . . traceable to the challenged action." *Lujan*, 504 U.S. at 560-61. The EOs did not terminate any particular fund or program; rather, they merely provided policy directives to federal agencies to execute consistent with all applicable law (including the terms and conditions of individual grants). *See Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) (holding that plaintiffs lacked standing to challenge an executive order that required agencies to "exercise discretion in conducting their cost-benefit analyses and deciding to use the Interim Estimates as 'appropriate and consistent with applicable law,'" because "the mere 'possibility of regulation' fails to satisfy injury in fact"); *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (plaintiff failed to demonstrate standing where "a different, independent official" had control over the action which allegedly harmed the plaintiff).

Importantly, even if this Court granted relief against the EOs and their implementation, that would not prevent defendant agencies from exercising their own independent authorities to determine whether, consistent with law, any termination of a fund/contract would be warranted. Consequently, neither Plaintiffs nor this Court can "begin to predict on this record what impact," if any, invalidating the EOs would have. *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 419 (D.C. Cir. 1994).

### B.    Plaintiffs' claims are not ripe for review.

Even assuming Plaintiffs have standing, their claims are not ripe for review because it is

speculative as to whether any of their contracts/grants will be terminated or whether Plaintiffs will face any enforcement proceedings, and even if so, on what basis. "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (citation omitted).

First, Plaintiffs' entire suit is based on speculations regarding intervening actions that the agencies *might* take to implement the EOs. To the extent that Plaintiffs identify any conduct by defendant agencies, none of that conduct shows that concrete action directed at Plaintiffs is imminent. For instance, while NFHA cites to a January 22, 2025, notice from HUD, which states: "please cease and desist all work activities associated with environmental justice, diversity, equity, and inclusion (DEI)," they do not allege that the notice was directed at NFHA (or any of its specific contracts/grants) in particular. *See* Rice Decl. ¶ 26.

Moreover, by their own terms, the EOs provide that when an agency takes steps to implement the EOs' directives, it must only take appropriate actions permitted "by law." EO 14,151 §§ 2(b)(i), 4(b); EO 14,168 §§ 3(e), 8(b); EO 14,173 § 8(b); *see also* EO 14,173 § 4 (targeting "[i]llegal DEI [d]iscrimination"). Plaintiffs' claims, therefore, are contingent upon several layers of future actions that are not only hypothetical but also contradictory: Plaintiffs' claims assume that agencies will not only take actions that will directly impact Plaintiffs, but will do so both in service of the EOs' directive to deprioritize DEI and "gender ideology," *and* in violation of the EOs' directive to stay within the confines of the law. These "contingent future events that may not occur as anticipated, or indeed may not occur at all," render Plaintiffs' claims unripe for review. *Trump*, 592 U.S. at 131 (quoting *Texas*, 523 U.S. at 300).

Indeed, as the D.C. Circuit has recognized, when "the Executive Order itself instructs the agency to follow the law," "[t]he mere possibility that some agency might make a legally suspect

13

decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration." *Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)). Ultimately, Plaintiffs' suit is nothing more than a broad challenge to a change in the Executive's policy priorities, which is not ripe for review.

## II. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM.

Even if this Court reaches the merits of Plaintiffs' claims, it should reject them. All of Plaintiffs' claims depend on this Court's inherent equitable powers to provide a cause of action to strike down ultra vires executive conduct. But "[t]he scope of non-APA ultra vires review is narrow." *Fed. Express Corp. v. U.S. Dep't of Com.*, 486 F. Supp. 3d 69, 81 (D.D.C. 2020) (citation omitted), *aff'd*, 39 F.4th 756 (D.C. Cir. 2022). Plaintiffs have failed to meet their burden to show equitable relief is warranted.

### A. Plaintiffs' Fifth Amendment challenge fails.

Plaintiffs challenge the provisions under the Due Process Clause, arguing that these provisions allow Defendants to enforce the EOs in an "arbitrary and discriminatory" manner and fail to give fair notice to Plaintiffs regarding the conduct that falls within the scope of the EOs' directives. These challenges fail at the threshold and on the merits.

### i. Plaintiffs' facial challenge under the Due Process Clause to presidential directives is categorically improper.

To begin with, the void-for-vagueness doctrine under the Fifth Amendment is inapplicable here. "The void-for-vagueness doctrine guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (plurality) (emphasis added). And although courts have applied this doctrine outside of the statutory context, they have done so with respect to regulations of primary conduct. *See, e.g.*, *FCC v. Fox Television*

14

*Stations, Inc*., 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)); *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (noting that the Fifth Amendment's "requirement of clarity" applies when the government imposes "civil penalties" (citations omitted)). There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). No such concerns arise when the President directs his own subordinates with respect to policy and enforcement priorities. That is true whether the directive is made informally (in a conversation) or formally (in an Executive Order). *See generally* Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order, 24 Op. O.L.C. 29, 29 (2000) (noting that there is "no basis for drawing a distinction as to the legal effectiveness of a presidential action based on the form or caption of the written document through which that action is conveyed").

Relying on *Diversity Officers*, Plaintiffs advocate for a novel application of the Due Process Clause to presidential directives that do not directly regulate primary conduct. *Diversity Officers* itself applied the doctrine to the EOs by relying on a single out-of-circuit citation. *See Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1140 (9th Cir. 2009). But even *Humanitarian* involved an Executive Order and its implementing regulations, which proscribed obligations prohibiting certain private transactions. *Id.* at 1145-47. And, in any event, the relevant portion of *Humanitarian* is dicta. *See id.* at 1146 (reasoning that the court need not determine whether the Fifth Amendment vagueness standard was applicable because plaintiffs' challenge failed under even the more permissive First Amendment standard).

