## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE, et al.,

*Plaintiffs*,

v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants*.

No. 1:25-cv-00471-TJK

## DO NO HARM'S AMICUS BRIEF IN OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Introduction, Interest & Summary of Argument ..................................................................... 1

Background ................................................................................................................................. 2

    A. Government entities and the private sector embrace unlawful DEI practices and extreme gender ideologies. .............................................................................................. 2

    B. The executive orders prioritize ending government-sponsored discrimination. ........... 4

    C. Plaintiffs ask for a broad injunction barring any application of the orders. ................. 7

Argument .................................................................................................................................... 8

    I.  The orders are not unconstitutionally vague. ................................................................. 9

    II. The First Amendment does not require the government to subsidize discrimination. .............................................................................................................. 20

    III. If anything, federal law *requires* the government to eliminate discrimination in the private sector. ...................................................................................................... 23

Conclusion ............................................................................................................................... 25

Certificate of Compliance ..................................................................................................... 26

Certificate of Service .............................................................................................................. 26

**INTRODUCTION, INTEREST & SUMMARY OF ARGUMENT**

Do No Harm is a nonprofit membership association with over 10,000 members—healthcare professionals, students, patients, and policymakers—who believe that medicine should be driven by scientific evidence, rather than ideology, and that professional opportunities should be allocated based on merit, rather than race or gender. Yesterday, this Court granted DNH leave to file this amicus brief and present argument at the preliminary injunction hearing. Interv.-Order (Doc. 39) at 1, 10; *see N.H. Lottery Comm'n v. Barr*, 2019 WL 1099715, at *3 (D.N.H. Mar. 8) (calling this "amicus-plus status").[*]

DNH agrees with parts II-V of Defendants' opposition to Plaintiffs' motion for a preliminary injunction. DNH writes separately to make three points, all of which reflect its unique interests and experience with the illegal programs that these executive orders address.

**1.** The challenged executive orders target illegal discrimination. They enforce our nation's civil-rights laws by withdrawing government funding for so-called "diversity, equity, and inclusion" practices that distribute benefits based on race and other protected characteristics. The orders, in other words, provide a clear standard for compliance: existing federal civil-rights laws. Unfortunately, many private-sector DEI programs—including some run by Plaintiffs—violate those laws. (In fact, DNH has filed lawsuits to end many such programs.) Because the orders clearly apply to that illegal conduct, they are not unconstitutionally vague.

**2.** The orders cannot possibly violate the First Amendment because there is no First Amendment right to discriminate. Nor does the First Amendment require the government to

---

[*] No counsel for any party authored this brief in whole or in part, and no party or counsel for any party contributed money to fund the preparation or submission of this brief. Fed.R.App.P.29(a)(4)(E). Do No Harm previously filed a corporate disclosure statement stating that no corporation owns 10% or more of its stock. *See* Fed.R.App.P.29(a)(4)(A), 26.1; Doc.32.

subsidize Plaintiffs' speech. Hence why the Supreme Court has consistently confirmed the government's authority to withdraw federal funds from institutions that discriminate based on race. *E.g.*, *Bob Jones University v. United States*, 461 U.S. 574, 594, 602-04 (1983).

**3.** The executive orders don't just comply with federal law; they're *required* by it. The Fifth Amendment and statutes like Title VI prohibit the government from paying private entities to discriminate. The orders simply implement the government's anti-discrimination obligations. So Plaintiffs cannot possibly prevail, let alone justify the drastic relief of a preliminary injunction against three executive orders.

## BACKGROUND

**A. Government entities and the private sector embrace unlawful DEI practices and extreme gender ideologies.**

In the lead up to these executive orders, DEI and gender ideology were ascendant. The logical end point of these ideologies is programs and policies that classify people based on race and gender. And that's what happened, throughout the public and private sectors.

**1.** Gender ideology includes the unscientific belief that gender is a fluid social construct rather than a biological reality—that boys can become girls and girls can become boys. This theory ignores important differences between men and women and undermines critical civil-rights protections for women, threatening their privacy, opportunities, and safety. *See* Walker, *UN study reveals transgender athletes have won nearly 900 medals in women's competitions*, ABC7 (Oct. 23, 2024), perma.cc/99UN-NPYH; Minock, *Sex offender who identifies as transgender exposes himself to kids again at Va. school.*, ABC7 (Jan. 27, 2025), perma.cc/JB6B-HPLW. Worse, advocates of gender ideology often seek to compel agreement with their view. Employers fire employees whose religious beliefs do not permit them to affirm the notion that gender is mutable. *See* Warner, *Balancing Title VII rights: Religious Worker fired for refusing to use trans co-worker's pronouns*,

HR Morning (Mar. 30, 2023), perma.cc/HD4N-3EAL. Or schools require students to use a transgender-identifying student's "preferred pronouns." *See* Lewis, *Virginia School district faces continued legal fight over gender policies*, FOX5 (Dec. 9, 2024), perma.cc/8373-MNES.

Gender ideology has proven especially dangerous for children. The number of minors experiencing gender dysphoria has risen dramatically over the past few years. Respaut & Ter-hune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022), bit.ly/3Fo0TzY. When these children seek help, gender-ideology advocates say that schools, medical professionals, and others must "affirm" the child's self-perception rather than their actual biological sex. *E.g.*, Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, *Version 8*, Int'l J. of Transgender Health S50 (2022), bit.ly/3Fthbrj. So-called "gender-affirming care" can include non-FDA-approved hormone treatments and even body-altering surgeries. *See White Paper: The Justice for Adolescent and Child Transitioners Act*, Do No Harm 3-5 (2023), perma.cc/X36C-H6AK (collecting sources). And the institutions entrusted with the care of our children, like schools, often start them on this path without even inform-ing parents. *E.g.*, Cowan, *California Becomes the First State to Ban Student Gender Notification Policies*, NY Times (July 16, 2024), bit.ly/3R6fMJB. All without a solid evidentiary basis that these treatments even "work" in the first place. *See White Paper*, Do No Harm, *supra*, at 6-15.

