## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL URBAN LEAGUE, et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 25-cv-00471 |
| DONALD J. TRUMP, et al., | |
| *Defendants.* | |

### <u>PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>

Jin Hee Lee, DC Bar No. 1740850
Gabriel Diaz, DC Bar No. 991618
Donya Khadem, DC Bar No. 1719557
NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
jlee@naacpldf.org
gdiaz@naacpldf.org
dkhadem@naacpldf.org

Leah Wong
NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
lzwong@naacpldf.org

Camilla B. Taylor, DC Bar No. IL0098
Kenneth D. Upton, Jr., DC Bar No. 1658621
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
(312) 605-3225
ctaylor@lambdalegal.org
kupton@lambdalegal.org

Stacey K. Grigsby, DC Bar No. 491197
Sarah E. Harrington, DC Bar No. 219218
Alison DiCiurcio, DC Bar No. 1601410
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
sgrigsby@cov.com
sharrington@cov.com
adiciurcio@cov.com

Nicholas E. Baer, DC Bar No. 1672517
James H. Fitch, DC Bar No. 1780894
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
nbaer@cov.com
jhfitch@cov.com

Jose Idio Abrigo
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(646) 307-7406
jabrigo@lambdalegal.org

Pelecanos
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017*
(323) 370-6909
pelecanos@lambdalegal.org

*Address for mailing purposes only

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

ARGUMENT ...................................................................................................................... 3

I.      Plaintiffs' Claims Are Justiciable. ........................................................................ 3

II.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims........................... 7

        A.      Plaintiffs Are Likely to Succeed on the Merits of Their Fifth Amendment
                Claims. ....................................................................................................... 7

        B.      Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment
                Claims. ..................................................................................................... 14

III.    Plaintiffs Have Satisfied the Remaining Factors for a Preliminary Injunction. ............... 20

        A.      Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm. .......... 20

        B.      The Balance of Equities and Public Interest Favor Relief. ................................... 23

IV.     Defendants Urge this Court to Enter an Unduly Narrow Injunction. .............................. 24

V.      A Bond Under Rule 65(c) Is Not Appropriate. ................................................... 25

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found.*
    *v. District of Columbia*,
    846 F.3d 391 (D.C. Cir. 2017) ........................................................................8, 13

*Agency for International Development v. Alliance for Open Society International,*
    *Inc.*,
    570 U.S. 205 (2013) ...................................................................................16, 18

*Aracely, R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018) ....................................................................21

*Baggett v. Bullitt*,
    377 U.S. 360 (1964) ...........................................................................................10

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ...............................................................................7

*Board of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972) ...........................................................................................10

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017) ..................................................................................3

*Crooks v. Mabus*,
    845 F.3d 412 (D.C. Cir. 2016) ...........................................................................13

*Cutter v. Wilkinson*,
    423 F.3d 579 (6th Cir. 2005) .............................................................................17

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) .............................................................................................4

*Elrod v. Burns*,
    427 U.S. 347 (1976) (plurality opinion) .............................................................21

*FCC v. Fox Television Studios*,
    567 U.S. 239 (2012) .....................................................................................11, 13

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .............................................................................................3

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975) ...........................................................................21

*Greatness v. Fed. Election Comm'n,*
    831 F.3d 500 (D.C. Cir. 2016) ................................................................................23

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ...................................................................................................13

*Humanitarian L. Project v. U.S. Treasury Dep't,*
    578 F.3d 1133 (9th Cir. 2009) ...........................................................................12, 13

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
    341 U.S. 123 (1951) (Black, J., concurring) ......................................................11, 19

*Karem v. Trump,*
    960 F.3d 656 (D.C. Cir. 2020) ................................................................................22

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ................................................................................................13

*Laird v. Tatum,*
    408 U.S. 1 (1972) ............................................................................................4, 15, 18

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ....................................................................................22

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................................3

*Maryland v. King,*
    567 U.S. 1301 (2012) ..............................................................................................20

*Meachum v. Fano,*
    427 U.S. 215 (1976) ................................................................................................11

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009) ..............................................................................21

*Mountain States Legal Found. v. Glickman,*
    92 F.3d 1228 (D.C. Cir. 1996) ..................................................................................3

*N.Y. Republican State Comm. v. SEC,*
    799 F.3d 1126 (D.C. Cir. 2015) ................................................................................5

*National Association of Diversity Officers in Higher Education v. Trump*
    *("Diversity Officers"),* No. 25-1189 (4th Cir. Mar. 14, 2025) ................................7

*Diversity Officers*, no. 1:25-cv-00333, 2025 WL 573764 (D. Md. Feb. 21, 2025)...........10, 12, 23

*Nat'l Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 (2024) ................................................................................................15

*Nat'l Student Ass'n v. Hershey*,
    412 F.2d 1103 (D.C. Cir. 1969) ........................................................................5

*National Council of Nonprofits v. OMB*
    2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) .............................................25

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
    48 F. Supp. 3d 87 (D.D.C. 2014) ....................................................................21

*P.J.E.S. by & through Escobar Francisco v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) .................................................................25

*Reeve Aleutian Airways, Inc. v. United States*,
    982 F.2d 594 (D.C. Cir. 1993) .........................................................................11

*Rosenberger v. Rector & Visitors of U. Va.*,
    515 U.S. 819 (1995) .........................................................................................15

*Rust v. Sullivan*,
    500 U.S. 173 (1991) .........................................................................................18

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020) ........................................................12, 23

S*print Commc'ns Co. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ...........................................................................................3

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...........................................................................................5

*Turner v. U.S. Agency for Glob. Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) .................................................................23

*Unity08 v. FEC*,
    596 F.3d 861 (D.C. Cir. 2010) ...........................................................................5

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .........................................................................................20

*Wis. Gas. Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .........................................................................22

*Woodhull Freedom Found. v. United States*,
    948 F.3d 363 (D.C. Cir. 2020) ......................................................................5, 13

## Other Authorities

Wright & Miller, 13B Fed. Prac. & Proc. Juris. § 3532.5 (3d ed.) .................................5

iv

U.S. Const. amend. I ................................................................................................ *passim*

U.S. Const. amend. V ........................................................................................7, 13, 14

Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ..............................................................................................................2

Exec. Order No. 14173, § 4, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025) ......................................2, 15, 17

Fed. R. Civ. P. 65 ..........................................................................................................24, 25

OMB Memo M-25-13 ..........................................................................................................4

Off. of the Att'y Gen., DOJ, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025) ......................................................................................2, 9

