**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| NATIONAL URBAN LEAGUE et al., |
| *Plaintiffs*, |
| v. |
| DONALD J. TRUMP et al., |
| *Defendants*. |

Civil Action No. 25-471 (TJK)

## MEMORANDUM OPINION

After taking office this January, President Trump promptly issued three executive orders addressing diversity, equity, and inclusion. Some provisions are internal to the government, directing Executive Branch officials to create certain lists or produce certain reports to advise the President. Others reach into the private sector—for example, by requiring grantees and contractors to certify that they do not operate DEI programs that violate federal antidiscrimination law. And still others straddle the line by directing agencies to terminate some federal grants and contracts, an intra-governmental directive that affects other entities.

Plaintiffs are three nonprofit organizations that incorporate DEI into their work. They also contract with and receive funding from several federal agencies. Concerned that President Trump's executive orders will prevent them from fulfilling their organizational missions, Plaintiffs sued to enjoin a host of agencies and officials from enforcing the orders. They moved for a preliminary injunction over a week later, arguing that eight provisions of the orders are unconstitutional under the First or Fifth Amendment—or both. More specifically, Plaintiffs contend that the challenged provisions are impermissibly vague, chill protected speech, and amount to unlawful viewpoint discrimination.

But Plaintiffs have not shown that they are likely to succeed on any of those claims, so the extraordinary relief of a preliminary injunction is unwarranted. For half the challenged provisions, Plaintiffs fail to establish a prerequisite to success on the merits: standing. Presidential directives to subordinates that inflict no concrete harm on private parties—or at least not on these parties—do not present a justiciable case or controversy. And for the remaining provisions, Plaintiffs' constitutional claims falter for various reasons. Two throughlines explain most of them. The government need not subsidize the exercise of constitutional rights to avoid infringing them, and the Constitution does not provide a right to violate federal antidiscrimination law. And those pressure points are even harder to overcome for Plaintiffs, who bring facial rather than as-applied challenges.

The motion before the Court is not about whether DEI policies, however defined in a given context, are good public policy. Nor is it about whether specific DEI initiatives comply with antidiscrimination law. Instead, it is about whether Plaintiffs have shown that they are entitled to a preliminary injunction prohibiting enforcement of the executive orders at issue. Because they are not likely to prevail on the merits, the Court will deny the motion.

## I.    Background

### A.    The Executive Orders

Throughout the campaign and as President-elect, Donald Trump took aim at DEI policies within the federal government and private sector. *See* ECF No. 29-1 at 12. Within two days of his inauguration, President Trump sought to advance this policy priority by issuing three executive orders about "gender ideology" and "diversity, equity, and inclusion." *See Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (codified Jan. 29, 2025) ("Government DEI Order"); *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (codified Jan. 30, 2025) ("Gender

Ideology Order"); *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (codified Jan. 31, 2025) ("Illegal Discrimination Order").

The first order purportedly aims to eliminate "illegal and immoral discrimination" that has "infiltrat[ed]" "virtually all aspects of the Federal Government."  Government DEI Order § 1.  To implement that directive, the Director of the Office of Management and Budget must "coordinate the termination of all discriminatory programs, including illegal DEI . . . mandates, policies, programs, preferences, and activities in the Federal Government."  *Id.* § 2(a).  Part of that implementation plan, moreover, calls on agencies to "terminate, to the maximum extent allowed by law," the following: (1) "all DEI, DEIA and 'environmental justice' offices and positions"; (2) "all 'equity action plans,' 'equity' actions, initiatives, or programs," and "'equity-related' grants or contracts"; and (3) "all DEI or DEIA performance requirements for employees, contractors, or grantees."  *Id.* § 2(b)(i) ("Equity Termination Provision").  This order also directs agencies to give the OMB Director a list of all "Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021."  *Id.* § 2(b)(ii)(C) ("List Provision").  And the order states that its implementation must be "consistent with applicable law."  *Id.* § 4(b).

Issued the same day, the second order addresses "gender ideology," defined as the displacement of "the biological category of sex with an ever-shifting concept of self-assessed gender identity."  Gender Ideology Order § 2(f).  Those "who deny the biological reality of sex," the order begins, have allowed "men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women."  *Id.* § 1.  And because the Trump administration believes that "eradicat[ing] the biological reality of sex . . . depriv[es]" women "of their dignity, safety, and well-being," the order gives agencies several marching orders.  *Id.*  Two are relevant here.  First,

agencies "shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e) ("Gender Funding Termination Provision"). And second, they must "assess grant conditions and grantee preferences and ensure grant funds" from the federal government "do not promote gender ideology." *Id.* § 3(g) ("Promoting Gender Ideology Provision"). As with the first order, implementation must be "consistent with applicable law." *Id.* § 8(b).

The third order returns to DEI more generally. It explains that both the federal government and private sector have adopted "race- and sex-based preferences under the guise of" DEI in ways "that can violate the civil-rights laws of this Nation." Illegal Discrimination Order § 1. Such "[i]llegal DEI" policies, the order says, violate those "longstanding" civil-rights laws and "undermine our national unity." *Id.* So the order emphasizes that the "Federal Government" will enforce these laws by "ending illegal preferences and discrimination." *Id.* To that end, the order aims to "terminat[e] illegal discrimination in the Federal Government" through several means. Each agency must include two terms in "every contract or grant award": one requiring the counterparty "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," and another requiring it to agree that compliance with those laws "is material to the government's payment decisions for purposes of" the False Claims Act, 31 U.S.C. § 3729(b)(4). *See id.* § 3(b)(iv)(A), (B) ("Certification Provision"). Further, the OMB Director must "[e]xcise references to DEI and DEIA principles" from "Federal acquisition, contracting, grants, and financial assistance procedures." *Id.* § 3(c)(ii) ("Contract Terms Provision"). And that director must eliminate "all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id.* § 3(c)(iii) ("Government Mandates Provision").

Finally, the Illegal Discrimination Order seeks to "encourag[e] the private sector to end

illegal DEI discrimination" too.  Illegal Discrimination Order § 4.  The central plank of this section directs the Attorney General to create a "report" that will "further inform and advise" President Trump so that he "may formulate appropriate and effective civil-rights policy." *Id.* § 4(b) ("Report Provision").  Generally, this report must include "recommendations for enforcing Federal civil-rights laws." *Id.*  And specifically, it must "contain a proposed strategic enforcement plan identifying," among other things, the "most egregious and discriminatory DEI practitioners in each sector of concern"; "specific steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences"; a list from each agency flagging "up to nine potential civil compliance investigations" of large private-sector entities; "[o]ther strategies to encourage the private sector to end illegal DEI discrimination . . . and comply with all Federal civil-rights laws"; and "potentially appropriate" litigation. *Id.*  Again, all parts of the order must "be implemented consistent with applicable law." *Id.* § 8(b).

Thus, across the three executive orders, eight provisions are relevant to Plaintiffs' request for preliminary relief.  The Court refers to them collectively as the "Challenged Provisions."  To recap, they are: Government DEI Order § 2(b)(i) ("Equity Termination Provision") and § 2(b)(ii)(c) ("List Provision"); Gender Ideology Order § 3(e) ("Gender Funding Termination Provision") and § 3(g) ("Promoting Gender Ideology Provision"); and Illegal Discrimination Order § 3(b)(iv)(A), (B) ("Certification Provision"), § 3(c)(ii) ("Contract Terms Provision"), § 3(c)(iii) ("Government Mandates Provision"), and § 4(b) ("Report Provision").

Less than a week after President Trump issued the orders, OMB told agencies to pause "agency grant, loan, and other financial assistance programs."  Off. of Mgmt. & Budget, Exec. Off. of the President, M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://dcg.usc.edu/wp-content/uploads/2025/01/OMB-

Memo-Pause.pdf.  Each agency had to analyze all its financial-assistance programs to identify "programs, projects, and activities that" any of President Trump's executive orders might "implicate[]."  *Id.* at 2.  Meanwhile, OMB instructed the agencies to "temporarily pause"—"to the extent permissible under applicable law"—"all activities related to" such financial assistance for, among other things, "DEI" and "woke gender ideology."  *Id.*

The Attorney General also chimed in.  In early February, she issued a memo about "ending illegal DEI and DEIA discrimination and preferences."  Off. of the Att'y Gen., Dep't of Just., *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.  The Department of Justice, the memo explained, "is committed to enforcing all federal civil rights laws."  *Id.* at 1.  And the Illegal Discrimination Order made "clear that policies relating to" DEI "violate the text and spirit of our longstanding Federal civil-rights laws."  *Id.* (quoting Illegal Discrimination Order § 1).  So DOJ will "investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds."  *Id.*  And consistent with the executive order, DOJ will create a report "containing recommendations for enforcing federal civil-rights laws" and "encourag[ing] the private sector to end illegal discrimination."  *Id.*

### B.     Related Litigation

Other litigants have challenged the executive orders elsewhere.  In the District of Maryland, three associations and the city of Baltimore moved to preliminarily enjoin the Equity Termination Provision, the Certification Provision, and the Report Provision.  *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333 (ABA), 2025 WL 573764, at *2–4 (D. Md. Feb. 21, 2025).  The District Court granted almost all parts of that request.  It began by holding that the Equity Termination Provision was likely void for vagueness under the Fifth Amendment—and

facially so. *Id.* at *19–21. Next, the court held that the plaintiffs' First Amendment challenge to the Certification Provision was also a likely winner. *See id.* at *21–23. The part of the Report Provision "threaten[ing] to initiate enforcement actions" probably violated the First Amendment too. *See id.* at *24 (emphasis omitted) (citing Illegal Discrimination Order § 4(b)(iii)). And other aspects of the Report Provision were likely unconstitutionally vague as well. *See id.* at *26 (so holding for, seemingly, Illegal Discrimination Order §§ 2, 3, 4(b)(iii)–(iv)). Because the court also found that the plaintiffs would suffer irreparable harm absent injunctive relief, it issued a nation-wide injunction enjoining the defendants from enforcing the contested provisions. *Id.* at *27–30.

The Fourth Circuit stayed that decision pending the appeal. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, Dkt. No. 29 (4th Cir. Mar. 14, 2025). In a brief order, the panel held that the government had carried its burden of "satisf[ying] the factors for a stay." *Id.* at 2. Concurring, Judge Harris explained that the challenged orders "are of distinctly limited scope" "on their face." *Id.* at 7 (Harris, J., concurring). Nothing in their text "purport[s] to establish the illegality of all efforts to advance diversity, equity or inclusion," so "they should not be . . . understood" that way. *Id.* Nor do they facially "authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities." *Id.* The government, then, had "shown the requisite likelihood that the challenged provisions do not on their face violate the First or Fifth Amendment." *Id.* And like her colleagues, Judge Harris reserved judgment for potential challenges to "[a]gency enforcement actions that go beyond the Orders' narrow scope." *Id.*; *see also id.* at 4 n.1 (Diaz, C.J., concurring); *id.* at 9 (Rushing, J., concurring).

Over in the Northern District of Illinois, a national nonprofit organization recently sought a temporary restraining order enjoining several government defendants from enforcing parts of the

executive orders. *See Chi. Women in Trades v. Trump*, No. 25-cv-2005 (MFK), 2025 WL 933871, at *1–2 (N.D. Ill. Mar. 27, 2025) ("*CWIT I*"). Only the Equity Termination and Certification Provisions cleared the jurisdictional hurdles. *See id.* at *2–4. But once they did, they also warranted a temporary restraining order. *See id.* at *11–13. The court, however, reconsidered part of its decision when ruling on the plaintiff's motion for a preliminary injunction. *See Chi. Women in Trades v. Trump*, No. 25-cv-2005 (MFK), 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ("*CWIT II*"). After again holding that the Certification Provision probably violated the First Amendment, *see id.* at 12, the court changed course and held that the Equity Termination Provision likely did not, *see id.* at 12–14. Nor did the latter provision flout the Fifth Amendment's prohibition on unduly vague laws and regulations. *See id.* at 14–16. But as applied to a specific grant, the Equity Termination Provision likely infringed Congress's powers under the Spending Clause. *See id.* at 16–18.

