# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE
~~; and~~ ~~80 Pine Street, 9th Floor,~~
~~New York, NY 10005;~~
~~NATIONAL FAIR HOUSING ALLIANCE~~
~~1331 Pennsylvania Avenue NW, #650,~~
~~Washington, DC 20004; and~~
AIDS FOUNDATION OF CHICAGO~~,~~
~~200 West Monroe Street, Suite #1150,~~
~~Chicago, IL 60606~~

       *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States
~~; 1600 Pennsylvania Avenue NW,~~
~~Washington, DC 20500;~~
OFFICE OF MANAGEMENT AND BUDGET
~~; 725 17th Street NW,~~
~~Washington, DC 20503;~~
RUSSELL VOUGHT, in his official capacity as
Director of the OFFICE OF MANAGEMENT
AND BUDGET
~~; 725 17th Street NW,~~
~~Washington, DC 20503;~~
OFFICE OF FEDERAL CONTRACT
COMPLIANCE PROGRAMS
; CATHERINE ESCHBACH~~U.S. Department of~~
~~Labor~~
~~200 Constitution Avenue NW,~~
~~Washington, DC 20210;~~
~~MICHAEL SCHLOSS~~, in ~~his~~her official
capacity as ~~Acting~~ Director of the Office of
FEDERAL CONTRACT COMPLIANCE
PROGRAMS
~~; 200 Constitution Avenue NW,~~
~~Washington, DC 20210;~~
U.S. DEPARTMENT OF LABOR
; LORI CHAVEZ-DEREMER~~200 Constitution~~
~~Avenue NW,~~
~~Washington, DC 20210;~~
~~VINCE MICONE~~, in ~~his~~her official capacity as
~~Acting~~ Secretary of the U.S. DEPARTMENT
OF LABOR
~~; 200 Constitution Avenue NW,~~

Civil Case No. **1:25-cv-00471 (TJK)**

*Caption continues on next page.*

1

~~Washington, DC 20210;~~

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

~~; 200 Independence Avenue SW,~~
~~Washington, DC 20201;~~

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of <u>the</u> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

~~; 200 Independence Avenue SW,~~
~~Washington, DC 20201;~~

U.S. DEPARTMENT OF COMMERCE

~~; 1401 Constitution Avenue NW,~~
~~Washington, DC 20230;~~

HOWARD LUTNICK, in his official capacity as Secretary of <u>the</u> U.S. DEPARTMENT OF COMMERCE

~~; 1401 Constitution Avenue NW,~~
~~Washington, DC 20230;~~

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

~~; 451 7th Street SW,~~
~~Washington, DC 20410;~~

SCOTT TURNER, in his official capacity as Secretary of <u>the</u> U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

~~; 451 7th Street SW,~~
~~Washington, DC 20410;~~

U.S. DEPARTMENT OF AGRICULTURE

~~; 1400 Independence Avenue SW,~~
~~Washington, DC 20250;~~

BROOKE ROLLINS, in her official capacity as Secretary of <u>the</u> U.S. DEPARTMENT OF AGRICULTURE

~~; 1400 Independence Avenue SW,~~
~~Washington, DC 20250;~~

NATIONAL INSTITUTES OF HEALTH

~~;~~ <u>JAYANTA BHATTACHARYA</u>~~9000 Rockville Pike,~~
~~Bethesda, MD 20892;~~

~~MATTHEW J. MEMOLI,~~ in his official capacity as ~~Acting~~ Director of <u>the</u> NATIONAL INSTITUTES OF HEALTH

~~; 9000 Rockville Pike,~~
~~Bethesda, MD 20892;~~

HEALTH RESOURCES AND SERVICES
ADMINISTRATION
; 5600 Fishers Lane,
Rockville, MD 20857;
THOMAS ENGELS, in his official capacity as
the Administrator of the HEALTH
RESOURCES AND SERVICES
ADMINISTRATION;
560 Fishers Lane,
Rockville, MD 20857;
CENTERS FOR DISEASE CONTROL AND
PREVENTION
; 1600 Clifton Road,
Atlanta, GA 30329;
SUSAN MONAREZ, in her official capacity as
Acting Director of the CENTERS FOR
DISEASE CONTROL AND PREVENTION
; 1600 Clifton Road,
Atlanta, GA 30329;
ADMINISTRATION FOR COMMUNITY
LIVING
; MARY LAZARE330 C Street SW,
Washington, DC 20201;
RICK NICHOLLS, in hisher official capacity as
Principal Deputy Administrator and Chief of
Staff forof the ADMINISTRATION FOR
COMMUNITY LIVING
; 330 C Street SW,
Washington, DC 20201;
U.S. ENVIRONMENTAL PROTECTION
AGENCY
; 1200 Pennsylvania Avenue NW,
Washington, DC 20460;
LEE ZELDIN, in his official capacity as
Administrator of the U.S. ENVIRONMENTAL
PROTECTION AGENCY
; 1200 Pennsylvania Avenue NW,
Washington, DC 20460;
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW,
; and Washington, DC 20530; and
PAMELA BONDI, in her official capacity as
Attorney General of the U.S. DEPARTMENT
OF JUSTICE.
950 Pennsylvania Avenue NW,
Washington, DC 20530

3

*Defendants.*[1]

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY TRIAL DEMAND**

1.     Plaintiffs National Urban League ("NUL"), National Fair Housing Alliance ("NFHA"), and AIDS Foundation of Chicago ("AFC") (collectively, "Plaintiffs") bring this civil rights action for injunctive and declaratory relief against Defendants Donald J. Trump, in his official capacity as President of the United States; the Office of Management and Budget ("OMB"); Russel Vought, the Director of OMB; the Office of Federal Contract Compliance Programs ("OFCCP"); Michael Schloss Catherine Eschbach, the Acting Director of OFCCP; the U.S. Department of Labor ("DOL"); Vince Micone Lori Chavez-DeRemer, the Acting U.S. Secretary of Labor DOL; the U.S. Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., the Secretary of HHS; the U.S. Department of Commerce ("DOC"); Howard Lutnick, the Secretary of Commerce DOC; the U.S. Department of Housing and Urban Development ("HUD"); Scott Turner, the HUD Secretary of HUD; the U.S. Department of Agriculture ("USDA"); Brooke Rollins, the Secretary of Agriculture USDA; the National Institutes of Health ("NIH"); Matthew J. Memoli, the Acting Jayanta Bhattacharya, the Director of NIH; the Health Resources and Services Administration ("HRSA"); Thomas Engels, the Administrator of HRSA; the Centers for Disease Control and Prevention ("CDC"); Susan Monarez, the Acting Director of CDC; the Administration for Community Living ("ACL"); Rick Nicholls Mary Lazare, the

---

[1] As relevant, the Defendants named in their official capacities include any successors in office.

Principal Deputy Administrator ~~and Chief of Staff~~ of ACL; the U.S. Environmental Protection Agency ("EPA"); Lee Zeldin, the Administrator of ~~the~~ EPA; the U.S. Department of Justice ("DOJ"); and Pamela ~~Jo~~ Bondi, the U.S. Attorney General (collectively, "Defendants") seeking declaratory and injunctive relief[2] for ultra vires presidential ~~actions,~~action and violations of the First and Fifth Amendments to the U.S. Constitution~~, and violations of the Administrative Procedure Act ("APA")~~.

2.    Plaintiffs ~~NUL, NFHA, and AFC are three~~are mission-driven non-profit organizations committed to the principles of diversity, equity, inclusion, and accessibility ("DEIA"), to the robust enforcement of our civil rights laws, and to the full equality of all people, regardless of their race, ethnicity, national origin, sex, sexual orientation, gender identity, or disabilities.  Plaintiffs strive to improve the lives and welfare of vulnerable and underserved communities ~~through their words and actions~~ and embrace the equal dignity of transgender people through their words and actions.  Due to historic and ongoing systemic inequalities and discrimination, people of color, women, LGBTQ people, and people with disabilities are disproportionately underserved, vulnerable to civil and human rights abuses, and in need of Plaintiffs' services.  ~~Each organization has~~Plaintiffs have been engaged in various efforts to serve these vulnerable populations, including by providing essential direct services and technical assistance, promoting economic empowerment, combatting housing discrimination, and mobilizing communities to create equity and justice for people living with and vulnerable to the human immunodeficiency virus ("HIV").  Plaintiffs receive federal funding in the form of grants and/or contracts and rely on that federal funding to ~~continue carrying~~carry out their mission-driven

---

[2] As against Defendant President Donald J. Trump, Plaintiffs seek declaratory relief only.

work.  Several of Plaintiffs' grants and/or contracts are congressionally appropriated for the purpose of advancing equity for marginalized communities.

3.      Plaintiffs bring this ~~suit~~lawsuit to challenge Executive Order No. 14151, "Ending Radical and Wasteful DEI Programs and Preferencing" ("Anti-Diversity1 Order"), issued January 20, 2025;[23] Executive Order No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Anti-Gender Order"), issued January 20, 2025;[34] Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("Anti-Diversity2 Order"), issued January 21, 2025 (collectively, the "Executive Orders");[45] and related agency actions, as ultra vires and in violation of the First and Fifth Amendments to the U.S. Constitution ~~and the APA, and,~~.  Plaintiffs accordingly~~,~~ seek declaratory and injunctive relief.

4.      The Executive Orders falsely assert that DEIA programs and activities are illegal and inconsistent with merit, hard work, and standards of excellence. ~~They~~, and they penalize Plaintiffs for expressing viewpoints in support of DEIA and transgender people. ~~Because of these Orders,~~As applied to Plaintiffs ~~are at significant risk of losing,~~ the Executive Orders have caused and risk further loss of the federal ~~funds that they~~funding Plaintiffs use to help people of color, women, LGBTQ people, and~~/or~~ people with disabilities overcome systemic barriers to ~~access~~accessing housing, education, employment, and healthcare ~~stemming~~that stem from discrimination, biases, and inequalities.

[23] Exec. Order No. 14151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).

[34] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[45] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).

5.      With vague and ambiguous language, the Executive Orders seek to intimidate, threaten, and ultimately stop Plaintiffs from performing services central to their missions; chill and censor ~~their~~Plaintiffs' speech, advocacy, and expressive activity based on its content and viewpoint; and jeopardize federal grants and contracts that are critical for Plaintiffs to accomplish their ~~mission-driven~~ work.  Defendants have already taken action to implement these Executive Orders ~~and have begun to terminate Plaintiffs'~~, including by terminating hundreds of thousands of dollars in crucial federal funding for one Plaintiff.  And this action, and the language in the Executive Orders, has already chilled Plaintiffs' speech.

6.      The Executive Orders disparage DEIA programs as "dangerous, demeaning, and immoral race- and sex-based preferences."[5]  In actuality, ~~these~~DEIA programs address longstanding, discriminatory barriers and disadvantages to help members of underrepresented groups fully participate in ~~our~~ society and have equal access to employment, education, housing, healthcare, and other resources.  These ~~types of~~ programs embody the principles and values of equality, fairness, and justice that are enshrined in our Constitution and federal civil rights laws, and they reflect a shared commitment to achieving the ideals of a multiracial democracy that fully includes all ~~its~~ people.  Plaintiffs firmly believe that the United States' longstanding and entrenched race and sex inequalities require proactive efforts, including DEIA programs, to break down barriers to opportunity and resources and to ~~both~~ remedy and prevent discrimination.

7.      While the ~~President~~Administration may have ~~his~~its own viewpoint, as flawed and discriminatory as it may be, the First Amendment bars ~~him~~it from unduly imposing ~~his~~its viewpoint on federal contractors and grantees ~~so~~such that Plaintiffs are forced to either ~~violate~~defy

---

[5] ~~Anti-Diversity2 Order § 1.~~

their organizational missions or risk losing the federal funding that is vitally necessary, and even sometimes lifesaving, for the communities they serve.

8.     The extraordinarily vague terms of the Executive Orders are extraordinarily vague and could prohibit Plaintiffs from engaging in *any* targeted effort to help a specific group of people facing unfair disadvantages.  The Executive Orders equate banned "DEIA" with any "equity-related" work—potentially including work that is specifically authorized or required by civil rights laws—and explicitly prohibit references to "DEI and DEIA principles, under whatever name they may appear."[6] Without any discernible standards or criteria of what is and what is not "dangerous," "demeaning," "immoral," and "illegal" DEIA,[7] as understood by this Administration, the future of Plaintiffs' fiscal viability and programming areis subject to the unfettered discretion of an Administration that has made clearclearly voiced its predisposition against any speech or action that advances equal opportunity for historically marginalized groups, including people of color, women, LGBTQ people, and/or people with disabilities.  SuchWhen agencies take action against Plaintiffs on the basis of such vague terms without, which lack sufficient standards or criteria, they deprive Plaintiffs of their due process rights under the Fifth Amendment.

9.     In addition to violating Plaintiffs' free speech and due process rights, the Executive Orders have a clear discriminatory purpose in violation of the Fifth Amendment's equal protection guarantees.  They seek to malign the targeted communities; to undermine and dismantle a wide spectrum of policies, programs, and activities intended to help historically marginalized, underserved, and under-resourced groups; and to erase transgender people from public life.

---

[6] *Id.* § 3.
[7] *Id.* § 1.

10.    As evidenced ~~during his first term in office by his~~by President Trump's response to the mass demonstrations against systemic anti-Black racism after the police killing of George Floyd during his first term, President Trump has sought to quell ~~any ensuing~~ efforts to advance racial justice, including efforts through DEIA ~~initiatives~~programs.  That singular focus has continued to his current Administration~~: the~~.  The recent Executive Orders ~~also~~ suggest that DEIA programs are inconsistent with merit~~, and do so~~ through their text, the aggressive messaging around them, and the way the Administration has implemented them thus far.  This emphasis on "merit" relies on longstanding stereotypes that Black people and other underrepresented groups are inherently unqualified and lack merit despite their accomplishments.    Rather than acknowledging the need ~~for~~to have DEIA programs to destroy these false stereotypes and remove unfair barriers to opportunity for Black people and other excluded groups, the Executive Orders rely on ~~these~~the false stereotypes to support the baseless assertion that ~~those~~DEIA programs provide ~~racial preferences~~preferential treatment to unqualified Black people and other people of color.  The Executive Orders simultaneously ~~codify~~articulate preferences for white people by suggesting that efforts to address racial inequity—for example, by "promoting diversity"—are, by definition, reverse discrimination.

11.    By attacking "DEIA," the Anti-Diversity Executive Orders expressly disadvantage people of color, women, LGBTQ people, and people with disabilities who already face unfair disadvantages or inequalities by eliminating and delegitimizing targeted efforts that were specifically created to help them overcome the systemic discrimination that produced those disadvantages and inequalities.  ~~In actuality~~Contrary to the Administration's claims, DEIA is utilized by both public and private entities to ensure ~~voluntary~~compliance with longstanding civil rights and anti-discrimination laws and to mitigate risk.  Yet, without evidence or support of the

opposite, the Trump Administration is using the power and resources of the federal government to launch a full-scale assault on DEIA—not only within federal agencies, but throughout the private sector as well, in contravention of the Constitution and other federal laws. People of color, women, LGBTQ people, and people with disabilities served by Plaintiffs' equity programs will be directly harmed by the Trump Administration's discriminatory actions, as Plaintiffs face censorship of speech and termination of funding and activities that support and benefit vulnerable communities..

12. Even more explicitly, theThe Anti-Gender Order discriminates against transgender people by repudiating their existence, deeming their identities "false,"[86] disparaging them, and ordering their exclusion from government recognition and protection in multiple aspects of their lives. The Anti-Gender Order seeks to erase transgender people from public life and poses an existential threat to transgender people themselves, as well as to the federally funded organizations that seek to support them and advance their civil rights.

13. Plaintiffs and the communities they work for have already been, and will continue to be, directly harmed by the Executive Orders, which have censored Plaintiffs' protected speech, terminated, and threatened additional termination of the federal funding that supports them. Accordingly, Plaintiffs respectfully ask the Court to uphold their constitutional rights and declare the Executive Orders unlawful so they may continue their important, urgent, and mission-driven work of supporting and providing services to the marginalized and underserved communities who are directly and intentionally targeted, maligned, and disadvantaged by the Executive Orders.

## JURISDICTION AND VENUE

14. Plaintiffs bring this action under the U.S. Constitution and the APA, 5 U.S.C. §§ 551 *et seq*.

---

[86] Anti-Gender Order § 2(f).

15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including the U.S. Constitution.

16.    Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiffs reside within this District and because each Defendant is an agency of the United States or an officer or employee of the United States or any agency thereof acting and sued in their official capacity, at least one Defendant resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

17.    The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 65.

## PARTIES

## I.    PLAINTIFFS

18.    The National Urban League NUL is a 501(c)(3) non-profit corporation headquartered in New York, New York.  It is the largest historic civil rights and urban advocacy organization committed to elevating the standard of living for Black Americans and, other historically underserved people, and urban communities through economic empowerment. Founded in 1910, NUL is also one of the oldest civil rights organizations in existence. NUL promotes economic empowerment through education and job training, housing and community development, workforce development, entrepreneurship, health, and quality of life, and publicly supports the rights of LGBTQ people.[9][7]

19.    NUL has 92 local affiliates (known as the affiliate movement) in 300 communities across 36 states and the District of Columbia that offer various direct services and advocacy that

---

[9][7] *See National Urban League,* VCU Libraries Social Welfare History Project, https://socialwelfare.library.vcu.edu/organizations/national-urban-league/ (last visited *National Urban League* (Feb. 16, 2025), https://socialwelfare.library.vcu.edu/organizations/national-urban-league/.

enhance the lives of more than 3.8 million people nationwide. Committed to principles of DEIA, NUL promotes economic empowerment through programming and advocacy around education and youth development, job training and workforce development, housing counseling, entrepreneurship, health equity, and overall quality of life, and it publicly supports the rights of LGBTQ people. NUL has been, is, and seeks to be in the future a federal contractor, federal subcontractor, and/or federal grant recipient. The challenged Executive Orders threatenhave already impacted and threatened NUL's ability to conduct its core business activities and accomplish its mission of providing direct services and technical assistance to underserved communities with the goal of advancing economic empowerment by censoring NUL's speech or withholding critical federal funds, and by discriminating against individuals whom NUL has served for over one hundred years. Because of the Executive Orders, NUL has already experienced the termination of hundreds of thousands of dollars in critical funding, censorship of its protected speech, and the threat of additional and imminent grant terminations.

20. NFHA is a 501(c)(3) non profit Virginia corporation headquartered in Washington, DC. NFHA is the country's only national civil rights organization dedicated solely to eliminating all forms of housing and lending discrimination and ensuring equitable housing opportunities for all people. Through its community development, education and outreach, responsible AI, member services, public policy and advocacy, consulting and compliance, and enforcement initiatives, NFHA works to dismantle longstanding discriminatory barriers and build inclusive, resilient, well-resourced communities where everyone can thrive. Pursuant to its mission to eliminate all housing and lending discrimination, NFHA advocates against discrimination based on race, national origin, religion, sex, disability, sexual orientation, gender identity, and other protected classes covered by federal, state, and local fair housing laws, including the federal Fair Housing Act.

21. NFHA's members include over 200 private, non-profit fair housing organizations, state and local civil rights agencies, and individuals across the United States. NFHA has over 70 operating member organizations nationwide that support fair housing work in their regions in 29 states and the District of Columbia. NFHA focuses on a variety of matters, including policy initiatives, research, education, and outreach, and operating members of NFHA provide direct services to victims of housing discrimination. NFHA has been, is, and seeks to be in the future a federal contractor, federal subcontractor, and/or federal grant recipient. The Executive Orders frustrate NFHA's mission to eliminate all forms of housing and lending discrimination by censoring NFHA's speech or withholding critical federal funds, and by making it more difficult for NFHA to serve individuals against whom the Executive Orders discriminate.

20. 22. AFC is a not-for-profit 501(c)(3) organization based in Chicago, Illinois that mobilizes communities to create equity and justice for people living with and vulnerable to the human immunodeficiency virus ("HIV") or other chronic conditions. Its strategic priorities include ending the HIV epidemic, ending homelessness, prioritizing racial equity, and mobilizing and developing communities of supporters and allies.

21. 23. AFC has been, is, and seeks to be in the future a federal grant recipient. The Executive Orders have already frustrated and continue to frustrate AFC's mission to create equity and justice for people living with andor vulnerable to HIV orand other chronic conditions by censoring AFC's speech or withholding, threatening to withhold critical federal funds, and by discriminating against individuals whom itAFC serves, as part of its mission.

## II.    DEFENDANTS

22. 24. Donald J. Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Executive Orders that are challenged in this lawsuit.

23. 25. OMB is the largest office within the Executive Office of the President of the United States.  OMB produces the President's budget and ensures that agency programs, policies, and procedures comply with the President's policies, including the policies set forth in the Executive Orders.

24. 26. Russell Vought is the Director of OMB and that agency's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

25. 27. OFCCP is part of the U.S. Department of LaborDOL and is responsible for ensuring that employers that do business with the federal government comply with laws and regulations requiring nondiscrimination.

26. 28. Michael SchlossCatherine Eschbach is the Acting Director of OFCCP and that agency's highest ranking official.  HeShe is charged with the supervision and management of all decisions and actions of that agency.  HeShe is sued in hisher official capacity.

27. 29. DOL is a federal agency charged with promoting the wellbeing of wage earners, job seekers, and retirees in the United States.  DOL contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff NUL.

28. 30. Vince MiconeLori Chavez-DeRemer is the Acting U.S. Secretary of Labor and that agency's highest ranking official.  HeShe is charged with the supervision and management of all decisions and actions of that agency.  HeShe is sued in hisher official capacity.

29. 31. HHS is a federal agency focused on the enhancing the health and wellbeing of all Americans.  HHS contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff AFC.

30. ~~32.~~ Robert F. Kennedy, Jr. is the Secretary of HHS and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

31. ~~33.~~ DOC is a federal agency which works to create the conditions for economic growth and opportunity for all communities. DOC contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff NUL.

32. ~~34.~~ Howard Lutnick is the Secretary of Commerce and ~~that agency's~~the DOC's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

33. ~~35.~~ HUD is a federal agency charged with creating strong, sustainable, inclusive communities and quality affordable homes for all. HUD contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiffs NUL, ~~NFHA,~~ and AFC.

34. ~~36.~~ Scott Turner is the ~~HUD~~ Secretary of HUD and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

35. ~~37.~~ USDA is a federal agency charged with developing and executing federal laws and policy related to food, agriculture, natural resources, rural development, nutrition, and related issues. USDA contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff NUL.

36. ~~38.~~ Brooke Rollins is the Secretary of Agriculture and ~~that agency's~~USDA's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

37. 39. NIH is a federal agency responsible for biomedical and public health research. NIH enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff AFC.

38. 40. Matthew J. Memoli Jayanta Bhattacharya is the Acting Director of NIH and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

39. 41. HRSA is a federal agency focused on free and low-cost healthcare services and services to people who are geographically isolated and economically or medically vulnerable relating to, inter alia, maternal and child health and HIV and AIDS. HRSA contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff AFC.

40. 42. Thomas Engels is the Administrator of HRSA and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

41. 43. CDC is a federal agency charged with protecting the public from health and safety threats through the control and prevention of disease, injury, and disability in the United States and abroad. CDC enters into contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiffs NUL and AFC.

42. 44. Susan Monarez is the Acting Director of CDC and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

43. 45. ACL is a federal agency that helps older adults and people with disabilities live independently and participate in their communities and is charged with improving access to health

care and long-term services. ACL contracts and/or subcontracts with—and/or provides grants to— private entities, including without limitation Plaintiff AFC.

44. ~~46. Rick Nicholls~~Mary Lazare is the Principal Deputy Administrator ~~and Chief of Staff~~ of ACL and that agency's highest ranking official. ~~He~~She is charged with the supervision and management of all decisions and actions of that agency. ~~He~~She is sued in ~~his~~her official capacity.

45. ~~47.~~ EPA is a federal agency charged with protecting human health and the environment. EPA contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff NUL. ~~Plaintiff NUL was selected for a grant from the EPA, and is in the process of finalizing the award with a fully executed agreement.~~

46. ~~48.~~ Lee Zeldin is the Administrator of EPA and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

47. ~~49.~~ DOJ is a federal agency charged with upholding the rule of law, keeping ~~our~~the country safe, and protecting civil rights. DOJ contracts and/or subcontracts with—and/or provides grants to—private entities, including without limitation Plaintiff NUL.

48. ~~50.~~ Pamela ~~Jo~~ Bondi is the U.S. Attorney General and DOJ's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

**FACTUAL ALLEGATIONS**

**I. PRESIDENT TRUMP ISSUED THREE EXECUTIVE ORDERS PROMOTING DISCRIMINATORY VIEWPOINTS THAT DISFAVOR FEDERAL CONTRACTORS AND GRANTEES WITH CONTRARY VIEWPOINTS.**

**FACTS COMMON TO ALL CLAIMS**

**A.      Plaintiffs Are Committed to Embracing DEIA and Advancing the Rights of Transgender People.**

49.     Plaintiffs NUL and AFC advance equal opportunity and elevate the standard of living for historically marginalized communities, with a particular focus on access to jobs, housing, life-sustaining healthcare, and education, among other essential needs.  Collectively, Plaintiffs' day-to-day work and organizational missions advance our civil rights laws, promote the equal rights of people of color, women, LGBTQ people, and people with disabilities, and combat the HIV/AIDS epidemic.

50.     To advance justice for the communities they serve, Plaintiffs proudly embrace the principles of diversity, equity, inclusion, and accessibility through their services, training, and speech.  As part of Plaintiffs' advocacy, they center diversity, equity, inclusion, and accessibility principles, condemning any discriminatory act that violates the civil rights of any person, regardless of who they are.

51.     Principles of DEIA are woven into every aspect of Plaintiffs' programming, both in their federally funded and non-federally funded work.  Plaintiffs advocate not only for the advancement of people of color, but also for the full equality of people with multiple marginalized identities, including LGBTQ people and people with disabilities.  For years, Plaintiffs have firmly supported the LGBTQ community and condemned violence, hate, and discrimination against transgender people in both its external and internal speech and services.  Plaintiffs firmly support

18

and embrace the dignity and humanity of transgender people in their speech, advocacy, services, and training.

**B.    All Plaintiffs Rely on Federal Contracts and Grants to Achieve Their Organizational Missions.**

52.    All Plaintiffs are long-time recipients of federal grants and contracts and rely on these funds to operate.

53.    For example, NUL and its affiliates have relied on federal funding to administer community-centered direct services programs since 1973.  Currently, NUL receives federal funds from DOJ, HUD, DOL, USDA, CDC, and DOC. These contracts and grants make up approximately 35% percent of NUL's annual budget. They support direct services and technical assistance programs involving youth development and success, vocational training, workforce readiness and skills training, pipelines to apprenticeships, employment programs for seniors, job programs for incarcerated people returning home, efforts to increase access to vaccines, and home ownership counseling, among other things.  In 2025 alone, NUL will subgrant tens of millions of dollars in federal grants to its affiliates.  NUL also intends to apply for federal funding in the future, which is necessary for the continued viability of its programs.

54.    Similarly, AFC regularly receives federal funding through contracts and grants, including from the HHS, HUD, NIH, HRSA, CDC, and ACL.  In Fiscal Year 2025, AFC received approximately $34.8 million in federal funding, which accounted for 84.3% of its annual operating budget.  Over $21 million of that funding supports programs requiring case management training through HHS and HUD.  These federal funds are statutorily authorized by, among other things, the Ryan White Comprehensive AIDS Resources Emergency Act of 1990 and HUD's Housing Opportunities for Persons with AIDS (HOPWA) program and Continuum of Care program.  Many of these programs include requirements and priorities that, based on Defendants' implementation

to date, appear to fall within the Executive Orders' sweeping prohibitions on "illegal DEI" or "gender ideology." AFC also intends to apply for future federal funding necessary to sustain its HIV prevention, housing, and care coordination programs, without which the organization would be forced to shut down, disrupting care for thousands of vulnerable individuals.

### C.    President Trump Issued Three Executive Orders Penalizing Federal Contractors and Grantees with Contrary Viewpoints.

55.    As race and gender justice issues have become increasingly salient in our public and political discourse, President Trump and his Administration have strategically leveraged divisive and racially coded language to advance his political prospects and agenda.

56.    First, President Trump and his Administration have co-opted the labels of "DEI" and "DEIA"—which typically refer to activities, prevalent throughout our society, aimed at promoting diversity and the fair treatment of everyone within organizations—as pejorative terms applied broadly to any promotion of diversity with which they disagree or to attempts to advance racial or gender equality. Characterizing all such action as illegal discrimination, President Trump and his allies have pledged to fight against "DEI" and "DEIA" by working to dismantle or reverse progress in the areas of civil rights and racial justice.

57.    Second, President Trump and his Administration have publicly and vocally opposed any recognition of the existence of transgender people, and they have steadfastly resisted any efforts to recognize transgender people's rights or afford them any government protections or benefits.

