**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| National Urban League, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>Donald J. Trump, in his official capacity as President of the United States, *et al.*,<br><br>      Defendants. | Case No. 25-cv-471 |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

ARGUMENT ...................................................................................................................... 7

I.  PLAINTIFFS' CLAIMS SUFFER FROM JURISDICTIONAL DEFECTS ................................. 7

    A.  Plaintiffs lack Article III standing ..................................................................... 7

    B.  This Court lacks jurisdiction to review challenges to the Funding Provisions under the Tucker Act ............................................................................................ 14

II.  PLAINTIFFS' CLAIMS FAIL ON THE MERITS ............................................................. 16

    A.  Plaintiffs have failed to state a void-for-vagueness claim under the Fifth Amendment ...................................................................................................... 16

    B.  Plaintiffs have failed to state a First Amendment claim ................................. 21

    C.  Plaintiffs have failed to state an equal protection claim with respect to EO 14,151 and EO 14,173 ...................................................................................... 27

    D.  Plaintiffs have failed to state an equal protection claim with respect to EO 14,168 ........ 37

    E.  Plaintiffs have failed to state an ultra vires claim with respect to any statute or regulation ........................................................................................................ 41

    F.  Plaintiffs have failed to state a claim that the Executive Orders are ultra vires in violation of separation of powers..................................................................... 44

CONCLUSION.................................................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez,*
    585 U.S. 579 (2018)................................................................................................. 36

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995)................................................................................................. 28

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013)................................................................................................. 22

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,*
    103 F.4th 765 (11th Cir. 2024)................................................................................ 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................................... 7

*Baird v. State Bar of Ariz.,*
    401 U.S. 1 (1971)..................................................................................................... 24

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
    591 U.S. 610 (2020)................................................................................................... 8

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................... 7

*Bennett v. New Jersey,*
    470 U.S. 632 (1985)................................................................................................. 18

*Bd. of Regents of State Colls. v. Roth,*
    408 U.S. 564 (1972)................................................................................................. 19

*Chicago Women in Trades v. Trump,*
    2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) .................................................. *passim*

*Clark v. Jeter,*
    486 U.S. 456 (1988)................................................................................................. 28

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)................................................................................................. 13

*Com. Drapery Contractors, Inc. v. United States,*
    133 F.3d 1 (D.C. Cir. 1998)..................................................................................... 19

*Common Cause v. Trump,*
    506 F. Supp. 3d 39 (D.D.C. 2020) .......................................................................... 42

*Construction Trades Department, AFL-CIO v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002)..........................................................................4, 41, 42

*Conset Corp. v. Cmty. Servs. Admin.*,
    655 F.2d 1291 (D.C. Cir. 1981)..................................................................... 19

*Cnty. of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ..........................................................45

*Davis v. Passman*,
    442 U.S. 228 (1979).......................................................................................... 28

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025) ............................................................................14, 15, 16

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)......................................................................................... 17

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    486 F. Supp. 3d 69 (D.D.C. 2020), *aff'd*, 39 F.4th 756 (D.C. Cir. 2022) ................................ 16

*Francis v. Acting Dir., D.C. Off. of Zoning*,
    2023 WL 4846625 (D.D.C. July 28, 2023)..................................................... 36

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)......................................................................................... 33

*Freedom Republicans, Inc. v. FEC*,
    13 F.3d 412 (D.C. Cir. 1994)......................................................................... 14

*Gizzo v. Ben-Habib*,
    44 F. Supp. 3d 374 (S.D.N.Y. 2014) ............................................................. 18

*Goldberg v. Kelly*,
    397 U.S. 254 (1970)......................................................................................... 18

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)...................................................................................17, 21

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)......................................................................................... 15

*Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*,
    463 U.S. 582 (1983)......................................................................................... 45

*Harris v. McRae*,
    448 U.S. 297 (1980)...................................................................................23, 24

*Heller v. Doe*,
   509 U.S. 312 (1993) ............................................................................ 36, 37

*Hettinga v. United States*,
   677 F.3d 471 (D.C. Cir. 2012) ................................................................. 20

*Kareem v. Haspel*,
   986 F.3d 859 (D.C. Cir. 2021) ................................................................... 7

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023), *aff'd*, 145 S. Ct. 1816 ............................... 40

*Levine v. Vilsack*,
   587 F.3d 986 (9th Cir. 2009) ................................................................... 14

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................... 7, 13

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ............................................................................... 4, 44

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   767 F. Supp. 3d 243 (D. Md.), *opinion clarified*,
   769 F. Supp. 3d 465 (D. Md. 2025) ........................................................... 6

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025) ...................... 6, 16, 21

*Nat'l Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998) ........................................................................ 2, 20, 24

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) ................................................................................. 23

*New Vision Photography Program, Inc. v. District of Columbia*,
   54 F. Supp. 3d 12 (D.D.C. 2014) ............................................................. 18

*Northrop Grumman Corp. v. United States*,
   46 Fed. Cl. 622 (2000) ............................................................................. 44

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ................................................................................. 18

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
   421 F.3d 1 (1st Cir. 2005) ........................................................................ 18

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ........................................................................... 29, 30

*Roberts* v. *U.S. Jaycees*,
    468 U.S. 609 (1984) ........................................................................... 37

*Reeve Aleutian Airways, Inc. v. United States*,
    982 F.2d 594 (D.C. Cir. 1993), *as amended on denial of reh'g* (Mar. 26, 1993) ..................... 19

*Regan v. Tax'n With Representation of Wash.*,
    461 U.S. 540 (1983) ........................................................................... 3

*Reno v. Flores*,
    507 U.S. 292 (1993) ........................................................................... 42

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ................................................................... 3, 22, 23

*Rothe Dev., Inc. v. United States Dep't of Def.*,
    836 F.3d 57 (D.C. Cir. 2016) ................................................................. 28

*San Francisco A.I.D.S. Found. v. Trump*,
    2025 WL 1621636 (N.D. Cal. June 9, 2025) ...................................... *passim*

*Smith v. Henderson*,
    982 F. Supp. 2d 32 (D.D.C. 2013) ........................................................... 29

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................ 7, 8

*Steffan v. Perry*,
    41 F.3d 677 (D.C. Cir. 1994) ........................................................ 36, 37, 41

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* (*SFFA*),
    600 U.S. 181 (2023) ..................................................................... 29, 32

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ........................................................................... 7

*Town of Castle Rock v. Gonzalez*,
    545 U.S. 748 (2005) ..................................................................... 17, 18

*Trump v. Am. Fed'n of Gov't Emps.*,
    2025 WL 1873449 (U.S. July 8, 2025). ................................................ 42, 43

*Trump v. New York*,
    592 U.S. 125 (2020) ......................................................................... 11

*United Presbyterian Church in the U.S.A. v. Reagan*,
    738 F.2d 1375 (D.C. Cir. 1984) ......................................................... 9, 10

*United States v. Am. Library Ass'n,*
   539 U.S. 194 (2003) ............................................................................... 23

*United States v. Salerno,*
   481 U.S. 739 (1987) ............................................................................. 4, 44

*United States v. Skrmetti,*
   145 S. Ct. 1816 (2025) ..................................................................... *passim*

*United States v. Stewart,*
   311 U.S. 60 (1940) .................................................................................. 42

*United States v. Williams,*
   553 U.S. 285 (2008) .......................................................................... 21, 24

*United States Conf. of Cath. Bishops v. U.S. Dep't of State,*
   770 F. Supp. 3d 155 (D.D.C. 2025) .................................................. 15, 16

*Vera Inst. of Just. v. U.S. Dep't of Just.,*
   2025 WL 1865160 (D.D.C. July 7, 2025) ................................................ 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ................................................................ 3, 30, 32, 36

*Walls v. Sanders,*
   760 F. Supp. 3d 766 (E.D. Ark. 2024) .............................................. 32, 36

*Williams v. Lew,*
   77 F. Supp. 3d 129 (D.D.C. 2015) .......................................................... 13

*Ysursa v. Pocatello Educ. Ass'n,*
   555 U.S. 353 (2009) ................................................................................ 23

**CONSTITUTION**

U.S. CONST. AMEND. XIV, § 1 ...................................................................... 28

**STATUTES**

28 U.S.C. § 1491(a) ...................................................................................... 14

28 U.S.C. § 1346(a)(2) ................................................................................. 14

41 U.S.C. § 1707(a)(1) ................................................................................. 34

42 U.S.C. § 300w-7(a)(2) ............................................................................. 43

H.R. 1, 119th Cong., Sec. 60016, (1st Sess. 2025) ....................................... 11

## RULES

Fed. R. Civ. P. 201(b) ..................................................................................................11

Fed. R. Civ. P. 12(b)(1) ................................................................................................ 7

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 7

## REGULATIONS

1 C.F.R. § 19.2 .............................................................................................................. 33

2 C.F.R. § 200.340 ........................................................................................................ 44

48 C.F.R. § 49.502 ........................................................................................................ 44

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth
   to the Federal Government,*
   Executive Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025)............................................ *passim*

*Ending Radical and Wasteful Government DEI Program and Preferencin*g,
   Executive Order 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025)............................................ *passim*

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,
   Executive Order 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025)............................................ *passim*

*Further Amendments to Executive Order 11478, Equal Employment Opportunity in the Federal
   Government, and Executive Order 11246, Equal Employment Opportunity*,
   Executive Order 13,672, 79 Fed. Reg. 42971 (July 21, 2014) ................................................. 34

## OTHER AUTHORITIES

Erica Newland, *Executive Orders in Court*, 124 YALE L.J. 2026 (2015) .................................... 33

*Executive Orders: An Introduction* (2025),
   https://www.congress.gov/crs-product/R46738 ........................................................................ 33

Kevin M. Stack, *The Statutory President*, 90 IOWA L. REV. 539 (2005) ................................ 33, 34

DEP'T OF VETERANS AFFAIRS, *Class Deviation from the Federal Acquisition Regulation (FAR)
   Regarding Executive Orders 14173 and 14168* (Mar. 20, 2025) https://www.va.gov
   /oal/docs/business/pps/devia tionFar20200320.pdf .................................................................. 35

GEN. SERV. ADMIN., *CAAC Consultation to Issue a Class Deviation From the Federal
   Acquisition Regulation (FAR) Regarding Executive orders 14173 and 14168* (Feb. 15, 2025)
   https://www.acquisition.gov/sites /default/files/caac/CAAC_Letter_2025-01.pdf ............ 34, 35

OFFICE OF MGMT. & BUDGET, *Interim Guidance Implementing Section 3 of Executive Order 14215, Titled "Ensuring Accountability for All Agencies"* (April 17, 2025) at 5-6 https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-24-Interim-Guidance-Implementing-Section-3-of-Executive-Order-14215-Titled-Ensuring-Accountability-for-All-Agencies.pdf .................................................................................................................. 35, 36

OFFICE OF MGMT. & BUDGET, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://dcg.usc.edu/wp-content/uploads/2025/01/OMB-Memo-Pause.pdf ................................................................................................................ 35

