# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL URBAN LEAGUE, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-471 (TJK) |
| DONALD J. TRUMP, et al., | |
| *Defendants*. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 1

I.      President Trump's Issuance of the Challenged Executive Orders. ..................................... 1

II.     Procedural History .................................................................................................... 3

LEGAL STANDARD ............................................................................................................. 4

ARGUMENT ........................................................................................................................... 4

I.      This Court Has Jurisdiction Over Plaintiffs' Claims. ........................................................ 4

      A.     Plaintiffs Have Article III Standing to Bring Their Claims. ................................... 4

              1.     Plaintiffs Have Standing to Challenge the Equity Termination, Gender Funding Termination, Promoting Gender Ideology, and Certification Provisions. ........................................................................... 6

              2.     Plaintiffs Have Standing to Challenge the Government Mandates, List, Report, and Contract Terms Provisions. ............................................. 8

      B.     The Tucker Act Does Not Affect the Court's Jurisdiction to Adjudicate Plaintiffs' Constitutional Claims. ......................................................................... 11

II.     Plaintiffs Sufficiently Allege First Amendment Violations. ............................................ 14

      A.     First Amendment Claim with Respect to the Funding and Contract Terms Provisions. ............................................................................................................ 15

              1.     The Funding and Contract Terms Provisions Impermissibly Use Government Funding to Silence Disfavored Ideas. .................................. 16

              2.     The Funding and Contract Terms Provisions Seek to Regulate Speech Outside of Government Programs. ............................................... 18

      B.     First Amendment Claim with Respect to the Certification Provision. ................... 18

III.    Plaintiffs Sufficiently Allege that the Challenged Provisions Are Impermissibly Vague, Both Facially and as Applied to Plaintiffs, in Violation of the Fifth Amendment. .......................................................................................................... 19

      A.     The Challenged Orders Regulate Plaintiffs' Conduct. ......................................... 20

      B.     The Challenged Orders Burden Protected Interests. ............................................. 22

C.     The Challenged Orders Do Not Give Fair Notice and Encourage Arbitrary and Discriminatory Enforcement. ........................................................ 25

IV.    Plaintiffs Sufficiently Allege a Violation of Equal Protection with Respect to the Anti-Diversity Orders. ..................................................................................... 28

V.     Plaintiffs Sufficiently Allege a Violation of Equal Protection with Respect to the Anti-Gender Order. ...................................................................................... 35

A.     The Anti-Gender Order Is Based on Animus. ........................................... 35

B.     The Anti-Gender Order's Sex-Based Classification Is Subject to Heightened Scrutiny. .................................................................................................. 36

C.     Because the Anti-Gender Order Classifies Based on Transgender Status, It Is Independently Subject to Heightened Scrutiny. ................................... 38

D.     *Skrmetti* Is Irrelevant to Consideration of Whether the Anti-Gender Order Violates the Equal Protection Guarantee. ............................................... 40

E.     The Anti-Gender Order Fails Any Level of Review. ................................ 40

VI.    Plaintiffs Sufficiently Allege That the Executive Orders Violate the Constitutional Separation of Powers. ......................................................................................... 41

A.     The Executive Orders Exceed the President's Statutory Authority as Applied to Plaintiffs. ............................................................................... 42

B.     On Their Face, the Executive Orders' Directives Usurp Congress's Legislative Function .................................................................................. 43

CONCLUSION .................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adkins v. City of N.Y.*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015) ................................................................................38

\*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) .............................................................................................12, 17, 18

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ........................................................................................42

*Armstrong v. D.C. Pub. Libr.*,
   154 F. Supp. 2d 67 (D.D.C. 2001) ..................................................................................22

*Ash v. Tyson Foods, Inc.*,
   546 U.S. 454 (2006) ........................................................................................................30

*Ashtari v. Pompeo*,
   496 F. Supp. 3d 462 (D.D.C. 2020) ..................................................................................4

\*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
   818 F.3d 493 (9th Cir. 2016) ..................................................................................*passim*

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ........................................................................................................20

*Bd. of Regents of State Colls. v. Roth*,
   408 U.S. 564 (1972) ........................................................................................................23

*Benham v. City of Charlotte*,
   635 F.3d 129 (4th Cir. 2011) .............................................................................................5

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) ..................................................................................................37, 39

*Bowen v. Gilliard*,
   483 U.S. 587 (1987) ..................................................................................................38, 39

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ........................................................................................................13

*Brockett v. Spokane Arcades, Inc.*,
   472 U.S. 491 (1985) ........................................................................................................44

*Bynum v. District of Columbia*,
    424 F. Supp. 3d 122 (D.D.C. 2020) ...........................................................................31

*California v. United States Dep't of Transportation*,
    2025 WL 1711531 (D.R.I. June 19, 2025) .................................................................14

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017) .........................................................................................5

*Chamber of Com. of U.S. v. Fed. Election Comm'n*,
    69 F.3d 600 (D.C. Cir. 1995) .......................................................................................6

*Chicago Women in Trades v. Trump*,
    778 F. Supp. (N.D. Ill. 2025) .........................................................................7, 14, 18

*City & Cty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...................................................................................42

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985).............................................................................................35, 38

*Common Cause v. Trump*,
    506 F.Supp.3d 39 (D.D.C. 2020) ..............................................................................44

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022) ..................................................................................13

*D.T. v. Christ*,
    552 F. Supp. 3d 888 (D. Ariz. 2021) .........................................................................37

*Department of Education v. California*,
    145 S. Ct. 966 (2025)...........................................................................................13, 14

*Doe v. Horne*,
    115 F.4th 1083 (9th Cir. 2024) ............................................................................37, 41

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972).....................................................................................................5

*Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) .....................................................................................4

*Evancho v. Pine-Richland Sch. Dist.*,
    237 F. Supp. 3d 267 (W.D. Pa. 2017).......................................................................38

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)...................................................................................................24

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ...............................................................38

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960)..................................................................................34

*Grimm v. Glouchester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ..............................................................38, 39

*Hill v. Colorado*,
530 U.S. 703 (2000)..................................................................................19

*Humanitarian L. Project v. U.S. Treasury Dep't*,
578 F.3d 1133 (9th Cir. 2009) .................................................................21

*Hunter v. Underwood*,
471 U.S. 222 (1985)..................................................................................31

*Hynes v. Mayor & Council of Borough of Oradell*,
425 U.S. 610 (1976)..................................................................................20

*Jenner & Block LLP v. U.S. Dep't of Just.*,
2025 WL 1482021 (D.D.C. May 23, 2025) ...............................................6

*Johnson v. U.S.*,
576 U.S. 591 (2015)..............................................................................19, 20

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ......................................................20, 24, 27

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) .................................................................38

*Kendall v. United States ex rel. Stokes*,
37 U.S. (12 Pet.) 524 (1838) ....................................................................42

*Lane v. Wilson*,
307 U.S. 268 (1939)..................................................................................34

*Lawrence v. Texas*,
539 U.S. 558 (2003)..................................................................................35

*\*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ..............................................5, 8, 44

*LeBlanc-Sternberg v. Fletcher*,
67 F.3d 412 (2d Cir. 1995)........................................................................31

*Legal Services Corp. v. Velazquez,*
 531 U.S. 533 (2001)......................................................................................16, 17

*LeTray v. City of Watertown,*
 718 F. Supp. 3d 192 (N.D.N.Y. 2024) ....................................................................37

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992)....................................................................................................5

*Martin Luther King, Jr. Cnty. v. Turner,*
 2025 WL 1582368 (W.D. Wash. June 3, 2025)......................................................14

*Media Matters for Am. v. Paxton,*
 732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025)...............5

*Megapulse, Inc. v. Lewis,*
 672 F.2d 959 (D.C. Cir. 1982) ...............................................................................12

*Mhany Mgmt., Inc. v. Cnty. of Nassau,*
 819 F.3d 581 (2d Cir. 2016)...............................................................................30, 32

*Mills v. Habluetzel,*
 456 U.S. 91 (1982)...................................................................................................39

*N. Carolina State Conf. of NAACP v. McCrory,*
 831 F.3d 204 (4th Cir. 2016) .............................................................................32, 33

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
 767 F. Supp. 3d 243 (D. Md. 2025)....................................................................7, 10

*Nat'l Urb. League v. Ross,*
 508 F. Supp. 3d 663 (N.D. Cal. 2020) .....................................................................6

*National Institutes of Health v. American Public Health Association,*
 2025 WL 2415669 (U.S. Aug. 21, 2025)................................................................14

*National Rifle Association of America v. Vullo,*
 602 U.S. 175 (2024).................................................................................................14

*Norwood v. Harrison,*
 413 U.S. 455 (1973).................................................................................................45

*Nyquist v. Mauclet,*
 432 U.S. 1 (1977).....................................................................................................39

*Orr v. Trump,*
 778 F. Supp. 3d 394 (N.D. Cal. 2025) .......................................................... *passim*

*NB ex rel. Peacock v. District of Columbia*,
  794 F.3d 31 (D.C. Cir. 2015) ................................................................22

*Perkins Coie LLP v. U.S. Dep't of Justice*,
  2025 WL 1276857 (D.D.C. May 2, 2025) ..............................................21

*PFLAG, Inc. v. Trump*,
  769 F. Supp. 3d 405 (D. Md. 2025) ...........................................36, 37, 40

*Poland v. D.C. Water & Sewer Auth.*,
  2022 WL 2452609 (D.D.C. July 6, 2022) ...............................................28

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ...............................................................................38

*Procunier v. Martinez*,
  416 U.S. 396 (1974), *overruled on other grounds by Thornburgh v. Abbott*,
  490 U.S. 401 (1989) ...............................................................................22

*Reeve Aleutian Airways, Inc. v. United States*,
  982 F.2d 594 (D.C. Cir. 1993), *amended on denial of reh'g* (Mar. 26, 1993) ............23, 24, 25

*Reno v. Am. C.L. Union*,
  521 U.S. 844 (1997) ...............................................................................28

*Rhode Island Coal. Against Domestic Violence v. Bondi*,
  2025 WL 2271867 (D.R.I. Aug. 8, 2025) ...............................................14

*Rhode Island v. Trump*,
  781 F. Supp. 3d 25 (D.R.I. 2025) ...........................................................32

*Romer v. Evans*,
  517 U.S. 620 (1996) ...............................................................35, 36, 41

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ...............................................................................15

*Rust v. Sullivan*,
  500 U.S. 173 (1991) .........................................................................16, 17

*San Francisco A.I.D.S. Found. v. Trump*,
  2025 WL 1621636 (N.D. Cal. 2025) .............................................*passim*

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020) ...................................................21

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017) .................................................................................38

*Smith v. Henderson,*
    982 F. Supp. 2d 32 (D.D.C. 2023) ...................................................................34, 35

*Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985) ..................................................................................12

*Speech First, Inc. v. Killeen,*
    968 F.3d 628 (7th Cir. 2020) ................................................................................5, 9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) .......................................................................................................37

*Talbott v. United States,*
    775 F. Supp. 3d 283 (D.D.C. 2025) .......................................................................37

*Thompson v. Hebdon,*
    7 F.4th 811 (9th Cir. 2021) ........................................................................................37

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ........................................................................................................6

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973) ......................................................................................................36

*U.S. v. Skrmetti,*
    145 S. Ct. 1816 (2025) ..........................................................................................37, 40

*United States v. Booker,*
    543 U.S. 220 (2005) ......................................................................................................44

*United States v. Johnson,*
    40 F.3d 436 (D.C. Cir. 1994) ............................................................................28, 29

*United States v. Suquilanda,*
    116 F.4th 129 (2d Cir. 2024) ....................................................................................30

