**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| National Urban League, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>Donald J. Trump, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Case No. 25-cv-471 |

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT .................................................................................................................... 2

I.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS'
      CLAIMS. ................................................................................................................ 2

II.   PLAINTIFFS' CLAIMS FAIL ON THEIR MERITS. ............................................................ 6

      A.    Fifth Amendment ................................................................................... 6

      B.    First Amendment .................................................................................. 10

      C.    Equal Protection .................................................................................. 15

            i.    *The relevant provisions of EO 14,151 and EO 14,173 do not
                  violate Equal Protection* ....................................................... 15

            ii.   *The relevant provisions of EO 14,168 do not violate Equal
                  Protection* ............................................................................. 19

      D.    Separation of Powers ........................................................................... 22

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)............................................................................................13

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*,
2025 WL 2615054 (D.D.C. Sept. 10, 2025) ........................................................7

*Animal Legal Def. Fund, Inc. v. Vilsack*,
111 F.4th 1219 (D.C. Cir. 2024).........................................................................5

*Armour v. Indianapolis*,
566 U.S. 673 (2012)............................................................................................22

*Ash v. Tyson Foods, Inc.*,
546 U.S. 454 (2006)............................................................................................17

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
818 F.3d 493 (9th Cir. 2016)..............................................................................17

*Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000)...........................................................................................11

*Bostock v. Clayton County*,
590 U.S. 644 (2020)............................................................................................21

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002)..............................................................................23

*Bynum v. District of Columbia*,
424 F. Supp. 3d 122 (D.D.C. 2020)....................................................................17

*California v. Texas*,
593 U.S. 659 (2021)..............................................................................................3

*Chicago Women in Trades v. Trump*,
778 F. Supp. 3d 959 (N.D. Ill. 2025)...............................................................8, 23

*Chicago Women in Trades v. Trump*,
2025 WL 1331743 (N.D. Ill. May 7, 2025) ........................................................23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..............................................................................................5

*Climate United Fund v. Citibank, N.A.*,
  154 F.4th 809 (D.C. Cir. 2025) ..................................................................22

*Dalton v. Specter*,
  511 U.S. 462 (1994).................................................................................22

*Dep't of Educ. v. California*,
  145 S. Ct. 966 (2025)................................................................................. 3

*Doe v. Webster*,
  991 F.2d 818 (D.C. Cir. 1993) ..................................................................20

*Finley v. Nat'l Endowment for the Arts*,
  100 F.3d 671 (9th Cir. 1996), *rev'd*, 524 U.S. 569 (1998) .......................... 7, 11, 12

*Finley v. Nat'l Endowment for the Arts*,
  524 U.S. 569 (1998)................................................................... 7, 11, 12

*Heckler v. Chaney*,
  470 U.S. 821 (1985)..................................................................................25

*Helmer v. Doletskaya*,
  393 F.3d 201 (D.C. Cir. 2004) ................................................................6, 9

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*,
  746 F.2d 855 (D.C. Cir. 1984) ..................................................................25

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993)................................................................................. 11

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001)..................................................................................10

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)..............................................................................24, 25

*Marijuana Pol'y Project v. United States*,
  304 F.3d 82 (D.C. Cir. 2002) ....................................................................10

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016).......................................................................17

*Murthy v. Missouri*,
  603 U.S. 43 (2024)..................................................................................... 4

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025)..................................................................................... 3

*New Vision Photography Program, Inc. v. District of Columbia*,
    54 F. Supp. 3d 12 (D.D.C. 2014) ................................................................. 7

*Northrop Gruman Corp. v. United States*,
    46 Fed. Cl. 622 (2000)................................................................................ 23

*Regan v. Tax'n With Representation of Wash.*,
    461 U.S. 540 (1983)................................................................................... 10

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)............................................................................. 11, 12

*Rust v. Sullivan*,
    500 U.S. 173 (1991)...................................................................... 10, 11, 24

*Steffan v. Perry*,
    41 F.3d 677 (D.C. Cir. 1994) ..................................................................... 19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("SFFA"),
    600 U.S. 181 (2023)............................................................................. 16, 18

*United States v. Hansen*,
    599 U.S. 762 (2023)................................................................................... 14

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025)................................................................... 20, 21, 22

*Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*,
    2025 WL 2374528 (D.D.C. Aug. 14, 2025)................................................ 7

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
    2025 WL 1865160 (D.D.C. July 7, 2025).................................................. 7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)....................................................................... 16, 17, 19

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)................................................................................... 20

**Statutes**

28 U.S.C. § 1491 ............................................................................................... 3

31 U.S.C. § 1501............................................................................................... 3

Pub. L. No. 119-21 (June 4, 2025)...................................................................................... 3

**Regulations**

2 C.F.R. § 200.340.......................................................................................................... 23

*Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*,
  Executive Order No. 13,985, § 1, 86 Fed. Reg. 7009, 7009 (Jan. 25, 2021).................... 12, 18

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*,
  Executive Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025)......................................... *passim*

*Ending Radical and Wasteful Government DEI Program and Preferencing*,
  Executive Order 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025)......................................... *passim*

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,
  Executive Order 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025)......................................... *passim*

**Other Authorities**

H.R. 1, 119th Cong., § 60016 (1st Sess. 2025)............................................................. 3

OFF. OF THE ATT'Y GEN., U.S. DEP'T OF JUST., *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025) ....................................................... 9, 10

**INTRODUCTION**

As Plaintiffs' Opposition confirms, their suit is a veiled request for this Court to substitute its own wisdom for that of the President on fiercely debated policy matters. This Court should reject that invitation and grant Defendants' Motion To Dismiss the Amended Complaint in its entirety.

To begin with, Plaintiffs lack standing to assert their claims to the challenged provisions of Executive Order 14,168 ("EO 14,168"); Executive Order 14,151 ("EO 14,151"); and Executive Order 14,173 ("EO 14,173"). They erroneously insist that they have standing to challenge purely intragovernmental directives in the Executive Orders—i.e. Report, List, Government Mandates, and Agency Requirements Provisions—by speculating about the provisions' purported effects (or future effects). But they do not plead sufficient facts to establish that any of these provisions have caused them—or will imminently cause them—any concrete injury. Without more, this Court should refrain from inserting itself between the President and the agencies he is constitutionally charged with supervising. Plaintiffs also lack standing to challenge the Orders' outward-facing provisions: Contract Terms Provision; Termination Provision, Funding Gender Ideology ("FGI") Provision, and Promoting Gender Ideology ("PGI") Provision (together, the "Funding Provisions"); and Certification Provision. Instead of challenging any specific agency implementation of these provisions, Plaintiffs take aim at the provisions themselves in the abstract by hypothesizing a link between the Contract Terms Provision and agency actions they complain of, speculating about future implementations of the Funding Provisions, and manufacturing injury resulting from their own misreading of the Certification Provision.