15

But even putting aside the inapplicability of the Due Process Clause to presidential directives to subordinates, Plaintiffs' challenge suffers from yet another threshold flaw: it is facial in nature. The appropriate posture for Due Process vagueness challenges is as-applied. That is because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright,* 486 U.S. 356, 361 (1988); *see also Carman*, 112 F.4th at 402 (noting that plaintiffs were unable to identify "a case when a preenforcement-facial-vagueness challenge was ripe, presumably because such cases benefit from factual development and applications of statutory provisions to particular scenarios").

Once again, Plaintiffs fail to confront this fundamental hurdle. Relying on *Diversity Officers*, Plaintiffs take it as given that a facial Due Process challenge is appropriate. But *Diversity Officers'* rationale for accepting facial challenges to the EOs does not withstand scrutiny. There, the court relied on *Johnson*, in which the Supreme Court upheld a facial vagueness challenge to the violent-felony residual clause of the Armed Career Criminal Act. 576 U.S. at 539. But the *Johnson* exception is exceedingly narrow. Indeed, the Supreme Court has only applied *Johnson* once outside the criminal context, and even there, it justified the extension of *Johnson* to a civil-removal statute by explaining that "deportation is a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence." *Dimaya*, 584 U.S. at 157 (citation omitted). For their parts, courts of appeals have recognized that "*Johnson*'s license to strike down a criminal statute . . . as facially vague even where it has some valid applications extends only to the exceptional circumstances present in that case and its progeny." *United States v. Requena*, 980 F.3d 30, 42 (2d Cir. 2020) (citing *Copeland v. Vance*, 893 F.3d 101, 122 (2d Cir. 2018) (quotations omitted)); *see also United States v. Morales-Lopez*, 92 F.4th 936, 942 (10th

16

Cir.), *cert. denied,* 145 S. Ct. 241 (2024) (reversing a "district court[, which] became the first and to date only federal court to read *Johnson* as overturning a significant number of Supreme and Circuit Court precedents and telling us facial challenges to criminal statutes are now readily available to defendants"); *Carman,* 112 F.4th at 402 (rejecting a facial vagueness challenge); *United States v. Hasson,* 26 F.4th 610, 618 (4th Cir. 2022) (rejecting the argument that following *Johnson,* "a defendant may raise a facial vagueness challenge without regard to whether the statute is vague as applied to him" (citation omitted)); *Kashem v. Barr,* 941 F.3d 358, 376-78 (9th Cir. 2019) ("[T]o the extent *Johnson* and *Dimaya* bypassed as-applied challenges and proceeded directly to facial vagueness, that approach appears to have turned on the exceptional circumstances of the provisions at issue." (citation omitted)); *City of El Cenizo, Texas v. Texas,* 890 F.3d 164, 191 (5th Cir. 2018) (refusing to accept a facial vagueness challenge because "[i]n contrast to the extreme circumstances in *Johnson,* the posture of this case calls for judicial restraint").[2]

But this Court need not define the contours of the *Johnson* exception—whatever its reach may be in the criminal and removal context, it surely has no application to presidential directives.

Simply put, Plaintiffs' facial Fifth Amendment challenge to presidential directives to subordinates demands a stunning expansion of the doctrine. Not only does Plaintiffs' theory lack basis in the law but it also raises serious separation-of-powers concerns. Opening the door to such challenges would allow courts to engage in searching judicial review of all presidential policy directives, which by their nature, often necessarily outline policy initiatives and priorities in broad

---

[2] Although "[t]he D.C. Circuit has not decid[ed] the full implications of *Johnson,*" *United States v. Andries,* 2022 WL 768684, at *9 (D.D.C. Mar. 14, 2022) (citation omitted), even following *Johnson,* it reiterated that "'[o]utside of the First Amendment context, a plaintiff must show that the law in question is impermissibly vague in all of its applications' to succeed on a facial challenge." *Crooks v. Mabus,* 845 F.3d 412, 417 (D.C. Cir. 2016) (quoting *Decatur Liquors, Inc. v. District of Columbia,* 478 F.3d 360, 364 (D.C. Cir. 2007)).

terms. Under Plaintiffs' theory, however, courts can effectively prohibit the President from directing executive officials unless he can do so with the same degree of specificity required of a criminal statute. This Court should reject Plaintiffs' invitation to scrutinize presidential directives under the demanding standard traditionally reserved for statutes and regulations that proscribe primary conduct.

### ii. Plaintiffs' Due Process claims fail on the merits.

Even if the Court reaches the merits of Plaintiffs' facial Due Process claims, it should reject them. Plaintiffs assert their Due Process challenges to the Challenged Provision by invoking two categories of protected interests with respect to the various provisions: (1) potential loss of funding (Termination, PGI, Contract Terms, and Government DEIA Provisions), and (2) potential enforcement action (Certification and Reporting Provisions). Both sets of claims fail.

**Loss of funding.** In order to assert a claim under the Due Process Clause, Plaintiffs must identify a liberty or property interest that is protected by the Fifth Amendment in the first place. With respect to the Termination, PGI, Contract Terms, and Government DEIA Provisions, Plaintiffs fail to establish that their purported contracts/grants are protected by the Due Process Clause.

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). Applying these principles, the Supreme Court has identified a narrow set of government benefits, so-called "new property," that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position);

*Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collected cases). The Due Process protections afforded to this set of entitlement-like benefits, however, have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)).

The distinction makes sense. As the Second Circuit explained in *S & D Maintenance Co. v. Goldin*, in the new-property line of cases, "the Due Process Clause [was] invoked to protect something more than an ordinary contractual right. Rather, procedural protection [was] sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure." 844 F.2d 962, 966 (2d Cir. 1988). The same logic does not extend to "contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." *Id.* at 967. Indeed, "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns." *Id.* at 966. And yet, that is exactly what the court did in *Diversity Officers* via a passing reference to *Roth*,[3] seemingly

---

[3] Notably, *Roth* involved a tenured-employment contract. As a district court in this jurisdiction has already explained, "[o]utside of the employment context, courts have resisted application of due-process principles to government contracts because [w]ith scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies

assuming that the new-property line of cases was freely applicable to all government contracts/grants. *See Diversity Officers*, 2025 WL 573764 at *20 n.10. That is an unprecedented expansion of the doctrine, and this Court should refrain from following suit.