**2.** "[R]acial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). The Fifth Amendment bars the federal government from discrimi-nating based on race. *Davis v. Passman*, 442 U.S. 228, 236 (1979). Title VI ensures the federal government does not facilitate race discrimination in the private sector. 42 U.S.C. §2000d. And

other federal laws directly prohibit race discrimination by private actors. *E.g.*, 42 U.S.C. §1981 (contracting), §2000e-2 (employment), §3604-06 (housing), §18116(a) (healthcare).

Unfortunately, many institutions—governments, businesses, nonprofits, schools, and others—continue to treat people differently depending on their race. These entities, which often receive funding from the federal government, assign disadvantages (or sometimes outright exclude) whites, Asians, and other groups in the name of "diversity, equity, and inclusion." *E.g.*, Sailer, *University of Washington Violated Non-Discrimination Policy, Internal Report Finds*, Nat'l Ass'n of Scholars (Oct. 31, 2023), perma.cc/WZ9H-3BMW (school's diversity committee "pressured one hiring committee to re-rank finalist candidates on the basis of race"). And when they do, they violate federal law. DNH is familiar with the problem, as it has successfully litigated to end many discriminatory DEI programs in the medical field: physicians denied bonuses because they aren't black; doctors denied appointments to state medical boards because they are not racial minorities; students denied networking opportunities and scholarships because they are not "BIPOC" or from "underrepresented" communities. *See infra* I; Interv.Mot.4-5, 9-10.

**B.    The executive orders prioritize ending government-sponsored discrimination.**

On the campaign trail, candidate Trump promised to tackle the growing problems of extreme gender ideology and DEI discrimination. *See Trump vows to stop 'transgender lunacy' and make two genders official US policy*, France24 (Dec. 23, 2024), bit.ly/4hwfzdo; Smith, *Trump plans to ban diversity and inclusion programs on his first day in office*, The Telegraph (Oct. 23, 2024), bit.ly/41D1Bk0. After winning, President Trump followed through on that promise. In the first two days of his administration, he issued three executive orders combating dangerous gender ideologies and unlawful racial preferences.

The first, "Defending Women from Gender Ideology Extremism and Restoring Truth to the Biological Government," addresses "[e]fforts to eradicate the biological reality of sex." Exec. Order 14168 §1, 90 Fed. Reg. 8615 (Jan. 20, 2025), perma.cc/76GM-6W6F ("Gender Ideology Order"). Those efforts "fundamentally attack women by depriving them of their dignity, safety, and well-being" and "transfor[m] laws and policies designed to protect sex-based opportunities into laws and policies that undermine them." *Id.* In response, the order affirms that sex is an immutable biological reality and states that the federal government "will enforce all sex-protective laws to promote this reality." §2. In particular, the order:

(1) Defines key terms. "Man," "Woman," and related terms are defined to reflect biological characteristics. §2(a)-(e). And "gender ideology" refers to efforts to "requir[e] all institutions of society" to adopt the view "that males can identify as and thus become women and vice versa." §2(g).

(2) Instructs agencies to operate on the understanding that men and women are distinct. §§3-4. Accordingly, federal agencies must enforce civil-rights laws "to protect men and women as biologically distinct sexes." §3(b)-(c).

(3) Directs agencies to ensure that federal grants are not used to support "gender ideology." §3(e), (g).

(4) Protects First Amendment rights by directing the Attorney General to issue guidance "ensur[ing] the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities." §5.

The second order, "Ending Radical and Wasteful Government DEI Programs and Preferencing," eliminates "illegal and immoral discrimination programs" in the federal government. Exec. Order 14151 §1, 90 Fed. Reg. 8339 (Jan. 20, 2025), perma.cc/J42P-CN2C ("Ending DEI Order"). This order focuses on undoing the harmful effects of prior executive orders that forced federal agencies to develop "Equity Action Plans" and implemented "shameful discrimination" throughout the government. *Id.* To that end, the order:

(1)   Orders agencies to tally the cost to the taxpayer of the prior administration's DEI policies and recommend actions to replace those policies with a "policy of equal dignity and respect." §2(b)(iii)

(2)   Convenes a meeting of agency leaders to recommend "effective civil-rights policies for the Executive Branch." §2(c).

(3)   Eliminates DEI mandates from the federal government. Agencies are instructed to terminate, "to the maximum extent allowed by law," DEI offices and staff, "equity" plans, "equity" grants and contracts, and DEI requirements for employees, contractors, or grantees. §2(b)(i)

(4)   Instructs each agency to prepare lists of (A) DEI-related positions within the agency, (B) contractors who have provided "DEI training" to the agency, and (C) grant recipients who received federal money for DEI-related programs or activities from the agency. §2(b)(ii). The order does not instruct anyone to take any action against these positions, contracts, or grants.

The third and final order, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," implements federal civil-rights laws by terminating DEI preferences in the federal government and withdrawing financial support for unlawful private-sector discrimination. Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025), perma.cc/W2JB-ZN3H ("Restoring Merit Order"). Discriminatory DEI practices, the order explains, undermine national unity and ignore the importance of individual merit. §1. More importantly, they "can violate the civil-rights laws of this Nation." *Id.* Accordingly, the order:

(1)   Rescinds prior executive orders that implemented discriminatory DEI preferences throughout the government. §3(a).

(2)   Removes race as a factor in federal contracting by: ending the government's preference for contractors who discriminate in the name of affirmative action, §3(b)(ii), requiring contractors to certify that they do not operate any DEI programs that violate federal antidiscrimination laws, §3(b)(iv), eliminating "diversity" and "equity" mandates and removing other references to DEI from grantmaking and contracting procedures, §3(c).

(3)   Instructs the Attorney General and other agency heads to prepare recommendations on how best to "enforc[e] federal civil-rights laws" and "end illegal discrimination"

in the private sector. §4(b). The report will identify the "most egregious" violators of federal law. §4(b)(i)-(iii), but it does not order or specifically authorize any enforcement action.