The Court is faced with three Executive Orders that violate Plaintiffs' core constitutional rights.  Defendants argue that the Court should not reach the merits of those claims because they are "speculative" and thus not justiciable.  That is not so.  Defendants are already implementing the unconstitutional orders to cancel and freeze Plaintiffs' funding because Plaintiffs support views the Administration opposes.  Defendant CDC froze funding to AFC on January 28, 2025 and froze a contract that funds AFC's work on February 1; on January 31, NHFA learned that Defendant HUD canceled a subcontract based off a keyword search of terms the Administration disfavors, and on February 11, HUD canceled part of another equity-related NFHA subcontract; and on March 12, NUL learned that Defendant EPA froze one of its grants.  Defendants have sent Plaintiffs and other similarly situated organizations clear specific threats that the government will take further adverse action because of the Orders—including action punishing them for purely private speech.  Simply put, Defendants are inflicting financial and constitutional injuries now, and therefore now is the appropriate time for the Court to enjoin them from causing further irreparable harm to Plaintiffs.

Plaintiffs have also shown that they are likely to prevail on the merits of their claims, and Defendants' arguments in opposition do not change that conclusion.  Defendants hardly attempt to explain how any of the provisions that Plaintiffs challenge as unconstitutionally vague are clear.  In addition, the Orders attack free speech much more forcefully than Defendants acknowledge.  Defendants say the Orders merely reflect the President's "policy priorities" for government-funded speech.  Defs.' Mem. at 11, 24, 36–37, 51, 53.  But the Administration has made clear that the Orders target private expression: the Orders explicitly try to get the "Private Sector to End Illegal

DEI,"[1] and after the President issued them, he proclaimed that his Administration "ended the tyranny of so-called Diversity, Equity, and Inclusion policies" in "the private sector."[2]  Defendants also say that key provisions of the Orders "target only illegal conduct" and do not "state that all DEIA is illegal."  Defs.' Mem. at 14, 41.  But the Attorney General has stated—without limitation—that the Executive Orders "mak[e] clear that policies relating to" DEI and DEIA "'violate the text and spirit of our longstanding Federal civil-rights laws.'"[3]  And Defendants' own actions enforcing the Orders suggest they interpret them to mean that *all* efforts supporting DEIA are unlawful.

The evidence before this Court indicates that Plaintiffs' funding was terminated and their speech censored because their grants were "equity-related"; because the Administration views *all* DEIA activities as illegal; and because Plaintiffs' respect for the existence of transgender people constitutes "promot[ion]" of so-called "gender ideology."[4]  The evidence thus shows that the Administration targeted Plaintiffs for enforcement of the Orders because it disapproves of their speech and the Congressionally authorized programs Plaintiffs implement.  In other words, the Administration uses the term "illegal" simply as a pejorative for programs and speech it does not

---

[1] Exec. Order No. 14173, § 4, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025) ("Anti-Diversity2 Order").

[2] *Transcript of President Donald Trump's Speech to a joint session of Congress*, Associated Press (Mar. 5, 2025), https://apnews.com/article/trump-speech-congress-transcript-751b5891a3265ff1e 5c1409c391fef7c.  Also, before President Trump issued the Orders, he promised to "end all of the Marxist diversity, equity, and inclusion policies across the entire federal government immediately," and "at the same time," to "ban them from the private sector as well."  *Trump Remarks at Turning Point's AmericaFest 2024 (Transcript)*, Sinju Post (Dec. 23, 2024), https://singjupost.com/trump-remarks-at-turning-points-americafest-2024-transcript/?singlepage=1 (citations omitted).

[3] Off. of the Att'y Gen., DOJ, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

[4] Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

like.[5]  In sum, the Executive Orders have caused and are continuing to cause harm to Plaintiffs'

constitutional rights and funding.  The Defendants flatly refuse to acknowledge these harms and

seek to evade fundamental constitutional boundaries that this Court should uphold.

## ARGUMENT

### I.    Plaintiffs' Claims Are Justiciable.

Defendants argue that Plaintiffs have not yet satisfied Article III standing or ripeness

requirements.  But it is undisputable that federal courts are open to claims that the government is

violating and threatening to violate constitutional rights or causing concrete financial injury.

Plaintiffs can properly seek injunctive relief here, where Defendants are presently chilling and

censoring their speech, cutting their funding, and sending them written threats of future cuts.

To establish standing, a plaintiff must show (1) an injury in fact that is (2) caused by the

defendant's action and is (3) likely to be redressed by a favorable decision.  *Lujan v. Defs. of

Wildlife*, 504 U.S. 555, 560–61 (1992).  For practical purposes, the second and third elements—

causation and redressability—are "flip sides of the same coin," and thus often boil down to one.

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting S*print Commc'ns Co. v.

APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)).  Further, if "at least one plaintiff" can show

standing, the court "need not consider the standing of the other plaintiffs." *Carpenters Indus.

Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) (quoting *Mountain States Legal Found. v.

Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)).  Here, not just one, but all three Plaintiffs allege

---

[5] Amicus Do No Harm invites this Court to become the first to hold, for example, that it is
"unlawful" to host support groups for women of color or direct funds obtained from housing
discrimination lawsuits back into majority Black or Latino neighborhoods.  Brief for Do No Harm
as *Amicus Curiae* in Support of Defendants at 17.  They cite no authority for the proposition that
these or other activities engaged in by Plaintiffs are unlawful, but simply ask this Court to take
their word for it.  Because amicus has been granted permission to present argument, Plaintiffs will
reserve further criticism of their position until then.

that the Executive Orders are causing or threatening to cause them injury in fact such that a preliminary injunction would redress their harms.

Plaintiffs' two principal injuries from the challenged provisions are loss of funding and chill of their First Amendment free speech rights. As to the first of these, Defendants concede that "loss of funding could satisfy injury in fact," Defs.' Mem. at 38, and Plaintiffs have shown that Defendants have already cut or frozen their funding:

| Defendant | Plaintiff | Date | Action |
|---|---|---|---|
| CDC | AFC | Jan. 28 | Froze access to funding following OMB Memo M-25-13. Declaration of Nadeen Israel ("Israel Decl.") ¶ 29. |
| HUD | NFHA | Jan. 31 | NFHA learned that HUD canceled subcontract where work order referenced DEIA. Declaration of Lisa Rice ("Rice Decl.") ¶ 32. |
| CDC, HRSA | AFC | Feb. 1 | Froze contract from City of Chicago subcontracts to AFC. Israel Decl. ¶ 31. |
| HUD | NFHA | Feb. 11 | Canceled part of subcontract related to housing equity and fairness. Rice Decl. ¶ 33. |
| EPA | NUL | Mar. 12 | NUL learned about freeze on grant for Urban Environmental Justice Collaborative Program. Supplemental Declaration of Marc Morial ("Suppl. Morial Decl.") ¶ 7. |

Thus, it is simply untrue for Defendants to assert in their brief that "Plaintiffs fail to sufficiently establish that any of their own federally funded grants/contracts are in imminent danger of termination." Defs.' Mem. at 12.