C.    **Plaintiffs' Challenge to the Executive Orders**

About a month after President Trump issued the executive orders, "three mission-driven non-profit organizations" filed this lawsuit alleging that several provisions are unconstitutional. *See* ECF No. 1 ("Compl.") ¶ 2. The National Urban League ("Urban League") advocates to "elevat[e] the standard of living for Black Americans and other historically underserved people and urban communities through economic empowerment." *Id.* ¶ 18. It does so by focusing on "education and youth development, job training and workforce development, housing counseling, entrepreneurship, health, and overall quality of life." *Id.* ¶ 19. To that end, the Urban League contracts with and receives grants from the federal government to advance its mission. *Id.* The organization has, since 1973, "consistently received federal funds" helping it to "combat[] inequities." ECF No. 29-2 ¶ 29 ("Morial Decl."). Its "active federal grants" total $62 million—about

35 percent of its annual budget—and come from several agencies: the Centers for Disease Control and Prevention, the Environmental Protection Agency, and the Departments of Labor, Commerce, Justice, Agriculture, and Housing and Urban Development. *Id.* ¶¶ 30–31. According to the Urban League, that federal money supports programs that "advance DEIA principles by helping participants overcome unfair biases based on race, ethnicity, sex, gender, disability, and other identities." *Id.* ¶ 31. To take one example, CDC grant money funds the Urban League's "Partnering for Vaccine Equity program," which aims to "improv[e] vaccination coverage in disproportionately affected populations"—including "Black adults who are not up to date on their COVID and flu vaccinations." *Id.* ¶ 35. And to take another, the Urban League recently "won a $500,000 grant from the EPA to support its Urban Environmental Justice Collaborative Program." ECF No. 44-1 ("Morial Supp. Decl.") ¶ 4. That project would have developed "climate resilience within Black communities disproportionately affected by climate-related disasters." *Id.* ¶ 6. But when the Urban League tried to withdraw funds from the grant in mid-March, it could not. *Id.* ¶ 7. The payment-system account "associated with the EPA grant," the Urban League later learned, had been "suspended." *Id.* ¶ 8.

For its part, the National Fair Housing Alliance ("Housing Alliance") strives to end "all forms of housing and lending discrimination" while "ensuring equitable housing opportunities for all people." Compl. ¶ 20. Among other initiatives, the Housing Alliance researches fair-housing issues, educates people about them, and helps "victims of housing discrimination. *Id.* ¶ 21. And it "regularly contracts with the federal government to provide educational services" that support "private nonprofit local fair housing organizations." ECF No. 29-5 ¶ 15 ("Rice Decl."). More than that, the Housing Alliance has received grants from HUD "many times over several decades"—including several "ongoing grants" and pending applications. *Id.* ¶ 20. One kind of grant,

for instance, "provides funding" to groups like the Housing Alliance "to conduct testing, investigate violations, and obtain enforcement of the rights granted under the Fair Housing Act" and similar local laws. *Id.* ¶ 21.

The AIDS Foundaton of Chicago ("AIDS Foundation") has a different focus: "creat[ing] equity and justice" for those "living with and vulnerable to the human immunodeficiency virus" or "chronic conditions." Compl. ¶ 22. To further that mission, it prioritizes "ending the HIV epidemic" and homelessness, as well as advancing "racial equity" and "developing communities of supporters and allies." *Id.* And like the other plaintiffs, the AIDS Foundation "is a federal grantee." ECF No. 29-7 ("Israel Decl.") ¶ 9. It receives, for example, "various forms of funding and sub-grants from" Chicago's and Illinois's public health departments as "pass-through funding" from the Department of Health and Human Services. *Id.* All told, about 85 percent of the AIDS Foundation's funding comes from the federal government. *Id.* ¶ 11.

Plaintiffs sued 27 defendants in late February, claiming that the Challenged Provisions are unlawful for seven reasons. *See* Compl. ¶¶ 231–333. They moved for a preliminary injunction over a week later. *See* ECF No. 29. In doing so, Plaintiffs press only two of their claims. The Challenged Provisions allegedly violate the Fifth Amendment's guarantee of due process because they are vague. *See* ECF No. 29-1 at 10. And those provisions, Plaintiffs say, violate the First Amendment too.[1] *Id.* Consistent with the parties' proposed scheduling order, the Court held a hearing on Plaintiffs' motion.

---

[1] Plaintiffs challenge all but two of the Challenged Provisions on both fronts. The exceptions are the Contract Terms Provision (challenged only on due-process grounds) and the Gender Funding Termination Provision (challenged only on First Amendment grounds). ECF No. 29 at 2 n.5.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). To obtain that remedy, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

Two factors are essential: likelihood of success on the merits and irreparable harm. "Before the Supreme Court's decision in *Winter*," a sliding-scale approach permitted a "weak showing on one factor to be overcome by a strong showing on another." *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 96 (D.D.C. 2020). But now "it is clear that failure to show a likelihood of irreparable harm" is, "standing alone, sufficient to defeat the motion." *Id.* (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)). So too is the "failure to show a likelihood of success on the merits" enough to show that a preliminary injunction is unwarranted. *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018).

## III.    Analysis

The Court begins and ends with the first preliminary-injunction factor: likelihood of success on the merits. For every provision of the executive orders that Plaintiffs challenge, at least one defect prevents them from showing that they are likely to prevail. Four of the provisions falter at the starting gate of all claims: jurisdiction. Those provisions include intra-governmental mandates that do not inflict on Plaintiffs an injury in fact, so Plaintiffs have not shown that they likely have standing to challenge them. As for the remaining provisions, Plaintiffs are unlikely to prevail on either their First or Fifth Amendment claim. Those claims are facial, not as-applied, and

Plaintiffs have not carried the heavier burden that results.  To start, Plaintiffs have not shown that the provisions threaten a protected liberty or property interest—a threshold requirement for due-process claims.  And even if they had, Plaintiffs' vagueness challenge fails for independent reasons.  The First Amendment claim, moreover, clashes with two settled rules: the government does not abridge the right to free speech by choosing not to subsidize it, and that right does not permit Plaintiffs or anyone else to violate federal antidiscrimination law.  With no claim likely to succeed on the merits, the Court "need not proceed to review the other three preliminary injunction factors" and will deny Plaintiffs' motion.  *Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016).

### A.    For Some of Their Claims, Plaintiffs Have Failed to Show that the Court Likely Has Jurisdiction

"[P]art of establishing a likelihood of success on the merits" is showing "a likelihood of success in establishing jurisdiction."  *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020).  That is because the "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood" that the Court will "*reach*[] the merits, which in turn depends on a likelihood that [the] plaintiff has standing."  *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (citation omitted).  The preliminary-injunction posture, then, requires a plaintiff to "make a 'clear showing' that she is 'likely' to establish each element of standing."  *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted).

Those familiar elements enforce Article III's case-or-controversy requirement—a "fundamental" limit ensuring that federal courts have "business deciding" a dispute.  *Murthy*, 603 U.S. at 56–57 (citations omitted).  To clear that bar, a plaintiff must show "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the

defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). But not all injuries count. Instead, an injury in fact is "concrete"—rather than "abstract"—and "particularized"—rather than "a generalized grievance." *Id.* at 381 (citation omitted). Even then, a concrete and particularized injury must also "be actual or imminent, not speculative." *Id.* That means it must "have already" happened (actual) or "be likely to" happen "soon" (imminent). *Id.* Plaintiffs seeking injunctive relief, moreover, must also show "a sufficient likelihood of future injury," *id.*—that is, a "substantial risk that, in the near future," the injury will occur. *Murthy*, 603 U.S. at 58. In sum, the injury-in-fact requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *All. for Hippocratic Med.*, 602 U.S. at 381.

Causation and redressability, for their part, are usually "flip sides of the same coin." *Sprint Cmmc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008). The former requires the plaintiff to show that his "injury likely was caused or likely will be caused by the defendant's conduct." *All. for Hippocratic Med.*, 602 U.S. at 382. And when that's true, "enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. But things get harder for a plaintiff when the government regulation does not "require or forbid some action by [him]." *Id.* at 382. Put a bit differently, if the "plaintiff is not himself the object of the government action or inaction he challenges, standing"—though "not precluded"—is "ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (citation omitted). All together, these bedrock requirements insist that a plaintiff "possess a personal stake" in the case. *All. for Hippocratic Med.*, 602 U.S. at 379. And that "ensure[s] that courts decide litigants' legal rights in specific cases" rather than "in the rarified atmosphere of a debating society." *Id.* (citation omitted).

Finally, standing for one claim against one defendant is not standing for all claims against all defendants. Because "standing is not dispensed in gross," "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And further still, Plaintiffs must show that "for every defendant," at "least one plaintiff [has] standing to seek an injunction." *Murthy*, 603 U.S. at 61. But if "multiple plaintiffs bring the same claims, a court need only ensure that one of those plaintiffs has standing to pursue them." *Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 250, 260 (D.D.C. 2015). Against that backdrop, the Court will "untangle the mass" of Plaintiffs' claims.[2] *Murthy*, 603 U.S. at 62.

### 1. Plaintiffs Likely Lack Standing to Challenge the List Provision, the Report Provision, the Government Mandates Provision, and the Contract Terms Provision

The List Provision is the lowest-hanging fruit. It instructs agencies, "as appropriate," to provide the OMB Director with a "list" of federal grantees who received federal funding "to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since" early 2021. Government DEI Order § 2(b)(ii)(C). In other words, the List Provision requires nothing from Plaintiffs—no compliance, no changed behavior, nothing at all—because it is "not 'aimed' at them" but instead tells only the agencies to do something. *Am. Libr. Ass'n v. Barr*, 956 F.2d 1178, 1194 (D.C. Cir. 1992) (no standing based on plaintiff's "subjective 'chill'").

---

[2] Plaintiffs omitted one defendant when describing the scope of their First and Fifth Amendment claims in their complaint: Thomas Engels, the administrator of the Health Resources and Services Administration. *Compare* Compl. at 77, 82, *with id.* ¶ 42. That was presumably inadvertent; Plaintiffs bring both claims against the agency that Engels administers, *see id.* at 77, 82, and they sued him in his official capacity, *see id.* at 3. In any event, although the Court cannot technically enjoin Engels in his official capacity given the operative complaint's omission, that point makes little practical difference for two reasons: an order enjoining HRSA could redress a concrete injury resulting from HRSA's conduct, and the Court finds that Plaintiffs are not entitled to injunctive relief as to HRSA or any Defendant at this stage.

So what injury do Plaintiffs claim will follow from their *possible* placement on one of these agency lists?  Pinning that down is challenging because Plaintiffs seldom untangle how each provision harms them (or contributes to a cognizable injury).  They instead sweepingly assert that "the Executive Orders" jeopardize the "funding that fuels their mission driven work" and "are chilling Plaintiffs' speech and advocacy."  ECF No. 29-1 at 19–21; *see also* ECF No. 44 at 11 (describing "Plaintiffs' two principal injuries from the challenged provisions" as "loss of funding and chill of their First Amendment free speech rights").

The List Provision causes neither purported injury.  Plaintiffs do not argue that this provision somehow affects their funding.  Nor could they; the provision says nothing about slashing the funds of listed entities.  And left with their chilling injury—to the extent that they even rely on it here—Plaintiffs fail to show that the List Provision causes a concrete and particularized harm that is actual or imminent.  Again, this provision does not tell the OMB Director to do anything with the list once he gets it, so this is not a case in which a plaintiff has an objectively reasonable basis to avoid speaking in hopes of avoiding some specific consequences resulting from being listed.  Instead, any asserted chilling injury here falls into a category of harms insufficient for standing: "subjective 'chill'" without "a claim of specific present objective harm or a threat of specific future harm."  *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (Scalia, J.) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).  The only possible "chilling effect" arises "merely from" Plaintiffs' "fear that, armed with the fruits of th[e agencies'] activities"— creating the lists—some unspecified government actor "might in the future take some *other* and additional action detrimental to" them.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (quoting *Laird*, 408 U.S. at 11).  And that is not enough, particularly because Plaintiffs do not even suggest what someone in the government might do based on a list created under this provision (to

say nothing of whether that hypothetical action would be imminent).  So no Plaintiff has estab-

lished that it likely has standing to challenge the List Provision.[3]

The Report Provision presents similar jurisdictional problems.  As with the List Provision,

the Report Provision "issues no commands or prohibitions to these plaintiffs, and sets forth no

standards governing their conduct." *Reagan*, 738 F.3d at 1378.  Everything is intra-governmental:

the President has directed the Attorney General to spearhead "a report" that will "further inform

and advise" him.  Illegal Discrimination Order § 4(b).  Plaintiffs never say how this provision

implicates their loss-of-funding injury.  Any such injury would also rest "on a highly attenuated

chain of possibilities" that "does not satisfy the requirement that threatened injury must be cer-

tainly impending." *Clapper*, 568 U.S. at 410.  For the Report Provision to cause Plaintiffs to lose

funding, something like the following would need to happen: (1) the Attorney General includes in

her report a "plan" or "strateg[y]" of cutting funds for organizations that engage in DEI, even

though the provision does not mention funding; (2) the President adopts that aspect of the "*pro-*

*posed* strategic enforcement plan"; (3) the plan, however finalized, includes Plaintiffs (or at least

one of them) within the scope of the funding-cut strategy; and (4) some government actor enforces

that part of the approved plan and slashes funding.  Illegal Discrimination Order § 4(b) (emphasis

added).  Such "multi-tiered speculation[]" is "inconsistent with Article III standing." *Williams v.*

*Lew*, 77 F. Supp. 3d 129, 133 (D.D.C. 2015); *see also CWIT I*, 2025 WL 933871, at *2 ("[I]t is

---

[3] To reiterate, Plaintiffs develop no argument specific to the List Provision.  But if they are suggesting that just being identified as a federal grantee creates a cognizable chilling-effect injury, that founders on causation and redressability.  Plaintiffs, after all, identify themselves as grant recipients that use funds for DEI purposes. *See, e.g.*, Morial Decl. ¶¶ 30–31 (Urban League); Rice Decl. ¶¶ 19–20, 25 (Housing Alliance); Israel Decl. ¶¶ 9, 11, 13 (AIDS Foundation).  That harm-causing identification, then, is "not fairly traceable to the Government's" lists of federal grantees. *Clapper*, 568 U.S. at 418.  Nor could an order enjoining the agencies from creating those lists put the cat back in the bag.

difficult to see how [plaintiff] can be in imminent danger of an injury based on a provision that simply requires a cabinet official to issue a report at a future date.").