58.    Within days of taking office, President Trump issued the Executive Orders to control and punish the speech of those who disagree with him on these race and gender justice issues. Specifically, the Executive Orders illegally attempt to limit access to federal funds to control and punish the speech of and discriminate against those who, like Plaintiffs, espouse

viewpoints contrary to those of the Administration with respect to, first, addressing (and acknowledging the existence of) continued disparities in advancement and opportunity based on race and gender and, second, affirming the existence of transgender individuals and safeguarding their civil rights.

**1.    A. The Anti-Diversity1 Order Terminates "Equity-Related" Contracts or and Grants.**

59. 51. On Inauguration Day, January 20, 2025, President Trump issued the Anti-Diversity1 Order, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing."  The Anti-Diversity1 Order expresses a viewpoint that "diversity, equity, inclusion, and accessibility," "DEIA," or and related programs are "illegal and immoral discrimination programs."[108]

60. 52. To impose the Administration's viewpoint, Section 2(b) of the Anti-Diversity1 Order ("the Equity Termination Provision") directs "[e]ach agency, department, or commission head" to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions (including but not limited to 'Chief Diversity Officer' positions); all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."  In Section 2(b)(ii)(C) ("the List Provision"), the Anti-Diversity1 Order directs agencies to give the OMB Director a list of all "Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021."

61. 53. The Anti-Diversity1 Order does not define "DEI," "DEIA," "diversity," "equity," "inclusion," or "accessibility."

---

[108] Anti-Diversity1 Order §§ 1–2.

62. ~~54.~~ Because the ~~Ant-Diversity1~~ Anti-Diversity1 Order does not define these terms, federal contractors and grantees, including Plaintiffs, who have ~~"equity-related"~~ federal grants or contracts~~, risk having contracts or grants that Defendants may consider to be "equity related" terminated~~ that support programs meant to equalize the playing field for underserved communities, are fearful of having these funding streams cut pursuant to the Equity Termination Provision.  The sweep of Defendants' prohibition and punitive action against "equity-related" grants appears to be unduly broad, as they equate any "diversity, equity, inclusion, and accessibility" or "DEIA" efforts with "equity" or "equity-related" grants or contracts to be terminated pursuant to the Order.

### 2. ~~B. The~~ Anti-Diversity2 Order Restricts "Diversity, Equity, Inclusion, and Accessibility" by Federal Contractors and Grantees.

63. ~~55.~~ On January 21, 2025, President Trump issued the Anti-Diversity2 Order, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."  The Anti-Diversity2 Order states that "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," ~~or~~ and "DEIA" policies are "illegal," "dangerous," and "immoral" and can violate federal civil rights laws.[~~11~~9]  As expressed in its title, the Anti-Diversity2 Order also characterizes DEIA efforts as contrary to merit-based opportunity.

64. ~~56. The~~ Section 1 of the Anti-Diversity2 Order~~, as expressed in Section 1,~~ states that "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," and "DEIA" are "dangerous, demeaning, and immoral race- and sex-based preferences"; "illegal" in violation of "the text and spirit of . . . Federal civil-rights laws"; "undermine our national unity"; "deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system"; "threaten the safety of American men, women, and children across the Nation by

---

[~~11~~9] Anti-Diversity2 Order § 1.

diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society"; are "illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing"; and are "illegal preferences and discrimination."

65. 57. Section 2 of the Anti-Diversity2 Order directs "all executive departments and agencies . . . to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements" to "protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work" and "to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities."

66. 58. Section 3(b) of the Anti-Diversity2 Order instructs the OFCCP to "immediately cease . . . " "[p]romoting 'diversity'"; "[h]olding Federal contractors and subcontractors responsible for taking 'affirmative action'"; and "[a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin."

67. 59. The Anti-Diversity2 Order then imposes new requirements on government contractors. Section 3(b) further(iv)(B) of the Anti-Diversity2 Order (the "Certification Provision") requires each agency head to "include in every contract or grant award: (A) a term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code," and, concerningly, "(B) a term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

68.    By directing agencies to require every federal contractor or grantee to certify, as a condition for receiving funding, that they do not "operate *any* programs promoting DEI," the Certification Provision purports to authorize cancellation of Plaintiffs' funding for their expression of views with which the Administration disagrees about race, sex, gender, and various concepts that it characterizes as DEIA or DEIA-related, even if that speech occurs apart from a government contract or grant program. It does this by directs.

69.    ~~60.~~ Section 3(c) of the Anti-Diversity2 Order ~~requires the Director of the OMB to "(i) Review and revise, as appropriate, all Government wide processes, directives, and guidance; (ii) Excise~~contains several problematic provisions.  First, section 3(c)(ii) ("the Contract Terms Provision") orders the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws~~; and~~.   Section 3(c)(iii) ~~Terminate~~("the Government Mandates Provision") instructs the director to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."

70.    ~~61.~~ Section 4(a) of the Anti-Diversity2 Order directs the heads of all agencies to "take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work," which the Executive Order asserts is inconsistent with DEIA.

71.    ~~62.~~ Section 4(b) of the Anti-Diversity2 Order ("the Report Provision") directs the Attorney General to submit a report "containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal

discrimination and preferences, including DEI." ~~In addition, the Anti-Diversity2 Order~~It states that the Attorney General's report must "contain a proposed strategic enforcement plan identifying: (i) Key sectors of concern within each agency's jurisdiction; (ii) The most egregious and discriminatory DEI practitioners in each sector of concern; (iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences," and it says that "[a]s a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars"; "(iv) Other strategies to encourage the private sector to end illegal DEI discrimination and preferences and comply with all Federal civil-rights laws; (v) Litigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest; and (vi) Potential regulatory action and sub-regulatory guidance."

~~63. Taken together, the Anti-Diversity1 and Anti-Diversity2 Orders express the viewpoint that policies, programs, and activities that Defendants determine to be related to DEIA do not comply with federal civil rights laws, do not advance federal civil rights laws, and must cease. Defendants thus disfavor federal grant recipients and contractors, including Plaintiffs, whose speech, trainings, research, and/or mission-driven services express or reflect viewpoints that support DEIA efforts, and who seek to assist people of color, women, LGBTQ people, and people with disabilities, including people living with HIV, in overcoming systemic barriers to equality resulting from past and current discrimination.~~

**3.** ~~**C.**~~**The Anti-Gender Order Forbids Contractors and Grantees from Acknowledging the Existence of Transgender People** ~~**and Their Legal Right to Equality and Respect**~~**.**

72. 64. On January 20, 2025, President Trump issued the Anti-Gender Order, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The Anti-Gender Order expresses a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people and gender identity, denying. It denies that transgender people exist, deeming deems them "false," ordering orders their exclusion from government recognition and protection in numerous aspects of their lives, and demanding demands that others do the same.

73. 65. Section 2 of the Anti-Gender Order states that a person's "sex" is an "immutable biological classification as either male or female."

66. It The definitions contained within the Anti-Gender Order deny the existence of gender identities that differ from a person's sex assigned at birth and repudiate the existence of people who are transgender altogether. Specifically, Section 2 of the Anti-Gender Order establishes that it is the "policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." Section 2 further states that "the Executive Branch will enforce all sex-protective laws to promote this reality," and the following subsequently sets forth definitions shall to govern all Executive interpretation of and application of Federal law and administration policy."

a. 67. Female: Section 2 of the Anti-Gender Order defines "Female" to mean "a person belonging, at conception, to the sex that produces the large reproductive cell,." and

b. Male: It defines "Male" to mean "a person belonging, at conception, to the sex that produces the small reproductive cell."

c.    68. *Gender Ideology*:  Section 2 of the Anti-Gender Order defines what it terms "gender ideology" as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."  It further states that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex.  Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."

d.    69. *Gender Identity*: In addition, Section 2 of the Anti-Gender Order defines what it terms "gender identity" as "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

70. Section 3(b) of the Anti-Gender Order directs each agency to "give the terms 'sex', 'male', 'female', 'men', 'women', 'boys' and 'girls'" the meanings defined in the Executive Order "when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications."

71. Section 3(d) of the Anti-Gender Order directs the Secretaries of State and Homeland Security to implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, reflect solely the holder's sex assigned at birth, pursuant to the definitions in Section 2 of the Order   thus preventing transgender people from carrying federal identity documentation that accords with their gender identities.

74. 72. Section 3(e) of the Anti-Gender Order ("the Gender Funding Termination Provision") further directs agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," and shall instructs them to "cease issuing such statements, policies, regulations, forms, communications or other messages."  It also demands that agencies "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."

73. Section 3(f) of the Anti-Gender Order disagrees with the legal position that "the Supreme Court's decision in *Bostock v. Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity based access to single sex spaces under, for example, Title IX of the Educational Amendments Act."  This section further directs the Attorney General to "immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock v. Clayton County* (2020) to sex based distinctions in agency activities" and "issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent."

75. 74. Section 3(g) of the Anti-Gender Order ("the Promoting Gender Ideology Provision") prohibits the use of federal funds "to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."

76. 75. Section 7 of the Anti-Gender Order requires each agency to submit an update on implementation of the Executive Order within 120 days, including "agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of" the Executive Order.  Section 7(a)(ii) of the Anti-Gender Order ("the Agency Requirements Provision") then directs agency heads to report to the President on requirements the agency has

imposed on contractors "to achieve the policy of this order," thus suggesting other, unspecified agency tracking of—and action concerning—contractors and grantees like Plaintiffs.

76. Defendants, therefore, disfavor federal contractors and grantees, including Plaintiffs, whose speech, trainings, research, and/or mission driven services express or reflect viewpoints that acknowledge the existence of transgender people and/or advocate for their equality.

77. Moreover, when taken together with the Anti-Diversity1 and Anti-Diversity2 Orders, Plaintiffs risk the loss of federal funding for the contracts and/or grants to the extent any of Plaintiffs' programs, policies, or activities recognize and/or advance the rights of transgender people.

II. ENFORCEMENT OF THE EXECUTIVE ORDERS

**D.** **The President Departed from Standard Procedure in the Issuance and Implementation of the Executive Orders.**

77. Presidents historically follow specific procedural steps for issuing executive orders, which ensure that they are properly reviewed, vetted, and implemented. Some of these steps can be found in the provisions of 1 C.F.R. § 19.2—"Routing and approval of drafts"—which lays out procedures for review of an executive order by OMB, the Attorney General, and the Office of the Federal Register to ensure legality before submission of the executive order to the President for signature.

78. These procedures are typically referenced in the executive order itself, along with provisions for amendment to reconcile the executive order with past orders, as well as instructions to the relevant cabinet Secretary to draft rules and regulations for implementation.[10]

---

[10] *See, e.g.*, Exec. Order No. 13672, 79 Fed. Reg. 42,971 (July 21, 2014) (instructing the Secretary of Labor to "prepare regulations to implement the requirements" of the order).

79.     Additionally, executive orders that affect government contracting are typically submitted to the Federal Acquisition Regulatory Council for development of proposed implementing regulations to be published in the Federal Register and, upon adoption, incorporated into federal government contracts.

80.     The challenged Executive Orders reflect a radical departure from past executive orders and from these standard procedures.  For example, unlike prior workplace discrimination-related executive orders, the Anti-Diversity2 Order does not instruct the Secretary of Labor to undertake further rulemaking to implement the requirements of the Order.  Instead, the Anti-Diversity2 Order merely instructs the DOL to cease "promoting diversity," "holding contractors and subcontractors responsible for 'taking affirmative action,'" and allowing contractors to "engage in workforce balancing."

81.     In another departure from ordinary substance and procedure, the Anti-Diversity2 Order lacks any mechanism for modifying the Federal Acquisition Regulation ("FAR"), which is incorporated as binding terms in all federal procurement contracts.[11]  The FAR is codified in title 48 of the Code of Federal Regulations.  Ordinarily, to amend the FAR (and the binding terms for government contracts specified therein)—by, for instance, including the language required by an executive order—agencies must go through general rulemaking procedures, which include publication of the proposed "procurement policy, regulation, procedure, or form and provide for a public comment period for receiving and considering the views of all interested parties on the proposal."[12]  The procurement policy or regulation "may not take effect until 60 days after it is

---

[11] 48 C.F.R. § 1.301(a)(1).
[12] 41 U.S.C. § 1707(b); *see also* 48 C.F.R. § 1.301(b); 48 C.F.R. Subpart 1.5.  The length of the comment period may not be less than 30 days.  *Id.*

published for public comment in the Federal Register" unless "there are compelling circumstances for the earlier effective date."[13]

82.    Contrary to these procedures, there was no notice of the Anti-Diversity2 Order's changes to government contracting requirements published in the Federal Register.  Thus, federal contractors were not afforded an opportunity to comment on the Anti-Diversity2 Order's terms before they were incorporated into federal contracts.

83.    Although waiver of the notice would be permitted if "urgent and compelling circumstances make compliance with [those] requirements impracticable,"[14] on information and belief, there has been no specific articulation as to the "urgent and compelling circumstances" that would render the notice and comment requirements impracticable here.

84.    Individual federal agencies also can issue FAR "deviations"—i.e., variations from standard FAR provisions and clauses—in accordance with specified procedures "when necessary to meet the specific needs and requirements of each agency."[15]  On February 15, 2025, the Civilian Agency Acquisition Council ("CAAC") issued a Memorandum for Civilian Agencies (CAAC Letter 2025-01) authorizing individual civilian agencies to "issue a class deviation to ensure compliance with [the Anti-Diversity2 Order and the Anti-Gender Order]."[16]  Among other things, the class deviation authorizes the removal of a series of standard FAR clauses prescribed under FAR subpart 22.8, entitled "Equal Employment Opportunity."  On February 15, 2025, the U.S.

---

[13] *Id.* § 1707(a).
[14] *Id.* § 1707(d).
[15] 48 C.F.R. § 1.402.
[16] GSA, Memorandum for Civilian Agencies, *CAAC Consultation to Issue a Class Deviation From the Federal Acquisition Regulation (FAR) Regarding Executive orders 14173 and 14168* (Feb. 15, 2025), https://www.acquisition.gov/sites/default/files/caac/CAAC_Letter_2025-01.pdf.

General Services Administration ("GSA") issued a FAR class deviation in reliance on the CAAC Memorandum for Civilian Agencies.[17]

85.    As discussed further below, memoranda issued by OPM and OMB purporting to implement the Executive Orders also did not go through standard procedures.  Under regulatory planning rules, agencies are required to submit all significant regulatory actions to the Office of Information and Regulatory Affairs ("OIRA") for review before issuing them to the public.  As of the date of this complaint, OIRA has not listed OPM's memorandum on their list of completed[18] or pending reviews.[19]

**E.    The Trump Administration Has Implemented the Executive Orders by Targeting All DEIA.**

86.    ~~78.~~ In the days following the release of the Executive Orders, the Trump Administration took multiple actions that penalized and attacked speech and viewpoints that, in the Administration's view, are related to DEIA.  These actions further confirm that the purpose of the Executive Orders ~~is~~was to establish the Administration's viewpoint on DEIA~~; to intimidate and instill fear in federal contractors who promote what the Administration considers to be DEIA in their operations; to coerce public and private compliance with the Administration's viewpoints with threats of civil and criminal liability; to suppress and chill speech and viewpoints with which the Trump Administration disagrees and to inflict harms against people of color, women, LGBTQ people, and people with disabilities by denying them the support of the federal government even~~

---

[17] GSA, Press Release, *GSA Announces FAR Class Deviations, Guidance for Contracting Officers* (Feb. 18, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-announces-far-class-deviations-guidance-for-contracting-officers-02182025.

[18] *See* OIRA, *Executive Order Reviews Completed Between January 01, 2025 to May 31, 2025,* https://www.reginfo.gov/public/do/eoHistReviewSearch (last visited June 23, 2025).

[19] *See* OIRA, *Executive Order Submissions Under Review*, https://www.reginfo.gov/public/do/eoReviewSearch (last visited June 23, 2025).

though they confront ongoing inequalities and barriers to equal opportunity., while silencing private entities that express disfavored viewpoints.

87. 79. On January 21, 2025, the acting directorActing Director of OPM released a memorandum titled "Initial Guidance Regarding DEIA Executive Orders" (the "January 21 OPM Memo") that purported to implement the Anti-Diversity1 Order.[12][20]  The January 21 OPM Memo directed agencies to take "prompt actions" against "DEIA initiatives and programs," including requiring agencies—within 24 hours—to "terminate any DEIA-related contractors," among other actions.[13][21]  The January 21 OPM Memo further demanded a report within 48 hours of "all DEIA-related agency contracts."[14][22]

88. 80. The January 21 OPM Memo also sought to root out what OPM characterized as efforts to evade the Trump Administration's policy.  The memorandum included an email template for agency heads to send to their employees, notifying them that the Trump Administration iswas "aware of efforts by some in government to disguise these [DEIA] programs by using coded or imprecise language."[15][23]  The email directed employees who knowknew about such efforts to report them to an email address "DEIAtruth@opm.gov" and threatensthreatened unspecified "adverse consequences" for not doing so.[16]The January 21 OPM Memo also demanded a "list" of "contract descriptions or personnel position descriptions" that had been recently "changed" to "obscure their connection to DEIA programs."[17][24]

---

[12][20] OPM, *Initial Guidance Regarding DEIA Executive Orders* (Jan. 21, 2025), https://www.opm.gov/media/e1zj1p0m/opm-memo-re-initial-guidance-regarding-deia-executive-orders-1-21-2025-final.pdf.
[13][21] *Id.* at 1–2.
[14][22] *Id.* at 12.
[15][23] *Id.* at 3.
[16] *Id.*
[17][24] *Id.* at 2.

89. ~~81.~~ On January 22, 2025, the White House released "Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI." [~~18~~25]  This "Fact Sheet" ~~explains~~explained that the Anti-Diversity2 Order ~~terminates~~terminated "radical DEI preferencing in federal contracting" and ~~directs~~directed "federal agencies to relentlessly combat private sector discrimination."  It ~~claims~~claimed that "DEI has dangerously tainted many of our critical businesses and influential institutions," that "DEI's foundational rhetoric and ideas foster intergroup hostility and authoritarianism," and that "[b]illions of dollars are spent annually on DEI, but rather than reducing bias and promoting inclusion, DEI creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict."

90. ~~82.~~ On January 23, 2025, at the World Economic Forum, President Trump announced that his Administration had "~~has~~ taken action to abolish all discriminatory diversity, equity, and inclusion nonsense—and these are policies that were absolute nonsense—throughout the government and the private sector."[~~19~~26]

91. ~~83.~~ On January 27, 2025, the Acting Director of OMB issued a memorandum titled "Temporary Pause of Agency Grant, Loan, and Other Financial assistance Programs" ("OMB Memo M-25-13").[~~20~~27]  OMB Memo M-25-13 purported to implement a series of executive orders signed by President Trump, including the Anti-Diversity1 Order and the Anti-Gender Order, and

---

[~~18~~25] The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-protects-civil-rights-and-merit-based-opportunity-by-ending-illegal-dei/.

[~~19~~26] ~~Remarks by~~ President Trump ~~at the~~Gives Virtual Remarks to World Economic Forum (Jan. 23, 2025), ~~https://www.whitehouse.gov/remarks/2025/01/remarks-by-president-trump-at-the-world-economic-forum/~~https://www.whitehouse.gov/videos/president-trump-gives-virtual-remarks-to-world-economic-forum.

[~~20~~27] OMB, Memorandum For Heads of Executive Departments and Agencies, M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://dcg.usc.edu/wp-content/uploads/2025/01/OMB-Memo-Pause.pdf.

directed agencies to freeze "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including but not limited to . . . DEI, [and] woke gender ideology."[21][28]   OMB Memo M-25-13 contained a footnote explaining that "Medicare or Social Security benefits" were the only federal assistance programs that it did not cover.[22][29]

84. The Trump Administration posted a "Q&A" that purported to clarify the scope of OMB Memo M-25-13.[23] The Q&A explained "any program that provides direct benefits to Americans is explicitly excluded from the pause" directed in OMB Memo M-25-13, but the Q&A reiterated that the funding pause did apply to "programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI."

85. The extensive scope of OMB Memo M-25-13 spurred widespread chaos and confusion. The next day, multiple groups sued to enjoin its enforcement for violating the APA. In *National Council of Nonprofits v. OMB*, No. 1:25-CV-00239 (D.D.C.) and *New York v. Trump*, No. 1:25-cv-00039 (D.R.I.), district courts took immediate action to stay enforcement of OMB Memo M-25-13. On January 28, 2025, in *National Council of Nonprofits*, the U.S. District Court for the District of Columbia issued a temporary stay pending its consideration of plaintiffs' motion for a temporary restraining order, during which it ordered the government defendants to "refrain from implementing OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards."[24] On January 31, 2025, in *New York*, the U.S. District Court for the District

---

[21][28] *Id.* at 2.

[22][29] *Id.* at 1 n.2.

[23] OMB, *Fact Sheet: OMB Q&A Regarding Memorandum M-25-13* (Jan. 28, 2025), https://web.archive.org/web/20250129143354/https://www.whitehouse.gov/fact-sheets/2025/01/omb-q-a-regarding-memorandum-m-25-13/.

[24] *National Council of Nonprofits v. OMB*, No. 1:25-CV-00239, 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025).

of Rhode Island granted the plaintiff states' motion for a temporary restraining order, holding that the states were likely to succeed on the merits of their claims that the OMB Memo M-25-13 violated the APA and a host of constitutional provisions, and enjoining the government defendants from freezing federal funding to the states, as threatened in OMB Memo M-25-13.[25] In holding that the plaintiff states were likely to prevail on their claims, the court highlighted that the executive branch's attempt to unilaterally suspend funds was arbitrary and capricious, unauthorized by law, and "threaten[ed] the States' ability to conduct essential services."[26] Then, on February 3, 2025, the U.S. District Court for the District of Columbia granted a temporary restraining order in *National Council of Nonprofits*, enjoined the defendants from freezing funding, and directed the defendants to release any funds they had paused.[27]

92. 86. On January 29, 2025, OMB rescinded OMB Memo M-25-13.[28][30] However, in a public statement, the White House Press Secretary said that OMB only rescinded OMB Memo M-25-13 to "end any confusion caused by the [a] court's injunction," that the recission of the Memorandum was "NOT a rescission of the federal funding freeze," and that the "President's EO's [sic] on federal funding remain in full force and effect, and will be rigorously implemented."[29][31]

87. As the U.S. District Court for the District of Rhode Island recognized, the "alleged rescission of the OMB Directive was in name only" and "[t]he substantive effect of the directive

---

[25] *New York v. Trump*, No. 1:25-CV-00039, 2025 WL 357368 (D.R.I. Jan. 31, 2025).
[26] *Id.* at *2.
[27] *National Council of Nonprofits v. OMB*, No. 1:25-CV-00239, 2025 WL 368852 (D.D.C. Feb. 3, 2025).
[28][30] OMB, Memorandum for Heads of Executive Departments and Agencies, M-25-14, *Recission of M-25-13* (Jan. 29, 2025), https://www.cogr.edu/sites/default/files/OMB%20M-25-14.pdf.
[29][31] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:40 p.m.), https://x.com/PressSec/status/1884672871944901034.

carries on."[30] The court also noted that the rescission "may have been issued simply to defeat the jurisdiction of the courts."[31] Accordingly, the court rejected the government defendants' argument that the rescission rendered plaintiffs' claims moot, explaining that "[b]ased on the Press Secretary's unequivocal statement and the continued actions of Executive agencies, the Court finds that the policies in the OMB Directive that the States challenge here are still in full force and effect and thus the issues presented in the States' TRO motion are not moot."[32] Similarly, the U.S. District Court for the District of Columbia said that "[t]he rescission, if it can be called that, appears to be nothing more than a thinly veiled attempt to prevent this court from granting relief."[33]

93. 88. On January 29, 2025, the acting director Acting Director of OPM issued a memo another memorandum titled "Initial Guidance Regarding President Trump's Executive Order *Defending Women*" (the "January 29 OPM Memo") that purports purported to implement the Anti-Gender Order.[34][32] The January 29 OPM Memo is was similar to the January 21 OPM Memo implementing the Anti-Diversity1 Order, insofar as it gave agencies forty-eight hours to "terminate" all programs, contracts, and grants and "[c]ancel any trainings that inculcate or promote gender ideology or have done so in the past," among other things.[35][33]

94. 89. To implement the President's Executive Orders in compliance with these memoranda, Defendant agencies have begun issuing issued stop-work orders or contract termination notices, forcing organizations to "cease and desist" performance of contracts,

---

[30] *New York*, 2025 WL 357368, at *4.

[31] *Id.*

[32] *Id.* at *5.

[33] *National Council of Nonprofits*, 2025 WL 368852, at *7.

[34][32] OPM, Memorandum for Heads and Acting Heads of Departments and Agencies, *Initial Guidance Regarding President Trump's Executive Order Defending Women* (Jan. 29, 2025), https://chcoc.gov/content/initial-guidance-regarding-president-trump%E2%80%99s-executive-order-defending-women.

[35][33] *Id.* at 1–2.

programs, and activities that, in the Administration's view, relate to DEIA.  Plaintiffs are among those who ~~have~~ received such stop-work orders or termination notices.

95.    ~~90. On~~For example, on January 22, 2025, Defendant DOL sent all Employment and Training Administration ("ETA") recipients, including Plaintiff NUL, a memorandum titled "Immediate Implementation of Executive Orders 'Ending Radical and Wasteful Government DEI Programs and Preferencing' and 'Ending Illegal Discrimination and Restoring Merit-Based Opportunity.'"[36]~~Specifically, the~~[34]  The memorandum stated~~:~~, "Effective immediately, all recipients of federal financial assistance awards are directed to cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of the EOs titled 'Ending Radical and Wasteful Government DEI Programs and Preferencing,' issued on January 20, 2025, and 'Ending Illegal Discrimination and Restoring Merit-Based Opportunity,' issued on January 21, 2025."[37][35] The memorandum continued:  "All awardees must immediately cease all award activities related to DEI or DEIA.  All other award activities should continue."[38][36]

~~91. On January 23, 2025, Defendant HUD sent Plaintiff NFHA an email with the subject "Immediate Action - STOP WORK ORDER," directing it to "cease and desist all work activities associated with environmental justice, diversity, equity, and inclusion (DEI)."~~

---

[36] ~~DOL, *Training and Employment Notice 21-24*, at 1 (Jan. 22, 2025), https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEN/2024/TEN%2021-24/TEN%2021-24.pdf.~~

[34] DOL, *Training and Employment Notice 21-24*, at 1 (Jan. 22, 2025), https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEN/2024/TEN%2021-24/TEN%2021-24.pdf.

[37][35] *Id.*

[38][36] *Id.* at 2.

92. On January 24, 2025, NFHA received a follow-up email from HUD, advising that, with respect to some HUD funding, any grants with certain terms deemed to have a "conceptual relationship" to the Executive Orders would receive greater scrutiny. Such terms included "racial," "underserved," "affirmatively," "systemic," "adversely," "accessible," and "disparate," among others. These terms appear in some of the very laws and regulations about which NFHA and its members seek to educate the public and which they enforce, such as the Fair Housing Act and the Equal Credit Opportunity Act.[39]

96. 93. On January 29, 2025, Defendants CDC and HHS sent the city of Chicago, which subcontracts CDC and HHS grants to Plaintiff AFC, a letter directing it to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contractors promoting 'diversity, equity, and inclusion' (DEI) at every level and activity . . . that are supported with funds from this award." The letter further stated that, "[a]ny vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." The city of Chicago confirmed receipt of these notices tonotified Plaintiff AFC of its receipt of this letter on February 1, 2025, and that theyconfirmed it would affect its subcontracts.

97. 94. Also on January 29, 2025, in a press briefing, Press Secretary Karoline Leavitt stated, "[I]t is the responsibility of this president and this administration to be good stewards of

---

[39] See, e.g., 42 U.S.C. § 3604(f)(3)(C)(i) (requiring public and common use areas of dwellings to be "readily accessible to and usable by" persons with disabilities and a dwelling to be "accessible" in numerous other ways under the Fair Housing Act); id. § 3608(e)(5) (requiring HUD secretary to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies" of the Fair Housing Act); 24 C.F.R. § 100.500(a) (providing that practice "has a discriminatory effect where it actually or predictably results in a disparate impact"); 15 U.S.C. § 1691(d) (providing protections for applicants who receive an "adverse action" from creditors).

taxpayer dollars.  That is something that President Trump campaigned on.  That's why he has launched DOGE, the Department of Government Efficiency, who is working alongside OMB.  And that's why OMB sent out this memo last night, because the president signed an executive order directing OMB to do just this.  And the reason for this is to ensure that every penny that is going out the door is not conflicting with the executive orders and actions that this president has taken. So, what does this pause mean?  It means no more funding for illegal DEI programs.  It means no more funding for the Green New Scam that has ta- — cost [sic] American taxpayers tens of billions of dollars.  It means no more funding for transgenderism and wokeness across our federal bureaucracy and agencies."[40][37]

98.    95.  On February 5, 2025, OPM Acting Director issued a memorandum titled "Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives" instructing federal agencies to terminate all DEIA offices, policies, and programs that allegedly "unlawfully discriminate" in employment actions based on protected characteristics, including race, sex, national origin, and disability.[41][38]  It defines defined "unlawful discrimination relating to DEI" to "include[] taking action motivated, in whole or in part, by protected characteristics.  To be unlawful, a protected characteristic does not need to be the sole or exclusive reason for an agency's action."[42][39]

---

[40][37] The White House, *Press Briefing By Press Secretary Karoline Leavitt* (Jan. 29, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/press-briefing-by-press-secretary-karoline-leavitt/.