OFFICE OF PERS. MGMT., *Initial Guidance Regarding DEIA Executive Orders* (Jan. 21, 2025) https://www.opm.gov/media/e1zj1p0m/opm-memo-re-initial-guidance-regarding-deia-executive-orders-1-21-2025-final.pdf .................................................................................... 35

Opp'n to Application, *Dep't of Educ. v. California*, No. 24A910 (U.S. Mar. 28, 2025) ............. 15

The White House, President Trump's One Big Beautiful Bill Is Now the Law (July 4, 2025), https://www.whitehouse.gov/articles/2025/07/president-trumps-one-big-beautiful-bill-is-now-the-law/ ............................................................................................................................11

U.S. DEP'T OF AGRIC., *Mission Area Senior Contracting Officials (MASCOs)* (Mar. 14, 2025) https://www.usda.gov/sites/default/files/documents/far-class-deviation-eo-14173-eo-14168.pdf ........................................................................................................................................ 35

U.S. DEP'T OF J., *Civil Rights Fraud Initiative* (May 19, 2025) https://www.justice.gov/dag/media/1400826/dl?inline=&utm_medium=email&utm_source=govdelivery ....................................................................................................................... 27

## INTRODUCTION

In his first days in office, the President issued three Executive Orders to steer the Executive's policy priorities in two areas: diversity, equity, inclusion (DEI) and "gender ideology." To that end, among other things, the Orders included four provisions that sought to align federal funding with these priorities. Specifically, three provisions (together, Funding Provisions) directed all federal agencies to (1) as "allowed by law," terminate "equity-related" grants or contracts (Termination Provision); (2) "as permitted by law, to end the Federal funding of gender ideology," (Funding Gender Ideology (FGI) Provision); and, (3) "ensure grant funds do not promote gender ideology," (Promoting Gender Ideology (PGI) Provision). Another provision directed the Director of the Office of Management and Budget (OMB) to "[e]xcise references to DEI and [diversity, equity, inclusion, accessibility (DEIA)] principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures," (Contract Terms Provision).

The Executive Orders also instructed the Executive Branch with respect to one of this administration's enforcement priorities—namely, to enforce federal antidiscrimination laws against DEI programs that are unlawful. To that end, one provision requires agencies to ensure that their grantees/contractors certify that they do not operate any DEI programs that "violate any applicable Federal anti-discrimination laws," (Certification Provision).

Plaintiffs, two non-profit organizations, raise numerous claims with respect to these Executive Orders, all of which suffer from the same fundamental flaw: instead of challenging any discrete agency action under the Administrative Procedure Act (APA), Plaintiffs set their sight on the Executive Orders themselves. But the Executive Orders are merely directives from the President to his own subordinates; they do not directly regulate any primary conduct. As such, Plaintiffs' claims are fundamentally misdirected. Predictably, Plaintiffs' novel challenges to

1

Presidential directives to subordinates are inherently riddled with jurisdictional defects and hinge on far-fetched applications of the law.

As an initial matter, Plaintiffs' claims suffer from various jurisdictional defects. First, they lack standing to bring their claims. While Plaintiffs purport to challenge the entirety of the three Executive Orders, they do not even allege that they are injured by most of those Orders' provisions, and they lack standing to challenge the Orders in gross. Where they do identify specific provisions, many "include intragovernmental mandates that do not inflict on Plaintiffs an injury in fact." ECF No. 57 (PI Op.) at 11. Second, to the extent they assert any non-speculative claims with respect to the Funding Provisions based on future grant terminations, this Court lacks jurisdiction over those claims, which must be brought in the Court of Federal Claims under the Tucker Act.

Plaintiffs also fail to state a claim. Plaintiffs' Fifth Amendment vagueness claim is premised on a fundamental misapplication of the Due Process vagueness doctrine to presidential directives to subordinates. *See id.* at 41 (explaining that "presidential directives to subordinates are . . . a square peg for a round hole" with respect to many of Plaintiffs' vagueness claims). Even if the Fifth Amendment vagueness standard was applicable, Plaintiffs' claims would still fail. With respect to the Funding Provisions and the Contract Terms Provision, Plaintiffs fail to assert a protected property interest under the Due Process Clause, which generally does not apply to routine federal contracts/grants. Moreover, these four provisions pertain to government funding, and as the Supreme Court has held, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). Although the Certification Provision pertains to the government's actions as "sovereign," even there, the vagueness doctrine has no bite because the provision does not declare any *new* conduct unlawful. Instead, it simply incorporates existing

2

antidiscrimination laws, which Plaintiffs do not challenge as vague.

Plaintiffs' First Amendment claims are similarly meritless. The Funding Provisions and the Contract Terms Provision do not attempt to regulate speech *outside* the scope of the funds. They simply reflect a decision to align federal funding with the President's policy pronouncements. The Supreme Court has long held that when it comes to what the government affirmatively chooses to fund, a "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983)). Plaintiffs' First Amendment claim with respect to the Certification Provision fails for the simple reason that the provision does not target constitutionally protected speech—it only targets conduct that violates federal discrimination laws. And "neither Plaintiffs nor anyone else have a First Amendment right to violate federal antidiscrimination law." PI Op. at 52.

Plaintiffs also challenge the three Orders under equal protection. They claim that the two DEI Orders amount to racial discrimination, but they fail to allege—as they must—that the facially neutral Orders were promulgated with "racially discriminatory intent." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Plaintiffs also claim that the third Order discriminates based on sex and trans-identifying status by restricting federal funding of "gender ideology." Plaintiffs' claim fails under the reasoning adopted by the Supreme Court in its recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), which illustrates that the Order does not classify funding based on sex or trans-identifying status. Because Plaintiffs fail to allege that any one of the three Orders discriminate on the basis of any protected characteristic, they are all reviewed under, and survive, rational-basis review.

Additionally, Plaintiffs' argument that the Executive Orders are ultra vires in violation of

certain statutes and regulations fails outright because all Orders direct the agencies to implement them to the extent permitted by law. A directive to follow the law does not violate the law. *See Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002).

Plaintiffs also argue that the Orders violate separation of powers. But Plaintiffs fail to allege—as they must in a facial posture—"that no set of circumstances exists under which the [Orders] would be valid" or "that the [Orders] lack[] a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). With respect to the Funding Provisions, it is clear that, at least in some instances, the Executive may terminate contracts/grants for convenience. Doing so here—as the Executive has done for decades in innumerate contexts—does not violate separation of powers. Plaintiffs' challenge to the Certification Provision is also futile because the provision does not impose a new requirement at all—it merely requests that recipients certify that they are honoring their preexisting obligations to abide by anti-discrimination laws in operating any DEI programs.

Because Plaintiffs' allegations fail to allege sufficient facts needed to establish both standing and a claim with respect to any of the challenged provisions, this Court should dismiss Plaintiffs' Amended Complaint in its entirety.

## BACKGROUND

On January 20, 2025, the President issued Executive Order 14,151, 90 Fed. Reg. 8339, *Ending Radical and Wasteful Government DEI Program and Preferencin*g (EO 14,151). As relevant here, this Executive Order includes the Termination Provision, which directs that within 60 days of the Order's issuance, each "agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" shall "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts." *Id.* § 2(b)(i).

On January 21, 2025, the President issued Executive Order 14,173, 90 Fed. Reg. 8633, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (EO 14,173). This Order's "purpose" is to ensure that the federal government is "enforcing our civil-rights laws" by "ending illegal preferences and discrimination." *Id.* § 1. As relevant here, the Order includes the Certification Provision, which provides that the "head of each agency shall include in every contract or grant award" a "term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B). That certification will be material to government payment decisions. *Id.* § 3(b)(iv)(A). The Order also includes a Contract Terms Provision, which instructs the OMB Director to "[e]xcise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures." *Id.* § 3(c)(ii).

On January 20, 2025, the President issued Executive Order 14,168, 90 Fed. Reg. 8615, entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (EO 14,168). As is relevant here, EO 14,168 includes a Funding Gender Ideology (FGI) Provision, which provides, among other things, that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," *id.* § 3(e); and a Promoting Gender Ideology (PGI) Provision, which provides that "Federal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," *id.* § 3(g).

All three Orders make clear that they must be "implemented consistent with applicable law." EO 14,151 § 4(b); EO 14,168 § 8(b); EO 14,173 § 8(b).

On February 19, 2025, National Urban League (NUL), National Fair Housing Alliance (NFHA), and AIDS Foundation of Chicago (AFC) brought this lawsuit. *See* ECF No. 1. On

February 28, 2025, NUL, NFHA, and AFC filed a Preliminary Injunction Motion, challenging various provisions of the three Orders under the Due Process Clause of the Fifth Amendment and First Amendment. *See* ECF No. 29. Following briefing and oral argument, this Court denied Plaintiffs' Motion, *see* ECF No. 56, concluding that "[f]or half the challenged provisions, Plaintiffs fail to establish a prerequisite to success on the merits: standing." PI Op. at 2. "And for the remaining provisions," the Court reasoned, "Plaintiffs' constitutional claims falter" because "the government need not subsidize the exercise of constitutional rights to avoid infringing them, and the Constitution does not provide a right to violate federal antidiscrimination law." *Id.*

On June 27, 2025, NFHA voluntarily dismissed its claims. *See* ECF No. 64. Subsequently, NUL and AFC (together, "Plaintiffs"), filed an Amended Complaint. *See* ECF No. 68 ("Am. Compl."). In it, they claim that the Orders violate the First Amendment, are void-for-vagueness under the Due Process Clause, violate equal protection, are ultra vires in violation of certain statutory and regulatory mandates, and violate separation of powers.

Several of the challenged provisions have been preliminarily enjoined by other courts. Of particular note, on February 21, 2025, the United States District Court for the District of Maryland preliminarily enjoined the implementation of the Termination, Certification, and Report Provisions. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,* 767 F. Supp. 3d 243 (D. Md.), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025). On March 14, 2025, a three-judge panel of the Fourth Circuit granted the government's motion to stay the preliminary injunction. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*Diversity Officers*), No. 25-1189, ECF No. 29 (4th Cir.  Mar. 14, 2025). On April 14, 2025, a Federal District Court for the Northern District of Illinois enjoined the Department of Labor from enforcing the Certification Provision nationwide, and further enjoined the application of the Termination Provision with respect to one

particular grant. *Chicago Women in Trades v. Trump*, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025).

On June 9, 2025, a Federal District Court for the Northern District of California enjoined the three

Funding Provisions with respect to plaintiffs. *San Francisco A.I.D.S. Found. v. Trump*, 2025 WL

1621636 (N.D. Cal. June 9, 2025). These preliminary injunctions have been appealed to the Fourth

Circuit, Seventh Circuit, and Ninth Circuit, respectively.

## ARGUMENT

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction.

The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence,

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and in making this determination, the Court

"may consider material outside the pleadings," *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir.

2021). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts

to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). The court considers "the complaint in its entirety, as well as . . . documents incorporated

into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs,

Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). While the Court accepts well-pleaded

factual allegations as true, "mere conclusory statements" and "'legal conclusion[s] couched as . . .

factual allegation[s]'" are "disentitle[d] . . . to th[is] presumption of truth." *Ashcroft v. Iqbal*, 556

U.S. 662, 678, 681 (2009) (citation omitted).