*United States v. Virginia,*
    518 U.S. 515 (1996) ........................................................................................38, 40, 41

*United States v. Windsor,*
    570 U.S. 744 (2013) ......................................................................................................35

*Unity08 v. Fed. Election Comm'n,*
    596 F.3d 861 (D.C. Cir. 2010) ...................................................................................9

*\*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .......................................................................................... *passim*

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)................................................................................26

*Washington v. Davis*,
    426 U.S. 229 (1976)..........................................................................28, 29

*Washington v. Trump*,
    768 F. Supp. 3d 1239 (W.D. Wash. 2025)....................................36, 37

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ...........................................................38

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 ............................38

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886)............................................................................34

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)............................................................................41

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009)............................................................................16

**Statutes**

28 U.S.C. § 1346(a) ................................................................................12

28 U.S.C. § 1491(a) ................................................................................12

**Other Authorities**

134 Cong. Rec. 4235 (1988)....................................................................39

1952 U.S.C.C.A.N. 1653 .........................................................................39

*A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57
    B.C. L. Rev. (2016)............................................................................39

Andresen, W. C., *Research Note: Comparing the Gay and Trans Panic Defenses.*
    *Women & Criminal Justice* 32 (2021) ...............................................39

Attorney General Bondi on February 5, 2025,
    https://www.justice.gov/ag/media/1388501/dl?inline .........................27

Blake Stilwell, *How Women Enlisted as Men to Fight in the Civil War* (Feb. 11,
    2025) ..................................................................................................39

Christi Jo Benson, *Crossing Borders: A Focus on Treatment of Transgender Individuals in U.S. Asylum Law and Society,* 30 Whittier L. Rev. 41 (2008) .......................39

Clare Sears, Arresting Dress: Cross-Dressing, Law, & Fascination in Nineteenth Century San Francisco (2015) ......................................................................................39

CSUN University Library, *Tolerance and Community: Virginia Prince and Transvestia Magazine* (Oct. 23, 2018)......................................................................39

Julian Honkasalo, *When Boys Will Not Be Boys: American Eugenics and the Formation of Gender Nonconformity as Psychopathology* (2016)...........................39

Kate Redburn, *Before Equal Protection: The Fall of Cross-Dressing Bans & the Transgender Legal Movement* L. & Hist. Rev. (2022) ...........................................39

Nancy Ordover, *American Eugenics: Race, Queer Anatomy, and the Science of Nationalism* (2003) ................................................................................................39

Off. of the Att'y Gen., U.S. Dep't of Just., *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://perma.cc/UYU5-KW2S..........................................................................27

Sonia Katyal & Ilona Turner, *Transparenthood*, 117 Mich. L. Rev. 1593 (2019).......................39

Susan Stryker, *Transgender History: The Roots of Today's Revolution* (2d ed. 2017) (2008)..................................................................................................39

## INTRODUCTION

Plaintiffs have standing to challenge the Executive Orders and have sufficiently pled that each Executive Order violates their Constitutional rights. The Executive Orders violate the First Amendment by suppressing and chilling Plaintiffs' speech that the Administration disfavors. The Orders violate the Fifth Amendment by failing to give Plaintiffs fair notice of what they require, threatening arbitrary and discriminatory enforcement, and denying Plaintiffs' equal protection under the laws. And the Orders contravene separation of powers principles that are foundational to the Constitution. At this stage in the litigation, the Court must accept Plaintiffs' well-pled facts as true and draw all reasonable inferences in favor of Plaintiffs. Defendants' motion to dismiss should be denied in its entirety.

## FACTUAL BACKGROUND

Within days of taking office, President Trump issued three Executive Orders designed to suppress disfavored viewpoints on diversity, equity, inclusion, and accessibility, and the existence and rights of transgender people: Executive Order No. 14151 ("Anti-Diversity1 Order"), Executive Order No. 14173 ("Anti-Diversity2 Order"), and Executive Order No. 14168 ("Anti-Gender Order") (collectively the "Executive Orders" or "Orders"). The Orders threaten recipients of federal funding who, like Plaintiffs, advocate for and support viewpoints disfavored by the Administration, with significant loss of federal funding and catastrophic civil penalties.

**I.     President Trump's Issuance of the Challenged Executive Orders.**

*The Anti-Diversity Orders*: On January 20 and 21, 2025, President Trump signed the two Anti-Diversity Orders, "Ending Radical and Wasteful Government DEI Programs and Preferencing" and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." These Orders advance the Administration's view that "diversity, equity, inclusion, and accessibility," "DEIA," and related equity-advancing efforts constitute "illegal and immoral discrimination"; are

"illegal," "dangerous," and "immoral"; can violate federal civil rights laws; and are contrary to merit-based opportunity. *See* First Amended Complaint, ECF No. 68 (hereinafter "FAC") ¶¶ 59-71. The Anti-Diversity Orders do not define operative terms such as "DEI," "DEIA," "diversity," "equity," "inclusion," or "accessibility." *See, e.g.*, *id.* ¶¶ 61-62, 120-133, 260.

Some provisions of the Anti-Diversity Orders terminate federal funding for organizations who advance viewpoints with which the President disagrees: (1) the Equity Termination Provision, Anti-Diversity1 Order § 2(b), which directs agencies to "terminate" all "equity-related grants or contracts;" (2) the Contract Terms Provision, Anti-Diversity2 Order § 3(c)(ii), which directs OMB to "[e]xise references to DEIA and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures"; and (3) the Government Mandates Provision, *id.* § 3(c)(iii), which instructs the director to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *See* FAC ¶¶ 60, 69, 168-72.

Other provisions of the Anti-Diversity Orders target organizations whom the Administration believes are advancing disfavored viewpoints for potential penalties: (1) the List Provision, Anti-Diversity1 Order § 2(b)(ii)(C), which directs agencies to compile a list of all "Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021"; and (2) the Report Provision, Anti-Diversity2 Order § 4(b), which directs the Attorney General to submit a report "containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences,

including DEI" and to identify "[t]he most egregious and discriminatory DEI practitioners in each sector of concern." *See* FAC ¶¶ 60, 71.

The Certification Provision of Anti-Diversity2 Order § 3(b)(iv)(B) creates new obligations for recipients of federal funding by requiring them to certify that they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and agree that compliance is "material" under the False Claims Act. *See* FAC ¶ 68.

***Anti-Gender Order***: On January 20, 2025, the President signed the Anti-Gender Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The Anti-Gender Order denies the existence of transgender people, deems them "false," and sets forth the "policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *See id.* ¶¶ 72-73. Like the Anti-Diversity Orders, the Anti-Gender Order threatens termination of federal funding for any organization that expresses views that are contrary to those of the Administration. *See, e.g.*, *id.* ¶¶ 72-76. Specifically, the Gender Funding Termination Provision, Anti-Gender Order § 3(e), demands that agencies "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," and the Promoting Gender Ideology Provision, Anti-Gender Order § 3(g), prohibits the use of federal funds "to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." FAC ¶¶ 74-75.

## II.    Procedural History

On February 19, 2025, Plaintiffs filed the instant suit, claiming that the Executive Orders violate Plaintiffs' First Amendment right to free speech by censoring and chilling their views on DEIA and transgender people, violate their Fifth Amendment right to due process by being unduly vague, and violate their Fifth Amendment guarantee to equal protection by intentionally

discriminating on the basis of race and transgender status. Plaintiffs also alleged that the Orders violated constitutional separation of powers principles.[1] On February 28, 2025, Plaintiffs filed a motion for a preliminary injunction, which the Court denied. ECF Nos. 56-57.  On June 27, 2025, Plaintiffs filed an Amended Complaint. ECF No. 68. Defendants moved to dismiss all claims on August 8, 2025. ECF No. 70.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A court evaluating a motion to dismiss may consider only "the facts alleged in the complaint [and] any documents[,] either attached to or incorporated in the complaint and matters, of which [the court] may take judicial notice." *Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

I.    **This Court Has Jurisdiction Over Plaintiffs' Claims.**

A.    **Plaintiffs Have Article III Standing to Bring Their Claims.**

Plaintiffs plausibly allege facts that establish standing to challenge all eight of the Executive Order provisions challenged in the First Amended Complaint.[2] To establish standing, a

---

[1] The National Fair Housing Alliance was originally a plaintiff but voluntarily dismissed its claims on June 27, 2025. ECF No. 64.

[2] Defendants assert that Plaintiffs are challenging the Executive Orders at issue in this case "as a unified whole." Defendants' Memorandum in Support of Motion to Dismiss, ECF No. 70-1 (hereinafter "Defs.' Mem.") at 17. That is not so. Plaintiffs bring claims against eight specific provisions of the Executive Orders. Because Plaintiffs do not challenge the Agency Requirements Provision of Executive Order 14168, Defendants' arguments regarding that provision are immaterial.

plaintiff must show (1) an injury in fact that is (2) caused by the defendant's action and (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Importantly, at the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct" are sufficient to establish standing. *Id*. at 561. And if "at least one plaintiff" can show standing, the court "need not consider the standing of the other plaintiffs." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017).

In a challenge to Executive Order provisions, a plaintiff may establish an injury in fact by alleging either actual harm or threatened harm that is imminent and substantial. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 193 (D.D.C. 2025). Where, as here, the plaintiff brings First Amendment claims, the rules for standing are "relaxed." *Eisenstadt v. Baird*, 405 U.S. 438, 444-46 & n.5 (1972). In such cases, plaintiffs need only allege that a law has or is likely to have an objectively reasonable chilling effect on the plaintiffs' speech. *See, e.g.*, *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 25 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025) (noting that "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression" and that chill is "objectively reasonable"); *accord Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (holding that "a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result"); *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) ("Government action will be sufficiently chilling when it is 'likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights.'" (alteration in original) (citation omitted)). Plaintiffs have done that here.

Plaintiffs' allegations show the provisions at issue injure Plaintiffs in two ways that are sufficient to establish standing. First, some provisions reduce or threaten to reduce Plaintiffs'

access to critical funding, which qualifies as a concrete injury under Article III. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 688 (N.D. Cal. 2020) ("[T]he possible loss of federal funds is a sufficient injury to establish Article III standing."). As this Court acknowledged at the preliminary injunction stage, three of the provisions "make it more likely that Plaintiffs will lose access to money—'a classic pocketbook injury sufficient to give [them] standing.'" Memorandum Opinion, ECF No. 57 (hereinafter "PI Op.") at 21 (quoting *Tyler v. Hennepin Cty.*, 598 U.S. 631, 636 (2023) (alteration in original)).

Second, other provisions of the Executive Orders burden and chill Plaintiffs' speech, which is also sufficient to confer standing. *See TransUnion LLC*, 594 U.S. at 425 (recognizing that abridgment of free speech is a concrete injury that bestows standing); *Chamber of Com. of U.S. v. Fed. Election Comm'n*, 69 F.3d 600, 604 (D.C. Cir. 1995) ("A party has standing to challenge, pre-enforcement, even the constitutionality of a statute if First Amendment rights are arguably chilled, so long as there is a credible threat of prosecution."); *Jenner & Block LLP v. U.S. Dep't of Just.*, 2025 WL 1482021, at *14 (D.D.C. May 23, 2025) ("[E]conomic injury is not the only sort the Constitution recognizes, and the injury to [the plaintiff's] constitutional right to express itself without fear of government reprisal itself confers standing."). Plaintiffs have adequately alleged that they have lost funding and experienced chill of their speech (and will continue to lose funding and experience chill of their speech) that enables them to challenge these provisions.