On the merits, Plaintiffs' legal theories are even more far-fetched. They attempt to bring their Fifth and First Amendment claims with respect to the Contract Terms and Funding Provisions

1

by arguing that the provisions trigger their "liberty" interest under the Fifth Amendment because they violate their "free speech" under the First Amendment. These claims must be dismissed for a simple reason: They are premised on Plaintiffs' flawed legal theory that they have a First Amendment right to federally subsidized speech on "equity" and "gender ideology."

Plaintiffs' Equal Protection challenges to the Funding Provisions are similarly meritless because none of the provisions classify based on the recipients' protected characteristics. Rather, they direct agencies to make *subject matter* funding choices that align with the President's policy priorities on "equity" and "gender ideology." The Funding Provisions are thus subject to, and survive, rational-basis review.

Plaintiffs' separation of powers challenge to the Funding Provisions also falls flat. Plaintiffs mainly complain that the funding directives—which specifically instruct agencies to follow the law—themselves violate the law. Plaintiffs provide no valid reason for this Court to simply ignore the Orders' limited-by-law qualifiers, which doom Plaintiffs' claim.

Lastly, all of Plaintiffs' various challenges to the Certification Provision fail because they are premised on a misreading of the provision. As correctly understood, the provision merely requires Plaintiffs to certify compliance with existing anti-discrimination laws. Such a requirement is neither unconstitutionally vague under the Fifth Amendment, an infringement on free speech under the First Amendment, or an affront to the separation of powers.

ARGUMENT

I.     **THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS.**

As Defendants explained in their opening brief, Plaintiffs lack standing to assert their claims. *See* ECF No. 70-1 ("Gov. Br.") at 7-14. In their opposition, Plaintiffs fail to rebut this conclusion with respect to any of the provisions.

2

***The Funding Provisions.*** Plaintiffs' only allegations regarding "suspended or terminated" funds pursuant to the Funding Provisions are: (1) an alleged pause in the AIDS Foundation of Chicago ("AFC")'s funding in January 2025 and (2) the Environmental Protection Agency ("EPA")'s termination of the National Urban League ("NUL")'s Urban Environmental Justice Collaborative Program on May 1, 2025. *See* Pl. Opp. at 7. But any allegation with respect to either the pause or the termination is now moot. After all, Plaintiffs admit that AFC's fund has been restored by characterizing the suspension as a "temporary fr[eeze]," *id.*, and the funding for NUL's Urban Environmental Justice Collaborative Program has been rescinded by Congress, *see* H.R. 1, 119th Cong., § 60016, (1st Sess. 2025).[1] Simply put, there is nothing left for the Government to do with respect to either funding stream, mooting any request for injunctive relief. And because this Court cannot issue any injunctive relief, it also lacks jurisdiction to issue any declaratory relief with respect to either fund. *See California v. Texas*, 593 U.S. 659, 673 (2021) (declaratory relief

---

[1] Plaintiffs claim that the at-issue bill does not extend to NUL's grant agreement because it "only rescinds funding for new grants going forward, not funding that had already been obligated in previously awarded grants." ECF No. 72 ("Pl. Opp.") at 7 n.5. But NUL's funding was not "obligated" when the bill went into effect on July 4, 2025. On May 1, 2025, NUL's grant agreement was terminated, which legally unobligated the funding for the grant agreement. *See* 31 U.S.C. § 1501(a)(1) ("An amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of . . . a binding agreement between an agency and another person (including an agency)"). And the bill "rescind[ed] unobligated funding for environmental and climate justice block grants that benefit disadvantaged communities." H.R. 1, 119th Cong., § 60016, (1st Sess. 2025) (bill summary for Pub. L. No. 119-21 (June 4, 2025)).

Besides even if the NUL-EPA grant agreement could be restored, this Court lacks jurisdiction to do so under the Tucker Act, 28 U.S.C. § 1491(a). *See Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam) (explaining that jurisdiction to "enforce [the Government's] contractual obligation to pay money" lays exclusively in the Court of Federal Claims (citation omitted)). Thus, even if this Court has jurisdiction to evaluate Plaintiffs' challenges to the Termination Provision, it lacks jurisdiction to reinstate the NUL-EPA grant agreement. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660-62 (2025) (Barrett, J., concurring) (explaining that even if the court has jurisdiction to review a challenge to a government policy, i.e. the EO, it still lacks jurisdiction to restore the terminated contract).

3

"cannot alone supply jurisdiction otherwise absent").

Without the ability to rely on any past terminations/suspensions, Plaintiffs must rely on their fears about Defendants' future conduct. But these allegations are too speculative to withstand scrutiny, *see* Gov. Br. at 13-14, and Plaintiffs cannot rescue their speculations by relying on other courts' conclusions that *different* plaintiffs alleging *different* facts had standing to challenge these provisions, *see* Pl. Opp. at 7 n.6.

***Contract Terms Provision.*** To establish standing for their claim with respect to the Contract Terms Provision, Plaintiffs reference their allegations that AFC has been asked by the Department of Housing and Urban Development ("HUD") to change certain language in their contract/grants related to "gender ideology," and that HUD removed some language related to equity from a specific form used by AFC. *See* Pl. Opp. at 11. But Plaintiffs provide no support for alleging that HUD's alleged actions were attempts to implement *this* particular provision (as opposed to the President's overarching policy positions more generally). Instead, Plaintiffs merely hypothesize a causal link between HUD's alleged actions and the Contract Terms Provision. Such speculations fail under Article III. *See Murthy v. Missouri*, 603 U.S. 43, 63 (2024) (explaining that plaintiffs cannot satisfy Article III by merely assuming causation).

Notably, Plaintiffs' failed attempt to allege some attenuated connection between HUD's actions and the Contract Terms Provision only serves to highlight the misdirected nature of Plaintiffs' suit. Because the Orders are first and foremost policy directives from the President, agencies will predictably implement the Orders' overarching directives in ways that may not necessarily be traceable to any specific provision. To the extent that such implementations have caused injury to Plaintiffs, they have standing to challenge them directly. But they cannot assert standing with respect to the Orders themselves by speculating about which provision deserves

4

blame for HUD's alleged actions.