Plaintiffs' facial claims fail under the above standard. Even pursuant to *Johnson*, a facial challenge fails "if a statute clearly applies to a great many actions." *Andries*, 2022 WL 768684, at *9. Here, Plaintiffs do not claim that "a great many" contracts/grants that will be subject to termination are constitutionally protected entitlement-like benefits. Indeed, any such assertion would be dubious as government contracts generally allow for "[t]ermination at the convenience of the Government," 48 C.F.R. § 49.502, as do many government grants, *see* 2 C.F.R. § 200.340(a)(4) (authority to terminate award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"). Indeed, courts have upheld the government's right to terminate a contract for convenience even absent a termination clause. *See G.L. Christian & Assoc. v. United States*, 160 Ct. Cl. (1963) (reading a termination for convenience clause into the contract by operation of law); *see also Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad."). That is the antithesis of a constitutionally protected entitlement.

Besides, to the extent that any such contracts/grants are subject (by their terms or applicable authorities) to procedural due process prior to termination, Plaintiffs fail to allege that a substantial number will be terminated without being afforded those rights. After all, the EOs specifically provide that the terminations be in accordance with the laws. *See* EO 14,151 §§ 2(b)(i), 4(b); EO 14,168 §§ 3(e), 8(b). To the extent that Plaintiffs worry that an agency may nevertheless ignore the

_____

would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." *New Vision*, 54 F. Supp. 3d at 29 (citation omitted); *see also id.* (collecting cases).

law (and the EOs' directive to follow the law), such speculation cannot justify facial invalidation. *See Allbaugh*, 295 F.3d at 33 ("The mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration." (citation omitted)). A directive to agencies cannot be unlawful when "the Executive Order itself instructs the agency to follow the law." *Id.*

Because many government contract/grants can be terminated for convenience, and any termination must be in accordance with the law, it is not surprising that Plaintiffs have not identified a single instance (let alone "a great many") where a defendant agency terminated a constitutionally protected contract/grant pursuant to the Provisions, and did so without affording the grantee/contractor the appropriate procedural rights required by law. And in any event, to the extent that any such terminations occur in the future, Plaintiffs may challenge that termination in an as-applied posture.[4] But the mere possibility of such terminations at some point in the future cannot justify facial invalidation of provisions that properly provide for the termination of "a great many" ordinary and routine government contracts/grants. *See Andries*, 2022 WL 768684, at *9.[5]

Lastly, the substance of Plaintiffs' vagueness claim is meritless. Plaintiffs argue that the funding provisions are unconstitutionally "vague" because they purport to limit government funding based on criteria they do not define—such as, "equity-related," and "promot[ing] gender ideology." PI at 15-21. In scrutinizing the text of these provisions, Plaintiffs improperly invoke

---

[4] To the extent that any such procedural rights exist under the terms of the contracts/grants, any as-applied challenge would arise under the terms of the contracts/grants themselves—not the Constitution.

[5] To reiterate, the gravely overinclusive nature of Plaintiffs' sought injunction highlights precisely why courts routinely reject facial Due Process Clause challenges outside of the *Johnson* exception. But, as explained above, even under the highly questionable application of *Johnson*, Plaintiffs' facial claims fail.

the vagueness standard that pertains to government enforcement actions. *See, e.g.*, *id.* at 19-12 (relying heavily on *United States v. Williams*, 553 U.S. 285 (2008), which involved a criminal statute). In *Finley*, however, the Supreme Court rejected the application of that demanding vagueness standard to government funding decisions. 524 U.S. 569. There, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. But, the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589; *see also id.* (cautioning that "[t]o accept [plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence'"). This Court should similarly reject Plaintiffs' invitation to impose a demanding vagueness standard on the government even when it "is acting as patron rather than as sovereign." *Id.*; *see also Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir. 2021) ("There is substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." (citation omitted)).

  ***Potential enforcement action.*** Plaintiffs bring Due Process Clause challenges to the Certification and Reporting Provisions by alleging that the provisions fail to give proper notice of prohibited conduct and provide for arbitrary enforcement. These claims also fail on the merits.

  The Due Process Clause requires that laws "give the person of ordinary intelligence a

reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108. While this doctrine demands scrutiny of statutes and regulations that identify a *new* conduct for punishment, it has little bite with respect to the challenged EOs, which simply outline enforcement priorities with respect to *existing* legal obligations. Plaintiffs have no legitimate concern that they will not be given a "reasonable opportunity to know what is prohibited." *Id*. After all, the Certification and Reporting Provisions are clear about their limits: existing federal law. By their own terms, the Reporting Provision only concerns "illegal discrimination or preferences," EO 14,173 § 4(b), and the Certification Provision demands that Plaintiffs certify that they do not operate programs that "violate federal antidiscrimination laws," *id*. § 3(b)(iv)(B). Neither penalize any new conduct; they merely prioritize the enforcement of existing antidiscrimination laws, which Plaintiffs do not challenge as unconstitutionally vague.

Plaintiffs, however, argue that these federal-law qualifiers are "cold comfort," because the government has not specified which DEI programs *it* considers illegal. PI at 23. Once again, Plaintiffs improperly scrutinize the EOs as if they were criminal statutes that sought to identify *new* conduct as "illegal." To reiterate, the Certification and Reporting Provisions do not target any conduct that is not already illegal under antidiscrimination laws. All Plaintiffs must do is comply with federal law itself—longstanding federal statutes that are not challenged here on vagueness grounds or any other. As such, "the *Administration's* apparent view" of which "DEI programs are illegal," *id.* (emphasis added), is irrelevant. Plaintiffs cannot show, as they must, that these provisions—which are tied to federal antidiscrimination law—are "utterly devoid of a standard of conduct so that [they] simply ha[ve] no core and cannot be validly applied to any conduct." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Georgia*, 40 F.4th 1320, 1327

(11th Cir. 2022) (citation omitted). And in any future enforcement, Plaintiffs are free to defend themselves by maintaining that their conduct is lawful, or by advancing any applicable as-applied vagueness defenses. But none of that is remotely ripe, let alone a sound basis for preemptively enjoining the government from enforcing antidiscrimination laws. *See Carman*, 112 F.4th at 402 (explaining that a preenforcement facial vagueness challenge is not ripe for review).