(4)     Directs agencies to prepare regulations and guidance to inform private entities (like employers and universities) of their nondiscrimination obligations under federal civil-rights laws. §§4(b)(vi), 5.

**C.     Plaintiffs ask for a broad injunction barring any application of the orders.**
Plaintiffs filed this lawsuit a month after President Trump issued the executive orders. A week later, they filed this preliminary-injunction motion. *See* PI-Mot. (Doc.29). All three Plaintiffs are nonprofits "committed" to DEI and gender ideology. Compl. ¶2. They operate a number of programs that offer academic, professional, financial, and medical benefits to millions of Americans. Compl. ¶¶18-23. But many are not equally open to everyone; they use illegal considerations to determine who receives their help. *See infra* I. All three Plaintiffs receive funding from the federal government, and that funding might now be at risk because they operate race-based programs. Compl. ¶¶4, 18-23.

Plaintiffs' lawsuit challenges many of the orders' "key provisions," including the funding-termination provisions, the provisions requiring federal contractors to certify that they do not violate civil-rights laws, the provisions excising certain DEI-related terms from federal contracting and grantmaking guidelines, and the provisions instructing federal agencies to prepare recommendations on enforcing civil-rights laws against illegal DEI practices. PI-Mot. (Doc. 29) at 1; PI-Mem. (Doc. 29-1) at 4-7. They lodge a series of legal attacks on these provisions, arguing everything from the First Amendment to vagueness to the Administrative Procedure Act. *See* Compl. ¶¶231-333; PI-Mem.14-39.

Then Plaintiffs ask this Court for broad relief. Ultimately, they demand a declaration that the orders are "unlawful, unconstitutional, and invalid" in their entirety, along with an

injunction that prohibits the government from enforcing any part of the orders and that requires the government to permanently rescind any directives implementing the orders. Compl.99. The preliminary-injunction motion is similarly broad. Like their ultimate request for relief, it seeks to enjoin the orders *themselves*, rather than any specific implementing actions taken against Plaintiffs. *See* Prop.-PI-Order (Doc.29-10) at 1-2; PI-Mem.3 & n.4. Plaintiffs ask the Court to bar the government from enforcing the orders' key provisions against *anyone*—Plaintiffs or otherwise—or promulgating any rules or regulations to facilitate such enforcement. Prop.-PI-Order at 1-2.

## ARGUMENT

Preliminary injunctions are "an extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). All the more so here, where Plaintiffs seek to enjoin "key provisions" of three executive orders in all their applications. PI-Mot.1; *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) ("Facial challenges are disfavored for several reasons."). To secure such an injunction, a plaintiff "must show," among other things, that "it is likely to succeed on the merits." *Nat'l Immigration Proj. of Nat'l Lawyers Guild v. EOIR*, 2020 WL 2026971, at *5 (D.D.C. Apr. 28). DNH will focus on the absence of the first—and, in a constitutional case, fatal—factor.

Plaintiffs make only two arguments in support of a preliminary injunction. First, that the challenged orders are impermissibly vague. And second, that the orders chill protected speech. (Plaintiffs' motion does *not* press an equal-protection, separation-of-powers, or Administrative Procedure Act argument. Nor does it argue that the orders violate federal spending statutes.) Both arguments fail. The orders are not vague in all applications, or even as

applied to Plaintiffs. And there is no First Amendment right to discriminate. Any contrary result would itself violate federal law.

## I.    The orders are not unconstitutionally vague.

Plaintiffs' lead argument is that the challenged executive orders are unconstitutionally vague. But vagueness is a demanding standard. It requires showing not just that the challenged law is "imprecise," but that "no standard of conduct is prescribed at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). And the required showing is even more difficult when, as here, plaintiffs bring a facial challenge. Such challenges succeed "only if the enactment is impermissibly vague in all of its applications." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982). And if the enactment is not vague as applied to Plaintiffs, they "cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian L. Proj.*, 561 U.S. 1, 20 (2010).

Plaintiffs have not met their burden of proving facial vagueness, for at least three independent reasons: The orders have clear and plainly lawful applications. The orders are lawful as applied to Plaintiffs. And the orders do not regulate Plaintiffs' conduct, so the vagueness doctrine does not even apply.

**1.** Plaintiffs' vagueness challenge fails because the orders are not vague. They provide a clear standard for compliance: existing law. Their explicit purpose is to effectuate "our civil-rights laws … by ending illegal preferences and discrimination." Restoring Merit Order §1; *see* Ending DEI Order §1 (putting an end to "illegal and immoral discrimination programs"). To that end, and as Plaintiffs acknowledge, *e.g.*, PI-Mem.18, the orders draw a clear distinction between lawful and unlawful practices. And they direct federal officials to terminate funding for *unlawful*, not lawful, practices.

Take §3(c)(iii) of the Restoring Merit Order, which orders the termination of certain DEI-related programs and grants. Plaintiffs say it is too vague because they cannot know "what they must do or not do to ensure their programs are not among those terminated." PI-Mem.16-17. But their confusion is manufactured. In reality, the language of the order makes clear that funding will be terminated only for DEI programs that violate federal law. The stated purpose of §3(c)(iii), like the rest of §3, is "terminating *illegal discrimination* in the federal government." §3 (emphasis added); *see Grand Trunk W. R.R. Co. v. DOL*, 875 F.3d 821, 826 n.6 (6th Cir. 2017) ("[T]he title of a statute and the heading of a section … can assist in clarifying ambiguity.") (cleaned up); *United States v. Lemus*, 93 F.4th 1255, 1260 (9th Cir. 2024) (same).