The injury to Plaintiffs' protected speech, though related to their loss of funding, also independently establishes injury. The rules for standing are "relaxed" for First Amendment claims. *Eisenstadt v. Baird*, 405 U.S. 438, 445–46 & n.5 (1972). Thus, Plaintiffs need only allege that they face "specific objective harm or a threat of specific future harm" to their speech, and not mere "subjective 'chill.'" *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). Defendants already have started cutting off Plaintiffs' funding based on their speech. *See* Rice Decl. ¶¶ 26–33; Israel Decl. ¶¶ 29–

31; Suppl. Morial Decl. ¶ 7.  Defendants have also censored AFC's program materials to eliminate reference to transgender people.  Declaration of John Peller ¶ 11.  Under these circumstances, Defendants have given Plaintiffs plenty of reason to objectively fear reprisal for their speech.

Even beyond the injuries they have already suffered, Plaintiffs also have standing to challenge a law pre-enforcement if "the threatened enforcement of law is 'sufficiently imminent.'" *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370 (D.C. Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)); *see also* Wright & Miller, 13B Fed. Prac. & Proc. Juris. § 3532.5 (3d ed.) ("Legions of cases" have been brought pre-enforcement seeking protection against threat of government enforcement).  Further, "courts' willingness to permit pre-enforcement review is 'at its peak' when claims are rooted in the First Amendment," and "[f]or many decades, the courts have shown special solicitude to pre-enforcement challenges brought under the First Amendment." *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015) (quoting *Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010)); *see also Nat'l Student Ass'n v. Hershey*, 412 F.2d 1103, 1113 (D.C. Cir. 1969) ("[S]uits alleging injury in the form of a chilling effect may be more readily justiciable than comparable suits not so affected with a First Amendment interest.").  Here, enforcement is imminent where Defendants have announced their intent to apply the Orders vigorously and have sent Plaintiffs notices threatening enforcement. *See, e.g.*, Rice Decl. ¶¶ 26, 28 (HUD sent NFHA emails threatening to cancel funding); Declaration of Marc Morial ¶¶ 47–48 (DOL sent NUL threatening memorandum).

Plaintiffs have also learned about Defendants' threats and adverse actions against similarly situated organizations.  *See, e.g.*, Israel Decl. ¶¶ 29–30 (AFC learned about threats from CDC).  Particularly disconcerting is HUD's decision to cancel funding to NFHA's partner organizations.  HUD has told those organizations that it did so because certain "key words were found on [their]

website or LinkedIn Profile," and that based on those words it determined that their "operations are not in compliance with the Executive Order titled 'Ending Radical and Wasteful Government DEI Programs and Preferencing.'" Declaration of Michelle Hayes ("Hayes Decl.") ¶ 11. Plaintiff NFHA works closely with those organizations and posts similar content on its website and LinkedIn page and is thus justifiably concerned that it will be next. Supplemental Declaration of Lisa Rice ¶¶ 3–10.

Defendants repeatedly resort to calling Plaintiffs' injuries "speculative." Defs.' Mem. at 12, 14, 20, 23, 49. But these assertions are remarkable where Defendants have *already cut off Plaintiffs' funding,* have already terminated contracts of others based solely on speech related to DEIA, and are continuing to threaten further adverse action based on the Orders.

As for causation and redressability, Plaintiffs also clearly allege that the Executive Orders are causing them injury such that enjoining enforcement of the Orders will redress their harms. Indeed, Defendants are themselves invoking the Orders as the sole authority for their adverse actions and threats against plaintiffs. *See, e.g.*, Rice Decl. ¶ 26 (stop work order sent to NFHA to be "consistent with an executive order"); Hayes Decl. ¶ 11 (purporting to terminate awards as "not in compliance with the Executive Order titled 'Ending Radical and Wasteful Government DEI Programs and Preferencing'").

In response, Defendants argue that the Orders are not self-executing, and thus not the proper target for Plaintiffs' claims. That argument ignores the record. Plaintiffs are suing to enjoin enforcement of the Orders because Defendants are claiming the Orders as their authority for the unconstitutional actions that Defendants are taking.

Finally, Plaintiffs' claims are also ripe for review. Defendants ask the Court to give them the benefit of the doubt that they will not apply the law in unconstitutional ways, but they are

already doing just that. And what matters for standing purposes is that Defendants are already enforcing the Orders against Plaintiffs and injuring them as a result. There is thus far more than the "mere possibility that some agency might make a legally suspect decision." *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

The Fourth Circuit's recent decision staying a nationwide preliminary injunction pending the appeal in *National Association of Diversity Officers in Higher Education v. Trump ("Diversity Officers")* confirms that Plaintiffs' claims are justiciable here. No. 25-1189 (4th Cir. Mar. 14, 2025). According to the Fourth Circuit panel, the plaintiffs had not yet alleged any actual enforcement of the Orders against them, leading the three members of the panel to suggest claims would be proper if and when such actions do occur. *See id.* at 4 n. 1 (Diaz, C.J., concurring) ("I . . . reserve judgment on how the administration enforces these executive orders, which may well implicate cognizable First and Fifth Amendment concerns."), 7 (Harris, J., concurring) ("But my vote to grant the stay comes with a caveat" that agency enforcement actions "may well raise serious First Amendment and Due Process concerns"), 9 (Rushing, J., concurring) (expressing view that claims were not justiciable where "this case does not challenge any particular agency action implementing the Executive Orders"). By contrast, here, Plaintiffs bring their claims based on facts in the record of how the Orders have already been implemented against them directly and will continue to be implemented. *See, e.g.*, Rice Decl. ¶¶ 26–33; Suppl. Morial Decl. ¶ 7; Israel Decl. ¶¶ 29–31; Hayes Decl. ¶¶ 8–14. Plaintiffs' claims are thus justiciable.

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

### A.    Plaintiffs Are Likely to Succeed on the Merits of Their Fifth Amendment Claims.

Plaintiffs' opening brief explained how seven of the challenged provisions are unconstitutionally vague. Defendants accuse Plaintiffs of "misreading" those provisions. Defs.'