Nor does the Report Provision support any other theory of standing that Plaintiffs might be asserting. If Plaintiffs worry about being identified as one of the "most egregious and discriminatory DEI practitioners," they have not tethered that concern to a cognizable harm. Illegal Discrimination Order § 4(b)(ii). Plaintiffs need a "concrete harm (past or immediately threatened) apart from the 'chill'" that might result from *possibly* finding themselves on this list within the report. *Am. Libr. Ass'n*, 956 F.2d at 1193. But they point to none. They do not say, for example, that the Report Provision directs agencies to cut funding for every identified entity or to never contract with them again. And the path to any such harm would be laden with the kind of speculation that defeats standing: (1) the Attorney General's report would need to identify Plaintiffs' sectors as "sectors of concern"; (2) the report would then have to identify Plaintiffs as one of the "most egregious and discriminatory DEI practitioners" in a highlighted sector; (3) the proposed strategic enforcement plan must contain some enforcement mechanism against those listed entities; (4) the President must adopt the proposed plan, including the enforcement action; and (5) a government actor must take enforcement action against Plaintiffs. Such impermissible speculation also underlies any standing theory premised on the directive to include within the proposed enforcement plan "up to nine potential civil compliance investigations" per agency. Illegal Discrimination Order § 4(b)(iii). Those "*potential*" investigations would still only be part of "a *proposed*" enforcement plan within a future report from the Attorney General to the President. *Id.* (emphases added). And Plaintiffs can offer only speculation that they will wind up on one of these investigation lists. Because "several speculative contingencies must occur before" Plaintiffs suffer any concrete harm, their chilling-effect injury rests on a hypothetical harm far too uncertain to support standing.

*Williams*, 77 F. Supp. 3d at 133.

The conclusion that Plaintiffs likely lack standing should come as no surprise for the List and Report Provisions. Indeed, the implications of Plaintiffs' theory—undeveloped as it is—that they have standing to challenge these provisions are startling. At their core, the List and Report Provisions tell the President's subordinates to gather information and propose policy strategies. Some component of the Executive Branch, to be sure, may eventually use that information or implement a proposed strategy in a way that directly affects Plaintiffs—say, by refusing to honor contracts with entities listed under either provision. But *that* is when Plaintiffs would have the requisite "personal stake." *All. for Hippocratic Med.*, 602 U.S. at 379 (citation omitted). Until then, Plaintiffs are at most "concerned bystanders" to internal Executive Branch processes. *Id.* at 382 (citation omitted). And Article III's case-or-controversy requirement does not cover a challenge to the kind of intra-governmental directives and policy planning implicated by the List and Report Provisions.

In a similar vein, Plaintiffs are also unlikely to establish standing to challenge the Government Mandates Provision. That provision requires the OMB Director to "[t]erminate," "as appropriate," the following "mandates, requirements, programs, or activities" and those "like" them: "diversity, equity, equitable decision-making, equitable deployment of financial and technical assistance," and "advancing equity." Illegal Discrimination Order § 3(c)(iii) (internal quotation marks omitted). As Defendants explain, this directive applies to "the government's *own* mandates, requirements, programs, or activities." ECF No. 38 at 38 (internal quotation marks and citation omitted). And the context of the executive order tracks that limited scope; the Government Mandates Provision is nestled within a part of the order titled "Terminating Illegal Discrimination *in the Federal Government*." Illegal Discrimination Order § 3 (emphasis added). Even after

Defendants highlighted that Plaintiffs "do not allege that they provide any relevant government-wide programs" that this provision might cover, *see* ECF No. 38 at 38, Plaintiffs offer no specific defense of their standing to challenge it, *see* ECF No. 44 at 10–14 (not mentioning the Government Mandates Provision when defending standing).  Nor does the Court see how this command to the OMB Director could lead to an actual or imminent concrete harm tied to lost funds or chilled speech.  In short, because the provision "focus[es] on internal government agency . . . programs" and activities, Plaintiffs have not shown that they have likely suffered "the required injury in fact" for standing.  *CWIT I*, 2025 WL 933871, at *2.

The Contract Terms Provision creates the closest call on standing.  By its terms—and in its context within the "Terminating Illegal Discrimination in the Federal Government" section—the provision seems to apply only to internal government procedures.  *See* Illegal Discrimination Order § 3.  Framed as a command to the OMB Director, the Contract Terms Provision instructs him to "[e]xcise references to DEI and DEIA principles, under whatever name they appear, from Federal acquisition, contracting, grants, and financial assistance procedures."  *Id.* § 3(c)(ii).  The goals include "streamlin[ing] those procedures, improv[ing] speed and efficiency, lower[ing] costs, and comply[ing] with civil rights laws."  *Id.*  Despite that seemingly internal focus, counsel for Defendants clarified that "[p]rivate parties subject to Government agreements may be required to follow some of the relevant federal procedures."  ECF No. 45 at 1.

Even after the hearing and that explanation, the scope of Contract Terms Provision is far from clear.  All the Court knows is that the provision requires the removal of DEI "references" from certain "federal procedures," some of which private entities contracting with the government may need to follow.  Read one way, this directive just removes certain terms that Plaintiffs (presumably) might prefer to have in their contracts without affecting funding availability.  But read

more aggressively, the provision perhaps instructs the OMB Director to eliminate substantive contract benefits—say, a grant of funding for a project promoting diversity in the workforce—if the contract provision "references" a DEI principle.

That uncertainty cuts against Plaintiffs here because they bear the burden of "mak[ing] a clear showing that [they] are likely to establish each element of standing." *Murthy*, 603 U.S. at 58 (internal quotation marks and citation omitted). Plaintiffs have not explained how the Contract Terms Provision inflicts (in whole or in part) either asserted harm: lost funding and chilled speech. They don't say, for example, that one of their federal contracts includes a "federal procedure" that was changed under this provision and that requires them to take an anti-DEI stance. And any "present deterrence from First Amendment conduct" stemming from "the difficulty of determining" how the provision "appli[es]" to Plaintiffs' existing (or potential) contracts does "not by itself support standing." *Barr*, 956 F.2d at 1193 (internal quotation marks and citation omitted). As for the claimed funding-loss injury, it would be odd for a provision about excising references from federal procedures to operate as a way for the government to cut funding. For one thing, the Contract Terms Provision is part of a section about terminating illegal discrimination "*in the Federal Government*." Illegal Discrimination Order § 3 (emphasis added). And relatedly, *different* provisions of the executive orders expressly direct agency heads to eliminate funding for certain projects and activities. *See* Gender Ideology Order § 3(e) (directing agencies to "end the Federal funding of gender ideology" "as permitted by law"); *id.* § 3(g) ("Federal funds shall not be used to promote gender ideology."); Government DEI Order § 2(b)(i) (directing agencies to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts"). Those provisions calling for funding cuts make it even less likely that the Contract Terms Provision, aimed at the government's procedures, serves as a way to eliminate Plaintiffs' federal funding.

In sum, Plaintiffs have not carried their burden of showing that a concrete injury has resulted or is likely to result from some enforcement—whatever that looks like—of the Contract Terms Provision. Defendants might, of course, interpret and apply the Contract Terms Provision in a way that creates a cognizable injury traceable to their conduct. But any such theory is "riddled with contingencies and speculation that impede judicial review," showing that such a challenge is likely not justiciable now. *Trump v. New York*, 592 U.S. 125, 131 (2020). Indeed, because "[a]ny prediction how the Executive Branch might eventually implement" the Contract Terms Provision is "no more than conjecture at this time," Plaintiffs have also failed to show that their challenge to this provision is likely ripe—yet another reason they are unlikely to succeed on the merits. *Id.* (internal quotation marks and citation omitted).

### 2. Plaintiffs Likely Have Standing to Challenge the Gender Funding Termination Provision, the Promoting Gender Ideology Provision, the Equity Termination Provision, and the Certification Provision

Unlike the provisions discussed above, the other four likely support standing for injunctive relief. Three group together as provisions that make it more likely that Plaintiffs will lose access to money—"a classic pocketbook injury sufficient to give [them] standing." *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023); *see also, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 243 (2021) (describing "pocketbook injury" as "a prototypical form of injury in fact"). The Gender Ideology Order contains two: § 3(e), which calls on agencies to "end the Federal funding of gender ideology" as "permitted by law," and § 3(g), which says that "Federal funds shall not be used to promote gender ideology." And the third provision, residing in § 2(b)(i) of the Government DEI Order, directs agencies to "[t]erminate" equity-related grants and contracts. On their face, these three provisions threaten a wide range of funding—any federal grant or contract related to equity, and any funding that promotes the idea that there are "genders . . . disconnected from one's sex." Gender Ideology Order § 2(f). So the standing question is whether Plaintiffs have shown that their

federal funds are or are likely to fall within that scope.

The Equity Termination Provision has likely already caused monetary injury to at least one Plaintiff, so the Court begins there. Before President Trump took office, the Urban League won a half-million-dollar grant from EPA to "launch" a project geared towards "enhancing climate resilience within Black communities." Morial Supp. Decl. ¶¶ 4, 6. But the Urban League could not withdraw funds in March, learning later that "the account associated with the EPA grant" had been "suspended." *Id.* ¶ 8. As Defendants' counsel acknowledged, this "instance . . . probably" establishes "standing" for the Urban League to seek an injunction barring EPA from enforcing the Equity Termination Provision. ECF No. 46 ("Hearing Tr.") at 52. Indeed it does: the Urban League won the grant for what seems like an equity-related project but then lost access to the funds, and an order enjoining EPA (and its administrator, Lee Zeldin) from enforcing the Equity Termination Provision would likely free up those funds because Defendants identify no other reason for withholding them.

Other Plaintiffs describe their lost funds less clearly. For example, the Housing Alliance says that it lost "part of another contract related to equity and fairness in housing that had been subcontracted to" it. Rice Decl. ¶ 33. But the details stop there, leaving the Court unsure whether the contract involved grant money that would support the pocketbook injury that the Housing Alliance claims. The AIDS Foundation, for its part, points to an email from Chicago—with whom it subcontracts—which apparently "confirmed . . . that we were subject to the Federal budget freeze." Israel Decl. ¶ 31. Again, though, the specifics are sparse. And without knowing more about the subcontracts, it is hard to identify the provision to which the monetary injury is "fairly traceable"—an essential part of Article III standing. *Clapper*, 568 U.S. at 402. Plaintiffs of course may bring a wide-ranging suit against over two dozen defendants while challenging eight

provisions of the executive orders. But the price of doing so is bearing the burden of establishing standing for each claim as to each defendant. That requires work—specifically, a showing that "for every defendant," "at least one plaintiff" has "standing to seek an injunction" for "each claim that" Plaintiffs "press." *Murthy*, 603 U.S. at 61 (citation omitted). And Plaintiffs have not done that across the board.