[41][38] OPM, Memorandum to the Heads and Acting Heads of Departments and Agencies, *Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives* (Feb. 5, 2025), https://www.chcoc.gov/content/further-guidance-regarding-ending-deia-offices-programs-and-initiatives.

[42][39] *Id.* at 1.

99. ~~96.~~ On February 5, 2025, Attorney General Pam Bondi issued a memorandum to all DOJ employees titled~~,~~ "Ending Illegal DEI and DEIA Discrimination and Preferences ("DOJ Memo 1").[43]~~It purports~~[40] It purported to implement the Anti-Diversity2 Order, which it ~~describes~~described as "making clear that policies relating to [DEI] and [DEIA] 'violate the text and spirit of our longstanding Federal civil-rights laws' and 'undermine our national unity.'"[44][41]

100. ~~97.~~ DOJ Memo 1 ~~directs~~directed the Department's Civil Rights Division to investigate and penalize entities in both the private sector and federally funded educational institutions that engage in DEI and DEIA policies and programs.

~~98.~~ DOJ Memo 1 also ~~directs~~directed the ~~DOJ's~~ Civil Rights Division and the Office of Legal Policy to submit a report by March 1, 2025, recommending enforcement actions against DEI and DEIA policies. ~~The~~It stated that the report must include~~, among other things,~~ a plan for deterring DEI and DEIA policies through criminal investigations and civil compliance actions, including up to nine targeted investigations.[45][42]

101. ~~99.~~ Also, on February 5, 2025, the Attorney General issued a memorandum titled~~,~~ "Eliminating Internal Discriminatory Practices" ("DOJ Memo 2") ~~directing~~concerning the elimination of DOJ ~~DEI and~~ DEIA programs, policies, and related initiatives.[46][43]

---

~~[43] Office of the Attorney General, DOJ, Memorandum to All Department Employees, Ending Illegal DEA and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.~~

[40] Office of the Attorney General, DOJ, Memorandum to All Department Employees, Ending Illegal DEA and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

[44][41] *Id.* at 1.

[45][42] *Id.* at 1–2.

[46][43] Office of the Attorney General, DOJ, Memorandum to All Department Employees, *Eliminating Internal Discriminatory Practices* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388556/dl.

102. ~~100.~~ DOJ Memo 2 ~~further directs~~ directed DOJ to eliminate its own DEI and DEIA programs.  It also directed DOJ, by March 15, 2025, to assist OMB in reviewing and revising government-wide policies to eliminate references to DEI and DEIA in federal acquisition, contracting, grants, and financial assistance procedures.

103. ~~101.~~ On February 6, 2025, the White House published "Memorandum for the Heads of Executive Departments and Agencies."[47][44]  In this public-facing memorandum, the President ~~declares~~ declared that "[i]t is the policy of my administration to stop funding NGOs that undermine the national interest" and that ~~the~~ agencies "shall align future funding decisions with the interests of the United States and with the goals and priorities of my Administration, as expressed in executive actions."[48][45]

104. ~~102.~~ These ~~agency actions~~ government directives have eliminated what the agencies deem to be DEIA programs and activities—and demonstrate an intent to eliminate more of such programs and activities in the future—without defining what types of programs and activities are banned as "DEI" or DEIA" and without any prior determinations of their illegality.

105. ~~103.~~ Likewise, these ~~agency actions~~ directives cut off federal funding~~,~~ through contracts or grants~~,~~ to any program or activity that the agencies have determined is or will determine to be "DEI" or "DEIA"—or related to "DEI" or "DEIA"—without any prior determination of (a) why they are considered to be "DEI" or "DEIA" or (b) why they are illegal pursuant to criteria that is articulable, discernible, and publicly known.

---

[47][44] The White House, Memorandum for the Heads of Executive Departments and Agencies, *Advancing United States Interests When Funding* (Feb. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/memorandum-for-the-heads-of-executive-departments-and-agencies/.

[48][45] *Id.*

104. These actions are arbitrary and capricious and do not follow administrative procedures established pursuant to federal law.

106. Rather than implementing any kind of process to make a determination as to whether a specific DEIA practice is permissible, the Administration has repeatedly made clear that it views *all* DEIA as discriminatory and unlawful, without reference to standards under existing precedent.

107. On January 22, 2025 the Federal Trade Commission ("FTC") issued a press release in which FTC Chairman Andrew N. Ferguson cited the Anti-Diversity1 and 2 Orders and announced that "DEI is Over at the FTC." In doing so, he stated generally that "DEI is a scourge on our institutions," that "[i]t promotes invidious discrimination," and that "it violates federal and natural law," without clarifying whether he was referring to all programs labeled as DEI, or only some that are unlawful under existing precedent.[46]

108. On January 23, 2025, the U.S. Department of Education issued a similar press release that cited the Anti-Diversity2 Order and stated that it would "Eliminate DEI." The Department said that it had "removed or archived hundreds of guidance documents, reports, and training materials that include mentions of DEI from its outward facing communication channels." The Department gave no indication that in doing so, it had limited its actions to eradicating efforts that were unlawful under existing precedent.[47]

---

[46] *FTC Chairman Ferguson Announces that DEI is Over at the FTC*, Fed. Trade Comm'n (Jan. 22, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-chairman-ferguson-announces-dei-over-ftc.

[47] *U.S. Department of Education Takes Action to Eliminate DEI*, U.S. Dep't of Educ. (Jan. 23, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-takes-action-eliminate-dei.

109.   On March 6, 2025, President Trump delivered a joint address to Congress.  He said, "We've ended the tyranny of so-called diversity, equity and inclusion policies all across the entire federal government and indeed the *private sector* and our military.  And our country will be woke no longer."  In doing so, he suggested that the "diversity, equity, and inclusion" that he had "ended" through his Executive Orders was equivalent to the broad category of policies he criticized as "woke"—not just policies that are unlawful under existing precedent.[48]

110.   On March 11, 2025, HUD issued a press release in which Defendant Turner stated unequivocally, "[L]et me be clear DEI is dead at HUD.  We will not provide funding to any program or grantee that does not comply with President Trump's executive orders."  In proclaiming "DEI" to be "dead," Turner made no distinction between legal and potentially illegal programs.[49]

111.   On April 29, 2025, the U.S. Department of Treasury issued a press release announcing that had "ended a wasteful contract with LinkedIn as the company continues to champion DEI in recruiting practices that prioritize identity over merit."  In stating this, the Department of Treasury did not clarify whether it believed that LinkedIn's use of "DEI in recruiting practices" was "discriminatory" in the way it said its own policies were, or if so, whether it believed LinkedIn's practices were unlawful under existing precedent.[50]

112.   On May 19, 2025, DOJ issued a memorandum announcing its "Civil Rights Fraud Initiative."  The memorandum invoked the Anti-Diversity2 Order and set forth DOJ's plan for "vigorous enforcement of the False Claims Act" against federal funding recipients "violating civil

---

[48] *Read President Trump's 2025 address to a joint session of Congress*, NPR (Mar. 5, 2025), https://www.npr.org/2025/03/05/nx-s1-5316232/trump-congress-joint-address-speech.

[49] *Secretary Turner Denounces DEI Criteria in Asheville's Draft Disaster Plan*, U.S. Dep't of Housing & Urban Dev., (Mar. 11, 2025) https://www.hud.gov/news/hud-no-25-040.

[50] *U.S. Department of the Treasury Announces Achievements in the First 100 Days of the Trump Administration*, U.S. Dep't of Treasury (April 29, 2025), https://home.treasury.gov/news/press-releases/sb0117.

rights laws," which purported to include those "engaging in racist . . . diversity, equity, and inclusion (DEI) programs."  It left unclear whether DOJ believes that most or all DEI programs are "racist" civil rights violations.  But it suggested that DOJ does.  For instance, it asserted that "many" corporations and schools engage in such "racist" practices.  The memorandum did not explain which practices it was referring to or how they are unlawful under existing precedent.[51]

113.  On May 30, 2025, President Trump announced on Truth Social that he was firing Kim Sajet, the Director of the National Portrait Gallery in part because she is "a strong supporter of DEI, which is totally inappropriate for her position."  In considering her support of DEI "inappropriate" and grounds for termination, he did not specify that she supported programs that were unlawful under existing precedent.[52]

114.  105. In addition, theThese agency actions and statements by the Trump Administration corroborateappear to criticize all DEIA, not merely activity that is unlawful under existing precent.  In doing so, they suggest that the purpose of the Executive Orders as suppression ofis to suppress speech and viewpoints supportive of DEIA efforts with which the Administration disagrees, to the detriment of people of color and/or LGBTQ people, including those served by Plaintiffs.

**F.    Similarly Situated Plaintiffs Have Successfully Challenged Various Provisions of the Executive Orders.**

115.  In *National Association of Diversity Officers in Higher Education v. Trump*, the U.S. District Court for the District of Maryland granted the plaintiffs' motion for a preliminary

---

[51] *Civil Rights Fraud Initiative*, Office of the Deputy Att'y Gen., U.S. Dep't of J. (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline=&utm_medium=email&utm_source=gov delivery.

[52] Donald J. Trump (@realDonaldTrump), Truth Social (May 30, 2025, 1:30 pm), https://truthsocial.com/@realDonaldTrump/posts/114597966895334541.

injunction enjoining the enforcement of the Equity Termination Provision, the Certification Provision, and the Report Provision. *See* 767 F. Supp. 3d 243, 291 (D. Md. 2025). The court held that the Equity Termination Provision was likely void for vagueness under the Fifth Amendment, *id*. at 276–78; the Certification Provision likely violated the First Amendment, *id*. at 281–83; and the Report Provision likely violated the First Amendment and was also unconstitutionally vague, *id*. at 284, 286.

116. The Fourth Circuit stayed the decision pending appeal. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025). According to the Fourth Circuit panel, the plaintiffs had not alleged any actual enforcement of the Orders against them, leading the three members of the panel to suggest claims would be proper if and when such actions do occur. *See id.* at 4 n. 1 (Diaz, C.J., concurring) ("I . . . reserve judgment on how the Administration enforces these executive orders, which may well implicate cognizable First and Fifth Amendment concerns."), 7 (Harris, J., concurring) ("But my vote to grant the stay comes with a caveat" that agency enforcement actions "may well raise serious First Amendment and Due Process concerns"), 9 (Rushing, J., concurring) (expressing view that claims were not justiciable where "this case does not challenge any particular agency action implementing the Executive Orders").

117. In *Chicago Women in Trades v. Trump*, the U.S. District Court for the Northern District of Illinois granted a temporary restraining order enjoining the DOL from enforcing the Certification Provision on a nationwide basis and from enforcing the Equity Termination Provision against the plaintiff. *See* No. 25 C 2005, 2025 WL 933871, at *10–13 (N.D. Ill. Mar. 27, 2025) ("*CWIT I*"). In a subsequent decision on the plaintiff's motion for a preliminary injunction, the court reaffirmed its ruling that the Certification Provision likely violated the First Amendment, but

it changed its ruling as to the Equity Termination Provision, finding that the provision likely did not violate the First or Fifth Amendments. *See* No. 25 C 2005, 2025 WL 1114466, at *11–16 (N.D. Ill. Apr. 14, 2025) ("*CWIT II*").

118.    In *San Francisco AIDS Foundation v. Trump*, the U.S. District Court for the Northern District of California granted the plaintiffs' motion for a preliminary injunction in part, enjoining the defendants from enforcing the Equity Termination Provision, the Gender Termination Provision, and the Promoting Gender Ideology Provision against the plaintiffs. *See* No. 25-CV-1824, 2025 WL 1621636 (N.D. Cal. June 9, 2025). The court found that the plaintiffs were likely to succeed on their claim that each of these three provisions violated the First Amendment, *id.* at *16–18; that the Equity Termination Provision was likely void for vagueness in violation of the Fifth Amendment, *id. A*t *20–22; and that the Gender Termination and Promoting Gender Ideology Provisions were likely to violate the Equal Protection Clause of the Fifth Amendment, *id.* at *13. Further, the court held that the Equity Termination Provision violates the Separation of Powers as applied to grants the plaintiffs receive pursuant to statutory authority, and that the Gender Termination Provision and Promoting Gender Ideology Provision violate the Separation of Powers "by contravening the antidiscrimination provisions of the [Affordable Care Act] and [Public Health Service Act]." *Id.* at *25–27.

119.    In *Thakur v. Trump*, the U.S. District Court for the Northern District of California similarly granted plaintiffs' motion for a preliminary injunction barring termination of grants under various executive orders, including the three Executive Orders at issue here. The court held that plaintiffs were "likely to succeed on their claims that the termination of grants for research involving blacklisted topics like 'diversity' and 'equity' violates the First Amendment and runs contrary to Congress's specific directives to support research concerning—and foster greater

involvement in the sciences of—underrepresented groups. Although a new presidential administration is entitled to develop programs with its chosen priorities, the Executive may not set out to suppress ideas it deems dangerous by trying to drive them out of the marketplace of ideas, and may not do so by canceling grants on the basis that they serve the very purposes for which Congress appropriated the funds." No. 25-cv-04737-RFL, 2025 WL 1734471, at *1 (N.D. Cal. June 23, 2025). The court explained that grant terminations pursuant to the executive orders, including the three Executive Orders at issue here, constituted an impermissible penalty on disfavored viewpoints in violation of the Constitution. *Id.* at 9.

> **G.    The Executive Orders Are Vague, Both on Their Face and As Applied to Plaintiffs.**

**III. THE PRESIDENT DEPARTED FROM STANDARD PROCEDURES IN ISSUANCE AND IMPLEMENTATION OF THE EXECUTIVE ORDERS.**

106. Presidents historically follow specific procedural steps for issuing executive orders, which ensure that they are properly reviewed, vetted, and implemented. One example of this procedure can be found in the provisions of 1 C.F.R. § 19.2—"Routing and approval of drafts"—which lays out procedures for review by OMB, the Attorney General, and the Office of the Federal Register, in order to ensure legality and language before submission of the executive order to the President for signature.

107. These procedures are typically referenced in the executive order itself with provisions for amendment to reconcile the executive order with past orders, as well as instructions to the relevant cabinet Secretary to draft rules and regulations for implementation.[49]

108. Additionally, executive orders that affect government contracting are typically submitted to the Federal Acquisition Regulatory Council for development of proposed

---

[49] *See, e.g.*, Exec. Order No. 13672, 79 Fed. Reg. 42,971 (Dec. 9, 2014) (instructing the Secretary of Labor to "prepare regulations to implement the requirements" of the order).

implementing regulations to be published in the Federal Register and, upon adoption, incorporated into federal government contracts.

109. The challenged Executive Orders reflect a radical departure from past executive orders and from these standard procedures. For example, unlike prior workplace discrimination related executive orders, the Anti-Diversity2 Order does not instruct the Secretary of Labor to undertake further rulemaking to implement the requirements of the Order. Instead, Anti-Diversity2 Order merely instructs the DOL to cease "promoting diversity," "holding contractors and subcontractors responsible for 'taking affirmative action,'" and allowing contractors to "engage in workforce balancing."

110. In another departure from the ordinary procedural attributes of executive orders concerning workplace discrimination, the Anti-Diversity2 Order lacks any mechanism for rulemaking to modify the Federal Acquisition Regulation ("FAR"), applicable provisions of which are incorporated as binding terms in all federal procurement contracts.[50] The FAR is codified in title 48 of the Code of Federal Regulations. Ordinarily, to amend the FAR (and the binding terms for government contracts specified therein)—e.g., to include the language required by the Anti-Diversity2 Order—agencies must go through general rulemaking procedures, which include publication of the proposed "procurement policy, regulation, procedure, or form and provide for a public comment period for receiving and considering the views of all interested parties on the proposal."[51] The length of the comment period may not be less than 30 days.[52] Further, the procurement policy or regulation "may not take effect until 60 days after it is published for public

---

[50] 48 C.F.R. § 1.301(a)(1).

[51] 41 U.S.C. § 1707(b); *see also* 48 C.F.R. § 1.301(b); 48 C.F.R. Subpart 1.5.

[52] *Id.*

comment in the Federal Register" unless "there are compelling circumstances for the earlier effective date."[53]

111. Contrary to these procedures, there was no notice published in the Federal Register of the Anti-Diversity2 Order's changes to government contracting requirements. Thus, federal contractors have not been afforded an opportunity to comment on the Anti-Diversity2 Order's terms before they are incorporated into federal contracts.

112. Although waiver of the notice would be permitted if "urgent and compelling circumstances make compliance with [those] requirements impracticable,"[54] on information and belief, there has been no specific articulation as to the "urgent and compelling circumstances" that would render the notice and comment requirements impracticable here.

113. Individual federal agencies also can issue FAR "deviations"—i.e., variations from standard FAR provisions and clauses—in accordance with specified procedures "when necessary to meet the specific needs and requirements of each agency."[55] On February 15, 2025, the Civilian Agency Acquisition Council ("CAAC") issued a Memorandum for Civilian Agencies (CAAC Letter 2025-01) authorizing individual civilian agencies to "issue a class deviation to ensure compliance with [the Anti-Diversity2 Order and the Anti-Gender Order]."[56] Among other things, the class deviation authorizes the removal of a series of standard FAR clauses prescribed under FAR subpart 22.8, entitled "Equal Employment Opportunity." On February 15, 2025, the U.S.

---

[53] *Id.* § 1707(a).

[54] *Id.* § 1707(d).

[55] 48 C.F.R. § 1.402.

[56] GSA, Memorandum for Civil Agencies, *CAAC Consultation to Issue a Class Deviation From the Federal Acquisition Regulation (FAR) Regarding Executive orders 14173 and 14168* (Feb. 15, 2025), https://www.acquisition.gov/sites/default/files/caac/CAAC_Letter_2025-01.pdf.

General Services Administration ("GSA") issued a FAR class deviation in reliance on the CAAC Memorandum for Civilian Agencies.[57]

114. The memoranda issued by OPM and OMB purporting to implement the Executive Orders also did not go through standard procedures.  Under regulatory planning rules, agencies are required to submit all significant regulatory actions to the Office of Information and Regulatory Affairs ("OIRA") for review before issuing them to the public.[58]It is unlikely that such submission occurred here; as of the date of this complaint, OIRA has not listed the memoranda on their list of completed reviews.

**IV. THE EXECUTIVE ORDERS ARE VAGUE.**

120.  ~~115.~~ The challenged Executive Orders are replete with vague and undefined terms and phrases, ~~the~~whose precise meanings ~~of which~~ are necessary to understand the scope of ~~its~~their prohibitions.  Under the terms of the challenged Executive Orders, there is no objective way to determine which speech activities are permitted and which are prohibited, creating a broad chilling effect and inviting unpredictable, uneven, and discriminatory enforcement against recipients of federal funding, including Plaintiffs.

121.  ~~116. For example, nowhere~~The language of the Executive Orders is vague on its face, as they contain myriad undefined ambiguous terms and fail to provide either enforcing agencies or Plaintiffs with guidance on what is prohibited and how to comply.  Nowhere do the Executive Orders even define the central terms of "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA."

---

[57] GSA, Press Release, *GSA Announces FAR Class Deviations, Guidance for Contracting Officers* (Feb. 18, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-announces-far-class-deviations-guidance-for-contracting-officers-02182025.
[58] Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993).

117. Similarly, the Executive Orders do not define the term "equity" when used independently from "diversity, equity, inclusion, and accessibility," even though Section 2(b) of the Anti-Diversity1 Order terminates "equity-related" grants and contracts, along with other DEI and DEIA activities.

122. The Executive Orders' lack of adequate definitions makes the provisions that Plaintiffs challenge impossible to comprehend. For example, the Equity Termination Provision of the Anti-Diversity1 Order directs termination of "equity-related" grants and contracts, but the Executive Orders do not define the terms "equity-related" or "equity" when used independently from "diversity, equity, inclusion, and accessibility" (or as part of DEIA, for that matter).

123. 118. Section 3(c)The Contract Terms Provision of the Anti-Diversity2 Order uses even broader vagueundefined terms, mandating that OMB to "[e]xcise references to DEI and DEIA *principles, under whatever name they may appear*, from Federal acquisition, contracting, grants, and financial assistance procedures." Anti-Diversity2 Order § 3(c)(ii) (emphasis added). Plaintiffs, therefore, are left speculating on what speech or activity might be considered DEI or DEIA "principles" even without using the actual terms "DEI" or "DEIA."

124. Similarly, the Promoting Gender Ideology Provision of the Anti-Gender Order states that "[f]ederal funds shall not be used to promote gender ideology," but fails to define what it means by "promote."

125. 119. When prohibiting certain speech and conduct, the Executive Orders use words that fail to make clear what Plaintiffs are unable to do. Thus, for example, it is unclear what is meant by "workforce balancing on race, color, sex, sexual preference, religion, or national origin," which is prohibited by Section 3(b) of the Anti-Diversity2 Order. Likewise, it is unclear what it means to "promote" gender ideology, for which Section 3 of the Anti-Gender Order prohibits the

~~use of federal funds.~~    Given these ambiguities, the Executive Orders fail to provide adequate notice as to which concepts may or may not be promoted or included in the performance of federal grants ~~and/~~or contracts and have the effect of chilling Plaintiffs' protected speech activity.

126. ~~120.~~ Additionally, while the Anti-Diversity1 and Anti-Diversity2 Orders are explicit in their condemnation of DEIA policies, programs, and activities and in their expression of the viewpoint that ~~all~~ such policies, programs, and activities violate federal anti-discrimination law, the Orders create additional ambiguity by distinguishing ~~at times between~~ DEIA that is "legal" from that which is "illegal~~.~~," without defining what constitutes "legal" or "illegal" DEI. For example, in Section 2 of the Anti-Diversity2 Order, President Trump expresses a policy of terminating all "discriminatory and illegal preferences" and "combat[ting] illegal private-sector DEI preferences, mandates policies, program, and activities." Similarly, ~~Section 3(b) of the Anti-Diversity2 Order~~the Certification Provision requires every federal contract or grant to include a certification from the contractor or grantee that "it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination law."

~~121.~~ The language in these provisions regarding illegality fails to specify who determines ~~what~~which DEIA policies, programs, and activities are legal, as opposed to illegal, and pursuant to what criteria. ~~Nevertheless,~~

127. President Trump's hostility toward DEIA, and the ~~Trump Administration's~~ actions already taken by the Trump Administration to eliminate whatever ~~they consider~~it considers to be DEIA from the federal workplace, demonstrate a strong likelihood that anything labeled DEIA, anything that uses terms that relate to historic or systemic racism, sexism, sexual orientation, or access for people with disabilities, and anything connected to core civil rights policies, programs,

and activities may be considered illegal by this Administration without an investigation or other due process.

128. ~~122.~~ This is especially true because the Executive Orders provide no clear, objective standards for enforcement.  In the absence of any objective standards, the Executive Orders give the Trump Administration unfettered discretion to enforce the prohibitions against federal contractors and grantees, inviting arbitrariness and discrimination that is subject to the whims of the decisionmaker.

129.  The expansive, uncertain scope of the Executive Orders' terms have rendered the Executive Orders vague as applied to Plaintiffs by failing to provide them with fair notice of what speech or activities are prohibited.  This lack of guidance has caused Plaintiffs to spend countless hours trying to ascertain what the Executive Orders may or may not mean, and it has ultimately caused Plaintiffs to refrain from engaging in protected speech and activity in hopes of mitigating enforcement and related penalties.

130.  The Executive Orders are also vague as applied to Plaintiffs because the Orders have already invited arbitrary, selective action against Plaintiffs and their existing funding.  In particular, the Equity Termination Provision's directive to terminate all "equity-related" contracts is entirely unclear to Plaintiffs because it fails to define "equity-related," which has left Plaintiffs guessing at which of their grants or contracts are at risk, including: for NUL, the Urban Seniors Jobs Program grant from the DOL, the Project Ready Mentor grant from the DOJ, the Apprenticeships Building America grant from the DOL, the Urban Youth Pathways grant from the DOL, the Growth Opportunities grant from the DOL, the Urban Construction Jobs Program grant from the DOL, the Project Heartwood Youth Conservation Corporation grant from the USDA, and

the Comprehensive Housing Counsel grant from HUD; and, for AFC, the Continuum of Care Grant from HUD and the Housing Opportunities for Persons with AIDS grant from HUD.

131.    The lack of clarity and breadth of the Equity Termination Provision has authorized the government to take arbitrary adverse action against NUL, as evidenced by the termination of its EPA grant.    On May 1, 2025, the EPA terminated a grant in support of NUL's Urban Environmental Justice Collaborative Program.    The purpose of the Urban Environmental Justice Collaborative Program was similar to the central purpose of many of the grants listed above: to advance equity for marginalized communities.    This termination has heightened NUL's confusion and fears around which grants are at risk of being terminated for being equity-related.    This termination—coupled with the fact that on May 2, 2025, the Trump Administration targeted NUL as an example of a "leftist, DEI-promoting entity" in its "skinny budget" proposal—demonstrates that the Administration is using the Executive Orders to selectively target NUL for its protected speech and its views in support of DEIA.

132.    Additionally, the Certification Provision's requirement that contractors and grantees certify they do not "operate any programs promoting DEI" in violation of federal law is unclear to Plaintiffs, as the word "promote" is an unclear and expansive term, and the Executive Orders provide no guidance about what it means to "promote" DEI in a manner that violates federal law.

133.    Relatedly, the Promoting Gender Ideology Provision's failure to define "promote" in connection with its prohibition against the use of federal funds "to promote gender ideology" similarly leaves Plaintiffs without any way of knowing how to conform their conduct and operations to the requirements of the Anti-Gender Order.    The Enforcement Threat Provision and List Provision also create uncertainty for Plaintiffs, as the provisions direct officials to identify

organizations suspected of engaging in "discriminatory DEI" or "provid[ing] or advanc[ing] DEI, DEIA," but fail to define those terms.

134. ~~123.~~ The ~~vagueness~~uncertain meaning of the Executive Orders~~' prohibitions, and the lack of discernible standards by which to determine violations of the Orders, are demonstrated by communications that Plaintiffs have received from federal agencies directing them to cease and terminate work activities "associating with" or "promoting" DEI, without providing a definition of DEI. In particular, Defendant HUD advised Plaintiff NFHA that terms like "racial," "underserved," "affirmatively," "systemic," "adversely," "accessible," and "disparate," among others, may receive greater scrutiny because of their "conceptual relationship" with DEI.~~ has resulted in chilling of Plaintiffs' protected speech. For instance, to mitigate the risk of enforcement under the Anti-Gender Order's Promoting Gender Ideology Provision, AFC considered eliminating *all* public-facing content referencing diversity, equity, inclusion, and transgender health—an approach that would have effectively silenced its organizational voice on core issues. AFC ultimately decided to wall off its Policy and Communications departments from federally funded activities and explicitly label *all* policy communications as privately funded, in an effort to preserve both its speech and federal funding.

135. Despite these precautions, AFC continues to face a persistent threat that HUD or other agencies may cancel its contracts based on any allegation—substantiated or not—that the organization has violated the Executive Orders. The chilling effect on AFC's speech and programming remains ongoing and severe.

136. Following the issuance of the Executive Orders, AFC undertook a sustained and labor-intensive effort to analyze their content, scope, and potential applicability to its federally

funded programs.  Despite these extensive efforts, AFC has been unable to determine with any clarity what the Executive Orders require or prohibit.

137.  AFC's leadership team spent dozens of staff hours developing scenario plans, reviewing contract language, and debating whether it was possible to continue operating programs and publishing communications that acknowledged racial and gender disparities without running afoul of the Orders' prohibitions on "promoting DEI" or "gender ideology."  These efforts were detailed in internal presentations and slide decks prepared for organizational decision-making.

138.  Despite these efforts, AFC has been unable to obtain any guidance from HUD, HHS, or any other federal agency clarifying how to comply with the Executive Orders.  The federal government has issued no rules, definitions, FAQs, or interpretive materials to define key operative terms such as "illegal DEI," "gender ideology," or what it means to "promote" them.

139.  As a result of this ambiguity, AFC remains in a perpetual state of legal and operational uncertainty.  The organization is unable to determine whether continued collection of data about transgender clients, acknowledgement of racial disparities in health outcomes, or training on cultural humility and trauma-informed care may subject it to grant cancellation or enforcement action.

140.  The confusion created by the Executive Orders has caused AFC to question whether routine and previously mandated practices, such as tracking the gender identity of clients for HUD reporting, referring clients to transgender-affirming healthcare providers, or documenting discrimination based on gender identity, could now be construed as violations of federal contract terms.

141.  AFC has received conflicting directives:  for example, HUD requires continued reporting of client gender identity data for program monitoring, while simultaneously

incorporating contract language prohibiting the use of funds to "promote gender ideology." This contradiction has placed AFC in an impossible position, where either course of action—collecting or not collecting data—risks noncompliance.