I.    **PLAINTIFFS' CLAIMS SUFFER FROM JURISDICTIONAL DEFECTS.**

A.  **Plaintiffs lack Article III standing.**

To establish standing, a plaintiff must show an "injury in fact," a causal connection between

the injury and the defendant's conduct, and a likelihood that "the injury will be redressed by a

favorable decision." *Lujan*, 504 U.S. at 560-61. As the party invoking federal jurisdiction,

Plaintiffs "bear[] the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). Plaintiffs fail to meet their burden.

At the outset, Plaintiffs do not even assert speculative (let alone Article III) harm with respect to many of the provisions in the Executive Orders. Indeed, for the most part, instead of challenging specific provisions of the Executive Orders, Plaintiffs challenge the Executive Orders as a unified whole. *See, e.g.*, Am. Compl. ¶ 256 ("The Executive Orders penalize Plaintiffs for engaging in protected First Amendment activity on topics disfavored by the Administration."); *id.* ¶ 279 ("[T]he Executive Orders fail to provide Plaintiffs with reasonable and adequate notice."); *id.* ¶ 297 ("[T]he Anti-Diversity1 and Anti-Diversity2 Orders discriminate against people of color."). Plaintiffs lack standing to challenge the Executive Orders "in gross." As the Supreme Court has established, "plaintiffs who successfully challenge one provision of a law may lack standing to challenge *other* provisions of that law." *Barr v. Am. Ass'n of Pol. Consultants, Inc*., 591 U.S. 610, 626-27 (2020). This presumption is buttressed by the severability provisions in all three Executive Orders. *See* EO 14,151 § 3; EO 14,173 § 6; EO 14,168 § 8(d).

At most, Plaintiffs seemingly attempt to assert injury with respect to nine provisions: Termination Provision, PGI Provision, FGI Provision (three Funding Provisions), List Provision, Report Provision, Agency Requirements Provision, Government Mandates Provision, Contract Terms Provision, and Certification Provision.

***Report Provision and List Provision***. The Report Provision directs the Attorney General, in consultation with agencies, to "submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and

preferences." EO 14,173 § 4(b). That report will include a "proposed strategic enforcement plan," *id.*, with, among other things, a plan of action "to deter DEI programs or principles" that "constitute illegal discrimination or preferences" wherein agencies will identify, as part of that plan of action, "potential civil compliance investigations" of certain large entities. *Id.* § 4(b)(iii). The List Provision directs the agencies to provide the OMB Director "with a list of all . . . Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." EO 14,151 § 2(b)(ii)(C).

Challenges to these two provisions "present[] similar jurisdictional problems." PI Op. at 16. At bottom, neither provision requires *Plaintiffs* to do anything. *See id.* at 14 (explaining that the List Provision "requires nothing from Plaintiffs . . . but instead tells only the agencies to do something"); *see id.* at 16 ("As with the List Provision, the Report Provision 'issues no commands or prohibitions to these plaintiffs, and sets forth no standards governing their conduct.'" (citation omitted)). Plaintiffs claim that these provisions "create uncertainty for [them], as the provisions direct officials to identify organizations suspected of engaging in 'discriminatory DEI' or 'provid[ing] or advanc[ing] DEI, DEIA,' but fail to define those terms." Am. Compl. ¶ 133. This alleged uncertainty, Plaintiffs claim, "has resulted in chilling of Plaintiffs' protected speech." *Id.* ¶ 134. But such allegations amount to nothing more than "subjective 'chill.'" *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (Scalia, J.) (citation omitted). That is because—as this Court has already explained—in order to draw any causal link between these wholly intra-governmental directives and future harm to Plaintiffs, the Court will have to take several speculative leaps. *See* PI Op. at 17-18 (outlining the various "'speculative contingencies [that] must occur before' Plaintiffs suffer any concrete harm" (citation omitted)). Without more, Plaintiffs' alleged chill is purely "subjective" and therefore insufficient under

Article III. *Reagan*, 738 F.2d at 1378.

 ***The Agency Requirements Provision.*** Plaintiffs' challenge to the Agency Requirements Provision of EO 14,168 also fails for the reasons identified above. The provision provides that "[w]ithin 120 days of the date of th[e] order, each agency head . . . submit an update on implementation of this order to the President" addressing, among other things, "agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of th[e] order." EO 14,168 § 7(a)(ii). Much like the List and Report Provisions, this provision "requires nothing from Plaintiffs . . . but instead tells only the agencies to do something." PI Op. at 14. As such, any alleged injury stemming from this provision is speculative under Article III.

 ***Government Mandates Provision.*** Plaintiffs also lack standing to challenge the Government Mandates Provision, which is a directive to the OMB Director to terminate the government's own "mandates, requirements, programs, or activities." EO 14,173 § 3(c)(iii); *see also id.* § 3(c)(i) (providing that the OMB Director "[r]eview and revise, as appropriate, all Government-wide processes, directives, and guidance"); PI Op. at 18 (explaining that "the Government Mandates Provision is nestled within a part of the order titled 'Terminating Illegal Discrimination *in the Federal Government*'" (quoting EO 14,173 § 3)). Simply put, the provision is not outward facing—i.e., it does not purport to regulate non-governmental mandates, requirements, programs, or activities. Plaintiffs do not allege that they provide any relevant government-wide programs. As such, Plaintiffs have failed to allege that the provision affects them at all—let alone has caused them any concrete injury.

 In their Amended Complaint, Plaintiffs make a singular feeble attempt to assert standing with respect to this provision by alleging that "[o]n information and belief, [the Environmental Protection Agency (EPA)]'s decision to terminate NUL's equity-related grant targeted at serving

Black communities, is because it is 'prioritizing merit' and fairness, is the result of the Anti-Diversity Orders and the Equity Termination and Government Mandates Provisions in particular." Am. Compl. ¶ 214. But any claim arising out of the termination of this grant is now moot. On July 3, Congress passed a final reconciliation bill that included rescission of all unobligated funds supporting the Environmental and Climate Justice Block Grants provided for in section 138 of the Clean Air Act, which includes NUL's terminated grant. *See* H.R. 1, 119th Cong., Sec. 60016, (1st Sess. 2025).[1] As such, Plaintiffs lack a live claim with respect to this provision.

**Contract Terms Provision.** Plaintiffs have also failed to allege standing with respect to the Contract Terms Provision for the reasons outlined in this Court's earlier ruling. *See* PI Op. at 19-21. This provision instructs the OMB Director to "[e]xcise references to DEI and DEIA principles, under whatever name they appear, from Federal acquisition, contracting, grants, and financial assistance procedures." EO 14,173 § 3(c)(ii). As was the case with their Preliminary-Injunction papers, Plaintiffs' Amended Complaint has not "explained how the Contract Terms Provision inflicts (in whole or in part) either . . . lost funding [or] chilled speech." PI. Op. at 20. At most, Plaintiffs allege that the provision leaves them "speculating on what speech or activity might be considered DEI or DEIA 'principles.'" Am. Compl. ¶ 123. But this theory, which assumes that the "Defendants might . . . interpret and apply the Contract Terms Provision in a way that creates a cognizable injury traceable to their conduct . . . . is 'riddled with contingencies and speculation that impede judicial review.'" PI Op. at 21 (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)).

**Certification Provision.** Plaintiffs also lack standing to challenge the Certification

---

[1] The bill was signed into law on July 4. *See* The White House, President Trump's One Big Beautiful Bill Is Now the Law (July 4, 2025), https://www.whitehouse.gov/articles/2025/07/president-trumps-one-big-beautiful-bill-is-now-the-law/. The Court may take judicial notice of facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b).

Provision, which directs agencies to ensure that their grantees/contractors certify that they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." EO 14,173 § 3(b)(iv)(B). By its own terms, this provision only requires compliance with existing anti-discrimination laws. As such, Plaintiffs' asserted injuries—chilled speech and loss of funding—are based on a misreading of the provision as targeting *all* DEI. *See, e.g.*, Am. Compl. ¶ 68 (alleging that the provision "require[s] every federal contractor or grantee to certify, as a condition for receiving funding, that they do 'operate *any* programs promoting DEI'"). Plaintiffs have advanced no argument that they would be injured by the provision as properly construed. For instance, Plaintiffs have not alleged that they operate any DEI programs that violate antidiscrimination laws such that certification would cause them concrete injury. *Cf. id.* ¶ 204 (alleging that NUL includes "DEIA principles" "through lawful activities"). Because Plaintiffs' alleged harm stems from an untenable reading of the provision, they lack standing to challenge it.

 ***The Funding Provisions.*** Other than Plaintiffs' now-mooted claim with respect to the NUL-EPA grant, the Amended Complaint fails to allege sufficient facts needed to link any loss of funding to the Funding Provisions. For instance, Plaintiffs allege that in January 2025, the government temporarily "suspen[ded] … [AFC's] funding in response to the Executive Orders." *Id.* ¶ 231. But, as Plaintiffs admit, "AFC was subsequently able to draw down on funds the following week," *id.*, thereby remedying any injury. Moreover, although Plaintiffs allege that "AFC's Welcome Home Program has been directly affected by the funding freeze," *id.* ¶ 232, they fail to explain how the temporary January pause in the flow of funds "affected" the program, or how any such alleged injury would be redressable now. Plaintiffs also allege that "AFC's Women's Connection Program, which provides HIV services tailored to Black cisgender and transgender women, has also been disrupted," *id.* ¶ 233, but they fail to allege sufficient facts linking any such

"disrupt[ion]" to the Funding Provisions (or any other provision in the Orders).

Plaintiffs' remaining grant-termination claims are all prospective. These claims also falter because Plaintiffs fail to allege that any such termination is "certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). In making these allegations, Plaintiffs assert that they receive federal funds, *see, e.g*, Am. Compl. ¶¶ 203, 226, and that much of their work pertains to "DEIA" and "gender ideology," *see, e.g.*, *id.* ¶¶ 204, 237. But Plaintiffs fail to allege sufficient facts demonstrating that the termination of these funds is "imminent." *Lujan*, 504 U.S. at 560. Instead, they speculate that at some undefined point in the future, the government *may* terminate their grants *and* do so pursuant to the Funding Provisions. *See, e.g*., ¶ 218 ("Given what is happening with its DOL and EPA grants, and what is happening with the grants of several peer organizations, NUL is concerned that several of its other grants that similarly advance equal opportunity will be targeted next."); *id.* ¶ 245 ("AFC remains under persistent threat that HUD could arbitrarily cancel its housing grants at any time, disrupting services for 512 clients who depend on stable housing to maintain their health."). Because Plaintiffs' allegations rely on "several speculative contingencies," they fail under Article III. *Williams v. Lew*, 77 F. Supp. 3d 129, 133 (D.D.C. 2015).