1.    **Plaintiffs Have Standing to Challenge the Equity Termination, Gender Funding Termination, Promoting Gender Ideology, and Certification Provisions.**

This Court has already concluded that Plaintiffs likely have standing to challenge the Equity Termination, Gender Funding Termination, Promoting Gender Ideology, and Certification

Provisions because they cause financial harm to Plaintiffs. PI Op. at 21. The Court found that these provisions "cause the likelihood that Plaintiffs will lose access to money because they direct agencies to stop providing the federal funds," and "an order enjoining Defendants from enforcing those provisions would redress that harm by making Plaintiffs less likely to suffer that monetary harm." *Id.* at 24. There is no basis for the Court to reassess that conclusion now.

**Equity Termination, Gender Funding Termination, and Promoting Gender Ideology Provisions ("Funding Provisions")**[3]**:** As the Court recognized, Plaintiffs receive several grants that are susceptible to termination under the Funding Provisions. *See* PI Op. at 23.[4] Moreover, Plaintiffs have already lost access to funding when Defendants suspended or terminated those grants. For example, on May 1, 2025, the EPA terminated a grant in support of NUL's Urban Environmental Justice Collaborative Program,[5] and in January 2025, AFC's funding used to provide housing and case management services was temporarily frozen. FAC ¶¶ 214, 231-33. Plaintiffs' actual and imminent loss of funds establishes standing to challenge these provisions.[6]

---

[3] Defendants refer to these three provisions collectively as "the Funding Provisions." *See, e.g.*, Defs.' Mem. at 10. Because Defendants' arguments apply equally to the three provisions and do not attempt to differentiate among them, Plaintiffs adopt that label for the purposes of this section.

[4] Specifically, NUL receives grants from the DOL, CDC, HUD, DOJ, DOC, EPA, and USDA that support its programs "advancing equity," FAC ¶¶ 53, 203, 209, and AFC receives grants from HUD, HHS, CDC, NIH, HRSA, and ACL to support its "DEI-related programming" and services for individuals living with HIV, *id.* ¶¶ 54, 226-28, 244.

[5] Defendants argue that any claim arising out of the termination of this EPA grant is now moot because Congress recently passed a reconciliation bill that rescinded funds supporting the grant. Defs.' Mem. at 20. The reconciliation bill does not moot NUL's claims, however, because the bill only rescinds funding for new grants going forward, not funding that had already been obligated in previously awarded grants.

[6] Other courts have recognized that plaintiffs who had grants or contracts terminated had standing to challenge these provisions. *See Chicago Women in Trades v. Trump* ("*CWIT*"), 778 F. Supp. at 977 (N.D. Ill. 2025); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* ("*NADOHE*"), 767 F. Supp. 3d 243, 269 (D. Md. 2025); *San Francisco A.I.D.S. Found. v. Trump* ("*SFAF*"), 2025 WL 1621636, at *9-10 (N.D. Cal. 2025).

**Certification Provision:** As this Court reasoned, the Certification Provision injures Plaintiffs because it "force[s] [Plaintiffs] to do something they otherwise would not need to"— change their programming, risk making a false certification, or forgo federal funds—and that injury is real, caused by the Certification Provision, and would be remedied by an order enjoining Defendants from applying it. PI Op. at 25. Defendants' assertion that the Certification Provision could cause injury only if Plaintiffs operated "illegal" DEI programs, Defs.' Mem. at 20-21, completely misses the point, as the provision harms Plaintiffs simply by requiring Plaintiffs to make an untenable choice. Moreover, Defendants' assertion appears to raise a factual dispute that is not proper at the motion to dismiss stage, particularly given Plaintiffs' well-pled allegations about the injuries that the Certification Provision has inflicted. *See* FAC ¶¶ 68, 126, 168, 210-11.

### 2. Plaintiffs Have Standing to Challenge the Government Mandates, List, Report, and Contract Terms Provisions.

Plaintiffs have standing to challenge the Government Mandates, List, Report, and Contract Terms Provisions. The Government Mandates Provision has already caused one Plaintiff (NUL) to lose significant grant funding, and it is objectively reasonable for the List, Report, and Contract Terms Provisions to have chilled Plaintiffs' protected speech.

Defendants argue that (1) these provisions do not regulate Plaintiffs' conduct, but instead involve directives to internal government entities, and (2) any potential future harm to Plaintiffs is too speculative to establish standing. *See* Defs.' Mem. at 17-20. Defendants' first argument fails for two reasons. First, whether the Orders are intragovernmental is not the categorical bar on standing that Defendants suggest. Indeed, courts routinely find that litigants have standing to challenge intragovernmental directives in Executive Orders. *See, e.g.*, *League of United Latin Am. Citizens*, 780 F. Supp. 3d at 193 (holding that plaintiffs had standing to challenge an executive order provision mandating that the Election Assistance Commission take action where the required

action would inflict a cognizable injury on Plaintiffs). Second, whether the provisions, in fact, regulate Plaintiffs' conduct is a factual issue that should be subject to discovery—not rejected at the motion to dismiss stage when Plaintiffs' allegations must be accepted as true.

Defendants' second argument—that any future harm to Plaintiffs is too speculative to establish standing—also fails, as it ignores the standard in cases with First Amendment claims. Where, as here, a case implicates First Amendment rights, a plaintiff may establish standing by showing "a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020); *see also Unity08 v. Fed. Election Comm'n*, 596 F.3d 861, 865 (D.C. Cir. 2010) (noting reluctance to deny standing where "First Amendment rights are implicated and arguably chilled by a credible threat of prosecution").

As explained below, Plaintiffs have experienced loss of funding from the Government Mandates Provision and chilled speech from the List, Report, and Contract Terms Provisions that are sufficient to establish standing.

**Government Mandates Provision:** The Government Mandates Provision has already caused Plaintiffs monetary harm and threatens to cause more. Plaintiffs allege that EPA's decision to terminate NUL's Environmental Justice Collaborative Program grant was based, in part, on the Government Mandates Provision. *See, e.g.*, FAC ¶ 214. This grant termination is "a classic pocketbook injury sufficient to give [them] standing." PI Op. at 21.

**Report and List Provisions:** The Report and List Provisions have harmed Plaintiffs by causing them to refrain from engaging in protected speech. *See* FAC ¶¶ 133, 146-47, 169. The Provisions have threatened to place Plaintiffs in a report or on a list that "would likely lead to future civil penalties and/or future economic reprisal or hostility," *id.* ¶ 169, and in fear of these consequences, Plaintiffs have censored their speech. For example, NUL has stopped addressing

9

"equity" in its quarterly reporting, and AFC has removed language about funding to "Black-led organizations" in its Annual Report. *Id.* ¶¶ 145-46, 153.

Plaintiffs' fear of being targeted by the Report and List Provisions and the resulting chill is reasonable, not subjective or speculative, for three reasons. *First*, the Administration has repeatedly announced its intent to bring civil actions enforcing the Executive Orders[7]—likely against organizations that are placed on the list or in the report. *Id.* ¶¶ 170-71. *Second*, the Administration has already singled out Plaintiff NUL by labeling it as a "leftist, DEI-promoting entity" in its "skinny budget" proposal, which shows that "NUL is already on the Administration's radar for holding viewpoints on DEIA that are contrary to the President's viewpoints and agenda." *Id*. ¶ 147; *see also id.* ¶ 217 (noting NUL's concern that "its mention in the skinny budget makes it more likely that the List Provision will also be enforced against it"). *Third*, the plain terms of the Provisions indicate they are designed to stomp out viewpoints that the Administration disfavors. Specifically, the Report Provision directs the government to prepare a report that includes "[a] plan of specific steps or measures to deter DEI programs or principles" to "encourage the private sector" to end "DEI." Anti-Diversity2 Order § 4(b).

As at least one other court has found, chilled speech resulting from the threat of being placed on a report of this type can establish standing. *See NADOHE*, 767 F. Supp. 3d at 269-70 (holding that plaintiffs had standing to challenge the Report Provision because they demonstrated that "they reasonably expect that they will be forced to either restrict their legal activities and expression that are arguably related to DEI, or forgo federal funding altogether").

---

[7] On May 19, 2025, DOJ announced the establishment of the Civil Rights Fraud Initiative to enforce the Executive Orders, along with its intent to use the False Claims Act to prosecute, among other conduct, "divisive DEI policies." *See* FAC ¶ 166. On June 11, 2025, DOJ issued another memorandum directing Civil Division lawyers to prioritize enforcement actions against "illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.*

**Contract Terms Provision:** Plaintiffs have similarly suffered First Amendment harms from the Contract Terms Provision. Indeed, Defendants have already taken action under this provision that suppressed Plaintiffs' speech. For example, in April 2025, HUD provided AFC with an updated contract for its Continuum of Care grant that specifically stated that AFC could "not use funds to promote 'gender ideology,' as defined in E.O. 14168." FAC ¶ 154. And the following month, HUD eliminated language referencing equity from a narrative reporting form required to be used by AFC. *Id.* ¶ 156. By changing contract terms and reporting forms, the government has prohibited Plaintiffs from taking positions and expressing viewpoints that they otherwise would have taken or expressed. This type of concrete injury gives Plaintiffs standing to challenge the Contract Terms Provision. *See* PI Op. at 20 (noting that Plaintiffs could have standing to challenge the Contract Terms Provision if they alleged, "for example, that one of their federal contracts includes a 'federal procedure' that was changed under this provision and that requires them to take an anti-DEI stance.").

### B.    The Tucker Act Does Not Affect the Court's Jurisdiction to Adjudicate Plaintiffs' Constitutional Claims.

Defendants assert that, under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction over Plaintiffs' claims challenging the Equity Termination, Gender Funding Termination, and Promoting Gender Ideology Provisions. To the contrary, Plaintiffs' case is squarely within this Court's jurisdiction irrespective of the Tucker Act. Plaintiffs claim that the Equity Termination, Gender Funding Termination, and Promoting Gender Ideology Provisions violate their constitutional rights under the First Amendment, the Fifth Amendment, or both; exceed the President's statutory authority; and usurp Congress' legislative authority in breach of the separation of powers. They seek declaratory relief, as well as injunctive relief to enjoin Defendants from enforcing those provisions against them. That is precisely the kind of case that

Article III courts are empowered to decide. Indeed, examples abound of federal district courts considering similar claims. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 211 (2013) (action by federal grantees claiming that funding provision "violated their First Amendment rights" and seeking an "injunction barring the Government from cutting off their funding").

While it may be true that—by operation of a pair of statutes, including the Tucker Act— the Court of Federal Claims has exclusive jurisdiction over certain actions based upon "any express or implied contract with the United States" that seek over $10,000 in money damages, 28 U.S.C. §§ 1346(a), 1491(a), the suit must be "*at its essence* a contract claim" to be within that exclusive jurisdiction, *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) (emphasis added). A two-prong test determines whether an action is, "at its essence," a contract claim, turning on (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *Id.* at 968. Here, both prongs demonstrate that Plaintiffs' claim is not contractual.

*First*, the source of the rights at issue here is based in the United States Constitution and federal statute, not in contracts. As the D.C. Circuit has recognized, where a plaintiff's claims are "based, not on breach of contract, but on an alleged governmental infringement of" rights that "exist independently of [a] contract," the action is not "at its essence" contractual. *Id.* at 968-69; *see also Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). The mere fact that an action may touch on contract issues does not change the result. Indeed, even a case— unlike the one here—that requires a court "to rule on a contract issue" does not "automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse*, 672 F.2d at 968.