***Certification Provision.*** Plaintiffs insist that they have standing to assert a claim with respect to the Certification Provision because the provision "require[es] [them] to make an untenable choice," which they describe as either "change their programming, risk making a false certification, or forgo federal funds." Pl. Opp. at 8. But as Defendants have already explained, this "untenable choice" is premised on an unreasonable reading of the provision. *See* Gov. Br. at 11-12. As correctly read, the Certification Provision requires Plaintiffs to certify that they comply with applicable and preexisting anti-discrimination laws. EO 14,173 § 3(b)(iv)(B). And Plaintiffs have not alleged that they promote any programs that violate existing anti-discrimination laws. Pursuant to their own allegations then, Plaintiffs need not "change their programming, risk making a false certification, or forgo federal funds" due to the Certification Provision.[2] As such, to the extent they have concocted this "untenable choice" for themselves, they have done so due to their own misreading of the provision. Any such injury is "largely of [their] own making," and therefore insufficient under Article III. *See Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1228 (D.C. Cir. 2024) (citation and quotation marks omitted).

***Report, List, Government Mandates, and Agency Requirements Provisions.*** Plaintiffs also fail to assert the requisites of Article III standing with respect to these intragovernmental provisions. *See* Gov. Br. at 8-11*; see also* ECF No. 57 ("PI Op.") at 14-19. In their Opposition, Plaintiffs argue that the intragovernmental nature of a provision is not a categorical bar on standing.

---

[2] Granted, if Plaintiffs had alleged that they intend to engage in a knowing violation of existing laws, then they could have properly claimed that the Certification Provision presented them with a "choice"—i.e. alter their conduct, risk making a false certification, or forgo funds. But because they have not made any such claim, they "cannot manufacture standing merely by inflicting harm on themselves based on their fears" of a different executive order than the one the President signed. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

*See* Pl. Opp. at 8-9. But as Plaintiffs also acknowledge, they can only assert standing with respect to intragovernmental provisions if they have adequately traced the provisions to a cognizable injury. *Id.* They have failed to do so. *See* PI Op. at 14-19. Nor can Plaintiffs fall back on the notion that the existence or imminence of such an injury is a question of fact. *See* Pl. Opp. at 9. Where, as here, the "inferences drawn by plaintiffs" are "unsupported by the facts set out in the complaint," "the court need not accept [them]." *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004) (citation and quotation marks omitted). Nothing in Plaintiffs' Amended Complaint adequately supports the inference that these provisions have injured—or will imminently injure—Plaintiffs. *See* Gov. Br. at 8-11 (explaining why the Plaintiffs' reliance on the EPA-NUL grant agreement to allege injury with respect to the Governments Mandate Provision is futile and that Plaintiffs' subjective fears regarding the application of the List and Report Provisions cannot establish standing).[3]

## II.    PLAINTIFFS' CLAIMS FAIL ON THEIR MERITS.

Even if Plaintiffs had standing to assert their claims with respect to the Funding, Contract Terms, and Certification Provisions, those claims should be dismissed on the merits.

### A.    Fifth Amendment:

***Termination, PGI, and Contract Terms Provisions.*** Plaintiffs' void-for-vagueness allegations with respect to the Termination, PGI, and Contract Terms Provisions fail at the threshold and on the merits.

Predictably, Plaintiffs all-but abandon any argument that their contracts/grants implicate a constitutionally protected property interest. As this Court has already recognized, "Plaintiffs offer[ed] no reason to think that their contracts and grants—which are '[o]utside of the

---

[3] Plaintiffs make no attempt to defend their standing with respect to the Agency Requirements Provision.

employment context'—are different from the 'millions of government contracts in effect at any point in time' to which courts seldom apply 'due-process principles.'" PI Op. at 38-39 (quoting *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014)). Since that ruling, other courts have followed suit. *See, e.g., Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 2025 WL 2615054, at *19 (D.D.C. Sept. 10, 2025); *Vera Inst. of Just. v. U.S. Dep't of Just.*, 2025 WL 1865160, at *16 (D.D.C. July 7, 2025); *Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, 2025 WL 2374528, at *23 (D.D.C. Aug. 14, 2025).

In a forced pivot, Plaintiffs now argue that termination of their Government grants/contracts would implicate constitutionally protected liberty interests. *First*, Plaintiffs argue that "freedom of speech" is a "liberty interest that triggers due process protections." Pl. Opp. at 22. That is true, but irrelevant. As Defendants have explained, the Government's refusal to subsidize speech is not an infringement on speech. *See* Gov. Br. at 21-25; *see infra* II.B. As such, Plaintiffs have failed to allege that the relevant provisions implicate their right to free speech in this first place. At most, the provisions merely implicate federal *funding* of Plaintiffs' speech, which does not trigger a property or liberty interest under the Fifth Amendment.[4]

---

[4] Plaintiffs rely on the Ninth Circuit's erroneous ruling in *Finley* to support their argument. *See* Opp. at 22-23 (citing *Finley v. Nat'l Endowment for the Arts*, 100 F.3d 671, 675 n.4 (9th Cir. 1996), *rev'd*, 524 U.S. 569 (1998), which reasoned that "artists . . . are protected by the due process clause from arbitrary and discriminatory enforcement of vague standards that abut[s] upon sensitive areas of basic First Amendment freedoms" (citation and quotation marks omitted)). According to Plaintiffs, "[a]lthough the Supreme Court in *Finley* ultimately found the law at issue was not void for vagueness, the Court analyzed the law under vagueness principles without questioning the Ninth Circuit's ruling that freedom of speech was the liberty interest underpinning the due process claim." Opp. at 23 n.12.

This analysis misses the point. The Ninth Circuit's conclusion on this score—i.e. that the relevant statute implicates a Fifth Amendment liberty interest in free speech—was based on its erroneous conclusion that the funding statute did, indeed, infringe on free speech. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 581-88 (1998) (reversing the Ninth Circuit's First Amendment ruling). Stripped of its First Amendment reasoning, the Ninth Circuit's "liberty" determination falls, too.