As such, even if the Court were inclined to demand more specificity than the EOs provide, any injunction on Due Process grounds would be premature in this pre-enforcement posture where courts must not "assume that the [government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests.*, 455 U.S. at 504. To the contrary, courts must consider the possibility that, prior to enforcement, the government "will sufficiently narrow potentially vague or arbitrary interpretations of the [directives]." *Id.* Indeed, federal agencies have already began providing guidance on the scope of the EOs. For instance, on February 5, 2025, OPM issued Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives. *See* OPM Guidance at 1 (attached hereto as Ex. A). In this Guidance, issued to all federal agencies, OPM expanded on the type of activity that constitutes "unlawful discrimination related to DEI." *Id.*[6] This Court should reject Plaintiffs' invitation to enjoin the government before it has had the opportunity to further "narrow potentially vague or arbitrary interpretations of the [directives]," prior to enforcement. *Vill. of Hoffman Ests.*, 455 U.S. at 504; *see also Carman*, 112 F.4th at 404 (rejecting facial vagueness claim in part because of forthcoming "regulatory guidance,"

---

[6] The Guidance provides that "[u]nlawful discrimination related to DEI includes taking action motivated, in whole or in part, by protected characteristics. To be unlawful, a protected characteristic does not need to be the sole or exclusive reason for an agency's action. Among other practices, this includes ending unlawful diversity requirements for the composition of hiring panels, as well as for the composition of candidate pools (also referred to as 'diverse slate' policies)." Ex. A at 1.

"enforcement action," and "regulations").

### B.      Plaintiffs' First Amendment challenges fail.

"Even in the First Amendment context, facial challenges are disfavored." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). Plaintiffs fail to establish that the EOs "prohibit[] a substantial amount of protected speech relative to [their] plainly legitimate sweep," as required to establish facial unconstitutionality. *United States v. Hansen*, 599 U.S. 762, 770 (2023). As such, Plaintiffs are not likely to succeed on the merits of their First Amendment facial challenges.

***PGI, FGI, and Termination Provisions.*** Plaintiffs bring First Amendment challenges to the PGI, FGI, and Termination Provisions, which direct federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," EO 14,168 § 3(e), "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," *id.* § 3(g); and, "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts," EO 14,151 § 2(b)(i). Plaintiffs argue that these directives amount to "viewpoint" discrimination and are improperly "vague" in violation of the First Amendment. Plaintiffs' claims fail because these provisions pertain to government's sponsorship of speech— not regulation of it. The Supreme Court has long been clear that First Amendment concerns are far less pronounced when the government acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate it.

Plaintiffs erroneously invoke the doctrine of viewpoint discrimination in challenging these three funding provisions. *See* PI at 31-33. It is well established that government spending is not subject to traditional First-Amendment scrutiny. As the Supreme Court explained in *Rust*, "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . . In so doing, the Government has not

discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion

of the other." 500 U.S. at 193. Thus, "[a]s a general matter, if a party objects to a condition on the

receipt of federal funding, its recourse is to decline the funds. This remains true when the objection

is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for*

*Int'l Dev. v. All. for Open Soc'y Int'l, Inc. (AID)*, 570 U.S. 205, 214 (2013) (collecting cases).

While government funding is not free from the First Amendment in all respects, the

relevant First Amendment limitation is the prohibition against unconstitutional "condition." *Id.* at

213-15. Under this limitation, the government may "specify the activities [it] wants to subsidize,"

but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Id.*

at 214-15 (emphasis added). Thus, for example, limitations on the use of federal funds for a

specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of

prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted),

but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution or

sex trafficking" is not, *id.*, at 210 (citation omitted). The latter amounts to an unconstitutional

condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19.

None of these three provisions impose an unconstitutional condition on Plaintiffs' speech;

rather, as permitted under *Rust* and *AID*, the provisions align the government's sponsorship of

activities with its policy priorities. In doing so, none of the provisions seek to regulate a

grantee/contractor's speech "outside the contours of" any such policy initiatives—i.e. they do not

prohibit entities from supporting "gender ideology" and/or "equity" on their "own time and dime."

*AID*, 570 U.S. at 218. The Supreme Court has repeatedly held that the government does not

penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay

for it. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that

government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "'decision not to subsidize the exercise of a fundamental right does not infringe the right'" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights").

Simply put, the Government is permitted to have policy priorities, and it does not violate the First Amendment by not affirmatively funding programs that do not align with those policies.

Moreover, to the extent that Plaintiffs argue that the funding provisions are "vague," and therefore impose a "chilling" effect on protected speech, *see* PI at 30, any such argument is foreclosed by the Supreme Court's decision in *Finley* for the same reasons outlined above, *see supra* II.A.ii. Indeed, in *Finley*, the Court expressly considered, and rejected, the same argument Plaintiffs make here—namely, that they must "censor their protected speech to confirm to the government's views in order to receive the funding they need." PI at 33; *see Finley*, 524 U.S. at 588 (holding that no First Amendment concern exists even though, "as a practical matter, [government-funding recipients] may conform their speech to what they believe to be the . . . decisionmaking criteria in order to acquire funding"). At bottom, when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id*. at 589; *see also id.* at 599 (Scalia, J., concurring) ("Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government *regulation* of expressive conduct . . . not government grant programs.").