Section 3(b)(iv)(B) of the Restoring Merit Order is even clearer. This provision simply requires federal contractors and grant recipients to "certify" that they do not operate any DEI programs that "violate … applicable Federal anti-discrimination laws." This phrase clearly limits the provision's application: contractors and grantees whose DEI programs violate antidiscrimination law cannot satisfy the certification requirement, but those whose programs *don't* discriminate in violation of federal law can. Indeed, even Plaintiffs seem to agree that the phrase has an obvious meaning that "truly limits the kind of programs the Provision prohibits." PI-Mem.18. In their words, it "allow[s] contractors and grantees to operate some programs promoting DEI as long as they do not violate anti-discrimination laws." PI-Mem.18. Plaintiffs suggest that lawyers might argue about exactly which DEI programs violate federal law, but they don't dispute that the touchstone either way is *existing* federal law. *See* PI-Mem.18.

And federal law is clear. "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, or denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d (Title VI). Plaintiffs, of course, do not argue that Title VI—or any other federal civil-rights law—is unconstitutionally vague. Nor could they. *See Lucero v. Detroit Pub. Schs.*, 160 F. Supp. 2d 767, 784 (E.D. Mich. 2001) ("The Title VI provisions are not vague and amorphous but clearly state that discrimination based upon race, color or national origin should not be the basis for exclusion or the denial of benefits.") So the certification requirement, which merely effectuates federal antidiscrimination law, is clear too. That explains why federal contracts have, *since 1965*, included substantially the same language governing contractors' employment practices. *See* Exec. Order 11246 §202, 30 Fed. Reg. 12319 (Sept. 28, 1965) (contractors must agree they "will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin").

Section 2(b)(i) of the Ending DEI Order is similarly bounded by federal law. *Contra* PI-Mem.16. In relevant part, it instructs agency heads to terminate "equity-related" grants or contracts. Plaintiffs quibble with the meaning of the term "equity-related," PI-Mem.16, but ignore the provision's real limiting language: Agency heads are to terminate equity-related funds "to the maximum extent allowed by law," §2(b)(i). As the D.C. Circuit has explained, that language offers clear direction to executive-branch officials. "If an executive agency … may lawfully implement the Executive Order," in this case by terminating an equity-related grant or contract, "then it must do so." *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). "If the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.* Plaintiffs worry that funding for *their* equity-related programs may be terminated. *See* PI-

Mem.16. But their belief that their conduct "conceivably fall[s] within the Provision's ambit," if anything, proves that the provision is *not* vague. PI-Mem.16. Perhaps the termination provision is "broad." PI-Mem.16. But laws are not vague just because they are broad. *Calzone v. Summers*, 942 F.3d 415, 426 (8th Cir. 2019). Nor are they vague just because a plaintiff does not want to follow them.

Finally, Plaintiffs take issue with the use of the term "promote" in §3(b)(iv)(B) of the Restoring Merit Order and §3(g) of the Gender Ideology Extremism Order. PI-Mem.20-21. (Though, confusingly, Plaintiffs *also* argue that "promotion" in the gender order *is* "define[d] in such a way as to" thwart their "advocacy for" transgender people. PI-Mem.6.) To support this point, Plaintiffs cite only a single decision: *United States v. Williams*, 553 U.S. 285 (2008). But that decision doesn't help Plaintiffs' argument; it hurts them. In *Williams*, the Court held that the term "promote" was *not* unconstitutionally vague when read "in context." *Id.* at 294-95 (statute barring the promotion of child pornography not vague). And other decisions have found the word "promote" sufficiently clear in other contexts. *E.g.*, *McConnell v. FEC*, 540 U.S. 93, 170 n.64 (2003) (statute regulating advertisements that promote a candidate for public office), *overruled on other grounds*, *Citizens United v. FEC*, 558 U.S. 310 (2010); *United States v. Martono*, 2021 WL 39584, at *2 (N.D. Tex. Jan. 5) (statute barring promotion of prostitution).

Here too, the word "promote" has a clear meaning when read in the context of the orders as a whole, even though it is not used "in a list" of related terms. *Martono*, 2021 WL 39584 at *2; *contra* PI-Mem.21 (arguing that "promote" must be vague here because it is not part of a longer list). A covered program "promotes" DEI if it supports or encourages the use of "dangerous, demeaning, and immoral race- and sex-based preferences." Ending DEI Order

§1; *see Promote*, Oxford English Dictionary at 1421 (3d ed. 2010) ("support or actively encourage (a cause, venture, etc.)"); *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005) (holding that a person "promotes" terrorism when they "hel[p] or encourag[e]" it).† Similarly, funds are used to "promote gender ideology" when they support the belief "that males can identify as and thus become women and vice versa" and encourage "institutions of society to regard this false claim as true." Gender Ideology Extremism Order §§2(f), 3(g). Using federal funds to treat the "communities most impacted by HIV," for example, would not run afoul of that requirement, because it does not necessarily endorse the view that biological sex is immutable. PI-Mem.21.

Forced to confront the actual text of the orders, Plaintiffs' vagueness argument boils down to a complaint that the orders do not provide exact definitions for every term. *E.g.*, PI-Mem.16 (complaining that terms like "equity" and "diversity" are "undefined"). But it is "commonsensical" that an order "need not define every term to survive a vagueness challenge." *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 717 (7th Cir. 2016) (collecting cases). That's what statutory (or regulatory) construction is for: In the absence of definitions, courts simply "apply a word's common and ordinary meaning, taking into account the context in which it is used." *Calzone*, 942 F.3d at 426. And here, the orders have a readily ascertainable, even if not exact, meaning. *See, e.g., Diversity, Equity, and Inclusion*, Merriam-Webster Dictionary (accessed Mar. 10, 2025), perma.cc/BR47-NAYS. The Fifth Amendment demands only a "reasonable degree

---

† In addition to the promotion requirement, §3(b)(iv)(B) of the Restoring Merit Order is *also* limited by the requirement that the program "violate … Federal anti-discrimination laws" because the program employs race-based criteria. Therefore, not all programs "promoting DEI" are precluded by §3(b)(iv)(B).

of certainty," not "meticulous specificity." *U.S. Telecomm. Ass'n v. FCC*, 825 F.3d 674, 737 (D.C. Cir. 2016).