Mem. at 11.  But Defendants barely make any effort to explain how those provisions satisfy the vagueness doctrine, let alone the more stringent version of the test that applies when speech is involved.  Indeed, Defendants fail to explain numerous key terms that form the basis for Plaintiffs' vagueness challenge, including:

- The definition of concepts that the Orders proscribe, such as "diversity," "equity," "equitable," "equity-related," "diversity, equity, and inclusion" (or "DEI"), or "diversity, equity, inclusion, and accessibility" ("DEIA"), *see* Pls.' Mem. at 23–24;

- Whether those proscribed terms are related—for instance, how "diversity" differs from "equity," "equity" from "equitable" or "equity-related," and how the meaning of individual words change (if at all) when they are used on their own or as part of compound phrases, *id.* at 25–26;

- What it means to "promote" or "advance" DEIA or "gender ideology," *id.* at 28–29, 31–32; or

- How officials, when they are instructed to do so, are meant to identify and "deter" "DEI programs or principles" whether "specifically denominated 'DEI' or otherwise," *id.* at 31.

That failure is remarkable.  Indeed, Defendants seem to concede that the Orders are vague as written and ask the Court to excuse that vagueness because they "are still in the process of evaluating and implementing the President's EOs."  Defs.' Mem. at 13.  But regardless of whether Defendants are "evaluating" the Orders, the reality is that they are enforcing and threatening to enforce the Orders against Plaintiffs *now*.  And to the extent Defendants have issued any "guidance," *id.*, that guidance only intensifies the vagueness by interpreting the Orders in breathtakingly broad ways.  *See, e.g.*, Israel Decl. ¶¶ 29–30 (CDC directive to eradicate "[a]ny vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government" and

declaring such programs "immediately, completely, and permanently terminated").  Defendants
cite an OPM Memo issued on February 5, 2025 and say that it provides "guidance on the scope of
the EOs."  Defs.' Mem. at 34.  But that single document, addressing only certain provisions, does
not provide the clarity that Plaintiffs need and that due process demands.  In any event, it was
issued to Administration personnel, not to Plaintiffs and other private entities who are subject to
the Executive Orders.

The only vague element of the Orders that Defendants engage with in any meaningful way
is the reference to discriminatory DEI in the Certification and Enforcement Threat Provisions.  In
their brief, Defendants offer the same answer: that those provisions simply require Plaintiffs to
comply with "existing" law.  Defs.' Mem. at 12–13, 33, 39, 43.  That might make sense in a
vacuum.  But that explanation does not hold up when nearly everything else in the Orders, along
with Defendants' statements and actions, suggest the opposite: that the Administration views *all*
DEI as illegal.  In places, the Orders categorically refer to "illegal DEI," without distinguishing
between legal DEI and a subset that is supposedly unlawful; the U.S. Attorney General issued a
memorandum interpreting the Orders as "making clear that policies relating to 'diversity, equity,
and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') 'violate the
text and spirit of our longstanding Federal civil-rights laws' and 'undermine our national unity'";[6]
and in implementing the Orders, Defendants have canceled funding for programs that are even
tangentially related to DEIA, without any indication that they have deemed those programs illegal.
*See supra* at 4 (detailing cancellations to date).

Defendants essentially argue that Plaintiffs should understand discriminatory DEI to mean

---

[6] Off. of the Att'y Gen., DOJ, *Ending Illegal DEI and DEIA Discrimination and
Preferences* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

one thing for purposes of the Certification and Enforcement Threat Provisions—that is, as simply incorporating recognized legal standards—while at the same time, Defendants have criticized and canceled programs on the grounds that *all* DEI is discriminatory and illegal.  That provides little guidance at all.  And that is why the references to discriminatory DEI in the Certification and Enforcement Threat Provisions are vague.  How will an ordinary person seeking to comply with those provisions feel comfortable knowing whether their expression relating to DEI satisfies Defendants' narrow conception of "legal" DEI, when Defendants refuse to explain the distinction between "legal" and "illegal" DEI?  They will not.  Instead, those affected have censored and will continue censoring their own speech to avoid any speech relating to DEI and "restrict[] their conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 368 (1964).  That violates due process and inhibits free speech.  *See*, *e.g.*, *id.* (invalidating on vagueness and overbreadth grounds an oath requiring teachers to forswear an "undefined variety" of behavior considered "subversive" to the government).

Instead of contending with the provisions' vagueness on the merits, Defendants suggest that even if the provisions are unduly vague in violation of due process standards, those standards do not apply.  Defendants are wrong.

Defendants first try to circumvent the requirement of due process by arguing that the Orders do not implicate an interest that due process protects.  Not so.  Defendants made the same argument in *Diversity Officers*, and the court rejected it.  No. 1:25-cv-00333, 2025 WL 573764, at *20 n.10 (D. Md. Feb. 21, 2025).  As the court said there, though Defendants argued that "it is not 'clear' whether Plaintiffs have a 'property interest' sufficient to give rise to due process protections at all," "that is not the law." *Id.* at *20 n.10.  The *Diversity Officers* court cited *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576–77 (1972), in which the Supreme Court recognized

that all manner of government benefits can implicate due process. Indeed, Defendants acknowledge, as they must, that Plaintiffs could have a property interest in their grants and contracts (although they argue that there is not "generally" such an interest). Defs.' Mem. at 13, 28–29. And while Defendants primarily address property interests, due process also protects against the deprivation of liberty interests, which are implicated here. For example, the D.C. Circuit has recognized that private entities have a protected liberty interest in being free from government action that causes reputational harms, which can occur when the government terminates work with a contractor or grantee. *See, e.g.*, *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993) (a government contractor has a "liberty interest in avoiding the damage to its reputation and business caused by a stigmatizing suspension"). In addition, the Orders' threats to place Plaintiffs on various lists implicate protected interests. *See, e.g.*, *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143 (1951) (Black, J., concurring) (recognizing a right to be "free from unjustified governmental defamation" by placement on government lists). In sum, the Orders implicate a range of protected interests.