Still, Plaintiffs' declarations do support a likelihood of standing to challenge the three funding-focused provisions as to most Defendants based on the likelihood that Plaintiffs *will* lose funding because of those provisions. The Urban League does the heaviest lifting on this score. Its active federal grants come from the EPA, CDC, and the Departments of Labor, Housing and Urban Development, Justice, Commerce, and Agriculture. Morial Decl. ¶ 30. Those funds support programs "advanc[ing] DEIA principles," meaning that grant money from those agencies is likely at risk under the Equity Termination Provision. *Id.* ¶ 31. More than that, the Urban League "advocates for" "LGBTQ people of color" and "Black transgender people." *Id.* ¶ 10. So it is likely to lose federal funding for that advocacy too under the Gender Funding Termination Provision and the Promoting Gender Ideology Provision because each directs agencies to avoid allowing federal money to promote gender ideology—a concept that includes elevating "self-assessed gender identity" over "biological categor[ies] of sex." Gender Ideology Order §§ 2(f), 3(e), (g). And the AIDS Foundation adds several other Defendants from which it receives federal funding: Health and Human Services, Health Resources and Services Administration, National Institutes of Health, and Administration for Community Living. *See* Israel Decl. ¶¶ 8–9. And like the Urban League, the AIDS Foundation engages in activities that render the organization susceptible to losing funds under the Equity Termination Provision and the two funding-focused provisions in the Gender Ideology Order. *See, e.g.*, *id.* ¶ 13 (discussing the foundation's focus on "address[ing] systemic

factors" like "racism, sexism, [and] anti-transgender bias"). Finally, these three provisions cause the likelihood that Plaintiffs will lose access to money because they direct agencies to stop providing the federal funds. And an order enjoining Defendants from enforcing those provisions would redress that harm by making Plaintiffs less likely to suffer that monetary harm. Unlike in *Lujan*, "the agencies funding" the grants and contracts that Plaintiffs worry about *are* "parties to the case," so the path to redressing the likely monetary injury is straightforward: an order telling the agencies not to enforce the provisions' mandate to terminate certain kinds of funding. *Lujan*, 504 U.S. at 568.[4] The bottom line is that Plaintiffs have standing to challenge the Equity Termination Provision, the Gender Funding Termination Provision, and the Promoting Gender Ideology Provision as to all Defendants except the few whom they have not connected to any injury that these provisions might cause—namely, OMB (and its Director) and the Office of Federal Contract Compliance Programs (and its Acting Director).[5]

The standing analysis for the Certification Provision follows a similar path. For all the reasons above, Plaintiffs (or at least one of them) are likely—based on their previous and planned

---

[4] At the hearing, Defendants argued that Plaintiffs have not established causation and redressability because agencies could cut funding for other reasons—that is, policy directives other than the executive orders could cause Plaintiffs to lose funding. Hearing Tr. at 51–52. What might those directives be? Defendants have not said. And if other directives do make a loss of funding likely such that enjoining the funding-focused provisions would not redress Plaintiffs' actual and probable monetary injuries, then the Court wonders why the President included these provisions in the executive orders at all. In any event, these provisions plainly and straightforwardly direct agencies to cut certain kinds of funding. And unsupported speculation about unidentified policies that might somehow threaten funding will not defeat causation at this stage. Nor must the requested relief *certainly* remedy Plaintiffs' injuries. Rather, the question is whether "the relief sought . . . will *likely* alleviate the particularized injury alleged." *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (emphasis added) (citation omitted). And Plaintiffs have shown that enjoining the three funding-focused provisions would likely do that.

[5] Plaintiffs do not seek "an injunction against President Trump," *see* ECF No. 44 at 31, so the Court need not address standing as to him for purposes of this motion.

activity as federal grantees—to face the "forced choice" that the Certification Provision presents: change their programming to enable them to make the certification; make the certification without changes and risk a false certification; or give up federal funds and contracts. *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir. 2024) (noting that whether conditions imposed under forced choice "offend the Fourth Amendment goes to the merits," not to "injury for standing purposes"). In this way, the Certification Provision is like a "regulation[] that require[s] . . . some action by the plaintiff" even though the Illegal Discrimination Order frames it as a directive to the agencies. *All. for Hippocratic Med.*, 602 U.S. at 382. Plaintiffs and others receiving grants or contracting with the government are forced to do something they otherwise would not need to. So this provision is the type for which "both the injury in fact and causation requirements" are "almost invariably satisf[ied]." *Id.*

That holds true here. Because of the Certification Provision, Plaintiffs must affirmatively state that they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws"—and that such compliance is material for purposes of the False Claims Act. Illegal Discrimination Order § 3(b)(iv). So Plaintiffs must assess whether the agency (or DOJ, or another Executive Branch entity) might find that *any* program—not just those federally funded—violates antidiscrimination law. And if Plaintiffs have doubts, the Certification Provision imposes the lose-lose-lose choice described above: change their programming, risk a false certification, or forgo the federal funds or contract. That injury is real, and Plaintiffs are likely to suffer it given their record as federal contractors and grant recipients. This harm is also caused by the Certification Provision and would be remedied by an order enjoining Defendants from applying it. And as explained above, Plaintiffs have alleged that all Defendants except a handful (OMB, OFCCP, and their leaders) are likely to have contracts or grants implicated by this provision. That

group of Defendants is also likely to impose this choice on at least one Plaintiff given the clear command of the executive order: "The head of *each* agency *shall* include in *every* contract or grant" the certification and FCA-materiality clauses. Illegal Discrimination Order § 3(b)(iv) (emphases added).

No matter, according to Defendants, because ripeness problems pose another jurisdictional barrier. *See* ECF No. 38 at 22–24. Ripeness and standing are "related doctrines of justiciability" that ensure strict adherence to Article III's case-or-controversy requirement. *Trump*, 592 U.S. at 131. Ripeness does that by preventing courts "from entangling themselves in abstract disagreements"—specifically, by assessing the issues' "fitness" for "judicial decision" and the "hardship to the parties of" not considering those issues. *Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 131 (D.D.C. 2017) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003)).

At least as to the provisions that Plaintiffs likely have standing to challenge, Defendants overstate the ripeness concerns. They begin with a charge of speculation: Plaintiffs' claims rest on conjecture about "intervening actions that the agencies *might* take to implement the" executive orders. ECF No. 38 at 23. But the remaining provisions don't mince words. Those addressing funding and contracts (the Equity Termination Provision, the Gender Funding Termination Provision, and the Promoting Gender Ideology Provision) all pointedly tell agencies to terminate grants and contracts in specified circumstances. And for its part, the Certification Provision also includes a straightforward directive: agencies must include two terms requiring certification in every contract and grant. The substance of those terms, moreover, is clear even if agencies might use slightly different formulations. They must require counterparties and grantees to certify that no programs promote DEI in a way that violates federal antidiscrimination law, and compliance with those laws

is material under the False Claims Act.  *See* Illegal Discrimination Order § 3(b)(iv).  So *Defendants* are the ones speculating by suggesting that the agencies will disregard these clear mandates when implementing the provisions.  And Plaintiffs have pointed to examples of agencies acting consistently with those directives by terminating or suspending grants and contracts.  *See* ECF No. 44 at 11.  Given that, Defendants' assertion that the agencies might implement the provisions in uncertain ways does not create a ripeness problem.

Pressing on, Defendants add that the executive orders' savings clauses—*i.e.*, the provisions instructing agencies to implement them as permitted by law—render Plaintiffs' claims unripe because they rely on speculation that the agencies will *not* comply with the law when applying the provisions.  *See* ECF No. 38 at 23–24.  But whether Defendants will apply the provisions in ways affecting Plaintiffs and whether they will do so unlawfully are distinct questions.  And ripeness is more concerned with the former.  Requiring Plaintiffs to show in the ripeness inquiry that Defendants will apply the provisions unlawfully would "conflate the analysis of constitutional ripeness with the merits of [their] claims."  *Rubinov v. Pliler*, No. 21-cv-4397 (LJL), 2021 WL 5567826, at *5 (S.D.N.Y. Nov. 29, 2021); *cf. Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing 'in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal." (citation omitted)).  That is why Defendants' main case for this argument, *Construction Trades Department, AFL-CIO v. Allbaugh*, never mentions ripeness.  *See* 295 F.3d 28, 33 (D.C. Cir. 2002) (describing what a plaintiff must show to prevail in a "facial attack" (citation omitted)).

The upshot is that Plaintiffs likely have standing to challenge four provisions as to most Defendants: the Equity Termination Provision, the Gender Funding Termination Provision, the

Promoting Gender Ideology Provision, and the Certification Provision.[6]  Those claims are also probably ripe, so they present no jurisdictional barriers at this stage.

### B.    Plaintiffs Fail to Establish That They Are Likely to Succeed on Their Claims Under the First and Fifth Amendments

#### 1.    Plaintiffs Bring Facial, Not As-Applied, Constitutional Challenges

The first step in assessing whether Plaintiffs are likely to prevail on their First or Fifth Amendment claims is clarifying whether those claims are facial challenges, as-applied challenges, or both.  The difference matters.  True, "the substantive rule of law necessary to establish a constitutional violation" remains the same.  *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019).  But the distinction "affects the extent to which the invalidity of the challenged" regulation "must be" shown "and the corresponding 'breadth of remedy.'"  *Id.* (citation omitted).  Some background on these kinds of claims, then, is necessary.

"A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."  *Bucklew*, 587 U.S. at 138.  That is a big claim.  And making it "comes at a cost."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  Facial challenges chafe against the ordinary rule that courts "handle constitutional claims case by case, not en masse."  *Id.*  That preference makes sense because facial challenges "often rest on speculation about the law's coverage and its future enforcement."  *Id.* (internal quotation marks and citation omitted).  On top of that, they "threaten to short circuit the democratic process by preventing" laws and regulations "from

---

[6] As explained below, Plaintiffs bring facial rather than as-applied challenges to these provisions.  But bringing "a facial challenge to the constitutionality of" a regulation or other directive does not "itself suffice[] to establish standing."  *Williams v. Lew*, 819 F.3d 466, 476 (D.C. Cir. 2016).  Instead, a plaintiff must still make the "constitutionally mandated showing" of injury in fact, causation, and redressability.  *Id.*; *see also Pub. Citizen v. Trump*, 435 F. Supp. 3d 144, 159–60 (D.D.C. 2019) (rejecting argument that the "breadth of [a] facial challenge" to "an Executive Order" establishes "standing").

being implemented in constitutional ways." *Id.* (internal quotation marks and citation omitted). That is why litigants raising such a challenge typically bear the heavy burden of showing that "no set of circumstances exists under which the" regulation "would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023) (citation omitted) (emphasis removed). But recognizing that "free expression" needs "breathing room," the doctrine softens when the challenged regulation implicates the First Amendment and permits facial invalidation "even though" the regulation "has lawful applications, and even at the behest of someone to whom the [regulation] can be lawfully applied." *Id.* In that context, a facial claim can succeed if the challenger shows that the regulation "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Id.* at 770 (internal quotation marks and citation omitted). The main takeaway is two-fold. "[F]acial challenges" are "hard to win," "even when . . . based on the First Amendment." *Moody*, 603 U.S. at 723. And they focus on the *entire* "scope" of the challenged regulation: "What activities, by what actors, do the laws prohibit or otherwise regulate" on their face? *Id.* at 724.

An as-applied challenge, on the other hand, is a claim that a regulation is "unconstitutional as applied to" a plaintiff's "particular" conduct—or, as relevant here, "particular speech activity." *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). Phrased differently: this kind of claim "tests the application of th[e] restriction to the facts of a plaintiff's concrete case." 16A Am. Jur. 2d Constitutional Law § 419 (Jan. 2025 update). And it does so based on a "factual record" that enables the Court to assess "the application of" the challenged restriction "to a specific person." *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc); *see also, e.g.*, *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014).

Distinguishing between facial and as-applied challenges is not always easy. But the "label is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). Instead, the key

considerations are the nature of the "plaintiffs' claim and the relief that would follow." *Id.* If those things "reach beyond the particular circumstances of the[] plaintiffs," then they must "satisfy [the] standards for a facial challenge." *Id.*

Against this backdrop, Plaintiffs' constitutional claims "challenge[]" the executive orders "as a whole, rather than as to particular applications." *Moody*, 603 U.S. at 717. Their motion sets that tone with its headers, which repeatedly assert that the "executive orders" violate the Constitution for various reasons—not that particular applications of the specific Challenged Provisions do. *See* ECF No. 29-1 at 22 ("The Executive Orders Violate the Fifth Amendment's Due Process Clause."); *id.* at 23 ("The Executive Orders Do Not Give Fair Notice of What They Require."); *id.* at 29 ("The Executive Orders Authorize Arbitrary and Discriminatory Enforcement."); *id.* at 32 ("The Executive Orders' Vagueness Chills Protected Speech."); *id.* at 33 ("The Executive Orders Violate the Constitution's Guarantees of Free Speech."). Classifying the form of a constitutional challenge is, to be sure, not a game of counting noses (or headers). But it is telling that Plaintiffs consistently underscore the constitutional defects of the executive orders writ large while never using the term "as applied" in their motion.