142.  The lack of federal clarity has not only chilled AFC's speech and compromised its programming, but has also imposed a substantial opportunity cost.  Time that would otherwise have been spent on client care, policy advocacy, fundraising, or program development has instead been diverted toward decoding vague and contradictory Executive directives.

143.  The lack of federal guidance has exacerbated these harms.  In addition to the operational costs, AFC has had to significantly change a large number of their programs.  This is exemplified by AFC engaging in extensive editing of its Annual Report excising terms and ideas core to their mission for fear of violating the executive orders.

144.  Because of the Executive Orders, NUL leadership has similarly spent dozens of hours navigating tensions between its commitment to deploying diversity, equity, inclusion, and accessibility in aiding vulnerable communities, and the fear of being subjected to the Equity Termination Provision.

145.  NUL has already been chilled by the vagueness of the Orders.  On February 12, 2025, the Department of Labor emailed NUL and directed the organization not to address the "equity portion of the question" in Section IV of its Quarterly Grant Narrative Report.  On information and belief, this request was made in connection with DOL's implementation of the Equity Termination Provision.  Since then, NUL has stopped addressing everything that could be considered "equity" in any of its quarterly reporting in an effort to mitigate the risk of enforcement under the Equity Termination Provision.

146.   NUL has further been chilled by the Report Provision and List Provision, which threaten to make NUL a potential target of government investigations for engaging in undefined DEIA-related programming—whatever the government means by "discriminatory DEI" or practices that "promote or advance DEI."

147.   NUL's concerns about retribution in connection with the Report and List Provisions is further reasonable, in view of the Trump Administration's May 2, 2025 targeting of NUL as an example of a "leftist, DEI-promoting entity" in its "skinny budget" proposal.  This revealed that NUL is already on the Administration's radar for holding viewpoints on DEIA that are contrary to the President's viewpoints and agenda.

148.   To date, despite months of diligent effort, Plaintiffs have been unable to resolve the ambiguities in the Executive Orders and remain at risk of losing essential funding due to enforcement actions premised on interpretations of undefined terms and undisclosed compliance standards.

149.   ~~124.  Despite being vague,~~Compounding the chilling effect on Plaintiffs' speech is the fact that the Executive Orders ~~include~~impose a range of serious penalties for non-compliance with their vague demands, including cancellation of existing contracts and grants, loss of eligibility for future government contracts and grants, and potential civil investigations, regulatory actions, and~~/or~~ litigation. ~~Thus, the vagueness of the Executive Orders' terms exacerbates the censorship of Plaintiffs' speech activities by producing an even greater chilling effect.~~

150.   ~~125. Because the~~Plaintiffs are harmed by the vagueness of the Executive Orders because their provision of ~~effective and comprehensive~~ housing and health care services, support, education, and advocacy for people of color, women, LGBTQ people, and ~~people living~~individuals with HIV necessarily requires education and awareness of the historical and ongoing inequities

resulting from~~, among other things,~~ a person's race, ethnicity, sex, gender identity, and/or disability, yet Plaintiffs have no way to discern how to differentiate between the acceptable provision of services in furtherance of their mission and the unacceptable "operation ~~and promotion~~ of ~~DEI"~~ programs ~~and activities or unacceptable promotion of ""~~advanc[ing] DEI," "promoting DEI," or "promoting gender ideology."

### ~~V. THE EXECUTIVE ORDERS CHILL AND CENSOR PLAINTIFFS' SPEECH AND VIEWPOINTS.~~

### H.     The Executive Orders Restrict and Chill Plaintiffs' Speech and Viewpoints.

151. ~~126.~~ The Executive Orders threaten a range of ~~adverse consequences~~penalties against Plaintiffs for engaging in speech or expression about diversity, equity, inclusion, accessibility, and transgender people that the Trump Administration disfavors, including but not limited to terminating their grant funding, cancelling their contracts, and threatening civil enforcement actions and lawsuits.  The net result intended by the Executive Orders is an impermissible chilling of Plaintiffs' protected speech.  Each Plaintiff has been significantly harmed in this way.

~~127. Sections 1 and 2(a) of the Anti-Diversity1 Order make clear that the Trump Administration will end funding to organizations like Plaintiffs who express views with which the Administration disagrees about topics such as race, sex, gender, and various concepts that it characterizes as DEIA or DEIA related, even if that speech occurs apart from a government contract or grant program.  For example, Section 3(b)(iv)(B) of the Anti-Diversity2 Order directs agencies to require every federal contractor or grantee to certify, as a condition for receiving funding, that they do not "operate any programs promoting DEI" (emphasis added).~~

152. NUL has been chilled from collecting and sharing information about equity by the Equity Termination Provision and the Diversity Termination Provision.  As noted above, NUL did

not address equity in any of its quarterly grant reporting after, on February 12, 2025, DOL expressly instructed NUL not to address the "equity portion of the question" in Section IV of its Quarterly Narrative Report.

153.  AFC has also been chilled from sharing information by the Equity Termination Provision and the Diversity Termination Provision.  In fear of having its funding terminated due to the restriction on equity-related activity, AFC has changed specific language used in its Annual Report.  It removed language about funding to "Black-led organizations" and replaced it with language about funding to "organizations primarily on the south and west sides" of Chicago.

154.  Likewise, AFC has been chilled from providing appropriate supportive housing by the Anti-Gender Order's Promoting Gender Ideology Provision.  In April 2025, HUD issued AFC a renewed $2.5 million Continuum of Care grant contract that incorporated provisions from Executive Orders 14151 and 14168, the Anti-Diversity1 Order and the Anti-Gender Order. Specifically, the contract stated that AFC "shall not use funds to promote 'gender ideology,' as defined in E.O. 14168."  In response to the new contractual language, AFC was forced to engage in extensive internal deliberations regarding its communications and programming.  Senior leadership and the Board of Directors convened to assess whether AFC could continue to publicly discuss issues of race, gender identity, and LGBTQ health disparities without risking loss of this federal funding. AFC leadership documented that these deliberations caused significant internal distress and operational disruption, and consumed substantial organizational time and resources.

155.  AFC also participates as a subgrantee under a Special Project of National Significance (SPNS) funded by HHS's Health Resources and Services Administration ("HRSA"), known as the SURE Housing Program.  On February 13, 2025, HRSA instructed that, in response to the Anti-Gender Order, AFC must (a) replace the term "gender" with "sex" in program materials;

(b) remove all references to "gender-affirming care," and (c) change the term "LGBTQIA" to "LBG."  AFC was later told to remove all references to "gender identity" from required client questionnaires and chart review forms "due to federal executive orders."  These directives included eliminating questions related to gender identity and hormone therapy, censoring important aspects of transgender healthcare and service delivery.

156.   Additionally, in May of 2025, HUD altered a required narrative reporting form used by AFC to eliminate language referencing equity and to remove a question about how grantees promote cultural humility and equitable access in program delivery.  These changes were implemented without explanation, and AFC believes they reflect HUD's effort to align with the Executive Orders' restrictions on so-called "illegal DEI" and "gender ideology."

157.   Around the same time, in a slide presentation shared through the Chicago Continuum of Care (CoC), HUD staff indicated that it would further revise data collection requirements for grantees like AFC in Fall 2025.  Specifically, HUD announced its intent to remove questions relating to transgender identity and replace the sex/gender question with a binary "male/female" option, eliminating any option to reflect the lived experiences of transgender, nonbinary, or gender nonconforming individuals.  These imposed changes have forced AFC to erase essential data about the health experiences of transgender clients, directly contradicting best practices in public health and HIV care and contract requirements.  AFC leadership determined that these changes compromised the organization's ability to provide culturally competent care and undermined data collection needed for effective program evaluation.

158.   The language of the Executive Orders and their implementation by Defendants illustrate that the Orders were plainly designed to target, punish, intimidate, and silence

organizations with viewpoints contrary to those of the Administration on issues of racial and gender justice.

159. 128. Each of the The Executive Orders contain provisions purporting to cancel federal contracts and grants that relate, in any way, to viewpoints that the Trump Administration opposes.  For example, Section 2(b)(i) of the Anti-Diversity1 Order directs executive branch officials to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts."  Section 3(e) of the Anti-Gender Order directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," and Section 3(g) provides that "[f]ederal funds shall not be used to promote gender ideology."  Section 3(e)(iii) of the Anti-Diversity2 Order directs the OMB director to "explicitly call for denying funding to those organizations on the opposite sides of the racial and gender justice issues from that preferred by the Administration. For example,  The Equity Termination Provision directs officials to terminate all "equity related" grants and contracts, "[e]xcise references to DEI and DEIA principles" from "contracts" and "grants," and "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making decision making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities."

129. These provisions effectively force Plaintiffs to either silence their speech and viewpoints relating to issues that are of great societal importance and central to Plaintiffs' missions, even outside of the government contract or grant program, or to forgo federal funding. That choice is nearly an impossible one: while Plaintiffs cannot perform their work without addressing views and ongoing concerns related to the communities they serve, they also rely on federal funding to do that work.  For example, part of NFHA's work is to promote integrated inclusive communities, which they do by promoting fair housing and educating people about the

importance of fair housing opportunities.  Thus, the Executive Orders place Plaintiffs, like NFHA, in an untenable bind that can result in a chilling effect of their speech and viewpoints.

130.  The penalties that the Orders threaten also go beyond loss of funding.  The Anti-Diversity2 Order invokes the False Claims Act ("FCA")[59] and its harsh treatment of "material" false statements to the government.[60] Section 3(b)(iv)(A) of the Anti-Diversity2 Order requires that, "for purposes of section 3729(b)(4) of title 31, United States Code," contractors and grantees agree that compliance with the Administration's understanding of applicable Federal anti-discrimination law is "material" to the government's payment decisions.  By invoking the FCA, the Anti-Diversity2 Order exposes Plaintiffs to private lawsuits, government prosecution, and stiff penalties of up to three times the amount of the government's damages.[61]

160.  Similarly, the Gender Funding Termination Provision directs agencies to take "all necessary steps, as permitted by law, to end the Federal funding of gender ideology," and provides that "federal funds shall not be used to promote gender ideology," while directing that each agency "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."

161.  On information and belief, based directly on these provisions, federal agencies have already frozen or terminated numerous funding sources for organizations similarly situated to Plaintiffs (and with respect to Plaintiffs, EPA has terminated one of NUL's grants), and agencies have promulgated additional regulations that threaten Plaintiffs' funding.  The agencies' actions reveal that the purpose of the challenged Executive Orders is to target disfavored speech, not merely to curb actions that violate federal law.

---

[59] 31 U.S.C. §§ 3729–33.
[60] *Id.* § 3729(1)(a)(B).
[61] *Id.* §§ 3729(1), 3730.

162.   The Administration's actions with respect to the challenged Executive Orders were not consistent with congressional intent in appropriating funds or as necessary to enforce federal law.  In none of those cases did the Administration suggest that canceling contracts based on words on a website was consistent with congressional intent, nor could it—indeed, it is likely inconsistent with congressional intent, as fulfilment of many equity-related grants would require the use of equity-related terms—and it is clearly not illegal to use such words.  Instead, the Administration has used the Executive Orders to deny funds to punish and dissuade future use of words and terms it does not like.

163.   As is demonstrated by the Administration's cancelation of contracts and grants based on searches for "offending" words on websites and social media, whether or not the use of such words was tied to grant money, the Administration seeks to use denial of federal funds to punish and coerce speech unrelated to the funding itself.

164.   This attempt to silence non–federally funded speech is also apparent from the Certification Provision of the Anti-Diversity2 Order, which requires federal grantees to "certify" that they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and "agree" that "compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes" of the False Claims Act.

165.   131. The chilling effect~~language~~ of the Executive Orders is magnified by their provisions directing officials to affirmatively identify private individuals and organizations suspected of opposing the Administration's views.  As part of a plan to "deter DEI programs or principles," Section 4(b)(iii) directs each agency to make a list of "up to nine" private entities whose use of "DEI programs or principles" makes them potential targets of investigation.  Section

2(b)(ii) of the Anti-Diversity1 Order directs agency, department, and commission heads to provide the Director of OMB with a "list" of contractors "who have provided DEI training or DEI training materials to agency or department employees" and grantees "who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities" in the last four years. Section 7(a)(ii) of the Anti-Gender Order directs agency heads to report to the President on requirements the agency has imposed on "contractors" "to achieve the policy of the order," thus suggesting other, unspecified agency tracking of—and action concerning—contractors and grantees like Plaintiffs. themselves, as well as agency actions interpreting the Executive Orders, makes plain that, from the perspective of the Administration, even *plainly legal* attempts to discuss and promote racial and gender justice will likely be characterized as violating federal law for this purpose. The plain text of the Anti-Diversity1 Order, for example, which discusses "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," makes clear that the Administration considers all "DEI" and "DEIA"—however they decide to define those terms—to be "illegal." Anti-Diversity1 Order § 1. Relatedly, as evidenced by Administration officials freezing funds and canceling contracts based merely on the results of word searches on the internet, the Administration considers the use of terms aligned with racial and gender justice to run afoul of the Executive Orders, even though they purport to concern themselves with combating only "illegal DEIA."

166. The DOJ's recent announcements bolster this expansive reading of the Orders. On May 19, 2025, the Department of Justice announced the establishment of the Civil Rights Fraud Initiative to enforce the Anti-Diversity Executive Orders. The DOJ memorandum and related press release announced an intent to "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates federal civil rights

laws," which seemingly includes "public institutions [that] codify inherently divisive policies like DEI" and is not limited to those that use federal funds for that purpose.  Further, on June 11, 2025, the recently confirmed Assistant Attorney General for the Civil Division at DOJ, Brett Shumate, issued a memorandum directing the Civil Division lawyers to prioritize investigations and enforcement actions "combatting discriminatory policies and practices."  The memo makes clear that "combatting discriminatory policies and practices" means going after what the Trump Administration considers to be "illegal private-sector DEI preferences, mandates, policies, programs, and activities."[53]

167.    The launch of the Civil Rights Frauds Initiative and Shumate's memorandum have heightened Plaintiffs' fears, intensified the chilling effect, and made that chilling even more reasonable.

168.    The requirement in the Anti-Diversity2 Order's Certification Provision that Plaintiffs certify that they do not "operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" is thus functionally a requirement that Plaintiffs certify that they do not engage in any kind of speech or activity—even with funding that does not come from the government—that the Administration could possibly interpret as related to advancing racial or gender justice.  The choice for Plaintiffs is, therefore, to completely abandon speech central to their missions or else risk future civil penalties.

169.    The Executive Orders also contain multiple provisions calculated to intimidate Plaintiffs and other organizations into abandoning such core speech by threatening to place them on a list or in a report that would likely lead to future civil penalties and/or future economic reprisal

---

[53] Office of the Assistant Attorney General, Memorandum to All Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025).

or hostility.  First, the List Provision of Anti-Diversity1 Order directs officials to provide the director of OMB with "list of all . . . federal grantees who received funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." Second, the Report Provision of Anti-Diversity2 Order directs the Attorney General or the Department of Justice to work with Administration officials to submit a report with "recommendations" to end DEI in the "private sector" and asks officials to compile a list identifying "[t]he most egregious and discriminatory DEI practitioners in each sector of concern" and a plan of action to "deter DEI programs or principles."  Anti-Diversity2 Order § 4(b).

170.  Given the language of the Executive Orders, actions taken by members of the Administration pursuant to the orders, and the current political climate, Plaintiffs reasonably believe that they will be harmed by placement on such a list or report and that the threat of such placement is calculated to intimidate Plaintiffs into abandoning speech and activity that is core to their missions.

171.  In the context of the Orders, which threaten loss of federal funding and potential liability under the False Claims Act for anyone advancing viewpoints on DEIA with which the Administration disagrees, the risk of funding loss or civil penalties is obvious.  Subsequent agency action makes the danger more apparent and disturbing—the May 19, 2025, DOJ memorandum and press release, for example, not only threaten investigation and prosecution, but also "strongly encourage[]" members of the public to file qui tam actions under the False Claims Act against federal funding recipients engaging in "discrimination," which they equate with "inherently divisive policies like DEI."

172.  Moreover, irrespective of these threats of funding loss or FCA liability, the charged and divisive nature of the issue as it has been framed by the Administration creates an environment

in which being listed as one of "[t]he most egregious and discriminatory DEI practitioners" will very likely lead to harassment, hostility, or reprisal from members of the public who agree with Trump's view on matters of racial justice.

132. The threat of these lists has an enormous deterrent effect on speech. Individuals and organizations, including Plaintiffs, are concerned that speaking in public or in private will place them at risk of being placed on these lists. And if Plaintiffs are placed on these lists, they will be further deterred—either directly by subsequent adverse government action or indirectly through negative consequences such as reputational harms. Moreover, the Executive Orders do not make clear whether such lists will be made public. If so, the lists would invite targeted harassment, hostility, and threats by members of the public.

**I.** ~~**VI. THE EXECUTIVE ORDERS INJURE PLAINTIFFS**~~**The Executive Orders Are Discriminatory.**

133. Plaintiffs NUL, NFHA, and AFC advance equal opportunity and elevate the standard of living for historically marginalized communities, with a particular focus on access to jobs, housing, healthcare, and education, among other essential needs. Collectively, Plaintiffs' day-to-day work and organizational missions advance our civil rights laws, promote the equal rights of people of color, women, LGBTQ people, and people with disabilities, and combat the HIV/AIDS epidemic.

173. During the early days of his second administration, President Trump devoted substantial federal resources to attacking and eliminating DEIA programs, which had been implemented in response to the country's increased focus on diversity, equity, inclusion, and accessibility in the aftermath of George Floyd's killing and the ensuing mass demonstrations against anti-Black racism. That discriminatory sentiment—to oppose efforts to eradicate systemic

racial discrimination suffered by Black people in the United States— motivated the issuance of the Anti-Diversity1 and Anti-Diversity2 Orders.

174.   In May 2020, the world watched in horror as video footage showed George Floyd cry for help and ultimately die while former Officer Derek Chauvin kneeled on his neck.  In the weeks following George Floyd's killing, 15–26 million people in 4,700 demonstrations across the United States protested against anti-Black racism and police violence.[54]   Outrage spread worldwide, as tens of thousands of protesters marched against structural racism in cities across the globe.  At the height of the largest movement, half a million people in the United States marched in 550 locations on a single day—June 6, 2020.[55]  In addition, over 170 Confederate symbols— which have long been associated with the enslavement of Black people in the United States—were removed from public spaces or renamed.[56]

175.  Public acknowledgment of anti-Black racism and the urgent need to remedy its ongoing harms proliferated in the private sector.  Professional sports associations like the National Football League and NASCAR voiced their support for Black Lives Matter[57] and the need to

---

[54] John Eligon, *Black Lives Matter Has Grown More Powerful, and More Divided*, N.Y. Times (June 4, 2021), https://www.nytimes.com/2021/06/04/us/black-lives-matter.html.

[55] Larry Buchanan *et al.*, *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. Times (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

[56] Damien Cave et al., *Huge Crowds Around the Globe March in Solidarity Against Police Brutality*, N.Y. Times (June 9, 2020), https://www.nytimes.com/2020/06/06/world/george-floyd-global-protests.html; *see also* Alan Taylor, *The Statues Brought Down Since the George Floyd Protests Began*, The Atlantic (July 2, 2020), https://www.theatlantic.com/photo/2020/07/photos-statues-removed-george-floyd-protests-began/613774/.

[57] Tonya Pendleton, *NASCAR Stands for 'Black Lives Matter' in Video*, The Grio (June 8, 2020), https://thegrio.com/2020/06/08/nascar-black-lives-matter/; Mark Maske and Adam Kilgore, *What made Roger Goodell say 'Black Lives Matter' and where it leaves the NFL*, Wash. Post (June 6, 2020), https://www.washingtonpost.com/sports/2020/06/06/roger-goodell-black-lives-matter/.

remedy anti-Black racism nationwide. Numerous corporations expressed support for racial justice protesters, their own Black employees, and the Black community writ large, as well as the urgent need to eradicate racism.[58] In the midst of this climate, jobs related to the pursuit of DEIA rose by 55% between June and August 2020.

176. President Trump made clear he disdained efforts to eliminate anti-Black racism. On July 3, 2020, in response to protests against monuments of men who enslaved Black people, President Trump signed an Executive Order to re-erect monuments of these men in a National Garden of American Heroes.[59] On September 17, 2020, President Trump hosted the inaugural White House Conference on American History, where he maligned Critical Race Theory and *The 1619 Project*—the *New York Times*'s historical account of American slavery and the contributions of Black Americans—as "crusade[s] against American history," "toxic propaganda," and "ideological poison that, if not removed, [would] . . . destroy our country."[60] During his remarks, President Trump explained that this was why he "banned trainings in this prejudiced ideology from the Federal Government and banned it in the strongest manner possible."

177. Three days later, on September 22, 2020, President Trump issued an Executive Order titled "Executive Order on Combating Race and Sex Stereotyping" ("EO 13950"), which prohibited federal contractors and grantees from engaging in certain speech activities related to what the Executive Order labeled "divisive concepts."[61] Many of the so-called "divisive concepts" pertained to systemic race and gender inequalities and/or efforts to acknowledge and remedy them.

[58] Tiffany Hsu, *Corporate Voices Get Behind 'Black Lives Matter' Cause*, N.Y. Times (May 31, 2020), https://www.nytimes.com/2020/05/31/business/media/companies-marketing-black-lives-matter-george-floyd.html.

[59] Exec. Order No. 13934, 85 Fed. Reg. 41165 (2020).

[60] *Remarks by Donald J. Trump at a White House Conference on American History* (Sept. 17, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000691/pdf/DCPD-202000691.pdf.

[61] Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020).

178.   As President Trump explained in a tweet, "A few weeks ago, I BANNED efforts to indoctrinate government employees with divisive and harmful sex and race-based ideologies. Today, I've expanded that ban to people and companies that do business . . . with our Country, the United States Military, Government Contractors, and Grantees.  Americans should be taught to take PRIDE in our Great Country, and if you don't, there's nothing in it for you!"[62]

179.   When issuing EO 13950, President Trump presented an inaccurate narrative of American history that minimized the outsized role of slavery, Jim Crow laws, and white supremacy in the United States, thereby minimizing the ongoing harms and disadvantages to Black people that remain unremedied.  For example, in refusing to acknowledge the significant role of slavery and white supremacy in the founding of the United States, EO 13950 pronounced that it was the "belief in the inherent equality of every individual that inspired the Founding generation to risk their lives, their fortunes, and their sacred honor to establish a new Nation . . . ."[63]  This ahistorical narrative continued in EO 13950's assertion that the "racialized views of America" that "were soundly defeated on the blood-stained battlefields of the Civil War" were likewise "rejected" by our "Founding documents."  *Id.*

180.   On October 8, 2020, in a sweeping action expanding the reach of EO 13950, Assistant Attorney General Lee Lofthus ordered DOJ leaders to suspend not only DEIA trainings, but also any related "programs, activities, and events."[64]  A week later, during the first debate for

---

[62] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539918075883523; Donald J. Trump (@realDonaldTrump), Twitter (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539921829781504.
[63] Exec. Order No. 13950 § 1.
[64] Katie Benner, *Justice Dept. Suspends All Diversity and Inclusion Training for Staff*, N.Y. Times (Oct. 9, 2020), https://www.nytimes.com/2020/10/09/us/politics/justice-department-diversity-training.html.

the 2020 presidential elections, President Trump was asked why he ended "racial sensitivity training that addresses white privilege or Critical Race Theory," and he responded, "I ended it because it's racist . . . [t]hey were teaching people to hate our country, and I'm not going to . . . allow that to happen."[65]

181.   Only two months after President Trump issued EO 13950, a federal district court, in *Santa Cruz Lesbian and Gay Community Center v. Trump*, enjoined its enforcement, concluding that the plaintiffs were likely to succeed in showing that it violated their rights to free speech under the First Amendment and due process under the Fifth Amendment.  *See* 508 F. Supp. 3d 521 (N.D. Cal. 2020).  The plaintiffs in *Santa Cruz* were federal contractors and grantees, including AFC, who were at risk of losing federal funding because their mission-driven work required them to engage in speech and expression acknowledging that race and gender inequalities created barriers to accessing quality healthcare services for people of color and LGBTQ individuals.

182.   Multiple federal courts have found state laws with prohibitions that are similar to EO 13950 violative of the First Amendment and/or the Fourteenth Amendment's Due Process Clause.[66]  Upon information and belief, no federal court has affirmed the legality of state governmental restrictions similar to EO 13950.

---

[65] PBS NewsHour, *WATCH: Biden Urges Unity to 'Defeat Racism'; Trump Decries Racial Sensitivity Training*, YouTube (Sept. 29, 2020), https://www.youtube.com/watch?v=pqGyzLjXfjo.

[66] *See, e.g., Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159 (N.D. Fla. 2022), *aff'd*, 94 F.4th 1272 (11th Cir. 2024); *Pernell v. Fla. Bd. of Governors of the State Univ. System*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), *appeal docketed, Pernell v. Lamb*, No. 22-13992 (11th Cir. 2023); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136 (W.D. Okla. 2024), *appeal docketed*, No. 24-6139 (10th Cir. 2024); *Local 8027, AFT-N.H., AFL-CIO v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024), *appeal docketed*, No. 24-1690 (1st Cir. 2024).

183.   President Trump continued to condemn "diversity, equity, and inclusion" programs and activities during his campaign for a second term in office.  For example, on December 21, 2024, at Turning Point's AmericaFest 2024 conference, President Trump stated, "I'll end all of the Marxist diversity, equity, and inclusion policies across the entire federal government immediately. And at the same time, we will ban these unlawful policies from . . . the private sector as well."[67]

184.   Contrary to President Trump's characterization of DEIA policies as "illegal," federal agencies have affirmed their legality.  For example, 2006 guidance from the U.S. Equal Employment Opportunity Commission (which remained in effect during President Trump's first administration) states that "Title VII permits diversity efforts designed to open up opportunities to everyone."[68]  Moreover, in January 2023, the U.S. Department of Education issued guidance stating that "[a]ctivities intended, in whole or in part, to further objectives such as diversity, equity, accessibility, and inclusion are not generally or categorically prohibited under Title VI."[69]

185.   President Trump issued the challenged Executive Orders during the first week of his second administration—some on his very first day.  By issuing the Anti-Diversity1 and Anti-Diversity2 Orders, President Trump effectuated his long-held intent to eradicate policies and programs—many initiated in response to George Floyd's killing and the ensuing racial justice demonstrations—that aim to dismantle longstanding inequalities for Black people.

---

[67] *Trump Remarks at Turning Point's AmericaFest 2024 (Transcript)*, Sinju Post (Dec. 23, 2024), https://singjupost.com/trump-remarks-at-turning-points-americafest-2024-transcript/?singlepage=1.

[68] U.S. Equal Emp. Opportunity Comm'n Directives Transmittal No. 915.003, *Compliance Manual Section 15: Race and Color Discrimination* 15-31 (Apr. 19, 2006), https://www.eeoc.gov/sites/default/files/migrated_files/policy/docs/race-color.pdf.

[69] Office for Civil Rights, U.S. Dep't of Educ., *Fact Sheet: Diversity & Inclusion Activities Under Title VI 1* (Jan. 2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocr-factsheet-tvi-dia-202301.pdf?utm_content=&utm_name=&utm_term=.

186.  DEIA has been used often as a proxy for race, and the contention that DEIA results in "racial preferences" for "unqualified" people is a common trope to disparage Black candidates. Thus, the false presumption that DEIA and merit are mutually exclusive perpetuates pernicious racial stereotypes of Black people that have been used to justify their exclusion and underrepresentation.

187.  The false assumption that Black people lack merit fails to acknowledge the present-day discrimination that prevents qualified Black candidates from having equal opportunities—a form of racial discrimination that is well-documented.  For example, from 2019 to 2021, researchers sent 80,000 resumes to apply for 10,000 jobs using resumes with equivalent qualifications, but applicants' names were changed to suggest that they were white or Black, and male or female.[70]  The research found that several companies asked to interview applicants with Black or female names significantly less frequently than applicants with white or male names with equivalent qualifications.  Even increasing the qualifications of the Black applicants to be more meritorious than the white applicants did not help—they were still less likely to be called back than less-qualified white applicants.[71]

188.  The racially biased stereotype of Black people being unqualified and lacking merit is reflected in the Anti-Diversity2 Order's official title: "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."  The Order perpetuates this stereotype by stating, "Illegal DEI and DEIA . . . deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-

---

[70] Claire Cain Miller & Josh Katz, *What Researchers Discovered When They Sent 80,000 Fake Resumes to U.S. Jobs*, N.Y. Times (Apr. 8, 2024), https://www.nytimes.com/2024/04/08/upshot/employment-discrimination-fake-resumes.html?searchResultPosition=1.

[71] *Id.*

based spoils system.  Hardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex."[72]

189.  By inaccurately concluding that DEIA denies "merit-based opportunities," the Anti-Diversity2 Order refuses to acknowledge barriers to opportunities for Black people that have no bearing on their qualifications or merit.  The Trump Administration starts from the false premise that there are no existing racial inequalities.  With this false premise in place, it characterizes as discriminatory any effort to mitigate the racial inequalities that exist through DEIA.