Ultimately, Plaintiffs' fears about future government action demonstrate that their real qualm is with the President's policy pronouncements regarding DEI and gender ideology. Predictably, many of their allegations lack any meaningful connection to any particular provision of the Executive Orders. *See, e.g*, *id.* ¶ 216 (alleging that the Presidents' *budgetary* proposal creates "risk" for "NUL's longstanding Urban Seniors Jobs Program"); *id.* ¶ 236 (alleging that "[t]he Executive Orders limit federal data collection on gender identity" without linking this allegation to any particular Executive Order—let alone any one provision). As such, even if this Court granted

relief against the Executive Orders, that would not prevent the agencies from exercising their own independent authority to carry out the President's policy priorities with respect to DEI and gender ideology. Consequently, neither Plaintiffs nor this Court can "begin to predict on this record what impact," if any, invalidating the Executive Orders would have. *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 419 (D.C. Cir. 1994); *see also Levine v. Vilsack*, 587 F.3d 986, 994–95 (9th Cir. 2009) (rejecting redressability guesswork).

### B. This Court lacks jurisdiction to review challenges to the Funding Provisions under the Tucker Act.

Even if this Court concludes that Plaintiffs' allegations regarding future loss of funding satisfy Article III with respect to the Funding Provisions, this Court should dismiss those claims for lack of jurisdiction under the Tucker Act.

In seeking to enjoin future termination of grants, Plaintiffs seek, in essence, an order to enforce the government's contractual obligation. That triggers jurisdiction in the Court of Federal Claims under the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a); *see id.* § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States.").

The Supreme Court reiterated this principle in its recent stay order in *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). There, plaintiffs challenged the termination of federal grants related to DEI under the APA. The Court concluded that the government is likely to succeed in showing that jurisdiction over plaintiffs' suit lays in the Court of Federal Claims under the Tucker Act, because the remedy granted by the district court was ultimately an order to "enforce [the government's] contractual obligation to pay money." *Id.* at 968.

14

The funds at issue in *California* were government grants, but the Tucker Act applied to them because they were among the "many . . . federal grant programs" that are "much in the nature of a contract." *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (citation omitted).

Moreover, the fact that Plaintiffs here raise Constitutional claims as opposed to APA claims is of no moment. The Court's reasoning applies with as much force here as it does in an APA suit. After all, the Court focused on the remedy sought by plaintiffs and the basis of plaintiffs' claims. A suit belongs in the Claims Court when the source of plaintiffs' asserted right is a contract and what plaintiffs seek amounts to contractual remedies. *See California*, 145 S. Ct. at 968 (jurisdiction lies in the Claims Court when the suit is "based on any express or implied contract with the United States" and the remedy seeks "to enforce a contractual obligation to pay money" (citations omitted)). That is true here. The source of Plaintiffs' funding claims are their agreements with the government—they would have no claim at all with respect to the Funding Provisions if not for their agreements. Accordingly, this Court lacks jurisdiction over Plaintiffs' funding claims.

The mere fact that Plaintiffs bring *pre*-termination claims is immaterial. A request to enjoin any future termination of contracts/grants—just like a request to reinstate already terminated contacts/grants—seeks, in essence, an "'enforce[ment] [of the government's] contractual obligation to pay money.'" *Id.* at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). In fact, plaintiffs in *California* also sought "an injunction against further unlawful terminations" along with their request for reinstatement of already terminated grants. Opp'n to Application at 25, *Dep't of Educ. v. California*, No. 24A910 (U.S. Mar. 28, 2025). Tellingly, the Supreme Court stayed the injunction in full.

At bottom, in seeking an injunction against the Funding Provisions, Plaintiffs "want[] the Government to keep paying up." *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, 770

F. Supp. 3d 155, 163 (D.D.C. 2025). Any order to the government to honor its ongoing contractual obligations is an order "to enforce [the government's] contractual obligation to pay money." *California*, 145 S. Ct. at 968 (citation omitted). As such, this Court lacks jurisdiction over challenges to the Funding Provisions, which belong in the Claims Court under the Tucker Act.

## II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS.

Even if this Court reaches the merits of Plaintiffs' claims, it should reject them. All of Plaintiffs' claims depend on this Court's inherent equitable powers to provide a cause of action to strike down ultra vires executive conduct. But "[t]he scope of non-APA ultra vires review is narrow." *Fed. Express Corp. v. U.S. Dep't of Com.*, 486 F. Supp. 3d 69, 81 (D.D.C. 2020) (citation omitted), *aff'd*, 39 F.4th 756 (D.C. Cir. 2022). Plaintiffs have failed to meet their burden to show equitable relief is warranted.[2]

### A.    Plaintiffs have failed to state a void-for-vagueness claim under the Fifth Amendment.

Plaintiffs challenge the Orders under the Fifth Amendment, alleging that they are "vague" and therefore allow the Defendants to enforce them in an arbitrary and discriminatory manner and fail to give fair notice to Plaintiffs regarding the conduct that falls within their scope. *See* Am. Compl. ¶ 276. These claims should be dismissed.

As a preliminary matter, as this Court has recognized, "presidential directives to subordinates are . . . a square peg for a round hole" with respect to many of Plaintiffs' vagueness claims. PI Op. at 41; *see also Diversity Officers*, at 5 n.2 (Diaz, CJ., concurring) ("[W]here the Orders only purport to direct executive policy and actors . . . vagueness principles [are not] outcome determinative."). That is because the vagueness doctrine traditionally applies to statutes

---

[2] Defendants will only address the merits of Plaintiffs' claims with respect to five provisions:  Termination Provision, PGI Provision, FGI Provision (three Funding Provisions), Contract Terms Provision, and Certification Provision.

and regulations that directly regulate primary conduct. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)). There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). No such concerns arise when the President gives his subordinates an unclear directive. That is true whether the directive is made informally (in a conversation) or formally (in an Executive Order). Unsurprisingly, Plaintiffs' misdirected vagueness claims falter at every level.

Plaintiffs assert their Due Process challenges to the Orders by invoking two categories of protected interests with respect to the provisions: (1) potential loss of funding (the Funding Provisions and the Contract Terms Provision), and (2) potential enforcement action (Certification Provision). Both sets of claims fail.

***Funding Provisions and Contract Terms Provision.*** In order to assert a claim under the Due Process Clause, Plaintiffs must identify a liberty or property interest that is protected by the Fifth Amendment in the first place. With respect to the three Funding Provisions and the Contract Terms Provision, Plaintiffs fail to allege sufficient facts needed to establish that their purported contracts/grants are protected by the Due Process Clause.

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545 U.S.

748, 756 (2005) (citation omitted). Applying these principles, the Supreme Court has identified a narrow set of entitlement-like government benefits as protected property under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). But the protections afforded to this narrow set of benefits have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)).

As this Court recognized, in moving for a Preliminary Injunction, "Plaintiffs offer[ed] no reason to think that their contracts and grants—which are '[o]utside of the employment context'— are different from the 'millions of government contracts in effect at any point in time' to which courts seldom apply 'due-process principles.'" PI Op. at 38-39 (quoting *New Vision Photography*, 54 F. Supp. 3d at 29); *see also Vera Inst. of Just. v. U.S. Dep't of Just.*, 2025 WL 1865160, at *16 (D.D.C. July 7, 2025) (agreeing with this Court's Preliminary-Injunction holding that there is "no property interest in a grant termination case").

Plaintiffs' Amended Complaint fares no better. In it, they repeatedly reference their contracts and grants without alleging sufficient facts needed to show that *any* of them "are like 'welfare benefits under statutory and administrative standards' or 'public employment' subject to 'tenure provisions.'" PI Op. at 38 (quoting *Roth*, 408 U.S. at 576–77); *see, e.g.*, Am. Compl. ¶ 2

("Several of Plaintiffs' grants and/or contracts are congressionally appropriated for the purpose of advancing equity for marginalized communities."); *see id.* ¶ 53 (alleging that NUL's contracts and grants "support direct services and technical assistance programs"). These allegations fail to assert the facts needed to show that Plaintiffs' contracts/grants are constitutionally protected property.

Separately, Plaintiffs also fail to allege that the loss of funding would deprive them of a protected liberty interest in safeguarding their reputation. Plaintiffs make a passing attempt at alleging that any decision by NUL to "cease … center[ing] DEIA principles" "in the hopes of retaining federal funding" "would fundamentally alter its reputation and mission as an organization." *Id.* ¶ 211.[3] This allegation, however, is insufficient. The factual allegations in cases where courts have identified a reputation-based liberty interest are a far cry from Plaintiffs' allegations. *See, e.g.*, *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir. 1998) (explaining that outright "[s]uspending a contractor" from government contracting triggers due process); *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993), *as amended on denial of reh'g* (Mar. 26, 1993) (reasoning that "branding an airline unsafe" triggers due process because it "creates a lasting blemish on a company's reputation, roughly the equivalent to Hawthorne's scarlet letter"); *Conset Corp. v. Cmty. Servs. Admin.*, 655 F.2d 1291, 1297 (D.C. Cir. 1981) (explaining that "due process may have [been] required" if the contractor was banned "from government contract work due to charges calling into question [its] integrity, honesty or business reputation"). Notably, in these cases, the alleged reputational harm was the type of harm that could *only* be caused by the government. Whereas, here, a budgetary shortfall can be caused (and remedied) in various ways. Ultimately, contrary to Plaintiffs' proposition, the Due Process

---

[3] Plaintiffs also allege that the Orders could damage Plaintiffs' reputations by compromising NUL's "annual report, the State of Black America ('SOBA')." Am. Compl. ¶ 207. But SOBA is not funded by federal grants. *Id.* ¶ 210.

Clause does not impose an obligation on the government to safeguard Plaintiffs' reputation by ensuring a continuous flow of federal funds for their projects.

In sum, Plaintiffs have failed to allege sufficient facts needed to establish either a property or liberty interest as a result of any future loss of funds. As such, they have failed to allege any as-applied (let alone, facial) void-for-vagueness claims with respect to the Funding Provisions and Contract Terms Provision. *See Hettinga v. United States*, 677 F.3d 471, 479–80 (D.C. Cir. 2012) (per curiam) (affirming the dismissal because plaintiff "failed to plead the threshold requirement of a due process claim: that the government has interfered with a cognizable liberty or property interest").

Even if this Court reaches the merits of Plaintiffs' vagueness claims with respect to the Funding Provisions and Contract Terms Provision, it should reject them. Plaintiffs allege that the Orders are unconstitutionally "vague" because they purport to limit government funding based on criteria they do not define—such as, "DEI," "equity-related," and "promot[ing] gender ideology." *See* Am. Compl. ¶¶ 121, 122, 124. But, as this Court explained, the "Constitution tolerates" some ambiguity where the provisions direct agencies (as opposed to regulate Plaintiffs) and pertain to government funding (as opposed to law enforcement). *See* PI Op. at 40-41 (citations omitted).