12

*Second*, the relief Plaintiffs seek also demonstrates that their claim is not, "at its essence," contractual. The "prototypical contract remedy" is money damages. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1110 (D.C. Cir. 2022) (citation omitted). But Plaintiffs seek only *equitable* relief in the form of a declaration and injunction—remedies that the Supreme Court has "stated categorically that 'the Court of [Federal] Claims has no power to grant.'" *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) (quoting *Richardson v. Morris*, 409 U.S. 464, 465 (1973) (per curiam)). Moreover, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893. Rather, so long as Plaintiffs "request[] declaratory and injunctive relief that, if granted, would have considerable value independent of (and not negligible in comparison to) any monetary recovery," as they do here, the claim is not, "at its essence," contractual. *Crowley*, 38 F.4th at 1102.

Defendants' citation to the Supreme Court's recent per curiam opinion in *Department of Education v. California*, 145 S. Ct. 966 (2025), is misplaced. The plaintiffs in *Department of Education* brought an APA challenge to certain grant terminations and sought an order requiring the government to pay money due under those grants. As Defendants recognize elsewhere in their briefing, Plaintiffs do not bring that kind of claim, seeking money due under their federal grants. *See* Defs.' Mem. at 10 ("[I]nstead of challenging any discrete agency action under the Administrative Procedure Act (APA), Plaintiffs set their sight on the Executive Orders themselves."). Instead, Plaintiffs bring constitutional claims and seek declaratory and injunctive

relief against future harm.[8] This Court, therefore, should follow clear precedent, as other district courts overwhelmingly have done,[9] and reject Defendants' erroneous assertions.

## II.    Plaintiffs Sufficiently Allege First Amendment Violations.

At the heart of the First Amendment's speech protection is the recognition that "viewpoint discrimination is uniquely harmful to a free and democratic society." *National Rifle Association of America v. Vullo*, 602 U.S. 175, 176 (2024). While the government is free to express its own beliefs and criticize the beliefs of others, it may not use the power of the state to punish or suppress disfavored expression. *Id.* Furthermore, it may not "do indirectly what [it] is barred from doing directly" by "coerc[ing] a private party to punish or suppress disfavored speech." *Id.* at 190 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-69 (1963)).

That is precisely what Plaintiffs allege the Defendants have done. Defendants created a regime that threatens financial ruin and False Claims Act liability to coerce Plaintiffs to abandon

---

[8] The Supreme Court's recent stay order in *National Institutes of Health v. American Public Health Association*, 2025 WL 2415669 (U.S. Aug. 21, 2025), is likewise inapposite. There, the Court relied on *Department of Education* to stay a judgment in another case like that one, in which the plaintiffs brought APA claims "based on" their grants and seeking to enforce the government's "'obligation to pay money' pursuant to those grants." *Id.* at *1 (quoting *Department of Education*, 145 S. Ct. at 968). That is not the situation presented here. *See also id.* at *6 (Jackson, J., concurring in part and dissenting in part) (criticizing the "considerable wingspan" of *Department of Education*," but still recognizing that it applies only to "APA challenges").

[9] *See*, *e.g.*, *SFAF*, 2025 WL 1621636, at *12 ("The Court therefore finds *Department of Education v. California* distinguishable and concludes that the Tucker Act does not preclude Plaintiffs from proceeding in district court."); *CWIT*, 778 F. Supp. 3d at 982 (same); *See also Rhode Island Coal. Against Domestic Violence v. Bondi*, 2025 WL 2271867, at *5 (D.R.I. Aug. 8, 2025) ("The Court need not spend much time on this argument. Like many other courts that have considered similar arguments, the Court finds that the Tucker Act does not cover challenges to grant funding conditions."); *California v. United States Dep't of Transportation*, 2025 WL 1711531, at *1 (D.R.I. June 19, 2025) ("[B]ecause [plaintiffs'] challenges are based on statutory and constitutional violations and the relief they seek is equitable, the essence of their claims are *not* contractual, so they are not subject to the exclusive jurisdiction of the Court of Claims under the Tucker Act."); *Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 1582368, at *12 (W.D. Wash. June 3, 2025) ("Thus, *Department of Education* has no application where, as here, the claims sound in statute and the Constitution, not a contract.").

disfavored speech concerning DEIA and transgender rights. *See, e.g.*, FAC ¶¶ 158, 168-70, 211, 268, 270. The threatened penalties are only for organizations like Plaintiffs that take positions that the government disagrees with. That is textbook viewpoint discrimination, and it violates the First Amendment. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets . . . particular views taken on a subject, the violation of the First Amendment is all the more blatant.").

Although Defendants cannot credibly dispute that the Executive Orders discriminate on the basis of viewpoint, they nonetheless move to dismiss Plaintiffs' First Amendment claims on two grounds. First, Defendants argue that the Equity Termination, Gender Funding Termination, Promoting Gender Ideology, and Contract Terms Provisions do not violate the First Amendment because they engage in a type of viewpoint discrimination that is permissible in the context of federal funding. Second, Defendants argue that the Certification Provision does not implicate First Amendment rights at all because it applies only to "illegal" discrimination. Defendants are wrong on both counts.

### A. First Amendment Claim with Respect to the Funding and Contract Terms Provisions.

Defendants' argument that the Equity Termination, Gender Funding Termination, Promoting Gender Ideology, and Contract Terms Provisions are permissible because they target viewpoints only within "the contours of federal funds," Defs.' Mem. at 30-31, is inconsistent with the law and with Plaintiffs' well-pled factual allegations. *First*, the Funding and Contract Terms Provisions' wholesale suppression of disfavored ideas by rendering ineligible for federal funding *any* speech about DEIA or transgender rights with which the government disagrees goes well beyond what the First Amendment allows, even in the context of federal funding. *Second*, the Funding and Contract Terms Provisions go beyond the "contours of federal funds" by targeting

speech outside of programming funded by the government.  Defendants acknowledge that such action violates the First Amendment, but they improperly ask this Court to credit their factual assertions that they are not targeting speech outside of federally funded programs rather than accepting Plaintiffs' well-pled allegations to the contrary as true.

### 1.    The Funding and Contract Terms Provisions Impermissibly Use Government Funding to Silence Disfavored Ideas.

Although the government may choose to fund only one side of an issue, the government may not use funding to "suppress[] a dangerous idea" by passing a "general law singling out a disfavored group on the basis of speech content." *Rust v. Sullivan*, 500 U.S. 173, 194-95 (1991) (citation omitted).

*Rust* and many cases since—included those cited by Defendants—have evaluated the line between proper funding restrictions and unconstitutional attempts to use funding to silence disfavored speech. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009) (noting that prohibition in question was "not aimed at the suppression of dangerous ideas").

In *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), the Supreme Court found that the government had violated the First Amendment by creating a program to provide financial support for legal representation with the exception that the program could not fund legal representation that involved "an effort to amend or otherwise challenge existing welfare law." *Velazquez*, 531 U.S. at 536-37. The Court reasoned that the restriction on funding could not be justified because it was an "attempt . . . to exclude from litigation those arguments and theories Congress finds unacceptable." *Id.* at 546. It distinguished the impermissible restriction in *Velazquez* from the restriction upheld in *Rust*, noting that *Rust* involved a valid exercise of funding discretion because the government had not "single[d] out a particular idea for suppression" nor "discriminated against viewpoints," but rather had "'merely chosen to fund one activity to the

exclusion of the other' . . . 'to ensure that the limits of the federal program [were] observed.'" *Id.*
at 541 (quoting *Rust*, 500 U.S. at 193-95 (alteration in original)).

The Funding and Contract Terms Provisions seek to silence disfavored speech like the
restriction struck down in *Velazquez*. These provisions do not merely involve the government's
decision to fund some speech over other speech under a particular federal program, as in *Rust*.
Instead, these provisions are designed to quash disfavored ideas on diversity, equity, inclusion and
accessibility and transgender rights by barring making organizations who espouse the disfavored
views wholesale ineligible for funding. This singling "out [of] a particular idea" unmoored from
the objective or scope of a particular government program, is exactly the kind of government action
the court in *Velazquez* held unlawful, and belies Defendants' claim that the Funding and Contract
Terms Provisions represent a valid exercise of their funding discretion. *Velazquez*, 531 U.S. at
541; *see also SFAF*, 2025 WL 1621636 at *16 (holding that even if the Funding provisions applied
solely to federally-funded activities, rather than to the recipients' private activity, they nevertheless
violated the First Amendment because they are "entirely untethered to any 'legitimate objective[]'
or 'programmatic message' of the programs they burden to justify their intrusion on protected
speech" (citations omitted)); *AID*, 570 U.S. at 214. Plaintiffs' FAC sufficiently alleges that the
restrictions in these Provisions are not directed towards advancing legitimate objectives but instead
towards suppressing viewpoints Defendants deem dangerous. *See, e.g.*, FAC ¶¶ 5, 58, 158, 254,
256, 254, 278. These provisions represent an unconstitutional attempt to regulate speech,
notwithstanding the government's assertions to the contrary. *See, e.g.*, *SFAF*, 2025 WL 1621636
at *16-18.

### 2.    The Funding and Contract Terms Provisions Seek to Regulate Speech Outside of Government Programs.

Defendants concede that the First Amendment does not allow them to leverage federal funding to regulate speech outside programs that they fund. *See* Defs.' Mem. at 31; *see also AID*, 570 U.S. at 214-15 ("[T]he relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself."). However, Plaintiffs allege that Defendants are doing just that—namely, they are using the Funding and Contract Terms Provisions to terminate funding based on Plaintiffs' expression of speech in areas of their work not subsidized by government funding. *See, e.g.*, FAC ¶¶ 161-65, 210.[10] Plaintiffs' allegations are sufficient to allow Plaintiffs' claims to proceed at this stage.

### B.    First Amendment Claim with Respect to the Certification Provision.

Defendants' request to dismiss Plaintiffs' claims regarding the Certification Provision is similarly unpersuasive because it, too, asks the Court to overlook Plaintiffs' well-pled allegations in favor of the government's assertions to the contrary. Although the government concedes that the Certification Provision attempts to regulate speech outside of government-funded programs, *see* Defs.' Mem. at 25-26; *see also CWIT*, 778 F. Supp. 3d at 984 (admitting that the Certification provision "plainly" applies "outside of the grants or contracts"), Defendants argue that such regulation is constitutional because it "merely requires Plaintiffs to certify that they do not operate

---

[10] Defendants appear to miss these allegations, asserting that "Plaintiffs fail to allege that the Defendants sought to regulate their speech *outside* the scope of their federally funded contracts/grants" and citing paragraphs in which Plaintiffs allege that the Executive Orders suppressed their government-funded speech. Defs.' Mem. at 33-34. Of course, Plaintiffs' allegations that Defendants suppressed disfavored ideas within government-funded activities do not erase their allegations of suppressing disfavored ideas outside of their federally funded activities. The Court must accept those allegations as true at this stage.

any DEI programs that 'violate any applicable Federal anti-discrimination laws,'" and that Plaintiffs have no First Amendment right to violate the law. Defs.' Mem. at 35. Plaintiffs repeatedly allege that Defendants equate certain speech advancing diversity, equity, inclusion, and accessibility with illegal discrimination, which the Court must credit as true. *See, e.g.*, FAC ¶¶ 8, 56, 99, 104-106, 165. Assuming the government does equate certain lawful speech about DEIA with illegal discrimination, the Certification Provision forces Plaintiffs to either forego critical funding completely, abandon DEIA, or certify that they do not operate illegal DEIA programs and government enforcement under the False Claims Act.  The First Amendment precludes Defendants from putting Plaintiffs in this untenable position.