7

*Second*, Plaintiffs argue that the provisions implicate their liberty interest based on reputation. Plaintiffs maintain that any decision by the Government to terminate their funds on the grounds that Plaintiffs have violated anti-discrimination laws would have reputational consequences. *See* Pl. Opp. at 23-24. Plaintiffs' argument is based on an erroneous reading of the Orders' directives with respect to termination of grants and contracts. The relevant provisions do not instruct the agencies to terminate funding for "'unlawful' conduct." Pl. Opp. at 24 n.13. Instead, they simply instruct the agencies to terminate funding for certain activities that no longer align with the President's policy priorities—regardless of whether the activities are illegal. *See* EO 14,151 § 2(b)(i) ("terminate. . .'equity-related' grants or contracts"); EO 14,168 § 3(e) ("end the Federal funding of gender ideology"); *id.* § 3(g) ("ensure grant funds do not promote gender ideology"). Any alleged harm due to policy-driven termination of Plaintiffs' grants and contracts is not akin to the type of reputational harm that triggers the Due Process Clause. *See* Gov. Br. at 19-20 (examining the relevant caselaw).

Even if Plaintiffs had sufficiently alleged a liberty or property interest implicated by the relevant provisions, their claim fails on the merits. Plaintiffs erroneously insist that the Court employ a stringent vagueness standard traditionally reserved for statutes and regulations that directly regulate primary conduct. *See* Pl. Opp. 26. But this standard is inapplicable, where, as here, the relevant provisions merely provide directives to Government agencies and pertain to Government funding priorities. *See* Gov. Br. at 20-21; PI Op. at 40-43; *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 989 (N.D. Ill. 2025).

**Certification Provision.** Plaintiffs argue that the Certification Provision is unconstitutionally "vague" under the Fifth Amendment because "the Defendants' definition of unlawful DEIA is inconsistent with existing law, in both federal statutes and precedent." Pl. Opp.

8

at 26. This argument is premised on Plaintiffs' erroneous reading of the provision as putting forth a new definition of "programs promoting DEI that violate any applicable Federal anti-discrimination laws." EO 14,173 § 3(b)(iv)(B). But as Defendants have explained, the Certification Provision does not purport to identify any new conduct as unlawful. *See* Gov. Br. at 21. This alone dooms Plaintiffs' claim, and they cannot revive it by masquerading their erroneous interpretation as a mere "factual dispute." Pl. Opp. at 26; *see Helmer*, 393 F.3d at 209 (explaining that the court need not "accept legal conclusions cast in the form of factual allegations" (citation and quotation marks omitted)).

Plaintiffs' attempt to muddy the text of the Certification Provision by relying on the postdated July 29 Memorandum from the Department of Justice is also unavailing. *See* Pl. Opp. at 26-27 (citing OFF. OF THE ATT'Y GEN., U.S. DEP'T OF JUST., *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025) (hereinafter "July 29 Memo")). For starters, the July 29 Memo—which, notably, provides only "non-binding suggestions," *see* July 29 Memo at 1—does not discuss the Certification Provision at all. Nor is it challenged in this lawsuit. Besides, despite complaining about the "novel, unsupported, and expansive view" of anti-discrimination laws in the Memo, *see* Pl. Opp. at 27, Plaintiffs fail to identify any such erroneous interpretation. At most, in a footnote, they claim that "the July 29 Memo states that programs targeted toward first generation students or individuals from particular geographic areas, spaces that are designated to encourage particular groups to gather but open to all, and cultural competency requirements *are prohibited by antidiscrimination law*, which is untrue." *Id.* at 27 n.15 (emphasis added). But the July 29 Memo does not make any such definitive statement. Instead, as a part of its "[r]ecommendations on [b]est [p]ractices," it merely recommends that "[c]riteria like socioeconomic status, first-generation status, or geographic diversity must not be used *if selected*

9

*to prioritize individuals based on racial, sex-based, or other protected characteristics*," and that "[i]ntent to influence demographic representation *risks* violating federal laws." July 29 Memo at 8 (emphases added). In doing so, the Memo provides "guidance [that] identifies 'Best Practices' as non-binding suggestions to help entities comply with federal antidiscrimination laws and avoid legal pitfalls," while making it clear that its recommendations "are not mandatory requirements but rather practical recommendations to minimize the risk of violations." *Id.* at 1.

Because the Certification Provision does not expand Plaintiffs' obligations beyond those in effect under existing anti-discrimination laws—which Plaintiffs do not challenge as unconstitutionally vague—their Fifth Amendment challenge to this provision must be dismissed.

**B.      First Amendment:**

***Funding and Contract Terms Provisions.*** As Defendants have explained, none of the provisions penalize or scrutinize recipients' speech outside of the funded awards. *See* Gov. Br. at 21-25. The Supreme Court has long held that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *see also Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983) (explaining that the "decision not to subsidize the exercise of a fundamental right does not infringe the right").

Plaintiffs posit a different First Amendment theory by relying on the Supreme Court's decision in *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 536 (2001), which they maintain stands for the proposition that, even in the context of funding conditions, the Government cannot make content- or viewpoint-based distinctions in order to "silence disfavored speech." Pl. Opp. at 17. Plaintiffs are misreading *Velazquez*, which the D.C. Circuit has explained, "rests on limited public forum doctrine." *Marijuana Pol'y Project v. United States,* 304 F.3d 82, 87 (D.C. Cir. 2002).

10

Plaintiffs have failed to allege any facts sufficient to establish that the "limited public forum" doctrine has any application here. Limited public forum cases recognize that certain funding programs open to all comers must comply with "[t]he standard of viewpoint neutrality found in the public forum cases." *Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 230 (2000). Those cases draw on the principle that when the Government creates a "limited public forum," open to discussion of a particular "subject matter"—such as an in-person space for discussion or a bulletin board—the Government must be "viewpoint neutral." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 389, 393 (1993). But when the Government decides to "selectively fund a program," it may choose grants that advance its policy goals and reject grants that do not. *Finley*, 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193).