***Government DEIA Provision.*** Plaintiffs also raise a First Amendment challenge to the Government DEIA Provision, which directs the OMB Director to work with the Attorney General to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of

financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." EO 14,173 § 3(c)(iii).

For starters, Plaintiffs lack standing to challenge this Provision, which is a directive to the OMB Director to terminate the government's *own* "mandates, requirements, programs, or activities."*; Id.; see also id.* § 3(c)(i) (providing that the OMB Director "[r]eview and revise, as appropriate, all Government-wide processes, directives, and guidance"). The provision does not purport to regulate private mandates, requirements, programs, or activities. Plaintiffs do not allege that they provide any relevant government-wide programs. As such, they have failed to allege any speculative (let alone Article III) injury with respect to this provision. *See FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 230 (1990) (refusing to reach the merits of certain provisions "because petitioners ha[d] failed to show they ha[d] standing to challenge them"). In any event, any such argument would fail on the merits because the provision simply pertains to the government's own speech. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").

***Certification Provision.*** Plaintiffs take issue with the Certification Provision because it directs federal agencies to include such provisions in all federal contracts/grants. Thus, Plaintiffs argue, any such certification is an unconstitutional condition.[7]

Plaintiffs' First Amendment challenge to the Certification Provision suffers from a fatal flaw: Plaintiffs have no First Amendment right to violate federal antidiscrimination laws in the first place. The Certification Requirement merely requires Plaintiffs to certify that they do not

---

[7] Although Plaintiffs frame this challenge in terms of viewpoint discrimination, *see* PI at 26-29, as explained above, for purposes of government funding, the First Amendment inquiry turns on the doctrine of unconstitutional condition.

operate any DEI programs that "violate any applicable Federal antidiscrimination laws." EO 14,173 § 3(b)(iv)(B). There is nothing unlawful about requiring recipients of federal contracts or grants to affirm that any DEI programs that they operate comply with antidiscrimination laws, and further requiring recipients to acknowledge that the government considers compliance with such laws material to its payment decisions. Importantly, this provision imposes no new requirements on primary conduct. Rather, it simply requires recipients to certify their compliance with existing legal obligations under the "applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which applies to all recipients of federal assistance, 42 U.S.C. § 2000d-1—laws that are binding independent of any certification requirement. The EO merely instructs agencies to require a certification that these obligations are being honored.

That is not novel. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983) (Marshall, J., dissenting) (citing regulations from Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, and Treasury). These "assurances" of compliance are "given in consideration of" federal aid, "and the federal government extends assistance in reliance on the assurance of compliance"—but the obligations of Title VI apply regardless of any certification. *Id.* (citation omitted). The requirement here is no different: although recipients must certify specifically that any DEI programs they run comply with federal antidiscrimination law, this certification "does not place upon a recipient any unanticipated burdens because any recipient must

anticipate having to comply with the law." *Id.* And while the provision addresses unlawful DEI programs specifically—a subset of the potential ways in which federal funding recipients might violate antidiscrimination law—that limitation merely renders it narrower than scores of certifications signed by recipients of federal assistance that they are complying with Title VI in every respect. Plaintiffs neither argue that these longstanding requirements are unconstitutional nor explain why their breadth is constitutionally required.

Plaintiffs, however, argue that the "clause concerning 'Federal anti-discrimination laws' does not appear to limit the Provision's scope, since the Orders purport to cast all DEIA as 'illegal.'" PI at 29. These assertions are irreconcilable with the EO's text, which does not adopt any new construction of antidiscrimination law. Nor does the EO claim all DEIA is illegal; rather, it requires entities to certify that they are not operating illegal DEI programs that *violate* antidiscrimination laws—not that they are not operating DEI programs at all. The Certification Provision merely directs agencies to expressly remind counterparties about those obligations under antidiscrimination laws and their materiality to the government's payment decisions. None of this implicates the First Amendment.

Plaintiffs' reliance on *AID* is similarly unpersuasive. In *AID*, under the relevant policy requirement, "[a] recipient [could not] avow the belief dictated by the Policy Requirement when spending [federal] funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime." 570 U.S. at 213. Here, unlike in *AID*, the Certification Requirement does not limit plaintiffs' Free Speech by compelling or restricting their speech: they remain free to engage in protected speech that espouses any viewpoint they want, including advocating for whatever DEI activities they prefer. *See* EO 14,173 § 7(b). It simply restricts their ability to engage in illegal discrimination while also securing federal funding—

discrimination that would be illegal even without federal funding. Such restrictions on illegal conduct do not violate the First Amendment. On this score, the Sixth Circuit's decision in *Cutter v. Wilkinson* is particularity informative. 423 F.3d 579 (6th Cir. 2005). Following reversal and remand from the Supreme Court on a separate First Amendment challenge to the Religious Land Use and Institutionalized Persons Act (RLUIPA),[8] the Sixth Circuit examined whether the government imposed an unconstitutional condition on federal funds under *Rust* when it conditioned funds to state prison officials on compliance with the RLUIPA. *Id.* at 588. The court reasoned that the condition did not violate the *Rust* standard because recipients had "no constitutional right, much less a fundamental constitutional right, to limit the exercise of religion by inmates" in the first instance. *Id.* Similarly, here, requiring recipients to certify that they are in compliance with the law does not amount to an unconstitutional "condition."

Lastly, Plaintiffs argue that the Certification Provision "[p]enalizes [d]isfavored [v]iews [u]nder the False Claims Act." PI at 33. According to Plaintiffs, because "the Orders wrongly suggest that all DEIA constitutes illegal discrimination, the Provision makes any Plaintiffs that supports DEIA vulnerable to lawsuit." *Id.* Once again, Plaintiffs' argument misreads the text of the EO, which does not purport to adopt any new construction of antidiscrimination law, or state that all DEIA is illegal, let alone threaten liability for failure to divine this new interpretation. Plaintiffs' argument also erroneously assumes that the False Claims Act permits liability based on a good-faith but incorrect interpretations of law. But, as the D.C. Circuit has explained, the False Claims Act "does not reach an innocent, good-faith mistake about the meaning of an applicable rule," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal

---

[8] In *Cutter v. Wilkinson*, 544 U.S. 709 (2005), the Supreme Court held that RLUIPA does not violate the Establishment Clause. *Id.* at 726. It remanded the case back to the Sixth Circuit to reach petitioners' remaining challenges. *Id.* at 718 n.7.

obligations." *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015). That provides ample protection against the sort of unfair liability that worries Plaintiffs.