**2.** Of course, there is "little doubt that imagination can conjure up hypothetical cases" in which the orders' exact meaning is unclear. *See Am. Commc'ns Ass'n. v. Douds*, 339 U.S. 382, 412 (1950). But even if Plaintiffs could conjure such an example here, it would not help them because vagueness in one application does not show vagueness in "all" (or even most) applications. *Hoffman Estates*, 455 U.S. at 494-95 (1982); *see United States v. Harris*, 347 U.S. 612, 618 (1954) ("marginal cases" where "doubts might arise" do not render a statute unconstitutionally vague). As long as a challenged law gives "sufficient notice" in the mine run of cases, it passes muster. *U.S. Telecomm. Ass'n*, 825 F.3d at 736. And these orders have at least one set of clear (and clearly constitutional) applications.

Whatever else they require, the orders clearly instruct federal officials to terminate funding for programs, both government-run and in the private sector, that violate federal civil-rights laws. *See, e.g.*, Ending DEI Order §§1, 2(b)(i) (targeting "illegal and immoral discrimination programs" and requiring the "terminat[ion]" of such programs "to the maximum extent allowed by law"); Restoring Merit Order §3(b)(iv)(B) (requiring every contract or grant recipient to "certify that it does not … violate applicable Federal antidiscrimination laws"). Unfortunately, these programs remain a very real problem, even after the Supreme Court called for an end to "all" government-sponsored discrimination in *SFFA v. Harvard*, 600 U.S. 181, 206 (2003). Many entities operate racially exclusive or otherwise discriminatory programs in violation of Title VI, the Equal Protection Clause, and other antidiscrimination laws. In fact, DNH has litigated to end many such programs:

- Pizer, the pharmaceutical giant, operated and widely promoted a "first-of-its-kind" fellowship program—the Breakthrough Fellowship Program—for students pursuing advanced degrees in business, health, and statistics. The fellowship promised summer internships, a full scholarship for graduate school, and ultimately a job at Pfizer. But white and Asian applicants were not invited to apply. That exclusion violated a number of federal antidiscrimination laws—including Title VI's ban on race discrimination in programs receiving federal funds, 42 U.S.C. §2000d, the Affordable Care Act's ban on race discrimination in health-related programs, 42 U.S.C. §18116(a), and the Civil Rights Act's ban on race discrimination in the making of contracts, 42 U.S.C. §1981. So DNH sued; and only after hard-fought litigation did Pfizer agree to remove race as a criterion for selecting fellows. *See* Rasmussen-Decl. ¶7.

- The University of Colorado hosted visiting medical students for a rotation in its Radiation Oncology Department and offered a $2,000 scholarship to defray the costs of attendance. But the scholarship was available only to "historically underrepresented" minorities, which—in the University's eyes—excludes white and Asian applicants. The racial criteria violated the Equal Protection Clause and Title VI, and the University eliminated that requirement only after DNH filed a lawsuit. *See* Rasmussen-Decl. ¶6.

- In 2021, the Centers for Medicare & Medicaid Services issued a rule that pays doctors more money if they adopt an "anti-racism plan" for their practice. The rule injects race-based decision-making into our health care system, in violation of the Medicare Access and CHIP Reauthorization Act of 2015. With DNH's support, a doctor (and a coalition of States) sued to vacate the rule, which remains in force today while the litigation continues. *See* Rasmussen-Decl. ¶4.

- The Society of Military Orthopaedic Surgeons, partnering with the U.S. Navy, organizes a scholarship program—which includes a four-week educational experience at a naval hospital and an up-to-$12,000 stipend—for "underrepresented" medical students. But SOMOS does not consider white men to be "underrepresented," so they are excluded. DNH has sued to end the program, which violates 42 U.S.C. §1981 and the Fifth Amendment's equal-protection requirements. *See* Rasmussen-Decl. ¶5.

These programs plainly fall within the scope of the executive orders: (1) they are focused on diversity, equity, and inclusion, and (2) they violate federal antidiscrimination laws. *See* Ending DEI Order §§1, 2(b)(i); Restoring Merit Order §3(b)(iv)(B) (targeting such programs). And other examples are not hard to find. *See Litigation*, Do No Harm, bit.ly/3XpN3D6. Thankfully, DNH has managed to shut many of these programs down. But

15

resources are limited, and groups like DNH cannot police discrimination everywhere. As a result, other unlawful DEI practices remain unchallenged, and without the executive orders withdrawing their funding, they may continue. As a small sample:

- The federal government runs a "Minority Fellowship Program" through the Substance Abuse and Mental Health Services Administration. *Minority Fellowship Program*, SAMHSA (accessed Mar. 13, 2024), bit.ly/4irsbUt. The program provides financial and educational benefits to those who are "committed to improving behavioral health outcomes for underserved, ethnic minority communities." *Fact Sheet* (archived Mar. 13, 2024), perma.cc/6PSW-J4EL. Various partner organizations administer the fellowship on SAMHSA's behalf, and many of them use race as a factor (or requirement) when selecting fellows. *E.g.*, *Eligibility Criteria*, Am. Nurses Ass'n (archived Mar. 13, 2024), perma.cc/LJ5N-BY72; *Interdisciplinary Minority Fellowship Program*, APA Leadership Dev. Inst. (archived Mar. 13, 2025), perma.cc/255E-6HTE; *MFP - Doctoral Students*, Council on Social Work Education (archived Mar. 13, 2025), perma.cc/8GD2-CLDA

- The Cleveland Clinic, which receives hundreds of millions of dollars each year from the federal government, distributes medical care based on race. *Lerner Research Institute Outcomes*, Cleveland Clinic (archived Mar. 13, 2025), perma.cc/6PRY-DPXB. Its "Minority Stroke Program" increases awareness about the causes of strokes and helps those who have suffered a stroke avoid additional health complications. *Minority Stroke Program* (archived Mar. 13, 2025), perma.cc/J8KA-PP4T. But the program, motivated by supposed "disparities" in health outcomes, only helps "racial and ethnic minorities." *Id.* And it encourages other healthcare professionals to "replicate" the race-exclusive program elsewhere. *Closing Racial Gaps in Cerebrovascular Mortality* (archived Mar. 13, 2025), perma.cc/WYC5-2WBR.