Failing that, Defendants argue that the Constitution's due process requirements simply do not apply to the Executive Orders because the Orders merely direct the Presidents' subordinates, and "do not directly regulate primary conduct." Defs.' Mem. at 25. Defendants offer no real support for their rule cabining the reach of due process in that way. The Due Process Clause is not itself so limited. Rather, as the Supreme Court has recognized, "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Meachum v. Fano*, 427 U.S. 215, 226 (1976) (citation omitted)—a principle that does not turn on the form of the enactment. There is no dispute due process applies beyond statutes. *See FCC v. Fox Television Studios*, 567 U.S. 239, 253 (2012). And, to the extent that presidents have issued executive orders that affect

11

protected interests in ways that confer standing, courts have had no trouble recognizing that such orders must comport with due process requirements. *See, e.g.*, *Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (evaluating executive orders for vagueness); *Diversity Officers,* 2025 WL 573764, at *19 n.7 ("[A]lthough many vagueness challenges take place within the statutory context, the same principles apply in the consideration of executive orders."); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) (holding "that Plaintiffs have demonstrated a likelihood of success on their Due Process claim challenging . . . the Executive Order as void for vagueness"). That is the case here.

Finally, Defendants contend that case law precludes Plaintiffs from challenging the Orders for vagueness because they are "facial in nature" and "[t]he appropriate posture for Due Process vagueness challenges is as-applied." Defs.' Mem. at 26. But Defendants' arguments mischaracterize the nature of Plaintiffs' claims and misstate the law on the availability of pre-enforcement vagueness challenges.

For one, Defendants erroneously cast Plaintiffs' due process challenge as a facial pre-enforcement challenge. In actuality, Plaintiffs' vagueness claim is not so limited. Plaintiffs' vagueness challenge is properly understood as an as-applied post-enforcement challenge, in that Defendants are presently violating Plaintiffs' due process rights by enforcing the Orders' vague provisions against them.

In any event, to the extent that Defendants have not yet enforced some of the provisions directly against Plaintiff such that the posture is still "pre-enforcement," Plaintiffs' claims also readily support a pre-enforcement facial vagueness challenge. Defendants' arguments to the contrary lack merit.

Defendants overstate the extent to which there is a bar on pre-enforcement facial vagueness challenges. Although the Supreme Court has foreclosed pre-enforcement facial vagueness challenges for plaintiffs whose conduct is "clearly proscribed" by a vague law such that they cannot claim lack of fair notice, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010), the D.C. Circuit has decided that that principle does not extend to pre-enforcement facial vagueness challenges premised on the vagueness doctrine's second consideration: the risk of arbitrary enforcement. *See Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 409–10 (D.C. Cir. 2017). In *Act Now*, this Circuit rejected an argument similar to the one advanced by Defendants here that a pre-enforcement facial vagueness was improper. *Id.* As the court explained, *Humanitarian Law Project* "addressed only whether the statute provides a person of ordinary intelligence fair notice of what is prohibited," *id.* (cleaned up), and therefore did not "bar a facial challenge like [plaintiff's] that a law is so vague as to subject the challenger itself to standardless enforcement discretion." *Id.* at 410 (citing *Fox*, 567 U.S. at 252–53 for the assumption that "vagueness challenges remain available when based on an enforcement-discretion theory"). Plaintiffs challenge the Orders both for lack of fair notice and for their potential for arbitrary enforcement. *See* Pls.' Mem. at 22–32. Therefore, a pre-enforcement, facial vagueness challenge is proper here. *See, e.g.*, *Woodhull Freedom Foundation v. United States*, 948 F.3d 363, 369 (D.C. Cir. 2020) (holding that plaintiffs had standing to bring "a pre-enforcement challenge" claiming a law was "impermissibly vague" under the Fifth Amendment).[7]

---

[7] Defendants' attempt to narrow the scope of facial vagueness challenges is wrong in another respect. Their brief, *see* Defs.' Mem. at 27 n.2, cites *Crooks v. Mabus*, 845 F.3d 412, 417 (D.C. Cir. 2016) for a rule that applies to facial vagueness challenges "[o]utside of the First Amendment context," while seemingly ignoring that Plaintiffs claim that the Executive Orders' vagueness (continued…)

In sum, each of Defendants' arguments seeking to avoid reaching the merits of Plaintiffs' vagueness claims fails. The Orders do not satisfy due process, and Plaintiffs are likely to succeed on the merits of their Fifth Amendment due process claims.

**B.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claims.**

By their plain terms, the Executive Orders are designed to silence private speech that supports viewpoints the Administration dislikes. The President's statements have revealed the Administration's unconstitutional project to attack private speech. Before issuing the Orders, the President committed not only to "end all of the Marxist diversity, equity, and inclusion policies across the entire federal government," but also to "ban these unlawful policies from . . . the private sector as well."[8] During his speech to Congress on March 4, 2025, the President announced: "We've ended the tyranny of so-called Diversity, Equity, and Inclusion policies all across the entire federal government and indeed the private sector and our military."[9] In accordance with the President's statements, the Orders target disfavored speech both inside and outside of the federal government. A particularly egregious example is HUD's invoking the Executive Orders to cancel grants based on "key words" in an organization's "website or LinkedIn Profile"—that is, their purely private speech. Hayes Decl. ¶ 11. Thus, the Executive Orders and Defendants' actions implementing them impose penalties for their privately held viewpoints.

---

imposes a chilling effect on protected speech. *See* Pls.' Mem. at 32–33. When First Amendment interests are at stake, pre-enforcement facial vagueness challenges are not categorically barred. *See Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (affirming the validity of facial vagueness challenges if the law in question "reaches a substantial amount of constitutionally protected conduct" (internal quotation marks and citation omitted)).

[8] *Trump Remarks at Turning Point's AmericaFest 2024 (Transcript)*, The Singju Post (Dec. 23, 2024), https://singjupost.com/trump-remarks-at-turning-points-americafest-2024-transcript/?singlepage=1.

[9] *Transcript of President Donald Trump's Speech to a joint session of Congress*, Associated Press (Mar.    5,    2025),    https://apnews.com/article/trump-speech-congress-transcript-751b5891a3265ff1e5c1409c391fef7c.

Plaintiffs do not dispute that Defendants have greater latitude to regulate their own policies and activities within the federal government. When, however, the government takes aim at private expression of particular ideas or viewpoints, the First Amendment provides protection. *See Rosenberger v. Rector & Visitors of U. Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). It is the Orders' suppression and chilling of private speech that makes Plaintiffs likely to succeed on the merits of their First Amendment challenge.