More to the point, Plaintiffs attack the executive orders and ask for relief in ways confirming that their challenges are facial and not as-applied. They begin and end their motion by asking the Court to "preliminary enjoin Defendants' continued implementation of the challenged provisions of the" executive orders. ECF No. 29-1 at 51; *see also id.* at 11 ("preliminarily enjoin Defendants from enforcing the Executive Orders"). Plaintiffs' proposed order, moreover, leads with a sweeping request for relief: "Defendants shall not implement or enforce the . . . 'Challenged Provisions' . . . including *without limitation* through the promulgation of any rules or regulations, or in *any manner* by way of contract, subcontract, purchase order, grant, or sub-grant[.]" ECF

No. 29-10 ¶ 1 (emphases added).  Further still, Plaintiffs request an order directing Defendants to "reinstate *any* contracts, subcontracts, grants, or subgrants or other agreements that have been rescinded as part of implementing or effectuating the Challenged Provisions."  *Id.* ¶ 3 (emphasis added).  Neither relief is cabined to Plaintiffs.[7]

True, Plaintiffs also ask the Court to order Defendants to "rescind all agency-wide directives implementing or effectuating the Challenged Provisions . . . against Plaintiffs," and to "rectify contracts" and "grants . . . entered into with Plaintiffs" if "provisions have been inserted pursuant to . . . the Challenged Provisions."  ECF No. 29-10 ¶¶ 2, 4.  But just mentioning Plaintiffs as part of some requested relief does not mean that Plaintiffs' constitutional challenges are as-applied rather than facial.  Plaintiffs still need to offer a factual basis for assessing how the Challenged Provisions "are unconstitutional as applied to their *particular* speech activity."  *Edwards*, 755 F.3d at 1001 (emphasis added).  Plaintiffs' requested relief, though, does not target any specific application of the Challenged Provisions to particular speech activity; the proposed order identifies no specific action that a Defendant has taken against a Plaintiff that Plaintiffs claim is unconstitutional and should be enjoined for that reason.  To the contrary, even the relief tethered to Plaintiffs covers "all" directives "implementing or effectuating the Challenged Provisions" against Plaintiffs—no matter what speech activity was at issue or how a given provision was implemented.  ECF No. 29-10 ¶ 2; *see also id.* ¶ 4 (requesting an order "rectify[ing]" contracts and grants entered into with Plaintiffs, without specifying any particular agreements or provisions altered).  That is not the stuff of an as-applied challenge.

---

[7] At the hearing, Plaintiffs said that they are asking "not for a nationwide injunction," but "for a party injunction."  Hearing Tr. at 11.  That is inconsistent with their briefing and proposed order.  In any event, and as explained below, this statement does not cure Plaintiffs' failure to identify the factual details necessary to support an as-applied challenge and their inability to articulate the contours of such a challenge in their briefing.

Plaintiffs' belated efforts to salvage an as-applied claim are unavailing.  In their reply, Plaintiffs—for the first time—contend that their "vagueness challenge is properly understood as an as-applied post-enforcement challenge" because Defendants are "presently violating Plaintiffs' due process rights by enforcing the Orders' vague provisions against them."  ECF No. 44 at 19.  Which Defendants?  What enforcement actions?  Against which Plaintiffs and which particular speech activity?  Plaintiffs' reply does not say.  For example, when arguing that they "could have a [protected] property interest in their grants and contracts," Plaintiffs do not identify a single grant or contract that purportedly supplies that interest.  *See id.* at 18.  This conclusory reply-brief asser-tion, then, is not enough to raise an as-applied challenge under the Due Process Clause.[8]  And even that is more attention than Plaintiffs give their purported as-applied First Amendment challenge.  Their reply brief mentions no such challenge in the section devoted to the merits of their First Amendment claim.  *See id.* at 21–27.  Instead, Plaintiffs reiterate the facial nature of their claim: "seven *provisions* across the Executive Orders"—not seven (or any) *applications* of the provi-sions—"violate  the First Amendment and justify the need for immediate preliminary relief."  *Id.* at 22 (emphasis added).

Pressed at the hearing about the scope and propriety of their purported as-applied chal-lenge, Plaintiffs offered five situations in which they claim one Defendant or another applied the Challenged Provisions.  First, they pointed to an instance in late January: the AIDS Foundation could not withdraw funds from a CDC grant for three days, and Plaintiffs believe that the Gender

---

[8] When addressing the breadth of the injunction, Plaintiffs say in their reply that they "chal-lenge the at-issue provisions both as-applied and on their face."  ECF No. 44 at 31.  It is unclear whether Plaintiffs are referring to their assertion that they have raised an as-applied vagueness challenge or whether they are trying to raise that kind of challenge on First Amendment grounds too.  In any event, this statement is even more conclusory than the first one.  And it is no substitute for identifying the facts necessary for an as-applied challenge—and explaining the contours of such a challenge.  *See United States v. Andujar-Arias*, 507 F.3d 734, 747 (1st Cir. 2007).

Funding Termination Provision and the Promoting Gender Ideology Provision caused that temporary disruption. *See* Hearing Tr. at 6–7. Second, they identify a "fair housing subcontract" that the Housing Alliance "had" but that "was canceled by HUD" on January 31—possibly the result of HUD applying the Contract Terms Provision or the Equity Termination Provision. *See id.* at 7–8. Third, Plaintiffs flag that on February 1 the AIDS Foundation "heard about the cancelation of a contract it relies on" as a subcontractor with Chicago. *See id.* at 8. Apparently, HRSA had "put on a presentation" for "grantees" and told "organizations" that they "needed to remove" certain words and "references to transgender people" from "their publications" under "the Anti-Gender Executive Order." *Id.* Fourth, the Housing Alliance learned on February 11 that HUD had canceled "a contract related to housing equity and fairness that had been subcontracted to it." *Id.* at 9. Fifth and finally, the Urban League could not withdraw funds under its EPA grant in mid-March and promptly learned that the grant would be suspended—presumably because of the Equity Termination Provision. *Id.* at 9–10.

Putting aside the problem of not raising these challenges until oral argument—and not even hinting at a non-facial challenge until the reply brief—these examples do not support an as-applied claim. "[A]s-applied challenge[s] necessarily require[] the development of a factual record for the court to consider." *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019) (internal quotation marks and citation omitted). True, the preliminary-injunction posture does not demand a summary-judgment type of record. But Plaintiffs have identified neither key parts of the record nor the contours of any as-applied challenges to Defendants' conduct. Start with the AIDS Foundation's temporary inability to access CDC grant funds. The declaration offers no details about the grant award—nothing about what it covers, what its terms are, whether it permits termination in some cases, or whether it has features that might support a cognizable

property interest.  *See* Israel Decl. ¶ 29.  So too for the AIDS Foundation's subcontract with Chicago.  Plaintiffs do not identify the specific grants or their terms, *see id.* ¶ 31—the kind of "particularized facts" that "allow a court" to assess "as-applied challenges" in situations like this, *see Justice*, 771 F.3d at 292.  Nor does the declaration elaborate on what "notices" HRSA had "been sending . . . to grantees like . . . Chicago about the implementation of the[] Executive Orders." Israel Decl. ¶ 31.

The Housing Alliance examples fare no better.  One includes no details about the contract or enforcement action that terminated it; all the Court knows is that an unidentified "part" of a "contract related to equity and fairness in housing . . . had been cancelled."  Rice Decl. ¶ 33. Again: no terms, no details about the termination, and no other facts sufficient to enable as-applied review.  The Housing Alliance offers more information about another terminated subcontract by explaining that the "initial work order for it" provided for a training outline that would "include a foundation of cultural competency" addressing DEI that is "necessary in all fair housing work." *Id.* ¶¶ 16, 32.  But the problem remains because Plaintiffs offer only this scarce detail without describing (or providing) key terms and provisions of the subcontract.  And without more details, how, for example, is the Court to assess whether *this* particular subcontract supports a protected property or liberty interest?  In short, the record is far too light on information about the specific enforcement actions that Plaintiffs cited at oral argument to supply the necessary "factual record" that would enable the court to assess "the application of" the Challenged Provisions "to a specific person."  *Richmond Med. Ctr. for Women*, 570 F.3d at 172.

The closest call is the EPA grant that the Urban League lost access to.  Its declarant described the scope of the grant, provided details about its purpose and the selection process, discussed the Urban League's inability to withdraw funds, and included as an exhibit the notice of

award and several conditions of the grant. *See* Morial Supp. Decl. ¶¶ 3–8; ECF No. 44-2. And Plaintiffs' failure to highlight this grant in their motion is understandable because the Urban League did not learn about the suspension until after that filing. *See* Morial Supp. Decl. ¶ 7. But failing to do so in their reply brief, filed almost a week after that discovery, is less excusable. Plaintiffs develop no as-applied argument for their First Amendment claim, and certainly not one specific to *this* application of the Challenged Provisions (presumably the Equity Termination Provision) by EPA to the Urban League. And despite gesturing at an "as-applied post-enforcement challenge" on vagueness grounds, Plaintiffs again fail to identify what that as-applied challenge looks like—say, by explaining how a "vague provision[]" was "enforc[ed]" against the Urban League with respect to this EPA grant. ECF No. 44 at 19. So even if the record *could* support an as-applied challenge focused on this EPA grant, Plaintiffs have not pressed such a claim in their briefing. And the Court will not construct an as-applied argument for them.

"If" Plaintiffs "are concerned about" particular contracts and grants, "they would be better served by bringing a First Amendment" or Fifth Amendment "challenge as applied to those" agreements. *Moody*, 603 U.S. at 745 (Barrett, J., concurring). But Plaintiffs' alternative focus has been clear: they target the Challenged Provisions as a whole and fail to develop the arguments (or identify the facts) necessary to raise an as-applied challenge alongside their facial ones. That "decision" was theirs to make, and it "comes at a cost." *Id.* at 723 (majority opinion). So the Court will assess their constitutional challenges as facial ones.

### 2. Plaintiffs Fail to Show that They Are Likely to Succeed on Their Fifth Amendment Claim

Having untangled those threshold issues, the Court turns to Plaintiffs' claim that the Challenged Provisions are void for vagueness. As explained, Plaintiffs fail to show that they likely have standing to contest four of the Challenged Provisions, and they press only a First Amendment

claim against the Gender Funding Termination Provision. So just three are in play here: the Certification Provision, the Equity Termination Provision, and the Promoting Gender Ideology Provision. And to repeat, the challenge to these provisions is facial rather than as-applied for the reasons discussed above.

The "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008). That doctrine recognizes two kinds of impermissible vagueness. The first rests on a "fundamental principle" of "our legal system": laws "regulat[ing] persons or entities must give fair notice of conduct that is forbidden or required." *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (citation omitted). To do so, the law must "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The second kind of vagueness arises if the law "authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* Typically, a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others" when he "engages in some conduct that is clearly proscribed." *Williams*, 553 U.S. at 304 (citation omitted). That "requirement" is "relaxed," however, "in the First Amendment context," where plaintiffs may "argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of speech." *Id.* And cases involving speech require "rigorous adherence" to vagueness principles "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Tel. Stations Inc.*, 567 U.S. 239, 253–54 (2012). Still, neither "perfect clarity" nor "precise guidance" is "required"—even when "regulations . . . restrict expressive activity." *Williams*, 553 U.S. at 304 (citation omitted). So a regulation may pass constitutional muster if it is "marked by flexibility and reasonable breadth[] rather than meticulous specificity." *Grayned v. City of Rockford*, 408 U.S. 104, 111 (1972) (internal quotation marks and citation

omitted).  And because Plaintiffs bring a facial challenge, they must show that the provisions are not "valid 'in the vast majority of [their] intended applications.'"  *Hill*, 530 U.S. at 733 (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)).

Responding to Plaintiffs' due-process claim, Defendants press two arguments.  They begin with what they say are threshold deficiencies.  The vagueness doctrine does not apply to these presidential directives that do not regulate "primary conduct," *see* ECF No. 38 at 24, and even if it did, Plaintiffs' facial challenge is categorically improper, *see id.* at 26–27.  Defendants add that Plaintiffs' due-process claim falters for independent reasons too, including that Plaintiffs have not identified a protected interest and that the provisions offer enough guidance.  *See id.* at 28–35.