190.  While the Anti-Diversity1 and Anti-Diversity2 Orders claim to be enforcing federal civil rights and anti-discrimination laws—and thus barring "illegal" DEIA, that claim does not mitigate the Orders' intent to discriminate; rather, it amplifies it.  In addition to taking substantial departures from the usual procedures to issue executive orders, *see supra* Section C, the Anti-Diversity1 and Anti-Diversity2 Orders take the unusual stance of presuming—without evidence—the illegality of DEIA programs and circumventing the normal process of investigating and litigating claims of civil rights violations.

191.  It is the greatest irony that Black people, for whom many of our anti-discrimination laws were enacted to benefit, have the heavy burden of actually *proving* racial discrimination, despite irrefutable evidence that racial inequalities persist in virtually every sector of American life.  Yet, the Trump Administration *presumes* racial discrimination against white people and is using the power and resources of the federal government to launch a full-scale assault on DEIA—not only within federal agencies, but throughout the private sector as well.

192.  Notably, the Executive Orders and subsequent DOJ memoranda contemplate possible investigations—both civil and criminal—of DEIA.  Upon information and belief, the

---

[72] Anti-Diversity2 Order § 1.

Trump Administration has not issued similar plans to use comparable federal resources to investigate and prosecute racial discrimination against Black people or other people of color.

193.   The Anti-Diversity1 Order's rescission of Executive Order No. 11246 further demonstrates the Trump Administration's disregard of, and hostility toward, proactive efforts to eradicate racial inequalities.  In 1965, during the height of the Civil Rights Movement, President Lyndon B. Johnson issued Executive Order No. 11246 to prohibit employment discrimination based on race, color, religion, and national origin by recipients of federal contracts and subcontracts and required affirmative action programs.  Issued in the wake of the passage of Title VII of the Civil Rights Act of 1964, Executive Order No. 11246 intended to address entrenched and rampant unemployment and income inequality that disproportionately harmed Black people, as well as people of other racial, ethnic, religious, and national origin groups in the United States.[73]

194.   President Trump rescinded Executive Order No. 11246 despite stark evidence of persistent inequality in employment opportunities based on race.  By rescinding this longstanding executive order, President Trump signaled his intent to prevent targeted efforts to help workers, who are underrepresented due to persistent discrimination and other unfair barriers, access equal employment opportunities.  That intent is embodied in the Anti-Diversity1 and Anti-Diversity2 Orders.

195.   The Anti-Diversity1 and Anti-Diversity2 Orders' disproportionate harm to Black people and other people of color is evident from Plaintiffs' injuries.  All of Plaintiffs' mission-driven work benefits Black people and other people of color, who are disproportionately harmed by the racial wealth and income gap, lack of access to fair and adequate housing, and the

---

[73] Heather Timmons, *Why LBJ signed executive order 11246 that Trump rescinded*, Reuters (Jan. 23, 2025), https://www.reuters.com/world/us/why-president-johnson-signed-executive-order-1965-that-trump-rescinded-2025-01-23/.

HIV/AIDS epidemic.  *See supra* Section J.  By delegitimizing DEIA efforts to help Black people and other people of color, and rendering those efforts illegal, the Anti-Diversity1 and Anti-Diversity2 Orders necessarily harm them.

196.   While the Anti-Diversity1 and Anti-Diversity2 Orders were issued with the intent to discriminate against Black people on the basis of race, the functional operation of the Orders classifies benefits and harms by race and sex so that all people of color, as well as women and LGBTQ people, are harmed by their prohibitions.  As "DEI" has become a term used pejoratively by President Trump and his Administration, it has morphed into a term signifying association with racial minorities and women.  At a minimum, the Anti-Diversity1 and Anti-Diversity2 Orders were crafted to disproportionately benefit people of a particular race (white people) while disproportionately harming people of other races (Black people, Indigenous people, Latino people, and Asian American people, among others).  The Anti-Diversity1 and Anti-Diversity2 Orders also disproportionately benefit people of a particular sex, sexual orientation, and gender identity (men, cisgender people, and heterosexual people), while disproportionately harming people of other sexes, sexual orientations, and gender identities (women, transgender people, lesbian, and gay people).

197.   People harmed by the Anti-Diversity1 and Anti-Diversity2 Orders—people of color, women, and LGBTQ people—are the same people who face discrimination and other unfair disadvantages that prevent them from having equal opportunities.  The Orders, therefore, aim to eliminate policies, programs, and activities that aim to benefit people of color, women, and LGBTQ people by increasing their diversity and inclusion in the workforce, housing, and healthcare, remedying the inequity of any unfair barriers to their access to resources or opportunities, and ensuring their full inclusion in economic and educational spaces.

198.  Finally, the Anti-Gender Order's express terms, which seek to erase and remove transgender people from public life, *see supra* Section C.3, unequivocally establish sex-based discrimination and unlawful animus.

**J.    The Executive Orders Injure Plaintiffs.**

199.  ~~134. Plaintiffs proudly embrace the principles of DEIA through words and deeds, and they condemn any discriminatory act that violates the civil rights of anyone, regardless of who they are.  Plaintiffs also firmly support and embrace the dignity and humanity of transgender people.~~  The Executive Orders deprive Plaintiffs of the ability to continue performing work central to their organizational missions, deprive them of scarce financial resources, and jeopardize ~~Plaintiffs'~~their ability to provide desperately needed services.

**1.    ~~A.~~The Executive Orders and Related Agency Actions ~~Irreparably Harm NUL~~Have Already Harmed, and Continue to Harm, NUL and the Communities NUL Serves.**

200.  ~~135.~~NUL was founded over ~~one hundred~~one hundred years ago as a social services organization with the goal of improving economic and social conditions for Black Americans. Under its first director, George Haynes, NUL led the charge to help Black migrants find success in cities by providing counseling, reading and writing classes, and childcare for workers, and by encouraging employers across the country to hire Black Americans.  During the 1930s and 1940s, NUL continued to improve access to housing and employment opportunities for Black Americans and advocated for federal anti-discrimination policies in the areas of housing, health, and welfare. In the 1960s, NUL supported the March on Washington and was a key player in the advocacy that led to the Civil Rights Act of 1964.  Thus, addressing inequities experienced by Black people and combatting anti-Black racism have always been central to NUL's mission.

201.  ~~136.~~Over sixty years after passage of the Civil Rights Act of 1964, the fight for racial equality is far from over.  For example, in 2000, Black men earned 75 cents for every dollar

earned by white men; by 2024, this figure had decreased to 71 cents.  Similarly, in 2024, Black women made 84 cents for every dollar earned by white women, slightly less than the 86 cents per dollar earned in 2000.  Black people remain relegated to lower wage jobs and less lucrative industries compared to white people with similar levels of education.[62][74]  The most common occupation for white workers in 2019 was in management (at a median hourly wage of $32.69), while Black workers were most commonly employed as cashiers (at a median hourly wage of $9.62).[63][75]  Black workers also face higher unemployment rates ~~and lower wages~~ than white workers.[64][76]

202. ~~137.~~ Given these persisting inequities, NUL's present-day economic justice programming and advocacy remain critical.  One of NUL's central objectives is for every American to have access to ~~jobs~~a job with a living wage and good benefits.  Thus, NUL, in partnership with staff at the local affiliates, manages direct services programs across several key areas: education and youth development, jobs and workforce, entrepreneurship, housing, and health.

~~138. NUL relies on federal funding to administer these community-centered programs. Since 1973, NUL has consistently received federal funds to combat inequality, and has consistently used those funds to provide direct services and technical assistance to communities of color. NUL currently has 19 individual active federal grants, totaling $62 million and comprising 35% of NUL's annual budget. NUL also intends to apply for federal funding in the future, which is necessary for the continued viability of its programs.~~

---

[62][74] *Id.*

[63][75] *See* Rebecca Dixon & Amy M. Traub, *Desegregating Opportunity: Why Uprooting Occupational Segregation is Critical to Building a Good-Jobs Economy,* ~~NELP~~Nat'l Emp. Law Project (May 2024), https://www.nelp.org/app/uploads/2024/05/Desegregating-Opportunity-May-2024.pdf.

[64][76] *Id.*

203. ~~139.~~ NUL's federal grants come from several agencies, including the DOL, the CDC, HUD, the DOJ, the DOC, the EPA, and the USDA.  NUL won almost all of its current federal grants through a rigorous and competitive Request for Proposals process.  Some of these federal ~~funds~~grants are statutorily authorized by~~, *inter alia*,~~ the Housing and Urban Development Act of 1968 and the Older Americans Act of 1965, which include requirements that some agency staff ~~may~~ believe may fall within the Executive Orders' rubric of DEIA.

~~140. Principles of DEIA are plainly woven into, and highlighted by, every aspect of NUL's programming, including its federally funded work.  In fact, a commitment to these principles is central to NUL's mission.  NUL believes that representation is necessary to combat inequities in education, wages, healthcare, housing, and the criminal legal system, among other things. Importantly, NUL advocates not only for the advancement of Black people and other people of color, but also for the full equality of people with multiple marginalized identities, including LGBTQ people and people living with disabilities.  For years, NUL has publicly supported the LGBTQ community and condemned violence, hate, and discrimination against transgender people.~~

204. ~~141. Although NUL willingly serves anyone~~NUL's services are available to all people, regardless of race or gender~~, the communities most served by NUL's programs are~~. Historically, those who have sought out NUL's services are often people of color, especially Black people, because of ongoing systemic inequalities.  These inequalities demand the inclusion of DEIA principles to ensure that the people most in need, who are disproportionately Black people and other people of color, receive crucial services.  NUL accomplishes these goals through lawful activities that respect the rights of each individual person, regardless of their race, ethnicity, sex, or gender identity.

142. The under-resourced and underserved communities receiving NUL's services will experience devastating consequences should Defendants terminate federal funding for these services, resulting in substantial frustration of NUL's mission. Examples of NUL's critical work for these underserved communities include the following.

143. **Urban Seniors Jobs Program** is a program supported by the Senior Community Service Employment Program grant from DOL. The grant is authorized by the Older Americans Act. As part of NUL's goal to ensure that every American has access to a job that pays a living wage and good benefits, the Urban Seniors Jobs Program provides subsidized, service based training for economically insecure people aged 55 years or older, who are unemployed but committed to finding employment. The program serves a very vulnerable population—91% of all participants in the program lived below the poverty level prior to entering the program, and 56% of participants lacked a college education. By design, every person recruited by the Urban Seniors Jobs Program experiences two or more "most in need" characteristics—they must have a disability, live in an area with persistent unemployment and/or have limited employment prospects, have limited English proficiency, have low literacy skills, reside in a rural area, be homeless or at-risk of homelessness, or be veterans. Through the Urban Seniors Jobs Program's efforts funded by the DOL, thousands of in-need seniors have been placed in jobs.

144. **Partnering for Vaccine Equity** is a program funded by a grant from the CDC focused on improving vaccination coverage across disproportionately affected populations through funded partnerships. The effort targets Black adults who were not up to date on their COVID-19 and flu vaccinations. In the first year of the program, more than 80,000 individuals across 38 local affiliates were vaccinated against COVID-19.

145. **Project Ready Mentor** is a program funded by a grant from the DOJ that helps disconnected, vulnerable, court-involved, predominantly Black and Latino youth, ages 11-17, develop social and emotional skills, aptitudes, and attitudes, foster anti-bullying and social connectedness, move from grade to grade on time, and graduate high school ready for college or work without the need for remediation. Since 2020, Project Ready Mentor has served 9,446 young people at 30 affiliate locations.

146. **Apprenticeships Building America** is a program supported by the DOL that facilitates the recruitment of individuals for preparatory training and pre-apprenticeship with a pathway into a registered apprenticeship program. As part of this program, NUL directly partners with employers to advance DEIA efforts and provide technical assistance. This program serves a population that is predominantly underutilized and underemployed, and majority people of color.

147. **Urban Youth Pathways** is a program funded by DOL that expands access to livable wage jobs and career opportunities by providing youth and young adults, ages 14-21, with opportunities to connect with part-time and full-time job placements, internships, behind-the-business tours, certification programs, and apprenticeship opportunities. This program serves historically underserved and marginalized youth, especially Black and Latino youth, including those involved with foster care, experiencing homelessness, and/or from income insecure households.

148. **Growth Opportunities** is a program funded by DOL that helps vulnerable youth secure wrap-around social services, including expungement, violence prevention workshops, occupational skills training, and placement into work experiences such as internships, apprenticeships, and part-time and full-time employment. The target service population for this

grant program is economically insecure Black youth who are either justice-involved or impacted by violent crimes.

149. **The Urban Construction Jobs Program** is funded through a grant awarded to Trade Futures from DOL. As a sub-grantee, NUL uses the pass-through money for this program to recruit 7,000 participants to enroll in a trade council's Apprenticeship Readiness Program (ARP), which trains candidates to apply for apprenticeships, including classes in construction industry awareness and math, health and safety, financial readiness. NUL's local affiliates recruit and train members of underrepresented communities, including Black people, formerly incarcerated people, and women, to power the construction industry and build back their communities.

150. **Project Heartwood Youth Conservation Corp.** is a program funded through a grant from the USDA, which provides an educational summer employment experience in urban forest planning, assessment, and management for disadvantaged youth, ages 15 to 18.

151. **Comprehensive Housing Counseling** is funded by HUD and makes housing options more accessible and sustainable by leveling the economic playing field for Black and other minority renters, homeowners, and the homeless. NUL has served 329,046 individuals and families through this program over the course of its funding from HUD, from 2009 through the present.

205. 152. DEIADEIA-related strategies are also central to NUL's national advocacy. NUL has been on the front lines of efforts to diversify America's workforce for over 100 years. Even before corporate leadership teams began including Diversity Officers or other similar positions, NUL had already spent decades refining jobs and workforce programs thatto provide direct support to diverse communities, whether living paycheck to paycheck, ornavigating career changes, or approaching retirement. Moreover, itsNUL's leadership and staff regularly engage in

public speaking events, including panels, conferences, and workshops, that center on DEIA topics. ~~Subject~~The subject matter discussed by NUL at these events ~~include~~includes the history and impact of systemic racism, privileges and disadvantages associated with race, implicit bias, and the collective responsibility of people of all races to overcome and eradicate societal discrimination.

206.    ~~153.~~ Recently, NUL hosted an in-person event (which was also livestreamed and ~~is~~ posted on their website) titled "The Demand Diversity Roundtable." This event brought together prominent civil rights leaders to discuss the critical need to safeguard DEIA principles, confront regressive measures, and chart actionable strategies for advancing equal opportunity for all. NUL also published an online resource called "Demand Diversity,"[3] which lists ways for the public to get involved with the fight to protect DEIA programs at their jobs, schools, and in their communities at large.

207.    ~~154.~~ NUL also publishes an annual report, the State of Black America ("SOBA"), which is NUL's seminal contribution to public policy research on Black America. SOBA has been published each year uninterrupted since the 1970s. SOBA is a highly anticipated~~, and is~~ report used by researchers, policymakers, and advocates. As such, it is a critical part of the organization's identity and reputation. NUL and its members use SOBA research and analysis ~~in support of~~to their federal legislative advocacy. SOBA is also a source of fundraising for the organization.

208.    The under-resourced and underserved communities receiving NUL's services have already experienced, and will continue to experience, devastating consequences as a result of the enforcement and implementation of the Executive Orders. For example, Black communities in Austin, Texas; Oklahoma City, Oklahoma; and Greenville, South Carolina, who are at risk of significant health harms because of climate change, are being harmed by EPA's cancellation of a

grant awarded to NUL for the purpose of launching a program targeted at improving their health outcomes.   Due to the vague nature of the Anti-Diversity Orders, there is a high risk of harm posed to the bulk of NUL's programming, not only this EPA grant, and the Trump Administration's enforcement of these Orders is potentially boundless in scope.

209.   155.   As a legacy civil rights organization, NUL is concerned that, under the Executive Orders, it would will no longer be eligible for federal funding if it stays true to its history and purpose and refuses to stop calling out the impacts of systematic discrimination.   NUL is concerned that its explicit promotion of DEIA is directly at odds with the Executive Orders. Because all of the federal grants NUL receives are used to provide direct services with the purpose of advancing "equity," on information and belief, NUL has reason to believe believes that all of its federal funding is at risk.

210.   156.   Because of the vagueness and ambiguity of the terms of these the Executive Orders, it is not clear to NUL's leadership, with any certainty, what kind of equity- and/or DEIA-related work would violate is permitted by the Orders and what would not.  As a result is not.  This concern is only exacerbated by the Certification Provision, which requires NUL to certify that "it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination law," without clarifying what "promoting DEI" means, and without limiting the certification to federally funded programs.  Given that all of NUL's work, and all of the work of NUL's affiliates, including non–federally funded work, is focused on advancing equity, NUL does not know what it must refrain from saying or doing.  NUL is also not sure whether to stay compliant with the Executive Orders.  The ambiguous language of the Certification Provision has caused NUL to fear that the Executive Orders' prohibitions extend to its non-grant-funded work relating to DEIA, such as research, speaking engagements, trainings, webinars, reports, (including *SOBA*

and its Equality Index), communications efforts like the Demand Diversity Roundtable, and factsheets that are not supported by federal dollars.

211. ~~157.~~This uncertainty leaves NUL with an impossible choice. It can continue doing what it has been doing since its inception, which is demand diversity and call out inequities, acknowledge this country's history of racism and sexism and the existence of transgender people and ~~supporting~~support them, and focus its efforts on the most vulnerable communities. This choice, however, would require forfeiting the federal funds NUL relies on to operate the service programs that directly aid vulnerable communities, which are predominantly people of color. In the alternative, NUL could cease to center DEIA principles in its work, which would fundamentally alter its reputation and mission as an organization, in hopes of retaining federal funding. NUL has already been chilled by the DOL, which on February 12, 2025, directed NUL not to address the equity portion of a question in its annual reporting related to the development and implementation of effective program strategies. Since then, NUL has not discussed equity in any of its quarterly grant reporting.

212. And unfortunately, NUL's fears that its funding streams will be targeted have proven to be reasonable by the Administration's own actions. The government has already enforced the Executive Orders directly against NUL, preventing it from accessing hundreds of thousands of dollars, and in turn, harming NUL, its affiliates, and communities nationwide.

213. Specifically, on March 12, 2025, NUL learned its grant from the EPA for its Urban Environmental Justice Collaborative Program was suspended, and that it could no longer draw funds for the program. The award amount was $500,000. This project, which was supposed to operate from January 15, 2025, to January 14, 2028, would have allowed NUL to launch a program

that directly serves Black communities in Austin, Texas; Oklahoma City, Oklahoma; and Greenville, South Carolina, who are at risk of significant health harms because of climate change.

214.    Then, on May 1, 2025, NUL received a letter from the EPA completely terminating the grant.  According to the termination letter, "The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions."  The Anti-Diversity Orders make clear that the Administration believes DEI and DEIA policies "threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination."  On information and belief, EPA's decision to terminate NUL's equity-related grant targeted at serving Black communities, is because it is "prioritizing merit" and fairness, is the result of the Anti-Diversity Orders and the Equity Termination and Government Mandates Provisions in particular.

215.    The EPA froze, and later terminated, this grant because of the project's health equity and environmental justice focuses.  From March 12, 2025, when NUL first learned it could not draw down funds, to May 1, 2025, when NUL learned the award was terminated, NUL could not access even a single dollar of the $500,000 it was awarded.  To date, NUL has still not been paid for the initial start-up costs that went into preparing to launch the Urban Environmental Justice Collaborative Program.  This is countless hours of work that NUL relied on being paid for.   NUL cannot move forward with the launch of this long-planned and critical effort because its federal funds are terminated. Losing access to $500,000 in federal funds significantly impacts the work of NUL and affiliate staff across the country who were preparing to administer this new program. Most critically, NUL's inability to move forward with its Urban Environmental Justice

Collaborative Program will have a disproportionate impact on the Black communities in need of the program's planned services.

216.    Its terminated EPA funding is not the only grant that NUL is imminently concerned about losing.  The Administration's proposed "skinny budget" from May 2, 2025, suggests that funding for NUL's longstanding Urban Seniors Jobs Program is also at risk.  The Urban Seniors Jobs program is supported by the Senior Community Service Employment Program grant from DOL, authorized by Congress through the Older Americans Act.  The Urban Seniors Jobs Program provides subsidized, service-based training for economically insecure people aged 55 years or older, who are unemployed but committed to finding employment.  The program serves a very vulnerable population—91% of all participants in the program lived below the poverty level prior to entering the program, and 56% of participants lacked a college education.  By design, every person recruited by the Urban Seniors Jobs Program must have two or more "most-in-need" characteristics—they must have a disability, live in an area with persistent unemployment and/or have limited employment prospects, have limited English proficiency, have low literacy skills, reside in a rural area, be homeless or at-risk of homelessness, or be veterans.  Through the Urban Seniors Jobs Program's efforts funded by the DOL, thousands of in-need seniors have been placed in jobs.

217.    Recent events have made it clear that the Administration does not value efforts like the Urban Seniors Jobs Program, and in fact, wants to cut them completely.  In President Trump's May 2, 2025 Discretionary Budget Request (the President's "skinny budget"), the Senior Community Service Employment Program was called out as "effectively an earmark to leftist,

DEI-promoting entities *like the National Urban League*."[77] In making this call out, the Administration not only voiced its disapproval of programs like SCSEP because, in the Administration's view, these programs are DEIA, but also expressly targeted Plaintiff NUL for promoting a viewpoint the Administration disfavors. The Administration's proposed budget request took direct aim at NUL for promoting DEI. As a result, NUL is reasonably fearful that its Senior Community Service Employment Program grant will be cut and that the organization at large is at risk of targeted enforcement. On information and belief, NUL believes that the Administration's activity is the result of several provisions of the Executive Orders, including the Equity Termination Provision. NUL is also concerned that its mention in the skinny budget makes it more likely that the List Provision will also be enforced against it.

218.    Given what is happening with its DOL and EPA grants, and what is happening with the grants of several peer organizations, NUL is concerned that several of its other grants that similarly advance equal opportunity will be targeted next. Many of NUL's flagship programs, which focus on advancing opportunities for people from communities who have experienced pervasive and systemic discrimination, are supported by federal funds and have been for decades

219.    For example, Project Ready Mentor is a program funded by a grant from the DOJ that helps disconnected, vulnerable, court-involved, predominantly Black and Latino youth, ages 11–17, develop social and emotional skills, aptitudes, and attitudes, foster anti-bullying and social connectedness, move from grade to grade on time, and graduate high school ready for college or work without the need for remediation. Apprenticeships Building America is a program supported by the DOL that facilitates the recruitment of individuals for preparatory training and pre-

---

[77] *Major Discretionary Funding Changes*, Executive Office of the President 28 (May 2, 2025) https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf (emphasis added).

apprenticeship with a pathway into a registered apprenticeship program.  Urban Youth Pathways is a program funded by DOL that expands access to livable wage jobs and career opportunities by providing youth and young adults, ages 14–21, with opportunities to connect with part-time and full-time job placements, internships, behind-the-business tours, certification programs, and apprenticeship opportunities.

220.  158. NUL is currently applying for and finalizing federal grants and federal grant renewals.  However, because there is no clarity regarding which grants are covered by the Executive Orders, there is uncertainty regarding NUL's eligibility to qualify for or fulfill future contracts or grants.  This includes a federal grant from the EPA, for which NUL has been selected but has not yet been finalized with a fully executed agreement.  This uncertainty harms NUL's ability to project future budgets and programming.  Even before a grant agreement is finalized, NUL must take actions action in anticipation of the grant.  After the announcement of the initial award or renewal, but before the agreement is fully finalized, NUL must expend resources to prepare for the work required by the grant.  In anticipation of beginning a grant, NUL must prepare to hire staff, build out organizational capacity, adjust organizational priorities, and shift existing resources to accommodate future work.  Because of the Executive Orders, NUL is apprehensive about planning programming in fear federal funding will be cancelled at any point, like the EPA grant.

221.  159. Without the additional support of federal funding, NUL and its local affiliates would be forced to significantly divert resources.  For example, without its current federal funding, NUL would need to cut staff.  Currently, NUL has 39 employees whose positions are paid in part by federal funding.  If NUL no longer qualifies for federal funding, the continued employment of these federally funded employees is also would be at risk.

222. 160. Without federal funding and without adequate staffing, NUL would ~~also~~ be forced to cut community programming and direct assistance to ~~the~~ vulnerable populations ~~it serves~~. Cutting NUL's programming at the local level would have catastrophic consequences across the 300 communities that the affiliate movement serves. Because NUL's national affiliate movement allows it to have an especially large impact, it is unlikely that every person seeking these services will be able to access them elsewhere. ~~Without NUL's operations, participants~~The people who cannot will likely be pushed further into poverty. ~~Because~~Since many of NUL's federally funded programs target people of color, the loss of these services at the community level will disproportionately impact Black people and other historically underserved groups.

**B. The Executive Orders and Related Agency Action Irreparably Harm NFHA.**

161. NFHA's mission is to promote and to assist its members in promoting, residential integration and combat discrimination in housing based on race, national origin, disability, sex, religion, familial status, source of income, and other protected statuses covered by federal, state, and local fair housing laws, including the federal Fair Housing Act. NFHA recognizes the importance of home as a component of the American Dream and aids in the creation of diverse, barrier-free communities throughout the nation. Specifically, NFHA works to eliminate housing discrimination and enforce fair housing and fair lending laws to ensure equitable housing opportunities for all people and communities. NFHA does this work through its education and outreach, member services, public policy, advocacy, housing and community development, responsible AI, enforcement, and consulting and compliance programs.

162. To address the urgent need for fair housing, NFHA's operating members also conduct activities to advance fair housing for all and to enforce fair housing and fair lending laws, including engaging in fair housing advocacy, enforcement, education, and outreach; communicating with

local community leaders on fair housing rights; and conducting training about fair housing rights and responsibilities, the harmful effects of segregation, and the need to counteract this historical practice. One of NFHA's core activities is to assist its members in accomplishing these tasks in various ways, including with the provision of technical assistance and training. NFHA and its members' educational activities and trainings educate the public on issues concerning fair housing, racial segregation, the continuing impact of racial segregation on housing in America, the United States' history of systemic racism and its continuing effects, explicit and implicit bias, racial privilege, and the importance of increasing diversity and access to fair housing and high opportunity neighborhoods for persons impacted by historic and ongoing discrimination in the housing market, including racial and ethnic minorities, women, LGBTQ people, people with disabilities, families with children, and others.

163. NFHA and its members' education activities and trainings also advocate for fair housing for the LGBTQ community, such as by providing advocacy around how the Fair Housing Act protects people against discrimination based on sex, including sexual orientation and gender identity. The organization is committed to exploring ways to build bridges with organizations that serve the LGBTQ community and steps that fair housing groups and industry partners can take to make their workplaces more inclusive of people from the LGBTQ community. For example, NFHA's national media campaign in 2021 (which received federal funding) was almost entirely about discrimination based on LGBTQ status, and NFHA has continued to devote resources to promote awareness that the Fair Housing Act bars such discrimination. NFHA helped coordinate a webinar regarding how to investigate such discrimination, and it has included speakers at its annual conferences from organizations devoted to combatting LGBTQ discrimination in housing.

164. To do its broad range of work, NFHA regularly receives funding from the federal government through contracts and grants. NFHA is set to receive approximately $1.3 million in the 2024 Fiscal Year and $2.5 million in the 2025 Fiscal Year, which would account for nearly 16.85% of NFHA's Fiscal Year 2024 annual budget and 27.25% of NFHA's Fiscal Year 2025 annual budget, respectively. Some of these federal funds are statutorily authorized by, *inter alia*, the Housing and Community Development Act of 1987, which created funds for private fair housing enforcement organizations to help enforce compliance with the Fair Housing Act,[65] and includes requirements that, based on actions thus far, Defendants seem to construe to fall within the Executive Orders' rubric of DEIA. When signing this legislation into law, President Ronald Reagan said it was necessary because "[t]oo often one case is too many families and individuals seeking to buy or rent homes still confront bigotry and discrimination. Well, the fair housing initiative program section of this bill will help ensure that such racism will not be tolerated."[66] NFHA also intends to apply for future federal funding that is necessary for the continued viability of its programs.

165. NFHA programs currently funded by federal contracts or grants include the following.

166. **Fair Housing Initiatives Program** ("FHIP") is a HUD initiative with which NFHA partners to fund its fair housing enforcement work, which includes investigating and halting violations of fair housing and anti-discrimination laws, recovering compensation for victims of housing discrimination, and preventing future discriminatory conduct. NFHA has received grants through this HUD program many times over for several decades. NFHA also receives other types

---

[65] President Ronald Reagan, Remarks on Signing the Housing and Community Development Act of 1987 (Feb. 5, 1988), transcript available at https://www.reaganlibrary.gov/archives/speech/remarks-signing-housing-and-community-development-act-1987.