In this light, any alleged "imprecision" in these provisions is "not constitutionally severe." *Finley*, 524 U.S. at 588; *see also* PI. Op. at 42-43 (explaining that the Funding Provisions "give enough guidance to avoid constitutional infirmity"); *Chicago Women in Trades*, 2025 WL 1114466 at *16 ("It is hard to see how the directive to terminate 'equity-related' grants is any vaguer than a statute 'awarding scholarship and grants on the basis of subject criteria such as excellence,' which the Supreme Court allowed in *Finley*." (citation omitted)); *See San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *22-23 (concluding that the PGI and FGI Provisions survive a

20

vagueness challenge at the preliminary-injunction stage).

   ***Certification Provision.*** Plaintiffs raise a void-for-vagueness challenge to the Certification Provision by alleging that the provision fails to give proper notice of prohibited conduct and provides for arbitrary enforcement. This claim should also be dismissed.

   The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108. While this doctrine demands scrutiny of statutes and regulations that identify a *new* conduct for punishment, it has little bite with respect to the Certification Provision, which simply incorporates *existing* legal obligations. Plaintiffs have no legitimate concern that they will not be given a "reasonable opportunity to know what is prohibited." *Id*. After all, the Certification Provision simply demands that Plaintiffs certify that they do not operate DEI programs that "violate federal antidiscrimination laws." EO 14,173 § 3(b)(iv)(B). As this Court explained, "the 'incriminating fact' is straightforward: is the counterparty violating federal antidiscrimination law?" PI Op. at 43 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)); *see also Diversity Officers*, at 7 (Harris, J., concurring) (explaining that the Certification Provision "appl[ies] only to conduct that violates existing federal anti-discrimination law"); *San Francisco A.I.D.S. Found*., 2025 WL 1621636, at *23 ("[T]he limiting qualifier implicating only DEI programs that 'violate any applicable Federal anti-discrimination law' is sufficiently defined because it incorporates by reference the body of existing federal law.").[4]

### B.  Plaintiffs have failed to state a First Amendment claim.

   ***Funding Provisions and Contract Terms Provision.*** Plaintiffs fail to allege that these

---

[4] Plaintiffs do not assert an as-applied challenge to the Certification Provision because they do not allege that the provision has been applied—i.e., enforced—against them.

provisions violate the First Amendment because they fail to allege that the provisions—either on their face or as-applied to Plaintiffs—regulate speech outside the contours of federal funds.

It is well-established that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust*, 500 U.S. at 193. Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 214 (2013) (collecting cases).

While government funding is not free from the First Amendment in all respects, the relevant First Amendment limitation is the prohibition against an unconstitutional "condition." *Id.* at 213-15. Under this limitation, the government may "specify the activities [it] wants to subsidize," but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Id.* at 214-15 (emphasis added). For example, limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 210 (citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19.

Thus, in order to sufficiently allege a First Amendment violation in the context of government funding, Plaintiffs must allege facts sufficient to establish that these provisions— either on their face or as-applied to Plaintiffs—regulate speech outside the contours of federal

funds. Plaintiffs have failed to allege any such facts.

On their face, the Funding Provisions and Contract Terms Provision do not purport to limit Plaintiffs' speech outside the scope of the funded project. *See* EO 14,151 § 2(b)(i) ("terminate. . . 'equity-related' *grants or contracts*"); EO 14,168 § 3(e) ("end the *Federal funding* of gender ideology"); *id.* § 3(g) ("ensure *grant funds* do not promote gender ideology"); EO 14,173 § 3(c)(ii) ("[e]xcise references to DEI and DEIA principles . . . from *Federal* acquisition, contracting, grants, and financial assistance procedures") (emphases added). By their own terms, the provisions merely constrain the use of federal funds pursuant to the Executive's policy priorities. Contrary to Plaintiffs' allegations, the refusal to fund does not amount to "impermissible chilling of Plaintiffs' protected speech." Am. Compl. ¶ 151. The Supreme Court has repeatedly held that the government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "'decision not to subsidize the exercise of a fundamental right does not infringe the right'" (quoting *Rust*, 500 U.S. at 193)).

Moreover, Plaintiffs' argument that the "terminat[ion] [of] their grant funding [and] cancell[ation] [of] their contracts" is a form of "penalt[y]," Am. Compl. ¶ 151, under the First Amendment also fails as a matter of law. "Because the government is not constitutionally obligated to fund Plaintiffs' preferred speech or to contract with them for certain purposes, the decision to stop funding that speech or contracting for those ends is not an example of the government doing 'indirectly what' it 'is barred from doing directly.'" PI Op. at 49 (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024)); *see also Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a

'penalty' on that activity."). Nor is the refusal to fund akin to "compelled disclosure of beliefs or associations." PI Op. at 49 (citing, among other cases, *Baird v. State Bar of Ariz.*, 401 U.S. 1, 2–3 (1971), which held that the denial of admission due to the applicant's refusal to make certain disclosures violates the First Amendment).

Lastly, any claim that the Funding Provisions and Contract Terms Provision are vague and therefore impose a "chilling" effect on protected speech is similarly futile. Any such claim has been foreclosed by *Finley*, where the Court explained that no First Amendment concern exists even though, "as a practical matter, [government-funding recipients] may conform their speech to what they believe to be the . . . decisionmaking criteria in order to acquire funding." 524 U.S. at 589. At bottom, when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id.*; *see also Chicago Women in Trades*, 2025 WL 1114466 at *14 (explaining that "[b]ecause the Court has concluded that the Termination Provision simply involves the government engaging in funding, as opposed to regulating, the vagueness concerns fall away as well" under *Finley*).[5]

Plaintiffs' as-applied First Amendment claims to the Funding Provisions and Contract Terms Provision fail for similar reasons: Plaintiffs fail to allege that the Defendants sought to regulate their speech *outside* the scope of their federally funded contracts/grants. *See* Am. Compl. ¶ 152 ("NUL did not address equity in any of its quarterly *grant reporting* after, on February 12, 2025, DOL expressly instructed NUL not to address the 'equity portion of the question' in Section IV of its *Quarterly Narrative Report*."); *id.* ¶ 153 ("In fear of having its funding terminated due

---

[5] But in any event, as this Court has explained "[t]he '[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment.'" PI Op. at 36 (quoting *Williams*, 553 U.S. at 304). And, as explained above, Plaintiffs' Fifth Amendment claims fail for independent reasons. *See supra* II.A.

to the restriction on equity-related activity, AFC has changed specific language used in its *Annual Report*."); *id.* ¶ 154 (alleging that HUD "issued AFC a renewed $2.5 million Continuum of Care grant contract," which "stated that AFC 'shall not *use funds* to promote gender ideology, as defined in E.O. 14168'"); *id.* ¶ 155 ("On February 13, 2025, HRSA instructed that, in response to the Anti-Gender Order, AFC must (a) replace the term 'gender' with 'sex' in *program materials*; (b) remove all references to 'gender-affirming care,' and (c) change the term 'LGBTQIA' to 'LBG.'"); *id.* ¶ 156 ("HUD altered a required narrative reporting form used by AFC to eliminate language referencing equity and to remove a question about how *grantees* promote cultural humility and equitable access in program delivery."); *id.* ¶ 157 ("HUD staff indicated that it would further revise data collection requirements for *grantees* like AFC in Fall 2025.") (emphases added).[6] As asserted, none of these allegations sufficiently establish that any of the Defendants sought to regulate speech that had nothing to do with federal funds. Without more, Plaintiffs have failed to state any as-applied First Amendment challenge to the Funding Provisions or Contract Terms Provision.

***Certification Provision.*** Plaintiffs also fail to state a First Amendment claim with respect to the Certification Provision. "For the Certification Provision to violate the First Amendment,

---

[6] In its Preliminary-Injunction ruling, this Court discussed two specific allegations, which potentially identified instances "of an agency going beyond the text of a Challenged Provision" to regulate speech outside the scope of the funds. *See* PI Op. at 50-51. The first example pertained to a HRSA subcontract with AFC. *See id.* As the Court explained, despite Plaintiffs' counsel's statement at the hearing, "[t]he supporting declaration [was] ambiguous . . . [and] suggest[ed] that the directive focused on th[e] federal program." *Id.* That example mirrors the allegation in Paragraph 155 of the Amended Complaint. As explained above—at least as alleged in the Amended Complaint—the paragraph fails to allege sufficient facts needed to establish that HRSA sought to regulate AFC's speech outside the scope of the funded program. The second example, pertained to Plaintiffs' previously asserted allegation of "HUD 'cancel[ing] funding' for one of the [NFHA]'s 'partner organizations.'" PI Op. at 51. This allegation is alluded to in several parts of the Amended Complaint. *See, e.g.*, Am. Compl. ¶165 ("Administration officials freezing funds and canceling contracts based merely on the results of word searches on the internet."). Despite these passing references, however, Plaintiffs do not re-assert their earlier allegation on this score in their Amended Complaint. For good reason—NFHA is no longer a plaintiff in this suit.

Plaintiffs must show that the certification requirement impermissibly restricts their ability to engage in *protected speech*." PI Op. at 52. The provision merely requires Plaintiffs to certify that they do not operate any DEI programs that "violate any applicable Federal anti-discrimination laws." EO 14,173 § 3(b)(iv)(B). And "neither Plaintiffs nor anyone else have a First Amendment right to violate federal antidiscrimination law." PI Op. at 52; *see also Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 (11th Cir. 2024) ("[T]he Supreme Court has clearly held that the First Amendment does *not* protect the very act of discriminating on the basis of race."); *see also San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *19 (rejecting plaintiffs' First Amendment challenge on the grounds that "[t]he Certification Provision does not 'penalize conduct beyond those prohibited by existing antidiscrimination laws' (citation omitted)).

In their Amended Complaint, Plaintiffs once again "insist that the Certification Provision does not really mean what it says." PI Op. at 53. They allege that "the Administration has repeatedly made clear that it views *all* DEIA as discriminatory and unlawful, without reference to standards under existing precedent." Am. Compl. ¶ 106. In support of this assertion, Plaintiffs allege, among other things, that various agencies have criticized DEI while stating that they seek to eliminate it without distinguishing between "legal" and "illegal" DEI. *See, e.g.*, *id.* ¶ 107 (alleging that "the Federal Trade Commission (FTC) issued a press release stating that 'DEI is Over at FTC"); *id.* ¶ 110 ("On March 11, 2025, HUD issued a press release in which Defendant Turner stated unequivocally, '[L]et me be clear DEI is dead at HUD.'"). But these allegations are consistent with the President's stated priority of deprioritizing all DEI—legal and illegal. They do not, however, illustrate that the government intends to enforce the *Certification Provision* against *all* DEI. *See San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *19 (explaining that instead of establishing that "the government has enforced or plans to enforce the *Certification Provision* in a

way that implicates DEI programs beyond those that 'violate any applicable Federal anti-discrimination law' . . . . Plaintiffs cite primarily to examples of the government's *termination* of federally funded DEI programs").