**III.     Plaintiffs Sufficiently Allege that the Challenged Provisions Are Impermissibly Vague, Both Facially and as Applied to Plaintiffs, in Violation of the Fifth Amendment.**

Plaintiffs sufficiently allege that the challenged Executive Orders fail to satisfy the fair notice and non-arbitrary enforcement requirements of due process, thus rendering the Orders void for vagueness both facially and as applied to Plaintiffs. These concerns are worsened here, where the Orders burden First Amendment protected speech and threaten significant civil penalties under the False Claims Act. For these reasons, the Court should reject Defendants' argument that "any alleged 'imprecision'" in the orders is not "constitutionally severe," Defs.' Mem. at 41, and permit Plaintiffs' due process claims to proceed.

A law is impermissibly vague in violation of due process if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Moreover, the Supreme Court has made clear that a law does not have to be vague in all of its applications to be unconstitutionally vague. *See Johnson v. U.S.*, 576 U.S. 591, 602 (2015). The Supreme Court's "holdings squarely contradict the theory that a vague provision

is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 602 (emphasis omitted).

Notably, the general test of vagueness becomes more rigorous in two circumstances, both of which apply here. *First*, a heightened standard applies to laws dealing with speech. *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976); *see also Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) ("[T]he vice of unconstitutional vagueness is further aggravated where . . . the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." (citation omitted)). *Second*, a more stringent standard for vagueness also applies where, like here, civil sanctions may be imposed. *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (significant due process interests are triggered whenever the government imposes civil penalties).

### A.    The Challenged Orders Regulate Plaintiffs' Conduct.

Defendants' contention that the challenged Executive Orders are not reviewable under vagueness standards because they are mere presidential directives to his subordinates is both unsupported by precedent and severely mischaracterizes the nature of these Orders.

As an initial matter, Defendants' argument rests on a factual assertion that merely disagrees with Plaintiffs' sufficiently pled allegations that the Orders are designed to force Plaintiffs to act in accordance with Defendants' viewpoints to avoid harsh consequences. *See, e.g.*, *supra* Section II. For that reason, this claim should be adjudicated after discovery.

Further, this court and other federal courts have already recognized that Defendants' characterization of the challenged Orders, as solely implicating internal government operations, defies logic. *See, e.g.*, *SFAF*, 2025 WL 1621636, at *20 (explaining that the Executive Orders expressly command action, including against recipients of federal funding). Furthermore, although some provisions of the challenged Orders include policy directives, many provisions also

command specific and significant action by or against Plaintiffs. For example, the Certification Provision mandates that recipients of federal funding certify that they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and the Equity Termination Provision requires Plaintiffs to adjust programming to comply with their mandates against equity-related grants. The challenged Orders make these commands without providing definitions of key terms or any rule or standard at all, let alone a comprehensible one that would satisfy due process.

This Court, and courts across the country, have repeatedly allowed vagueness challenges to executive orders, including the Orders at issue in the present case. *See e.g.*, *Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (evaluating executive order for vagueness); *Perkins Coie LLP v. U.S. Dep't of Justice*, 2025 WL 1276857 (D.D.C. May 2, 2025) (holding executive order void for vagueness where the order failed to provide adequate notice as to what diversity, equity, and inclusion policies the government prohibited and failed to define the terms diversity, equity, and inclusion in the first place); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543-44 (N.D. Cal. 2020) (holding that an executive order provision conditioning federal funds on the "recipient's certification that it will not use federal funds to 'promote' [divisive concepts, including] . . . that 'an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously'" was "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited"); *SFAF*, 2025 WL 1621636 (at preliminary injunction, finding vagueness challenge to Equity Termination Provision likely to succeed). The Court likewise should allow a vagueness challenge to proceed in this case.

### B.      The Challenged Orders Burden Protected Interests.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'" *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (quoting *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010)). Plaintiffs satisfy this requirement. Defendants insist that the Equity Termination, Promoting Gender Ideology, and Contract Terms Provisions do not implicate a liberty or property interest protected by the Fifth Amendment. Defs.' Mem. at 26-29.[11] They make two principal arguments: (1) that these provisions concern government contracts or grants that do not create a cognizable property interest; and (2) that Plaintiffs have not demonstrated a deprivation of their liberty interest in their reputation. *Id.* These arguments should be rejected for the reasons below.

*First*, Plaintiffs have alleged that the Equity Termination, Promoting Gender Ideology, and Contract Terms Provisions interfere with their freedom of speech, which is a liberty interest that triggers due process protections. *See Procunier v. Martinez*, 416 U.S. 396, 418 (1974) (stating that an interest in speech under "the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment"), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). Courts have recognized that due process vagueness challenges can be predicated on a liberty interest in being free from government incursions on free speech. *See Armstrong v. D.C. Pub. Libr.*, 154 F. Supp. 2d 67, 80 (D.D.C. 2001) (accepting the plaintiff's argument that his "constitutionally guaranteed First Amendment right of access to information and ideas" was a liberty interest that supported his due process claim); *accord Finley*, 100 F.3d 671, 675 n.4 (9th

---

[11] Although Defendants include all of the "Funding Provisions" in their argument—that is, the Equity Termination, Gender Funding Termination, and Promoting Gender Ideology Provisions— Plaintiffs only challenge the Equity Termination and Promoting Gender Ideology Provisions as unconstitutionally vague.

Cir. 1996) (decision below in *Finley*, stating that the plaintiffs' "right to engage in free speech is a liberty interest protected by due process").[12] Here, Plaintiffs have alleged that the ambiguous and undefined language in the Executive Orders, including in the Equity Termination, Promoting Gender Ideology, and Contract Terms Provisions, leave Plaintiffs guessing at what the Orders prohibit or require, causing Plaintiffs to abandon protected speech. *See* FAC ¶¶ 122-50. Plaintiffs have therefore adequately pled a cognizable liberty interest.

*Second*, the Equity Termination, Promoting Gender Ideology, and Contract Terms Provisions threaten Plaintiffs' interest in being free from government action that damages their reputations. Where, as here, an entity's "good name, reputation, honor, or integrity is at stake because of what the government is doing," due process is required. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972); *see also Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993), *amended on denial of reh'g* (Mar. 26, 1993) (noting "there [was] no real dispute at the first stage of the due process analysis . . . that some process is due because [the plaintiff] has a liberty interest in avoiding the damage to its reputation and business caused by a stigmatizing suspension").

Defendants acknowledge judicial findings of cognizable liberty interests based on reputation, but claim that Plaintiffs' allegations are unlike those cases. *See* Defs.' Mem. at 28. However, a closer reading of the cases cited by Defendants makes clear that Plaintiffs' allegations are comparable to the factual circumstances in those cases. For example, in *Reeve*, the court found that a government agency's decision to suspend an air carrier "imposed a sure stigma" and was

---

[12] Although the Supreme Court in *Finley* ultimately found the law at issue was not void for vagueness, the Court analyzed the law under vagueness principles without questioning the Ninth Circuit's ruling that freedom of speech was the liberty interest underpinning the due process claim. *Finley*, 524 U.S. at 580-90.

tantamount to "branding an airline unsafe, [which] creates a lasting blemish on a company's reputation." *Reeve*, 982 F.2d at 598. Similar to the "lasting blemish" in *Reeve*, a government decision to suspend or terminate Plaintiffs' federal grants pursuant to the Executive Orders would impose ruinous consequences on Plaintiffs. Plaintiffs are organizations whose very existence not only depends on government funding, *see* FAC ¶¶ 203, 221-22, 229, but whose core work and future ability to fundraise and partner with other organizations would be undermined significantly if Defendants canceled their grants on grounds that they—two social services organizations that combat discrimination—had themselves engaged in alleged discrimination.[13] *Id.* ¶¶ 207, 211.

Defendants do not even attempt to contest that the remaining provisions under challenge implicate a liberty or property interest.[14] Nor could they. Due process interests are triggered "whenever the government imposes 'civil penalties.'" *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996)); *see also, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) (requiring a law carrying civil penalties to meet due process standards under the vagueness doctrine). As Plaintiffs have alleged, and Defendants do not dispute, the Certification Provision and related DOJ memoranda threaten significant civil money penalties under the False Claims Act. *See* FAC ¶¶ 164-68, 171, 259-62, 281. As to the List and Report Provisions, Plaintiffs' allegations demonstrate that these two provisions implicate their interest in being free from government incursions on free speech.

---

[13] For similar reasons, a grant suspension or termination on grounds that Plaintiffs engaged in "unlawful" conduct under the Executive Orders is comparable to the government contracting suspension at issue in another case cited by Defendants, *Com. Drapery Contractors, Inc. v. United States*, which stated that action that "directs the power and prestige of government at a single entity, and may cause economic injury" triggered due process. 133 F.3d 1, 6 (D.C. Cir. 1998) ("An agency may not impose even a temporary suspension without providing the 'core requirements' of due process" (citation omitted)).

[14] In fact, Defendants' motion does not address the merits of Plaintiffs' claims with respect to the List or Report Provisions at all. *See* Defs.' Mem. at 25 n.2. And Defendants do not attempt an argument with respect to the protected interests implicated by the Certification Provision.

*See id.* ¶¶ 133-34 (discussing chilling effects on AFC created by vague terms in the List and Report Provisions, including failure to define "discriminatory DEI" and "provid[ing] or advance[ing] DEI"), 146-47 (similar for NUL). In addition, the List and Report Provisions threaten to place organizations like Plaintiffs on government "lists" without fair notice, which would create the type of stigmatic injury that the court in *Reeve* found was sufficient for purposes of the first stage of the due process analysis. *See Reeve*, 982 F.2d at 598. Thus, even though Defendants did not attempt an argument about these provisions, they also trigger due process requirements, which they fail to meet as explained below.

### C. The Challenged Orders Do Not Give Fair Notice and Encourage Arbitrary and Discriminatory Enforcement.

In addition to identifying interests protected by due process, Plaintiffs sufficiently allege that the Executive Orders both fail to provide notice and encourage arbitrary and discriminatory enforcement in violation of due process requirements. Plaintiffs allege that the challenged Orders are replete with vague and undefined language that provides no objective way to determine which speech activities are permitted and which are prohibited. *See, e.g.*, FAC ¶¶ 122 (alleging that the Equity Provision fails to define the terms "equity-related" or "equity"), 123 (alleging that the Contract Terms provision "uses even broader undefined terms"), 124 (alleging that "the Promoting Gender Ideology Provision fails to define what it means by "promote""), 132 (alleging that the word "promote" in the Certification Provision is an unclear and expansive term, and the orders provide no guidance about what it means to "promote" DEI in a manner that violates federal law), 133 (alleging that the Report and List Provisions direct officials to identify organizations suspected of engaging in "discriminatory DEI" or "provid[ing] or advanc[ing] DEI, DEIA," but fail to define those terms). This vagueness necessarily creates a broad chilling effect and invites unpredictable

and discriminatory enforcement against recipients of federal funding, like Plaintiffs, who advocate for disfavored viewpoints. *See, e.g.*, FAC ¶¶ 120, 121, 278.