The Supreme Court extended this doctrine to certain Government "funding decisions" in *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995), even though funding programs are "a forum more in a metaphysical than in a spatial or geographic sense," *id.* at 830. That case involved a public university's funding of a variety of student groups in order to provide "a wide range of opportunities" for students. *Id.* at 824 (quotation omitted). The Court emphasized that it addressed a situation in which "the University … expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

The Supreme Court's subsequent decision in *Finley* was a direct response to an opinion by a divided appellate panel that applied *Rosenberger*'s viewpoint-neutrality requirement to the National Endowment of the Arts' selective grant program. *Finley*, 100 F.3d at 683 ("Although NEA awarded only 88 grants from an applicant pool of 5,168, it cannot provide those scarce grants to favor a particular viewpoint."). The dissenting judge would have held that "[w]hether government can consider content and viewpoint depends on whether the money it gives out is

11

generally available to all who meet some basic standard, or whether it is a prize given to a select few." *Id.* at 684 (Kleinfeld, J., dissenting). The Supreme Court held that the Ninth Circuit majority's "reliance on …. *Rosenberger* … [was] misplaced" for the reason stated in the Ninth Circuit dissent, notably that the NEA's grant program was "distinguish[ed] … from *Rosenberger*" because of "the competitive process according to which the grants are allocated." *Finley*, 524 U.S. at 586. Where, as in *Finley*, "the Government does not indiscriminately 'encourage a diversity of views from private speakers,'" and is not making similarly "objective decisions on allocating public benefits," *Rosenberger* is inapplicable. *Id.* (quoting *Rosenberger*, 515 U.S. at 834). Thus, unless the provision at issue in *Finley* was "applied in a manner that raises concern about the suppression of disfavored viewpoints," it was constitutional. *Id.* at 587. Such suppression could not be attributed merely to selective funding decisions, whose validity the Court reaffirmed. *See id.* at 588.

Through this series of cases, the Supreme Court has thus clarified that as a general matter, when engaged in selective funding, the Government need not be agnostic about the type of activity it funds. Indeed, that principle gave rise to the grants at issue here in the first place: The Government explicitly favored means of promoting equity in its grantmaking. *See, e.g.*, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, Executive Order No. 13,985, § 1, 86 Fed. Reg. 7009, 7009 (Jan. 25, 2021), *revoked by* Executive Order No. 14,148 (hereinafter "EO 13,985") ("It is therefore the policy of [the Biden] Administration that the Federal Government should pursue a comprehensive approach to advancing equity…."). Plaintiffs presumably do not believe that this selectivity was unconstitutional when it was deployed to their benefit. The only thing that has changed is that the

12

Government no longer wishes to fund these particular types of grants, and nothing about that change alters the relevant legal principles.

Because Plaintiffs have failed to allege sufficient facts needed to invoke the limited public forum doctrine, *Velazquez* and its progeny are inapplicable. As such, the Funding and Contract Terms Provisions all survive First Amendment scrutiny because they do not regulate speech outside the contours of the funded activity. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218-19 (2013) (regulation of speech is not unconstitutional under the First Amendment so long as it allows the recipient to exercise his speech on his "own time and dime").

Plaintiffs attempt to salvage their First Amendment challenges by claiming that Defendants are, indeed, "using the Funding and Contract Terms Provisions to terminate funding based on Plaintiffs' expression of speech in areas of their work not subsidized by government funding." Pl. Opp. at 18. For this proposition, they reference several paragraphs in their Amendment Complaint, *see* First Am. Compl., ECF No. 68 (hereinafter "Am. Compl.") ¶¶ 161-65, 210, none of which supports their claim. Paragraph 161 claims that "[o]n information and belief, based directly on these provisions, federal agencies have already frozen or terminated numerous funding sources for organizations similarly situated to Plaintiffs (and with respect to Plaintiffs, EPA has terminated one of NUL's grants), and agencies have promulgated additional regulations that threaten Plaintiffs' funding." *Id.* ¶ 161. Putting aside the highly speculative nature of this allegation (pertaining to unnamed non-Plaintiff organizations), it does not even allege that the terminations were due to speech outside the contours of the funds. Indeed, the paragraph goes to state that "[t]he agencies' actions reveal that the purpose of the challenged Executive Orders is to target disfavored speech, not merely to curb actions that violate federal law," *id.*, which makes it clear that Plaintiffs' allegation is simply confusing the Funding Provisions and the Certification Provision.

13

The relevant parts of Paragraphs 162, 163, and 165 seemingly allude to the allegations previously asserted by then-Plaintiff National Fair Housing Alliance ("NFHA"). *See id.* ¶ 162 (referencing allegations of funding terminations based on "words on a website"); *id.* ¶ 163 ("[C]ancelation of contracts and grants based on searches for 'offending' words on websites and social media, whether or not the use of such words was tied to grant money"); *id.* ¶ 165 ("[A]s evidenced by Administration officials freezing funds and canceling contracts based merely on the results of word searches on the internet, the Administration considers the use of terms aligned with racial and gender justice to run afoul of the Executive Orders"). But as Defendants have already explained, NFHA is no longer a plaintiff in this suit, *see* Gov. Br. at 25 n.6, and Plaintiffs cannot leverage a non-Plaintiffs' previously asserted allegations to prevail on their *own* as-applied challenges. Moreover, any attempt to leverage then-Plaintiff NFHA's previous allegations to support their facial challenges is also futile. As this Court has already explained, a few examples of unconstitutional application "does not establish the 'lopsided ratio' justifying the 'strong medicine' of facial invalidation" PI Op. at 51 (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)).

Paragraph 164 once again highlights Plaintiffs' confusion about the differing roles of the Funding Provisions and the Certification Provision. It claims that "[t]h[e] attempt to silence non–federally funded speech is also apparent from the Certification Provision." Am. Compl. ¶ 164. Because the Certification Provision only pertains to DEI programs that violate Federal anti-discrimination laws, *see* Gov. Br. at 21, it is permissible under the First Amendment, *see infra* p.15. Finally, the relevant part of Plaintiffs' allegations in Paragraph 210 merely express NUL's "fear [that] the Executive Orders' prohibitions extend to its non-grant-funded work relating to DEIA." Am. Compl. ¶ 210. Once again, any such fear is based on a misreading of the relevant

14

provisions, and therefore does not amount to a material factual dispute. Because Plaintiffs have failed to plead sufficient facts to support their claim that Defendants are applying any of the Funding Provisions or the Contract Terms Provision to regulate *Plaintiffs'* speech outside the contours of their funded grants or contract, any as-applied challenges to these provisions must also be dismissed.