**Reporting Provision.** Plaintiffs' First Amendment challenge to the Reporting Provision may be worse of all. The Provision directs the Attorney General to submit a report to "inform and advise" the President "so that [the] Administration may formulate appropriate and effective civil-rights policy." EO 14,173 § 4(b). That report shall "contain[] recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI." *Id.* Among other things, the report shall identify "steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences," and identify "potential civil compliance investigations" of large corporations, associations, foundations, and institutions of higher education. *Id.* § 4(b)(iii). Plaintiffs lack standing to bring this claim, which also fails on the merits.

First, the Provision merely compels the submission of a report regarding how to address a particular category of unlawful action. There is no live case or controversy involving any such potential enforcement action stemming from that report, which is far too inchoate to be challenged at this time. Indeed, the Attorney General has not yet neared the end of the 120-day internal deadline (May 21, 2025) to submit her written report to the President—let alone launch potential enforcement action against Plaintiffs. Even the court in *Diversity Officers* denied in part plaintiffs' request to enjoin the Reporting Provision "to the extent it is merely a directive from the President to the Attorney General to identify '[a] plan of specific steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences.'" 2025 WL 573764 at *24 n.13 (alterations in original) (quoting EO 14,173 § 4(b)(iii)). That denial makes sense; it is hard to see how plaintiffs would have standing to challenge the drafting of a report, or how a directive to

draft a report could be unconstitutional. But that is all the Reporting Provision does. It does not authorize, or require, any enforcement action. It merely directs the Attorney General to draft a report regarding how the President's policies can be achieved by enforcing existing law. Enforcement is left to agency (or presidential) discretion. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (explaining that "report to the President [that] carries no direct consequences" for parties is "not final and therefore not subject to review" under the APA).

For similar reasons, Plaintiffs fail to establish standing to assert their First Amendment claim to the Reporting Provision. In order to assert standing in this pre-enforcement posture, "a constitutionally affected interest and a credible threat of enforcement are required; without them, [P]laintiffs can establish neither a realistic threat of legal sanction for engaging in protected speech nor an objectively good reason for self-censoring." *Sandvig v. Barr*, 451 F. Supp. 3d 73, 78-79 (D.D.C. 2020), *appeal dismissed sub nom. Sandvig v. Garland*, 2021 WL 2525027 (D.C. Cir. June 10, 2021). Plaintiffs have failed to make either showing.

To begin with, the provision does not purport to target a First Amendment right at all. By its own terms, the provision directs the Attorney General to take steps to deter only "*illegal* discrimination." Plaintiffs have no First Amendment right to engage in illegal *conduct*. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 243-44 (4th Cir. 1997); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777-79 (11th Cir. 2024).

Plaintiffs' only lifeline, therefore, is to assume that there is a "credible threat" that the government's as-of-yet inchoate enforcement will erroneously cover even legal activities. This theory of standing fails to withstand scrutiny because Plaintiffs fail to identify a "credible threat" of such erroneous enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see also Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 160 (D.D.C. 2014) ("When plaintiffs do

not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court." (citation omitted)). Plaintiffs' argument relies on the unfavored presumption that the government will execute the EOs' directive in bad faith and ignore its own declaration to only target illegal conduct. Plaintiffs provide no factual basis for this assumption other than mere speculations about bad-faith future enforcement action, which cannot sustain a facial challenge. *Cf. Hansen*, 599 U.S. at 782, 785 (rejecting First Amendment overbreadth challenge because plaintiff relied on "hypotheticals" and "speculative shot at the bad"). And in any event, such speculations are contrary to the presumption of good faith that courts routinely accord the government. *See, e.g.*, *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[U]nlike in the case of a private party, [the courts] presume the government is acting in good faith."); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors . . . are accorded a presumption of good faith because they are public servants, not self-interested private parties."), *aff'd*, 563 U.S. 277 (2011).

Relatedly, any argument that enforcement actions would be motivated by something other than targeting unlawful discrimination amounts to a selective-enforcement claim, which is not only a difficult to prove, *see Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1137-38 (D.C. Cir. 2023), but also categorically unripe at this juncture, *see id.* (explaining that to assert a selective-enforcement claim, a plaintiffs must "demonstrate he was singled out for enforcement from among others similarly situated," which is "a fact-intensive and case-specific comparative inquiry" (citation omitted)).

In short, Plaintiffs have failed to identify a credible threat that the government will enforce antidiscrimination laws by improperly targeting their constitutionally protected speech. As such,

any alleged "chilling" effect is wholly subjective and insufficient to establish Article III standing. *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Moreover, to the extent Plaintiffs suggest that focusing enforcement resources on particular categories of unlawful conduct under antidiscrimination laws amounts to viewpoint discrimination, *see* PI at 34, that is a nonstarter. Discrimination is unlawful conduct, and the President has discretion to determine which forms of unlawful discrimination to prioritize for enforcement. If the President announced, for example, that religious discrimination against a particular group was prevalent and pernicious, and directed federal agencies to focus on curtailing such discrimination, there would be no plausible claim of viewpoint discrimination. At bottom, "[b]ecause the executive cannot address every violation of the laws, the prosecution (and non-prosecution) power is a vital aspect of the executive power." *Frederick Douglass*, 82 F.4th at 1136; *see also id.* ("'[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'" (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974))).