- According to whistleblowers who served on the school's admissions committee, the prestigious UCLA School of Medicine has for years considered race in admissions, in violation of both state and federal law. Sibarium, *'A Failed Medical School': How Racial Preferences, Supposedly Outlawed in California, Have Persisted at UCLA*, Wash. Free Beacon (archived Mar. 13, 2025), perma.cc/ULF5-5DBB; *see SFFA*, 600 U.S. at 213.

Again, the executive orders clearly require termination of funds for these programs. Not even Plaintiffs dispute that. Which means the orders have a "core meaning that can be reasonably understood." *Brache v. Westchester County*, 658 F.2d 47, 50-51 (2d Cir. 1981. And that ascertainable core meaning "necessarily means that the [orders are] not vague on [their] face." *Id.*; *see United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1981) (same); *United States v.*

*Sandlin*, 575 F. Supp. 3d 16, 30 (D.D.C. 2021) (same); *Hill v. Colorado*, 530 U.S. 703, 733 (2000)

("[V]agueness in hypothetical situations … will not support a facial attack on a statute when it

is surely valid in the vast majority of its intended applications." (cleaned up)).

In any event, the orders are not vague as applied to Plaintiffs, as Plaintiffs themselves

operate a number of unlawful DEI programs. And a "plaintiff who engages in some conduct

that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct

of others. That rule makes no exception for conduct in the form of speech." *Holder*, 561 U.S.

at 20 (cleaned up). Consider just a few examples of Plaintiffs' discriminatory activities:

- The National Urban League operates "Project Ready," a career and college preparation program that offers academic and social support, including a mentorship program, for 6th through 12th-graders. Membership in the program is also a prerequisite to receive the organization's college scholarship. *See* Rasmussen-Decl. ¶9. And the program is funded at least in part "by a grant from the DOJ." Compl. ¶145. But Project Ready is not equally open to everyone; it "specifically targets 11 to 18-year-old African American" students. *See* Rasmussen-Decl. ¶9.

- The National Fair Housing Alliance runs an "Inclusive Communities Grant Program," which works with local partners to support homeownership (including through preferential home loans) specifically in "Black and Latino communities." In fact, the grant application explicitly asks applicants to "certify that activities proposed in this application will serve a community in predominantly Black or Latino census tracts OR will serve clients who are Black or Latino." Rasmussen-Decl. ¶10. The grants come from settlement funds NFHA has secured in Fair Housing Act lawsuits. *Funding Opportunity Announcement*, perma.cc/DFU6-FSBN. NFHA's activities, including its Fair Housing Act lawsuits, are funded in significant part by federal contracts and grants. Compl. ¶164 (federal funds account for more than a quarter of NFHA's 2025 budget).

- The AIDS Foundation of Chicago has multiple race- and gender-based programs. It runs the "Women Evolving Program," which "streamline[s] entry into health care" exclusively for "Black cisgender and transgender women" who have recently finished serving a criminal sentence. It runs the "Women's Connection," which increases the accessibility of HIV-related care for "cis and trans women of color." And it runs the "Learning Circle Collaborative," which provides leadership training, technical assistance, and grants exclusively for "Black-led social service providers and organizations." Rasmussen-Decl. ¶11. "AFC receives a majority of its funding from HHS and HUD." Compl. ¶185.

These race-based activities violate federal antidiscrimination laws. *E.g.*, 42 U.S.C. §1981 (right to make and enforce contracts); 42 U.S.C. §2000d (Title VI); 42 U.S.C. §§3604-06 (Fair Housing Act); 42 U.S.C. §18116 (nondiscrimination in health care). And like the programs described above, they are covered by the executive orders. Indeed, Plaintiffs do not argue that it is not clear whether the orders apply to DEI programs that "violate the civil-rights laws of this Nation." Restoring Merit Order §1. After all, that's their "core" application. *Sandlin*, 575 F. Supp. 3d at 30. Because substantial conduct falls within that core, Plaintiffs cannot "successfully challenge it for vagueness." *Id.* (quoting *Parker*, 417 U.S. at 756).

**3.** Ultimately, though, even if the orders were somewhat "ambiguous," PI-Mem.15, Plaintiffs' Fifth Amendment argument still would not prevail because the vagueness doctrine does not apply to these orders in the first place. Vagueness applies to laws that actually regulate conduct or speech, not laws that merely outline criteria for government funding. The doctrine is designed to ensure that people of "ordinary intelligence" are able to conform their conduct to the law. *Grayned v. Rockford*, 408 U.S. 104, 108-09 (1972). But the government is not regulating anyone's conduct when it simply directs its own agencies on how to disburse subsidies, which is why the Supreme Court has long distinguished between "criminal statute[s] or regulatory scheme[s]" and "grants." *NEA v. Finley*, 524 U.S. 569, 588-89 (1998). The former are subject to vagueness while the latter are not. *Id.* at 587-89. "[W]hen the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe," even if some potential funding recipients might make the voluntary decision to "conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding." *Id.* at 589.

18

Proving the point, the Supreme Court "has steadfastly applied the void-for-vagueness doctrine only to statutes or regulations that purport to define the lawfulness of conduct or speech." *Nyeholt v. Sec'y of V.A..*, 298 F.3d 1350, 1356 (Fed Cir. 2002) (collecting cases). And Plaintiffs, for their part, have not cited any cases—outside of challenges to *these* executive orders—declaring a funding rule void for vagueness. If *any* vagueness standard applies to funding laws, it is certainly less rigorous than it is for laws that directly regulate expressive conduct. *FAIR v. Rumsfeld*, 291 F.Supp.2d 269, 318 (D.N.J. 2003).