Plaintiffs identify seven provisions across the Executive Orders that violate the First Amendment and justify the need for immediate preliminary relief. As explained in their opening brief, two provisions directly restrict speech based on viewpoint and content: the Enforcement Threat Provision, and the Certification Provision. Pls.' Mem. at 34–37

In addition, these two provisions, as well as five others—the Diversity Termination Provision, the Equity Termination Provision, the Gender Termination Provision, the Gender Promotion Provision, and the List Provision—have the unlawful purpose and effect of chilling disfavored speech. *See* Pls.' Mem. at 37–44. As the Supreme Court has held, "government regulations that fall short of a direct prohibition against the exercise of First Amendment rights" violate the First Amendment if they have a "deterrent, or 'chilling,' effect" on speech. *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (stating "a government official cannot do indirectly what she is barred from doing directly" to "punish or suppress disfavored speech"). One does not need to look far under the hood of the Orders to realize they are designed precisely to chill speech. The text of the Anti-Diversity2 Order directs officials work to end DEI in the "private sector." Anti-Diversity2 Order § 4. And the President himself has said their purpose is to suppress speech in the private sector. *See supra* at

1–2, 14.  If there were ever a set of Executive Orders designed to deter protected speech, it is these.

Defendants offer no coherent response to Plaintiffs' First Amendment challenge.  *First*, Defendants barely engage on the merits of Plaintiffs' claim that the Enforcement Threat Provision is a paradigmatic example of viewpoint discrimination.  Instead, Defendants' principal defense is that the government has not yet brought enforcement actions against Plaintiffs pursuant to the provision, and therefore Plaintiffs do not have standing to challenge it.  Defs.' Mem. at 42–43.  As explained above, Plaintiffs have adequately demonstrated a threat of future enforcement to satisfy standing.  *See supra* Section I.  In any event, Defendants' argument about standing does not rebut Plaintiffs' claim on the merits.

The only argument that Defendants can muster on the merits is an assertion that the Enforcement Threat Provision only targets "illegal discrimination" and for that reason "does not purport to target a First Amendment right at all."  Defs.' Mem. at 43–44.  But as discussed above, the Executive Orders are not so limited by either their language or their enforcement; the plain text of the Orders, along with actions that Defendants have taken since signing the Orders, make clear that Defendants seek to suppress *all* efforts promoting DEI, regardless of whether such efforts are considered "legal" or "illegal."  *See supra* at 9–10.

*Second*, Defendants seek to defend the Certification Provision in a way that does not actually address the essence of Plaintiffs' claim, which is that the provision imposes an unconstitutional condition in violation of free speech under *Agency for International Development v. Alliance for Open Society International, Inc.* ("*AID*"), 570 U.S. 205 (2013).  As Plaintiffs explain, the Certification Provision is just like the unconstitutional condition in *AID* because it does not only require contractors and grantees to certify that they will not engage in prohibited speech as part of their government-funded work; it requires them to certify that they will not

16

engage in such speech *at all* as a condition for federal funding.  Pls.' Mem. at 36–37.

Defendants attempt to draw attention away from this reality by insisting that *AID* is distinguishable because the Certification Provision only "restricts [funding recipients'] ability to engage in illegal discrimination."  Defs.' Mem. at 40–41.  Again, although the provision references "Federal anti-discrimination laws," Anti-Diversity2 Order § 3(b)(iv)(B), this reference is meaningless where the Orders and Defendants' actions make clear that in practice, the Administration seeks to dismantle much more than unlawful activity.  *See supra* at 9–10.  If an executive order required a person to certify that they did not engage in illegal "journalism," or another form of protected speech, that provision would still violate the First Amendment, especially where the Administration makes clear that it views all or a large swath of journalism as illegal.  The same is true here.

Defendants rely on *Cutter v. Wilkinson*, 423 F.3d 579 (6th Cir. 2005), to argue that requiring compliance with law "does not amount to an unconstitutional 'condition.'"  Defs.' Mem. at 41.  But Plaintiffs are not seeking government funds to support unlawful activities, as was the issue in the portion of *Cutter* that Defendants cite.  Plaintiffs do not engage in any unlawful discrimination, for that matter.  Rather, the issue is that Defendants have themselves made clear that they view all speech supporting DEI and acknowledging the reality that transgender people exist—including constitutionally protected speech that does not discriminate—as unlawful.  Defendants cannot block off a whole arena of protected speech by incorrectly labeling it discriminatory or illegal.

*Third*, Defendants barely engage with Plaintiffs' claims about the ways in which the challenged provisions—both individually and taken together—have the purpose and profound effect of chilling speech that the Administration opposes.  Instead, Defendants offer a bevy of

discrete arguments that do not address the crux of Plaintiffs' chilling effects argument. In any event, none is persuasive.

a. Rather than respond to Plaintiffs' argument that the Gender Promotion, Gender Termination, Diversity Termination, and Equity Termination chill speech, Defendants create a straw man they can easily topple, by arguing that these provisions do not impose unconstitutional conditions under *AID* and *Rust v. Sullivan*, 500 U.S. 173 (1991) or that they pertain to government speech. *See* Defs.' Mem. at 35–38; *supra* at 16–17. Tellingly, though, Defendants do not respond to Plaintiffs' arguments under the line of cases cited in Plaintiffs' opening brief that stand for the proposition that the First Amendment protects against governmental attempts to control speech through indirect means. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also* Pls.' Mem. at 37–38 (collecting cases). Thus, even if the individual terms of those provisions do not directly restrict speech outside of government-funded programs, their overall purpose and chilling effect is to do exactly that.

b. In rejecting Plaintiffs' claims about the chilling effects of the Certification Provision, Defendants insist that Plaintiffs cannot be chilled because they have "misread[] the text of the EO, which does not purport to adopt any new construction of antidiscrimination law, or state that all DEIA is illegal, let alone threaten liability for failure to divine this new interpretation." Defs.' Mem. at 41. These are hollow assurances in light of the text of the Orders and the Administration's actions, which demonstrate radical departures from longstanding interpretations of anti-discrimination law. In addition, Defendants argue that any chill created by the threat of False Claims Act liability is dispelled by the fact that an intent-based defense remains available to Plaintiffs. Defs.' Mem. at 41–42. Organizations may well be able to assert defenses grounded in scienter and other elements to the extent the government brings an enforcement action or litigation

18

under the False Claims Act.  The availability of these defenses does not ameliorate the threat of even potential liability under the statute and the chilling effects that flow from that threat.

c. Defendants' rebuttal as to *McGrath* and the Enforcement Threat Provision entirely misses the point.[10]  Defendants respond around the edges, contending that the list aspect of the Enforcement Threat Provision is distinguishable from the list provision in *McGrath*.  Defs.' Mem. at 46.  But the entire point of Justice Black's concurrence was to recognize that the "list" of names that the executive order directed the Attorney General to compile was akin to a bill of attainder that the Founders forbade.  Justice Black cautioned that "prejudice" against "unpopular views" "manifests itself in much the same way in every age and country," and that "what has happened before can happen again"—even if it does not occur in precisely the same form.  *McGrath*, 341 U.S. at 145 (Black, J., concurring).  Justice Black's concerns resonate here.  Plaintiffs' point is not that the Orders are exactly like those in *McGrath*, or that Justice Black's concurring opinion in *McGrath* controls this case's outcome.  Rather, his persuasive reasoning is applicable here, and it shows that the Administration's actions here bear troubling similarities to government action that has long been recognized as unconstitutional.  Defendants' refusal to admit these similarities speaks volumes.