Plaintiffs' due-process claim suffers from several flaws that make success on the merits unlikely.  Begin with a bedrock requirement for those claims: an interest that due process protects but that the remaining Challenged Provisions threaten.  "[A] void-for-vagueness challenge is," at bottom, "a due-process claim," so Plaintiffs must show that they were "deprived of a constitution-ally-protected property or liberty interest."  *McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023).  That follows from the vagueness doctrine's origins as "an outgrowth . . . of the Due Process Clause of the Fifth Amendment."  *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303 (D.C. Cir. 2023) (citation omitted).  And the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in liberty or property."  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (internal quotation marks and citation omitted); *see also Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023) (explaining that the "void-for-vagueness doctrine" is a "component of due process" and "bars a state from taking away life, liberty, or property under a law that fails to 'give a person of ordinary intelligence adequate notice of what conduct is prohibited' or lacks 'sufficient

standards to prevent arbitrary and discriminatory enforcement'" (citation omitted)); *Karem*, 960 F.3d at 665 (explaining that the "protection of fair notice" applies when the plaintiff's interest in "a White House press pass . . . undoubtedly qualifies as a protected liberty interest" (citation omitted and cleaned up)).  In Defendants' view, Plaintiffs fail to identify a constitutionally protected interest because the contracts and grants they worry about are not the kind that create a "legitimate claim of entitlement" to the benefit—*i.e.*, not the kind that provide a protected property interest. ECF No. 38 at 28–29 (citation omitted).  That is because "courts have resisted" applying "due-process principles to government contracts" outside "the employment context." *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014); *see also Redondo-Borges v. HUD*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract"—including the revocation of a "bid award"—does not amount to an unconstitutional deprivation of property.").

Plaintiffs hardly address this point in reply, offering two halfhearted efforts to show that the Challenged Provisions implicate a protected interest that would support a due-process claim. They start by pointing to the now-stayed decision in *Diversity Officers*, which found in a footnote that the plaintiffs there had cleared this hurdle. *See* 2025 WL 573764, at *20 n.10.  The Court respectfully finds unconvincing whatever persuasive force this analysis might retain after the Fourth Circuit's stay.  The *Diversity Officers* court accepted the plaintiffs' argument without explanation—and with nothing but a citation to *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).  Neither that court nor Plaintiffs here, however, explain how the vulnerable contracts and grants are like "welfare benefits under statutory and administrative standards" or "public employment" subject to "tenure provisions." *Roth*, 408 U.S. at 576–77.  Put another way, Plaintiffs offer no reason to think that their contracts and grants—which are "[o]utside of the employment

context"—are different from the "millions of government contracts in effect at any point in time" to which courts seldom apply "due-process principles." *New Vision Photography*, 54 F. Supp. 3d at 29 (citation omitted).  And "'ordinary' or 'routine' government contracts do not, by themselves, give rise to . . . an interest" that due process protects. *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014).  A different rule would "risk . . . transmogrifying virtually every dispute involving an alleged breach of contract by" the government "into a constitutional case." *Redondo-Borges*, 421 F.3d at 10.  For their part, Plaintiffs barely contend that they *do* have a protected property interest; they say only that they "*could* have a property interest in their grants and contracts." ECF No. 44 at 18 (emphasis added).  That kind of speculation, stripped of specifics, is not enough to carry their burden at the preliminary-injunction stage.

Plaintiffs next argue that they have a liberty interest "in being free from government action that causes reputational harms" that "can occur when the government terminates work with a contractor or grantee." ECF No. 44 at 18.  Without elaborating on how these provisions implicate such an interest, Plaintiffs cite one case that just shows why their argument falters.  In *Reeve Aleutian Airways, Inc. v. United States*, a government review board suspended the plaintiff "from the military airlift transportation program." 982 F.2d 594, 595 (D.C. Cir. 1993).  The government did "not deny" that the plaintiff had "a liberty interest in avoiding the damage to its reputation and business caused by a stigmatizing suspension." *Id.* at 598.  And the D.C. Circuit agreed because "branding an airline unsafe creates a lasting blemish on a company's reputation"—a sensible intuition confirmed by the plaintiff's evidence that it "lost over $20,000 a day in military business" and half "its civilian traffic." *Id.*  But Plaintiffs never explain how the actual (or potential) cancelation of their contracts or grants is anything like that stigmatizing, safety-based suspension, which was "the equivalent to Hawthorne's scarlet letter pinned across the heart of Hester Prynne."

*Id.* Nor have they shown that the government has "effectively bar[red]" them "from virtually all Government work due to charges that the[y]," as "contractor[s]," "lack[] honesty or integrity." *New Vision Photography*, 54 F. Supp. 3d at 31 (describing the requirements of the "reputation-plus test" for establishing a "protected liberty interest") (citation omitted).

More to the point given the facial posture here, Plaintiffs have not come close to showing that most applications of the remaining Challenged Provisions will implicate protected property or liberty interests. Indeed, they have not really tried to. All they say is that "a protected liberty interest . . . *can*" flow from terminated contracts or grants. ECF No. 44 at 18 (emphasis added). But they never explain how terminations under the Challenged Provisions would implicate that interest for Plaintiffs or anyone else. *See id.* And without a showing that the Certification Provision, Equity Termination Provision, or Promoting Gender Ideology Provision does so, Plaintiffs' facial vagueness claim—rooted in due process—falters at the start.

That problem aside, others persist and prevent Plaintiffs from making the required likelihood-of-success showing. Consider first the Equity Termination Provision and Promoting Gender Ideology Provision. Plaintiffs skew these provisions by claiming that they "proscribe" and "forbid" certain views. ECF No. 29-1 at 23, 28. Far from it—at least on their face. These provisions require nothing of Plaintiffs, nor do they prohibit them from doing anything. Rather, the provisions regulate the President's subordinates. The Equity Termination Provision directs *agencies* to "terminate, to the maximum extent allowed by law," equity-related grants and contracts. Government DEI Order § 2(b)(i). And the Promoting Gender Ideology Provision requires something similar for gender ideology: agencies must "ensure grant funds do not promote" it. Gender Ideology Order § 3(g). In this way, neither provision directly "regulate[s]" Plaintiffs by "forbid[ding] or requir[ing]" any "conduct." *Karem*, 960 F.3d at 664. Because Plaintiffs are not "those to whom"

the provisions are "directed," the "fair notice" aspect of the vagueness doctrine is a poor fit. *Cf.*

*Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950).

Nor are these provisions constitutionally problematic under the arbitrary-enforcement path.

On this front, "speculation about possible vagueness in hypothetical situations not before the Court

will not support a facial attack" when the provisions are "valid in the vast majority of [their] in-

tended applications." *Hill*, 530 U.S. at 733 (citation omitted). And presidential directives to sub-

ordinates are yet again a square peg for a round hole here. Typically, this strand of vagueness

doctrine is concerned about "*law enforcement authorities*" lacking "adequate guidance." *Id.* (em-

phasis added); *see also, e.g.*, *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y*

*Freedom Found. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (law is "void for

vagueness" when "it fails to set reasonably clear guidelines for law enforcement officials and triers

of fact in order to prevent arbitrary and discriminatory enforcement" (internal quotation marks and

citation omitted)). So courts have "greater tolerance" for "enactments with civil rather than crim-

inal penalties because the consequences of imprecision are qualitatively less" serious. *Village of*

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). On top of that,

the "Constitution tolerates" even *more* ambiguity here because the Equity Termination Provision

and Promoting Gender Ideology Provision just tell agencies to stop funding certain things or con-

tracting in certain ways. *Id.* at 498 ("economic regulation is subject to a less strict vagueness test").

Indeed, "when the Government is acting as patron rather than as sovereign," the effects "of impre-

cision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589

(1998). That remains true when the funding regulation implicates speech. *See id.* (statute not

unconstitutionally vague even though "artists," "as a practical matter," "may conform their speech

to what they believe to be the decisionmaking criteria in order to acquire funding").

41

Against that backdrop, these two provisions give enough guidance to avoid constitutional infirmity—and for the same reasons satisfy any fair-notice concerns. Agencies must, under the Equity Termination Provision, terminate equity-related contracts as permitted by law. Might the exact scope of the equity-related qualifier "vary depending upon whom you ask"? *United States v. Robertson*, 588 F. Supp. 3d 114, 122 (D.D.C. 2022). Maybe, but a "vagueness challenge will fail" in that situation so long as the regulation provides a "comprehensible normative standard," even if "imprecise." *Id.* (citation omitted). Whether a grant relates to equity might "sometimes be difficult to determine." *Williams*, 553 U.S. at 306. A statute is vague, though, not when that determination is hard, but when there is "indeterminacy" as to "precisely what th[e] fact is" that triggers the provision. *Id.*; *see also Act Now*, 846 F.3d at 412 ("Ostensible vagueness about whether the incriminating fact has been proved is not vagueness at all." (citation omitted and cleaned up)). Nor is it enough to say that an agency might "exercise[] [its] discretion unlawfully" under this provision. *Act Now*, 846 F.3d at 412 (citation and brackets omitted). The question is instead whether "anything in the" provision "prevent[s]" the agency "from doing so." *Id.* (citation omitted). And the Equity Termination Provision meets that standard on its face; it tells agencies to cancel equity-related agreements in accordance with the law, not whenever they see fit.

For mostly the same reasons, the Promoting Gender Ideology Provision likely poses no fair-notice or arbitrary-enforcement problems either. The executive order defines "gender ideology," *see* Gender Ideology Order § 2(f), so Plaintiffs target the word "promote" instead, *see* ECF No. 29-1 at 28–29. Pointing to *United States v. Williams*, they say that "promotes" is "susceptible of multiple and wide-ranging meanings." *Id.* at 28 (quoting 553 U.S. at 294). *Williams*, though, described "promotes" that way when addressing an overbreadth challenge, and the decision never mentioned the word when discussing the respondent's vagueness argument. *See* 553 U.S. at 304–

307. In any event, a regulation can be "broad" and "reach[] a wide range of . . . actions" without being "vague." *United States v. Andries*, No. 21-cr-93 (RC), 2022 WL 768684, at *9 (D.D.C. Mar. 14, 2022). And that describes the Promoting Gender Ideology Provision. To "promote" something is to "contribute to [its] growth or prosperity." *Promote*, Merriam-Webster 2.a, https://www.merriam-webster.com/dictionary/promote (last visited May 1, 2025); *see also Promote*, Oxford English Dictionary I.2.a, https://www.oed.com/dictionary/promote_v?tl=true&tab=meaning_and_use (last visited May 1, 2025) ("To further the growth, development, progress, or establishment of (a thing)."). And the executive order, as explained, defines the thing that federal funding shall not promote: gender ideology. That there might be "close cases" of whether some activity "promotes" gender ideology is not a vagueness problem; such tight calls "can be imagined under virtually any statute" or regulation. *Williams*, 553 U.S. at 306. Especially under the relaxed vagueness standard for funding regulations, the Promoting Gender Ideology Provision and the Equity Termination Provision are likely not impermissibly vague—even putting aside the threshold problem that Plaintiffs have not identified a protected liberty or property interest that they jeopardize.

The Certification Provision likely survives vagueness scrutiny too. Plaintiffs raise the same argument about that provision's use of the verb "promotes," and it founders for the reasons discussed above. In fact, the Certification Provision is even clearer. Under that provision, counterparties and grant recipients must certify that they "do not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Illegal Discrimination Order § 3(b)(iv)(B). So the "incriminating fact" is straightforward: is the counterparty violating federal antidiscrimination law? *Williams*, 553 U.S. at 306. That is a "true-or-false determination," and any difficulty in determining whether that fact "has been proved" in a case does not render the provision unconstitutionally vague. *Id.* Nor do Plaintiffs move the needle with their claim that

the executive order classifies *all* DEI as illegal by using the phrase "illegal DEI and DEIA policies." ECF No. 29-1 at 26. That reading is strained; a school that prohibits students from using "illegal drugs" on campus is targeting a subset of drugs (the illegal ones) rather than banning Advil or lawful prescriptions.[9] And more to the point, Plaintiffs continue to focus on the difficulty of proving the "incriminating fact"—whether a DEI program violates federal antidiscrimination law—rather than "indeterminacy of precisely what the fact is." *Williams*, 553 U.S. at 306. But the latter is the touchstone of vagueness. So Plaintiffs have not carried their heavy burden of showing that the Certification Provision is facially unconstitutional.[10]

In sum, Plaintiffs have failed to show that they are likely to succeed on their due-process challenge to the provisions for which they likely have standing. They have not identified a protected property or liberty interest that these provisions threaten. Nor have they shown that the fair-

---

[9] Plaintiffs also repeatedly contend that the Attorney General views the "Orders as making clear that policies relating to" DEI "violate the text and spirit of our longstanding Federal civil-rights laws." ECF No. 44 at 16 (internal quotation marks and citation omitted). So, Plaintiffs say, there is no "subset" of DEI that is "supposedly lawful" under the executive orders. *Id.* That overstates the Attorney General's memo. For one thing, that memo addressed only the Illegal Discrimination Order. *See* Off. of the Att'y Gen., Dep't of Just., *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline. For another, the surrounding context clarifies a focus on DEI "preferences, mandates, policies, programs, and activities" that are "illegal." *Id.* at 1. The header of the first section is titled "Ending Illegal DEI and DEIA Discrimination and Preferences." *Id.* This section describes the executive order's mandate to create a report addressing how to "encourage the private sector to end *illegal* discrimination." *Id.* (emphasis added). And the memo also distinguishes between "policies that discriminate, exclude, or divide individuals based on race or sex" on the one hand, and "observances" that "celebrate diversity" and "promote awareness without engaging in exclusion or discrimination" on the other. *See id.* at 1 n.1. In any event, the Court will not read one snippet of this memo to override the text of the executive orders for purposes of Plaintiffs' facial challenge.