[66] *Id.*

of FHIP grants, including grants to educate the public and to assist in establishing new fair housing organizations. NFHA has asked OMB if FHIP funding is affected by the Executive Orders but, thus far, has not received a response.

167. **Cloudburst Consulting Group** has a contract with HUD and is subcontracting with NFHA to provide training to cultivate strong financial management of FHIP fair housing partners to ensure timely, thorough, and comprehensive financial management and reporting. According to the work order for this subcontract, "The [training] outline will include a foundation of cultural competency that addresses the diversity, equity, and inclusion necessary in all fair housing work, and how to recognize and address individual and collective biases." HUD issued a stop work order and the remaining work for the contract was terminated following the Executive Order, even though the work product already performed (including a training) did not address diversity, equity, and inclusion.

168. In addition, NFHA has established a Responsible AI Lab with a focus on equity in technology concerning human-made discrimination that is replicated and embedded in algorithmic models assessing credit and insurance scoring, underwriting, and pricing models in housing and financial services. NFHA views developing and advocating for DEIA within automation as part and parcel of its fight for equitable access to housing opportunities. In June 2023, NFHA produced industry leading research, including a public joint report with Tech Equity Collaborative about how technology could add to the history of housing providers "disproportionately screening out members of a certain group or groups in violation of the Fair Housing Act, Equal Credit Opportunity Act, or another anti-discrimination law."[67] The report's overall goal was to "outline

---

[67] Hannah Holloway *et al.*, *Privacy, Technology and Fair Housing—A Case for Corporate and Regulatory Action*, NFHA 5 (Aug. 22, 2023),

ethical standards for responsible tech, advance effective policies for regulating AI tools, and increase diversity and inclusion in the tech field."[68]

169. As part of its core work to achieve fair housing for all, NFHA regularly holds conferences, symposia, and speaking events each year where speakers from various backgrounds present on these aforementioned topics. Attendees include employees of NFHA members, representatives from the housing and lending industry, representatives from federal, state, and local government agencies, and representatives from civil rights organizations. On average, NFHA conducts at least two such events every year, and in recent years has regularly held more. For example, in 2024, NFHA held a conference titled "Housing Equity Now: Building an Inclusive and Just Future," where member organizations, fair housing advocates, and subject matter experts from around the country engaged in discussions on a range of fair housing issues. The conference had panels that highlighted, among other things, the racial wealth gap and large disparities in rates of homeownership between Black and white families and the connection between housing equity and principles of diversity, equity, and inclusion.[69]

170. As an organization focused on preventing housing discrimination and providing underserved populations with equal access to housing opportunities and otherwise working for equity in the housing and lending markets, NFHA appreciates the importance of embedding DEIA in everything it does. Therefore, within its own organizational plan, NFHA requires regular

---

https://nationalfairhousing.org/resource/privacy-technology-and-fair-housing-a-case-for-corporate-and-regulatory-action/?utm_medium=referral&utm_source=TechEquity&utm_campaign=Privacy-Housing-Paper.

[68] *Id.* at 4.

[69] Adelaide del Angel, *Insights from the 2024 National Fair Housing Alliance Conference,* Open Cmtys. (July 23, 2024), https://www.open-communities.org/post/insights-from-the-2024-national-fair-housing-alliance-conference.

policies and practices supporting DEIA, including but not limited to training for all staff. For example, all staff received a three hour training on DEIA at NFHA's 2022 staff retreat. Before NFHA's 2022 annual conference, NFHA provided training for members and staff on how fair housing organizations can embrace a culture of DEIA and create workplaces where future generations of fair housing advocates can thrive and be leaders. NFHA also holds education and outreach events and trainings with other non-profit organizations and housing and lending stakeholders, including fair housing organizations, academics, think tanks, non-profit organizations, financial services institutions, governmental entities, real estate sales organizations, and housing and lending industry trade associations on issues of systemic racism, structural inequities, sexism, unconscious bias, and intersectionality. These events and trainings explain the continuing significance of residential segregation in many communities; the underlying cause of racial disparities with respect to arrest and conviction rates; the relationship between segregation and disparate health, housing, credit, and criminal justice outcomes; and programs and policies that should be implemented to address continuing racial inequality.

171. One of NFHA's primary publications is its annual Fair Housing Trends Report. The Fair Housing Trends Report describes the universe of fair housing complaints received by private fair housing organizations and government agencies, broken down by state, protected class, type of housing or lending transaction, and more. It describes emerging and longstanding issues in fair housing, covering issues like residential segregation and its intersection with structural inequality, environmental injustice, criminal injustice, and climate change. The report often also deals with issues that impact fair housing, such as implicit bias, systemic racism, and sexism, and is used by a wide group of stakeholders, including NFHA operating members and employees. NFHA's data, compiled from private non-profit fair housing organizations, HUD, state and local Fair Housing

Assistance Program agencies, and DOJ, are instructive in educating the public and policy makers that housing discrimination continues to be a serious problem, it perpetuates racial and ethnic inequality in communities throughout the nation, and it merits considerably more attention and remedies.

172. NFHA also engages in public policy and advocacy around fair housing, the elimination of discrimination, and the promotion of equitable outcomes in housing and lending. NFHA's leadership team testifies before Congress several times a year, and the organization's recommendations have helped, for example, usher in new policies at federal agencies to promote a more fair and inclusive housing finance system. NFHA advocated for more inclusive representation in the federal government—such as ensuring that the Federal Reserve Board had its most diverse slate of nominees, which resulted in the first Black women and first Latina to serve in the Board's 109 year history. A major part of NFHA's public policy advocacy has been to advocate for explicit protections in the Fair Housing Act to prohibit discrimination on the basis of sexual orientation, gender identity, and marital and familial status.

173. Within its own organization, NFHA has a mutual interest with its employees in ensuring DEIA in its workplace so that all employees, regardless of their race, ethnicity, sex, gender, sexual orientation, or gender identity, feel welcome and valued. In fact, having a more diverse and inclusive workplace increases employee satisfaction and productivity, produces greater innovation and ideas, and helps NFHA better serve its mission overall. NFHA is concerned that the Executive Orders will have a detrimental impact not only on the communities it serves, but also on its employees of color, female employees, and LGBTQ employees, who may not be able to challenge the Executive Orders themselves.

174. As a direct result of the Executive Orders, NFHA and its members have experienced and continue to experience a negative financial impact, a chilling effect on their ability to carry out core activities, and the need to divert resources to combat these negative effects. NFHA is concerned that the Executive Orders create a tension in which NFHA must either continue its work addressing housing discrimination without references to DEIA—or any concepts that the Trump Administration deems to be equivalent—or lose federal funding for all its existing and future programs. Given those concepts' inextricable relationship to ending discrimination based on race, sex, and other protected classes, NFHA is not able to stop engaging in speech about diversity, inclusion, equity, and accessibility—or topics related to these broad concepts—while fully carrying out its work combating housing discrimination. Effective anti-discrimination advocacy requires discussing the very concepts that the Executive Orders appear to eliminate from the federal government and the private organizations, like NFHA, that it funds.

175. NFHA's viewpoint is that effective enforcement or description of the Fair Housing Act, Equal Credit Opportunity Act, and other relevant laws is impossible without reference to many of these terms. If use of such routine terminology of federal law causes grants to be subject to heightened scrutiny and recipients of federal grants and contracts to be subject to potential termination, it will be considerably more difficult for NFHA and its members to apply for and receive federal funding and to carry out core activities in furtherance of their missions. NFHA and its members will be forced to change the way they discuss these laws, which are central to their missions, in order to minimize the risk to their federal funding. In fact, NFHA has serious concerns that the Executive Orders' reach has been extended broadly to govern core activities in promoting compliance with and enforcing federal and state fair housing and civil rights laws. On information

and belief, the Trump Administration may use its attack on DEIA to constrict enforcement of federal civil rights laws, including the Fair Housing Act.

176. Every year, there are over 4 million incidents of housing discrimination, with most going unreported.[70] In 2023, private, non-profit fair housing organizations, like NFHA, processed the majority of housing discrimination complaints at 75.52%.  Private fair housing agencies like NFHA serve on the frontlines, guiding everyday individuals and families impacted by unlawful discrimination to seek the appropriate remedy to their harms.  NFHA's core business activities will be hindered and its mission will be frustrated if its ability to engage the public and the government about discrimination is barred, and if it is punished for such speech by a termination of vital federal funds.

177. Since January 20, 2025, NFHA's senior leadership has been spending hours each day guiding affiliate members who do not know how to interpret the Executive Orders and are hesitant to continue their work.  The resources spent responding to the government's Executive Orders are diverted not only from the actual anti-discrimination services that NFHA provides across the country, but also from public education activities about the importance of its fair housing work.

178. If NFHA cannot continue its work addressing discrimination, bias, and harassment in all areas of housing, the reluctance of communities of color, women, the LGBTQ community, and people with disabilities to report the harms they experience will only be exacerbated.  By its plain terms, the Executive Orders threaten to bar enforcement and discussion of the Fair Housing Act and other civil rights laws that make our country more equitable.  If the Executive Order mean

---

[70] Janelle Brevard, *Housing Discrimination Complaints Continue to Trend Upward*, NFHA (July 10, 2024), https://nationalfairhousing.org/housing-discrimination-complaints-continue-to-trend-upward/.

something else, it is not clear, and NFHA has no way of ascertaining whether its grants directly fall within the category of grants that would be terminated.

179. On a local level, predatory landlords and organizations engaged in implicit and explicit bias against various underserved communities will be empowered to continue illegal discrimination without the enforcement functions that organizations like NFHA and its members provide in partnership with the federal government. These harms compound other inequities in accessing fair housing in the United States. For example, in 2022, a record high 22.4 million renter households were "cost burdened," meaning they spent more than 30% of their income on rent and utilities. Black and Latino renters were more likely than white renters to be cost burdened. These disparities make it more difficult for Black and Latino renters to build wealth and save for down payments for homeownership. Further, despite important efforts to close racial homeownership gaps, the white homeownership rate is nearly 67% higher than the Black homeownership rate, 45% higher than the Latino homeownership rate, and 20% higher than the rate for the Asian American community.

180. NFHA has also advocated for the expansion of the Fair Housing Act to explicitly prohibit discrimination on the basis of sexual orientation, gender identity, marital status, and source of income. NFHA has taken the position that, following the Supreme Court's decision in *Bostock*, the Fair Housing Act bars housing discrimination based on sexual orientation or gender identity; accordingly, NFHA and its members have investigated and brought complaints regarding allegations of such discrimination. NFHA is not certain whether any of this activity falls under the definition of "gender ideology," a term that has no established meaning and is not clearly defined in the Executive Order. On top of the vagueness of the Administration's use of the term "gender ideology," HUD already appears to view the Anti-Gender Order as compelling it not to

~~enforce existing legal protections for transgender persons. NFHA's ability to carry out its mission and core business operations will be adversely affected by this Executive Order if NFHA and its member organizations must stop promoting fair housing for the LGBTQ community—including by enforcing the Fair Housing Act in accordance with established case law—or lose federal funding.~~

~~181. The Executive Orders interfere with NFHA's ability to carry out its core business activities in pursuit of its mission, which is to combat unequal access to housing opportunities. NFHA's mission is rooted around the belief that where people live matters because it affects access to schools, to jobs, to good health, and to everything people need to succeed. NFHA believes that only by speaking clearly about what has happened to protected classes in the pursuit of housing can we make progress toward fairer housing markets. Given that NFHA's core mission is to work to dismantle illegal, systemic discrimination, Plaintiff NFHA is irreparably harmed by the Executive Orders.~~

### **2.** ~~**C.**~~**The Executive Orders and Related Agency Action** ~~**Irreparably Harm AFC**~~**Have Harmed, and Continue to Harm, AFC and the Communities It Serves**.

**223.** ~~182.~~AFC brings together service providers and funders to develop systems that meet the needs of people living with HIV or AIDS. Since its inception, AFC has led both ~~state-~~state-wide and city-wide efforts to coordinate essential medical and support services for people living with HIV/AIDS in Illinois and the greater ~~Chicagoland~~Chicago area. Preventing new cases of HIV is at the core of AFC's work.

**224.** ~~183.~~Every ~~day~~year, AFC supports almost 7,000 people living with or vulnerable to HIV who need support to achieve their health and life goals. This work includes intentionally focusing on the communities and populations that are disproportionately impacted by the HIV epidemic. In Chicago, and across the nation, the populations most impacted by the HIV epidemic

include~~are the~~ Black, Latino, and transgender communities.  Currently, of all of the clients in AFC's programs, 57.5% are Black, 26.8% are Latino, and 2.5% identify as Indigenous, Asian, or multicultural.  Additionally, 35% of AFC's clients are gay or lesbian, 7% are bisexual, 1.2% are queer, and 8.5% are transgender, non-binary, or genderqueer.

225. ~~184.~~ AFC is committed to prioritizing marginalized populations that are disproportionately impacted by social determinants that contribute to health disparities in HIV/AIDS.  HIV and chronic conditions disproportionately impact marginalized populations.  As an organization that has been doing ~~this~~HIV-prevention work for 40 years, AFC recognizes that it will have the greatest impact on the HIV epidemic by focusing its efforts on ~~those~~the people most impacted by HIV, based on epidemiological data and unmet need: young Black gay and bisexual men, transgender women of color, Black women living in areas with high diagnoses of HIV, and Latino gay and bisexual men.

226. ~~185.~~ AFC receives a majority of its funding from HHS and HUD.  This federal funding supports a range of critical services, including HIV prevention, treatment, case management, and supportive housing programs for people living with HIV.

227. ~~186.~~ Specifically, AFC receives ~~federal~~HHS grants ~~through~~ from various HHS agencies—the CDC, the NIH, HRSA, and the ACL~~,~~ and through the 340B Drug Discount Program.  Additionally, AFC administers federal pass-through funding from the Illinois Department of Public Health (IDPH) and the Chicago Department of Public Health (CDPH).

228. ~~187.~~ AFC also receives ~~HUD~~federal funding through ~~the~~HUD's Housing Opportunities for Persons with AIDS ("HOPWA") program, which supports rental subsidies, permanent supportive housing, and homelessness prevention services for individuals living with HIV.

229. 188. Federal funding accounts for approximately 83.4% of AFC's total budget—, amounting to $34.8 million annually.  The loss of this funding would force AFC to cease operations, eliminating which would eliminate services for nearly 7,000 people annually, including 1,300 households currently receiving housing assistance.

230.  AFC has already begun experiencing irreparable harm from the Executive Orders. First, the lack of clear guidance from federal agencies on what the Executive Orders prohibit has created confusion, fear, and instability among AFC service providers, funders, and community partners.

231. 189. Second, AFC has been harmed by government suspension of its funding in response to the Executive Orders.  On January 28, 2025, AFC attempted to draw down federal grant funds to continue providing housing and case management services, but it was unable to process the request due to a federal administrative lock on funds.  AFC was subsequently able to draw down on funds the following week after a TRO was issued against the Administration's freeze.

190. AFC plays a key role in coordinating case management for over 30 Chicago-based organizations serving people living with HIV.  As part of this effort, AFC trains approximately 160 case managers across 31 agencies, equipping them to provide trauma-informed, culturally competent services tailored to Black, Latino, and transgender communities who are disproportionately affected by HIV.

232. 191. AFC's Welcome Home Program has been directly affected by the funding freeze.  AFC's Welcome Home program helps people living with HIV who are leaving prison or jail to connect with stable housing.  Transgender women are disproportionately represented in this population.  Homelessness is extremely high among transgender people; a 2024 CDC report

indicated that 31% of transgender people in one survey reported being unhoused for up to 11 months in the previous year.[71][78]   The program's ability to offer gender-affirming housing and healthcare referrals is now in jeopardy.

233.   192. AFC's Women's Connection Program, which provides HIV services tailored to Black cisgender and transgender women, has also been disrupted.  This initiative focuses on domestic violence advocacy, healthcare access, and economic stability, all of which require cultural competency training and service delivery that the Executive Orders now threaten.

234.   193. AFC's ability to train case managers and service providers in cultural competency, trauma-informed care, and gender-affirming practices is now in question, further exacerbating existing health disparities.  AFC plays a key role in coordinating case management for over 30 Chicago-based organizations serving people living with HIV.  As part of this effort, AFC trains approximately 160 case managers across 31 agencies, equipping them to provide trauma-informed, culturally competent services tailored to Black, Latino, and transgender communities who are disproportionately affected by HIV.

235.   194. The A further loss of federal funding would not only harm AFC's ability to provide direct services, but would also impair AFC's ability to engage in critical public health advocacy.  This advocacy includes ongoing work with the Illinois Getting to Zero initiative, a statewide effort to end the HIV epidemic by 2030.

236.   195. AFC has also been harmed by the Executive Orders' restrictions on its speech and activity.   The Executive Orders limit federal data collection on gender identity, making it

---

[71][78] Ruthanne Marcus et al., *Transgender Women Experiencing Homelessness — National HIV Behavioral Surveillance Among Transgender Women, Seven Urban Areas, United States, 2019–2020*, CDC (Jan. 25, 2024), https://www.cdc.gov/mmwr/volumes/73/su/su7301a5.htm?s_cid=su7301a5_w.

impossible for AFC to track and respond to public health crises affecting marginalized populations. Without access to federal funding for data collection, AFC ~~will not be able to~~cannot identify emerging HIV outbreaks, develop targeted testing initiatives, or implement effective prevention strategies.

237. ~~196.~~The Executive Orders also prevent AFC from acknowledging or addressing ~~transgender~~ health disparities in HIV populations, forcing AFC to violate best practices in HIV prevention and care. ~~For example, transgender~~Transgender women in the United States have a 21.6% HIV prevalence rate, which is exponentially higher than for other populations. Culturally competent services are essential for increasing engagement in HIV care and achieving viral suppression in this population. The Anti-Gender Order's repudiation of "gender identity" and prohibition of the promotion of "gender ideology" directly impedes ~~Plaintiff~~AFC's mission as an HIV services organization by preventing it from effectively serving the transgender community—a group disproportionately impacted by HIV.

238. ~~197. The~~Most notably, the Anti-Gender Order's language preventing recipients of federal funds from even acknowledging the existence of transgender people renders it impossible for ~~Plaintiff~~AFC to provide culturally competent and affirming services, including targeted HIV prevention, testing, ~~and~~ treatment, and housing services that are critical for transgender people.

239. ~~198.~~For example, AFC must refer transgender people to healthcare providers who have received transgender cultural competency training and medical training in providing healthcare services to transgender people. Medical providers make transgender clients comfortable with disclosing their transgender status through actions like using their chosen name and correct pronouns. If transgender people do not disclose their transgender status, important

health conditions could be missed; for example, older transgender women who have prostates need regular screening to detect cancer. ~~When identifying housing for~~

240.    ~~transgender people, AFC~~In addition, AFC must consider transgender status when assisting clients with finding housing.  AFC staff must take into account the need for transgender people to be placed in neighborhoods where they will be safe, since "~~transgender~~[t]ransgender people are over four times more likely than cisgender people to experience violent victimization."[~~72~~79]

241.  ~~199.~~ By forcing recipients of federal funds, including ~~Plaintiff~~ AFC, to omit essential aspects of transgender identity in outreach, programming, and services, the Anti-Gender Order not only undermines ~~Plaintiff~~AFC's mission to combat HIV among vulnerable populations, but also contributes to further marginalization of a community already facing significant health disparities.  The percentage of transgender women who are virally suppressed is 67%,[~~73~~80] which is far lower than the 90% rate that AFC achieves among people living with HIV who are receiving case management funded by the Ryan White Program.

242.  ~~200.~~ The Executive Orders also jeopardize AFC's life-saving programs for people with HIV by banning any reference to systemic racism, gender bias, or LGBTQ discrimination in federally funded trainings, service delivery, and public health outreach.  As a result, AFC's core programming is now in direct conflict with federal funding restrictions.

---

[~~72~~ ~~Andrew R. Flores *et al.*, *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, Am. J. of Pub. Health~~79] Press Release, UCLA Williams Institute, *Transgender People Over Four Times More Likely Than Cisgender People To Be Victims of Violent Crime* (Mar. 23, 2021), https://williamsinstitute.law.ucla.edu/press/ncvs-trans-press-release/.

[~~73~~80] Jeffrey S. Becasen et al., *HIV Care Outcomes Among Transgender Persons with HIV Infection in the United States, 2006–2021*, Nat'l Library of Med. (Feb. 1, 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC10680039/.

243. 201. AFC's ability to fulfill its mission, which is to mobilize communities to create equity and justice for people living with and vulnerable to HIV, is now under direct threat because of the Executive Orders.  Without immediate intervention, AFC will be forced to scale back or shut down vital programs, leaving thousands of people without essential HIV care and housing services.

202. AFC has already begun experiencing irreparable harm due to the Executive Orders and the subsequent federal funding freeze.  The lack of clear guidance from federal agencies has created confusion, fear, and instability among service providers, funders, and community partners.

244. 203. AFC cannot comply with the Executive Orders without fundamentally undermining its mission.  The forced elimination of DEI-related programming would result in the loss of life-saving services for Black, Latino, and transgender communities, worsening health disparities that AFC has spent decades working to reduce.

245.  AFC faces constant uncertainty because the government has provided no clear guidance on how exactly to comply with vague mandates prohibiting the promotion of "gender ideology."  This lack of clarity creates ongoing anxiety and operational disruption. AFC remains under persistent threat that HUD could arbitrarily cancel its housing grants at any time, disrupting services for 512 clients who depend on stable housing to maintain their health.

246.  Compliance pressures have forced AFC to consider stopping certain types of critical services or altering service documentation, such as referrals to gender-affirming medical care, significantly risking adverse health outcomes for vulnerable transgender clients.  AFC's leadership has articulated that these Executive Orders threaten their core mission by potentially removing the critical support structures needed for client health and safety.  Thus, the federal government's attempt to silence HIV service providers like AFC is not just unconstitutional; it is potentially deadly.

204. The federal government's attempt to silence HIV service providers is not just unconstitutional; it is deadly. AFC cannot be silent in the face of policies that jeopardize the health and safety of the communities it serves.

## VII. THE EXECUTIVE ORDERS ARE DISCRIMINATORY.

205. During these early days of his second administration, President Trump is devoting substantial federal resources to attacking and eliminating DEIA programs. President Trump was vociferous in his opposition to the increased focus on diversity, equity, and accessibility in the aftermath of George Floyd's killing and the ensuing mass demonstrations against anti-Black racism. That discriminatory sentiment to oppose efforts to eradicate systemic racial discrimination suffered by Black people in the United States—motivated the issuance of the Anti-Diversity1 and Anti-Diversity2 Orders.

206. In May 2025, the world watched in horror as video footage showed George Floyd cry for help and ultimately die while former Officer Derek Chauvin kneeled on his neck. In the weeks following George Floyd's killing, 15–26 million people in 4,700 demonstrations across the United States protested against anti-Black racism and police violence.[74]Outrage spread worldwide, as tens of thousands of protesters marched against structural racism in cities across the globe. At the height of the largest movement, half a million people in the United States marched in 550 locations on a single day—June 6, 2020.[75]In addition, over 170 Confederate symbols—which have long

---

[74] John Eligon, *Black Lives Matter Has Grown More Powerful, and More Divided*, N.Y. Times (June 14, 2021), https://www.nytimes.com/2021/06/04/us/black-lives-matter.html.
[75] Larry Buchanan et al., *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. Times (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

been associated with the enslavement of Black people in the United States—were removed from public spaces or renamed.[76]

207. Public acknowledgment of anti-Black racism and the urgent need to remedy its ongoing harms proliferated in the private sector. Professional sports associations like the National Football League and NASCAR voiced their support for Black Lives Matter[77]and the need to remedy anti-Black racism nationwide. Numerous corporations expressed support for racial justice protesters, their own Black employees, and the Black community writ large, as well as the urgent need to eradicate racism.[78]In the midst of this climate, jobs related to the pursuit of DEIA rose by 55% between June and August 2020.

208. In the midst of the widespread support for eradicating anti-Black racism, President Trump made his disdain for that effort clear. On July 3, 2020, in response to protests against monuments of men who enslaved Black people, President Trump signed an Executive Order to re-erect monuments of these men in a National Garden of American Heroes.[79]On September 17, 2020, President Trump hosted the inaugural White House Conference on American History, where he maligned Critical Race Theory and *The 1619 Project*—the *New York Times*' historical account

---

[76] Damien Cave *et al.*, *Huge Crowds Around the Globe March in Solidarity Against Police Brutality*, N.Y. Times (June 9, 2020), https://www.nytimes.com/2020/06/06/world/george-floyd-global-protests.html; *see also* Alan Taylor, *The Statues Brought Down Since the George Floyd Protests Began*, Atlantic (July 2, 2020), https://www.theatlantic.com/photo/2020/07/photos-statues-removed-george-floyd-protests-began/613774/.

[77] Tonya Pendleton, *NASCAR stands for 'Black Lives Matter' in video*, The Grio (June 8, 2020), https://thegrio.com/2020/06/08/nascar-black-lives-matter/; Mark Maske and Adam Kilgore, *What made Roger Goodell say 'Black Lives Matter' and where it leaves the NFL*, Wash. Post (June 6, 2020), https://www.washingtonpost.com/sports/2020/06/06/roger-goodell-black-lives-matter/.

[78] Tiffany Hsu, *Corporate Voices Get Behind 'Black Lives Matter' Cause*, N.Y. Times (May 31, 2020), https://www.nytimes.com/2020/05/31/business/media/companies-marketing-black-lives-matter-george-floyd.html.

[79] Exec. Order No. 13934, 85 C.F.R. 41165 (2020).

of American slavery and the contributions of Black Americans—as "crusade[s] against American history," "toxic propaganda," and "ideological poison that, if not removed, [would] . . . destroy our country."[80] During his remarks, President Trump explained that this was why he "banned trainings in this prejudiced ideology from the federal government and banned it in the strongest manner possible."

209. Three days later, on September 22, 2020, President Trump issued an Executive Order titled "Executive Order on Combating Race and Sex Stereotyping" ("EO 13950"), which prohibited federal contractors and grantees from engaging in certain speech activities related to what the Executive Order labeled "divisive concepts."[81] Many of the so-called "divisive concepts" pertained to systemic race and gender inequalities and/or efforts to acknowledge and remedy them.

210. As President Trump explained in a tweet, "A few weeks ago, I BANNED efforts to indoctrinate government employees with divisive and harmful sex and race based ideologies. Today, I've expanded that ban to people and companies that do business . . . with our Country, the United States Military, Government Contractors, and Grantees.  Americans should be taught to take PRIDE in our Great Country, and if you don't, there's nothing in it for you!"[82]

211. When issuing EO 13950, President Trump presented an inaccurate narrative of American history that minimized the outsized role of slavery, Jim Crow laws, and white supremacy in the United States, thereby minimizing the ongoing harms and disadvantages to Black people

---

[80] *Remarks by Donald J. Trump at a White House Conference on American History* (Sept. 17, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000691/pdf/DCPD-202000691.pdf.

[81] Exec. Order 13950, *Combating Race and Sex Stereotyping*, 85 Fed. Reg. 60683 (Sep. 22, 2020).

[82] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539918075883523; Donald J. Trump (@realDonaldTrump), Twitter (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539921829781504.

that remain unremedied.  For example, in refusing to acknowledge the significant role of slavery and white supremacy in the founding of the United States, EO 13950 pronounced that it was the "belief in the inherent equality of every individual that inspired the Founding generation to risk their lives, their fortunes, and their sacred honor to establish a new Nation . . . ."[83]This ahistorical narrative continued in EO 13950's assertion that the "racialized views of America" that "were soundly defeated on the blood-stained battlefields of the Civil War" were likewise "rejected" by our "Founding documents."  *Id.*

212. On October 8, 2020, in a sweeping action expanding the reach of EO 13950, Assistant Attorney General Lee Lofthus ordered DOJ leaders to suspend not only DEIA trainings, but also any related "programs, activities, and events."[84]A week later, during the first debate for the 2020 presidential elections, President Trump was asked why he ended "racial sensitivity training that addresses white privilege or Critical Race Theory," and he responded, "I ended it because it's racist . . . [t]hey were teaching people to hate our country, and I'm not going to . . . allow that to happen."[85]

213. Only two months after President Trump issued EO 13950, a federal district court, in *Santa Cruz Lesbian and Gay Community Ctr. v. Trump*, No. 20-CV-7741 (N.D. Cal.), enjoined its enforcement, concluding that the plaintiffs were likely to succeed in showing that it violated their rights to free speech under the First Amendment and due process under the Fifth Amendment.  *See Santa Cruz*, 508 F. Supp. 3d 521 (N.D. Cal. 2020).  The plaintiffs in *Santa Cruz* were federal

---

[83] EO 13950 § 1.

[84] Katie Benner, *Justice Dept. Suspends All Diversity and Inclusion Training for Staff*, N.Y. Times (Oct. 9, 2020), https://www.nytimes.com/2020/10/09/us/politics/justice-department-diversity-training.html.