In an attempt to allege that the government intends to bring legal action against all DEI, Plaintiffs point to a Department of Justice (DOJ) memorandum issued on February 5, 2025, *see* Am. Compl. ¶¶ 99-100, and another DOJ memorandum issued on May 19, 2025, *see id.* ¶ 112. Neither, however, establish that the government intends to enforce the Certification Provision against legally permissible DEI programs. To the contrary, the May 19 memorandum explicitly establishes a "Civil Rights Fraud Initiative" to "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates *federal civil rights laws.*" *See* Office of the Deputy Att'y Gen., *Civil Rights Fraud Initiative*, U.S. DEP'T OF J. (May 19, 2025) at 2 https://www.justice.gov/dag/media/1400826/dl?inline=&utm_medium=email&utm_source=govdelivery (emphasis added); *see also* PI Op. at 44 n.9 (explaining that, read wholistically, the February 5 memorandum does not purport to identify all DEI as illegal).

Ultimately, Plaintiffs' "real concern is with the Executive Branch's interpretation of antidiscrimination law, not with the Certification Provision." PI Op. at 54. "But Plaintiffs may contest whether their DEI programs fall within the scope of that law if they ever face an enforcement action connected to the Certification Provision." *Id.* Until then, Plaintiffs cannot sustain a First Amendment claim to the provision based on their fears that the Executive *might* not stick to its word when it says that it will only pursue illegal actions.

### C.  Plaintiffs have failed to state an equal protection claim with respect to EO 14,151 and EO 14,173.

Plaintiffs claim that EO 14,151 and EO 14,173 violate the Constitution's equal protection requirements because they "were promulgated and/or implemented by the Trump Administration,

at least in part, with the purpose of discriminating against Black people and other people of color." Am. Compl. ¶ 292. Plaintiffs' claim fails.

The Due Process Clause of the Fifth Amendment "forbids the Federal Government to deny equal protection of the laws," *Davis v. Passman*, 442 U.S. 228, 234 (1979), and the Fourteenth Amendment prohibits the States from denying to any person within their jurisdiction "the equal protection of the laws," U.S. CONST. AMEND. XIV, § 1. "[T]he equal protection obligations imposed by the Fifth and the Fourteenth Amendments" are "indistinguishable." *Adarand Constructors, Inc. v. Pen*a, 515 U.S. 200, 217 (1995).

Under the equal protection analysis, courts "apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Typically, a classification in the law need only be "rationally related to a legitimate governmental purpose." *Id.* "Classifications based on race or national origin," on the other hand, are by their nature suspect and receive "the most exacting scrutiny." *Id.* And "[b]etween these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*

***EO 14,151 and EO 14,173 do not discriminate based on race.*** Racial discrimination can be asserted in three ways: (1) "the government has expressly classified individuals based on their race," (2) "the government has applied facially neutral laws or policies in an intentionally discriminatory manner," or (3) the government has adopted  "facially neutral laws or policies [that] 'result in racially disproportionate impact and are motivated by a racially discriminatory purpose.'" *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 63 (D.C. Cir. 2016) (quoting *Adarand Constructors*, 515 U.S. at 213). Plaintiffs invoke the third form, alleging that the facially neutral Executive Orders were enacted with the intent to discriminate based on race and

disproportionately harm "Black people and other people of color." Am. Compl. ¶ 292.

At the outset, it is important to note that the core of Plaintiffs' argument appears to be premised on the notion that programs that "benefit people of color" are constitutionally *required*. *See id.* ¶ 197. According to Plaintiffs, DEI and DEIA programs seek to "remedy[] the inequity of any unfair barriers," and advantage "people who face discrimination and other unfair disadvantages that prevent them from having equal opportunities." *Id*. And, Plaintiffs posit, by seeking to eliminate these programs, the Executive Orders discriminate against people of color. *See id.* ¶ 292.; *see also id.* ¶ 189 ("The Trump Administration starts from the false premise that there are no existing racial inequalities.").

In other words, as Plaintiffs see it, the Constitution comes with an affirmative mandate to the government to remedy historical and societal discrimination, and to do so by funding DEI programs that specifically "benefit people of color." *See id.* ¶ 197; *see also id.* ¶ 11 ("DEIA is utilized by both public and private entities to ensure compliance with longstanding civil rights and antidiscrimination laws and to mitigate risk."). This is not the law. Indeed, in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* (*SFFA*), the Supreme Court explicitly rejected the notion that the Constitution would tolerate (let alone, mandate) race-based preferences as a mechanism for remedying societal and historical discrimination. 600 U.S. 181, 226-27 (2023). Simply put, Plaintiffs' core theory goes even further than the one rejected in *SFFA*. Predictably, as outlined below, Plaintiffs' allegations—deeply entangled in this flawed theory—fail under well-established precedent.

"Proving intentional discrimination is notoriously difficult, absent direct evidence of a discriminatory rationale." *Smith v. Henderson*, 982 F. Supp. 2d 32, 49 (D.D.C. 2013). "After all, discriminatory intent 'implies more than intent as volition or intent as awareness of consequences.

29

It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (internal quotation omitted)). In *Arlington Heights*, the Supreme Court identified a series of non-exhaustive factors to determine whether an otherwise neutral law is nevertheless discriminatory because it has discriminatory intent and disproportionate impact: whether the impact "bears more heavily on one race than another"; the "historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes"; "specific sequence of events leading up to the challenged decision"; "legislative or administrative history"; "[d]epartures from the normal procedural sequence"; and "[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 266-68 (citation omitted). Plaintiffs fail to assert sufficient facts needed to allege discriminatory intent under *Arlington Heights*.

First, Plaintiffs take issue with the text of the Executive Orders. For instance, they allege that "[t]he racially biased stereotype of Black people being unqualified and lacking merit is reflected in [Executive Order 14,173]'s official title: 'Ending Illegal Discrimination and Restoring Merit-Based Opportunity.'" Am. Compl. ¶ 188. They also allege that "[b]y inaccurately concluding that DEIA denies 'merit-based opportunities,' the [Executive Order 14,173] refuses to acknowledge barriers to opportunities for Black people that have no bearing on their qualifications or merit." *Id.* ¶ 189; *see also id.* ¶ 296 ("[T]he express terms of [EO 14,151] and [EO 14,173] mandate that white people will disproportionately benefit, and people of color will be disproportionately harmed, from the Orders' implementation and enforcement."). Plaintiffs' characterization of the Orders is entirely detached from their text. Far from reflecting an intent to

discriminate based on race, the Executive Orders seek to advance equally by, among other things, enforcing protections against discrimination based on race. *See* EO 14,173 § 1 (aiming to enforce "civil-rights laws [that] protect individual Americans from discrimination based on race, color, religion, sex, or national origin"); EO 14, 151 § 1 ("Americans deserve a government committed to serving every person with equal dignity and respect.").

Next, Plaintiffs point to prior statements and actions by the President to allege that, in issuing the Orders, the President was motivated by an intent to discriminate based on race. According to Plaintiffs, starting in the summer of 2020, the President began criticizing DEI and other DEI-adjacent programs. For instance, they allege that in September 2020, the President criticized "Critical Race Theory and *The 1619 Project*—the *New York Times*'s historical account of American slavery and the contributions of Black Americans—as 'crusade[s] against American history,' 'toxic propaganda,' and 'ideological poison that, if not removed, [would] . . . destroy our country.'" Am. Compl. ¶ 176; *see also id.* ¶ 177 (alleging that soon after, the President issued an Executive Order in 2020, "which prohibited federal contractors and grantees from engaging in certain speech activities related to what the Executive Order labeled 'divisive concepts[,] . . . [m]any of [which] pertained to systemic race and gender inequalities and/or efforts to acknowledge and remedy them"). Plaintiffs go on to allege that the President "continued to condemn 'diversity, equity, and inclusion' programs and activities during his campaign for a second term in office." *Id.* ¶ 183. Once in office for his second term, the President issued EO 14,151 and EO 14,173 while also rescinding "Executive Order No. 11246 [which] prohibit[ed] employment discrimination based on race, color, religion, and national origin by recipients of federal contracts and subcontracts and required affirmative action programs." *Id.* ¶ 193.

Contrary to Plaintiffs' assertion, however, these statements and actions do not support

Plaintiffs' claim that the Executive Orders were motivated by an intent to discriminate based on race—let alone any particular race. To begin with, many of these allegations precede the issuance of the Executive Orders by several *years* and therefore lack any meaningful "contempora[neous]" force. *Arlington Heights*, 429 U.S. at 268. But regardless, none of the statements or actions reflect an intent to discriminate based on race; rather, they merely reflect the President's criticism of DEI and DEI-adjacent programs. Plaintiffs' racial-animus claim thus seemingly assumes that the President's alleged criticism of DEI is necessarily motivated by racial animus. But that assumption is deeply flawed. After all, there are numerous good-faith bases to criticize DEI and DEI-adjacent programs. *See, e.g., SFFA*, 600 U.S. at 257 (Thomas, concurring) (expressing the view that paeans to "diversity" often conceal invidious racial discrimination). Needless to say, this Court need not weigh in on the wisdom of DEI programs. The mere recognition that criticism of DEI may be motivated by something other than racial animus sufficiently illustrates that the President's criticism of DEI and DEI-adjacent programs cannot be equated with an intent to discriminate based on race. *See Walls v. Sanders*, 760 F. Supp. 3d 766, 806 (E.D. Ark. 2024) (explaining that "allegations of animus toward Critical Race Theory are not synonymous with allegations of an intent to discriminate against African Americans"). Ultimately, while "Plaintiffs may vehemently disagree" with the President's criticism of DEI, they cannot take as-given that he "is, by definition, acting with a discriminatory purpose." *Id.* at 805, 808.

In a final attempt to allege that the Executive Orders are motivated by racial animus, Plaintiffs assert that the Executive Branch failed to follow standard procedures in issuing and implementing the Orders. *See* Am. Compl. ¶¶ 77-85. These allegations also fail.

To begin with, "[i]n contrast to legislation or agency regulation, there are almost no legally enforceable procedural requirements that the [P]resident must satisfy before issuing (or repealing)

an executive order or other presidential directive." *See* Kevin M. Stack, *The Statutory President*, 90 IOWA L. REV. 539, 552 (2005). Indeed, a key distinction between laws/regulations and Executive Orders is that the latter "may bypass the procedural restraints imposed on" the former. *See* Erica Newland, *Executive Orders in Court*, 124 YALE L.J. 2026, 2032 (2015). As such, Plaintiffs' argument—premised on the flawed notion that Executive Orders are somehow constrained by a set of decipherable "standard procedures"—fails at the outset. Separately, the level of scrutiny advocated by Plaintiffs of the *procedure* by which the President directs his *own* subordinates is manifestly inconsistent with the judicial deference traditionally granted to the President. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (concluding that the President's actions are not subject to the APA in part because "of respect for the separation of powers and the unique constitutional position of the President"). For these reasons, this Court should reject Plaintiffs' argument on this score outright without reaching its merits.