Defendants do not deny that the Equity Termination, Promoting Gender Ideology, and Contract Terms Provisions are imprecise and contain ambiguities. Instead, they simply argue that some ambiguity is permitted "where the provisions direct agencies (as opposed to regulate Plaintiffs) and pertain to government funding (as opposed to law enforcement)." Defs.' Mem. at 29. But as explained above, Defendants are wrong that the challenged provisions do not regulate Plaintiffs' conduct directly. *See supra* Section III.A. Furthermore, Defendants seek to minimize the degree of ambiguity in the Equity Termination, Promoting Gender Ideology, and Contract Terms Provisions, ignoring Plaintiffs' well-pled allegations about their inability to decipher their meaning. *See* FAC ¶¶ 120-33. Defendants also ignore that the Funding and Contract Terms Provisions, as the FAC alleges, burden Plaintiffs' freedom of speech, which triggers greater scrutiny of any ambiguity. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (where a law "interferes with the right of free speech . . . a more stringent vagueness test should apply"); *Finley*, 524 U.S. at 588 ("Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards"). Thus, it is even more urgent to test the constitutionality of this ambiguity through the litigation process— certainly beyond the mere pleading stage.

Defendants further argue that a reasonable person could not complain about the vagueness of the Certification Provision since it only pertains to activities that federal antidiscrimination law prohibits. Yet again, this argument is premised on Defendants' factual dispute with Plaintiffs' sufficiently pled allegations that the Defendants' definition of unlawful DEIA is inconsistent with existing law, in both federal statutes and precedent. *See supra* Section II.B. Defendants' fringe and

unsupported interpretation of anti-discrimination law is evidenced by the "Guidance for Recipients of Federal Funding on Unlawful Discrimination" (the "July 29 Memo"), issued by the Department of Justice ("DOJ") on July 29, 2025, after Plaintiffs filed their FAC in this case. *See* Off. of the Att'y Gen., U.S. Dep't of Just., *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://perma.cc/UYU5-KW2S. The July 29 Memo lists activities that the Administration suspects violate civil rights laws, thus advancing a novel, unsupported, and expansive view of what is required by federal antidiscrimination law.[15] Defendants' erroneous and disconcerting views of anti-discrimination and equal protection, therefore, undermine their spurious contention that "Plaintiffs have no legitimate concern that they will not be given a 'reasonable opportunity to know what is prohibited.'" Defs.' Mem. at 30 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Further, the Certification Provision, especially considering the July 29 Memo, encourages agencies and private parties to take actions in line with the administration's expansive and novel view of civil rights laws, including by inviting False Claims Act litigation against organizations, like Plaintiffs, that advocate for disfavored viewpoints. The significant damages associated with False Claims Act liability heightens the severity of due process concerns raised by the Certification Provision. *See Karem*, 960 F.3d at 664 (significant due process interests are triggered whenever the government imposes civil penalties).[16]

---

[15] For example, the July 29 Memo states that programs targeted toward first generation students or individuals from particular geographic areas, spaces that are designated to encourage particular groups to gather but open to all, and cultural competency requirements are prohibited by antidiscrimination law, which is untrue.

[16] Further, the types of statements or affirmations that the Certification Provision requires recipients of federal funding to provide could serve as a basis for a criminal prosecution. In fact, the memorandum issued by Attorney General Bondi on February 5, 2025, https://www.justice.gov/ag/media/1388501/dl?inline, directs the Department of Justice to propose potential criminal investigations related to DEIA. Given that criminal penalties are also a (continued…)

**IV.**     **Plaintiffs Sufficiently Allege a Violation of Equal Protection with Respect to the Anti-Diversity Orders.**

Plaintiffs adequately plead that the two Anti-Diversity Orders reflect intentional and impermissible racial discrimination, and Defendants' arguments to dismiss this claim are meritless. Plaintiffs do not allege that "the Constitution comes with an affirmative mandate to the government to remedy historical and societal discrimination." Defs.' Mem. at 38. Rather, the Constitution prohibits any law from targeting a particular race, *Washington v. Davis*, 426 U.S. 229, 239 (1976), which is precisely what the Anti-Diversity Orders do by targeting federal grants and contracts for cancellation simply because they connect, in some way, to advancing *racial* equity for people of color, especially Black people. To bring an Equal Protection claim, Plaintiffs must produce "direct or circumstantial evidence" that (a) "a discriminatory reason more likely than not motivated" the Executive Orders and that (b) the Executive Orders "adversely affected the [Plaintiffs] in some way." *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016) (citation omitted); *United States v. Johnson*, 40 F.3d 436, 439-40 (D.C. Cir. 1994) (same). "At the motion to dismiss stage, 'there is a very low bar for alleging an inference of discrimination.'" *Poland v. D.C. Water & Sewer Auth.*, 2022 WL 2452609, at *4 (D.D.C. July 6, 2022) (quoting *Sims v. Sunovion Pharms, Inc.*, 2019 WL 690343, at *8 (D.D.C. Feb. 19, 2019)). Plaintiffs need only plausibly allege that the Executive Orders "[were] passed at least in part with [the] purpose" of "impact[ing] members of different races differently." *Johnson*, 40 F.3d at 439.

Since there is rarely direct evidence of purposeful discrimination, Plaintiffs may rely on circumstantial evidence of intent, which "may often be inferred from the totality of the relevant

---

possibility, the due process concerns at play are even more severe. *Reno v. Am. C.L. Union*, 521 U.S. 844, 871-72 (1997) (where "content-based regulation of speech" implicates criminal penalties, vagueness is of the utmost "special concern").

facts." *Washington*, 426 U.S. at 242. Courts may consider evidence like (1) "the historical background" of the Orders, (2) "the specific sequence of events leading up to [their] enactment," (3) any "departure from the normal procedural sequence," (4) any "substantive departure from a routine decision or rule," (5) "contemporary legislators' statements," and (6) "the 'inevitability or foreseeability of the consequence of the law'" as "[c]ircumstantial evidence of racially discriminatory legislative purpose." *Johnson*, 40 F.3d at 440 (citation omitted). These elements are not "exhaustive," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977), and Plaintiffs "need not establish any particular element in order to prevail," *Ave. 6E Invs., LLC*, 818 F.3d at 504. As set forth below, Plaintiffs have pled sufficient allegations supporting their claim that the Anti-Diversity Orders were issued with a discriminatory purpose.

   ***Historical Background and Sequence of Events:*** The complaint sufficiently alleges President Trump's historical opposition toward pro-equality efforts aimed at benefiting Black individuals. *See, e.g.*, *id.* at 508 (concluding that "demonstrating a history of . . . opposition to the development of affordable housing developments" supported inference of discrimination).[17] Plaintiffs also plausibly allege that President Trump continued attacking pro-equity initiatives upon returning to the White House by issuing the Orders, which seek to eliminate many of the very programs implemented in response to the country's increased focus on diversity, equity, inclusion, and accessibility in the aftermath of George Floyd's killing and the ensuing mass

---

[17] In the wake of racial justice protests following the police killing of George Floyd, over 170 Confederate symbols—which have long been associated with the enslavement of Black people in the United States—were removed from public spaces or renamed, but, during his first Administration, President Trump issued an Executive Order to re-erect monuments of these Confederate soldiers and political leaders in a National Garden of American Heroes. FAC ¶¶ 174, 176. President Trump again turned to executive action when he sought to eliminate training aimed at creating more equitable and inclusive work environments for those who have historically experienced workplace discrimination, like Black people. *Id.* ¶¶ 176-78.

demonstrations against anti-Black racism. FAC ¶ 173. The Anti-Diversity2 Order demonstrates President Trump's belief that such programs affect people of particular races, including Black people, by characterizing these initiatives as "racist" and "race- and sex-based preferences." *Id.* ¶¶ 6, 178. The Anti-Diversity2 Order's official title—"*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*"—also shows that, at least in part, President Trump's motivation for the Orders is related to the stereotypical belief that Black people are achieving success only because of racial preferences and that they are unqualified and lack merit to justify their achievements. *Id.* ¶ 188; *cf. United States v. Suquilanda*, 116 F.4th 129, 141 (2d Cir. 2024) ("[C]onnotation of racial animus in the naming of [the Executive Orders] weighs in favor of a finding of discriminatory motive."). Altogether, taken as true, this history and sequence of events support a reasonable inference of "a series of official actions taken" by President Trump against initiatives and activities aimed at supporting Black people and their social and/or economic progress within the context of ongoing racial inequalities. *Arlington Heights*, 429 U.S. at 267.

**Contemporaneous Statements:** "[T]he use of 'code words' may demonstrate discriminatory intent." *Ave. 6E Invs., LLC*, 818 F.3d at 505 (citation omitted); *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." (alteration in original) (citation omitted)). Code words or epithets are "potentially probative . . . depend[ing] on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (explaining that the term "boy" when said without a racial classification does not negate a finding a racial motive). In this instance, Plaintiffs adequately allege that, leading up to the enactment of the Order, President Trump and his close advisors began referring to diversity, equity, inclusion,

and accessibility as a proxy for race. FAC ¶¶ 10, 186. By equating equity-related trainings with "racism," President Trump considered the stated purpose of advancing racial equity in such trainings as a factor in his decision to suspend or terminate diversity, equity, inclusion, and accessibility programs. *Id.* ¶ 180.

In "construing the allegations in the complaint in favor of plaintiffs as well as drawing all inferences in their favor," the court in *Avenue 6E Investments* concluded that "the alleged statements by the neighborhood opposition submitted to city officials contained . . . code words consisting of stereotypes of Hispanics" even though "[n]one of the alleged statements expressly refer[red] to race or national origin." 818 F.3d at 505-06. "[R]ather, they raise[d] various concerns about issues including large families, unattended children, parking, and crime." *Id.* Similarly here, the factual circumstances surrounding the usage of "diversity, equity, inclusion, and accessibility" by President Trump and his close allies supports a reasonable inference that they are conveying the racial stereotype that Black people advance in employment and education due to unfair preferences from diversity, equity, inclusion, and accessibility programs and not from hard work, qualifications, or merit. *See Bynum v. District of Columbia*, 424 F. Supp. 3d 122, 134 (D.D.C. 2020) (denying motion to dismiss where the plaintiff, a Black woman, alleged she was told she needed to "go back to the South where [she] came from" due to plausible racial epithets).

President Trump's contemporaneous statements are "highly relevant" in assessing discriminatory purpose. *Arlington Heights*, 429 U.S. at 268. Courts routinely infer motivations for legal enactments by their author or sponsor. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (statement of the president of the state constitutional convention relevant to discriminatory intent of law). Statements "by those to whom the decision-makers, [*i.e.*, President Trump] were knowingly responsive," *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995), like his

senior advisors also "can support a finding of discriminatory motives . . . even if [President Trump] do[es] not personally hold such views." *Ave. 6E Invs., LLC*, 818 F.3d at 504.

**Departure From Normal Procedures:** Plaintiffs sufficiently allege multiple departures from normal procedures sufficient to support the inference "that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. First, President Trump rushed implementation of the Orders, thereby ignoring traditional procedural steps. *Compare* FAC ¶¶ 77-85, *with N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214-17, 227-29 (4th Cir. 2016) (describing the "rushed" legislative process as probative of discriminatory intent). Also, the Orders take the unusual path of defying federal regulations by seeking to cancel Plaintiffs' funding based on the President's policy preferences. *Compare* FAC ¶¶ 93, 96, 102, 105, *with Mhany Mgmt., Inc.*, 819 F.3d at 606-08 (describing the "oddness and abruptness" of timing of city ordinance supported race-based animus); *see also Rhode Island v. Trump*, 781 F. Supp. 3d 25, 49 (D.R.I. 2025) ("Congress has expressly restricted the Executive Branch from taking control of its appropriation powers.").

Most shocking is the rescission of the civil rights era Executive Order No. 11246 in the Anti-Diversity1 Order, on the purported grounds that it constituted "illegal discrimination."  FAC ¶¶ 193-94. Initially issued by President Johnson, Executive Order No. 11246 has been enforced by numerous presidents over the course of six decades. Not until this Administration has this executive order's mandate to eliminate discrimination been characterized as "illegal discrimination."