*Certification Provision.* In order to support their First Amendment challenge to the Certification Provision, Plaintiffs insist that the provision extends beyond unlawful DEI programs. To support this assertion, Plaintiffs point to what they describe as "repeated[] alleg[ations] that Defendants equate certain speech advancing diversity, equity, inclusion, and accessibility with illegal discrimination, which the Court must credit as true." Pl. Opp. at 19. But the allegations Plaintiffs reference, *see* Am. Compl. ¶¶ 8, 56, 99, 104-106, 165, do not sufficiently establish that the Government has applied the *Certification Provision* with respect to lawful DEI programs. The allegations highlight Plaintiffs' speculations and fears about future misapplication of the provision, *see id.* ¶¶ 8, 165; misinterpret the scope of the provision, *see id.* ¶¶ 8, 99, 104, 106, 165; depart from the text of the Orders to speculate about their underlying motivations, *see id.* ¶¶ 56, 104; or conflate allegations about the Government's application of the Funding Provisions with the Certification Provision, *see id.* ¶¶ 105, 165. Contrary to Plaintiffs' assertion, none of these allegations amounts to material factual disputes.

At bottom, Plaintiffs cannot escape the plain text of the Certification Provision, which "limits it to constitutional applications." PI Op. at 54. As such, Plaintiffs' First Amendment challenge to the Certification Provision must be dismissed.

C.     **Equal Protection:**

     i.     ***The relevant provisions of EO 14,151 and EO 14,173 do not violate Equal Protection:***

15

Plaintiffs have failed to sufficiently plead an Equal Protection claim with respect to EO 14,151 and EO 14,173. At a fundamental level, Plaintiffs' legal theory is deeply flawed. According to Plaintiffs, the Constitution comes with an affirmative mandate to fund equity-related projects that "advanc[e] *racial* equity for people of color, especially Black people." Pl. Opp. at 28 (emphasis in original). This conclusion is impossible to square with the Equal Protection doctrine, which rejects the notion that the Constitution permits (let alone requires) the Government to "intentionally allocate preference to those who may have little in common with one another but the color of their skin." *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA*"), 600 U.S. 181, 200 (2023) (citation and quotation omitted).

Plaintiffs object to this characterization of their legal theory. According to Plaintiffs, they do not argue that the Constitution *mandates* federal funding of racial-equity projects; instead, they merely argue that the Constitution bars the *termination* of federal funding of such projects. *See* Pl. Opp. at 28. That is a distinction without a difference. But to the extent that the distinction is material, it only makes Plaintiffs' constitutional theory less palatable: As Plaintiffs see it, because the previous administration *chose* to fund such equity projects, the current administration (and all other future administrations) *must* continue to fund them to avoid running afoul of Equal Protection. No reasonable interpretation of Equal Protection would convert discretionary-funding choices by one administration into mandatory ones for all future administrations.

Unsurprisingly, Plaintiffs' attempt to defend this legal theory under *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), falls flat. To support their claim, Plaintiffs emphasize their allegations of the President's past opposition to "diversity, equity, inclusion, and accessibility." *See* Pl. Opp. at 29. But these allegations do not do the heavy lifting Plaintiffs need them to. To begin with, several of their allegations are outdated—dating as far back

16

as 2020. *See id*. at 29. As such, they fail to provide any "contempora[neous]" insight. *Arlington Heights*, 429 U.S. at 268. Plaintiffs' contemporaneous allegations, *see* Pl. Opp. at 30-31, are likewise futile because they convey nothing more than the President's opposition to DEI programs and projects.

In an attempt to portray the President's alleged criticism of DEI as evidence of discriminatory intent, Plaintiffs argue that the President's statements amount to "code words" that mask racial animus. Pl. Opp. at 30-31. To support this proposition, Plaintiffs identify a few cases that only undermine their argument. *See Ash v. Tyson Foods, Inc*., 546 U.S. 454, 456 (2006) (whether the word "boy" conveyed racial animus may depend on "various factors including context, inflection, tone of voice, local custom, and historical usage"); *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 506 (9th Cir. 2016) (alleging "code words consisting of stereotypes of Hispanics that would be well-understood in [the particular neighborhood]" such as complaints of "large households [living in] single-family homes as multi-family dwellings," people who "own numerous vehicles which they park in the streets and yards," and "allow unattended children to roam the streets"); *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 608 (2d Cir. 2016) (alleging statements expressing "concern that R–M zoning would change the 'flavor' and 'character' of Garden City"); *Bynum v. District of Columbia*, 424 F. Supp. 3d 122, 134 (D.D.C. 2020) (explaining that "shout[ing]" at a Black woman that she should 'go back to the South where [she] came from' . . . . may demonstrate racial animus based on multiple factors, including the phrase's historical usage, its context, [the declarant]'s inflection, and his tone of voice").

These cases merely establish that even seemingly neutral language may convey racial animus in light of the "context, inflection, tone of voice, local custom, and historical usage." *Ash*, 546 U.S. at 456. Plaintiffs fail to allege any such context with respect to the President's alleged

17

criticism of DEI programs—nor could they. Despite Plaintiffs' contrary assumption, there are good-faith disagreements regarding the merits and efficacy of such programs. *Compare SFFA*, 600 U.S. at 268, 277 (Thomas, J., concurring) (expressing the view that a race-based solution that "initially seems like aid may in reality be a burden, including for the very people it seeks to assist" and that "[t]he solution to our Nation's racial problems thus cannot come from policies grounded in affirmative action or some other conception of equity"), *with id.* at 371 (Sotomayor, J., dissenting) (disagreeing with the notion that "race-conscious college admissions policies supposedly 'burden' racial minorities").

The President is permitted to take a side on the ongoing debate regarding the merits of racial-equity programs, and doing so is not *ipso facto* evidence of racial animus.

Plaintiffs' attempt to allege discriminatory intent by identifying "departures from normal procedures," Pl. Opp. at 32, is similarly futile. As Defendants have explained, unlike statutes and regulations, Executive Orders are not subject to "procedures" to begin with. *See* Gov. Br. at 32-33. Indeed, by Plaintiffs' own description, the "[m]ost shocking" evidence of the purported departure they could identify is the fact that EO 14,173 rescinded Executive Order No. 11,246. *See* Pl. Opp. at 32.[5] Predictably, Plaintiffs make no attempt to support their characterization of this practice as a "departure" from standard practice. After all, recission of one Executive Order via another Executive Order is hardly uncommon (let alone "shocking"). *See, e.g.*, EO 13,985 § 10 (an Executive Order entitled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government" rescinded two previous Executive Orders).