Plaintiffs' challenge to the "listing" subprovision of the Reporting Provision fails for similar reasons. The subprovision instructs the Attorney General to identify certain large entities for purposes of "potential civil compliance investigations" as a part of a "strategic enforcement plan" "to deter DEI programs or principles … that constitute illegal discrimination or preferences." EO 14,173 § 4(b)(iii). For the above reasons, Plaintiffs have failed to establish standing to challenge this subprovision. They do not allege any "credible threat" that they will be listed in the report. Without more, the mere existence of this directive to the Attorney General does not pose a "credible threat" to Plaintiffs.

Plaintiffs' attempt to challenge this subprovision in reliance on Justice Black's concurrence in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951), is similarly fruitless. *McGrath* involved a directive to the Attorney General to furnish "a list of organizations designated by him as Communist … to the Loyalty Review Board of the United States Civil Service Commission." *Id.* at 125. The *McGrath* directive is in no way analogous to the one at issue, which instructs the Attorney General to identify entities for purposes of compliance with antidiscrimination law. The instant directive to devise a plan to enforce the law falls squarely within the Executive's Article II power. *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (citation omitted)). Besides, the plurality in *McGrath* merely held that plaintiffs had stated a claim for relief. *See* 341 U.S. at 142. As the D.C. Circuit later acknowledged, "only . . . Justice Black reached the conclusion [that] . . . such listing is irreconcilable with the First Amendment." *Veterans of Abraham Lincoln Brigade v. Att'y Gen. of U.S.*, 470 F.2d 441, 444-45 (D.C. Cir. 1972).

In sum, Plaintiffs' challenge to the Reporting Provision is nothing more than an attempt to halt the Executive's pronouncement of its enforcement priorities based on Plaintiffs' fear that the Executive *might* not stick to its word when it says that it will only pursue illegal actions. At a very fundamental level, Plaintiffs' theory would kneecap the Executive's enforcement authority. Under Plaintiffs' theory, even when the Executive claims that its enforcement priorities will target only illegal conduct, Plaintiffs could nevertheless preemptively halt any investigation and enforcement by speculating that the Executive may also impressibility target legal conduct. The Court should reject Plaintiffs' invitation to encroach on the Executive's Article II authority to set its

enforcement priorities under the guise of protecting Free Speech.[9]

## III.    THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF.

### A.    Plaintiffs have not shown irreparable injury attributable to the EOs.

In this Circuit, there is a "high standard for irreparable injury." *Chaplaincy*, 454 F.3d at 297. Any alleged irreparable harm "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). It also must be of such "*imminence* that there is a clear and present need for equitable relief." *Id.* (quoting *Wis. Gas Co.*, 758 F.2d at 674 (per curiam)) (emphasis in original)). Plaintiffs' motion can be denied solely on the basis that they have failed to demonstrate irreparable injury. *See id.* ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989))). Plaintiffs have failed to meet this standard.

As an initial matter, Plaintiffs' own delay in seeking preliminary relief weighs against finding irreparable harm. The EOs were issued on January 20 and January 21, but Plaintiffs waited until February 28 to file their Motion. *See Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (holding that delay of thirty-six days before filing for preliminary injunctive relief was "dilatory action" that failed to clear the high bar needed to show entitlement to relief); *see also Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that a delay of forty-four days before bringing action for injunctive relief was "inexcusable," and

---

[9] In any potential individual enforcement action, Plaintiffs would, of course, have the opportunity to argue their conduct did not violate the law. But they cannot halt an announcement of enforcement priorities at the outset based on the possibility that a hypothetical future enforcement may target legal conduct.

"bolstered" the "conclusion that an injunction should not issue," particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm).

In fact, in the intervening six weeks, several courts issued preliminary relief with implications for the federal funds at issue.[10] For instance, following the preliminary injunction in *Diversity Officers*, DOL withdrew the January 22, 2025, notice to recipients to cease all DEI and DEIA activities. *See* February 27, 2025, DOL Notice (attached hereto as Ex. B). Surely, these injunctions did not render Plaintiffs' alleged harm *more* imminent. And yet, Plaintiffs waited until after these injunctions were already in place to move for preliminary relief. Such "an unreasonable delay in filing for injunctive relief . . . weigh[s] against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013).

But regardless, Plaintiffs fail to establish irreparable harm pursuant to any of their four theories. As explained above, three of Plaintiffs' theories—regulatory uncertainty, subjective chill, and frustration of their organizations' missions—do not amount to injury in fact. *See supra* I.A. As such, they cannot form the basis for irreparable harm. And even if there is sufficient harm for purposes of standing, Plaintiffs have not established that such harm is "certain and great" enough to justify emergency relief. *Chaplaincy*, 454 F.3d at 297. Take, for instance, Plaintiffs' allegations of chilled speech. Plaintiffs assert, in mere general terms, that in order to comply with the EOs, they must "chill" their speech. But "[i]t is not enough to 'merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong.'" *Ateba v. Jean-Pierre*, No. CV 23-2321, 2023 WL 5748567, at *5 (D.D.C. Sept. 6, 2023) (quoting *Chaplaincy*, 454 F.3d at 301). Without more, bare allegations of potential future "chilling" does not warrant emergency relief. *Cf. Ateba*,

---

[10] *See Diversity Officers*, 2025 WL 573764; *Nat'l Council of Nonprofits v. OMB*, ---F. Supp. 3d---, 2025 WL 597959 (D.D.C. Feb. 25, 2025); *New York v. Trump*, ---F. Supp. 3d---, 2025 WL 357368 (D.R.I. Jan. 31, 2025), *appeal filed*, No. 25-1138 (1st Cir. Feb. 10, 2025).

2023 WL 5748567, at *5 ("Because the White House policy does not limit what [plaintiff] can publish, his bare assertion that the policy violates the freedom of the press does not suffice to establish a likelihood of irreparable harm.").