This error is particularly fatal for Plaintiffs' enforcement-discretion argument. They worry that supposed imprecision in the orders' language will "create a risk of arbitrary enforcement." PI-Mem.21. But *none* of the provisions that Plaintiffs cite to justify this fear direct any kind of enforcement against nongovernment actors. *See* PI-Mem.21-24. Instead, they direct federal officials to remove DEI references from federal contracting and grant-disbursement procedures, Restoring Merit Order §3(c)(ii), prepare a list of entities that have received grants to conduct DEI or environmental-justice activities, Ending DEI Order §2(b)(ii)(C), identify the "most egregious and discriminatory DEI practitioners," Restoring Merit Order §4(b)(ii), develop a plan to deter "illegal discrimination" in the private sector, Restoring Merit Order §4(b)(iii), and revise grant conditions and preferences to ensure federal funds are not used to promote extreme gender ideology, Gender Ideology Order §3(g). These provisions do not "prohibi[t] any conduct"; they simply instruct federal officials on "how to exercise their discretion within the bounds established by Congress." *Beckles v. United States*, 580 U.S. 256, 266 (2017). So they "do not implicate the vagueness doctrine's concern with arbitrary enforcement." *Id.*

19

## II.    The First Amendment does not require the government to subsidize discrimination.

Plaintiffs' First Amendment argument fares no better than their vagueness argument. They say the orders penalize or chill disfavored "speech" by threatening to withdraw funding, impose liability under the False Claims Act, and enforce federal civil-rights laws against those who promote discriminatory DEI practices or gender ideology. PI-Mem.25-39. But two well-established principles put a stop to Plaintiffs' First Amendment arguments: Illegal discrimination is not speech; and even if it were, the government needn't subsidize it.

**1.** There is no First Amendment right to discriminate. "[A]lthough the Constitution does not proscribe private bias, it places no value on discrimination." *Norwood v. Harrison*, 413 U.S. 455, 469-70 (1973). The Supreme Court has therefore recognized that, while the Constitution might protect someone's right to harbor a *belief* in the propriety of racial discrimination, it "does *not* protect the very act of discriminating on the basis of race." *Am. Alliance for Equal Rights v. Fearless Fund Mgmt.*, 103 F.4th 765, 777-79 (11th Cir. 2024) (discussing Supreme Court cases); *see, e.g., Norwood*, 413 U.S. at 469-70; *Runyon v. McCrary*, 427 U.S. 160, 175-76 (1976); *Bob Jones University v. United States*, 461 U.S. 574, 602-04 (1983); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). Nor does it protect discriminatory acts with an expressive component: "[A]cts are not shielded from regulation merely because they [also] express a discriminatory idea or philosophy." *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992).

The challenged provisions of the Ending DEI and Restoring Merit Orders therefore do not trigger First Amendment scrutiny, because those orders target not just racial discrimination but *illegal* racial discrimination. *See Hishon*, 467 U.S. at 78 (enforcing civil rights laws to

prohibit race discrimination does not "infringe constitutional rights of expression or association"). Both announce, up front, that the purpose of the orders is to remove "illegal and immoral discrimination programs" from the federal government and the private sector. Ending DEI Order §1; *see* Restoring Merit Order §1 ("The purpose of this order is to ensure that" the government enforces "civil-rights laws" by "ending illegal preferences and discrimination."). And when a law "include[s] a statement of purpose," the court reads the statute's other terms "consistent with [that] expressed purpose." *HIAS, Inc. v. Trump*, 985 F.3d 309, 319 (4th. Cir. 2021). But the rest of the orders' text demonstrates a focus on illegal DEI discrimination as well. For example, §§3(c)(iii) and 4(b)(iii) of the Restoring Merit Order—the so-called "Enforcement Threat" and "Diversity Termination" provisions, PI-Mem.26, 31—specifically cover "illegal discrimination" and "illegal … preferences." §§3, 4, 4(b). And §3(b)(iv)(B), the "Certification Provision," PI-Mem.28-29, likewise affects only those DEI programs that "violate … Federal anti-discrimination laws."

**2.** Even if Plaintiffs' activities were protected by the First Amendment, they are not entitled to government funds to subsidize their expression. *Contra* PI-Mem.28-32 (complaining that parts of the orders, including the "Certification Provision" and various "Termination Provision[s]," threaten to withhold funding). Indeed, the Supreme Court "has never held" that the government "must grant a benefit … to a person who wishes to exercise a constitutional right." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983); *see id.* at 546 ("We … reject the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." (cleaned up)). Instead, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *AID v. All.*

*For Open Soc'y Int'l*, 570 U.S. 205, 214 (D.C. Cir. 2013). The only recognized exception to this general rule—an exception known as the "unconstitutional conditions" doctrine—prohibits the government from imposing a condition requiring a funding recipient to do something that the government "could not directly require" the recipient to do. *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 59 (2006); *see* PI-Mem.28 (relying on this exception). But there is no dispute that Congress constitutionally can prohibit—and *already has* prohibited—race-based decisionmaking in employment, contracting, and federally-funded programs. *See* 42 U.S.C. §§1981, 2000d. Hence why Harvard—a private university that received federal funds—could not claim a First Amendment exemption from Title VI that let it keep using race in admissions.

Plaintiffs' arguments to the contrary are reminiscent of the University's arguments in *Bob Jones*, which the Supreme Court roundly rejected. 461 U.S. at 592-96, 602-04. Like Plaintiffs here, Bob Jones claimed that a federal regulation withdrawing a financial benefit (tax-exempt status) from universities that "practice[d] racial discrimination" violated the First Amendment. *Id.* at 578, 602-03. The University's discriminatory practices were rooted in sincere "religious beliefs," which it argued were protected by the First Amendment's religion clauses. *Id.* at 602-03; *see* Compl. ¶6 (asserting that Plaintiffs' support for discriminatory DEI practices is rooted in a "fir[m] belie[f]" that such practices are "require[d]" to remedy "entrenched race and sex inequalities"). But the University's belief in the virtue of racial discrimination, explained the Supreme Court, could not outweigh the government's "fundamental, overriding interest in eradicating racial discrimination in education." 461 U.S. at 604. And the answer is the same here: Plaintiffs' belief in the benefits of discriminatory DEI practices—however sincere—

cannot overcome the "fundamental national public policy" against racial discrimination. *Id.* at 593.