*Finally*, Defendants contend that Plaintiffs' challenges interfere with the Executive branch's "authority to set its enforcement priorities under the guise of protecting Free Speech." Defs.' Mem. at 46.  Defendants maintain that the President "has discretion to determine which forms of unlawful discrimination to prioritize for enforcement," and that "Plaintiffs' theory would

---

[10] Defendants ignore Plaintiffs' claim against the List Provision of the Anti-Diversity1 Order, which directs agency heads to bring the director of OMB a list of all federal grantees who have received funding for DEIA-related activities since the date President Trump's first term ended. Anti-Diversity1 Order § 2(b)(ii)(c).  They neither respond to nor mention Plaintiffs' arguments about this provision.

kneecap the Executive's enforcement authority." *Id.* at 45–46. Defendants do not cite a single case saying that vague allusions to "enforcement authority" or "enforcement priorities" can justify the Administration's encroachment on free speech. Nor could they. Allowing Defendants to erode First Amendment guarantees through such shallow appeals to "enforcement priorities" would only invite further abuses.

In short, the Executive Orders are a sweeping attempt to control and chill both government and private speech. Our Constitution does not tolerate that kind of authority: under the First Amendment, "[a]uthority . . . is to be controlled by public opinion, not public opinion by authority." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943). Plaintiffs are thus likely to succeed in their First Amendment claims.

## III.    Plaintiffs Have Satisfied the Remaining Factors for a Preliminary Injunction.

### A.    Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm.

Despite wrongly arguing that Plaintiffs have not satisfied standing because their claims are not yet ripe, Defendants make a 180-degree turn to argue that Plaintiffs' alleged delay in moving for preliminary injunction shows they have not suffered irreparable harm. Defs.' Mem. at 47–48 (claiming that "Plaintiffs' own delay in seeking preliminary relief weighs against finding irreparable harm"). In other words, according to Defendants, Plaintiffs are too early to establish standing and too late to establish irreparable harm. But Defendants cannot have it both ways.

In any event, the argument fails. Plaintiffs filed the complaint on February 19, 2025, less than one month after the President signed the Executive Orders. Plaintiffs filed a motion for preliminary injunction less than ten days later on February 28, 2025. Plaintiffs made these filings amid the Administration's flurry of implementing memoranda, notices, and funding terminations, which remain ongoing and have been relentless since the first days of President Trump's presidency. The short time that Plaintiffs took to process these implementing actions is more than

reasonable and does not weigh against a finding of irreparable harm. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (rejecting an argument that a state's "eight-week delay in applying for a stay undermines its allegation of irreparable harm"); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155–56 (D.D.C. 2018) (a four-month delay in the filing of a motion for preliminary injunction did not undermine Plaintiffs' allegations of irreparable harms in the face of a "rapidly changing legal landscape").

The two cases that Defendants cite are readily distinguishable. In *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87 (D.D.C. 2014), the court held that a 36-day delay in moving for preliminary relief, *coupled* with a request to continue a court hearing by 95 days while the plaintiff's obtained alternate counsel, amounted to "dilatory action." *Id.* at 90. Defendants selectively focus on the delay of 36 days in *Open Top Sightseeing*, while ignoring that the plaintiff's 95-day hearing extension request also formed the basis for the court's determination. In *Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975), the court held that the plaintiff's 44-day delay in moving for a temporary restraining order was "inexcusable," where the plaintiff was on notice of proposed regulations and waited 44 days until "the final regulations were issued" to file. *Id.* at 987. Here, by contrast, Plaintiffs move for a preliminary injunction, not a temporary restraining order, and they have not waited for Defendants' "final" word on the Executive Orders.

Defendants' remaining challenges are unpersuasive. As with their arguments about standing, Defendants mischaracterize Plaintiffs' theories of irreparable harm in a transparent attempt to shoehorn them into categories that Defendants can then easily dismiss. But their brief does not offer a response to Plaintiffs' contention, based on Supreme Court precedent, that the loss of First Amendment freedoms "for even minimal periods of time" constitutes irreparable injury. Pls.' Mem. at 47 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also*

21

*Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Indeed, even "'a prospective violation of a constitutional right constitutes irreparable injury for . . . purposes' of 'seeking equitable relief.'" *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (alterations in original) (citation omitted). As discussed above, Plaintiffs have shown a high likelihood they will suffer the loss of constitutional rights as a result of the Executive Orders. *See supra* Section II.

Nor do Defendants respond at all to Plaintiffs' claims that the Orders "perceptibly impair[]" the Plaintiffs' organizational programs and "directly conflict [their] mission," which is a type of injury that Plaintiffs have established that courts in this Circuit recognize as irreparable. *See* Pls.' Mem. at 47–49 (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016)).

And although Defendants contend that Plaintiffs' economic injuries are insufficient, they concede that economic losses can be irreparable where they are significant enough. Defs.' Mem. at 50 (acknowledging that economic loss can constitute irreparable injury where it "threatens the very existence of the movant's business" (quoting *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The declarations before this Court confirm the harm to Plaintiffs—even under the "high bar" that Defendants insist Plaintiffs must meet. Defs.' Mem. at 49; *see* Morial Decl. ¶¶ 31, 50–62 (asserting that the Executive Orders risk jeopardizing NUL's federal funding, which constitutes 35 percent of NUL's annual budget, and would therefore force NUL to reduce its staffing and "cut essential programming and assistance to the vulnerable communities it serves"); Rice Decl. ¶¶ 19, 24–25, 35–36, 47–48 (noting that approximately one-third of budget for NFHA's Fair Housing Act enforcement-comes from HUD, and describing ways in which the Executive Orders threaten NFHA's "core business activities" by threatening critical funding streams and causing it to divert scarce resources); Israel Decl. ¶¶ 11, 23, 39 (Executive Orders threaten AFC's

federal funds, which account for 83.4% of AFC's organizational budget, given that "[m]any of our federal awards were specifically designed to address . . . disparities in health and housing, including related to race, gender identity, and other systemic inequities").  And, while Defendants seek to diminish the harms to Plaintiffs as "wholly speculative," Defs.' Mem. at 49, there is nothing speculative about them, as shown by the actions that Defendants have taken against Plaintiffs and similarly situated nonprofits.  *See supra* Section I.