[10] Plaintiffs briefly contend in their due-process argument that the "executive orders' vagueness chills protected speech." ECF No. 29-1 at 32–33. True enough, the vagueness inquiry becomes more rigorous in the First Amendment context. But at its core, the vagueness doctrine is still about due process—specifically, fair notice and evenhanded enforcement. The Court has accounted for the First Amendment concerns when analyzing Plaintiffs' due-process claim. But it addresses their chilling-effect argument within the First Amendment framework.

notice and arbitrary-enforcement concerns underlying the vagueness doctrine likely render these provisions unconstitutional, particularly because the provisions address how the government funds and contracts with entities rather than when it imposes civil or criminal liability.

### 3. Plaintiffs Fail to Show that They Are Likely to Succeed on Their First Amendment Claim

Plaintiffs also argue that the Challenged Provisions violate the First Amendment's free-speech guarantee. As a reminder, only four provisions remain live for this challenge: the Certification Provision, the Equity Termination Provision, the Gender Funding Termination Provision, and the Promoting Gender Ideology Provision. Of those, Plaintiffs say the Certification Provision amounts to unlawful viewpoint discrimination. *See* ECF No. 29-1 at 34–37. And all four provisions, Plaintiffs add, "chill speech by penalizing disfavored views." *Id.* at 38; *see also id.* at 37–47.

The First Amendment prohibits governments from "abridging the freedom of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). Sometimes that right requires the government to "accommodate expression." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009). But the Supreme Court has "reject[ed] the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 546 (1983) (internal quotation marks and citation omitted). Put slightly differently, "even where the Constitution prohibits coercive governmental interference with specific individual rights, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Lyng v. UAW*, 485 U.S. 360, 369 (1988) (internal quotation marks and citations omitted). That is why the "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality opinion) (quoting *Rust*

*v. Sullivan*, 500 U.S. 173, 193 (1991)).  And for that reason, the typical "recourse" for a "party" that "objects to a condition on the receipt of federal funding" is "to decline the funds."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).[11]  At the same time, though, "a funding condition can result in an unconstitutional burden on First Amendment rights."  *Id.* That "line is hardly clear."  *Id.* at 215.  But the key consideration—or at least one of them—is whether the condition "specif[ies] the activities" the government "wants to subsidize" or if it "seek[s] to leverage funding to regulate speech *outside* the contours of the program itself."  *Id.* at 214–15 (emphasis added).

Plaintiffs bring only a facial First Amendment challenge, and that choice dictates how much constitutional invalidity they must show.  Ordinarily, a facial claim fails unless the plaintiff shows "that no set of circumstances exists under which the [law] would be valid" or "that the law lacks a 'plainly legitimate sweep.'"  *Moody*, 603 U.S. at 723 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  But that "very high bar" is lower in "First Amendment cases."  *Id.* "[F]ree expression" needs "breathing room," so in this context Plaintiffs may prevail on their facial claim by showing that "a substantial number of" the Challenged Provisions' "applications are unconstitutional, judged in relation to [their] plainly legitimate sweep."  *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).  That translates to an inquiry that first assesses the scope of the Challenged Provisions—*i.e.*, "[w]hat activities, by what actors," do they

---

[11] Plaintiffs do not press a claim under the Constitution's Spending Clause in their motion. Under that clause, Congress has "broad discretion to," among other things, "fund[] particular state or private programs or activities."  *Agency for Int'l Dev.*, 570 U.S. at 213.  But Plaintiffs do not argue, for example, that the "challenged provisions of the Executive Orders" violate the Spending Clause by "plac[ing] significant conditions on federal funding that Congress did not prescribe." *PFLAG, Inc. v. Trump*, No. 25-cv-337 (BAH), 2025 WL 685124, at *1 (D. Md. Mar. 4, 2025). Nor do they explain whether or how the inquiry under *Agency for International Development* changes because the funding decisions flow from the Executive rather than Legislative Branch.

"regulate"?—and then analyzes which "applications violate the First Amendment" before "measur[ing]" those "against the rest." *Id.* at 724–25. This standard remains "rigorous." *Id.* at 723. Facial invalidation "destroys some good along with the bad," so it is justified only when the "unconstitutional applications" are "realistic" rather than "fanciful." *Hansen*, 599 U.S. at 770. And those impermissible applications "must be substantially disproportionate to" the lawful ones because only a "lopsided ratio" warrants this "strong medicine." *Id.* (citation omitted).

Begin with the Equity Termination, Promoting Gender Ideology, and Gender Funding Termination Provisions, which move together within the First Amendment analysis. By their terms, these provisions tell agencies what to do with federal funds and contracts. Under the first, agencies must terminate equity-related grants and contracts in accordance with the law. *See* Government DEI Order § 2(b)(i). And the latter two target the federal funding of gender ideology. Gender Ideology Order § 3(e), (g). These provisions, then, do not reach beyond the scope of the grant or fund at issue. The directives do not tell agencies to cancel contracts with entities doing equity-related work outside their contracts or to ensure that federal funds do not support grantees promoting gender ideology with non-federal funds. In this way, the provisions do not "prohibit[] the recipient from engaging in the protected conduct outside the scope of the federally funded program" or contract. *Agency for Int'l Dev.*, 570 U.S. at 217 (quoting *Rust*, 500 U.S. at 197). The provisions, in other words, are part of a government effort "to fund one activity to the exclusion of another"—or to contract for certain purposes to the exclusion of others—which does not amount to "discriminat[ion] on the basis of viewpoint." *Rust*, 500 U.S. at 193. That result follows from the principle that "refus[ing] to fund protected activity, without more," does not "penal[ize]" the "activity." *Am. Libr. Ass'n*, 539 U.S. at 212 (plurality opinion) (citation omitted).

Because these provisions do not on their face restrict speech outside the scope of the federal

funds or contract, they do "not run afoul of the First Amendment." *Agency for Int'l Dev.*, 570 U.S. at 217. Or more specifically, most of their applications will not. Consider an entity that receives four federal grants. It uses one to fund a program advancing the idea that transgender women should be able to participate in women's sports. The other three grants, though, support projects far afield from transgender rights or gender ideology more generally. Directed to "end the Federal funding of gender ideology" as "permitted by law" and ensure that such funds do not "promote gender ideology," an agency would presumably terminate the first grant or tell the recipient that it will do so unless the recipient stops using the funds for that purpose. Gender Ideology Order § 3(e), (g). But because the other grants are not advancing gender ideology in any way, the gender-ideology provisions are no basis—at least in most of their applications—to cut those grants. Said another way, because the provisions do not "effectively prohibit[]" or otherwise restrict "the recipient from engaging in the protected conduct outside the scope of the federal[] fund[s]," they do not "place[]" a constitutionally problematic "condition on the *recipient* of the subsidy." *Rust*, 500 U.S. at 197. And the same result holds for the Equity Termination Provision: its text does not say that a contractor with four contracts, only one of which is equity-related, will lose the other three by advocating for equity principles outside the scope of those contracts.

Now to the other side of the ledger. Plaintiffs must make two showings about the unconstitutional applications of these funding-focused provisions: those applications are "realistic" rather than "fanciful," and "their number" is "substantially disproportionate to [their] lawful sweep." *Hansen*, 599 U.S. at 770. But Plaintiffs do not clearly describe what those applications look like. The bulk of their First Amendment challenge focuses on the Certification Provision—which the Court discusses below—and the Report and List Provisions—which Plaintiffs likely lack standing to challenge. *See* ECF No. 29-1 at 34–37, 41–44. True, Plaintiffs say that the Equity Termination

Provision and gender-ideology provisions (and others) "make clear that the Administration will cut federal funding to organizations that engage in protected speech that the government opposes." *Id.* at 38. That message, Plaintiffs contend, impermissibly chills speech. *See id.* at 38–41. But this argument just invites the question: when is the government allowed to fund some things (or contract for some purposes) instead of others? And as explained, Plaintiffs' desire to speak about certain topics with the government's help does not mean that "refus[ing] to fund such activities" denies Plaintiffs "the right to engage" in that protected activity. *Rust*, 500 U.S. at 198.

Plaintiffs' rejoinders are unpersuasive. Because the government is not constitutionally obligated to fund Plaintiffs' preferred speech or to contract with them for certain purposes, the decision to stop funding that speech or contracting for those ends is not an example of the government doing "indirectly what" it "is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Nor do the Challenged Provisions operate like the laws in the other cases that Plaintiffs cite for the idea that the government cannot use indirect "mechanisms" to "suppress the views of private actors." ECF No. 29-1 at 38. The throughline of those cases was compelled disclosure of beliefs or associations. *See Baird v. State Bar of Ariz.*, 401 U.S. 1, 2–3 (1971) (plurality opinion) (invalidating rule under which applicants were denied admission to the state bar after refusing to disclose certain associations and personal beliefs); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 592–93 (1967) (analyzing "state program" under which state employees were dismissed after refusing to disclose existence of ties to Communism and other "subversive" organizations or groups); *Lamont v. Postmaster Gen. of the U.S.*, 381 U.S. 301, 303, 305 (1965) (holding unconstitutional a statute limiting "the unfettered exercise of . . . First Amendment rights" because it required recipients of mail containing "communist political propaganda" to return a "reply card" to prevent the mail's destruction); *Baggett v. Bullitt*, 377 U.S. 360, 361–

62, 367, 371 (1964) (invalidating statute requiring state employees to "swear that" they are "not a subversive person" and also, on vagueness grounds, a statute requiring state-licensed teachers to promise to "promote respect for the flag and the institutions of the United States"); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 466 (1958) (reversing judgment of civil contempt because the state failed to justify the "deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have").

By contrast, the Equity Termination Provision and gender-ideology provisions do not on their face "requir[e]" Plaintiffs "to profess a specific belief" or disclose anything. *Agency for Int'l Dev.*, 570 U.S. at 218. They just tell *agencies* to cut some kinds of funding and cancel certain contracts as permitted by law. And because the Supreme Court has "reject[ed] the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State,'" *Regan*, 461 U.S. at 546 (citation omitted), any chill that Plaintiffs feel from these provisions is not the sort that can support a First Amendment claim.

Between their briefing and oral argument, Plaintiffs point to two examples that they say show that the funding-focused provisions reach beyond the scope of the federal funds and contracts. In a meeting with an "HHS contractor" in mid-February, the "program officer" told the AIDS Foundation that "the term 'gender' must be replaced with 'sex' in . . . program materials." ECF No. 29-9 ("Peller Decl.") ¶ 11; *see also* ECF No. 29-1 at 21. That officer also said that the materials must no longer contain "reference to 'gender-affirming' care," and that "LBG" must replace the acronym "LBGTQIA." Peller Decl. ¶ 11. At the hearing, however, Plaintiffs asserted that HRSA told the AIDS Foundation at this meeting "to remove words not just in federally funded programs, but on all their publications." Hearing Tr. at 21. The supporting declaration is ambiguous on that front; it describes a meeting "about *a program* under which [the AIDS Foundation]

is a subcontractor," suggesting that the directive focused on that federal program.  Peller Decl. ¶ 11.  But even if HRSA did tell the AIDS Foundation to alter its materials outside the scope of federally funded programs, this example hardly shows that the "unconstitutional applications" of these provisions "substantially outweigh [their] constitutional ones."  *Moody*, 603 U.S. at 724.  At most, an HRSA representative aggressively—and incorrectly—interpreted the gender-ideology provisions to say that recipients of federal funds cannot promote gender ideology, no matter whether they use federal funds to do so.  But that does not establish the "lopsided ratio" justifying the "strong medicine" of facial invalidation.  *Hansen*, 599 U.S. at 770 (citation omitted).