[85] PBS NewsHour, *WATCH: Biden urges unity to 'defeat racism'; Trump decries racial sensitivity training*, YouTube (Sept. 29, 2020), https://www.youtube.com/watch?v=pqGyzLjXfjo.

contractors and grantees, including AFC, who were at risk of losing federal funding because their mission-driven work required them to engage in speech and expression acknowledging that race and gender inequalities created barriers to accessing quality health care services for people of color and LGBTQ individuals, and related health disparities.

214. Multiple federal courts have found state laws with prohibitions that are similar to EO 13950 violative of the First Amendment and/or the Fourteenth Amendment's Due Process Clause.[86] Upon information and belief, no federal court has affirmed the legality of state governmental restrictions similar to EO 13950.

215. President Trump continued to condemn "diversity, equity, and inclusion" programs and activities during his campaign for a second term in office. For example, on December 21, 2024, at Turning Point's AmericaFest 2024 conference, President Trump stated, "I'll end all of the Marxist diversity, equity, and inclusion policies across the entire federal government immediately. And at the same time, we will ban these unlawful policies from . . . the private sector as well."[87]

216. Contrary to President Trump's characterization of DEIA policies as "illegal," federal agencies have affirmed their legality. For example, 2006 guidance from the U.S. Equal Employment Opportunity Commission (which remained in effect during President Trump's first administration) states that "Title VII permits diversity efforts designed to open up opportunities to

---

[86] *See, e.g.*, *Honeyfund.com, Inc. et al. v. DeSantis et al.*, 622 F. Supp. 3d 1159 (N.D. Fla. 2022), *aff'd*, 94 F.4th 1272 (2024); *Pernell et al. v. Fla. Bd. of Governors of the State Univ. System et al.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), appeal docketed, *Pernell v. Lamb*, No. 22-13992 (11th Cir.); *Black Emergency Response Team et al. v. Drummond et al.*, 737 F. Supp. 3d 1136 (W.D. Okla. 2024), appeal docketed, No. 24-6139 (10th Cir.); *Local 8027 et al. -v. Edelblut et al.*, No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024), appeal docketed, No. 24-1690 (1st Cir.).

[87] *Trump Remarks at Turning Point's AmericaFest 2024 (Transcript)*, Sinju Post (Dec. 23, 2024), https://singjupost.com/trump-remarks-at-turning-points-americafest-2024-transcript/?singlepage=1.

everyone."[88]Moreover, in January 2023, the U.S. Department of Education issued guidance, stating that "[a]ctivities intended, in whole or in part, to further objectives such as diversity, equity, accessibility, and inclusion are not generally or categorically prohibited under Title VI."[89]

217. President Trump issued the Executive Orders during the first week of his second administration—some on his very first day.  By issuing the Anti-Diversity1 and Anti-Diversity2 Orders, President Trump effectuated his long-held intent to eradicate policies and programs—many initiated in response to George Floyd's killing and the ensuing racial justice demonstrations—that aim to dismantle longstanding inequalities for Black people.

218. DEIA has been used often as a proxy for race, and the contention that DEIA results in "racial preferences" for "unqualified" people is a common trope to disparage Black candidates.  Thus, the false presumption that DEIA and merit are mutually exclusive perpetuates pernicious racial stereotypes of Black people that have been used to justify their exclusion and underrepresentation.

219. The false assumption that Black people lack merit fails to acknowledge the present-day discrimination that prevents qualified Black candidates from having equal opportunities—a form of racial discrimination that is well-documented.  For example, from 2019 to 2021, researchers sent 80,000 resumes to apply for 10,000 jobs using resumes with equivalent qualifications, but applicants' names were changed to suggest that they were white or Black, and

---

[88] U.S. Equal Emp. Opportunity Comm'n, Section 15 Race and Color Discrimination, in Directives Transmittal: (EEOC No. 915.003) 15-31 (2006), https://www.eeoc.gov/sites/default/files/migrated_files/policy/docs/race-color.pdf.

[89] Office for Civil Rights, U.S. Dep't of Educ., *Fact Sheet: Diversity & Inclusion Activities Under Title VI I* (Jan. 2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocr-factsheet-tvi-dia-202301.pdf?utm_content=&utm_name=&utm_term=.

male or female.[90] The research found that several companies asked to interview applicants with Black or female names significantly less frequently than white and male applicants with equivalent qualifications. Even increasing the qualifications of the Black applicants to be more meritorious than the white applicants did not help—they were still less likely to be called back than less qualified white applicants.[91]

220. The racially biased stereotype of Black people being unqualified and lacking merit is reflected in the Anti-Diversity2 Order's official title: "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." The Order perpetuates this stereotype by stating, "Illegal DEI and DEIA . . . deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system. Hardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex."[92]

221. By inaccurately concluding that DEIA denies "merit-based opportunities," the Anti-Diversity2 Order refuses to acknowledge barriers to opportunities for Black people that have no bearing on their qualifications or merit. The Trump Administration starts from the false premise that there are no existing racial inequalities. With this false premise in place, it characterizes as discriminatory any effort to mitigate the racial inequalities that exist through DEIA.

222. The Anti-Diversity1 and Anti-Diversity2 Orders claim to be enforcing federal civil rights and anti-discrimination laws—and thus barring "illegal" DEIA—but that claim does not

---

[90] Claire Cain Miller & Josh Katz, *What Researchers Discovered When They Sent 80,000 Fake Resumes to U.S. Jobs*, N.Y. Times (Apr. 8, 2024), https://www.nytimes.com/2024/04/08/upshot/employment-discrimination-fake-resumes.html?searchResultPosition=1.

[91] *Id.*

[92] Anti-Diversity2 Order § 1.

mitigate the Orders' intent to discriminate; rather, it amplifies it. In addition to the substantial departures from the usual procedures to issue executive orders, *see supra* Section III, the Anti-Diversity1 and Anti-Diversity2 Orders take the unusual stance of presuming—without evidence— the illegality of DEIA programs and circumventing the normal process of investigating and litigating claims of civil rights violations.

223. It is the greatest irony that Black people, for whom many of our anti-discrimination laws were enacted to benefit, have the heavy burden of actually *proving* racial discrimination, despite irrefutable evidence that racial inequalities persist in virtually every sector of American life. Yet, the Trump Administration *presumes* racial discrimination against white people and is using the power and resources of the federal government to launch a full-scale assault on DEIA— not only within federal agencies, but throughout the private sector as well.

224. Notably, the Executive Orders and subsequent DOJ memoranda contemplate possible investigations—both civil and criminal—of DEIA. Upon information and belief, the Trump Administration has not issued similar plans to use comparable federal resources to investigate and prosecute racial discrimination against Black people or other people of color.

225. The Anti-Diversity1 Order's rescission of Executive Order No. 11246 further demonstrates the Trump Administration's disregard of, and hostility towards, proactive efforts to eradicate racial inequalities. In 1965, during the height of the Civil Rights Movement, President Lyndon B. Johnson issued Executive Order No. 11246 to prohibit employment discrimination based on race, color, religion, and national origin by recipients of federal contracts and subcontracts and required affirmative action programs. Issued in the wake of the passage of Title VII of the Civil Rights Act of 1964, Executive Order No. 11246 intended to address entrenched

and rampant unemployment and income inequality that disproportionately harmed Black people, as well as people of other racial, ethnic, religious, and national origin groups in the United States.[93]

226. President Trump rescinded Executive Order No. 11246 despite stark evidence of persistent inequality in employment opportunities based on race. By rescinding this longstanding executive order, President Trump signaled his intent to prevent targeted efforts to help workers, who are underrepresented due to persistent discrimination and other unfair barriers, access equal employment opportunities. That intent is embodied in the Anti-Diversity1 and Anti-Diversity2 Orders.

227. The Anti-Diversity1 and Anti-Diversity2 Orders' disproportionate harm to Black people and other people of color is evident from Plaintiffs' injuries. All of Plaintiffs' mission-driven work benefits Black people and other people of color, who are disproportionately harmed by the racial wealth and income gap, lack of access to fair and adequate housing, and the HIV/AIDS epidemic. *See supra* Section VI. By delegitimizing DEIA efforts to help Black people and other people of color, and rendering those efforts illegal, the Anti-Diversity1 and Anti-Diversity2 Orders necessarily harm them.

228. While the Anti-Diversity1 and Anti-Diversity2 Orders were issued with the intent to discriminate against Black people on the basis of race, the functional operation of the Orders classifies benefits and harms by race and sex so that all people of color, as well as women and LGBTQ people, are harmed by their prohibitions. At a minimum, the Anti-Diversity1 and Anti-Diversity2 Orders were crafted to disproportionately benefit people of a particular race (white people) while disproportionately harming people of another race (Black people, Indigenous

---

[93] Heather Timmons, *Why LBJ signed executive order 11246 that Trump rescinded*, Reuters (Jan. 23, 2025), https://www.reuters.com/world/us/why-president-johnson-signed-executive-order-1965-that-trump-rescinded-2025-01-23/.

people, Latino people, and Asian American people, among others). The Anti-Diversity1 and Anti-Diversity2 Orders additionally benefit people of a particular sex, sexual orientation, and gender identity (men, cisgender people, and heterosexual people), while disproportionately harming people of other sexes, sexual orientations, and gender identities (*e.g.*, women, transgender people, lesbian, and gay people).

229. People harmed by the Anti-Diversity1 and Anti-Diversity2 Orders—people of color, women, and LGBTQ people—are the same people who face discrimination and other unfair disadvantages that prevent them from equal opportunities. The Orders, therefore, aim to eliminate policies, programs, and activities that aimed to benefit people of color, women, and LGBTQ people by increasing their diversity and inclusion in the workforce, housing, and healthcare, remedying the inequity of any unfair barriers to their access to resources or opportunities, and ensuring their full inclusion in economic and educational spaces.

230. Finally, the Anti-Gender Order's express terms, which seek to erase and remove transgender people from public life, *see supra* Section I.C., unequivocally establish sex-based discrimination and unlawful animus.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE FIRST AMENDMENT

### Violation of the First Amendment
### (Viewpoint and Content Discrimination and Chilled Speech)

**(Plaintiff NUL as to Defendants Trump, Kennedy, Jr., ~~Micone~~Chavez-DeRemer, Lutnick, Turner, Monarez, Bondi, Rollins, Zeldin, Vought, ~~Schloss~~Eschbach, HHS, DOL, DOC, HUD, CDC, DOJ, USDA, EPA, OMB, and OFCCP)**

**(Plaintiff NFHA as to Defendants Trump, Turner, Bondi, Vought, Schloss, HUD, DOJ, OMB, and OFCCP)**

**(Plaintiff AFC as to Defendants Trump, Kennedy, Jr., Turner, ~~Espinosa~~Engels,
Monarez, ~~Memoli, Nicholls~~Bhattacharya, Lazare, Bondi, Vought, ~~Schloss~~Eschbach, HHS,
HUD, HRSA, CDC, NIH, ACL, DOJ, OMB, and OFCCP)**

247. ~~231.~~ Plaintiffs repeat and incorporate by reference each and every allegation
contained in the preceding paragraphs as if fully set forth herein.

248.  All Plaintiffs state this cause of action against all Defendants and challenge the
Executive Orders and any agency action seeking to implement the Executive Orders both facially
and as applied.

249. ~~232.~~ Plaintiffs' claim for relief arises from the principle of non-statutory review to
enjoin Executive Officers and Departments from seeking to enforce illegal, ultra vires Presidential
action.

250. ~~233.~~ The First Amendment provides that the government "shall make no law . . .
abridging the freedom of speech."  U.S. Const. amend. I.

251. ~~234.~~ The First Amendment provides strong protection against government attempts
to control the topics discussed—and even more so, the *views* expressed—in public discourse.  As
the Supreme Court has put it, "If there is any fixed star in our constitutional constellation, it is that
no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or
other matters of opinion."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).
Accordingly, laws that restrict speakers from expressing certain viewpoints are a "blatant" and
"egregious" form of government speech control that is "presumed to be unconstitutional."
*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995); *see also id.* at 828
("It is axiomatic that the government may not regulate speech based on its substantive content or
the message it conveys.").

252. ~~235.~~ Plaintiffs engage in speech and advocacy to combat systemic racism, sexism,
and anti-LGBTQ discrimination and to advance equity.  Such speech and advocacy constitute core

political speech that is critical to their missions and necessary to effectively provide their services. Plaintiffs wish to continue engaging in such speech and advocacy.

253. 236. Plaintiffs engage in such speech and advocacy in multiple ways. They conduct certain training of for their own staff, the staff of other federally funded entities, and others on topics relating to implicit bias, health disparities, and the needs of specific communities they serve. They do not conduct these trainings on behalf of the government itself, but for their own employees, their clients, or the populations they serve. They receive federal funding both directly and indirectly, including through other federal contractors and grantees. TheyPlaintiffs also perform outreach to populations that experience systemic obstacles to accessing medical care, housing, and other services, including through systemic racism, sexism, and anti-transgender bias. Plaintiffs' decision to conduct trainings that advance DEIA and acknowledge the personhood of transgender people constitutes protected First Amendment activity, as does their decision to perform outreach and acknowledge and address these issues in the provision of their services.

254. 237. The purpose and effect of the Executive Orders is to suppress constitutionally protected First Amendment activity by targeting specific content and viewpoints through a range of mechanisms. The Executive Orders endorse idiosyncratic, fringe, unscientific, and counter-factual viewpoints with respect to (among other things) the purpose and effect of DEIA programs; the continued existence of systemic obstacles to equality for members of populations that have historically experienced discrimination historically; whether discrimination against these populations continues to the present day; whether advocating for an end to such discrimination and related disparities is a worthy exercise; whether transgender people even exist; and the legal landscape surrounding enforcement of civil rights laws.

255. 238. Defendants then use the Executive Orders to engage in impermissible viewpoint and content discrimination by penalizing Plaintiffs' speech that expresses a contrary viewpoint to that of the government, including Plaintiffs' core protected speech.

256. 239. The Executive Orders penalize Plaintiffs for engaging in protected First Amendment activity on topics disfavored by the Administration, primarily by leveraging the federal funding that is key to theirPlaintiffs' ability to operate and execute their missions.

257. The Anti-Diversity1 Order requires agencies to terminate "equity-related" grants.

258. 240. The Executive Orders further require agencies to terminate equity related grants and ensureAnti-Gender Order ensures that no federal funding goes to grantees or contractors for the promotion of an understanding that transgender people exist.

259. 241. The Anti-Diversity2 Order imposes coercive funding conditions that weaponize the False Claims Act (31 U.S.C. §§ 3729 *et seq.*) to deter protected speech and expression related to DEIA. *See, e.g., Anti-Diversity2 Order § 3(b)(iv)(A).*

260. 242. Section 3(b)(iv)Specifically, the Certification Provision of the Anti-Diversity2 Order requires that all federal contracts and grants include a provision certifying that recipients do not engage in DEI activities that violate civil rights laws.  Given the racially coded, vague and undefined nature of the Trump Administration use of the term "illegal DEI," this condition creates a coercive and unconstitutional chilling effect by forcing federal grantees and contractors to either self-censor or risk prosecution under the False Claims Act.

261. 243. The threat of civil investigations, potential False Claims Act liability, and the risk of funding termination restricts Plaintiffs and other non-profit organizations from advocating for racial, gender, and LGBTQ equality.

262. ~~244. These~~The penalties and threats to funding set forth above are intended to chill ~~the~~ Plaintiffs from engaging in speech and related advocacy central to their missions and to coerce them to refrain from engaging in services and research essential to the health and welfare of the populations they serve.

263. ~~245.~~Discrimination against speech based on its content and viewpoint is a violation of the First Amendment. Efforts to suppress speech based on the government's opposition to the speaker's view are unconstitutional.

264. ~~246.~~Further, viewpoint and content discrimination are presumptively unconstitutional, requiring the government to justify its discrimination.

265. ~~247.~~The government is unable to circumvent these First Amendment protections by acting through private, third parties or conditioning government spending on restrictions to speech.

266. ~~248.~~Here, the Executive Orders and any related federal policy and directives violate the Free Speech Clause of the First Amendment in at least four respects.

267. ~~249.~~*First*, Defendants' threats under the Executive Orders and any related federal policy directives impermissibly burden and chill Plaintiffs' exercise of constitutionally protected speech, expression, and expressive conduct based on the content and viewpoint of their speech.

268. ~~250.~~*Second*, Defendants intend the Executive Orders and any related federal policy directives to coerce Plaintiffs to adopt, endorse, and comply with the government's own viewpoint as if it were their own. The forced-choice framework imposed by the Executive Orders is to comply with viewpoint-based restrictions or lose federal funding. Plaintiffs are being forced to either abandon their missions or risk financial ruin, effectively silencing advocacy for racial justice, LGBTQ rights, and public health protections.

269. 251. *Third*, as to those plaintiffs who refuse to be chilled or coerced to comply with the government's favored viewpoint, the Executive Orders and any related federal policy directives discriminate against them for engaging in protected speech and expression of their own viewpoint. Here, the Executive Orders and related actions make clear that they have the purpose of rooting out views about DEIA that the Administration disagrees with and replacing them with its own. The Executive Orders achieve that speech-restrictive purpose by chilling speech through multiple mechanisms.

270. 252. *Fourth*, the Executive Orders and any related federal policy directives impose an unconstitutional condition on Congressionalcongressional funding by requiring Plaintiffs, as a condition of receiving public grants and contracts to relinquish their First Amendment rights of free speech by refraining from speaking on a certain subject, *i.e.,* DEIA. The Executive Orders are a mandate spun from whole cloth that is antithetical to the federal interests and goals of the programs.

271. 253. The government lacks even a legitimate justification for its viewpoint and content restrictions, let alone the compelling one required here.

272. 254. The Executive Orders inflict current, direct First Amendment injury on Plaintiffs. Further, Plaintiffs face a realistic danger of sustaining ongoing and future injuries in the future.

## SECOND CLAIM FOR RELIEF
### ~~VIOLATION OF THE FIFTH AMENDMENT - VOID FOR VAGUENESS~~

### Violation of the Fifth Amendment - Void For Vagueness

**(Plaintiff NUL as to Defendants Trump, Kennedy, Jr., ~~Micone~~Chavez-DeRemer, Lutnick, Turner, Monarez, Bondi, Rollins, Zeldin, Vought, ~~Schloss~~Eschbach, HHS, DOL, DOC, HUD, CDC, DOJ, USDA, EPA, OMB, and OFCCP)**

**~~(Plaintiff NFHA as to Defendants Trump, Turner, Bondi, Vought, Schloss, HUD, DOJ, OMB, and OFCCP)~~**

**(Plaintiff AFC as to Defendants Trump, Kennedy, Jr., Turner, ~~Espinosa~~Engels, Monarez, ~~Memoli, Nicholls~~Bhattacharya, Lazare, Bondi, Vought, ~~Schloss~~Eschbach, HHS, HUD, HRSA, CDC, NIH, ACL, DOJ, OMB, and OFCCP)**

273. ~~255.~~ Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

274. Plaintiffs state this cause of action against all Defendants and challenge the Executive Orders and any agency action seeking to implement the Executive Orders both facially and as applied.

275. ~~256.~~ The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

276. ~~257.~~ Under the Fifth Amendment, a governmental enactment, like the Executive Orders, is unconstitutionally vague on its face if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement. Put differently, governmental enactments are unconstitutionally void for vagueness when their prohibitions are not clearly defined. Such enactments may also be void for vagueness as applied if they inhibit First Amendment freedoms.

277. 258. Vague prohibitions inhibit freedom of speech when individuals do not know whether their speech is permitted and choose not to exercise their rights for fear of the consequences.

278. 259. The Facially, the Executive Orders include vague and subjective terms that lend themselves to conflicting interpretations and appear designed to authorize discriminatory and arbitrary enforcement in order to achieve maximum chill of disfavored viewpoints.

279. As applied, the Executive Orders fail to provide Plaintiffs with reasonable and adequate notice as to which speech, advocacy, and activities may or may not be permitted in projects funded by federal grants and/or contracts, or even projects that are not federally funded, if Plaintiffs wish to continue to receive federal funding.

280. 260. The Executive Orders leave Plaintiffs guessing about whether they can or cannot engage in speech and activities that express the need and intent to target provide support and services to communities that are underrepresented and underserved communities by virtue of their race, ethnicity, sex, or disability status. Nor can Plaintiffs cannot reasonably ascertain the parameters of such the speech and activity that is and is not permissible under the Executive Orders' terms. The Anti-Diversity1 Order fails to define "equity-related," which makes Plaintiffs wonder which of their funding is most at risk. The Anti-Diversity2 Order provides no definition of what constitutes promotion of "promoting DEI," and thus Plaintiffs do not know what they must do or say to comply with the Order. Moreover, the Anti-Gender Order provides no definition of what constitutes promotion of "promot[ing] gender ideology," leaving Plaintiffs guessing as to whether any acknowledgement of the existence of transgender people, or even the use of the term "transgender," would violate the Order.

261. The Executive Orders fail to provide reasonable and adequate notice as to which speech, advocacy, and activities may or may not be permitted in the performance of federal grants and/or contracts, or even permitted if funded by non-federal funds if Plaintiffs wish to continue to receive federal funding.

281. 262. In spite of the Executive Orders' vagueness, they include a range of penalties, including cancellation of existing federal contracts and, loss of eligibility for future government contracts, discontinuation of federal grants, and potential False Claims Act liability. The Executive Orders require contractors and grantees to agree that compliance with the government's view is "material" to funding for purposes of the False Claims Act, thus invoking the specter of vexatious litigation and significant monetary damages under that Act. Anti-Diversity2 Order § 3(b)(iv)(A).

282. 263. Plaintiffs engage in speech, as well as and conduct trainings, research, services, and advocacy, that acknowledges systemic racism, sexism, anti-LGBTQ bias, and the existence of transgender people, all of which are central to fulfillment of their missions. Plaintiffs do not know which of their activities are prohibited by the Executive Orders. Because of this uncertainty, they Plaintiffs are justifiably fearful of conducting any activities that might threaten their direct or indirect federal funding, in spite of these activities' centrality to their missions and their ability to serve vulnerable and marginalized communities.

283. 264. By predicating penalties and threatened liability on such imprecise terms, the Executive Orders create risk of unguided enforcement. The indeterminate nature of what is prohibited under the Executive Orders grants Defendants unrestrained discretion, resulting in risk of arbitrary and selective enforcement treatment of private organizations, including Plaintiffs. The

284. In sum, the Executive Orders violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution and are void for vagueness both facially and as applied

because they infringe on Plaintiffs' constitutionally protected right to free speech, provide inadequate notice of the conduct they purport to prohibit, and authorize arbitrary, ~~selective enforcement decisions~~ government action.

### THIRD CLAIM FOR RELIEF
~~VIOLATION OF THE FIFTH AMENDMENT - EQUAL PROTECTION~~

**Violation of the Fifth Amendment - Equal Protection**
**(Race Discrimination)**

**(Plaintiff NUL as to Defendants Trump, Kennedy, Jr., ~~Micone~~Chavez-DeRemer, Lutnick, Turner, Monarez, Bondi, Rollins, Zeldin, Vought, ~~Schloss~~Eschbach, HHS, DOL, DOC, HUD, CDC, DOJ, USDA, EPA, OMB, and OFCCP)**

**~~(Plaintiff NFHA as to Defendants Trump, Turner, Bondi, Vought, Schloss, HUD, DOJ, OMB, and OFCCP)~~**

**(Plaintiff AFC as to Defendants Trump, Kennedy, Jr., Turner, ~~Espinosa~~Engels, Monarez, ~~Memoli, Nicholls~~Bhattacharya, Lazare, Bondi, Vought, ~~Schloss~~Eschbach, HHS, HUD, HRSA, CDC, NIH, ACL, DOJ, OMB, and OFCCP)**

285. ~~265.~~ Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

286. ~~266.~~ Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, ultra vires Presidential action.

287. ~~267.~~ The Fifth Amendment to the U.S. Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

288. ~~268.~~ The Fifth Amendment's Due Process Clause makes the Fourteenth Amendment's guarantee of equal protection applicable to the federal government, its agencies, its officials, and its employees.

289. ~~269.~~ The Equal Protection Clause of the Fourteenth Amendment prohibits denying "any person . . . the equal protection of the laws." U.S. Const. amend. XIV, § 1. This direction

requires "all persons similarly situated [to] be treated alike." *City of Cleburne, Tex.* v. *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

290. 270. A violation of the Equal Protection Clause need not rest "solely on . . . discriminatory purposes" or even have a discriminatory purpose that is "dominant" or "primary." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). However, if a discriminatory purpose is a motivating factor in the decision, judicial deference is no longer justified. *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

291. 271. Non-exhaustive factors that point to the existence of discriminatory intent include (1) whether the impact of the action bears more heavily on one race than another; (2) the "historical background" of the decision, particularly if it demonstrates other actions taken for an invidious purpose; (3) any departures from normal procedures; (4) any "substantive[s]ubstantive departures" from factors normally considered in reaching a decision; and (5) the administrative history of the decision. *Id.* at 266–68.

292. 272. The Anti-Diversity1 and Anti-Diversity2 Orders were promulgated and/or implemented by the Trump Administration, at least in part, with the purpose of discriminating against Black people and other people of color through the chilling and suppression of speech concerning racism and through the targeting of federally funded entities that seek to address and ameliorate systemic obstacles to racial equality for cessation of their federal grants and contracts. Accordingly, the Anti-Diversity1 and Anti-Diversity2 Orders discriminate against Black people and other people of color who are served by Plaintiffs' programs and services and are unable to avail themselves of their rights by frustrating Plaintiffs' missions, chilling theirPlaintiffs' speech

on racism, and penalizing ~~them~~Plaintiffs for their efforts to address harms and disadvantages disproportionately borne by Black people and other people of color.

293.  ~~273.~~ The history of the Anti-Diversity1 and ~~Anti-DEIA 2~~Anti-Diversity2 Orders, the sequence of events taken to implement them, and the contemporaneous statements and actions of President Trump and Administration officials ~~in his Administration~~ raise a strong inference of a discriminatory purpose.

294.  ~~274.~~ The known and reasonably foreseeable discriminatory impact of the Anti-Diversity1 and Anti-Diversity2 Orders on Black people and other people of color~~, among other factors, raise~~ also raises a strong inference of a discriminatory purpose.

295.  ~~275.~~ Moreover, the Anti-Diversity1 and Anti-Diversity2 Orders were motivated by, perpetuate, and further entrench discriminatory and baseless stereotypes concerning the relative qualifications of Black people and~~/or~~ other people of color.

296.  ~~276. The~~In addition, the Anti-Diversity1 and Anti-Diversity2 Orders classify their beneficiaries ~~of the Orders~~ by race~~ by prohibiting~~.  They prohibit DEIA policies, programs, and activities, which are established means of combatting the effects of entrenched discrimination and other unfair barriers to opportunities, to the advantage of white people and to the detriment of people of color.

~~277.~~  In addition, the express terms of the Anti-Diversity1 and Anti-Diversity2 Orders mandate that white people will disproportionately benefit, and people of color will be disproportionately harmed, from the Orders' implementation and enforcement.

297.  ~~278.~~ Accordingly, the Anti-Diversity1 and Anti-Diversity2 Orders discriminate against people of color who are served by Plaintiffs' programs and ~~services and are~~ unable to avail themselves of their rights by frustrating Plaintiffs' missions, chilling ~~their~~Plaintiffs' speech on

racial justice issues, and penalizing ~~them~~Plaintiffs for their efforts to address harms and disadvantages disproportionately borne by people of color.

298.    ~~279.~~The Anti-Diversity1 and Anti-Diversity2 Orders also discriminate on the basis of race by targeting equity-related grants for cessation because such grants benefit people of color. By singling out the services provided by Plaintiffs for disfavor and cessation because they seek to address racial inequalities, the Anti-Diversity1 and Anti-Diversity2 Orders discriminate against people of color, including those who are served by Plaintiffs, have a close relationship with Plaintiffs, and are not in a position to vindicate their rights.

299.    ~~280.~~Moreover, the race discrimination from the Anti-Diversity1 and Anti-Diversity2 Orders frustrates Plaintiffs' organizational missions.

300.    ~~281.~~Defendants lack even a rational justification for the Anti-Diversity1 and Anti-Diversity2 Orders, let alone the compelling one required, ~~nor are~~and they are not adequately tailored to meet that purported justification.

301.    ~~282.~~Defendants' violations cause ongoing harm to Plaintiffs and the Black people and other people of color whom they serve.

**FOURTH CLAIM FOR RELIEF**
~~**VIOLATION OF THE FIFTH AMENDMENT - EQUAL PROTECTION**~~

**Violation of the Fifth Amendment - Equal Protection**
**(Sex, Sexual Orientation, Gender Identity, and Transgender Status)**

**(Plaintiff NUL as to Defendants Trump, Kennedy, Jr., ~~Micone~~Chavez-DeRemer, Lutnick, Turner, Monarez, Bondi, Rollins, Zeldin, Vought, ~~Schloss~~Eschbach, HHS, DOL, DOC, HUD, CDC, DOJ, USDA, EPA, OMB, and OFCCP)**

~~**(Plaintiff NFHA as to Defendants Trump, Turner, Bondi, Vought, Schloss, HUD, DOJ, OMB, and OFCCP)**~~

**(Plaintiff AFC as to Defendants Trump, Kennedy, Jr., Turner, ~~Espinosa~~Engels, Monarez, ~~Memoli, Nicholls~~Bhattacharya, Lazare, Bondi, Vought, ~~Schloss~~Eschbach, HHS, HUD, HRSA, CDC, NIH, ACL, DOJ, OMB, and OFCCP)**

302. 283. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

303. 284. The Anti-Gender Order and implementation discriminatediscriminates against Plaintiffs and the transgender people whom Plaintiffs serve on the basis of sex and transgender status, without lawful justification, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment.