But even if this Court reaches the merits of this argument, it should reject it. Plaintiffs overstate the alleged "departure" from the "standard procedures" they identify. For instance, Plaintiffs allege that the Executive Orders failed to follow the regulations set out in 1 C.F.R. § 19.2. *See* Am. Compl. ¶ 77. But "[n]ot all executive orders go through this process." *See Executive Orders: An Introduction* (2025), https://www.congress.gov/crs-product/R46738. Indeed, it would be anomalous, at the least, to conclude that the President's Article II powers to issue Executive Orders—which long predate the existence of the Federal Register—are somehow constrained by the procedural regulations outlined in 1 C.F.R. § 19.2. *See* Sacks, *supra*, at 548 ("Presidents have asserted power unilaterally through presidential orders since the time of the Founding.").

Plaintiffs also allege that the Orders deviate from other executive orders which "typically reference[] . . . provisions for amendment to reconcile the executive order with past orders, as well

as instructions to the relevant cabinet Secretary to draft rules and regulations for implementation." Am. Compl. ¶ 78. For this proposition, Plaintiffs cite to a singular Executive Order—issued over a decade ago—which purported to "instruct[] the Secretary of Labor to 'prepare regulations to implement the requirements' of the order." *Id.* ¶ 78 n.10 (citing Executive Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014)). Along similar lines, Plaintiffs also allege that the Executive Orders fail to "instruct the Secretary of Labor to undertake further rulemaking to implement the requirements of the Order." Am. Compl. ¶ 80. Putting aside the unsupported nature of these allegations, Plaintiffs fail to allege facts needed to establish that any such deviation is material. For instance, Plaintiffs fail to explain why EO 14,173's directive to the Secretary of Labor to "cease" "[p]romoting 'diversity,'" is materially different than an explicit directive to the Secretary to do so *through* promulgating regulations. But in any event, an explicit directive to promulgate regulations appears in Section (2)(b)(iii)(B) of EO 14,151 ("recommend[ing] actions, such as . . . regulations").

Plaintiffs also allege that EO 14,173 calls for modifications to the Federal Acquisition Regulation (FAR) without following the standard process, including notice and publication in the Federal Register pursuant to 41 U.S.C. § 1707(a)(1). *See* Am. Compl. ¶¶ 81-83. But EO 14,173 does not modify the FAR on its own, and as such, is not subject to the notice and publication requirements of 41 U.S.C. § 1707(a)(1). The implementation of the Order is left to the agencies. And as Plaintiffs admit, "[i]ndividual federal agencies also can issue FAR 'deviations'—i.e., variations from standard FAR provisions and clauses." Am. Compl. ¶ 84. They further admit that on February 15, 2025, the General Services Administration (GSA) issued a Memorandum, "authorizing agencies to issue a class deviation to ensure compliance with Executive orders 14173 and 14168." GEN. SERV. ADMIN., *CAAC Consultation to Issue a Class Deviation From the Federal Acquisition Regulation (FAR) Regarding Executive orders 14173 and 14168* (Feb. 15, 2025) at 1

https://www.acquisition.gov/sites/default/files/caac/CAAC_Letter_2025-01.pdf. Indeed, pursuant to the GSA's authorization, several agencies have already issued class deviations to ensure compliance with EO 14,173 and EO 14,168. *See, e.g.*, U.S. DEP'T OF AGRIC., *Mission Area Senior Contracting Officials (MASCOs)* (Mar. 14, 2025) https://www.usda.gov/sites/default/files/ documents/far-class-deviation-eo-14173-eo-14168.pdf; DEP'T OF VETERANS AFFAIRS, *Class Deviation from the Federal Acquisition Regulation (FAR) Regarding Executive Orders 14173 and 14168* (Mar. 20, 2025) https://www.va.gov /oal/docs/business/pps/devia tionFar20200320.pdf.

Lastly, Plaintiffs allege that the "memoranda issued by OPM and OMB purporting to implement the Executive Orders also did not go through standard procedures" because the agencies did not submit them to "the Office of Information and Regulatory Affairs ('OIRA') for review before issuing them to the public." Am. Compl. ¶ 85. This allegation fails on its own terms because the Office of Personnel Management (OPM) and OMB memoranda referenced by Plaintiffs[7] are not the type of materials that are generally subject to OIRA review in the first place. *See* OFFICE OF MGMT. & BUDGET, *Interim Guidance Implementing Section 3 of Executive Order 14215, Titled "Ensuring Accountability for All Agencies"* (April 17, 2025) at 5-6 https://www.whi tehouse.gov/wp-content/uploads/2025/02/M-25-24-Interim-Guidance-Implementing-Section-3-of-Executive-Order-14215-Titled-Ensuring-Accountability-for-All-Agencies.pdf (explaining that OIRA review excludes "internal guidance directed to the issuing agency or other agencies that is not intended to have substantial future effect on the behavior of regulated parties" and "internal

---

[7] Plaintiffs are seemingly referencing OFFICE OF PERS. MGMT., *Initial Guidance Regarding DEIA Executive Orders* (Jan. 21, 2025) https://www.opm.gov/media/e1zj1p0m/opm-memo-re-initial-guidance-regarding-deia-executive-orders-1-21-2025-final.pdf; and OFFICE OF MGMT. & BUDGET, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://dcg.usc.edu/wp-content/uploads/2025/01/OMB-Memo-Pause.pdf.  These memoranda are internal to the Executive Branch.

Executive Branch legal advice or legal opinions addressed to Executive Branch officials").

In sum, Plaintiffs' tortured attempts to allege minor deviations from ill-defined "standard procedures" fall short of identifying the type of departure needed to allege discriminatory intent. *See Abbott v. Perez*, 585 U.S. 579, 608 (2018) (reasoning that the redistricting plan was not issued with discriminatory intent even though the process was expedited). Plaintiffs' allegations are particularly futile given the lack of "standard procedures" regarding the issuance of Executive Orders in the first place. *See Walls*, 760 F. Supp. 3d at 810 (explaining that where "[t]he legislative branch does not follow any standardized procedure to determine what legislation to pass[,] . . . . it is probably impossible for a legislature to 'substantively depart' in the way that *Arlington Heights* uses that phrase").

Thus, Plaintiffs have failed to sufficiently allege that the Executive Orders were motivated by the intent to discriminate based on race. As such, this Court should conclude that Plaintiffs have failed to allege racial discrimination without considering Plaintiffs' allegations regarding disproportionate impact. *See Arlington Heights*, 429 U.S. at 264–65 (explaining that an action is not "unconstitutional solely because it results in a racially disproportionate impact . . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"); *see also Francis v. Acting Dir., D.C. Off. of Zoning*, 2023 WL 4846625, at *3 (D.D.C. July 28, 2023) (intent to discriminate is a "necessary second element of a disparate-impact claim").

***EO 14,151 and EO 14,173 survive rational-basis review.*** Because Plaintiffs have failed to allege that EO 14,151 and EO 14,173 discriminate based on race, the Orders must be reviewed under rational-basis review. In undertaking this review, the Court must consider whether the Orders are (1) "directed at the achievement of a legitimate governmental purpose," and (2) "rationally further that purpose." *Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994). "'[T]he burden is on

[Plaintiffs] to negative every conceivable basis which might support [the Orders],' whether or not the basis has a foundation in the record." *Heller v. Doe,* 509 U.S. 312, 320-21 (1993) (citation omitted). Under this standard, the Court must not "judge the wisdom, fairness, or logic of [the Executive's] choices.'" *Id.*at 319 (citation omitted). Moreover, the government "has no obligation to produce evidence to sustain the rationality of" the Orders. *Id.* at 320.

The Executive Orders satisfy this highly deferential standard. Their goals of prioritizing merit and eliminating discrimination are plainly legitimate governmental interests, *see Roberts* v. *U.S. Jaycees,* 468 U.S. 609, 623 (1984), and they rationally further those goals by reallocating government funding and setting enforcement priorities that are consistent with them.

### D.   Plaintiffs have failed to state an equal protection claim with respect to EO 14,168.

Plaintiffs also bring an equal protection challenge to EO 14,168, which they allege "discriminates against Plaintiffs and the transgender people whom Plaintiffs serve on the basis of sex and transgender status." Am. Compl. ¶ 303.[8] Plaintiffs' challenge fails under the Supreme Court's recent decision in *Skrmetti*. Under the Court's reasoning in *Skrmetti*, PGI and FGI Provisions—which restrict the use of federal funds for programs that promote "gender ideology"— do not discriminate based on sex or trans-identifying status. As such, they are reviewed under, and survive, rational-basis review.

***The PGI and FGI Provisions do not discriminate on the basis of sex.*** In *Skrmetti*, the Supreme Court held that Tennessee's child-protection law proscribing sex transition interventions

---

[8] Although Plaintiffs' equal protection challenge seemingly targets EO 14,168 in gross, *see, e.g.*, Am. Compl. ¶ 306, they lack standing to challenge any provision other than the PGI and FGI Provisions. Take, for instance, the provision regarding "government-issued identification documents." *See* EO 14,168 § 3(d). Needless to say, Plaintiffs—as nonprofit organizations—do not apply for, nor receive, passports and visas, and therefore lack standing to challenge this provision. Because EO 14,168 is only relevant to Plaintiffs so far as it pertains to funding, Defendants limit their equal protection analysis to the PGI and FGI Provisions.

for minors, including the use of puberty blockers, cross-sex hormones, and surgery to address gender dysphoria, was not subject to heightened scrutiny because it did not classify based on sex or "transgender status." 145 S. Ct. 1816. In particular, the Tennessee law prohibited a healthcare provider from "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being," or "[p]rescribing, administering, or dispensing any puberty blocker or hormone" for the purpose of (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or (2) "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." *Id.* at 1826. The Tennessee law was limited, however, in that it did not restrict the administration of puberty blockers or hormones to individuals 18 and over. And it did not fully ban the administration of such drugs to minors: a healthcare provider could administer puberty blockers or hormones to treat a minor's congenital defect, precocious puberty, disease, or physical injury. The Tennessee law expressly excluded the following from the definitions of "congenital defect" and "disease": "gender dysphoria, gender identity disorder, [and] gender incongruence." *Id.* at 1826–27.

The Supreme Court held that the Tennessee law was not subject to heightened review because it merely classified "based on age" and "based on medical use," and "[c]lassifications that turn on age or medical use are subject to only rational basis review." *Skrmetti*, 145 S. Ct. at 1829. The Court explained that the law classified on the basis of age because "[h]ealthcare providers may administer certain medical treatments to individuals ages 18 and older but not to minors." *Id.* And it also classified on the basis of medical use because "[h]ealthcare providers may administer puberty blockers or hormones to minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence." *Id.*

The Court rejected the plaintiffs' contention that the Tennessee law "relies on sex-based

classifications," noting that "[n]either of the above classifications"—on the basis of age or medical use—"turns on sex." *Skrmetti*, 145 S. Ct. at 1829. Rather, the Court explained, the law "prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex." *Id*. (emphases in original). And, because the law's classifications were "neither covertly nor overtly based on sex," the plaintiffs' argument that the law evinced "sex-based stereotyping" was "misplaced." *Id.* at 1832.