**Inevitability or Foreseeability of Consequences:** The inevitable consequence of the Orders will bear disproportionately on Black people. "Showing disproportionate impact, even if not

overwhelming impact, suffices to establish *one* of the circumstances evidencing discriminatory intent." *McCrory*, 831 F.3d at 231.

Plaintiffs allege that, in 2024, Black men earned 71 cents for every dollar earned by white men and Black women made 84 cents for every dollar earned by white women. FAC ¶ 201. To address this inequality, NUL's programs aim to improve access to housing and employment opportunities for Black Americans. *Id.* ¶ 200. Predictably, Defendants have targeted NUL's programs that predominantly benefit Black people. *Id.* ¶¶ 208, 214-15, 219, 222. For example, the EPA froze, and later terminated, NUL's grant focused on Black communities at risk of significant health harms because of climate change. *Id.* ¶¶ 208, 215-214. NUL's federally funded equity-related programs—like Project Ready Mentor, Apprenticeships Building America, and Urban Youth Pathways, which are open to all races but service mostly Black people—are all at risk of being terminated because of the Orders. *Id.* ¶ 219. The Administration's termination and threatened termination of programs that predominantly service Black people illustrates a "clear pattern, unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266.

Across the nation, the populations most impacted by the HIV epidemic are the Black, Latino, and transgender communities. *Id.* ¶ 224. In turn, AFC intentionally focuses on the communities and populations that are disproportionately impacted by the HIV epidemic. *Id.* ¶ 225. Federal funding accounts for approximately 83.4% of AFC's total budget, and loss of that funding would eliminate services for its clientele, including 1,300 households currently receiving housing assistance. *Id.* ¶ 229. Every year, AFC supports almost 7,000 people living with or vulnerable to HIV, mostly working with Black individuals. *Id.* ¶¶ 224-25. AFC's Welcome Home Program and Women's Connection Program, which predominately services Black people, have been directly affected by the funding freeze. *Id.* ¶¶ 232-33.

In fact, the consequences of the Anti-Diversity Orders are so inevitable and foreseeable that Plaintiffs have sufficiently pled that implementation of the Orders provide a pattern that "is as stark as that in *Gomillion* or *Yick Wo*." *See Smith v. Henderson*, 982 F. Supp. 2d 32, 50 (D.D.C. 2023). By focusing exclusively on "diversity, equity, inclusion, and accessibility," the Anti-Diversity Orders necessarily benefit white men to the detriment of people in any other demographic group, establishing discriminatory intent in the very text of the Orders themselves. *Id.* ¶¶ 190-92, 195. Given the Orders' transparent intent to disadvantage people of particular races—as well as particular ethnicities, sexes, genders, and sexual orientations—who would benefit from diversity, equity, inclusion, and accessibility programs, *id.* ¶ 196-97, this is one of the rare instances when the stark pattern of enforcement alone obviates establishing any other *Arlington Heights* factor. *See Arlington Heights*, 429 U.S. at 266 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . . The evidentiary inquiry is then relatively easy. But such cases are rare.").

While "[p]roving intentional discrimination is notoriously difficult, absent direct evidence of a discriminatory rationale," a plaintiff may survive a 12(b)(6) motion even with bare allegations if "the treatment of [two racial groups] can be adequately compared" through discovery. *Smith*, 982 F. Supp. 2d at 49-51. For example, in *Smith v. Henderson,* the D.C. District Court found pleadings sufficient to survive a motion to dismiss when the plaintiffs only alleged the government had a neutral policy of closing under-enrolled schools but only closed predominately Black schools while students were bused to white schools to avoid closures. 982 F.Supp.2d 32. The pleading was sufficient because any more information regarding differing treatment would be in the defendants'

34

possession. *Id*. at 51. Here, the Anti-Diversity Orders terminate programs that predominantly serve Black people and do not terminate any program that predominately serves white people. *See* FAC ¶ 298. "[T]here is absolutely no race-neutral justification for the difference" in termination of grants and programs. *Smith*, 982 F. Supp. 2d at 50.

## V.    Plaintiffs Sufficiently Allege a Violation of Equal Protection with Respect to the Anti-Gender Order.

Plaintiffs have stated a valid claim that the Anti-Gender Order purposefully discriminates against them and the people they serve based on transgender status. Plaintiffs sufficiently allege that the Anti-Gender Order reflects a status-based classification of persons undertaken for its own sake, which is forbidden by the Constitution's equal protection guarantee, and does not survive any level of review.

### A.    The Anti-Gender Order Is Based on Animus.

The Anti-Gender Order fails any level of scrutiny because it is transparently motivated by a "bare desire to harm" transgender people. *Romer v. Evans*, 517 U.S. 620, 635 (1996) (citation omitted). Its stated purpose is to deny the existence of transgender people altogether. *See* Anti-Gender Order § 2 ("It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality.") Indeed, the Anti-Gender Order repudiates their very existence, *see supra* at 3, and bear[s] hallmarks of policies driven by a bare desire to harm transgender Americans." *Orr*, 778 F. Supp. 3d at 414; *see also SFAF*, 2025 WL 1621636, at *15. Our Constitution forbids policies based on such "irrational prejudice." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985); *see also United States v. Windsor*, 570 U.S. 744, 769-74 (2013); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring).

Disapproval of transgender people and rendering them unequal is not an incidental effect of the Anti-Gender Order; it is its very purpose. As one court noted, "[t]he Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 446 (D. Md. 2025). In short, the Anti-Gender Order is a status-based classification of persons undertaken for its own sake, which is forbidden by the Constitution's equal protection guarantee, and cannot survive any level of review. *Romer*, 517 U.S. at 634; see also *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

**B.    The Anti-Gender Order's Sex-Based Classification Is Subject to Heightened Scrutiny.**

On its face, the Anti-Gender Order draws lines based on sex and transgender status. It defines "sex" as an individual's "immutable biological classification as either male or female" that "is not a synonym for and does not include the concept of gender identity," and asserts that transgender identities are invalid and "false" identities that "[do] not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." EO 14168 §§ 2(a), (f)-(g). It further defines "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa." *Id.* § 2(f).

The Anti-Gender Order thus discriminates based on sex in multiple ways. *First*, it facially classifies based on sex. "These sex-based classifications are not incidental . . . ; rather, the sex-based line drawing is the very purpose of the Executive Order." *Orr v. Trump*, 778 F. Supp. 3d 394, 411 (N.D. Cal. 2025); *see also Washington v. Trump*, 768 F. Supp. 3d 1239, 1266 (W.D. Wash. 2025). *Second*, it targets a person's transgender status—namely, their failure to identify with their assigned sex. This, too, is unlawful sex discrimination. *See*, *e.g.*, *SFAF*, 2025 WL 1621636, at *14 (holding "the Gender Order withholds federal funding based on the transgender

36

status of the individuals that grantees serve" and that it therefore "facially discriminat[es] based on transgender status"); *PFLAG,* 769 F. Supp. 3d at 446 ("[T]he Court finds that the Executive Orders facially classify on the basis of transgender status."); *Washington*, 768 F. Supp. 3d at 1266. As the Supreme Court has explained, "discrimination based on . . . transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020).[18]

Although *Bostock* arose under Title VII, its reasoning applies in the equal protection context.[19] *Talbott v. United States*, 775 F. Supp. 3d 283, 316-17 (D.D.C. 2025); *see also Doe v. Horne*, 115 F.4th 1083, 1107 (9th Cir. 2024); *LeTray v. City of Watertown*, 718 F. Supp. 3d 192, 205 (N.D.N.Y. 2024); *D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Ariz. 2021). Courts are bound not just by holdings, but by the reasoning of Supreme Court decisions. *See Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021); *see also Orr*, 778 F. Supp. 3d at 411; *Talbott*, 775 F. Supp. 3d at 316-20. Black letter law holds that discrimination based on "sex" encompasses discrimination based on the failure to conform to sex stereotypes. At its core, the Anti-Gender Order is a directive that the individuals whom federal funding recipients serve must conform to rigid, government-imposed notions of how men and women should identify, appear, and behave based solely on their

---

[18] In *Skrmetti*, the Supreme Court did not back away from the holding in *Bostock*. To the contrary, it reaffirmed it. *See U.S. v. Skrmetti*, 145 S. Ct. 1816, 1834 (2025). Nor did *Skrmetti* reject the argument that *Bostock*'s reasoning applies in the equal protection context. *See id.* at 1834 ("We have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context, and we need not do so here.").

[19] While differences exist between Title VII and the Equal Protection Clause, those distinctions typically concern whether sex discrimination is permissible—not whether a sex classification exists in the first place. Sex discrimination under Title VII is categorically prohibited, but a sex classification may still be permissible under the Equal Protection Clause if it satisfies heightened scrutiny. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308-309 (2023) (Gorsuch, J., concurring) (drawing distinction between Title VI and Title VII's categorical prohibitions on race and sex discrimination and the Equal Protection Clause's application of strict and intermediate scrutiny).

birth-sex. This is the essence of impermissible sex stereotyping. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Indeed, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011).

Because the Anti-Gender Order classifies based on sex, it is subject to intermediate scrutiny. *See United States v. Virginia*, 518 U.S. 515, 533 (1996); *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017).

### C. Because the Anti-Gender Order Classifies Based on Transgender Status, It Is Independently Subject to Heightened Scrutiny.

On its face, the Anti-Gender Order classifies based on transgender status. Such classifications are quasi-suspect. Heightened scrutiny applies where the government targets a class that: (1) has been historically "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," *City of Cleburne*, 473 U.S. at 440-41; (3) has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Bowen*, 483 U.S. at 602; and (4) is "a minority or politically powerless," *id*. Not all considerations need to point toward heightened scrutiny; the first two alone may be dispositive. *See Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 570 U.S. 744.

As multiple courts have found, all four factors are present here. *See*, *e.g.*, *Grimm v. Glouchester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020); *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015). As to the first and second factors, "[t]here is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist.*

*No. 1 Bd. Of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).[20] This discrimination is unrelated to transgender people's ability to contribute to society. *See Grimm*, 972 F.3d at 612. As to the third factor, gender identity is innate, cannot be voluntarily changed, and includes "distinguishing characteristics that define [individuals] as a discrete group." *Bowen*, 483 U.S. at 602.[21] As to the fourth and final factor, transgender people are a politically vulnerable group. *See also Grimm*, 972 F.3d at 612.