---

[5] Plaintiffs mistakenly allege that EO 14,151 (as opposed to EO 14,173) rescinded Executive Order No. 11,246. *See* Am. Compl. ¶ 193; *see also* Pl. Opp. at 32.

Because Plaintiffs have failed to sufficiently allege discriminatory intent, any alleged disproportionate impact of the Orders on a racial group is irrelevant. *See Arlington Heights*, 429 U.S. at 264-65 (regardless of any "racially disproportionate impact[,] . . . .[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause").

For the above reasons, Plaintiffs have failed to allege that EO 14,151 and EO 14,173 discriminate based on race. As such, the Orders must be reviewed under rational-basis review, which they easily satisfy. *See Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (explaining that a provision survives rational-basis review if it reflects a "legitimate governmental purpose" and "rationally further[s] that purpose"). The Orders reflect the President's goals of prioritizing merit and eliminating discrimination, which are "legitimate governmental" interests, and the Orders rationally further those goals by aligning funding and enforcement priorities accordingly.

Because Plaintiffs have failed to allege that EO 14,151 and EO 14,173 discriminate based on race, or that they lack a rational basis, this Court should dismiss Plaintiffs' Equal Protection claim with respect to EO 14,151 and EO 14,173.

### ii.    *The relevant provisions of EO 14,168 do not violate Equal Protection:*

On their face, the challenged provisions of EO 14,168 do not draw any distinctions based on sex or any other protected characteristic. They merely direct agencies to ensure that, to the extent permitted by law, federal funds are not used to promote "gender ideology." *See* EO 14,168 §§ 3(e), (g); *see also id.* § 8(b) ("This order shall be implemented consistent with applicable law."). Simply put, these directives are permissible *subject matter* funding choices that reflect one of the President's policy priorities. Plaintiffs evidently disagree with the President's policy position on this issue, but that disagreement does not transform facially neutral funding directives into discriminatory ones.

19

Plaintiffs attempt to portray the relevant provisions as discriminatory by departing entirely from what provisions say and instead taking issue with the rhetoric elsewhere in the Order. According to Plaintiffs, the Order "draws lines based on sex and transgender status," because it defines "sex" and "gender identity" as different concepts and "'gender ideology' as 'permitting the false claim that males can identify as and thus become women and vice versa.'" Pl. Opp. at 36 (quoting EO 14168 §§ 2(a), (f)). Contrary to Plaintiffs' assertion, none of this amounts to "unlawful sex discrimination." Pl. Opp. at 36. These provisions merely espouse a view of gender identity (albeit one with which Plaintiffs disagree). But they do not *do* anything. And it is black-letter law that only Government *action* can violate Equal Protection. *See Doe v. Webster*, 991 F.2d 818, 818 (D.C. Cir. 1993) (per curiam) ("[A] discriminatory action may give rise to an equal protection challenge."). Absent any allegation of discriminatory action, this Court lacks jurisdiction to enjoin or police an Executive Order's language. After all, "it is the democratic electoral process that first and foremost provides a check on government speech." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

The only actions contemplated by the relevant provision are termination of grants based on the subject of the funded activity. Contrary to Plaintiffs' assertion, the funding directives do not require "that the *individuals* whom federal funding recipients serve must conform to rigid, government-imposed notions of how men and women should identify, appear, and behave based solely on their birth-sex." Pl. Opp. at 37-38 (emphasis added). Indeed, the funding directives impose no sex- or identity-based restriction on the recipients at all. In this way, the provisions mirror the law at issue in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). There, the Court considered a Tennessee law, which prohibited certain medical treatments for minors for the purpose of (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent

with the minor's sex," or (2) "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." *Id.* at 1826. The Court reasoned that the law classifies based on age and medical use—as opposed to sex or trans-identifying status. *See id.* at 1829. Similarly, here, the provisions restrict funding based on the activity's subject matter (regardless of the sex or identity of the recipients).[6]

For similar reasons, Plaintiffs' reliance on *Bostock v. Clayton County*, 590 U.S. 644 (2020), fails. Even assuming that *Bostock*'s logic applies to Equal Protection analysis, the provisions satisfy it. Under *Bostock*'s reasoning, if changing the sex of the relevant individual changes the outcome, then the action amounts to discrimination based on sex. *See Skrmetti*, 145 S. Ct. at 1834-35 (explaining *Bostock*'s logic). But here—as was the case in *Skrmetti*—the outcome remains the same regardless of the recipients' sex (or identity). *See id.* (explaining that the law satisfies *Bostock*'s reasoning because it denies testosterone to a minor that lacks a "qualifying diagnosis" regardless of the minor's sex or trans-identifying status). Under the PGI and FGI Provisions, a federally funded program that promotes gender ideology could lose funding regardless of whether the fund's recipients are male, female, trans-identifying, or non-trans-identifying, whereas a federally funded program on an unrelated topic would not be subject to the provisions no matter the sex or identity of its recipients.[7] The absence of any discrimination based on a protected characteristic defeats Plaintiffs' invocation of heightened scrutiny, and they cannot revive it through grievances about the rhetoric of the Order.

---

[6] Because the provisions do not classify based on trans-identifying status, this Court—much like the Court in *Skrmetti*—should refrain from deciding whether trans-identifying individuals are a suspect class to begin with. *See Skrmetti*, 145 S. Ct. at 1832–33. But even if this Court reaches the issue, it should reject Plaintiffs' invitation to treat trans-identifying status as a suspect classification for the reasons identified in Defendants' opening brief. *See* Gov. Br. 40 n.9.

[7] Because the provisions satisfy *Bostock*'s line of reasoning, this Court need not determine whether *Bostock* is applicable to Equal Protection.

21

The provisions are thus subject to rational-basis review, which puts "the burden . . . on the one attacking the [provisions] to negative *every* conceivable basis which might support it." *See Armour v. Indianapolis*, 566 U.S. 673, 685 (2012) (emphasis added) (citation and quotation marks omitted). Despite Plaintiffs' argument to the contrary, *see* Pl. Opp. at 40-41, the provisions satisfy this highly deferential standard. In *Skrmetti*, the Court recognized that "medical treatment in [this] evolving field" presents "fierce scientific and policy debates," and as a result, the Court must "leave questions regarding [the law's] policy to the people, their elected representatives, and the democratic process." *Skrmetti*, 145 S. Ct. at 1837. Similarly, programs that promote gender ideology are subject to vigorous debates and differing opinions. "The Equal Protection Clause does not resolve these disagreements. Nor does it afford [the Court] license to decide them as [it] see[s] best." *Id.* The President has a legitimate interest in taking a position on this policy issue, and it is rational for him to direct agencies to align federal funding with his policy position.