Plaintiffs' fourth theory—potential loss of federal funds—also fails because Plaintiffs have not shown that any loss is more than "substantial, in terms of money, time and energy." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). This is a high bar. "It is well settled in this Circuit that 'economic loss does not, in and of itself, constitute irreparable harm.'" *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) (quoting *Wisc. Gas Co.*, 758 F.2d at 674). Rather, "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wisconsin Gas*, 758 F.2d at 674; *see also Air Transp. Ass'n*, 840 F. Supp. 2d at 335 ("[E]conomic harm [must] be significant, even where it is irretrievable because a defendant has sovereign immunity."). Here, economic losses, if any, may be recoverable because if any of Plaintiffs' funds or contracts are terminated, Plaintiffs will have the opportunity to dispute the termination, and, if successful, might retain the funds.[11]

None of the three Plaintiffs show that the impending financial harm from the EOs would "threaten[] th[ier] very existence." *Id.* At most, AFC alleges that "a significant portion of AFC's revenue" comes from federal agencies and that "[t]he loss of this federal funding would be catastrophic for [AFC] and would force [it] to shut down." ECF No. 29-7 (Israel Decl.) ¶ 11. But AFC's fear is wholly speculative. AFC does not claim that it has lost its federal funding, nor does it claim that it been told by any federal agencies that it will lose any (let alone all) of its

---

[11] Notably, a contractual termination for convenience provides for compensation to the contractor for its termination costs and also, oftentimes, a reasonable allowance for profit. *See* 48 C.F.R. §§ 49.201, 31.205-42.

funds/grants. Indeed, AFC does not even speculate that any such loss of federal funding would be imminent—it simply speculates about a world in which it *may* lose *all* of its federal funding *at some point* in the future. Such doomsday-like speculations do not establish the type of imminent, existential financial loss needed to satisfy irreparable harm.

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, as-applied challenges to any future government action. Their declarations do not establish the need for broad relief in a single lawsuit, rather than proceeding in the ordinary course of APA review over discrete, specific funding decisions.

**B.    The balance of the equities and public interest weigh squarely against relief.**

Lastly, Plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary injunction. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435.

In arguing that the public interest weighs in their favor, Plaintiffs mostly repackage their arguments on the merits, which are fruitless. *See supra* II. Meanwhile, on the other end of the balancing test, any injunction here would effectively disable almost a dozen federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities. "Any time [the government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (citation omitted).

Additionally, where the government is legally entitled to make decisions about the disbursement or allocation of federal funds and contracts but is nonetheless enjoined from doing so, such funds may not be retrievable afterwards. By contrast, if Plaintiffs' contracts are terminated in accordance with their terms, they may be entitled to recovery of costs, or even reasonable profits.

*See supra* III.A. Relatedly, a broad preliminary injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide government spending decisions and enforcement priorities. Agencies may feel obligated to forgo pursuing legally permissible actions in furtherance of the President's policy priorities—independent of the EOs—for fear of risking contempt. Thus, the balance of equities favors the government and relief should be denied.

## IV.    ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (explaining that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). In line with these principles, to the extent the Court intends to grant Plaintiffs' request for a preliminary injunction, such relief should be narrowly tailored to apply only to Plaintiffs and the agency defendants, and to leave intact the Executive's discretion to engage in further consideration of the topic at hand and implement new policies consistent with law.

### A.    Injunctive relief should be limited to the Plaintiffs and agency defendants only.

Any preliminary relief should be limited to address any established harms of the present Plaintiffs and their specific grants/contracts. There is no basis for extending relief to non-parties in this suit (or to Plaintiffs that have failed to articulate any imminent, irreparable harm). Accordingly, any preliminary injunction should confirm that all obligations in the injunctive order apply only with respect to any grants or contracts involving Plaintiffs specifically. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions *of the parties* until a trial on the merits can be held." (emphasis

41

added)); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Moreover, the relief should be limited to any agency defendant with respect to whom Plaintiffs have adequately alleged standing and an impending irreparable injury, as opposed to the Executive Branch at large. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (explaining that "a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions," but may not "lawfully enjoin the world at large, or purport to enjoin challenged laws themselves." (citation omitted)); *see also Lujan*, 504 U.S. at 569 & n.4 (Scalia, J., plurality op.) (holding that resolution of a disputed legal issue "would not have been binding upon the agencies" that "were not parties to the suit"). As explained above, at most, Plaintiffs have attempted to allege imminent loss of federal funds only with respect to contracts between third-parties and HUD/HHS. *See supra* I.A. Thus, an injunction (if any) must be limited to those two agencies. *See Murthy*, 144 S. Ct. at 1988 (explaining that in analyzing standing with respect to each defendant, the court must not "treat[] the defendants . . . as a unified whole").

Lastly, although Plaintiffs name the President as a defendant, any injunction against the President himself would be improper. The Supreme Court has long recognized that courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 499, 501 (1866); *see also Dellinger v. Bessent,* 25-5028, Denial of Emergency Motion to Stay, 4 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (outlining the President's immunity from judicial encroachment).

**B.    Relief should clarify that it preserves the Executive's discretionary authority.**

If the Court enters Plaintiffs' proposed request for relief, that order should be limited to mitigate (albeit not eliminate) the significant harms it would cause to the Executive's abilities to exercise its lawful statutory authority and discretion. To that end, Defendants respectfully request that any preliminary relief clarify that it does not prohibit the President from reissuing a different directive or Executive Order or limit the defendant agencies from taking actions pursuant to their legal authority to regulate in furtherance of the substantive policy priorities in the EOs.

Moreover, Defendants respectfully request that any preliminary relief be appropriately narrowly tailored to preserve the Executive's authority to enforce federal antidiscrimination laws. *See TransUnion*, 594 U.S. at 429 ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch."). That is the normal equitable remedy, and anything broader would constitute a significant intrusion on the separation of powers.

**V.      ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.**

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

The Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

**CONCLUSION**

For these reasons, this Court should deny Plaintiffs' Preliminary Injunction motion.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director


*/s/ Pardis Gheibi*
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Pardis Gheibi*