Indeed, as *Bob Jones* noted, presidents have "consistently" used executive orders like those at issue here to further the "eradication of racial discrimination." *Id.* at 594. Like President Trump, "President Truman issued Executive Orders prohibiting racial discrimination in federal employment decisions." *Id.* And President Kennedy issued an order empowering federal agencies to "cancel or terminate" contracts with, and "refrain from extending further aid" to, entities that "discriminat[e] because of race, color, creed, or national origin." Exec. Order 11063 §§101, 302(a)-(b), 27 Fed. Reg. 11527 (1962); *see Bob Jones*, 461 U.S. at 594. President Trump's executive orders, in other words, are well within the historical norm.

## III.    If anything, federal law *requires* the government to eliminate discrimination in the private sector.

Plaintiffs are likely to fail on the merits for another reason: The challenged portions of the executive orders are not just permitted by existing civil-rights law; they are required. Federal law prohibits disbursing funds to facilitate racial discrimination by private parties.

Start with the Constitution. The Fifth Amendment bars discrimination on the basis of race by the federal government. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217-18 (1995); *United States v. Windsor*, 570 U.S. 744, 774 (2013). It is "implicated any time the federal government treats people differently because of their race." *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 473-74 (N.D. Tex. 2024). And it plainly covers programs that use race as a factor when deciding who will receive academic, professional, financial, medical, or other benefits. *E.g.*, *Nuziard*, 721 F. Supp. 3d at 449, 497-98 (federal agency violated Fifth Amendment

23

when it used a "racial barrier" to determine which small businesses received "grant opportunities" and other resources). Critically, the government may not circumvent the Fifth Amendment's ban on racial discrimination by outsourcing the actual discrimination to private actors: It is "'axiomatic that [the government] may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.'" *Norwood*, 413 U.S. at 464.

That anticircumvention rule covers payments that support discriminatory programs. In *Norwood*, for example, the Supreme Court held that Mississippi could not use state funds to provide free textbooks to students at a private school that admitted students based on race. *Id.* at 463-64; *see Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 608 (D.S.C. 1974) ("[T]he federal government cannot, consistent with the Due Process Clause of the Fifth Amendment, provide direct grants-in-aid to" a university that discriminates "on the basis of race."). Other courts have applied the Fifth Amendment to hold that the government cannot fund discrimination in law enforcement agencies, *Nat'l Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 580-83 (D.C. Cir. 1983), or segregation in low-income housing programs, *Gautreaux v. Romney*, 448 F.2d 731, 737 (7th Cir. 1971); *Young v. Pierce*, 628 F. Supp. 1037, 1052 (E.D. Tex. 1985). The government's "constitutional obligation requires it to steer clear, not only of" discriminating itself, "but also of giving significant aid to institutions that practice racial or other invidious discrimination." *Norwood*, 413 U.S. at 467.

Statutory civil-rights laws likewise compel the federal government to refrain from funding discrimination. Most obviously, Title VI was enacted to eliminate "'[f]ederal financial assistance to racially segregated institutions.'" *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 331 (1978) (Brennan, J., concurring in part and dissenting in part). It prohibits discrimination

"under any program or activity receiving Federal financial assistance" and directs federal agencies "to effectuate" that prohibition through implementing regulations. 42 U.S.C. §§2000d, d-1. Courts have interpreted Title VI to impose an affirmative obligation on federal agencies to withdraw funds from entities who have engaged in racial discrimination. *E.g.*, *Adams v. Richardson*, 480 F.2d 1159, 1161-63 (D.C. Cir. 1973); *Shannon v. HUD*, 436 F.2d 809, 819 (3d Cir. 1970); *Gautreaux*, 448 F.2d at 737, 740.

Put simply, federal law leaves no room for discretion. The government *must* ensure its funds are not going towards discriminatory enterprises. *See Nat'l Black Police Ass'n*, 712 F.2d at 581 (it is not "permissible for the federal government to fund discriminating agencies"). And the executive orders here carry out that obligation: They remove race as a factor from federal grants and contracts specifically to "comply with civil-rights laws." Restoring Merit Order §§3(b), 3(c)(ii); *see* Ending DEI Order §2(b)(i). Given the demands of the Fifth Amendment and Title VI, if the government did not have a policy against discriminatory funding—like the policy set forth in these orders—it would be obligated to create one. *Cf. Adams*, 480 F.2d at 1162 ("a general policy" of not enforcing Title VI's ban on racial discrimination "is in effect an abdication of its statutory duty"). Plaintiffs' challenge must fail because it asks the government to abandon its constitutional and statutory obligations.

## CONCLUSION

This Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: March 13, 2025                    Respectfully submitted,

                                         */s/ Cameron T. Norris*
                                         Thomas R. McCarthy (DC Bar
                                         #489651)
                                         Cameron T. Norris
                                         Frank H. Chang (DC Bar #1686578)
                                         Paul R. Draper*
                                         CONSOVOY MCCARTHY PLLC
                                         1600 Wilson Boulevard
                                         Suite 700
                                         Arlington, VA 22209
                                         (703) 243-9423
                                         tom@consovoymccarthy.com
                                         cam@consovoymccarthy.com
                                         frank@consovoymccarthy.com
                                         paul@consovoymccarthy.com

                                         *\* pro hac vice application forthcoming*

                                         *Counsel for Do No Harm*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with LCvR.5.1(d) and LCvR.7(o)(4) and is pre-

pared in a double-spaced format using 13-point Garamond font.

        Dated: March 13, 2025                    */s/ Cameron T. Norris*
                                                 Counsel for Do No Harm

## CERTIFICATE OF SERVICE

On March 13, 2025, I e-filed this motion and its attachments with the Court via ECF,

which will email everyone requiring service.

        Dated: March 13, 2025                    */s/ Cameron T. Norris*
                                                 Counsel for Do No Harm