### B.    The Balance of Equities and Public Interest Favor Relief.

The balance of equities and the public interest also support granting Plaintiffs their requested preliminary relief.  Defendants largely rehash arguments that a federal district court has already rejected.  They assert that "any injunction here would effectively disable almost a dozen federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities," Defs.' Mem. at 50–51, which is the same argument verbatim that Defendants made in *Diversity Officers*, and which that court dismissed.  *See Diversity Officers*, 2025 WL 573764, at *28.  In response to Defendants' prediction that an injunction would hamstring the government, *Diversity Officers* stated: "The government is free to promulgate regulations, take litigating positions, propose legislation, or any number of other steps, so long as they are consistent with statutes and the Constitution."  *Id.*

The same is true here.  Defendants' attempts to equate its litigation position with the public interest fails given Plaintiffs' strong likelihood of success on the merits.  *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation . . . ."); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) ("[G]overnment actions in contravention of the Constitution are 'always contrary to the public interest.'" (citation omitted)).  Preliminary relief is also particularly

necessary here because Plaintiffs exist to provide crucial public services, and "the public interest is served by reducing barriers to health care and other critical services for all communities." *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 547 (N.D. Cal. 2020) (granting preliminary injunction to Plaintiff AFC and others).

## IV.    Defendants Urge this Court to Enter an Unduly Narrow Injunction.

Defendants argue that any injunctive relief should be limited to Plaintiffs, should exclude the President, and should apply against only two Defendant agencies—HUD and HHS. Defendants claim these two agencies are the only two for whom Plaintiffs "have attempted to allege imminent loss of federal funds." Defs.' Mem. at 52. Once again, Defendants have misconstrued Plaintiffs' claims. For one, Plaintiffs have not said that they are moving for a so-called nationwide injunction. Nor are they moving for an injunction against President Trump. *See* Mot. Prelim. Inj., ECF No. 29, at 1 n.1. Plaintiffs challenge the at-issue provisions both as-applied and on their face, but seek an order enjoining Defendants from enforcing the provisions against themselves only.

Furthermore, Defendants' contention that any injunction should only bind HHS and HUD is wrong, given that Plaintiffs have contracts and grants with Defendant agencies named in the complaint that remain at imminent risk of being terminated or suspended pursuant to the Orders. Other Defendants have canceled Plaintiffs' funds, including EPA and CDC. *See* Israel Decl. ¶ 31; Suppl. Morial Decl. ¶ 7. Crediting Defendants' position would not cure any of the chilling effects that Plaintiffs have experienced and will experience because the threat of termination and other penalties by any non-enjoined Defendant agencies would continue to loom over them. Moreover, certain other Defendants that Plaintiffs name are mentioned as having implementing roles on the face of the challenged provisions, i.e., Defendants DOJ, OMB, and OFCCP, and should be

enjoined from enforcing those provisions against Plaintiffs on that basis.  Thus, to grant Plaintiffs the full relief provided under Fed. R. Civ. P. 65(d)(2)—against the "parties," their "officers, agents, servants, employees, and attorneys," as well as any "other persons who are in active concert or participation with" them—an injunction against HHS and HUD is insufficient.

## V.      A Bond Under Rule 65(c) Is Not Appropriate.

Under Federal Rule of Civil Procedure 65(c), a court ordering a preliminary injunction has "broad discretion" to decide whether to order the movant to give security in the form of a bond, "including the discretion to require no bond at all."  *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (citation omitted).  Recently, in *National Council of Nonprofits v. OMB*, another court in this District did not require any bond when it ordered a preliminary injunction requiring the Administration to unfreeze grant funds, reasoning that "it would defy logic" to require bond "[i]n a case where the government is alleged to have unlawfully withheld trillions of dollars of previously committed funds to countless recipients," especially when the defendants "will personally face no monetary injury from the injunction."  2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025).  The same reasoning applies here.  Additionally, to the extent that Defendants' request for a bond appears to be part of a broader push by this Administration to discourage lawsuits challenging its unlawful actions,[11] the Court should reject the Administration's attempt to wield Rule 65(c) for the purpose of deterring organizations like Plaintiffs from bringing litigation that vindicates their constitutional rights.

## <u>CONCLUSION</u>

Plaintiffs respectfully request that this Court grant its motion for a preliminary injunction.

---

[11] White House Memorandum for the Heads of Executive Departments and Agencies, Ensuring the Enforcement of Federal Rule 65(c) (Mar. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/.

Dated: March 17, 2025

Respectfully submitted,

_____/s/ *Stacey K. Grigsby*_____

Jin Hee Lee, DC Bar No. 1740850
Gabriel Diaz, DC Bar No. 991618
Donya Khadem, DC Bar No. 1719557
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
jlee@naacpldf.org
gdiaz@naacpldf.org
dkhadem@naacpldf.org

Leah Wong
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
lzwong@naacpldf.org

Camilla B. Taylor, DC Bar No. IL0098
Kenneth D. Upton, Jr., DC Bar No. 1658621
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
(312) 605-3225
ctaylor@lambdalegal.org
kupton@lambdalegal.org

Jose Idio Abrigo
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(646) 307-7406
jabrigo@lambdalegal.org

Pelecanos
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260

Stacey K. Grigsby, DC Bar No. 491197
Sarah E. Harrington, DC Bar No. 219218
Alison DiCiurcio, DC Bar No. 1601410
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
sgrigsby@cov.com
sharrington@cov.com
adiciurcio@cov.com

Nicholas E. Baer, DC Bar No. 1672517
James H. Fitch, DC Bar No. 1780894
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
nbaer@cov.com
jhfitch@cov.com

Los Angeles, CA 90017*
(323) 370-6909
pelecanos@lambdalegal.org

*Address for mailing purposes only

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on March 17, 2025, the foregoing Reply Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction was filed through the CM/ECF system and sent electronically to the participants identified on the Notice of Electronic Filing.

*/s/ Stacey K. Grigsby*
Stacey K. Grigsby (DC Bar No. 491197)
Covington & Burling LLP

28