Nor does the example of HUD "cancel[ing] funding" for one of the Housing Alliance's "partner organizations."  ECF No. 44 at 12–13.  According to Plaintiffs, HUD invoked the Government DEI Order—presumably, the Equity Termination Provision—to terminate the grant "based on 'key words' in [the] organization's 'website or Linked Profile.'"  *Id.* at 21 (citation omitted).  So, Plaintiffs reason, that provision reaches speech "both inside and outside of the federal government"—*i.e.*, "purely private speech" untethered to federal grants or contracts.  *Id.*  But this example, even taken together with the HRSA directive to the AIDS Foundation, is too slender a reed to support facial invalidation.  To start, while the cover email from HUD references "key words," ECF No. 44-8, the termination notice itself explains that the partner organization's "operations and performance *in connection with* the subject awards" did not comply with the Government DEI Order, ECF No. 44-9 at 1 (emphasis added).  So it is unclear whether HUD terminated the awards because of the organization's conduct outside the scope of the awards or because its conduct under the awards made them "equity-related."  But even if the former, this example remains at best just a second instance of an agency going beyond the text of a Challenged Provision.  After all, the Equity Termination Provision says nothing about whether the grant *recipient's*

activities are equity-related; it asks whether the *grant* is equity-related.  So conduct beyond the scope of the federal funding should, under the provision's plain text, not warrant termination.  And Plaintiffs "may not leverag[e] a few alleged unconstitutional applications" of these provisions "into a ruling invalidating [them] in all [their] applications."  *Schickel v. Dilger*, 925 F.3d 858, 880 (6th Cir. 2019) (internal quotation marks and citation omitted).

To sum up, the text of these three provisions points to a heartland of constitutional applications.  And on this record, Plaintiffs have not shown that "unconstitutional applications substantially outweigh" their "plainly legitimate sweep."  *Moody*, 603 U.S. at 723–24.

The Certification Provision is not facially invalid either despite Plaintiffs' three-pronged attack on it.  First, they claim that it "imposes unconstitutional funding conditions based on viewpoint."  ECF No. 29-1 at 36–37.  Next, Plaintiffs say that this provision, like the others, chills protected speech.  *See id.* at 37–41.  And finally, they add that it "further penalizes disfavored views under the False Claims Act."  *Id.* at 41–42.

As Defendants acknowledge, the Certification Provision *does* cover conduct "outside the scope of" federal grants and funds.  *Agency for Int'l Dev.*, 570 U.S. at 216; *see* Hearing Tr. at 40.  It requires grant recipients and contractual counterparties to certify that they do "not operate *any* programs"—rather than just federally funded ones—"promoting DEI that violate" federal antidiscrimination law.  Illegal Discrimination Order § 3(b)(iv)(B) (emphasis added).  So Plaintiffs have cleared a hurdle here that they did not for the other provisions.

But that victory is partial and short-lived.  For the Certification Provision to violate the First Amendment, Plaintiffs must show that the certification requirement impermissibly restricts their ability to engage in *protected speech*.  Yet neither Plaintiffs nor anyone else have a First Amendment right to violate federal antidiscrimination law.  To the contrary, "the Supreme Court

has clearly held that the First Amendment does *not* protect the very act of discriminating on the basis of race." *Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 (11th Cir. 2024). More generally, the right to speak freely provides no shield for "private individuals or institutions" that "engage in discrimination" that violates federal law. *Grove City Coll. v. Bell*, 687 F.2d 684, 702 (3d Cir. 1982). So Plaintiffs cannot "assert an alleged first amendment right to be free of the strictures of" federal antidiscrimination law "and also claim the right to continued federal funding" and contracts. *Id.* That is why, for example, prison officials cannot claim that the government "impose[s] conditions that restrict[] [their] ability to exercise" their "First Amendment right to free speech" when the officials seek to unlawfully "limit the exercise of religion by inmates." *Cutter v. Wilkinson*, 423 F.3d 579, 588 (6th Cir. 2005). The reason is straightforward: there is "no constitutional right" to do that, *id.*, just like there is no constitutional right to operate DEI programs that violate federal antidiscrimination law.

Resisting that conclusion, Plaintiffs insist that the Certification Provision does not really mean what it says. On their reading, the provision "purports to make organizations that 'promot[e] DEI' ineligible for government contracts and grants." ECF No. 29-1 at 39. But Plaintiffs offer no reason to disregard the Certification Provision's text for their preferred reading. On its face, all the provision requires is a certification that the grant recipient or contractual counterparty will not violate the federal antidiscrimination laws that they had to comply with long before President Trump issued the executive orders. It does not "purport to establish the illegality of all efforts to advance [DEI]," and it "should not be so understood." *Nat'l Ass'n of Diversity Officers*, No. 25-1189, Dkt. No. 29 at 7 (Harris, J., concurring). And according to Plaintiffs, they "do not engage in any unlawful discrimination." ECF No. 44 at 24. If Plaintiffs worry that this administration takes a broader view of what counts as illegal discrimination, that is a concern with the

interpretation of the underlying federal antidiscrimination law—which Plaintiffs do not challenge—rather than the Certification Provision. True, the provision incorporates that federal law. But Plaintiffs may contest whether their DEI programs fall within the scope of that law if they ever face an enforcement action connected to the Certification Provision. The text of the Certification Provision limits it to constitutional applications, and Plaintiffs' fear that Defendants will warp that text is no substitute for establishing a "lopsided ratio" of unconstitutional ones. *Hansen*, 599 U.S. at 770.

Plaintiffs' second argument about the Certification Provision falters for reasons already discussed. A provision requiring counterparties to certify that they do not violate federal laws that they are otherwise obligated to comply with does not chill protected speech. Again, the First Amendment does not give Plaintiffs a right to disregard federal antidiscrimination law. And their real concern is with the Executive Branch's interpretation of antidiscrimination law, not with the Certification Provision. After all, if the Certification Provision did not exist, Plaintiffs would still be subject to that federal law. Yet Plaintiffs cite no case—and the Court has found none—suggesting that the fear of liability for violating federal antidiscrimination law supports a chilling-effect claim under the First Amendment. *See Vullo*, 602 U.S. at 198 (First Amendment does not "give[] advocacy groups . . . a right to absolute immunity from government investigation, or a right to disregard state or federal laws" (internal quotation marks, citation, and brackets omitted)). To reiterate: if Plaintiffs believe that the Executive Branch has wrongly interpreted federal antidiscrimination law, they can challenge that interpretation in a specific enforcement action. But Plaintiffs have not carried their burden of showing that the Court should presume that Defendants will, in most cases, apply the Certification Provision in a way that violates the First Amendment.

Nor does Plaintiffs' reliance on the materiality provision salvage their claim. Recall that

the Certification Provision directs agencies to include in contracts and grants a "term requiring" agreement that "compliance . . . with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of" the False Claims Act.  Illegal Discrimination Order § 3(b)(iv)(A).  In simpler terms: if someone knowingly makes a false statement about their compliance with federal antidiscrimination law, the Certification Provision seems to increase the risk of False Claims Act liability.  *See* 31 U.S.C. § 3729(a)(1)(B).  But this is not a case of the government "relying on the threat of invoking legal sanctions" to "achieve the suppression of disfavored speech."  *Vullo*, 602 U.S. at 189 (internal quotation marks and citation omitted).  To repeat, the Certification Provision addresses only DEI programs that violate federal antidiscrimination law, and Plaintiffs have no First Amendment right to operate such programs.  A different rule would mean that the federal antidiscrimination laws themselves breach the First Amendment by threatening liability for unlawful discrimination.  But as explained, that is not the law. The False Claims Act, moreover, does not create liability for good-faith but mistaken beliefs that DEI programs comply with federal law.  The statute's scienter requirement "refers to" the person's "knowledge and subjective beliefs."  *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023).  And that "requirement helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability."  *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015); *see also id.* at 288 (FCA does not "reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations").  So Plaintiffs have overstated the First Amendment implications of this aspect of the Certification Provision.

The temporary restraining order that a court in the Northern District of Illinois recently issued does not change the Court's analysis.  In *CWIT I*, the court found that the plaintiff was likely

to succeed on the merits of its First Amendment challenge to the Equity Termination Provision and Certification Provision. Starting with the former, the court held that the provision "is reasonably understood to be a coercive threat." *CWIT I*, 2025 WL 933871, at *6 (citation omitted). But Plaintiffs here never argue that a directive for agencies to cancel certain contracts and grants—as permitted by law—amounts to a coercive threat under the First Amendment. For good reason. *Vullo*, the case relied on in *CWIT I*, addressed the "framework for claims that the government has coerced a third party to violate the First Amendment rights of another." *Vullo*, 602 U.S. at 191. Sensibly so, because the unconstitutional action there involved a government official "coercing" specific "entities to terminate their business relationships with" an organization "to punish or suppress" that organization's "advocacy." *Id.* at 198. But this First Amendment concern has little bearing on government funding decisions, especially since the Supreme Court has repeatedly held that the government's "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust*, 500 U.S. at 193 (quoting *Regan*, 461 U.S. at 549). That is why the court reconsidered this aspect of its holding and found that the Equity Termination Provision does not likely violate the First Amendment. *See CWIT II*, 2025 WL 1114466, at *12–13. This provision, in short, tells *agencies* to cancel certain contracts and grants. And it does not purport to regulate private entities—say, by forbidding them from speaking about equity outside the scope of the grants or contracts. *See Nat'l Ass'n of Diversity Officers*, No. 25-1189, Dkt. No. 29 at 7 (Harris, J., concurring) (explaining that the Equity Termination Provision "directs the termination of grants, subject to applicable legal limits, based only on the nature of the grant-funded activity itself").

The Court also agrees with *CWIT II*'s analysis of potential "vagueness concerns" with the Equity Termination Provision. *See CWIT II*, 2025 WL 1114466, at *14. On its face, this provision "involves the government engaging in funding," not "regulating." *Id.* As a "funder," then, the

government has wiggle room under *Finley* that it might not have in the context of "criminal or regulatory proscriptions." *Id.* Although "citizens cannot simply opt out of" those prohibitions, they can "decline federal funding" if they dislike how the government's policy preferences influence funding decisions. *Id.*

The Court respectfully disagrees, though, with the holding that the Certification Provision likely violates the First Amendment. In so finding, the *CWIT* court faulted the provision (and the government) for not clarifying "what might make any given 'DEI' program violate Federal antidiscrimination laws." *CWIT I*, 2025 WL 933871, at *8; *CWIT II*, 2025 WL 1114466, at *11–12. But again, if the First Amendment required the government to preemptively identify programs that violate antidiscrimination law outside of concrete enforcement actions, then federal antidiscrimination law itself would collide with the First Amendment. Yet no one makes that claim. And it is just not true that the Certification Provision on its face requires "grantees" to eliminate all programs "promot[ing] DEI." *CWIT I*, 2025 WL 933871, at *8; *CWIT II*, 2025 WL 1114466, at *11. That is not to say, of course, that grantees could not challenge the government's interpretation of what counts as "illegal" DEI in a specific case. But the government does not violate the First Amendment by incorporating preexisting federal law into an executive order and declining to detail hypothetical examples of things that might violate that law.

In sum, Plaintiffs are not likely to show that the Certification Provision, Equity Termination Provision, Promoting Gender Ideology Provision, or Gender Funding Termination Provision violates the First Amendment—either individually or collectively. On the latter point, Plaintiffs have not articulated how the provisions, "taken together," create a "profound" chilling effect on their protected speech. ECF No. 44 at 24. Just saying so is not enough to show that they are entitled to the "extraordinary relief of a preliminary injunction." *Alpine Secs. Corp. v. Fin. Indus.*

*Reg. Auth.*, 121 F.4th 1314, 1332 (D.C. Cir. 2024).  And the Court does not see how the provisions would operate synergistically to violate the First Amendment given the shortcomings of Plaintiffs' arguments as to each specific provision.  For all these reasons, then, Plaintiffs are not likely to succeed on the merits of their First Amendment claim.

*   *   *

For one reason or another, Plaintiffs' claims are likely to fail.  Some falter on standing—a prerequisite to success on the merits—and others on the underlying First and Fifth Amendment claims.  In reaching that conclusion, as the Fourth Circuit did in *Diversity Officers,* the Court reserves judgment on the merits of any as-applied challenges to specific enforcement actions that Defendants may initiate.  But Plaintiffs' failure to show "a likelihood of success on the merits" on the facial claims they do press here is reason enough to "deny [their] motion for [a] preliminary injunction."  *Williams v. Walsh*, 619 F. Supp. 3d 48, 62 (D.D.C. 2022) (citation omitted).

## IV.   Conclusion

For all the above reasons, the Court will deny Plaintiffs' Motion for Preliminary Injunction. A separate order will issue.

/s/ Timothy J. Kelly

TIMOTHY J. KELLY

United States District Judge

Date: May 2, 2025