304. 285. By directing agencies to withhold grants from entities that "promote gender ideology," the Anti-Gender Order discriminates based on sex and transgender status.

305. Further, the government's threat to deny federal funding unless Plaintiffs exclude (discriminate against) a protected class of people evidences the government's attempt to contract with private entities to accomplish what the government itself is constitutionally forbidden to accomplish. This unconstitutional condition results in a direct injury to Plaintiffs, as well as the transgender people they serve.

306. 286. The Anti-Gender Order facially discriminates based on sex because it creates idiosyncratic and unscientific sex-based definitions for the purpose of exclusion and directs agencies to withhold grants from entities that "promote gender ideology."

307. 287. The Anti-Gender Order also facially discriminates based on transgender status because it expresses a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people and gender identity, denyingdenies that transgender people exist, deemingdeems them "false," and orderingorders their exclusion from government recognition and protection.

288. The Anti-Gender Order was issued for the openly discriminatory purpose of expressing governmental disapproval of transgender people, repudiating their existence,

~~preventing them from expressing gender identities that differ from the sex assigned to them at birth, and imposing discriminatory burdens upon them in numerous respects in every aspect of their daily lives.  This animus laden purpose is not a legitimate governmental interest and fails under any standard of review.~~

308.  ~~289.~~ Transgender people have experienced a long history of discrimination and continue to suffer ~~that~~ from such discrimination.  They are a discrete and insular group and lack the power to protect their rights through the political process.  A person's gender identity or transgender status bears no relation to that person's ability to contribute to society, and gender identity is a core defining trait that is so fundamental to a person's sense of self and personhood that they cannot be required to abandon it as a condition of equal treatment.  Efforts to change a person's gender identity through intervention have been widely condemned.

309.  The Anti-Gender Order was issued for the openly discriminatory purpose of expressing governmental disapproval of transgender people, repudiating their existence, preventing them from expressing gender identities that differ from the sex assigned to them at birth, and imposing discriminatory burdens upon them in every aspect of their daily lives.  This animus-laden purpose is not a legitimate governmental interest and fails under any standard of review.

310.  ~~290. Moreover, the~~ The sex, sexual orientation, and gender identity discrimination ~~from the Anti-Diversity1 and Anti-Diversity2 Orders frustrate~~ of the Anti-Gender Order frustrates Plaintiffs' organizational missions.

311.  ~~291.~~ Discrimination on the basis of sex is presumptively unconstitutional and subject to heightened scrutiny.

312. 292. Discrimination based on transgender status is also presumptively unconstitutional and subject to heightened scrutiny.

313. 293. Defendants lack even a rational or legitimate justification for the Anti-Diversity1 and Anti-Diversity2 Executive OrdersAnti-Gender Order, let alone the exceedingly persuasive or compelling one required, nor are theyand the Order is not adequately tailored to meet that justification under any standard of review.

314. 294. Defendants' violations cause ongoing harm to Plaintiffs and the women and/or LGBTQtransgender people whom they serve.

### FIFTH CLAIM FOR RELIEF
### ULTRA VIRES PRESIDENTIAL ACTION IN EXCESS OF AUTHORITY

### Ultra Vires Presidential Action in Excess of Authority
### (USURPING THE LEGISLATIVE FUNCTIONAs Applied to Plaintiffs Contrary to Statutes)

**(Plaintiff NUL as to Defendants Trump, Kennedy, Jr., MiconeChavez-DeRemer, Lutnick, Turner, Monarez, Bondi, Rollins, Zeldin, Vought, SchlossEschbach, HHS, DOL, DOC, HUD, CDC, DOJ, USDA, EPA, OMB, and OFCCP)**

**(Plaintiff NFHAAFC as to Defendants Trump, Kennedy, Jr., Turner, Engels, Monarez, Bhattacharya, Lazare, Bondi, Vought, SchlossEschbach, HHS, HUD, HRSA, CDC, NIH, ACL, DOJ, OMB, and OFCCP)**

315. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

316. Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, ultra vires Presidential action.

317. Federal statutes and regulations specifically authorize Plaintiffs' equity-related services and advocacy, and efforts to eradicate discrimination against transgender people. President Trump does not have the power to override those statutes and prohibit grant recipients from doing precisely what Congress has directed, and what duly promulgated regulations

prescribe. The Executive Orders are inconsistent with the U.S. Constitution's separation of powers clause.

318.    The Anti-Diversity1 and Anti-Diversity2 Orders impose sweeping funding restrictions on federal contractors and grantees, directing agencies to terminate "equity-related" grants and contracts without lawful statutory basis.   The Anti-Gender Order imposes similar sweeping restrictions on federal contractors and grantees, prohibiting the use of federal funding for "promoting gender ideology."

319.    When the President usurps congressional authority and infringes on the constitutional rights of individuals, the essential role of the courts is to "say what the law is." The Executive Orders should be declared unlawful, and the Defendants should be enjoined from enforcing or implementing them.

320.    The following non-exhaustive list of Federal statutes and regulations specifically authorize Plaintiffs' equity-related services and advocacy, and their efforts to eradicate discrimination against transgender people:

| Agency Funder | Plaintiff Grantees | Statutory/Regulatory Provision Contravened |
|---|---|---|
| U.S. Department of Labor | NUL | No payment shall be made by the Secretary toward the cost of any project established or administered by such an organization or agency unless the Secretary determines that such project— (M) will ensure that, to the extent feasible, such project will **serve the needs of minority and Indian eligible individuals, eligible individuals with limited English proficiency, and eligible individuals with greatest economic need**, at least in proportion to their numbers in the area served and **take into consideration their rates of poverty and unemployment.** 42 U.S.C. § 3056(b)(1). <br><br> For purposes of subsection (a)(1), the Secretary shall select the eligible applicants to receive grants based on the following: (1) The applicant's ability to administer a project that **serves the greatest number of eligible individuals, giving particular consideration to individuals with greatest economic need, individuals with greatest social need,** and individuals described in |

| | | |
|---|---|---|
| | | subsection (a)(3)(B)(ii) or (b)(2) of section 3056p of this title. 42 U.S.C. § 3056l(c).<br><br>The term ''greatest social need'' means the need caused by noneconomic factors, which include—<br>**(A) physical and mental disabilities;**<br>(B) language barriers; and<br>**(C) cultural, social, or geographical isolation, including isolation caused by racial or ethnic status**, that—<br>(i) restricts the ability of an individual to perform normal daily tasks. 42 U.S.C. § 3002(24). |
| U.S. Department of Commerce | NUL | The term "minority business enterprise-(i) that is not less than **51 percent-owned by 1 or more socially or economically disadvantaged individuals**; and (ii) the management and daily business operations of which are controlled by 1 or more socially or economically disadvantaged individuals. 15 U.S.C. § 9501(9)(A).<br><br>The term "socially or economically disadvantaged individual" means an **individual who has been subjected to racial or ethnic prejudice or cultural bias** (or the ability of whom to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same line of business and competitive market area) because of the identity of the individual as a member of a group, without regard to any individual quality of the individual that is unrelated to that identity. 15 U.S.C. § 9501(15)(A). |
| U.S. Department of Housing and Urban Development – (a) Youth Homelessness Demonstration Program; and (b) Continuum of Care Program – Transitional Housing/Rapid Rehousing Component | NUL, AFC | "It is the purpose of this chapter-- … **to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans.**" 42 U.S.C. § 11301(b)(3).<br><br>"The purposes of this part are-- … **to provide funding for efforts by nonprofit providers** and State and local governments **to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness . . . .**" 42 U.S.C. § 11381(2).<br><br>"The Secretary shall award grants, on a competitive basis, and using the selection criteria described in section 11386a of this title, to carry out eligible activities under this part for projects that meet the program requirements under section 11386 of this title, either by directly awarding funds to project sponsors or by awarding funds to unified funding agencies." 42 U.S.C. § 11382(a). |

| | | "**Special populations.** All eligible costs are eligible to the same extent for **program participants who are unaccompanied homeless youth; persons living with HIV/AIDS; and victims of domestic violence, dating violence, sexual assault, or stalking.**" 24 C.F.R. § 578.53(c). |
|---|---|---|
| Centers for Disease Control and Prevention | NUL, AFC | "Except as otherwise provided for in this title (or an amendment made by this title), **an individual shall not, on the ground prohibited under** title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), **title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.),** the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, **any health program or activity, any part of which is receiving Federal financial assistance**, including credits, subsidies, or contracts of insurance." 42 U.S.C. §18116(a). |
| U.S. Environmental Protection Agency | NUL | The Administrator of the Environmental Protection Agency shall, on and after October 6, 1992, to the fullest extent possible, ensure that at least 8 per centum of Federal funding for prime and subcontracts awarded in support of authorized programs, including grants, loans, and contracts for wastewater treatment and leaking underground storage tanks grants, be made available to business concerns or other organizations owned or controlled by **socially and economically disadvantaged individuals** (within the meaning of section 637(a)(5) and (6) of title 15), including historically black colleges and universities. For purposes of this section, economically and socially disadvantaged individuals shall be deemed to include women. 42 U.S.C. § 4370(d).<br><br>(5) Socially disadvantaged individuals are those who have been **subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities**.<br>(6)(A) Economically disadvantaged individuals are those **socially disadvantaged individuals** whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. 15 U.S.C. § 637(6)(A). |
| U.S. Department of Health and Human Services | AFC | "Except as otherwise provided for in this title (or an amendment made by this title), **an individual shall not, on the ground prohibited under** title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), **title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.),** the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, **any health program or activity, any part of** |

| | | which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." 42 U.S.C. § 18116(a). |
|---|---|---|
| National Institutes of Health | AFC | "In carrying out the purposes of section 241 of this title, the Secretary, acting through **the Director of NIH—shall assemble accurate data to be used to assess research priorities**, including— (A) information to better evaluate scientific opportunity, public health burdens, and progress in **reducing health disparities**; and (B) data on study populations of clinical research, funded by or conducted at each national research institute and national center, which—(i) **specifies the inclusion of**—(I) women; (II) **members of minority groups**; (III) relevant age categories, including pediatric subgroups; and (IV) other demographic variables as the Director of the National Institutes of Health determines appropriate . . . ." 42 U.S.C. § 282(b)(4). "In the case of clinical research, the catalog shall, as appropriate, identify study populations by demographic variables, including biological and social variables and relevant age categories (such as pediatric subgroups), and determinants of health, that **contribute to research on minority health and health disparities**." 42 U.S.C. § 283(a)(4)(B). "The Director of the National Institutes of Health shall, as appropriate, **encourage efforts to improve research related to the health of sexual and gender minority populations**, including by— (1) **facilitating increased participation of sexual and gender minority populations in clinical research** supported by the National Institutes of Health, and reporting on such participation, as applicable; (2) **facilitating the development of valid and reliable methods for research relevant to sexual and gender minority populations**; and (3) addressing methodological challenges." 42 U.S.C. § 283p. "The Associate Director for Special Populations [of the National Institute of Mental Health] **shall**—(A) **develop and coordinate research policies and programs to assure increased emphasis on the mental health needs of** women and minority populations; (B) **support programs of basic and applied social and behavioral research on the mental health problems of** women and minority populations; (C) **study the effects of discrimination on institutions and individuals**, including majority institutions and individuals; (D) support and develop research designed to eliminate institutional discrimination; and (E) **provide increased emphasis on the concerns of** women and **minority populations in training programs, service delivery programs, and research endeavors of the Institute**." 42 U.S.C. § 285p(e)(2). "The general purpose of the National Institute on Minority Health and Health Disparities ... is the **conduct and support of research,** |

|  |  | training, dissemination of information, and other programs with respect to minority health conditions and other populations with health disparities." 42 U.S.C. § 285t.

"The Director of the Institute shall make awards of grants or contracts to designated biomedical and behavioral research institutions under paragraph (1) of subsection (c), or to consortia under paragraph (2) of such subsection, for the purpose of assisting the institutions in supporting programs of excellence in biomedical and behavioral research training for individuals who are members of minority health disparity populations or other health disparity populations." 42 U.S.C. § 285t-1.
"In conducting or supporting clinical research for purposes of this subchapter, the Director of NIH shall, subject to subsection (b), ensure that … members of minority groups are included as subjects in such research." 42 U.S.C. § 289a-2(a)(1)(B).
"The Director of NIH … shall conduct or support outreach programs for the recruitment of women and members of minority groups as subjects in projects of clinical research." 42 U.S.C. § 289a-2(a)(2). |
| Health Resources and Services Administration | AFC | "No person shall on the ground of sex or religion be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under this part." 42 U.S.C. § 300w-7(a)(2) (emphasis added). |

321.    President Trump does not have the power to override these statutes and prohibit grant recipients and contractors from doing precisely what Congress has directed, and what duly promulgated regulations prescribe. The Executive Orders are inconsistent with the Constitution's separation of powers clause.

322.    Plaintiffs are entitled to a declaration that the Anti-Diversity1, Anti-Diversity2, and Anti-Gender Orders are ultra vires because they impermissibly direct agencies to take actions in violation of statutory laws.

**SIXTH CLAIM FOR RELIEF**
**Ultra Vires Presidential Action in Excess of Authority**
**(Facial Usurping of the Legislative Function)**

**(Plaintiff NUL as to Defendants Trump, Kennedy, Jr., Chavez-DeRemer, Lutnick, Turner, Monarez, Bondi, Rollins, Zeldin, Vought, Eschbach, HHS, DOL, DOC, HUD, CDC, DOJ, USDA, EPA, OMB, and OFCCP)**

**(Plaintiff AFC as to Defendants Trump, Kennedy, Jr., Turner, ~~Espinosa~~Engels, Monarez, ~~Memoli, Nicholls~~Bhattacharya, Lazare, Bondi, Vought, ~~Schloss~~Eschbach, HHS, HUD, HRSA, CDC, NIH, ACL, DOJ, OMB, and OFCCP)**

323. ~~295.~~ Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

324. ~~296.~~ The U.S. Constitution vests Congress, not the President, with the exclusive authority over federal spending under Article I, § 8 and Article I, § 9, clause 7. The Executive Orders usurp this power by unilaterally terminating or modifying federal grants and contracts without congressional authorization for such actions.

325. ~~297.~~ Article I of the Constitution vests Congress with the powers to make laws and control the public fisc. The Presentment Clause provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States." U.S. Const. art. I, § 7, cl. 2. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7, and the Spending Clause vests Congress with the power to ~~use Treasury funds~~ expend those funds for the "general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

326. ~~298.~~ Thus, it is Congress, not the President, who is vested with the power of the purse. The President does not have unilateral power to withhold federal funds that have been previously authorized by Congress and signed into law, and the President does not have the power

to impose his own conditions on the use of funds when Congress has not delegated to him the power to do so.

327. ~~299.~~ As part of its power over the public fisc, Congress distributes millions of dollars every year in grants related to social services, community investment, employment, healthcare, housing, and education.  Congress may specify how its grants are used, generally by passing federal statutes, or in their annual appropriations bill.  None of the ~~Congressional~~congressional conditions placed on the grants administered or disbursed contain the unique restrictions described in the Executive Orders relating to DEIA or the promotion of "gender ideology."

328. ~~300.~~ No provision of the Constitution authorizes the ~~executive~~Executive to enact, amend, or repeal statutes, including appropriations approved by Congress and signed into law by the President.  The Executive cannot unilaterally amend or cancel appropriations that Congress has duly enacted.

329. ~~301.~~ By directing agencies to terminate congressionally appropriated grants based on the President's own policy preferences, the Executive Orders attempt to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations.  These mandates exceed the President's powers under Article II, unconstitutionally infringe upon those powers vested in Congress, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.  *See* U.S. Const. art. I, § 7, cl. 2, 3.

330. ~~302.~~ By directing agencies to terminate or withhold congressionally appropriated grants, the Executive Orders attempt to expend public funds to advance the President's policy preferences, rather than those of Congress.  This exceeds the President's powers under Article II and unconstitutionally infringes upon ~~those~~the powers vested in Congress.

331. 303. These actions exceed the President's powers under Article II, unconstitutionally infringe upon those powers vested in Congress, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.

332. 304. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Executive Orders violate the constitutional principles of the separation of powers doctrine and impermissibly arrogate to the executive power that is reserved to Congress.

### SIXTH CLAIM FOR RELIEF
### ULTRA VIRES PRESIDENTIAL ACTION IN EXCESS OF AUTHORITY

#### (Contrary to Statutes)

**(Plaintiff NUL as to Defendants Trump, Kennedy, Jr., Micone, Lutnick, Turner, Monarez, Bondi, Rollins, Zeldin, Vought, Schloss, HHS, DOL, DOC, HUD, CDC, DOJ, USDA, EPA, OMB, and OFCCP)**

**(Plaintiff NFHA as to Defendants Trump, Turner, Bondi, Vought, Schloss, HUD, DOJ, OMB, and OFCCP)**

**(Plaintiff AFC as to Defendants Trump, Kennedy, Jr., Turner, Espinosa, Monarez, Memoli, Nicholls, Bondi, Vought, Schloss, HHS, HUD, HRSA, CDC, NIH, ACL, DOJ, OMB, and OFCCP)**

305. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

306. Far from authorizing the President to mandate that grant recipients refrain from engaging in DEIA practices, addressing systemic obstacles to equality and health disparities, or acknowledging and supporting transgender people, federal law specifically authorizes Plaintiffs' equity-related services and advocacy. President Trump does not have the power to override those statutes and prohibit grant recipients from doing precisely what Congress has directed, and what duly promulgated regulations prescribe. The Executive Orders are inconsistent with our Constitution's separation of powers.

307. The Executive Orders impose sweeping funding restrictions on federal contractors and grantees, directing agencies to, *inter alia*, terminate "equity related" grants and contracts without lawful statutory basis. These actions violate the constitutional separation of powers principles and amount to an unconstitutional exercise of executive authority over federal appropriations.

308. When the President usurps congressional authority and infringes on the constitutional rights of individuals, the essential role of the courts is to "say what the law is." The Executive Orders should be declared unlawful, and the agency Defendants should be enjoined from enforcing or implementing them.

309. The Executive Orders are contrary to the federal interests of the funding statutes applicable to plaintiff NUL, including the Housing and Urban Development Act of 1968 and the Older Americans Act of 1965.

310. NUL's Housing Counseling Program is funded by a grant from HUD, authorized by Section 106 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701x. Pursuant to statute, this grant is for the purpose of providing "information, advice, and technical assistance, including but not limited to" "counseling and advice to tenants and homeowners . . . to assist them in improving their housing conditions . . . ."[51]

311. The statute references the need for counselors to be competent in specific subject matters, including without limitation "[f]air housing laws and requirements." Fair housing laws and requirements prohibit housing and lending discrimination on the bases of race, national origin, religion, sex, disability, sexual orientation, gender identity, and other protected classes. Thus, the Executive Orders' prohibitions against DEIA, as viewed by agency officials, may bar NUL staff

from providing counseling on fair housing laws and requirements, in direct conflict with the Housing and Urban Development Act.

312. Moreover, regulations governing the Housing Counseling Program refer to "fair housing and predatory lending" as "approved housing counseling, education, and outreach topics" that NUL counselors may provide and discuss with clients. However, to the extent "fair housing" and "predatory lending" pertain to any specific communities vulnerable to housing discrimination and predatory lending and are also associated with DEIA, as understood by agency officials, those topics may be prohibited by the Executive Orders in contravention of agency regulations.

313. NUL's Urban Seniors Jobs Program is authorized by the Older Americans Act, pursuant to which the Senior Community Service Employment Program ("SCSEP") was established. The SCSEP is a community service and work-based job training program for older Americans. The program provides training for economically insecure, unemployed seniors who are committed to finding employment opportunities. Participants also have access to employment assistance through American Job Centers.

314. The Older Americans Act requires consideration of a program's effectiveness in targeting services for underserved older Americans with the greatest economic and social needs, which the statute identifies as including "low-income minority individuals" and "older individuals residing in rural areas."[52] Further, the statute requires a pre-approved plan for programs and services to older individuals, which must include "specific objectives" for service provision to certain, identified high-need populations, including without limitation "low-income minority older individuals."[53] The Older Americans Act also requires outreach to certain older populations, including without limitation "low-income minority individuals and older individuals residing in rural areas" with the greatest economic and social needs, as well as "older individuals with severe

disabilities."[54]  These statutory requirements may be undermined by the views agency officials take under color of the Executive Orders.

315. The Executive Orders are contrary to the federal interests of the funding statutes applicable to Plaintiff NFHA, including the Housing and Community Development Act of 1987. This statute authorizes funds for private fair housing enforcement organizations, like NFHA and its members, to help enforce compliance with the Fair Housing Act, which prohibits housing and lending discrimination on the basis of race, national origin, religion, sex, disability, sexual orientation, gender identity, and other protected classes. Based on agency actions thus far, Defendants seem to construe NFHA's work enforcing the Fair Housing Act to fall within the Executive Orders' rubric of DEIA and, thus, subject to termination of federal funds.

316. The Executive Orders are contrary to the federal interests of the funding statutes applicable to Plaintiff AFC, including the HIV Health Care Services Program and Housing Opportunities for People with AIDS.

317. The statutory framework for the HIV Health Care Services Program (also known as "Ryan White Program") constituted the initial national response to HIV and explicitly directs resources to underserved populations, reflecting Congress's intent to address disparities in access to healthcare for individuals living with HIV/AIDS.  42 U.S.C. § 300ff.

318. The Ryan White Program requires grant recipients to create HIV health services planning councils that reflect the demographics of individuals with HIV/AIDS in a given area, with particular consideration for disproportionately affected and historically underserved groups and subpopulations.  42 U.S.C. § 300ff-12(b)(1).

319. The Ryan White Program also mandates that grant recipients target services to underserved populations, including minority populations, ex-offenders, individuals with

comorbidities, low-income populations, inner-city populations, and rural populations. 42 U.S.C. § 300ff 52.

320. The Ryan White Program establishes the Minority AIDS Initiative to evaluate and address racial and ethnic disparities in access to HIV care, with funding distributed based on the disproportionate impact of HIV/AIDS on racial and ethnic minorities. 42 U.S.C. § 300ff 121.

321. The Housing Opportunities for People with AIDS ("HOPWA") regulations reinforce the prioritization of marginalized populations. They provide fair housing guidance and nondiscrimination in the housing services. 24 C.F.R. § 574.300. HOPWA imposes affirmative outreach obligations on grantees to ensure all eligible individuals, including those at risk of discrimination based on race, national origin, sex, or disability, are aware of and can access HOPWA-funded housing and services. 24 C.F.R. § 574.603. Finally, the regulations explicitly define "family" in a manner inclusive of LGBTQ people, ensuring access to housing assistance regardless of sexual orientation or gender identity. 24 C.F.R. § 574.3.

322. The Executive Orders violate these statutory and regulatory mandates. The HOPWA and Ryan White programs are structured to remediate systemic inequities in healthcare and housing, and executive orders that disregard these obligations contradict the express will of Congress.

### SEVENTH CLAIM FOR RELIEF

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

**(Contrary to Constitution, Excess of Statutory Authority, Arbitrary and Capricious)**

**(Plaintiff NUL as to Defendants Kennedy, Jr., Micone, Lutnick, Turner, Monarez, Bondi, Rollins, Zeldin, Vought, Schloss, HHS, DOL, DOC, HUD, CDC, DOJ, USDA, EPA, OMB, and OFCCP)**

**(Plaintiff NFHA as to Defendants Turner, Bondi, Vought, Schloss, HUD, DOJ, OMB, and OFCCP)**

**(Plaintiff AFC as to Defendants Kennedy, Jr., Turner, Espinosa, Monarez, Memoli, Nicholls, Bondi, Vought, Schloss, HHS, HUD, HRSA, CDC, NIH, ACL, DOJ, OMB, and OFCCP)**

323. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

324. Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

325. Defendant agencies have taken actions to eliminate DEIA programs and activities without defining what types of programs and activities are banned as "DEI" or DEIA" and without any prior determinations of their illegality.

326. They have also banned "gender ideology," a term created by the federal government based on idiosyncratic and unscientific sex-based definitions.

327. Likewise, these agency actions cut off federal funding, through contracts or grants, to any program or activity that is "DEI" or "DEIA"—or related to "DEI" or "DEIA"—without any prior determination of (a) why they are considered to be "DEI" or "DEIA" or (b) why they are illegal pursuant to criteria that is articulable, discernible, and publicly known.

328. They also cut off federal funding, through contracts or grants, to any program activity that promotes "gender ideology," a term created by the federal government based on idiosyncratic and unscientific sex-based definitions.

329. The agencies' actions in response to the unlawful Executive Orders constitute agency actions that should be set aside for at least three reasons.

330. The agencies' actions taken pursuant to the Executive Orders are contrary to constitutional right, power, privilege, or immunity in violation of 5 U.S.C. § 706(2)(B), as more particularly described Claims for Relief One, Two, Three, and Four, above.

331. The agencies' actions taken pursuant to the Executive Orders are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C), as more particularly described in Claim for Relief Five, above.

332. The agencies' actions are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), as more particularly described in Claim for Relief Two, above.

333. The Court should hold unlawful and set aside the actions of the agencies acting pursuant to the Executive Orders,

### JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims triable.

### REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.    A declaration pursuant to 28 U.S.C. § 2201 that Executive Order Nos. 14151, 14168, and 14173 and any implementing agency actions are unlawful, unconstitutional, and invalid.

B.    A permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing Executive Order Nos. 14151, 14168, and 14173, including without limitation the promulgation of any rules or regulations, in any manner against Plaintiffs by way of contract, subcontract, purchase order, grant, or sub-grant.

C.    A permanent injunction mandating that Defendants permanently rescind all agency-wide directives implementing and effectuating Executive Order Nos. 14151, 14168, and 14173 against Plaintiffs that were issued prior to this injunction.

D.    A permanent injunction mandating that Defendants unwind, rescind, strike, modify, or otherwise rectify contracts, subcontracts, agreements, and/or any other such binding documents entered into with Plaintiffs, in which terms, clauses, or provisions have been inserted pursuant to or in furtherance of Executive Order Nos. 14151, 14168, and 14173.

E.    A permanent injunction mandating that Defendants provide notice of this injunction to all Plaintiffs and their subcontractors, vendors, and/or sub-grantees for whom such terms, clauses, or provisions have already been imposed.

F.    An order awarding Plaintiffs' cost of suit and reasonable attorneys' fees and expenses, pursuant to any applicable law; and

G.    Such other relief as this Court deems equitable, just, and proper.

Dated:  ~~February 19~~June 27, 2025                    Respectfully submitted,


                                        /s/ Jin Hee Lee
                                        _____

Jin Hee Lee, DC Bar No. 1740850                Stacey K. Grigsby, DC Bar No. 491197
Gabriel Diaz, DC Bar No. 991618                Sarah E. Harrington, DC Bar No. 219218*
Donya Khadem, DC Bar No. 1719557*              Alison DiCiurcio, DC Bar No. 1601410*
Candace Caruthers                              COVINGTON & BURLING LLP
~~Avatara Smith Carrington~~Loreal Hawk, DC Bar   850 Tenth Street, NW
No. ~~90013196~~90033817                       Washington, DC 20001
NAACP LEGAL DEFENSE &                          (202) 662-6000
    EDUCATIONAL FUND, INC.                     sgrigsby@cov.com
700 14th Street NW, Suite 600                  sharrington@cov.com
Washington, DC 20005                           adiciurcio@cov.com
(202) 682-1300
jlee@naacpldf.org                              Nicholas E. Baer, DC Bar No. 1672517*
gdiaz@naacpldf.org                             James H. Fitch, DC Bar No. 1780894*
dkhadem@naacpldf.org                           COVINGTON & BURLING LLP
~~acarrington~~ccaruthers@naacpldf.org         620 Eighth Avenue
                                               New York, NY 10018
Leah Wong*                                     (212) 841-1000
~~Alexis Johnson*~~                            nbaer@cov.com
NAACP LEGAL DEFENSE &                          jhfitch@cov.com
    EDUCATIONAL FUND, INC.

40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
lzwong@naacpldf.org
~~amjohnson@naacpldf.org~~

Camilla B. Taylor, DC Bar No. IL0098
Kenneth D. Upton, Jr., DC Bar No. 1658621
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
(312) 605-3225
ctaylor@lambdalegal.org
kupton@lambdalegal.org

Jose Idio Abrigo*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(646) 307-7406
jabrigo@lambdalegal.org

Pelecanos*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017**
(323) 370-6909
pelecanos@lambdalegal.org

~~*Admission Pro Hac Vice forthcoming~~
**Address for mailing purposes only