Similarly, here, the PGI and FGI Provisions do not classify based on sex. Indeed, they do not classify based on any status. Rather, they classify based on the *subject matter* of the funded projects—i.e., "gender ideology." Moreover, as was true with respect to the Tennessee law, the mere fact that the EO uses "sex-based language" to describe "gender ideology" does not mean that it classifies based on sex. "[The Supreme Court] has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny." *Skrmetti*, at 1829.

### *The PGI and FGI Provisions do not discriminate on the basis of trans-identifying status*.

In *Skrmetti*, the Court further held that the Tennessee law did not discriminate against trans-identifying individuals or classify on the basis of transgender status, without deciding whether trans-identifying individuals are a suspect class to begin with. *Skrmetti*, 145 S. Ct. at 1832–33. Specifically, the Court concluded that the Tennessee law's prohibition on medical interventions for gender dysphoria, gender identity disorder, and gender incongruence did not discriminate against trans-identifying individuals because "there is a 'lack of identity' between transgender status and the excluded medical diagnoses," given that some but not all trans-identifying individuals might seek the excluded interventions. *Id.* at 1833. Similarly, here, "there is a 'lack of identity' between transgender status" and the receipt of federal funds, given that not all trans-identifying individuals might seek federal funding for the promotion of "gender ideology." Indeed, the "lack of identity"

between a recipients' trans-identifying status and federal funds is particularly stark here. After all, a non-trans-identifying individual with a federal grant that promotes gender ideology could see their grant terminated under the provisions, whereas a trans-identifying individual with federal grants that do not promote gender ideology would not.[9]

***The PGI and FGI Provisions satisfy rational-basis review.*** "The rational basis inquiry employs a relatively relaxed standard" under which a classification will be upheld "so long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Skrmetti*, 145 S. Ct. at 1835. "Where there exist plausible reasons for the relevant government action, [the court's] inquiry is at an end." *Id.*

In *Skrmetti*, the Supreme Court held that the Tennessee statute survived rational-basis review because of concerns that treatments may have "irreversibl[e]" and long-term effects and that "minors lack the maturity to fully understand and appreciate the life-altering consequences of such procedures and [may later] express[ ] regret for medical procedures that were performed on or administered to them for such purposes when they were minors." *Id.* at 1835-36. Among other things, the Court also considered the current "medical and scientific uncertainty" about the risks and benefits associated with administering puberty blockers and hormones to address gender dysphoria, and recognized that there are "open questions regarding basic factual issues" on these matters. *Id.* at 1836, 1837. As the Court concluded, "[t]he Equal Protection Clause does not resolve these disagreements," which are instead left to "the people, their elected representatives, and the

_____

[9] Although this Court need not reach the issue, Defendants maintain that trans-identifying individuals are not a suspect class. That is because trans-identifying individuals do not exhibit "obvious, immutable, or distinguishing characteristics" that define them as "a discrete group"; have not, "[a]s a historical matter, … been subjected to discrimination"; and are not a "politically powerless" group, *id.* at 1851–55 (Barrett, J., concurring); *accord id.* at 1860–67 (Alito, J., concurring in part and concurring in the judgment); *see also L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 486–87 (6th Cir. 2023), *aff 'd*, 145 S. Ct. 1816.

democratic process." *Id.* at 1837.

Similar considerations provide the "reasonably conceivable" basis to support the PGI and FGI Provisions. Indeed, the provisions here satisfy rational-basis review in a more straightforward way than the state law in *Skrmetti*: the provisions do not purport to *ban* anything; they only align federal funding with the President's policy pronouncement. Ultimately, transgender issues are "an evolving field" involving "fierce scientific and policy debates." *Id.* The President reasonably took a side on those questions. By aligning federal funding with the President's stated policy, the provisions amount to democratically accountable policy decisions. The government has a "legitimate interest" in taking a position on inherently political issues and aligning federal funding with that position "rationally further[s] its goals." *Steffan*, 41 F.3d at 685.

### E. Plaintiffs have failed to state an ultra vires claim with respect to any statute or regulation.

Plaintiffs also claim that "the [Executive Orders] are ultra vires because they impermissibly direct agencies to take actions in violation of statutory laws." Am. Compl. ¶ 322. According to Plaintiffs, the Executive Orders "impose sweeping funding restrictions . . . without lawful statutory basis." *Id.* ¶ 318. In support of this proposition, Plaintiffs list a series of statutes and regulations, which they claim "authorize Plaintiffs' equity-related services and advocacy, and their efforts to eradicate discrimination against transgender people." *Id.* ¶ 320.

Plaintiffs' argument suffers from a fundamental flaw: the Executive Orders explicitly direct the agencies to implement the Orders "consistent with applicable law." EO 14,151 § 4(b); EO 14,168 § 8(b); EO 14,173 § 8(b).[10] In this way, these qualifiers mirror the one that appeared in the

---

[10] The Funding Provisions also explicitly direct the agencies to limit federal funding as permitted by law. *See* EO 14,151 § 2(b)(i) (directing federal agencies to "terminate, to the maximum extent allowed by law . . . all . . . 'equity-related' grants or contracts"); EO 14,168 § 3(e)

Executive Order at issue in the D.C. Circuit's decision in *Allbaugh*, 295 F.3d 28. There, Plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction project could require or prohibit bidders or contractors from entering into a project labor agreement. *Id.* at 29. As the D.C. Circuit explained, the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration." *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

Similarly, here, the Orders explicitly constrain any implementation of the Orders to applicable laws. As was the case in *Allbaugh*, "[i]n the event that an agency does contravene the law in a particular instance," Plaintiffs may challenge *that* termination as inconsistent with an applicable law. 295 F.3d at 33. Notably, this past month, the Supreme Court stayed an injunction with respect to an Executive Order regarding government restructuring, which included a similar limited-by-law qualifier. *Trump v. Am. Fed'n of Gov't Emps.*, 2025 WL 1873449 (U.S. July 8, 2025). Writing separately, Justice Sotomayor stated that although "the President cannot restructure

---

(providing, among other things, that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology"). Although Section 3(g) of EO 14,168 does not expressly restate the qualifier that is explicit in Section 3(e)—"as permitted by law"—the two provisions must be read together because they appear in the same section and address the same subject matter. *See United States v. Stewart*, 311 U.S. 60, 64 (1940) ("[A]ll acts *in pari materia* are to be taken together, as if they were one law.").

federal agencies in a manner inconsistent with congressional mandates," a stay of the injunction was warranted because "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law.'" *Id.* at *1 (Sotomayor, concurring).

In sum, Plaintiffs' argument on this score only serves to highlight that their claims are fundamentally misdirected. To the extent any termination flouts any particular statute or regulation, Plaintiffs' qualm is with the termination (i.e., agency action)—not the Executive Orders that instruct agencies to follow the law.[11] Take, for instance, Plaintiffs' argument with respect to 42 U.S.C. § 300w-7(a)(2), which provides that "[n]o person shall on the ground of sex or religion be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under this part." Plaintiffs seemingly argue that any termination of AFC's grant/contracts would violate this provision. *See* Am. Compl. ¶ 320. If that is correct (which Defendants do not concede), the Orders would instruct agencies to yield to the statutory mandate and refrain from terminating AFC's grants. In this hypothetical, any subsequent termination would not only contravene the applicable laws, but also the Orders' express instructions to follow the law.[12] Simply put, any allegation that an agency acted beyond the scope of the Orders by terminating a grant in violation of a particular statute does not establish that the *Orders* violate that statute. Because the Orders explicitly instruct the agencies to follow the law, Plaintiffs' claim that the Executive Orders "impermissibly direct agencies to take actions in violation of statutory law," Am. Compl. ¶ 322, fails on its own terms.

---

[11] Any challenge to any such agency action must be brought under the APA, which Plaintiffs have not asserted.

[12] Defendants do not concede—and this Court need and should not address—whether any termination of AFC's grants would violate 42 U.S.C. § 300w-7(a)(2). Any such claim is not properly part of this litigation because Plaintiffs have only challenged the Executive Orders. Moreover, this Court lacks jurisdiction over any such termination claim, which would be channeled to the Court of Federal Claims under the Tucker Act. *See supra* I.B.

**F.  Plaintiffs have failed to state a claim that the Executive Orders are ultra vires in violation of separation of powers.**

Plaintiffs also argue that the Executive Orders violate separation of powers by exceeding the President's Article II powers and improperly infringing on Congress' Article I powers. In making this argument, Plaintiffs seemingly target the Funding Provisions and the Contract Terms Provision by arguing that the Executive Orders infringe on Congress' spending "power by unilaterally terminating or modifying federal grants and contracts without congressional authorization for such actions." *Id.* ¶ 324. This argument fails on every level.

To begin with, as explained above, the Executive Orders specifically direct the agencies to follow the law. So, any allegation that "the Executive Orders attempt to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations," *id.* ¶ 329, is based on a misreading of the Executive Orders, and therefore fails at the outset.

Moreover, because Plaintiffs' challenge is facial, they must allege "that no set of circumstances exists under which the [Orders] would be valid" or "that the [Orders] lack[] a 'plainly legitimate sweep.'" *Moody*, 603 U.S. at 723 (quoting *Salerno*, 481 U.S. at 745). Plaintiffs' arguments fall far short of meeting this standard. After all, there are undisputedly instances where the Executive can terminate contracts for convenience without congressional approval. 48 C.F.R. § 49.502 (allowing for termination at the "convenience of the Government"). Indeed, any holding to the contrary would upend decades of precedent providing the Executive ample leeway in contract terminations. *See Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000). Additionally, the Executive may in some instances, without seeking congressional approval, terminate grants "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). As such, Plaintiffs cannot establish—as they must in a facial posture—that every termination of a government grant/contract would violate

separation of powers. *See San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at \*24 (rejecting plaintiffs' facial separation-of-powers claim by explaining that the relevant provisions "involve at least some contracts and grants that can properly be terminated without violating the Spending Clause"); *Chicago Women in Trades*, 2025 WL 1114466 at \*17 (explaining that plaintiff is unlikely to prevail on its facial separation-of-powers challenge because it could not "show that the Termination Provision conflicts with *every* statute that appropriates funds for grants").

Lastly, to the extent Plaintiffs attempt to allege that the Certification Provision also violates separation of powers because it imposes a "condition[] on the use of funds," Am. Compl. ¶ 326, that argument also fails. While some courts have reasoned that "*new* conditions on federal funds" may implicate separation of powers, *see Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 516 (N.D. Cal. 2017) (emphasis added), no such concern arises when the Executive merely reinforces preexisting legal obligations. The requirement that federal funding recipients follow the law is not new. *See Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983) (Marshall, J., dissenting) (citing regulations from various agencies). For decades, federal agencies have required recipients to certify their compliance with federal laws, including antidiscrimination laws. *Id*. The Certification Provision requires recipients to certify that they are honoring their preexisting obligation to follow the law with respect to DEI programs in particular. That limitation merely renders it narrower than routine compliance-with-law certifications, which Plaintiffs do not argue violate separation of powers.

## CONCLUSION

For the reasons identified above, Defendants respectfully request that this Court dismiss Plaintiffs' claims.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Pardis Gheibi*
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Pardis Gheibi*