---

[20] People who transgress gendered norms, declaring they are not their sex assigned at birth, have faced extensive *de facto* and *de jure* discrimination from the times of colonial America to the present. This discrimination includes hundreds of laws and ordinances criminalizing cross-dressing for gender nonconforming people, the persecution of Indigenous gender diversity, the exclusion and deportation of gender nonconforming immigrants, the institutionalization and sterilization of gender nonconforming people in state psychiatric hospitals, the threats by states' attorneys general against doctors performing gender-affirming care in the mid twentieth century to today, the intentional exclusion of transgender people from state and federal civil rights protections, the loss of marriage benefits and child custody because of gender nonconformity, the revocation of benefits for gender nonconforming people who secretly served in the military, the twentieth century censure of magazines about gender nonconforming people, the firing and prosecution of gender nonconforming people during the "lavender scare," panic defenses excusing the murder of transgender people, and more. *See* Kate Redburn, *Before Equal Protection: The Fall of Cross-Dressing Bans & the Transgender Legal Movement*, 1963-86, 40 L. & Hist. Rev. (2022); Clare Sears, Arresting Dress: Cross-Dressing, Law, & Fascination in Nineteenth Century San Francisco (2015); 1952 U.S.C.C.A.N. 1653, 1701; Christi Jo Benson, *Crossing Borders: A Focus on Treatment of Transgender Individuals in U.S. Asylum Law and Society*, 30 Whittier L. Rev. 41 (2008); Julian Honkasalo, *When Boys Will Not Be Boys: American Eugenics and the Formation of Gender Nonconformity as Psychopathology* (2016); Nancy Ordover, *American Eugenics: Race, Queer Anatomy, and the Science of Nationalism* (2003); Harry Benjamin, The Transsexual Phenomenon 81 (Electronic ed. 1999) (1966); 134 Cong. Rec. 4235, 4249-50, 4235 (1988); Kevin Barry at al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. Rev. (2016); Sonia Katyal & Ilona Turner, *Transparenthood*, 117 Mich. L. Rev. 1593 (2019); Blake Stilwell, *How Women Enlisted as Men to Fight in the Civil War*, Military.com (Feb. 11, 2025); CSUN University Library, *Tolerance and Community: Virginia Prince and Transvestia Magazine* (Oct. 23, 2018); Susan Stryker, *Transgender History: The Roots of Today's Revolution* (2d ed. 2017) (2008); Andresen, W. C., *Research Note: Comparing the Gay and Trans Panic Defenses. Women & Criminal Justice* 32 (2021); *Bostock*, 590 U.S. at 644. Indeed, "one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Grimm*, 972 F.3d at 610-11.

[21] For example, illegitimacy and alienage are quasi-suspect or suspect classifications notwithstanding that they are not immutable. *See Mills v. Habluetzel*, 456 U.S. 91, 98-99 (1982); *Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977).

D.    *Skrmetti* **Is Irrelevant to Consideration of Whether the Anti-Gender Order Violates the Equal Protection Guarantee.**

Defendants' heavy reliance on *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), is misplaced for its contention that the Anti-Gender Order does not discriminate on the basis of sex or transgender status. That decision addressed a narrow set of medical regulations and has little bearing on the explicit classifications drawn by the Anti-Gender Order.

The Supreme Court in *Skrmetti* emphasized that it was considering a statute that regulated "age and medical use" in restricting certain treatments for minors, not a law that singled out people based on identity in the form of sex or transgender status. *Id.* at 1835-37. The Court was careful to distinguish laws that regulate "a class of treatments or conditions" from laws that "regulate a class of *persons* identified on the basis of a specified characteristic." *Id.* at 1834 n.3 (emphasis in original). According to the Supreme Court, the Tennessee law fell into the former category. The Anti-Gender Order clearly is the latter: "the Gender Order's stated purpose is to deny the existence of transgender persons entirely." *SFAF*, 2025 WL 1621636, at *15; *see also PFLAG*, 769 F. Supp. 3d at 443 ("The Gender Identity Order, appears, however, to deny the existence of transgender persons altogether."). "By singling out grants that *serve* transgender people, the Anti-Gender Order necessarily singles out transgender people and excludes them from being able to benefit from federal funds." *SFAF*, 2025 WL 1621636 at *14. The Anti-Gender Order thus directly regulates based on a class of persons, as opposed to classifying solely based on "subject matter," as Defendants inaccurately contend. Defs.' Mem. at 48 (emphasis omitted).

E.    **The Anti-Gender Order Fails Any Level of Review.**

Intermediate scrutiny is a "demanding" standard. *United States v. Virginia*, 518 U.S. 515, 533 (1996). The burden "rests entirely on the State" to demonstrate an "exceedingly persuasive" justification for its differential treatment. *Id.* It must show "that the [challenged] classification

40

serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (cleaned up). Here, Defendants cannot meet even the lowest level of review, let alone heightened scrutiny. Disapproving of transgender people, discouraging people from expressing their gender identities, and directing agencies and federal grantees to do the same are plainly illegitimate purposes and demonstrate that the Anti-Gender Order was issued for the express purpose of discriminating against transgender people. Such an objective is not even a legitimate state interest. *See Romer*, 517 U.S. at 632; *Horne*, 115 F.4th at 1104.

In sum, Plaintiffs have stated a viable equal protection claim. The Anti-Gender Order discriminates based on sex and transgender status, warrants intermediate scrutiny, and fails any level of review because it is animated by impermissible animus.

## VI.    Plaintiffs Sufficiently Allege That the Executive Orders Violate the Constitutional Separation of Powers.

"The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive Orders at issue here stem from neither. In issuing the Executive Orders, the President exceeded the authority granted by Congress and his authority under Article II of the Constitution.

In cases where the President is allegedly exceeding authority granted to him by Congress, the court must determine whether the President's actions contravene the text, history, and purpose of the statute under which Congress has delegated that power. In cases where Congress has not delegated such power to the President, the court must determine whether the President is acting pursuant to the authority bestowed to him by Article II. But even then, the President's actions are limited by a constitutional analysis of the underlying legal claims. For instance, if his actions

purportedly violate the First Amendment, the standards and tests for a First Amendment claim govern.

### A.   The Executive Orders Exceed the President's Statutory Authority as Applied to Plaintiffs.

The President has no authority to disobey duly enacted statutes, even for policy reasons. *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). Yet, by using the Executive Orders to deny Plaintiffs grant funding, the President is doing just that. Since Congress alone holds the "power of the purse," the President cannot unilaterally impose conditions on federal funding. *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1233-34 (9th Cir. 2018) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)) (noting that "[w]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon").

Defendants claim that the Anti-Diversity Orders, as applied to Plaintiffs' specific funding programs, cannot be contrary to statutory authority because the Orders contain the magic words "consistent with applicable law." Defs.' Mem. at 50. Defendants make a similar claim about the Anti-Gender Order, but admit that the "consistent with all applicable law" language pertains to an internal agency directive, not to the Order provisions involved in this case. *Id.* at 50 n.10. In any case, the "consistent with all applicable law" language cannot save the Executive Orders because they have no valid application.

Any enforcement of the Anti-Gender Order against Plaintiffs' programs, which were funded consistent with statutory purpose, necessarily begins with the imposition of a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people and gender identity; repudiates the existence of transgender people; deems their identities to be false; and orders their exclusion from government recognition and protection. Defendants can point to no

42

law under which such an animus-laden policy could be validly applied without contravening funding statutes that Congress enacted.

Similarly, the Anti-Diversity Orders turn on the newfound concept of "illegal DEI." Defendants' assertion that the Orders do not create new conditions, but rather merely reinforce preexisting legal obligations under nondiscrimination laws, would render the Orders futile and irrelevant because federally funded programs have long required grantees to abide by nondiscrimination laws. Congress has neither recognized a new forbidden category of "illegal DEI" nor incorporated such disqualifying conditions in any of the statutes under which Plaintiffs receive funding. Indeed, the Executive Orders' animating principles directly contravene the stated purpose of many of the statutes identified in paragraph 320 of the FAC.

The Executive Orders dictate specific actions that agencies must take to terminate government funding without further analysis or discretion—and that is what Defendants are faithfully doing. There is no next step consisting of genuine inquiry or investigation of suspected illegality that could potentially make the Executive Orders legally applicable. To the contrary, any application contravenes the statutes governing the federal funds at issue here.

**B.    On Their Face, the Executive Orders' Directives Usurp Congress's Legislative Function.**

The Executive Orders' directives place unconstitutional conditions on grant funding without Congressional authority and, thus, violate separation of powers. As indicated above, the Executive Orders independently violate the First Amendment and the Fifth Amendment's due process and equal protection guarantees. Defendants argue that Plaintiffs cannot allege that any set of circumstances exists under which the Executive Orders would be valid. But Defendants overstate the test by ignoring the severability clause in each challenged Executive Order. Thus, the correct test is not whether each and every directive within the Executive Order is facially invalid,

but instead whether a specific directive at issue in this case, which directs non-statutory conditions on grant funding, is invalid. Even if some of the other directives that are not implicated in this lawsuit—such as an internal administrative guidance or directions to agencies—*might* have valid applications or give rise to ripeness concerns, a proper facial analysis must focus on the specific provisions that concern conditions placed on recipients of government funding.[22] For this reason, *League of United Latin American Citizens*, 780 F.Supp.3d at 174, is more instructive than *Common Cause v. Trump*, 506 F.Supp.3d 39, 47 (D.D.C. 2020), cited by Defendants.

Once a court concludes that a law contains unconstitutional provisions or applications, it must sever the constitutional parts from the rest. Partial, rather than facial, invalidation is the required course of action. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985). Courts must retain those portions of the law that are valid, capable of functioning independently, and consistent with the law's objectives. *United States v. Booker*, 543 U.S. 220, 258-59 (2005).

The Executive Orders target Plaintiffs and the people they serve for opprobrium and exclusion from federal financial assistance because of the viewpoints they support and who they are. That alone should be sufficient reason to invalidate the Orders on their face. Nevertheless, seeking to leverage the federal government's vast reach throughout the economy to control private thought and speech, federal agencies are instructed to condition federal contracts and grants on private parties' commitments to silence themselves about "diversity, equity, inclusion, and accessibility" or the very existence of transgender people. Those specific, illegal provisions of the Executive Orders certainly justify striking the grant directives separately. It is axiomatic that the government may not contract with "private persons to accomplish what it is constitutionally

---

[22] Severability should not be confused with an as-applied challenge. The analysis of the severed component is still viewed facially and not in a specific context.

forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). That is what the directives of the Executive Orders seek to accomplish here. At a minimum, there is no lawful application of the Executive Orders' grant conditions, notwithstanding whether the other aspects of the Order have valid applications or whether the Administration could terminate or condition the funding under some other law.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: September 12, 2025                  Respectfully submitted,

<br>

Jin Hee Lee, DC Bar No. 1740850          Stacey K. Grigsby, DC Bar No. 491197
Gabriel Diaz, DC Bar No. 991618          Sarah E. Harrington, DC Bar No. 219218
Donya Khadem, DC Bar No. 1719557         Alison DiCiurcio, DC Bar No. 1601410
Loreal Hawk, DC Bar No. 90033817         COVINGTON & BURLING LLP
NAACP LEGAL DEFENSE &                     850 Tenth Street, NW
EDUCATIONAL FUND, INC.                    Washington, DC 20001
700 14th Street NW, Suite 600            (202) 662-6000
Washington, DC 20005                     sgrigsby@cov.com
(202) 682-1300                           sharrington@cov.com
jlee@naacpldf.org                        adiciurcio@cov.com
gdiaz@naacpldf.org
dkhadem@naacpldf.org                     Nicholas E. Baer, DC Bar No. 1672517
lhawk@naacpldf.org                       James H. Fitch, DC Bar No. 1780894
                                         COVINGTON & BURLING LLP
Amira Perryman                           620 Eighth Avenue
NAACP LEGAL DEFENSE &                     New York, NY 10018
EDUCATIONAL FUND, INC.                    (212) 841-1000
40 Rector Street, 5th Floor              nbaer@cov.com
New York, NY 10006                       jhfitch@cov.com
(212) 965-2200
aperryman@naacpldf.org

Camilla B. Taylor, DC Bar No. IL0098
Kenneth D. Upton, Jr., DC Bar No. 1658621
LAMBDA LEGAL DEFENSE AND

EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
(312) 605-3225
ctaylor@lambdalegal.org
kupton@lambdalegal.org

Jose Idio Abrigo
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(646) 307-7406
jabrigo@lambdalegal.org

Pelecanos
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017*
(323) 370-6909
pelecanos@lambdalegal.org

*Address for mailing purposes only