## D.    Separation of Powers:

Plaintiffs' separation of powers challenges also falter under scrutiny.

***The Orders do not violate statutes.*** Plaintiffs argue that the Orders "disobey duly enacted statutes." Pl. Opp. at 42.[8] This claim is belied by the text of the Orders, which direct agencies to carry out any termination to the extent permitted by law. *See* EO 14,151 § 2(b)(i) (directing

---

[8] Notably, this argument is not a "separation of powers" challenge to begin with. As the Supreme Court made clear in *Dalton v. Specter*, 511 U.S. 462 (1994), any allegation that Executive Branch officials have exceeded their *statutory* authority is merely a statutory claim—not a constitutional one. *Id.* at 472 (explaining that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution. On the contrary, [the Supreme Court] ha[s] often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority"); *see also Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 827 (D.C. Cir. 2025) ("The grantees here allege violations of the statute, not the Constitution, and we decline to adopt a principle that would convert every statutory challenge to agency action into a constitutional claim."). But, as explained above, regardless of how it is framed, Plaintiffs' challenge fails on its merits.

22

agencies to "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts"); EO 14,168 § 3(e) (directing agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology"); *see also* EO 14,151 § 4(b); EO 14,168 § 8(b); EO 14,173 § 8(b). As the D.C. Circuit recognized in *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), a directive with a permitted-by-law qualifier cannot violate the law because it explicitly "instructs the agency to follow the law." *Id.* at 33.

Plaintiffs do not even mention—let alone attempt to distinguish—*Allbaugh*. Instead, they argue that the qualifiers "cannot save the Executive Orders because they have no valid application." Pl. Opp. at 42. This is a big claim, and predictably, Plaintiffs fail to support it. It is well established that the Executive has wide discretion to terminate contracts for "convenience," *see Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000), and some grants allow for termination if they "no longer effectuate[] the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4). Plaintiffs fail to allege that *every* relevant statute bars the Executive from exercising its termination authority with respect to grants and contracts related to "equity" and "gender ideology." *See Chicago Women in Trades*, 778 F. Supp. 3d at 990 (recognizing that plaintiff cannot "show that the Termination Provision conflicts with *every* statute that appropriates funds for grants"); *see also Chicago Women in Trades v. Trump*, 2025 WL 1331743, at *5-9 (N.D. Ill. May 7, 2025) (recognizing that four of the five at-issue grants can be terminated pursuant to EO 14,151 without violating the relevant statutes).[9]

---

[9] Although Plaintiffs frame this claim as an "as [a]pplied" challenge, they fail to allege it as such—specifically, they fail to allege any instance in which a Defendant terminated their contract/grant in violation of any particular statute. But regardless, any such termination could only give rise to a challenge to *that* termination—not the Orders. Moreover, even if Plaintiffs had asserted a challenge to any particular termination—which they have not—this Court would lack jurisdiction over any such as-applied termination claim under the Tucker Act.

Plaintiffs' challenge to the Certification Provision is also futile. Plaintiffs argue that the Orders create a "newfound concept of 'illegal DEI.'" Pl. Opp. at 43. As the Government has repeatedly explained, however, the Orders do no such thing. *See* Gov. Br. at 21; *supra* p.9. Plaintiffs acknowledge the Government's explanation but complain that it renders the Orders "futile and irrelevant because federally funded programs have long required grantees to abide by nondiscrimination laws." Pl. Opp. at 43. To begin with, "irrelevan[ce]" does not render the Certification Provision offensive to the separation of powers. But regardless, the provision is far from futile or irrelevant—it serves as a reminder to recipients that they cannot mask discriminatory practices under the guise of promoting "diversity, equity, and inclusion."

***The Orders do not usurp Congress' powers.***[10] Second, Plaintiffs argue that the "Orders' directives place unconstitutional conditions on grant funding without Congressional authority." Pl. Opp. at 43. Plaintiffs' argument confuses a "condition" on funds with an "allocation" of funds. A "condition" is a limitation put on the *recipient*, *see Rust*, 500 U.S. at 175, whereas an "allocation" is a limitation imposed on the *type* of federally funded programs, *see Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). The Funding Provisions fall into the latter category. *See supra* II.B.[11] And the Supreme Court has long upheld the Executive's authority to make allocation choices. *See Lincoln*, 508 U.S. at 193 (explaining that the Executive may "allocate[e] . . . funds from a lump-sum

---

[10] Plaintiffs begin their argument on the "usurp[ation]" of congressional power with a puzzling discussion on severability. *See* Opp. at 43-44. Defendants agree with Plaintiffs that the Orders are subject to the severability doctrine. *See* Gov. Br. at 8. Contrary to Plaintiffs' characterization of Defendants' arguments, Defendants have not—and do not—argue that the correct test for a facial challenge is "whether each and every directive within the Executive Order is facially invalid." Opp. at 43. Where, as here, the provisions are severable, each provision is evaluated on its own merits. And as explained above, Plaintiffs have failed to show that any challenged provision is *independently* facially invalid.

[11] Although the Certification Provision's reach extends beyond the funded activity, the provision does not "usurp" Congress' powers because it does not impose any "new" condition on the recipients. *See* Gov. Br. at 45.

24

appropriation" by considering various factors, including "whether a particular program 'best fits the agency's overall policies'" (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985))). Indeed, concluding that mere allocation choices offend the separation of powers would upend countless lump-sum appropriations, which routinely give the Executive considerable leeway to make allocation choices. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.").

Lastly, Plaintiffs argue that the Funding Provisions "seek[] to leverage the federal government's vast reach throughout the economy to control private thought and speech . . . [and] to silence [private parties] about 'diversity, equity, inclusion, and accessibility' or the very existence of transgender people." Pl. Opp. at 44. These arguments lack any separation of powers dimensions. After all, Congress does not have any greater constitutional leeway than the President to "control private thought and speech." *Id.* At bottom, these arguments are merely duplicative of Plaintiffs' other claims, and fail for the reasons identified above.

## CONCLUSION

For the reasons identified above, Defendants respectfully request that this Court grant Defendants' Motion to Dismiss.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

25

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Pardis Gheibi*
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Pardis Gheibi*